JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Ross S. Barr
Richard H. Engman

- and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox
Ryan T. Routh

Proposed Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| Metaldyne Corporation, *et al.,* | : | Case No. 09-13412 (___) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

-------------------------------------------------------------x

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 361, 362, 363, 364 AND 510 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE PREPETITION SECURED LENDERS, (II) OBTAIN POSTPETITION FINANCING AND (III) PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS, (B) AUTHORIZING DEBTORS TO ENTER INTO, AND APPROVING, AN ACCOMMODATION AGREEMENT WITH CERTAIN CUSTOMERS AND (C) PROVIDING NOTICE AND SCHEDULING FINAL HEARING

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 3

PREPETITION INDEBTEDNESS .............................................................................. 9

    The Prepetition Term Credit Agreement ............................................................. 9

    The Prepetition ABL Credit Agreement ............................................................. 12

    The 2013 Notes ................................................................................................... 14

    The 2012 Notes ................................................................................................... 15

    The Intercreditor Agreements ............................................................................. 16

    The Customer Notes ............................................................................................ 17

JURISDICTION .......................................................................................................... 18

RELIEF REQUESTED ................................................................................................ 18

THE DEBTORS' URGENT NEED FOR POSTPETITION FINANCING ................... 21

THE PROPOSED DEBTOR IN POSSESSION FINANCING FACILITY ................... 23

    Summary of the Material Terms of the DIP Facility .......................................... 25

    Summary of the Material Terms of the Accommodation Agreement .................. 33

REQUEST FOR APPROVAL OF THE DIP FACILITY AND RELATED ACTIONS ............. 37

    Approval Under Section 364 of the Bankruptcy Code ........................................ 38

    The Debtors Were Unable to Obtain Necessary Financing on an Unsecured Basis ........ 40

    The Terms of the DIP Facility Are Fair, Reasonable and Appropriate ............... 42

    The DIP Facility is Necessary to Preserve Assets of the Debtors' Estates ......... 43

    The Prepetition Term Lenders are Deemed to Consent to the DIP Facility Pursuant to the First Priority Intercreditor Agreement and Section 510(a) of the Bankruptcy Code ........................................................................................................... 45

    Application of the Business Judgment Standard ................................................. 49

AUTHORITY TO ENTER INTO THE ACCOMMODATION AGREEMENT ..........................50

REQUEST FOR USE OF CASH COLLATERAL ........................................................................51

    The Prepetition Lenders Consent or are Deemed to Consent to the DIP Financing, the
        Proposed Adequate Protection and the Use of Cash Collateral.............................52

    The Use of Cash Collateral is Necessary to Preserve Assets of the Debtors' Estates .......54

THE PREPETITION LENDERS ARE ADEQUATELY PROTECTED .......................................55

REQUEST FOR AUTHORITY TO MAKE INTERIM BORROWINGS UNDER THE DIP
FACILITY ......................................................................................................................................61

GOOD FAITH ...............................................................................................................................62

REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY ..........................................63

REQUEST FOR FINAL HEARING ...............................................................................................63

NOTICE .........................................................................................................................................63

NO PRIOR REQUEST ..................................................................................................................64

TO THE HONORABLE
UNITED STATES BANKRUPTCY JUDGE:

Metaldyne Corporation and 30 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent as follows:

## Preliminary Statement

1.      As is described in greater detail below, the Metaldyne Companies are leading global manufacturers of highly engineered metal components for the global light vehicle market, market leaders for many of the products they sell and are among the 50 largest auto parts suppliers in North America. The Metaldyne Companies' (as defined below) products are used in cars, vans, sport-utility vehicles, light trucks, heavy trucks and other vehicles and provide content for the majority of the light vehicles manufactured in North America. The majority of the products manufactured by the Metaldyne Companies are sold directly to original equipment manufacturers ("OEMs"), and the Metaldyne Companies also make substantial amounts of sales to the OEMs' Tier I suppliers. The Metaldyne Companies' largest customers are Ford, Chrysler and General Motors (collectively, the "North American OEMs"), which accounted for approximately 43% of the Metaldyne Companies' 2008 direct sales.

2.      After significant exploration of their options prepetition, the Debtors have determined that the best alternative for preserving and maximizing value for all stakeholders is to continue an expedited process for the sale of their businesses as going concerns. As discussed in greater detail below, during the months leading to the Petition Date (as defined below) the Debtors have made significant progress toward negotiating the terms of letters of intent for the sale of substantially all of the Debtors' businesses as going concerns. During this period, however, the Debtors experienced severe liquidity constraints that they were able to manage only through the support and cooperation of the Prepetition ABL Lenders (as defined below) and the

North American OEMs. In order to complete the Sale Processes (as defined below), the Debtors determined that it was necessary to file these chapter 11 cases and obtain postpetition financing to maintain liquidity sufficient to continue operating the Debtors' businesses during the period prior to the asset sales. After conducting an exhaustive search for postpetition financing from traditional lending sources, including the Prepetition Lenders (as defined below), however, the Debtors determined that it would not be possible to obtain financing necessary to successfully complete these chapter 11 cases from such sources alone.

3.     The Debtors, therefore, sought a postpetition financing arrangement comprised of the following four distinct, but dependant, components: (a) financial accommodations from the North American OEMs; (b) the use of the Cash Collateral (as defined below); (c) debtor in possession financing provided by the DIP Lender (as defined below) and funded by the North American OEMs; and (d) the NCM Production Agreement.[1] After extensive negotiations with the North American OEMs, the Prepetition ABL Lenders and the DIP Lender, the Debtors were able to reach agreement on the terms of a multi-source postpetition financing arrangement that addresses the Debtors' liquidity needs during the Sale Processes. As described in greater detail below, none of the individual components of the Debtors' proposed postpetition financing arrangement is individually sufficient to address the Debtors' postpetition financing needs. As a result, the approval of each component described herein is a condition precedent to the effectiveness of the others, and all components are necessary to the success of the Debtors' chapter 11 cases.

---

[1]     Approval of the NCM Production Agreement is sought in a separate companion motion, filed contemporaneously herewith, entitled Motion of Debtors and Debtors in Possession, Pursuant to Sections 105(a), 363(b)(1) of the Bankruptcy Code, for an Order Authorizing Them to Enter Into Production Agreement With Chrysler (the "NCM Motion").

4. In addition, the terms of the Interim Order (as defined below) make it clear that the liens granted in connection with the DIP Facility (as defined below) and the use of Cash Collateral do not impair, in any way, the liens of the Prepetition Term Lenders (as defined below) in the Prepetition Term Priority Collateral. In fact, the parties to the financing arrangements described herein went to great lengths to ensure that the collateral rights of the Prepetition Term Lenders under the Interim Order remain consistent with the Prepetition Term Lenders' collateral rights as set forth in the First Priority Intercreditor Agreement (as defined below). The relative rights of the parties with respect to the collateral pledged in connection with the Interim Order are summarized, for the Court's convenience, in the lien priority chart attached hereto as Exhibit A.

5. Immediate approval of the Accommodation Agreement (as defined below), the DIP Facility (as defined below) and the NCM Production Agreement, and the use of Cash Collateral is, therefore, necessary to the success of these chapter 11 cases. These sources of financing will provide the Debtors with working capital during these chapter 11 cases to provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course and to successfully conclude the Sale Processes. Absent the immediate approval of this financing arrangement, the Debtors' ability to maximize the value of their estates would be jeopardized and the Debtors could be quickly forced to cease all business operations and thereby risk the loss of their going concern value to the direct detriment of all parties in interest.

**Background**

6. On May 27, 2009 (the "Petition Date"), the Debtors commenced their reorganization cases through the filing of voluntary petitions for relief under chapter 11 of

title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have requested that their chapter 11 cases be consolidated for procedural purposes only and administered jointly.

7. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. Metaldyne Corporation ("Metaldyne") is a wholly-owned subsidiary of Metaldyne Holdings LLC ("Metaldyne Holdings"). On January 11, 2007, in connection with a plan of merger, Asahi Tec Corporation ("Asahi Tec"), a Japanese corporation, acquired the shares of Metaldyne. On the same date, Asahi Tec contributed those shares to Metaldyne Holdings, and Asahi Tec thereby became the indirect parent of Metaldyne and the other Debtors. RHJ International S.A. ("RHJI"), a corporation formed under the laws of Belgium and listed on the Euronext exchange, presently holds approximately 60.1% of the outstanding capital stock of Asahi Tec.

9. Debtor MD Products Corp. ("MD Products") is a New York corporation. Metaldyne is the direct or indirect parent of MD Products, each of the other Debtors and each of the Debtors' nondebtor subsidiaries (collectively, the "Metaldyne Companies"). Metaldyne maintains its corporate headquarters in Plymouth, Michigan. The Debtors own or lease 23 different properties, including 14 domestic manufacturing facilities in six states, and also have manufacturing and business operations in more than 10 foreign countries in North America, Europe, South America and Asia.

10. The Metaldyne Companies are leading global manufacturers of highly engineered metal components for the global light vehicle market, market leaders for many of the products they sell and are among the 50 largest auto parts suppliers in North America. The

Metaldyne Companies operate through two business units, the Powertrain segment and the Chassis segment. The Powertrain segment manufactures a range of products for engine and transmission applications, including sintered powder metal engine connecting rods and engine bearing caps, aluminum transmission valve bodies, transmission clutch modules, engine balance shaft modules, transmission differential assemblies, engine crankshaft dampers, engine tubular fabricated exhaust manifolds, front engine cover assemblies and transmission end cover assemblies. The Chassis segment manufactures components, modules and systems, including wheel-ends, knuckles and mini-corner assemblies, and utilizes a variety of machining and assembly processes.

11.     The Metaldyne Companies' products are used in cars, vans, sport-utility vehicles, light trucks, heavy trucks and other vehicles and provide content for the majority of the light vehicles manufactured in North America. The majority of the products manufactured by the Metaldyne Companies are sold directly to OEMs, but the Metaldyne Companies also make substantial amounts of sales to the OEMs' Tier I suppliers. The Metaldyne Companies' largest customers are the North American OEMs, which accounted for approximately 43% of the Metaldyne Companies' 2008 direct sales. If "indirect sales" — the sales of parts that are made to Tier I suppliers that are incorporated into products and assemblies that are then sold to the North American OEMs — were added to the direct sales made to the North American OEMs, these entities ultimately would have accounted for well over 60% of the Metaldyne Companies' 2008 sales.

12.     The Metaldyne Companies went into and emerged from their merger transaction with Asahi Tec as highly-leveraged entities. To ameliorate the effects of such continuing leverage, in early 2008 the Debtors developed and began to implement an internal

restructuring that was designed to excise costs, increase revenues and enhance operational efficiencies. Prior to the Petition Date, the Debtors had implemented several phases of that plan, which resulted in cost savings of approximately $60 million per year (in addition to $40 million in annual interest savings obtained through the Tender Offer transaction described below).

13. Due to the precipitous reduction in production levels by the North American OEMs in 2008 and the tightening of consumer and wholesale financing for the OEMs' vehicles, the Debtors experienced liquidity pressures in the Summer and Fall of 2008. These problems were exacerbated by the constraints placed upon the Debtors by their own debt service obligations. After reaching a series of agreements with Asahi Tec, RHJI and the North American OEMs, among other parties, on October 29, 2008, the Debtors launched a cash tender offer (the "Tender Offer") for the outstanding 11% senior subordinated notes due 2012 and 10% senior notes due 2013 (collectively, the "Notes"). The Tender Offer consideration to be paid by the Debtors was significantly less than the par value of the Notes. The Tender Offer, which was accepted by over 90% of the eligible noteholders, was completed on November 28, 2008 and resulted in the retirement of over $350 million in debt, or approximately 40% of the aggregate long-term debt of the Debtors that was outstanding at the time. Cash for the Tender Offer was received from Asahi Tec (after Asahi Tec received such cash through an equity investment by RHJI) and from the North American OEMs in exchange for the issuance of $60 million in new notes to the North American OEMs by Metaldyne. In addition, as part of the Tender Offer, the Notes, which had been secured, became unsecured obligations of the Debtors.

14. While the completion of the Tender Offer provided the Debtors with a brief respite from liquidity pressures, the extended holiday shutdowns of the Debtors' North American OEM customers and the continued historic difficulties in the North American

automotive industry quickly eroded the Debtors' liquidity in December 2008 and early 2009. As has been widely reported, North American vehicle production has dropped nearly in half, with over 15 million units produced in each year between 2004 and 2007, approximately 12.6 million units produced in 2008 and only 1.7 million units produced in the first quarter of 2009. Key industry analysts are projecting production of approximately 8 million units for 2009.

15. Reacting to these unprecedented figures, in early 2009, the Metaldyne Companies implemented a new round of internal restructuring initiatives and began exploring options to further refinance and/or de-lever the Metaldyne Companies. Specifically, the Debtors sought additional capital from various sources, including private equity firms, RHJI and the Debtors' senior secured lenders. While various entities explored options for making a capital investment into the Debtors, ultimately none of the entities approached by the Metaldyne Companies were willing to make a direct investment in the companies or enter into a re-financing transaction; however, certain such entities expressed a desire to purchase certain assets or businesses from the Debtors pursuant to a sale under section 363 of the Bankruptcy Code. The Debtors' efforts, thus, were refocused upon negotiating with potential purchasers in an effort to arrange a sale of the company as a whole or a sale of one or more business units on a going concern basis.

16. The Debtors received interest from various parties for the purchase of certain of the assets of their Chassis segment and interest from other parties for the purchase of a majority of the assets of their Powertrain segment. The Debtors have entered into or are finalizing letters of intent to sell these two groups of assets and are negotiating the terms of an asset purchase agreement for the sale of one business and will commence negotiations for an asset purchase agreement for the other business once the indications of interest are resolved. The

Debtors anticipate that they shortly will file one or more motions to approve the establishment of an auction process or processes and bid procedures to consummate these sales (collectively, the "Sale Processes").

17.     In addition, as described in greater detail below, the Debtors have negotiated the terms of a debtor in possession financing facility provided by Deutsche Bank A.G., New York ("DBNY") (as agent and lender) in which the North American OEMs will purchase 100% economic subordinated participations pursuant to the Participation Agreement (as defined below), and have obtained the agreement of the Prepetition ABL Lenders (as defined below) to such facility. The Debtors expect this postpetition financing facility will provide them with sufficient funding to complete expedited Sales Processes in these cases notwithstanding current industry turmoil and the recent commencement of chapter 11 cases by Chrysler LLC. The Debtors believe that the institution of these chapter 11 cases and the consummation of the Sale Processes for the majority of their operating assets will allow the vast majority of their business operations to continue, thus preserving jobs, maximizing value to stakeholders and preventing additional turmoil in a sector of the economy that can ill afford it at this time.

18.     For the fiscal year ended March 29, 2008, the Metaldyne Companies recorded annual revenue of approximately $1.32 billion, of which approximately $782 million was from sales of the Debtors. As of March 29, 2008, utilizing book values, the Metaldyne Companies had assets of approximately $977 million and liabilities of approximately $927 million. As of the Petition Date, the Metaldyne Companies have approximately 4,450 employees, of which approximately 2,500 are employees of the Debtors.

## Prepetition Indebtedness

### *The Prepetition Term Credit Agreement*

19.     Debtor Metaldyne Company LLC ("Metaldyne Company") is a borrower under a senior secured credit facility (as amended, the "Prepetition Term Credit Agreement") pursuant to the Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Debtor Metaldyne Intermediate Holdco, Inc. ("Metaldyne Intermediate"), The Bank of New York Mellon ("BONYM" or the "Prepetition Term Agent") (as administrative agent and collateral agent)[2], Citicorp North America, Inc. (as syndication agent), Deutsche Bank Securities Inc. (as documentation agent) and the other lender parties thereto (collectively, the "Prepetition Term Lenders").[3] Twenty-four of the other Debtors are guarantors under the Prepetition Term Credit Agreement (the "Subsidiary Guarantors").[4]

20.     On October 29, 2008, in connection with the Tender Offer, Metaldyne Company and Metaldyne Intermediate entered into an agreement with the Prepetition Term Lenders to amend such credit agreements to ease certain covenants, increase the interest rates in certain circumstances, provide additional security to the lenders and make certain other changes.

---

[2]     BONYM is in the process of taking over as successor agent to JP Morgan Chase, N.A.; the Debtors are presently unaware if that transition is completed. The Debtors understand that JP Morgan Chase will continue to serve as agent for the letter of credit facility under the Prepetition Term Credit Agreement.

[3]     Metaldyne Company is a wholly-owned subsidiary of Metaldyne Intermediate. Metaldyne Intermediate is a wholly-owned subsidiary of Metaldyne.

[4]     The Subsidiary Guarantors are: ER Acquisition Corp.; Metaldyne Tubular Products, Inc.; W.C. McCurdy Co.; Halyard Aviation Services, Inc.; Metaldyne Europe, Inc.; NC-M Chassis Systems, LLC; MASG Disposition, Inc.; Metaldyne Services, Inc.; Metaldyne Machining and Assembly Company, Inc.; Precision Headed Products, Inc.; Metaldyne Sintered Components St. Marys, Inc. (f/k/a Windfall Products, Inc.); Metaldyne Asia, Inc.; Punchcraft Company; Metaldyne Sintered Components, LLC; Metaldyne Sintered Components of Indiana, Inc.; GMTI Holding Company; Metaldyne Precision Forming - Fort Wayne, Inc.; MASX Energy Services Group, Inc.; Metaldyne Light Metals Company, Inc.; Stahl International, Inc.; Metaldyne U.S. Holding Co.; Metaldyne DuPage Die Casting Corporation; Metaldyne Lester Precision Die Casting, Inc.; and Windfall Specialty Powders, Inc.

21.     The Prepetition Term Credit Agreement has a seven-year term loan component (the "Secured Term Loan"), and all amounts outstanding thereunder mature on January 11, 2014. The Secured Term Loan and other indebtedness outstanding under the Prepetition Term Credit Agreement may become due prior to the maturity date thereunder if the Metaldyne Company or the Subsidiary Guarantors fail to comply with the conditions set forth in the Prepetition Term Credit Agreement. Borrowings under the Secured Term Loan presently bear interest at a rate per annum equal to, at the option of Metaldyne Company, the sum of (a) either (i) the London Interbank Offered Rate ("LIBO Rate"), based on a 1, 2 or 3 month interest period as selected by the borrower or (ii) the "ABR Rate"[5] plus (a) the "Applicable Margin,"[6] plus (c) default interest of 2.00% plus (d) paid in kind interest of 1.00%.[7] On the Petition Date, the principal amount outstanding under the Secured Term Loan portion of the Prepetition Term Credit Agreement was $408 million.

22.     The Prepetition Term Credit Agreement also contains a revolving credit facility that provided for revolving credit loans (the "DF Revolving Credit Loans") up to $10.0 million and a synthetic letter of credit facility pursuant to which the Debtors may request letters of credit for the benefit of third parties up to $60.0 million (less the amount of the DF Revolving Credit Loans outstanding). As of the Petition Date, $10 million in principal amount had been borrowed as DF Revolving Credit Loans. The DF Revolving Credit Loans bear

---

[5]     The "ABR Rate" is the greatest of (a) the prime rate, (b) the federal funds rate plus 0.5% or (c) one-month LIBO Rate plus 1.0%.

[6]     The "Applicable Margin" for LIBO Rate loans is currently 3.50% and the Applicable Margin for ABR Rate loans is currently 2.50%, but may increase depending upon the leverage ratio submitted by the borrowers under the Prepetition Term Credit Agreement.

[7]     The amount of paid in kind interest charged can range from 1.00% to 2.00% based upon the leverage ratio submitted by the borrowers under the Prepetition Term Credit Agreement.

interest, for each borrowing, at the same rate as the Secured Term Loan. The DF Revolving Credit Loans mature on January 11, 2012, and any issued but not disbursed letters of credit expire on the same date.

23.     Shortly before the Petition Date, the beneficiary under a letter of credit in the amount of approximately $9.7 million that was issued under the Prepetition Term Credit Agreement made a drawing under such letter of credit, and the amount of the drawing now represents a reimbursement obligation of the Debtors to the Prepetition Term Agent under the facility. This obligation bears interest at the ABR Rate plus (a) 2.50%, (b) a default rate of 2.00% and (c) paid in kind interest of 1.00%. An additional $38.6 million in undrawn letters of credit issued have been issued, which, if drawn, increase the amounts to be repaid under the Prepetition Term Credit Agreement.

24.     To secure the obligations under the Prepetition Term Credit Agreement (the "Prepetition Term Loan Obligations") Metaldyne Intermediate, Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted BONYM, as agent and for the benefit of the Prepetition Term Lenders, security interests in substantially all of their personal tangible and intangible property (subject to certain exceptions including, among other things, the limitation of security interests to 65% of such entities' equity interests in their first-tier foreign subsidiaries) (collectively, the "Common Collateral"). Moreover, to further secure the Prepetition Term Loan Obligations, BONYM, as agent and for the benefit of the Prepetition Term Lenders, obtained a first-priority mortgage upon the Debtors' three facilities located in New Castle, Indiana; Greenville, North Carolina; and Farmington Hills, Michigan (the

"Mortgaged Facilities" and together with the Common Collateral, the "Prepetition Collateral").[8] Two intercreditor agreements (discussed below) govern the relative priorities of the Prepetition Term Credit Agreement obligations and the Debtors' other secured debt with respect to the Common Collateral.

### *The Prepetition ABL Credit Agreement*

25.     Metaldyne Company also is a borrower under a revolving credit facility (as amended, the "Prepetition ABL Credit Agreement" and, together with the Prepetition Term Credit Agreement, the "Prepetition Credit Facilities") pursuant to the ABL Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate, DBNY (in such capacity, the "Prepetition ABL Agent" and, together with the Prepetition Term Agent, the "Prepetition Agents") (as administrative agent and collateral agent), JPMorgan Chase Bank, N.A. (as syndication agent) and Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central) (as co-documentation agents) and the other lender parties thereto (the "Prepetition ABL Lenders" and together with the Prepetition Term Lenders, the "Prepetition Lenders").  The Subsidiary Guarantors also are guarantors under the Prepetition ABL Credit Agreement.

26.     On October 29, 2008, in connection with the Tender Offer, Metaldyne Company and Metaldyne Intermediate entered into an amendment of the Prepetition ABL Credit Agreement with the Prepetition ABL Lenders to ease certain covenants, increase the interest rates, provide additional security to the Prepetition ABL Lenders, reduce availability of revolving commitments and make certain other changes.

---

[8]     The Greenville, North Carolina facility was sold in September 2008, and the mortgage was released.

27.     The Prepetition ABL Credit Agreement was amended as of April 22, 2009 pursuant to a Forbearance Agreement and Second Amendment to Credit Agreement, and in connection therewith the commitments of the Prepetition ABL Lenders were reduced to an aggregate amount equal to $55,000,000. The Prepetition ABL Credit Agreement was further amended as of May 21, 2009 to (a) reduce the original revolving loan commitments by an additional $20,000,000 and (b) provide for additional commitments (the "Incremental Loan Commitment") up to a maximum amount of $6,491,000. DBNY, who is one of the Prepetition ABL Lenders (in such capacity, the "Incremental Loan Lender"), agreed to provide the Incremental Loan Commitment and extend loans (the "Incremental Loans") under the Prepetition ABL Agreement. As a result, the aggregate amount of commitments under the Prepetition ABL Credit Agreement, after taking into account the Incremental Loan Commitment, remained less than the original total commitment. The Incremental Loan Lender and North American OEMs entered into a Subordinated Participation Agreement (the "Participation Agreement") as of May 21, 2009, pursuant to which the Incremental Loan Lender sold an economic participation in the Incremental Loans to the North American OEMs.

28.     Loans under the Prepetition ABL Credit Agreement mature on January 11, 2012, and any issued but not disbursed letters of credit expire on the same date. Borrowings (other than the Incremental Loans) under the Prepetition ABL Credit Agreement currently bear interest, for each borrowing, at a rate equal to, at the option of Metaldyne Company, the sum of (i) either (a) the LIBO Rate or (b) the ABR Rate plus (ii) the "Applicable Margin" for the Prepetition ABL Credit Agreement.[9] Incremental Loans under the Prepetition ABL Credit

---

[9]     The "Applicable Margin" for the Prepetition ABL Agreement is 3.25% for LIBO Rate loans and 2.25% for ABR Rate loans.

Agreement currently bear interest at a rate equal to ABR plus 2.00% per annum. The principal amount outstanding under the Prepetition ABL Credit Agreement as of the Petition Date was approximately $35.49 million, consisting of approximately $29 million in revolving loans and $6.49 million in Incremental Loans. Borrowings under the Prepetition ABL Credit Agreement have been used for Metaldyne's working capital and other general corporate purposes, including capital expenditures. Despite the Debtors' having been in default under the Prepetition ABL Credit Agreement prior to the Petition Date, DBNY and the Prepetition ABL Lenders have continued to work with the Debtors to ensure that the Debtors had sufficient working capital to continue operating through the filing of these cases.

29.     To secure the obligations under the Prepetition ABL Credit Agreement (the "Prepetition ABL Obligations" and together with the Prepetition Term Loan Obligations, the "Prepetition Obligations"), Metaldyne Intermediate, Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted DBNY, as agent and for the benefit of the Prepetition ABL Lenders, security interests in the Common Collateral. In addition, to secure the Prepetition ABL Obligations, DBNY, as agent and for the benefit of the Prepetition ABL Lenders, obtained a second-priority mortgage upon the Mortgaged Facilities. Two intercreditor agreements (discussed below) govern the relative priorities of the Prepetition ABL Credit Agreement obligations and the Debtors' other secured debt with respect to the Common Collateral.

***The 2013 Notes***

30.     Metaldyne is borrower under the Indenture (as supplemented, the "2013 Agreement"), dated as of October 27, 2003, by and among Metaldyne (as Issuer), each of the guarantors named therein and The Bank of New York Mellon Trust Company, N.A.

("BONYTC") (as Indenture Trustee), as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008, with respect to the 10% senior notes due November 1, 2013 in the original aggregate principal amount of $142.2 million, with interest due bi-annually (the "2013 Notes"). The Subsidiary Guarantors are the guarantors under the 2013 Agreement.

31.     Although the obligations under the 2013 Notes were secured prior to the Tender Offer and related consent solicitation, the collateral securing the 2013 Notes was released pursuant to the Third Supplemental Indenture executed in connection with the Tender Offer and related consent solicitation. In addition, as described above, the overwhelming majority of the 2013 Notes were extinguished as a part of the Tender Offer transaction. Accordingly, the 2013 Notes are now unsecured obligations, of which approximately $1.49 million in principal amount is outstanding as of the Petition Date.

**The 2012 Notes**

32.     Metaldyne is borrower under the Indenture (as supplemented, the "2012 Agreement"), dated as of June 20, 2002, between Metaldyne (as Issuer), each of the guarantors named therein and BONYTC (as Indenture Trustee), as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008, with respect to the 11% senior subordinated notes due June 15, 2012 in the original aggregate principal amount of $250 million, with interest due bi-annually (the "2012 Notes"). Section 10 of the 2012 Agreement subordinates the 2012 Subordinated Note obligations to obligations under the 2013 Notes, the Prepetition Term Credit Agreement and the Prepetition ABL Credit Agreement.

33.    Although the obligations under the 2012 Notes were secured prior to the Tender Offer and related consent solicitation, the collateral securing the 2012 Notes was released pursuant to the Third Supplemental Indenture in connection with the Tender Offer and related consent solicitation. In addition, as described above, most of the 2012 Notes were extinguished as a part of the Tender Offer transaction. Accordingly, the 2012 Notes are now unsecured obligations, of which approximately $29.3 million in principal amount is outstanding as of the Petition Date.

### The Intercreditor Agreements

34.    In connection with certain of the Debtors' entry into the Prepetition Term Credit Agreement and the Prepetition ABL Credit Agreement, to establish their relative rights and priorities, the various secured lenders of the Debtors entered into that certain Three Priority Intercreditor Agreement, dated January 11, 2007, among the Prepetition Term Agent; DBNY, as collateral agent under the Prepetition ABL Credit Agreement; BONYTC, as collateral agent and trustee for the 2013 Notes; BONYTC, as collateral agent and trustee for the 2012 Notes; Metaldyne Company; and Metaldyne, for itself and for certain others of the Debtors (the "Three Priority Intercreditor Agreement"). Pursuant to the Three Priority Intercreditor Agreement, the secured parties were granted relative priorities in the non-real property collateral that they had in common, as follows:  the Prepetition Term Agent and DBNY were jointly granted first priority for the Prepetition Term Lenders and the Prepetition ABL Lenders; BONYTC, was granted second priority for the 2013 Notes; and BONYTC was granted third priority for the 2012 Notes. Pursuant to the release of collateral in connection with the Tender Offer and related consent solicitation, however, the 2013 Notes and the 2012 Notes are now unsecured obligations and are no longer entitled to share in any collateral of the Prepetition ABL Lenders or the Prepetition Term Lenders.

35.     A second intercreditor agreement (the "<u>First Priority Intercreditor</u> <u>Agreement</u>"), dated as of January 11, 2007, was entered into by BONYM, as successor to JPMorgan Chase Bank, N.A., as administrative agent under the Prepetition Term Credit Agreement, and DBNY, as administrative agent under the Prepetition ABL Credit Agreement, Metaldyne Intermediate and Metaldyne Company. The First Priority Intercreditor Agreement distinguishes the relative priorities of the Prepetition ABL Lenders under the Prepetition ABL Credit Agreement and the Prepetition Term Lenders under the Prepetition Term Credit Agreement with respect to Common Collateral. The First Priority Intercreditor Agreement provides that the Prepetition ABL Lenders have a first-priority security interest in Common Collateral constituting accounts, chattel paper representing accounts, deposit accounts and related property, inventory and certain related collateral, including the proceeds of the foregoing (collectively, the "<u>Prepetition ABL Priority Collateral</u>"). The Prepetition Term Lenders have a second-priority security interest on the Prepetition ABL Priority Collateral. The Prepetition Term Lenders have a first-priority security interest, and the Prepetition ABL Lenders have a second-priority security interest, in the remaining Common Collateral (the "<u>Prepetition Term</u> <u>Priority Collateral</u>").

***The Customer Notes***

36.     In November 2008, in connection with the Tender Offer transaction, Metaldyne issued three promissory notes in the aggregate amount of $60 million (collectively, the "<u>Customer Notes</u>"): (a) a note in the amount of $27.5 million, payable to Chrysler LLC; (b) a note in the amount of $22.75 million, payable to Ford Motor Company; and (c) a note in the amount of $9.75 million, payable to General Motors Corporation. The Customer Notes mature and are payable, together with all accrued interest, on April 15, 2014. Interest under the Customer Notes accrues at a rate of 5% per annum, accrues throughout the term of the notes and

is payable at the maturity of the notes. Each holder of a Customer Note has agreed under the terms of the notes to waive rights of setoff or recoupment that it might have that would permit it to setoff accounts receivable owed to the Metaldyne Companies against the amounts owed by Metaldyne under the Customer Notes.

37.     The Customer Notes are secured by a pledge of 100% of the stock of Metaldyne Intermediate, the direct subsidiary of Metaldyne and the parent of Metaldyne Company. Because Metaldyne Intermediate has no assets other than 100% of the equity of Metaldyne Company LLC and because the Debtors believe that Metaldyne Intermediate is insolvent as of the Petition Date, the Debtors believe that the Customer Notes are, in essence, unsecured obligations of Metaldyne.

## Jurisdiction

38.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

39.     By this Motion, pursuant to sections 105, 362, 363, 364, 507 and 510(a) of the Bankruptcy Code, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules"), the Debtors respectfully seek:

> a.     authority to obtain credit and incur debt pursuant to sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code, in the form of a secured, superpriority credit facility (the "DIP Facility", and any loans or other extensions of

credit thereunder, the "DIP Loans") provided by DBNY as agent (in such capacity, the "DIP Agent") and as lender (in such capacity, the "DIP Lender"):[10] (i) on an interim basis, during the period (the "Interim Period") from the Petition Date through and including the date of entry of a Final Order (as defined below), up to a maximum principal amount of $11,700,000; and (ii) upon entry of the Final Order, up to a maximum principal amount of $18,508,789. The terms of the DIP Facility are set forth in the Interim Order attached hereto as Exhibit J (the "Interim Order") and in the DIP Facility terms sheet attached hereto as Exhibit B (the "DIP Terms").

      b.      authority to use proceeds of the DIP Facility in accordance with the 13-week consolidated cash flow forecast prepared by the Debtors and annexed hereto as Exhibit C (as updated from time to time, subject to the approval of the Prepetition ABL Agent, the DIP Agent and the North American OEMs, the "Budget"), and as otherwise provided in the Interim Order, including to repay the Prepetition ABL Obligations to the extent set forth in the Interim Order.

      c.      authority to grant to the DIP Agent for the benefit of the DIP Lender (collectively, the "DIP Secured Parties"), as security for repayment of the DIP Obligations (as defined in the Interim Order), in accordance with the relative priorities among the liens securing the DIP Facility, the liens securing the Prepetition Credit Facilities and the Adequate Protection Replacement Liens (as defined below), in each case as subject to the Carve-Out (as defined below):

      i.      pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative claim having recourse to all prepetition and postpetition assets and property of the Debtors' estates and proceeds thereof, including, for the avoidance, of doubt all Unencumbered Foreign Stock (as defined below) and, to the extent avoided, the Specified Mortgages (as defined below), but excluding the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law, and the proceeds thereof, whether received by judgment, settlement or otherwise (the "Avoidance Actions");

      ii.      pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, enforceable, perfected and non-avoidable lien on all assets and property of the Debtors (now owned or hereafter acquired) that were not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date, other than (i) Avoidance Actions and (ii) thirty-five percent (35%) of the equity interests (collectively, the "Unencumbered Foreign Stock") of the Debtors in their

---

[10]    The North American OEMs will purchase upon entry of the Interim Order a one hundred percent (100%) fully subordinated, last-out participation in the DIP Facility pursuant to the Participation Agreement (the "Subordinated Participations"), and the DIP Lender shall have no obligation to fund DIP Loans unless and until the North American OEMs' participation in such DIP Loans has been fully funded by the North American OEMs and made immediately available to the DIP Agent.

wholly-owned direct foreign subsidiaries, and proceeds thereof (collectively, all such unencumbered assets and property, other than the Unencumbered Foreign Stock and Avoidance Actions, the "Unencumbered Collateral"), *pari passu* with the Adequate Protection Replacement Liens thereon in favor of the Prepetition ABL Secured Parties (as defined in the Interim Order);

iii.    pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, enforceable, perfected and non-avoidable lien on all assets and property of the Debtors (now owned or hereafter acquired) and proceeds thereof which, in the case of liens on assets or property (x) comprising Prepetition Term Priority Collateral, shall be (A) junior and subject to (1) the Prepetition Liens (as defined Interim Order) and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties (as defined in the Interim Order) and (2) Third Party Liens (as defined below) that were, as of the Petition Date, senior and prior to the Prepetition Liens on the Prepetition Term Priority Collateral of the Prepetition Term Secured Parties, and (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties, and (y) that were, as of the Petition Date, encumbered only by Third Party Liens, shall be junior and subject to such Third Party Liens;[11]

iv.    pursuant to sections 364(d)(1) and 510(a) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable priming lien on all DIP Collateral (as defined in the Interim Order) (x) which, in the case of liens on all DIP Collateral other than Prepetition Term Priority Collateral and the Unencumbered Collateral, shall be (A) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties, and (B) senior and prior to the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties and all Third Party Liens thereon which were junior and subject to the Prepetition Liens of the Prepetition Term Secured Parties as of the Petition Date, and (y) comprising Prepetition Term Priority Collateral, which liens shall be (A) junior and subject to the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties, and all Third Party Liens thereon which were, as of the Petition Date, senior and prior to the Prepetition Liens of the Prepetition Term Secured Parties, (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties and (C) senior and prior to all Third Party Liens thereon

---

[11]    As used herein, "Third Party Liens" means all liens on the Debtors' assets or property of any parties (the "Third Party Lienholders") other than the Prepetition Secured Parties (as defined in the Interim Order) that were valid, enforceable, perfected and non-avoidable as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code).

which, as of the Petition Date, were junior and subject to the Prepetition Liens thereon of the Prepetition ABL Secured Parties.

        d.       enforcing the terms of the First Priority Intercreditor Agreement pursuant to section 510(a) of the Bankruptcy Code.

        e.       authority to use, during the Interim Period, the Cash Collateral in which the Prepetition Secured Parties have an interest including, in the case of the proceeds of Prepetition ABL Priority Collateral, to permanently and indefeasibly repay Prepetition ABL Obligations as and to the fullest extent set forth in the Interim Order.

        f.       authority to grant, as of the Petition Date, Adequate Protection Superpriority Claims (as defined below) and Adequate Protection Replacement Liens, to the extent of and as compensation for any Diminution in Value (as defined in the Interim Order), to the Prepetition Agents for the benefit of the Prepetition Secured Parties, in each case in accordance with the relative priorities among the claims for and liens securing repayment of the DIP Loans and the Prepetition Credit Facilities, as set forth more fully below, and subject to the Carve-Out.

        g.       modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order.

        h.       approval of the Accommodation Agreement (as defined below) substantially in the form attached hereto as Exhibit D.

        i.       the scheduling of a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion.

        j.       the waiving of any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and providing for immediate effectiveness of the Interim Order.

## The Debtors' Urgent Need for Postpetition Financing

        40.      It is essential that the Debtors obtain immediate postpetition financing and authority to use the Prepetition Lenders' cash collateral (the Prepetition ABL Priority Collateral, the "Cash Collateral"). This relief is essential to the Debtors' efforts to continue their ordinary course, day-to-day operations, provide goods to their customers, effect the Sales Processes and maximize value to stakeholders. See Affidavit of Terry Iwasaki in Support of the Motion at ¶ 26 (the "Iwasaki Affidavit"), attached hereto as Exhibit E.

41.    In the highly challenging automotive environment in which the Metaldyne Companies have found themselves in the past several years, the Metaldyne Companies' revenues have recently suffered sharp declines, and the Debtors' operations in the United States have been particularly hard hit. The Debtors' sales have fallen by 25%, comparing revenues for the fiscal year ended March 31, 2008 with the fiscal year ended March 31, 2009. The Debtors' preliminary views of the current fiscal year (ending March 31, 2010) project similar deterioration on a year-over-year basis. See Affidavit of Thomas A. Amato in Support of the First-Day Pleadings at ¶ 71.

42.    In light of such deterioration, the Debtors sought out of court restructuring recapitalization opportunities. It soon became apparent, however, that the Debtors' best alternative for preserving and maximizing value for their constituents was selling their businesses as going concerns. Hence, after a lengthy marketing process, the Debtors have entered into a letter of intent, and are currently negotiating a purchase agreement, for the sale of most of their chassis business. The Debtors are also negotiating letters of intent for the sale of their powertrain business. All three letters contemplate going concern sales to maximize the value of the estates. In order to complete the negotiation process and effect sales that preserve the going concern value of their businesses and maximize recoveries for their creditors, the Debtors must maintain liquidity sufficient to operate the Debtors' businesses and to fund the Sale Processes. Immediate access to postpetition financing and the use of Cash Collateral is necessary, therefore, to provide working capital during these chapter 11 cases to provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course. See Iwasaki Affidavit at ¶ 27. Absent access to postpetition financing and the ability to use Cash

Collateral immediately, not only would the Debtors' ability to maximize the value of their estates be jeopardized, but the Debtors also could be forced to cease all business operations in the short term and, thereby, risk the loss of their going concern value to the direct detriment of all parties in interest. See id.

43.     Accordingly, without the immediate access to postpetition financing and the ability to use Cash Collateral, the Debtors could suffer substantial and irreparable harm, which could threaten their ability to maximize value for stakeholders. By contrast, if the relief sought in this Motion is approved, the Debtors' ability to minimize disruption to their business operations, instill confidence in their various stakeholders and successfully complete the Sale Processes will be substantially enhanced. The Debtors' need for postpetition financing and the use of Cash Collateral, therefore, is urgent. In addition, because the Debtors lack sufficient unencumbered funds to meet their imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim financing under the terms set forth in the Interim Order before the Court conducts the Final Hearing. See id. at ¶ 28.

## The Proposed Debtor in Possession Financing Facility

44.     The Debtors have determined, in the exercise of their sound business judgment, that they require the use of Cash Collateral and postpetition financing to meet their ongoing working capital and general business needs. The Debtors also require sufficient liquidity to continue the comprehensive process for the sale of their assets that they began prepetition. The terms set forth in the Interim Order will reasonably address the Debtors' near term liquidity requirements and constitute the best alternative available under the circumstances. As discussed in greater detail below, the Debtors sought proposals for debtor in possession financing from numerous sophisticated commercial entities active in the debtor in possession

financing market, including traditional banks, asset-based lenders, investment banks, private equity and hedge funds and institutional lenders. The Debtors also sought financing from private equity funds that have been known to provide working capital or other loans as a bridge to ownership. The Debtors, however, were unable to secure a commitment from any of these finance providers prior to the Petition Date. Nor could the Debtors obtain a financing commitment from the Prepetition Term Lenders or the Prepetition ABL Lenders. See Declaration of Eric Mendelsohn in Support of the Motion at ¶ 12 (the "Mendelsohn Declaration"), a copy of which is attached hereto as Exhibit F.

45.     As a result, the Debtors sought (a) debtor in possession financing, (b) certain financial accommodations from the North American OEMs, (c) commercial agreements embodied in the NCM Production Agreement and (d) the right to use Cash Collateral on a consensual basis from the Prepetition ABL Lenders.[12]  As a result of the negotiations with the DIP Lender, the North American OEMs and the Prepetition ABL Lenders, the Debtors were able to secure debtor in possession financing from the DIP Lender and the right to use the Prepetition Lenders' Cash Collateral on a consensual basis, on the terms in the Interim Order. See id. at ¶ 13.

46.     The DIP Lender, the North American OEMs and the Debtors have agreed to the DIP Facility terms as described in the Interim Order. The DIP Lender agreed to provide debtor in possession financing to the Debtors, which will be fully funded by the North American OEMs through the purchase of the Subordinated Participations. Pursuant to the terms of the

---

[12]     In connection with the Accommodation Agreement, the Debtors' non-debtor Canadian affiliate, Metaldyne Machining and Assembly Mfg. Co. (Canada) Ltd., will enter into an Access and Security Agreement substantially in the form attached hereto as Exhibit G.

Participation Agreement, the North American OEMs will agree to subordinate their right of payment to that of the Prepetition ABL Lenders. See Iwasaki Affidavit at ¶ 29.

47.    In addition, the North American OEMs also have agreed to certain financial accommodations in connection with their purchase of component parts from the Debtors. Specifically, the North American OEMs and the Debtors will enter into an Accommodation Agreement memorializing these terms (the "Accommodation Agreement"). Pursuant to the Accommodation Agreement, the North American OEMs agree, subject to entry of an acceptable financing order, to limit resourcing activities and provide the Debtors with certain financial accommodations and purchase the Subordinated Participations. For example, pursuant to the Accommodation Agreement, the North American OEMs will grant the Debtors certain credit enhancements, including expedited payment terms and limit their right of setoff to 3% of the face value of invoices. The Debtors will acknowledge the North American OEMs' tooling ownership, agree to cooperate with the North American OEMs in their resourcing activities if certain sales milestones are not met or a default occurs and grant the North American OEMs an option to acquire dedicated tooling and equipment that remain in the estates after the Sale Processes are concluded, all pursuant to the terms specified therein. See id. at ¶ 30.

*Summary of the Material Terms of the DIP Facility*

48.    Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Facility with the DIP Lender and the Accommodation Agreement with the North American OEMs.[13] See Iwasaki Affidavit at ¶ 31.

---

[13]    As noted above, they will also seek authority to enter into the NCM Production Agreement, approval for which is sought in the NCM Motion.

49. The following is a summary of the material provisions of the DIP Facility pursuant to Rule 4001 and Local Rule 4001-2.[14]

(a) **General Terms**. Extensions of credit by the DIP Lender will be made to the Debtors, in accordance with the Budget and the Interim Order (including, as applicable, the Final Order).

(b) **Total Facilities**. The DIP Facility is a $18,508,789 facility, subject to upward adjustment in accordance with the Accommodation Agreement, with $11,700,000 million being requested for use in the Interim Period. (Interim Order ¶¶ (i), 2(b))

(c) **Use of Cash Collateral and Proceeds of the DIP Facility**. Subject to the Interim Order, each Debtor will be authorized to use during the Term (as defined in the Interim Order) (and, subject to paragraph 15(b) of the Interim Order, not beyond) (a) the advances under the DIP Facility, and (b) Cash Collateral, in each case in the amounts and for the line item expenditures set forth in the Budget. (Interim Order ¶¶ 3(a), 7)

(d) **Borrowing Base and Applicable Availability Block; Reserves; Mandatory Prepayments**. The Borrowing Base (as defined in the Interim Order) and the Applicable Availability Block (as defined in the Prepetition ABL Credit Agreement) shall continue in effect in accordance with the terms of the Prepetition ABL Credit Agreement subject to the Borrowing Base terms in substantially the same form as Exhibit H attached hereto (the "Borrowing Base Terms") and, notwithstanding anything to the contrary in the Interim Order, shall constitute a further limitation on the Debtors' use of Cash Collateral under the Interim Order. Without limiting any other provision hereof, the Debtors shall make mandatory prepayments of the Prepetition ABL Obligations (other than the Incremental Loans) as set forth in the Borrowing Base Terms, which shall be indefeasible and shall permanently reduce the Prepetition ABL Obligations (other than the Incremental Loans). This provision applies proceeds of the DIP Facility to pay prepetition debt. (Interim Order ¶ 3(b))

(e) **Term**. The term of the DIP Facility shall be from the Petition Date to the earliest of: (i) the latest closing date for the sale of some or all of the Debtors' assets; (ii) the occurrence of an Event of Default under the DIP Facility, after any applicable cure period has expired and any such default has not been cured within that applicable cure period; or (iii) sixty (60) days following the entry of the Interim Order, provided that Metaldyne may extend this term for up to two consecutive fifteen (15) day periods (the "Extended Termination Date") if sale orders have been entered and if Metaldyne would still have funding availability under the terms of the Interim Order or the Final Order (the

---

[14] This summary of the DIP Facility is intended only to assist the Court in understanding key aspects of the arrangement and is qualified in its entirety by reference to the DIP Facility, as it may be modified by the proposed Interim Order and the Final Order. All capitalized terms not otherwise defined herein have the meanings given to them in the proposed Interim Order.

earliest of (i), (ii) and (iii), the "Termination Date"). (Interim Order ¶ 2(a); Accommodation Agreement ¶ 2)

(f) **Interest Rates**. The DIP Facility will bear interest at a the prime rate of interest established from time to time by JPMorgan Chase plus 2.00%, which accrued interest will be added to the DIP Obligations. (Interim Order ¶ 2(a))

(g) **Expenses**. The Debtors will pay all reasonable expenses incurred by the Prepetition ABL Agent and the North American OEMs in connection with the preparation, execution, delivery and administration of the DIP Facility and the Interim Order. (Interim Order ¶ 18(b))

(h) **DIP Liens**. The DIP Agent for the ratable benefit of the DIP Secured Parties will be granted the following DIP Liens (as defined in the Interim Order) pursuant to the Interim Order and any Final Order, subject to the Carve-Out:

(i) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable lien on all DIP Collateral which comprises Unencumbered Collateral, which lien shall be *pari passu* with the Adequate Protection Replacement Liens thereon granted to the Prepetition ABL Secured Parties;

(ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable lien upon all DIP Collateral which, in the case of liens on assets or property (x) comprising Prepetition Term Priority Collateral, shall be junior and subject to (A) the Prepetition Liens and the Adequate Protection Replacement Liens thereon of, in each case, the Prepetition Term Secured Parties and (B) any Third Party Liens which as of the Petition Date were senior and prior to the Prepetition Liens on the Prepetition Term Priority Collateral of the Prepetition Term Secured Parties; and (y) that were encumbered as of the Petition Date only by Third Party Liens, shall be junior and subject to such Third Party Liens (collectively, the prepetition liens which are senior and prior to the DIP Liens as and to the extent set forth in this subparagraph are hereafter referred to as the "Senior Prepetition Liens");

(iii) pursuant to sections 364(d)(1) and 510(a) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable priming lien on all DIP Collateral (x) which, in the case of liens on all DIP Collateral other than Prepetition Term Priority Collateral and the Unencumbered Collateral, shall be (A) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties, and (B) senior and prior to the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties and all Third Party Liens thereon which were junior and subject to the Prepetition Liens of the Prepetition Term Secured Parties as of the Petition Date, and (y) comprising Prepetition Term Priority Collateral, which liens shall be (A) junior and subject to the Prepetition Liens and the Adequate

Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties, and all Third Party Liens thereon which were, as of the Petition Date, senior and prior to the Prepetition Liens of the Prepetition Term Secured Parties, (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties and (C) senior and prior to all Third Party Liens thereon which, as of the Petition Date, were junior and subject to the Prepetition Liens thereon of the Prepetition ABL Secured Parties.

(Interim Order ¶ 2(c))

(i) **Superpriority Administrative Claim Status**.

(i) The DIP Obligations shall, pursuant to section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "DIP Superpriority Claims") of the DIP Lender, and be payable from and have recourse to all DIP Collateral and the Unencumbered Foreign Stock. All DIP Superpriority Claims shall be subject to the Carve-Out.

(ii) Other than as expressly provided in the Interim Order, including with respect to the Adequate Protection Superpriority Claims in favor of the Prepetition ABL Secured Parties and the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these cases, or in any Successor Cases (as defined in the Interim Order), and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising in the Interim Order or under or in connection with the DIP Facility.

(Interim Order ¶ 2(g))

(j) **Carve-Out**. The Interim Order provides for a "Carve-Out" equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (ii) $6,000,000 to pay any allowed (after proper application therefor and Court order) fees or expenses incurred by the Debtors and any statutory committee appointed in these cases (each, a "Committee") to the extent provided for in the then current Budget, $100,000 for the benefit of any Chapter 7 trustee appointed in the Debtors' cases for "burial" type expenses if the cases are converted to Chapter 7. No portion of the Carve-Out, any Cash Collateral or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in challenging, among other things, any of the Prepetition Secured Parties or the DIP Secured Parties' liens or claims (or the value of their respective Prepetition Collateral or DIP Collateral), or the initiation or prosecution of any claim or action against any of the Prepetition Secured Parties or the DIP Secured Parties in respect of any of the Prepetition Credit Facilities or the DIP Facility. (Interim Order ¶ 7)

(k)     **Section 506(c) Waiver**.  Subject to the entry of a Final Order, the Debtors will be prohibited from attempting to surcharge the DIP Collateral and the Prepetition ABL Priority Collateral under section 506(c) of the Bankruptcy Code.  (Interim Order ¶ 9)

(l)     **DIP and Adequate Protection Replacement Lien Perfection**.  The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of filing or recording any financing statement or document which may otherwise be required under the law of any jurisdiction to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the same to the priorities granted in the Interim Order.  (Interim Order ¶ 5)

(m)     **Waiver of the Automatic Stay**.  Any automatic stay otherwise applicable to the Prepetition ABL Secured Parties will be modified so that (i) after the occurrence of any Event of Default and (ii) at any time thereafter during the continuance of such Event of Default, upon five (5) business days' prior written notice of such occurrence the Prepetition ABL Secured Parties will be entitled to exercise their rights and remedies in respect of the DIP Collateral (other than Prepetition Term Priority Collateral), in accordance with the Interim Order and the Prepetition ABL Loan Documents.  (Interim Order ¶ 15(b))

(n)     **Stipulations as to the Prepetition Credit Facilities**.

(i)     <u>Enforceability, etc. of Prepetition Obligations</u>.  The Prepetition Obligations are stipulated (a) legal, valid, binding, and enforceable against each applicable Prepetition Loan Party Debtor (as defined in the Interim Order) and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable nonbankruptcy law or otherwise (except for the lien subordination contemplated herein and in the First Priority Intercreditor Agreement).  (Interim Order ¶ F(iii))

(ii)     <u>Enforceability, etc. of Prepetition Liens</u>.  The Prepetition Liens on the Prepetition Collateral granted in favor of the Prepetition Agents (other than in respect of the Specified Mortgages) are deemed legal, valid, enforceable, non-avoidable and duly perfected and are not subject to challenge, attack, offset, re-characterization or subordination under the Bankruptcy Code, under applicable nonbankruptcy law or otherwise.  (Interim Order ¶ F(iv))

(iii)     <u>Prepetition Security Interests, Liens, Collateral, etc.</u>  The liens granted by the Debtors on substantially all of their assets as security for the Prepetition Obligations are deemed legal, valid, enforceable, and property recorded and perfected under state law (other than in respect of mortgages on certain Prepetition Term Priority Collateral Consisting of real property granted

within ninety days prior to the Petition Date, which may be avoidable (the "Specified Mortgages")).  (Interim Order ¶ (E)(iii))

(o)    **Indemnity**.  The Prepetition ABL Agent, the DIP Agent and the DIP Lender have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related to negotiating and implementing the DIP Facility and the use of Cash Collateral.  The Prepetition ABL Agent and the DIP Agent shall be indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof.  (Interim Order ¶ F(v))

(p)    **Adequate Protection for Prepetition Secured Parties**.  As adequate protection for the respective interests of the Prepetition Secured Parties in the respective Prepetition Collateral (including Cash Collateral), the subordination of the Prepetition Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a), the Prepetition Secured Parties shall receive adequate protection as follows:

(i)    Adequate Protection Replacement Liens.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have pursuant to sections 361 and 363(e) of the Bankruptcy Code, replacement security interests in and liens upon (the "Adequate Protection Replacement Liens") all of the DIP Collateral.  The Adequate Protection Replacement Liens of the Prepetition ABL Secured Parties shall be (x) in the case of all DIP Collateral other than Prepetition Term Priority Collateral (i) *pari passu* with the DIP Liens and the Prepetition Liens in favor of the Prepetition ABL Secured Parties, in each case thereon, and (ii) senior and prior to all other liens thereon other than Third Party Liens which, as of the Petition Date, were senior and prior to the Prepetition Liens thereon of the Prepetition ABL Secured Parties; and (y) in the case of Prepetition Term Priority Collateral, (i) *pari passu* with the DIP Liens and the Prepetition Liens in favor of the Prepetition ABL Secured Parties, in each case thereon, and (ii) senior and prior to all other liens thereon other than the Prepetition Liens and the Adequate Protection Replacement Liens of the Prepetition Term Secured Parties, and any Third Party Liens, which as of the Petition Date, were senior and prior to the Prepetition Liens thereon of the Prepetition Term Secured Parties.  The Adequate Protection Replacement Liens of the Prepetition Term Secured Parties shall be senior and prior to (x) in the case of all DIP Collateral other than Prepetition Term Priority Collateral, all liens thereon other than the DIP Liens, the Prepetition Liens and the Adequate Protection Replacement Liens of the Prepetition ABL Secured Parties and any Senior Prepetition Liens thereon in favor of Third Party Lienholders, and (y) in the case of Prepetition Term Priority Collateral, all liens thereon other than any Senior Prepetition Liens thereon in favor of Third Party Lienholders.  All Adequate Protection Replacement Liens shall be subject to the Carve-Out.  (Interim Order ¶ 4(a))

(ii)    Adequate Protection Superpriority Claims.  To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have, subject to the payment of the Carve-Out, allowed superpriority administrative expense

claims (the "Adequate Protection Superpriority Claims") as provided for in section 507(b) of the Bankruptcy Code and payable from and having recourse to all DIP Collateral and the proceeds of Unencumbered Foreign Stock, subject to all security interests therein and liens thereon. The Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties shall have priority over the Adequate Protection Superpriority Claims of the Prepetition Term Secured Parties in respect of recourse to proceeds of all DIP Collateral other than Prepetition Term Priority Collateral, while the Adequate Protection Superpriority Claims of the Prepetition Term Secured Parties shall have priority over the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties in respect of recourse to proceeds of Prepetition Term Priority Collateral. The Adequate Protection Superpriority Claims granted to the Prepetition Term Secured Parties under the Prepetition Term Credit Agreement may be impaired pursuant to a Plan (as defined in the Interim Order) with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code. (Interim Order ¶ 4(b))

(iii)    Adequate Protection Payments, etc. The Prepetition ABL Agent shall receive from the Debtors (x) upon entry of the Interim Order, immediate cash payment of all accrued and unpaid interest on the Prepetition ABL Loans (as defined in the Interim Order) at the default rate and fees provided for in the Prepetition ABL Credit Agreement, and all other reasonable accrued and unpaid fees and disbursements owing to any of the agents or lenders under the Prepetition ABL Credit Agreement, including in each case to the extent incurred prior to the Petition Date, (y) when due, all accrued but unpaid interest on the Prepetition ABL Loans and fees at the non-default contract rate provided for in the Prepetition ABL Credit Agreement; provided, that (1) the Prepetition ABL Agent reserves the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition ABL Credit Agreement, and for the payment of any other amounts provided for in the Prepetition ABL Credit Agreement, and (2) if, in accordance with applicable law, the Bankruptcy Court allows any claim by the Prepetition ABL Agent under the Prepetition ABL Credit Agreement for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition ABL Credit Agreement, or for the payment of any other amounts provided for in the Prepetition ABL Credit Agreement, such claim shall be added to and comprise part of the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties for all purposes herein, and (z) to the fullest extent set forth in the Interim Order, permanent repayments of the Prepetition ABL Obligations (other than the Incremental Loans). Promptly upon receipt of invoices therefor, the Prepetition ABL Agent shall receive from the Debtors current cash payments of all reasonable professional fees and expenses of the ABL Advisors (as defined in the Interim Order). The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without

limiting the right of the various professionals to redact privileged, confidential or sensitive information). (Interim Order ¶ 4(c)).

(q) **Disposition of DIP Collateral**. The Debtors shall not transfer, sell, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except for sales of inventory and collection of accounts receivable in the ordinary course of business or as approved by the Bankruptcy Court to the extent required under applicable bankruptcy law. (Interim Order ¶ 13)

(r) **Events of Default**. The Interim Order contains customary events of default (each, an "Event of Default"), including the following:

(i) Any Debtor shall file any motion seeking to incur indebtedness or to obtain credit (other than under the DIP Facility, as expressly permitted herein or unsecured credit incurred in the ordinary course of the Debtors' businesses and consistent with the Debtors' past business practices) unless, in connection therewith, all of the Prepetition ABL Obligations and the DIP Obligations, and the Adequate Protection Superpriority Claims granted to the Prepetition ABL Secured Parties shall first be paid indefeasibly in full and satisfied; (Interim Order ¶ 15(ii))

(ii) Any of the Debtors shall make any payment on or in respect of the DIP Facility, on account of the DIP Obligations, the DIP Superpriority Claims or otherwise, or the DIP Secured Parties shall seek enforcement of any rights in respect thereof, before the Prepetition ABL Obligations and the Adequate Protection Superpriority Claims in favor of the Prepetition ABL Secured Parties shall first be paid indefeasibly in full in cash and satisfied; (Interim Order ¶ 15(iii))

(iii) Any Debtor shall seek to, or shall support (in any such case by way of, inter alia, any motion or other pleading filed with the Court) any other person's motion to disallow or subordinate in whole or in part the Prepetition ABL Secured Parties' claims in respect of the Prepetition ABL Obligations, or to challenge the validity, enforceability, perfection or priority of the liens in favor of the Prepetition ABL Secured Parties (including, without limitation, any of their Prepetition Liens), but, without limiting any other provision of the Interim Order, excluding any challenge to the Specified Mortgages; and (Interim Order ¶ 15(xiv))

(iv) The expiration of the period provided by section 1121 of the Bankruptcy Code for the Debtors' exclusive right to file a plan, as such period may be extended pursuant to section 1121 of the Bankruptcy Code, without the Debtors having filed and continuing to pursue confirmation of a plan, or the granting of any motion providing for the termination of the Debtors' exclusivity period. (Interim Order ¶ 15(xvii))

*Summary of the Material Terms of the Accommodation Agreement*

50.    In addition to the material terms of the DIP Facility set forth above, the

North American OEMs also have agreed to provide other accommodations to the Debtors in

connection with the DIP Facility pursuant to the terms of the Accommodation Agreement.[15]

(a)    **Sale Process**.  Upon commencement of the Debtors' chapter 11 cases, Metaldyne will continue the Sale Processes with the intent to close such sales within 60 days of the Effective Date (as defined in the Accommodation Agreement) and the following additional milestones (collectively, the "Milestones").

(i)    Letter(s) of Intent.  Obtain, by June 5, 2009 a letter or letters of intent for the sale of some or all of the Sale Assets (as defined in the Accommodation Agreement).

(ii)    Definitive Agreement(s).  Execute by June 15, 2009 one or more definitive purchase agreements and file motions to approve the sales on the terms outlined in the definitive purchase agreements with the Bankruptcy Court; provided however that such dates shall be extended by the North American OEMs, in the event Metaldyne has made good faith progress toward finalizing definitive purchase agreements, such that an extension will not jeopardize a closing by the date set forth below.

(iii)    Sale Process Approval(s).  Obtain by June 24, 2009 an order approving procedures for the approval of one or more sales and any applicable bidding protections and procedures.

(iv)    Sale Approval Order(s).  Obtain, by July 27, 2009, an order from the Bankruptcy Court approving one or more sales.

(v)    Closing Date(s).  Close one or more sales by the later of (a) 60 days after the Effective Date or (b) the Extended Termination Date (as defined in the Accommodation Agreement).

(Accommodation Agreement ¶ 3)

---

[15]    Capitalized terms in this paragraph not otherwise defined in this Motion have the meaning given to them in the Accommodation Agreement.  In the event of any conflict between this summary and the Accommodation Agreement, the terms of the Accommodation Agreement will govern.

(b) **North American OEM Accommodations.**[16]

(i) <u>Limitation on Setoffs</u>. The North American OEMs will agree not to exercise setoff or recoupment rights against payables to Metaldyne other than Allowed Setoffs, Tooling Setoffs, Material Setoffs and, as to Chrysler, Bailed Inventory Setoffs, (each as defined in the Accommodation Agreement) and, in addition to other limitations, under no circumstances may Allowed Setoffs exceed 3% percent ("<u>Cap</u>") of the face amount of any invoices or accounts payable. (Accommodation Agreement ¶ 5(A))

(ii) <u>Inventory Purchase Agreement</u>. Upon the occurrence of an Inventory Trigger Event (as defined in the Accommodation Agreement), each North American OEM will purchase and pay for, within 30 days of the Inventory Trigger Event, all of Metaldyne's raw materials (including purchased components) and finished goods inventory related to that North American OEM's Component Parts (as defined in the Accommodation Agreement) that are usable and merchantable and any Component Parts that are the subject of unsatisfied releases that are open as of the date of an Inventory Trigger Event. (Accommodation Agreement ¶ 5(B))

(iii) <u>Change of Account Payable Terms</u>. For those shipments of the Component Parts invoiced or shipped on and after the Effective Date by Metaldyne, including its Canadian affiliate, through the expiration or termination of the Accommodation Agreement, the North American OEMs will make payments on net immediate terms, except for Chrysler Mexico, which will make payments under its current payment terms of 10/25 prox. The term "<u>net immediate</u>" shall means payments on average within 8 days after receipt by one of the North American OEMs. (Accommodation Agreement ¶ 5(D)

(iv) <u>Resourcing</u>. Until the first to occur of (A) the expiration or termination of the Accommodation Agreement or (B) an Event of Default, the North American OEMs will not resource the Component Parts, other than Component Parts manufactured at facilities Metaldyne has designated to be closed or which Metaldyne and each North American OEM mutually agree may be resourced. The North American OEMs may take action to prepare for resourcing such as entering into discussions and sending requests for proposals to alternative suppliers regarding the production of the Component Parts Metaldyne will fully cooperate and assist the North American OEMs in their respective resourcing preparations, <u>provided</u>, that (x) reasonable steps will be taken to protect confidential or trade-secret information from competitors, and (y) the costs for such preparations are contained within the Budget or are paid for directly by the

---

[16] In addition to those terms summarized herein, nothing in the Accommodation Agreement shall pertain to the New Castle Component Parts, which shall be governed by the terms of the NCM Production Agreement toe approved as part and parcel of the approval of the DIP Facility. (Accommodation Agreement ¶ 5(E))

North American OEM seeking such preparations. (Accommodation Agreement ¶ 5(G))

(c)     **Metaldyne's Accommodations**.

      (i)     <u>Continued Production</u>. Metaldyne will continue to manufacture the Component Parts for the North American OEMs in accordance with the terms of their respective Purchase Orders (as defined in the Accommodation Agreement) and related releases; provided that, in the case of the Remainco Plants (as defined in the Accommodation Agreement), Metaldyne has sufficient liquidity or financing to do so. (Accommodation Agreement ¶ 6(A))

      (ii)     <u>Inventory Banks</u>. Metaldyne will build for each North American OEM an inventory bank of Component Parts in accordance with a schedule to be provided to Metaldyne by each North American OEM. Metaldyne will immediately begin producing inventory banks on the later of the Effective Date, or the date on which the schedule is received by Metaldyne, and will ship inventory-bank parts as they are produced. Metaldyne's obligation to build the inventory bank parts will be subject to: (A) Receipt of a schedule by each North American OEM; (B) the procurement of parts by Metaldyne; (C) the Budget; (D) reasonably applied internal capacity limitations; and (E) each North American OEM's payment of verifiable, incremental out-of-pocket costs incurred by Metaldyne in connection with building the inventory bank including, but not limited to, all special packaging and handling costs. (Accommodation Agreement ¶ 6(D))

      (iii)     <u>Cooperation in Resourcing Business</u>. If it becomes necessary to do so and is otherwise permitted under the Accommodation Agreement, and, (for clarity, as to Remainco Component Parts (as defined in the Accommodation Agreement) immediately upon the Effective Date) Metaldyne will cooperate and use its best efforts assisting the North American OEMs in moving the production of Component Parts to one or more replacement suppliers; provided that the costs of such cooperation are paid directly by the applicable North American OEM outside the Budget. (Accommodation Agreement ¶ 6(E))

      (iv)     <u>Tooling Acknowledgement</u>. Metaldyne will acknowledge and agree that Customer Tooling (as defined in the Accommodation Agreement) is (A) subject to the terms of the Accommodation Agreement, (B) owned by the North American OEMs and (C) held by Metaldyne as bailees-at-will. (Accommodation Agreement ¶ 7(B))

      (v)     <u>Options</u>. Metaldyne will grant to the North American OEMs an irrevocable and exclusive option (the "Option") to purchase, free and clear of the lien of the DIP Lender and the Prepetition ABL Lenders, but subject to the lien of the Prepetition Term Lenders, exercisable on the expiration of the Accommodation Agreement, any Supplier Owned Tooling, any returnable containers or dunnage, and any machinery or equipment and related or ancillary

items which are owned by Metaldyne and dedicated exclusively to the manufacture, assembly or transport of Component Parts for the North American OEMs (collectively, "Dedicated Equipment"), for a price, subject to the Prepetition Term Agent's consent, (A) equal to the orderly liquidation value of any Dedicated Equipment as determined by the Stout Resius Ross appraisal of January 2007, or (B) agreed to by Metaldyne, the Prepetition Term Agent and the North American OEMs. (Accommodation Agreement ¶ 8(A))

(d) **Events of Default**. The occurrence of any one or more of the following will be an "Event of Default" under the Accommodation Agreement:

(i) Metaldyne repudiates or materially breaches its obligations, or refuses to perform its material obligations, under the Accommodation Agreement or a North American OEM's Purchase Order, provided the North American OEM is in compliance with its obligations, the consequence of which is a substantial likelihood that North American OEM's production of Component Parts will be interrupted (in which case the Event of Default applies only to that North American OEM);

(ii) The Debtors' chapter 11 cases are converted to cases under chapter 7, or a trustee or examiner is appointed for the Debtors;

(iii) Metaldyne breaches or fails to meet any of the Milestones; and

(iv) An Event of Default occurs under the Interim Order then in effect that is not cured or stayed from enforcement within the five business days following notice of Event of Default, or the DIP Lender otherwise ceases to make advances under the DIP Facility after the expiration of such five business day period for any reason other than an a North American OEM's failure to fund its Subordinated Participation.

(Accommodation Agreement ¶ 9)

51. The Prepetition ABL Lenders have consented to the terms of the DIP Facility, the Debtors' use of Cash Collateral and the adequate protection proposed in the Interim Order and, as discussed in greater detail below, the Prepetition Term Lenders are deemed to consent to such terms and the relief requested herein pursuant to sections 5.2 and 5.4 of the First Priority Intercreditor Agreement.

## Request for Approval of the DIP Facility and Related Actions

52.     The Debtors must have sufficient liquidity to continue to operate their businesses as a going concern and to carry out their plans to sell the Debtors' assets expeditiously as a going concern for the direct benefit of all stakeholders. It is, therefore, essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient postpetition financing. The preservation of estate assets, the Debtors' continuing viability and their ability to maximize value for stakeholders successfully, thus, depend heavily upon the expeditious approval of the relief requested herein.

53.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code,[17] a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

---

[17]     Section 364(c) of the Bankruptcy Code provides as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

54. Because the Debtors propose to obtain financing under the DIP Facility that is secured by first, second and/or third priority liens with respect to the Prepetition Collateral (subject only to the Carve-Out), and to prime certain of the liens securing the Prepetition ABL Priority Collateral and the liens of the Prepetition ABL Lenders in the Term Priority Collateral, by virtue of the operation of the First Priority Intercreditor Agreement, the approval of the DIP Facility is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

***Approval Under Section 364 of the Bankruptcy Code***

55. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

56. Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)  the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)  the credit transaction is necessary to preserve the assets of the estate; and

(c)  the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

<u>In re Aqua Assocs.</u>, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and finding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); <u>In re Ames Dep't Stores</u>, 115 B.R. at 37-39. The Mendelsohn Declaration and the Iwasaki Affidavit present evidence that these three elements are satisfied. <u>See</u> Iwasaki Affidavit at ¶¶ 29-36, 39-41; Mendelsohn Declaration at ¶¶ 14-17.

57.     The Debtors also seek approval of the DIP Facility under section 364(d)(1) of the Bankruptcy Code.[18] The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." <u>See</u> <u>Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.)</u>, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contacting numerous lenders" and was unable to obtain credit without a priming lien, it had met its burden under section 364(d)); <u>In re Dunes Casino Hotel</u>, 69 B.R. 784, 796 (Bankr. D.N.J. 1986) (holding that the debtor had made required efforts under section 364(d)(1) of the Bankruptcy Code based on evidence that the debtor had attempted

---

[18]     Section 364(d)(1) of the Bankruptcy Code provides as follows:

(d)(1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

unsuccessfully to borrow funds on an unsecured basis or secured by junior liens, but that at least three such lenders were willing to advance funds secured by a superpriority lien). In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy); Dunes Casino, 69 B.R. at 793 (noting that "[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

58.     The proposed DIP Facility would "prime" the liens of the Prepetition Lenders in the Priority ABL Collateral by granting DIP Liens in the Prepetition ABL Priority Collateral that are (a) *pari passu* with the Prepetition Liens of the Prepetition ABL Lenders and (b) senior to the Prepetition Liens of the Prepetition Term Lenders. The Prepetition ABL Lenders consent to the terms of the DIP Facility, including the priming of their liens, the use of Cash Collateral and the proposed adequate protection. As discussed in greater detail below, because (a) the Prepetition ABL Lenders have consented to the terms of the DIP Facility and (b) the DIP Liens do not prime the liens of the Prepetition Term Lenders in the Prepetition Term Priority Collateral, the Prepetition Term Secured Parties are deemed to consent to the terms of the DIP Facility, including the priming of their liens, the use of Cash Collateral and the proposed adequate protection, pursuant to the terms of the First Priority Intercreditor Agreement.

***The Debtors Were Unable to Obtain Necessary Financing on an Unsecured Basis***

59.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. and Loan

Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id. at 1088; see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

60. To obtain postpetition financing, the Debtors and their advisors approached numerous sophisticated commercial entities active in the debtor in possession financing market, including traditional banks, asset-based lenders, investment banks, hedge funds, private equity funds and institutional lenders (collectively, the "Potential Lenders"). The Debtors also sought financing from private equity funds that have expressed interest in purchasing at least a portion of the Debtors' assets in connection with the Sale Processes. No fewer than 19 Potential Lenders were contacted directly by Lazard regarding postpetition financing, only 8 of which executed confidentiality agreements so that they could be provided due diligence packages by the Debtors' advisors. See Mendelsohn Declaration at ¶ 14. Beginning with in-person and/or telephonic meetings in March 2009 and on several subsequent occasions, the Debtors and their advisors also approached the Prepetition ABL Lenders (approximately 9 institutions as of early 2009) and the Prepetition Term Lenders (approximately 40 institutions as of early 2009) to obtain postpetition financing. Through these discussions, the Debtors and Lazard effectively approached many of the major institutions that have experience

providing distressed financing. The Prepetition Term Lenders consistently declined to provide financing. While the Prepetition ABL Lenders other than DBNY have declined to provide new financing, they have consented to the use of their Cash Collateral. See id. at ¶ 14.

### *The Terms of the DIP Facility Are Fair, Reasonable and Appropriate*

61.     None of the Potential Lenders, including the Prepetition Lenders, was willing to make a postpetition loan either on an unsecured basis or any other basis. See id. at ¶ 15. The Mendelsohn Declaration reflects that the Debtors could not have obtained a postpetition financing facility of the type and magnitude required in these chapter 11 cases on an unsecured basis. See id. In fact, after an extensive search for financing from traditional lenders active in the debtor in possession financing market and from private equity funds that might be interested in providing bridge financing to ultimate ownership, the Debtors were unable to obtain any commitment for postpetition financing other than from the DIP Lender on the terms set forth in the Interim Order. See id. The DIP Facility, therefore, provides the only option for the Debtors to address their immediate postpetition financing needs. Moreover, the interest rate and lack of fees payable to the DIP Lenders under the Interim Order are superior to current debtor in possession financing market terms. The favorable terms were negotiated in conjunction with the protections provided to the DIP Lenders in the Accommodation Agreement. See id. As such, when considering all of the factors, the Debtors concluded that the DIP Facility was their best and only financing alternative. See id. The Debtors' efforts to seek necessary postpetition financing on terms more favorable than those of the DIP Facility from 19 large, sophisticated Potential Lenders satisfy the statutory requirements of section 364 of the Bankruptcy Code. See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor seeking financing under section 364(c) of the Bankruptcy Code made acceptable attempt to

obtain less onerous financing by speaking to several lenders that denied the loan request); Ames, 115 B.R. at 40.

62.    In addition, the proposed Interim Order provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lender are subject to the Carve-Out, which provides for (a) fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee, (b) payment of fees and expenses of case professionals and (c) chapter 7 "burial" type expenses if necessary. See Mendelsohn Declaration at ¶ 16. In Ames Department Stores, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that official committees and debtors' estates are adequately assisted by counsel and other professionals. Ames, 115 B.R. at 38.

63.    Likewise, the DIP Lender is charging no fees or other charges under the DIP Facility and merely seeks reimbursement of its professional fees. The Debtors submit that the absence of lender fees coupled with the very modest interest rate of prime plus 2% are well below the parameters of market fee structures for postpetition financing in the current environment. See Mendelsohn Declaration at ¶ 17.

### The DIP Facility is Necessary to Preserve Assets of the Debtors' Estates

64.    It is essential that the Debtors immediately obtain the financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and to make certain capital expenditures and satisfy certain working capital requirements of the Debtors' businesses. See Iwasaki Affidavit at ¶ 32. The DIP Facility and the use of Cash Collateral are also essential to provide the Debtors' various stakeholders, including customers, employees, vendors, service providers and other key constituencies, with confidence in the Debtors' ability to continue to operate as a going concern while they pursue the Sale Processes. As a result, the DIP

Facility is necessary to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. See id.

65.     The success of these chapter 11 cases depends on, among other things, (a) the Debtors' ability to meet their day-to-day working capital requirements without interruption or delay and (b) the confidence of the Debtors' stakeholders. See id. at ¶ 33. If the relief sought in this Motion is denied or delayed, the Debtors likely will experience business disruptions in the short term, stakeholder confidence may be destroyed and the Debtors' ability to maximize value for stakeholders through the Sale Processes may be damaged irreparably. See id. Further, pursuant to the Prepetition Term Credit Agreement and the Prepetition ABL Credit Agreement, the Debtors have pledged virtually all their cash and the proceeds of existing accounts receivable and inventory as collateral. See id. As a result, without immediate access to the Cash Collateral and new borrowing relief, the Debtors' business operations would grind to an almost immediate halt, which would seriously jeopardize, and may destroy, the going concern value of the Debtors' businesses. See id. In addition, the new liquidity under the proposed interim portion of the DIP Facility will ensure that the Debtors can make the payments requested by the First Day Pleadings, pay claims incurred in the ordinary course and provide assurances to the Debtors' customers that they will be able to deliver products during these chapter 11 cases. See id.

66.     As a result of the Debtors' recent liquidity constraints and in anticipation of the immediate need for the postpetition financing and the use of Cash Collateral, the Debtors have, in consultation with AlixPartners, LLP, as financial advisors to the Debtors, performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and AlixPartners, LLP have prepared the Budget outlining the Debtors' postpetition cash

needs. See id. at ¶ 34. The Budget was subsequently vetted and negotiated with the Prepetition ABL Agent and the North American OEMs with an eye toward prudent husbandry of resources during these cases. The Budget was also provided to the Prepetition Term Lenders. See id.

67.     The interim availability under the proposed DIP Facility along with the use of Cash Collateral will allow the Debtors to meet their projected cash needs and help provide assurances to the Debtors' suppliers, vendors and employees that they will be paid for postpetition services. See id. at ¶ 35. The liquidity provided by the DIP Facility, to be used in accordance with the Budget, also will provide assurances to the Debtors' customers that they will be able to deliver products during these chapter 11 cases. See id. Approval of interim borrowing under the DIP Facility thus is crucial to maximizing the value of the Debtors' estates. See id.

***The Prepetition Term Lenders are Deemed to Consent to the DIP Facility Pursuant to the First Priority Intercreditor Agreement and Section 510(a) of the Bankruptcy Code***

68.     In connection with agreeing to make loans and provide other financial accommodations to the Borrowers, the Prepetition ABL Lenders and the Prepetition Term Lenders entered into the First Priority Intercreditor Agreement. The First Priority Intercreditor Agreement sets forth the rights of the Prepetition ABL Lenders and Prepetition Term Lenders with respect to the collateral securing the payment and performance of the Debtors' Prepetition Obligations. It describes the priority of liens arising in favor of the Prepetition ABL Lenders and the Prepetition Term Lenders with respect to Common Collateral and was designed to operate in a wide range of contingencies, including the insolvency of the Debtors. First Party Intercreditor Agreement, Section 5.2(a); see HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.), 364 F.3d 355, 361 (1st Cir. Mass. 2004).

69.     The Prepetition ABL Lenders and the Prepetition Term Lenders agreed that the First Priority Intercreditor Agreement is a "subordination agreement" as such term is

used in section 510(a) of the Bankruptcy Code. First Priority Intercreditor Agreement, Section 5.9. A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another. <u>In re Best Products Co., Inc.</u>, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994). Section 510(a) of the Bankruptcy Code provides that a subordination agreement is enforceable "in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). Accordingly, bankruptcy courts must enforce lawful subordination agreements according to their terms. In re <u>Best Products Co.</u>, 168 B.R. at 70 (citing <u>In re Credit Indus. Corp.</u>, 366 F.2d 402, 410 (N.Y. 1966)).[19] Under New York law, when a contractual subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement, and the words of that agreement are given their plain, ordinary and usual meaning. <u>Id.</u> (citing <u>Hong Kong Export Credit, Inc. v. Dun & Bradstreet</u>, 414 F. Supp. 153, 158 (S.D.N.Y. 1975)).

70.     When interpreting contracts, New York courts apply the "familiar and eminently sensible proposition of law that, when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." <u>Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.</u>,  1 N.Y.3d 470, 475 (N.Y. 2004) (citations omitted).  New York courts have also emphasized this rule's special import "where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's

---

[19]     The court in <u>Best Products</u> also noted that "[t]o deprive lending institutions of the right to enforce lawful subordination agreements and require them to prove in each instance that they relied on such agreements in advancing funds to businesses would not only place in jeopardy literally billions of dollars of outstanding loans, but in all probability would prompt lending institutions to reconsider, and possibly curtail, their subordinated debt-financing activities to the detriment of the entire business community." <u>Best Products Co.</u>, 168 B.R. at 70.

length." Id. Where, as here, the agreement was negotiated by sophisticated parties, New York courts are "extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include," and "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." See id.; Worcester Creameries Corp. v. City of New York, 861 N.Y.S.2d 198, 201 (N.Y. Sup. Ct. App. Div. 2008).[20]

71.   Section 5.2 (a) of the First Priority Intercreditor Agreement provides, in relevant part:

> If the [Prepetition] ABL Agent or the other [Prepetition ABL Lenders] seek to consent (or not object) to any order under section 363 of the Bankruptcy Code for the use of collateral that constitutes all or any portion of the Common Collateral, ABL Priority Collateral, and Term Priority Collateral or seek to provide, or consent (or not object) to a third party providing, [the Debtors] with financing under section 364 of the Bankruptcy Code (a "DIP Financing"), with such DIP Financing to be secured by all or any portion of the Common Collateral, ABL Priority Collateral, and Term Priority Collateral, then the [Prepetition] Term Agent, on behalf of itself and the other [Prepetition Term Lenders], agrees that each [Prepetition Term Lender] (i) will be deemed to have consented to, and will not raise or support any objection to, the use of such collateral or such DIP Financing on the grounds of a failure to provide adequate protection for the [liens] securing the [Prepetition] Term Obligations, or any other grounds, and (ii) will not request or accept adequate protection or any other relief in connection with the use of such collateral or such DIP Financing except as set forth in paragraph 5.4 [of the First Priority Intercreditor Agreement] . . . .

See First Priority Intercreditor Agreement Section 5.2(a) (Financing Matters).[21] Under the plain and unambiguous language of this provision, once the Prepetition ABL Agent consents to the use

---

[20]   Section 9.5 of the First Priority Intercreditor Agreement states that the agreement shall be governed by New York law.

[21]   A copy of the First Priority Intercreditor Agreement is Attached hereto as Exhibit I.

of Cash Collateral and the terms of the DIP Facility, the Prepetition Term Lenders will be deemed to consent to the same terms, and may not object to such terms as long as the remaining provisions of Section 5.2(a) of the First Priority Intercreditor Agreement are satisfied.

72.    The consent of the Prepetition ABL Lenders will bind the Prepetition Term Lenders pursuant to Section 5.2(a) provided that (a) the Prepetition Term Agent retains its liens on the Prepetition ABL Priority Collateral, the Prepetition Term Priority Collateral and the Common Collateral, (b) as to the Prepetition Term Priority Collateral only, such liens securing the Prepetition Term Loan Obligations retain the same priority as existed prior to the commencement of the chapter 11 cases, and any lien securing the DIP Loans is junior and subordinate to the liens of the Prepetition Term Lenders on the Prepetition Term Priority Collateral, (c) all liens securing the DIP Loans shall be senior to or in parity with liens on the Prepetition ABL Priority Collateral securing the Prepetition ABL Obligations, and (d) if the Prepetition ABL Agent is granted a replacement or adequate protection lien on the postpetition assets of the Debtors, then the Prepetition Term Agent also receives a replacement or adequate protection lien on such postpetition assets. See First Priority Intercreditor Agreement Section 5.2(a) (Financing Matters).

73.    The terms of the DIP Facility and the Interim Order satisfy each of the conditions in (a), (b), (c) and (d) above. Specifically, the liens to be provided to the DIP Secured Parties in connection with the proposed DIP Facility will not alter or affect the priority of the Prepetition Term Lenders' liens on the Prepetition Term Priority Collateral and are junior and subordinate to the liens of the Prepetition Term Lenders with respect to the Prepetition Term Priority Collateral. Also, the liens securing the proposed DIP Facility will be *pari passu* with the liens securing the Prepetition ABL Obligations as contemplated under Section 5.2(a) of the First

Priority Intercreditor Agreement. Because each of (a), (b), (c) and (d) above are satisfied, the Prepetition Term Lenders are deemed to consent, and are precluded from objecting to the proposed DIP Facility or the Debtors' use of Cash Collateral.

*Application of the Business Judgment Standard*

74.     After appropriate investigation and review of market alternatives, the Debtors' management has concluded that the DIP Facility provides the best alternative available in the circumstances of these chapter 11 cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"), rev'd on other grounds, 134 F.3d 188 (3d Cir. 1998); cf. Group of Inst. Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

75.     The Debtors have exercised sound business judgment in determining that a postpetition credit facility is appropriate for these cases. The terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates, and the Debtors could not obtain postpetition financing from any other lending source on any other terms. See Iwasaki Affidavit at ¶ 36. Accordingly, the Court should grant the Debtors authority to enter into the DIP

Facility and obtain funds from the DIP Lender on the secured and administrative "superpriority" basis described above, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code

### Authority to Enter into the Accommodation Agreement

76.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under applicable case law in this circuit, if a debtor's proposed use of property pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved. See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

77.     The standards set forth above are met here. The additional liquidity made possible by the Accommodation Agreement is essential to the Debtors' ability to fund their postpetition operations as set forth in the Budget. In fact, the approval of the Accommodation Agreement is a condition precedent to the effectiveness of the DIP Facility, the Debtors' ability to borrow thereunder and the Debtors' ability to use the Cash Collateral. Under the Accommodation Agreement, the North American OEMs will provide the Debtors with certain financial accommodations that (a) provide immediate sources of additional liquidity and (b) provide comfort to the Prepetition ABL Lenders that the value of the Prepetition ABL Priority Collateral will be preserved such that they are willing to allow the Debtors to use the Cash Collateral. Specifically, as described above, pursuant to the terms of the Accommodation Agreement, the North American OEMs have agreed to limit their right to set off their accounts

payable to 3% of the face value of the outstanding invoiced amount. Without this protection of the value of the Debtors' accounts receivable, it is doubtful that the Prepetition ABL Lenders would agree to the use of their Cash Collateral during these cases. In addition, the North American OEMs' commitment to purchasing inventory pursuant to the terms of the Accommodation Agreement provides addition protection to express that the value of the Prepetition ABL Priority Collateral will be maintained and is an important component of the adequate protection provided to the Prepetition Lenders for the use of the Cash Collateral. Without these accommodations, and the others more fully described above, the DIP Lender and the North American OEMs would not agree to enter into the DIP Facility and the Debtors' ability to maintain value as going concerns would be substantially impaired or destroyed.

### Request for Use of Cash Collateral

78. By this Motion, the Debtors also request authority to use Cash Collateral on the terms set forth in the proposed Interim Order. The Debtors' use of Cash Collateral, including the Debtors' proposal to make Adequate Protection Payments (as defined in the Interim Order) to the Prepetition ABL Lenders, provide the Adequate Protection Replacement Liens to the Prepetition Lenders and provide the Adequate Protection Superpriority Claims to the Prepetition Lenders in connection with such use, is authorized pursuant to section 363(c) of the Bankruptcy Code. Section 363(c) of the Bankruptcy Code provides as follows:

(1)     If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2)     The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless —

> (a)     each entity that has an interest in such cash collateral consents; or
>
> (b)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c). Section 363(e) of the Bankruptcy Code further provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest . . . ."

79.     The Debtors must have sufficient liquidity to continue to operate their businesses as a going concern and to carry out their plans to sell the Debtors' assets as a going concern for the direct benefit of all stakeholders. It is, therefore, essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain authority to use Cash Collateral. The preservation of estate assets, the Debtors' continuing viability and their ability to maximize value for stakeholders successfully, thus, depend heavily upon the expeditious approval of the relief requested herein.

### The Prepetition Lenders Consent or are Deemed to Consent to the DIP Financing, the Proposed Adequate Protection and the Use of Cash Collateral

80.     It is a fundamental principle that adequate protection need not be provided where the affected party consents. Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp., 153 F.3d 61, 69 (2d Cir. 1998) (stating that any use of cash collateral would require the Debtor to seek consent of the creditor or provide adequate protection); In re Blackwood Assocs., L.P., 165 B.R. 108, 111 (Bankr. E.D.N.Y. 1994) (stating that a creditor cannot claim that it is not receiving adequate protection since it agreed to fees being paid for cash collateral in a stipulation). As described above, the Prepetition ABL Lenders have consented to the terms of the DIP Facility, the Debtors' use of Cash Collateral and the adequate protection proposed in the

Interim Order. As a result of such consent, the Prepetition Term Lenders are deemed to consent to the same terms pursuant to Sections 5.2 and 5.4 of the First Priority Intercreditor Agreement.

81.     As discussed in paragraphs 68 through 73 above, by virtue of the operation of Section 5.2 of the First Priority Intercreditor Agreement, the Prepetition Term Lenders are deemed to consent to the use of Cash Collateral and may only seek adequate protection in accordance with Section 5.4 of the First Priority Intercreditor Agreement. Section 5.4(a) of the First Priority Intercreditor Agreement limits the rights of the Prepetition Term Lenders to request or object to adequate protection when the Prepetition ABL Lenders consent. Under Section 5.4(a), the Prepetition Term Lenders cannot object to any request for adequate protection by the Prepetition ABL Lenders, including the payment of fees, expenses or other amounts under section 506(b) of the Bankruptcy Code or otherwise. See First Priority Intercreditor Agreement Section 5.4(a) (Adequate Protection). The Prepetition Term Lenders may seek or request adequate protection of their interests in the Prepetition ABL Priority Collateral *only if* the Prepetition ABL Agent or any Prepetition ABL Lender is granted adequate protection of its interests in the Prepetition ABL Priority Collateral consisting of postpetition liens on Prepetition ABL Priority Collateral and superpriority claims in connection with the DIP Facility and the Debtors' use of Cash Collateral. See id.

82.     If the Prepetition ABL Agent (or any Prepetition ABL Lender) is granted adequate protection described above, then the Prepetition Term Agent (on behalf of itself and the Prepetition Term Lenders) may seek or accept adequate protection of their interests in the Prepetition ABL Priority Collateral consisting *only of* (a) postpetition liens on the same collateral, subordinated to the liens securing the Prepetition ABL Obligations and the DIP Obligations, and (b) superpriority claims for any diminution in value of the Prepetition Term

Lenders' interests in the Prepetition ABL Priority Collateral, junior to the superpriority claims granted to the Prepetition ABL Lenders in the Prepetition ABL Priority Collateral. See First Priority Intercreditor Agreement Section 5.4(a) (Adequate Protection). The proposed adequate protection to be provided to the Prepetition Term Secured Parties outlined above satisfies each of the criteria under Section 5.4(a). Therefore, the Prepetition Term Secured Parties are contractually obligated to accept the adequate protection provided in the Interim Order. As a result, the Debtors submit that the consent of the Prepetition ABL Lenders and the deemed consent of the Prepetition Term Lenders provides them the authority to use the Prepetition Lenders' Cash Collateral on a consensual basis pursuant to section 363(c)(2)(a) of the Bankruptcy Code.

### *The Use of Cash Collateral is Necessary to Preserve Assets of the Debtors' Estates*

83.     Even if the Debtors lacked the consent of the Prepetition Lenders to use Cash Collateral as requested herein (which they do not), the Debtors submit that they satisfy the requirements for non-consensual use of cash collateral pursuant to section 363(c)(2)(b) of the Bankruptcy Code. The Debtors require immediate access to their cash and the proceeds of existing accounts receivable and inventory to operate their businesses, preserve and maximize their value as going concerns and complete sales of the Debtors' assets on a going concern basis. A bankruptcy court may hold a preliminary hearing to authorize a debtor in possession's use of cash collateral if the estate will suffer immediate and irreparable harm if not permitted to use cash collateral during the period prior to a final determination on a motion. Fed. R. Bankr. Proc. 4001(b)(2). Immediate and irreparable harm exists where the absence of relief would impair a debtor's value as a going concern. Cf. Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.), 91 Civ. 8319, 1992 WL 154200, at *1 (S.D.N.Y. June 18, 1992) (discussing "immediate and irreparable harm" under Bankruptcy Rule 4001(c)(2)). Bankruptcy Rule

4001(b)(2) is designed to help the estate by permitting a preliminary hearing to be conducted as quickly as possible if there is an emergency need for the use of cash collateral, such as the need to meet payroll or to preserve assets. <u>See</u> 9-4001 Collier on Bankruptcy (15th ed.) § 4001.05[3].

84.     The proposed emergency use of the Cash Collateral is an essential component to affording the Debtors the liquidity they need to maintain the value of their estates and to continue the orderly going concern sale process that they commenced prepetition. A critical need for the liquidity sufficient to preserve the Debtors' value as a going concern is sufficient to meet the immediate and irreparable harm standard. <u>See</u> <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. 34, 36 n.2, 38 n.4 (Bankr. S.D.N.Y. 1990).

## The Prepetition Lenders are Adequately Protected

85.     Section 363(c)(2) contemplates that the Court may authorize the Debtors to use Cash Collateral even without the consent of the secured parties with an interest therein. <u>See</u> 11 U.S.C. § 363(c)(2)(B). In considering whether to authorize use of cash collateral, however, upon a party's request, a court must find that the interests of the holder of the secured claim are adequately protected if they do not consent to such use. In addition, under section 364(d)(1) of the Bankruptcy Code, if interests in collateral are to be "primed," then such "primed" parties must be adequately protected. 11 U.S.C. § 364(d)(1). The principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. <u>See</u> <u>In re 495 Central Park Avenue Corp.</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11); <u>In re Continental Airlines, Inc.</u>, 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same); <u>In re Beker Indus. Corp.</u>, 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (same).

86.     The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code. Section 361 sets forth three non-exclusive forms of adequate protection: (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and (c) such other relief as will result in an entity realizing the indubitable equivalent of its interest in property. 11 U.S.C. § 361. As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection. In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987). Ultimately, adequate protection is determined on a case-by-case basis in light of the particular facts and circumstances presented. Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis); In re 495 Central Park, 136 B.R. at 631 (stating that, although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive and suggests a broad and flexible definition); Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n.3 (Bankr. E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)); see also 3 Collier on Bankruptcy (15 ed.) § 363.05 (stating that, although section 361 provides examples of adequate protection, "[t]hese examples are not intended to be limiting, and the circumstances of the case will dictate the necessary relief to be given").

87.     Courts have held that adequate protection may also be demonstrated by a showing that the secured creditor's interest in the collateral is preserved by the debtor's use of the

cash collateral in a manner that maintains or enhances the collateral's value.  See In re Atrium Dev. Co., 159 B.R. 464, 470 (Bankr. E.D. Va. 1993) ("Adequate protection is typically established by the fact that cash is being used to maintain and enhance the value of the underlying income producing real property in which the creditor also usually holds a security interest."); Federal Nat. Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship, 153 B.R. 204, 214 (N.D. Ill. 1993) (authorizing the debtor to reinvest rental income in the operation and maintenance of the rental property, thereby increasing the value of the creditor's interest in its collateral); In re Salem Plaza Associates, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected when cash collateral was used to pay necessary operating expenses); In re Constable Plaza Assocs., L.P., 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); McCombs Props. VI, Ltd. v. First Texas Savings Association (In re McCombs Props. VI, Ltd.), 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (holding that committing to use cash collateral for operating expenses substantially eliminated the risk of diminution in the secured creditor's interest in the collateral).

88.     In this case, the Prepetition Lenders' interests in the Prepetition Collateral are adequately protected by virtue of (a) the Debtors' expenditure of cash in accordance with the Budget, which will maintain and enhance the collateral's value so that assets can be sold as going concerns, and (b) the grant of the Adequate Protection Replacement Liens on, and the Adequate Protection Superpriority Claims against, the Debtors' assets.  The Budget, which was prepared with the assistance of the Debtors' professional advisors and vetted with the DIP Lender's, the Prepetition ABL Lenders' and the North American OEMs' advisors, provides an additional layer of adequate protection because it ensures that the Debtors' expenditure of cash will be limited to

only those items that are necessary and essential to fund the Debtors' operations and preserve the value of the Prepetition Collateral during the Sale Processes. If funds are not made available to pay these essential items on an emergency basis, the Debtors' businesses likely would be forced immediately to shut down, and the value of the Prepetition Lenders' collateral would substantially decline. See Iwasaki Affidavit at ¶ 37. Accordingly, there is no harm done to the Prepetition Lenders' interests by the Debtors' proposed use of the Cash Collateral since such use and the corresponding maintenance and preservation of the Debtors' businesses protects the value of the Prepetition Collateral.

89. In particular, the Prepetition ABL Priority Collateral, which includes an estimated $43.5 million in eligible accounts receivable from the Debtors' customers, would be subject to risk of significant decline in the event of a shut down of the Debtors' operations. In such an event, the Debtors would be unable to continue to supply the North American OEMs and their other customers, thus resulting in a potential breach of the Debtors' obligations under the supply agreements with their customers. The Debtors anticipate that their customers would take the position that they are entitled to set off any damages that may result from the Debtors' failure to satisfy their obligations to the customers against the accounts receivable owed by such customers to the Debtors. In fact, certain of the Debtors' customers already have indicated their intention to effectuate such a setoff in the event that the Debtors are unable to perform their supply obligations. The Debtors estimate these potential setoffs would reduce significantly (if not eliminate altogether) the Debtors' accounts receivable and, therefore, destroy the value of this portion of the Prepetition ABL Priority Collateral. As a result, a significant portion of the value of the Prepetition ABL Priority Collateral is directly dependant on the Debtors' continued operation as a going concern, which is possibly only if the Debtors are authorized to enter into

the Accommodation Agreement, make borrowings under the DIP Facility and use the Cash Collateral. See id. at ¶ 38.

90. Furthermore, in connection with the DIP Facility and the Accommodation Agreement, the North American OEMs have agreed (a) to limit their right of setoff with respect to their accounts receivable and (b) to be obligated to purchase (i) finished component parts manufactured for the North American OEMs and (ii) all useable and merchantable raw materials used to manufacture finished component parts for the North American OEMs. These additional measures of adequate protection, which "bullet proof" the value of the Prepetition ABL Priority Collateral even in a the event of a default under the DIP Facility, simply would not be available to the Prepetition Lenders if the relief sought in this Motion is not granted.[22]

91. Based on the foregoing, the Debtors believe the Prepetition Lenders require no other or further adequate protection. Nevertheless, in order to remove any doubt that their interests in the Prepetition Collateral are adequately protected, the Debtors also are granting the Prepetition Lenders Adequate Protection Replacement Liens, Adequate Protection Superpriority Claims, Adequate Protection Payments (for the Prepetition ABL Lenders), and certain informational rights (each described in the Interim Order).

92. In sum, the Prepetition Lenders are adequately protected because (a) the Debtors' use of the Cash Collateral in accordance with the Budget will serve only to maximize

---

[22] Even independent of the proposed use of Cash Collateral to preserve the Debtors' going concern value, the Prepetition ABL Lenders' interests in the collateral are already adequately protected simply by virtue of the existence of the substantial value of the Prepetition ABL Priority Collateral in comparison to the amount outstanding under the Prepetition ABL Credit Agreement. A sufficient equity cushion alone may constitute adequate protection. See In re Gallegos Research Corp., 193 B.R. 577, 584 (Bankr. D. Colo. 1995); In re Tucker, 5 B.R. 180, 182 (Bankr. S.D.N.Y. 1980) ("An adequate "cushion" can itself constitute adequate protection with nothing more.") The current amount outstanding under the Prepetition ABL Credit Agreement is approximately $35.49 million. The Debtors estimate that the value of the Prepetition ABL Priority Collateral is approximately $72.9 million, consisting of approximately $43.5 million in eligible accounts receivable and $29.4 million in estimated inventory.

the value of the Prepetition Collateral, (b) a sufficient equity cushion exists that protects the Prepetition ABL Lenders' interests from any diminution in value and they will receive the Adequate Protection Payments, (c) the Prepetition ABL Lenders and Prepetition Term Lenders will be granted replacement liens (in the priorities described in the Interim Order) to the extent of any diminution in the value of their interests in the Cash Collateral and their other Prepetition Collateral, and (d) the Prepetition Lenders will a be entitled to an administrative expense claim under section 507(b) of the Bankruptcy Code (in the priorities described in the Interim Order) to protect the Prepetition Lenders to the extent the other adequate protection provided in the Interim Order proves inadequate to secure against any diminution in the value of the their interests in the Cash Collateral. The Debtors submit that any one of the foregoing would suffice as adequate protection and, taken together, the Prepetition Lenders clearly are more than adequately protected under the circumstances.

93.     If authorized, the requested relief would protect the going concern value of the businesses while the Debtors seek to continue with the process of selling their assets on a going concern basis and would, therefore, augment or preserve the value of the Cash Collateral rather than diminish it. In contrast, if the requested use of the Cash Collateral is not promptly authorized, the value of the Prepetition Collateral would be significantly eroded to the detriment of all parties in interest. Accordingly, the Debtors respectfully submit that no other or further adequate protection is necessary or required.

94.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an interim hearing and authorize the Debtors use of Cash Collateral in order to (a) maintain and finance the ongoing operations of the Debtors, (b) finance the Debtors' efforts to

sell the Debtors' assets on a going concern basis and (c) avoid immediate and irreparable harm

and prejudice to the Debtors' estates and all parties in interest.

## Request for Authority to Make
## Interim Borrowings Under the DIP Facility

95.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than

15 days after the service of such motion.  Upon request, however, the Court is empowered to

conduct a preliminary expedited hearing  on the motion and authorize the obtaining of credit to

the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining

requests for interim relief under this rule, courts apply the same business judgment standard

applicable to other business decisions.  See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449

(Bankr. D. Colo. 1985); see also Ames, 115 B.R. at 38.  After the 15-day period, the request for

financing is not limited to those amounts necessary to prevent disruption of the debtor's business,

and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its

business.  See, e.g., Simasko, 47 B.R. at 449.

96.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court

conduct an interim hearing and authorize the Debtors use of $56,000,000 of Cash Collateral and

to borrow $11,700,000 million in cash under the DIP Facility, each on an interim basis, in order

to (a) maintain and finance the ongoing operations of the Debtors, (b) finance the Debtors' efforts

to market and sell the Debtors' assets on a going concern basis and (c) avoid immediate and

irreparable harm and prejudice to the Debtors' estates and all parties in interest.[23] See Iwasaki Affidavit at ¶ 39.

97.    The Debtors have an urgent and immediate need for cash to continue to operate. As described above, the Debtors do not have sufficient funds with which to operate their businesses through only the use of Cash Collateral. Absent authorization from the Court to obtain secured credit and use the Cash Collateral, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The use of the Cash Collateral and the availability of interim loans under the DIP Facility will provide the necessary assurance to vendors, employees and customers of the Debtors' ability to meet their near-term obligations and preserve the value of their assets as the Debtors seek to sell their assets on a going concern basis. See id.

## **Good Faith**

98.    The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length. See Iwasaki Affidavit at ¶ 40. Therefore, the DIP Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Facility, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

---

[23]    As described in the Budget, the interim financing and use of Cash Collateral requested herein is necessary to make disbursement in the first 30 days of the Debtors' chapter 11 cases, to satisfy obligations necessary to maintain their ordinary course business operations, including payments to (or on account of): trade vendors and raw material suppliers; equipment and real property lessors; utilities; freight and shipping vendors; capital service and maintenance; insurance; taxing authorities; employees; plant consolidation and rigging expenses; and professional fees.

## Request for Modification of the Automatic Stay

99.     The proposed DIP Facility contemplates a modification of the automatic stay imposed by operation of section 362 of the Bankruptcy Code to (a) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Lenders and the DIP Lender hereunder and (b) authorize the Prepetition ABL Lenders to retain and apply payments and proceeds of Prepetition Collateral (including Cash Collateral) and DIP Collateral as provided in the Interim Order.

100.    Such stay modification provisions are customary features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  Accordingly, the Debtors respectfully request that this Court modify the automatic stay to the extent contemplated by the proposed Interim Order.

## Request for Final Hearing

101.    Finally, pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully request that this Court set a date for the Final Hearing that is no later than 15 days from the Petition Date and approve the provisions for notice of such Final Hearing that are set forth in the proposed Interim Order.

## Notice

102.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) counsel to The Bank of New York Mellon and JPMorgan Chase Bank, N.A., as agents for the Debtors' prepetition senior secured credit facility; (c) counsel to DBNY, in its capacity as DIP Lender, DIP Agent and as agent for the Debtors' prepetition asset-backed secured revolving credit facility; (d) counsel to The Bank of New York Trust Company, N.A., in its capacity as the indenture trustee for the

remaining outstanding Notes; (e) counsel to the North American OEMs; (f) counsel to Asahi Tec; (g) counsel to RHJI; and (h) those creditors holding the 50 largest unsecured claims against the Debtors' estates. The Debtors submit that no other or further notice need be provided.

## **No Prior Request**

103. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (a) enter the Interim Order, granting the interim relief requested herein that is substantially in the form annexed hereto as Exhibit A; (b) enter the Final Order; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: May 28, 2009
      New York, New York

Respectfully submitted,

\s\ Ross S. Barr
Richard H. Engman
Ross S. Barr
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

- and -

Heather Lennox
Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION