# EXHIBIT A

# LIEN PRIORITY CHART

# Interim Order - Relative Lien Priority

| Lien Priority | Prepetition ABL Priority Collateral | Prepetition Term Priority Collateral | Unencumbered Collateral |
|---|---|---|---|
| First Priority | DIP Facility Liens, Prepetition ABL Facility Liens and Prepetition ABL Facility Adequate Protection Replacement Liens, all on a <u>pari passu</u> basis | Prepetition Term Facility Adequate Protection Replacement Liens | DIP Facility Liens and ABL Facility Adequate Protection Replacement Liens, all on a <u>pari passu</u> basis |
| Second Priority | Prepetition Term Facility Adequate Protection Replacement Liens | Prepetition Term Facility Liens | Prepetition Term Facility Adequate Protection Replacement Liens |
| Third Priority | Prepetition Term Facility Liens | DIP Facility Liens, Prepetition ABL Facility Liens and Prepetition ABL Facility Adequate Protection Replacement Liens, all on a <u>pari passu</u> basis | |

All Prepetition ABL Facility Adequate Protection Replacement Liens and DIP Liens are subject to the Carve-Out and certain prepetition senior third party liens.

# EXHIBIT B

# DIP TERMS

CHI-1706315v1

## DIP Facility Terms

To request a DIP Loan borrowing, the Borrower shall notify the DIP Agent of such request by telephone not later than 12:00 noon, New York City time, two (2) business days before the date of the proposed borrowing. Each such telephonic borrowing request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the DIP Agent of a written borrowing request in a form approved by the DIP Agent and signed by the Borrower. Each such telephonic and written borrowing request shall specify the date, which shall be a business day, and amount of such borrowing. Promptly following receipt of a borrowing request in accordance herewith, the DIP Agent shall advise each Customer of the details thereof and of the amount of such Customer's participation therein. The Customers shall fund their respective participations no later than 12:00 noon on the business day prior to the date of the proposed borrowing. The DIP Agent shall have no obligation to fund DIP Loans unless the full amount of the Customers' participations therein have been fully funded and are immediately available to the DIP Agent. Each borrowing of DIP Loans shall be in an amount that is an integral multiple of $100,000 and not less than $500,000. The proceeds of such borrowing shall be funded into the following account: [     ].

All payments made by the Debtors under the DIP Facility will be made without setoff, counterclaim or other defense. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income or net profits of the DIP Secured Parties pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such DIP Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, the Debtors agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under the DIP Facility, after withholding or deduction for or on account of any Taxes, will not be less than the amount otherwise payable thereunder. If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Debtors agree to reimburse the DIP Secured Parties, upon the DIP Agent's written request, for taxes imposed on or measured by the net income or net profits of the DIP Secured Parties pursuant to the laws of the jurisdiction in which they are organized or in which the principal office or applicable lending office of the DIP Secured Parties is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which they are organized or in which the principal office or applicable lending office of the DIP Secured Parties is located and for any withholding of taxes as they shall determine are payable by, or withheld from, the DIP Secured Parties, in respect of such amounts so paid to or on behalf of the DIP Secured Parties pursuant to the preceding sentence and in respect of any amounts paid to or on behalf of them pursuant to this sentence. The Debtors will furnish to the

DIP Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Debtors. The Debtors agree to indemnify and hold harmless the DIP Secured Parties, and reimburse the DIP Secured Parties upon their written request, for the amount of any Taxes so levied or imposed and paid by them.

The DIP Agent will be entitled to the benefits and protections which correspond to the benefits and protections afforded to the Prepetition ABL Agent pursuant to Article VIII of the Prepetition ABL Credit Agreement, which is incorporated herein _mutatis mutandis_.

To the extent that the Prepetition ABL Collateral Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition ABL Security Document, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Prepetition ABL Security Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order. The Prepetition ABL Collateral Agent shall serve as agent for the DIP Agent for purposes of perfecting their respective security interests and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

# EXHIBIT C

# BUDGET

CHI-1706315v1

# METALDYNE
## Cash Flow - Budget [A]

USD,000's
United States
Week Ending

| | Preliminary 5/22/2009 | 5/29/2009 (5/27 Filing) | 3 6/5/2009 | 4 6/12/2009 | 5 6/19/2009 | 6 6/26/2009 | 7 7/3/2009 | 8 7/10/2009 | 9 7/17/2009 | 10 7/24/2009 | 11 7/31/2009 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $71 | $3,096 | $1,026 | ($409) | $546 | $2,162 | $846 | $2,162 | ($44,849) | ($8,554) | ($18,035) | $71 |
| **Receipts** | | | | | | | | | | | | |
| Customer Receipts | 4,656 | 8,792 | 8,010 | 3,806 | 6,136 | 4,757 | 3,206 | 2,608 | 3,986 | 1,915 | 3,960 | 51,827 |
| Net Instant Receipts - Big Three | - | 1,564 | 1,564 | 3,711 | 3,711 | 3,711 | 3,711 | 2,608 | 3,986 | 6,331 | 6,331 | 29,591 |
| Proceeds from DIP Loans | 6,491 | - | - | - | - | - | - | - | - | - | - | 6,491 |
| Pre-petition A/R Customer (DIP) Loans [C] | - | - | - | - | - | - | - | - | - | - | - | - |
| Process Charge | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts [D] | 700 | 2,000 | 2,000 | 2,000 | 2,000 | 3,250 | 1,783 | 300 | 300 | 1,783 | 3,250 | 12,950 |
| Total Receipts | 11,127 | 9,492 | 11,564 | 9,594 | 16,361 | 13,502 | 6,919 | 2,608 | 10,429 | 10,329 | 13,541 | 106,195 |
| **Disbursements** | | | | | | | | | | | | |
| A/P Taxes | (20) | - | - | - | - | - | - | - | - | - | - | |
| Leases | (2,280) | (6,960) | (6,962) | (6,796) | (6,514) | (6,514) | (6,507) | (6,507) | (6,898) | (6,898) | (6,898) | (57,905) |
| Utilities | - | (993) | (94) | (406) | (608) | (550) | (951) | (951) | (743) | (743) | (743) | (8,591) |
| Freight | (2,280) | - | - | - | - | - | (5,359) | - | - | - | - | |
| Capital Expenditures | (150) | (150) | (150) | (188) | (533) | (315) | (315) | (315) | (315) | (315) | (356) | (1,925) |
| Insurance Payments | (129) | (129) | (129) | (533) | (275) | (816) | (143) | (143) | (172) | (172) | (172) | (2,729) |
| Taxes | (175) | (50) | (56) | (624) | (386) | (285) | (49) | (93) | (93) | (93) | (897) | (813) |
| Employee | - | - | - | (44) | - | - | - | - | (251) | (251) | (131) | (1,144) |
| Total A/P Disbursements | (2,458) | (8,321) | (6,982) | (6,796) | (7,815) | (7,570) | (6,607) | (6,507) | (8,140) | (8,140) | (8,148) | (72,169) |
| Payroll | (700) | (700) | (2,851) | (2,851) | (2,851) | (2,827) | (2,827) | (2,885) | (1,357) | (8,532) | (3,100) | |
| Salaried Severance / Incentive | (815) | (100) | (100) | (100) | (100) | (100) | (25) | (25) | (25) | (25) | (25) | (656) |
| Benefits | (638) | (660) | (660) | (660) | (691) | (825) | (496) | (966) | (965) | (856) | (3,100) | (7,816) |
| Operating Disbursements | (4,024) | (9,657) | (10,632) | (10,652) | (11,050) | (12,256) | (10,249) | (11,327) | (10,224) | (10,221) | (11,953) | (99,934) |
| **Operating Cash Flow** | $4,024 | $841 | $941 | $566 | $546 | $4,312 | $6,919 | ($8,627) | ($17,474) | $108 | $1,588 | $10,125 |
| Plant Consolidation / Paging | - | - | - | - | - | - | - | - | - | - | - | |
| Utility Deposits | - | (188) | (188) | (188) | (188) | (188) | (188) | (188) | (188) | (188) | (188) | |
| Primary Professional Fees [legal Advisors] [B] | (767) | (469) | (420) | (533) | (533) | (616) | (325) | (780) | (325) | (487) | (697) | (1,600) |
| Other Professional Fees [legal Advisors] [B] | (413) | (183) | (275) | (624) | (386) | (285) | (325) | (325) | (325) | (325) | (687) | (5,783) |
| Bank Fees / Interest pay | - | (146) | (56) | (44) | (251) | (49) | (93) | (93) | (93) | (93) | (93) | (3,677) |
| ABL Draw (Paydown) | (3,847) | (1,080) | (1,225) | (1,776) | (994) | (1,904) | (1,106) | (3,973) | (1,510) | (272) | (416) | (17,144) |
| Cumulative disbursements before ABL paydown [a] | (59) | - | - | - | - | - | - | - | - | - | - | (17,414) |
| **Total Cash Inflow (Outflow)** | ($6,491) | ($465) | ($459) | $457 | $546 | $2,162 | ($32,786) | ($8,554) | ($18,035) | ($500) | $401 | ($18,201) |
| **Ending Cash Balance** | $3,096 | $1,026 | ($409) | $546 | $2,162 | $846 | $2,162 | ($44,849) | ($8,554) | ($18,035) | ($18,201) | ($18,201) |

## LIQUIDITY

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrowing Base | $38,974 | $38,835 | $37,610 | 35,634 | 34,840 | 32,536 | 31,936 | 27,857 | 26,347 | 29,441 | 31,033 | |
| Permitted Variance % | 20.0% | 20.0% | 12.5% | 12.5% | 12.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | |
| Cumulative Permitted Debt. Variance [b] | (7,795) | (2,961) | (4,394) | (3,906) | (43,420) | (53,414) | (63,963) | (67,963) | (79,910) | (90,593) | (103,734) | |
| Less: Loudry Block | (10,455) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | |
| Less: ABL Drawn | (29,915) | (28,835) | (27,610) | (26,634) | (25,640) | (22,936) | (21,830) | (17,857) | (16,347) | (16,347) | (16,347) | |
| Total Availability | 59 | - | - | (1,776) | (994) | (1,904) | (1,106) | (3,973) | 2,534 | 2,534 | 3,665 | |
| Customer pre-petition loan | - | - | - | - | - | - | - | - | - | - | - | |

## NOTES:

**[A]** Consistent with the calculation of the borrowing base under the existing revolving credit facility, the Budget excludes all receipts and disbursements associated with shipments of parts into and out of the Company's Ramos, Mexico facility (which is a maquiladora under Mexican law). In the normal course, Metaldyne utilizes cash received from the Ramos facility as described in the Metaldyne's Cash to make certain disbursements on behalf of this entity. This facility is expected to be self-funding during the 13-week period. As such, disbursements made that relate to the Ramos, Mexico location are not included as disbursements for purposes of the permitted variance calculation.

[a] Calculated as cumulative disbursements before ABL paydown times the permitted variance % for the period.
[b] The permitted variance calculation also excludes disbursements made on behalf of Ramos (USA, see note).

**[B]** Assumes Advisory Success fee is paid from asset sale proceeds.
**[C]** Represents collection of pre-petition A/R owing to domestic. Metaldyne entities associated with direct production agreement negotiations. Metaldyne is also working with customers for the purchase of inventory. Inventory collections are not included and amount is to be determined.
**[D]** Other receipts includes estimated reimbursement for direct production operating costs, lease cost reimbursement, and associated overhead allocations. Estimates are based on preliminary assessment of budgeted costs. Metaldyne continues to work with customers to develop specific production schedules and reimbursement of related costs.

CONFIDENTIAL

# EXHIBIT D

# ACCOMMODATION AGREEMENT

# ACCOMMODATION AGREEMENT

Metaldyne Corporation, on behalf of itself and its domestic and Canadian controlled affiliates and subsidiaries (collectively, "<u>Supplier</u>"), Deutsche Bank AG New York Branch in its capacity as DIP lender and DIP agent ("<u>Lender</u>"), Ford Motor Company ("<u>Ford</u>"), General Motors Corporation ("<u>GM</u>"), Chrysler LLC, on behalf of itself and Chrysler Motors LLC ("Chrysler US"<u>) and</u> Chrysler de Mexico S.A. de C.V. ("<u>Chrysler Mexico</u>", and together with Chrysler US, "<u>Chrysler</u>"), as debtor-in-possession under Case No. 09-50002 pending in the United States Bankruptcy Court for the Southern District of New York, ("<u>Chrysler</u>", and together with Ford and GM the "<u>Customers</u>" or each individually, "<u>Customer</u>") enter into this accommodation agreement ("<u>Agreement</u>") on May ___, 2009.

## BACKGROUND

A.    Pursuant to various supply agreements and/or releases issued by the Customers and accepted by Supplier ("<u>Purchase Orders</u>" or individually, a "<u>Purchase Order</u>"), Supplier is obligated to manufacture the Customers' requirements of certain component parts, service parts and assembled goods, as modified to reflect any approved engineering changes (collectively, "<u>Component Parts</u>" or individually, a "<u>Component Part</u>").  Notwithstanding anything herein to the contrary, component parts produced at the New Castle facility shall not be included in the definition of Component Parts or be governed by this Agreement.

B.    Supplier has determined that it must file petitions under chapter 11 of title 11 of the United States Code (the "<u>Chapter 11 Cases</u>") to effect a sale (the "<u>Sale Process</u>") of all or substantially all of their assets used in connection with their powertrain, balance shaft module and chassis businesses (the "<u>Sale Assets</u>").  To continue its operations during the Chapter 11 Cases, Supplier must obtain debtor-in-possession financing ("<u>DIP Financing</u>") in accordance with, among other things, financing orders to be entered in the Chapter 11 Cases (the interim and final of such orders, the "<u>Financing Orders</u>").

C.    Metaldyne Company LLC ("<u>Metaldyne Company</u>") is a borrower under a revolving credit facility (as amended and with all related loan and security documents, the "<u>Prepetition ABL Loan Documents</u>") pursuant to the ABL Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate Holdco, Inc. ("<u>Metaldyne Intermediate</u>"), Deutsche Bank AG New York Branch (the "<u>Prepetition ABL Agent</u>") (as administrative agent and collateral agent), JPMorgan Chase Bank, N.A. (as syndication agent) and Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central) (as co-documentation agents) and the other lender parties thereto (the "<u>Prepetition ABL Lenders</u>" and, together with the Prepetition ABL Agent, the "<u>ABL Secured Parties</u>").  In addition, Metaldyne Company is a borrower under a senior secured credit facility (as amended and with all related loan and security documents, the "<u>Prepetition Term Loan Documents</u>" and, together with the Prepetition

ABL Loan Documents, the "<u>Prepetition Loan Documents</u>") pursuant to the Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate, The Bank of New York Mellon (the "<u>Prepetition Term Agent</u>" and, together with the Prepetition ABL Agent, the "<u>Prepetition Agents</u>") (as administrative agent and collateral agent), Citicorp North America, Inc. (as syndication agent), Deutsche Bank Securities Inc. (as documentation agent) and the other lender parties thereto (collectively, the "<u>Prepetition Term Lenders</u>" and, together with the Prepetition Term Agent, the "<u>Term Secured Parties</u>"). The ABL Secured Parties and the Term Secured Parties are collectively referred to herein as the "<u>Prepetition Lenders</u>." To secure the indebtedness outstanding under the Prepetition Loan Documents, the Prepetition Lenders have prepetition liens on substantially all of Supplier's assets.

D.    The Lender has agreed to make the DIP Financing available to the Supplier subject to, among other things, receiving funded Participations (as defined below) and the financial accommodations from the Customers set forth herein (collectively, the "<u>Customer Accommodations</u>"). The DIP Financing will be structured as a Replacement ABL Agreement (as such term is defined in the Intercreditor Agreement, dated as of January 11, 2007, among Deutsche Bank AG, New York Branch, as collateral agent, JPMorgan Chase Bank, N.A., as collateral agent, Metaldyne Intermediate and Metaldyne Company) (the "<u>Intercreditor Agreement</u>").

E.    In consideration for the Customers agreeing to provide such financial and other accommodations, the Customers have requested that Supplier provide them with certain assurances and acknowledgments in connection with the protection of the supply of Component Parts.

F.    Subject to the terms of this Agreement, the Customers have agreed to provide certain financial and other accommodations to Supplier, and Supplier has agreed to provide the Customers with certain supply protection.

Based on the foregoing recitals and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows:

## TERMS AND CONDITIONS

1.    **Conditions to Effectiveness**

The effectiveness of this Agreement is expressly conditional upon occurrence of the following conditions precedent ("<u>Effective Date</u>"):

a.    All parties to this Agreement have executed this Agreement;

b.    Supplier has commenced the Chapter 11 Cases;

c.    The entry of an interim Financing Order or other orders acceptable to the Customers that, among other things, approve this Agreement and the NCM Production Agreement (as defined infra.) as postpetition contracts in the Chapter 11 Cases.

2. **Term of the Agreement**

For purposes of this Agreement, the "Term" shall mean the period from the Effective Date through the earlier of (the "Termination Date") (i) the Sale Date (defined below); (ii) the occurrence of an Event of Default (as defined below); and (iii) sixty (60) days following the Effective Date; provided that Supplier may extend the Term for up to two consecutive fifteen (15) day periods (the "Extended Termination Date") if Sale Orders have been entered and if the Supplier would still have funding availability under the terms of the Financing Orders. If sufficient funding is not available for any such fifteen (15) day period, without an obligation to provide any additional funding, the Customer agree to consider, in good faith, a request for additional funding.

3. **Sale Process**

A.    **Sale Process**. Upon commencement of the Chapter 11 Cases, Supplier will continue the sale processes that were commenced prepetition to effect one or more transactions for the sale of Supplier's assets (each, a "Sale") with the intent to close such Sales within 60 days of the Effective Date of this Agreement (the closing date of the latest of such sales, the "Sale Date").

B.    **Milestones**. The following milestones will apply to the Sale Process (each a "Milestone" or collectively, the "Milestones"):

(i)    **Letter(s) of Intent**. Obtain, by June 5, 2009 a letter or letters of intent for the sale of some or all of the Sale Assets.

(ii)    **Definitive Agreement(s)**. Execute by June 15, 2009 one or more definitive purchase agreements and file motions to approve the Sales on the terms outlined in the definitive purchase agreements with the Bankruptcy Court; provided however that such dates shall be extended by the Customers, in the event Supplier has made good faith progress toward finalizing definitive purchase agreements, such that an extension will not jeopardize a closing by the date set forth below.

(iii)    **Sale Process Approval(s)**. Obtain by June 24, 2009 an order approving procedures for the approval of one or more Sales and any applicable bidding protections and procedures;

(iv)    **Sale Approval Order(s)**. Obtain, by July 27, 2009, an order from the Bankruptcy Court approving one or more Sales.

(v)    **Closing Date(s)**. Close one or more Sales by the later of 60 days after the Effective Date or the Extended Termination Date (the "Closing Deadline").

Supplier further agrees to provide the Customers updates, as frequently as is requested by the Customers, on the status of the Sale Process. Subject to (i) the execution of confidentiality agreements in form and substance mutually agreeable to Supplier and Customers and (ii) any other confidentiality agreements that Supplier may have with

third parties, Supplier will promptly provide Customers copies of all nonprivileged documents and information relating to the Sale Processes including, but not limited to, offering memoranda, letters of interest or intent and executed copies of asset purchase agreements.

C.    RemainCo. It is Supplier's current intent that the assets of Supplier that are not sold pursuant to the Sale Processes, together with the remaining liabilities of the estates (collectively, "Remainco"), unless previously liquidated, sold, will either be transferred to a creditors' trust through a plan of reorganization or otherwise wound down, any such particular course of action depending entirely upon the available resources to fund such particular course of action. The DIP Financing will not fund the costs to operate the non-US plants in Remainco that are identified in a nonexclusive list on Exhibit A (the "Remainco Plants"), as may be supplemented by written notice by Supplier to the Customers. The cash management order entered in the Chapter 11 Cases will permit the prepetition cash management system related to Supplier's Canadian affiliate to continue postpetition. If, after expiration of the Term, any Customer desires production of Component Parts from any of the Remainco Plants, the applicable Customer and Supplier will work in good faith to determine the cost of such production, which cost Customer shall bear. The Customers and the Supplier will work together to transfer the Component Part production of each of the Customers from the Remainco Plants prior to the expiration of the Term, with the costs of transfer to be funded by the applicable Customer. The costs of transfer may, at the option of the applicable Customer, be funded as additional advances under the DIP Financing by the purchase of additional Participations (as defined, infra.). In the event that the Sale Process is not concluded by Termination Date or, if applicable the Extended Termination Date, the DIP Financing will terminate. For clarity, the DIP Financing will not fund extraordinary costs associated with the Remainco facilities after the Term expires.

4.    **Funding**

A.    As a condition to the Lender's provision of the DIP Financing, the Customers will each purchase their respective percentages (55.9% Ford; 24.3% Chrysler; and 19.8% GM) of subordinated, last-out participations in loans made under the Replacement ABL Agreement, as and when required, in accordance with a Budget (as defined below) and pursuant to the terms of a Subordinated Participation Agreement reasonably acceptable to Lender and the Customers (each, a "Participation"). The aggregate amount of the Participations will be $18,508,789 (the "Maximum DIP Participations") plus the amounts of any participations acquired pursuant to Section 6.J. herein,

B.    Supplier, Lender and the Customers will agree on the terms of a budget (the "Budget") pursuant to which Supplier will conduct its operations during the Term. The Budget will contain an agreed-upon funding for Supplier's incentive and severance costs, Supplier's professional fees and the fees of the UST.

C.    Subject to the Customers providing the Customer Accommodations, Lender will provide Supplier with the DIP Financing pursuant and subject to the terms and conditions of the Financing Orders during the Term in accordance with the Financing Orders.

D.    During the Term, no Customer will impose pricedowns or price reductions on Supplier with respect to the Component Parts.

E.    Within 10 days of the Effective Date, each Customer will acknowledge to Supplier its account payable balance and its tooling payable balance. Each Customer will use its commercial best efforts to resolve any disputed tooling invoices within 10 days of the Effective Date.

## 5.    Customers' Accommodations

A.    Limitation on Setoffs. As to all accounts payable owing by each Customer to Supplier generated or existing prior to the expiration of the Term, including prepetition payables ("Customer Accounts"), each Customer agrees, solely for the benefit of Lender and the Prepetition Lenders, or any assignee or successor of Lender, not to exercise its respective rights of setoff and/or recoupment, including, without limitation, in connection with any prior, existing or future defaults under any Purchase Orders, or any defenses, rights and claims (including without limitation claims for any incidental, special or consequential damages), other than to the extent of the Allowed Setoffs, Tooling Setoffs and Material Setoffs,  (each defined below); provided, however, (i) under no circumstances may Allowed Setoffs exceed 3% percent ("Cap") of the face amount of any invoices or accounts payable; (ii) once an Allowed Setoff is deducted from a particular invoice or account payable, no further Allowed Setoffs may be taken against such invoice or account payable, and (iii) if an invoice or account payable is paid, a Customer will have no right after that payment to assert an Allowed Setoff in respect of that payment.  Any Allowed Setoffs in excess of the Cap will be rolled over and available for deduction against any subsequent payment of any invoices or accounts payable; provided, however, under no circumstances will an Allowed Setoff against any invoice or account payable exceed the Cap.

(i)    For purposes of this Agreement:

(a)    "Allowed Setoffs" means any setoff, recoupment or deductions, whether for defective or nonconforming products, quality problems, unordered or unreleased parts (other than for parts produced for an Inventory Bank pursuant to this Agreement) returned to Supplier, short shipments, hostage payments made to material vendors that are not Material Setoffs and for which Supplier has requested in writing (or, if relating to a period prior to the Effective Date, that Customer has identified to Supplier in writing) that such Customer make such payments, misshipments, premium freight charges (not caused by a Customer), improper invoices, mispricing, duplicate payments or billing errors, and

professional fees and costs incurred by one law firm and one financial advisory firm per Customer and related to Supplier incurred by each Customer individually (the "Professional Fees") but excluding any incidental, special or consequential damages arising from or relating to such items.

(b)     "Material Setoffs" means any setoff or recoupment for (A) direct payments to vendors by a Customer for the cost of materials, services or components purchased by a Customer pursuant to Supplier's written request and used by Supplier in connection with the production of Component Parts, if such material, services or components could have been purchased by Supplier but for the vendor's refusal to sell to Supplier on a COD basis, or (B) materials, services or components supplied to Supplier by a Customer in the ordinary course of business to be used in production of Component Parts for which in either instance written notice of the amount paid to vendors or Supplier, or the invoice amount of such items provided in the ordinary course, as applicable, for those materials, services or components ("Direct Payment Notice") has been received by Lender and the Prepetition ABL Agent in advance of the next reporting date for the borrowing base under the Prepetition ABL Loan Documents.  Material Setoffs may be taken only against accounts that arise from shipments made by Supplier to Customer from and after the one business day following receipt by Lender and the Prepetition ABL Agent of the Direct Payment Notice.

(c)     "Tooling Setoffs" means any  payments to tooling vendors, including progress payments, necessary to receive possession of tooling (i) over which Lender or the Prepetition Lenders do not possess a priority lien with respect to such tooling; or (ii) which payments are necessary to secure the release of tooling where the affected Customer(s), acting in good faith, determine(s) insufficient time exists to exercise judicial remedies to obtain possession or control of such tooling.  Tooling Setoffs may be taken only (1) against amounts owed by Customer to Supplier under the applicable tooling purchase order, and (2) only as to which a written notice of the amount paid to the tooling vendor(s) has been provided to the Lender and the Prepetition Agents in advance of such intended setoff.  If the amount due to the Supplier under the tooling purchase order for particular tooling, less any amounts paid to the tooling vendor by a Customer, exceeds, as a result of a prior partial payment by the Supplier to the tooling vendor, the amount owed to the tooling vendor,  the applicable Customer shall pay the excess (less the cost to complete if applicable) to the Prepetition Term Lenders on account of Supplier, or to Supplier in the event

that Lender's and the Prepetition Lenders' claims have been satisfied in full.

(ii)     Customers reserve and do not waive any rights and interests they respectively may or would have against the Supplier but for this Agreement, including the right to assert affirmative claims against Supplier and setoffs asserted for defense purposes. Customers further agree that they will not assert any such rights and interest against any purchaser in a Sale, including any assignee of a purchase order if the Customers, or a Customer, consent(s) to such assignment.

B.     Inventory Purchase Agreement.

(i)     Upon the occurrence of an Inventory Trigger Event (defined below), each Customer will purchase and pay for, within 30 days of the Inventory Trigger Event, all of (collectively, "Customer Inventory"): Supplier's raw materials (including purchased components),and finished goods inventory related to that Customer's Component Parts that are usable (defined below) by the Customer or the Customer's new supplier and merchantable (defined below) and any Component Parts that are the subject of unsatisfied releases that are or were provided to Supplier and under which Supplier actually produced Component Parts ("Releases") from (i) Lender or the Prepetition ABL Agent, as applicable, (if Lender or the Prepetition ABL Agent obtains possession of and the right to sell such inventory by way of repossession, voluntary surrender, judicial intervention or otherwise), (ii) a trustee, receiver or interim receiver lawfully acting for the benefit of the Lender ("Trustee") or (iii) Supplier, if Lender and the Prepetition ABL Agent so elect.

(ii)     Notwithstanding anything contained in this Agreement to the contrary, Customers will be required to purchase Customer Inventory pursuant to this Agreement only upon the occurrence of an Inventory Trigger Event,  provided that Lender, the Prepetition ABL Agent, Supplier or a Trustee, as the case may be, can make the Customer Inventory available for pick up by the applicable Customer free and clear of all liens and security interests within 30 days after the occurrence of an Inventory Trigger Event; provided, however, that the determination of whether the Customer Inventory is usable and merchantable shall be made on the date of the Customer Inventory is available for pick up by the applicable Customer ("Determination Date").

(iii)     For purposes of this Agreement, the following definitions shall apply:

(a)     "merchantable" means merchantable as that term is defined in U.C.C. § 2-314 and in conformance with applicable Purchase Order or supply contract specifications, reasonably applied.

(b)     "Inventory Trigger Event" means the first to occur of the following events without payment of all of the obligations of the

Supplier to the Lender and the Prepetition ABL Agent: (i) as to each Customer separately, such Customer resources some or all of its Component Part production from Supplier (provided that resourcing by a Customer of less than all of its business shall be deemed to be a Trigger Event only as to Customer Inventory related to the resourced Component Parts); (ii) expiration of the Term; (iii) conversion of any of the Supplier's chapter 11 cases to a chapter 7 case under the Bankruptcy Code; and (iv) an Event of Default by Supplier that is continuing and is not waived by the applicable Customer.

(c)    "usable" means finished goods and raw materials, as the case may be, relating to the Component Parts or tooling which are usable by Customer (or the Customer's alternative supplier(s) of the Component Parts) in connection with manufacturing the Component Parts for which a Customer has unsatisfied requirements as of the Determination Date but in all cases in quantities not less than those called for by any Releases (including so-called fabrication or similar Releases relating to the procurement of raw materials and any inventory bank builds requested by a Customer) existing as of the Determination Date less any portion of such releases that are satisfied by the delivery of Component Parts or Customer Inventory prior to the Determination Date, it being understood that Customer Inventory in amounts called for by unsatisfied Releases (including any requested inventory bank builds) shall be deemed usable for purposes of this Agreement.

C.    Purchase Price.  The price for Customer Inventory to be purchased under this Agreement ("Purchase Price") will be calculated as follows:

(i)    for raw materials – 100% of Supplier's actual and documented cost of the raw materials excluding premium freight charges not requested by the Customer; and

(ii)    for finished Component Parts – 100% of the existing Purchase Order price (in effect on the date of purchase of the Inventory) to Customer.

All prices are F.O.B. Supplier.  Upon a Customer's request made within two business days after an Inventory Trigger Event, and subject to the Customer's agreement to purchase the resulting finished goods, Lender and the Prepetition ABL Agent will permit, Supplier will complete, work-in-process inventory after an Inventory Trigger Event subject to agreement by Lender, the Prepetition ABL Agent, Supplier, and Customer on a budget to cover the costs incurred for such production and the price to Customer of the resulting finished goods, and payment in advance by the applicable Customer or Customers of all costs associated with completing the work in process pursuant to such budget; provided, further, that such production shall be completed no later than five business days after the Inventory Trigger Event.

In the event merchantable and usable raw material is used in the production of Component Parts for more than one Customer ("Common Materials"), the Common Materials will be allocated to each Customer, without regard to any portion allocated to any other customer, on a pro-rata basis based upon each party's respective sales percentage at the applicable plant over the 4 month period ending April 30, 2009.

Customers agree to pay directly to the Prepetition ABL Agent or, if the claims of the Prepetition ABL Secured Parties have been paid in full in cash, Lender (for Supplier's account) the Purchase Price of their respective Customer Inventory purchased pursuant to this Agreement without setoff, recoupment or deduction for any claims or rights Customers may otherwise have against Supplier or the Prepetition Lenders, which rights and claims Customers otherwise reserve and do not waive, except as otherwise provided under this Agreement.

D. Change of Account Payable Terms. For those shipments of the Component Parts invoiced or shipped on and after the Effective Date by the Supplier, including its Canadian affiliate, through the expiration or termination of the Term, all Customers except Chrysler Mexico will make payments on net immediate terms. Chrysler Mexico will continue its current payment terms of 10/25 prox. For purposes of this Agreement "net immediate" shall mean payments on average within 8 days after receipt by the Customer. Ford agrees that all pre-Effective Date accounts payable will be paid no later than 15 days after the Bankruptcy Filing, provided that an interim Financing Order has been entered before that time. GM agrees that it shall on May 29, 2009 pay all accounts payable for all goods received by GM and reflected in GM's disbursement system as of the close of business on May 28, 2009. Chrysler agrees that Chrysler Mexico shall pay its reconciled pre-Effective Date payable of approximately $1.61 million on or before two business days of the Effective Date and shall use its best efforts to reconcile its disputed Component Parts accounts within fourteen days of the Effective Date with such reconciled amounts paid within the next payment cycle. Chrysler agrees that Chrysler Mexico shall pay its reconciled pre-Effective Date payable of approximately $1.61 Million on or before two business days of the Effective Date and shall use its best efforts to reconcile its disputed Component Part accounts within fourteen days of the Effective Date with such reconciled amounts paid within the next payment cycle. Chrysler US shall pay its reconciled accounts as set forth in the NCM Production Agreement

E. Exclusion of New Castle Facility. Nothing in this Agreement shall pertain to the New Castle Component Parts, which shall be governed by the terms of the NCM Production Agreement dated May , 2009, which agreement shall be approved by the Bankruptcy Court. Chrysler shall have no rights under this Agreement unless it enters into a mutually acceptable NCM Production Agreement on or before the Effective Date. Chrysler US asserts that Supplier supplies goods or services critical to the going concern value of Chrysler US' businesses or the consummation of a sale transaction among Chrysler LLC and certain subsidiaries and New Carco Acquisition LLC and an indirect wholly owned subsidiary of Fiat S.p.A.

9

F.   Bankruptcy.  In the event a Customer files a petition for relief under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court during the Term, that Customer will file a motion on its petition date to seek Court approval and direction to assume and continue performance of its obligations under this Agreement, including timely payment of all prepetition amounts owed Supplier, and will diligently prosecute such motion to obtain expedited approval thereof.  No rights of any Customer hereunder and no obligations of Supplier to any Customer shall be of any force and effect unless such Customer is in full compliance with all of its obligations under this Agreement, including the funding of Subordinated Participations as set forth above.

G.   Resourcing.  Until the first to occur of (i) the expiration or termination of the Term or; and (ii) an Event of Default occurs, the Customers will not resource and will not further dual source the Component Parts, other than Component Parts manufactured at the Remainco Plants or the Component Parts that the Supplier and the Customer mutually agree in writing may be (the "Remainco Component Parts").  The foregoing limitation shall not prohibit the Customers from taking action during the Term to prepare for resourcing such as entering into discussions and sending requests for proposals to alternative suppliers regarding the production of the Component Parts Supplier will fully cooperate and assist the Customers in their respective resourcing preparations, provided, however, that (i) reasonable steps will be taken to protect confidential or trade-secret information and the Excluded Technology from competitors, and (ii) the costs for such preparations are contained within the Budget or are paid for directly by the Customer seeking such preparations.  For clarity, this Section is not intended to constitute a commitment under this Agreement for the Customers to retain any of their business with Supplier after the expiration or termination of the Term or to consent to assignment of any of their respective purchase orders, and (b) the Customers may immediately begin to resource Component Parts manufactured at the Remainco Plants.

For clarity, the foregoing limitation does not include or prohibit (i) changes in releases due to normal business fluctuations, (ii) cessation of production due to product or program changes.

H.   Survival. The obligations of the Customers described in Clauses A, B, C and D above are continuing obligations that survive the expiration of the Term.

6.   **Supplier's Obligations**

A.   Continued Production.  Supplier will continue to manufacture the Component Parts for the Customers in accordance with the terms of their respective Purchase Orders and related releases; provided that, in the case of the Remainco Plants, Supplier has sufficient liquidity or financing to do so.  Supplier agrees to notify Customers' respective line purchasing agent of any threat or threats to shipment of Component Parts on a timely basis, promptly upon learning of that threat or threats. Except as specifically provided in this Agreement, this Agreement is not intended to

modify the terms and conditions of the Customers' respective Purchase Orders, which terms and conditions otherwise remain in full force and effect. In the event of any inconsistency between the terms of this Agreement and the terms of the Customers' respective Purchase Orders, the terms of this Agreement will control.

B. <u>Bankruptcy Filing</u>. Supplier will immediately file a Voluntary Petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). As promptly as possible upon the filing of its Chapter 11 Cases, Metaldyne will file such necessary motions to approve and effectuate the DIP Order.

C. <u>Purchase Order Assignment</u>. No Purchase Order of any Customer may be assigned to any proposed purchaser or assignee of the purchase order without the express prior written consent of the Customer party to the Purchase Order.

D. <u>Inventory Banks</u>. Supplier will build for each Customer an inventory bank of Component Parts in accordance with a schedule to be provided to Supplier by each Customer. Supplier will immediately begin producing inventory banks on the later of the Effective Date or the date on which the schedule is received by the Supplier and ship inventory-bank parts as they are produced. The Customers will pay for the Component Parts in accordance with the payment terms set forth in this Agreement. Supplier's obligation to build the inventory bank parts will be subject to: (i) receipt of a schedule by each Customer, (ii) the procurement of parts by Supplier, provided, Supplier shall immediately notify any Customer of an inability to procure parts that will impair the ability of the Supplier to produce that Customer's inventory bank; (iii) the Budget, provided, however, that if the Debtor asserts it is unable to produce the inventory bank for any customer due to budgetary limitation, such Customer may advance the amounts necessary to commence or continue the inventory bank directly to the Supplier and the Supplier shall thereupon immediately commence or continue its production, (iv) reasonably applied internal capacity limitations (e.g., machine capacity and manpower limitations); and (v) Customer's payment of verifiable, incremental out-of-pocket costs incurred by Supplier in connection with building the Inventory Bank including, but not limited to, all special packaging and handling costs (e.g., disposable dunnage, wrapping, coating, etc.) ("<u>Incremental Bank Costs</u>"). Supplier's production of an inventory bank for a Customer cannot disrupt normal production for other Customers of Supplier. Supplier will fulfill releases for "all time buys" of past-model service Component Parts if requested to do so by a Customer, which shall be part of the inventory bank. Upon a Customer's request for an inventory bank, Supplier shall promptly provide a schedule to the Customer setting forth the Incremental Bank Costs Supplier anticipates that it will incur in connection with building the inventory bank ("<u>Bank Build Budget</u>"). The Customers are not obligated to reimburse Supplier for any Incremental Bank Costs that have not been disclosed to the Customer and approved in writing before being incurred and Supplier is not obligated to commence production of an inventory bank before such approval. Supplier will ship the Inventory Bank to the locations designated in writing by each Customer, as produced, and each Customer will pay for its inventory bank according to the terms of this Agreement. The Customers agree that, to the extent that the inventory banks consist of Component

Parts other than Remainco Component Parts and a Sale occurs, the Customer will negotiate in good faith with the successful purchaser with respect to the manner in which the Component Parts will be utilized by the Customer.

Supplier will not produce inventory banks for Supplier's other customers ("Other Customers") unless (x) such Other Customer agrees to provide all of the accommodations provided by the Customers or other accommodations which have a reasonably equivalent economic impact, or (y) producing inventory banks for the Other Customer does not utilize available capacity that could be used to build inventory banks requested by Customers and such Other Customers agree in writing to piece price increases that reasonably compensate Supplier for all incremental costs incurred in producing the inventory bank, including premium labor costs.

E. Cooperation in Resourcing Business. If it becomes necessary to do so and is otherwise permitted under this Agreement, and, (for clarity, as to Remainco Component Parts, immediately upon the Effective Date), Supplier will cooperate and use its best efforts assisting Customers in moving the production of Component Parts to one or more replacement suppliers; provided that the costs of such cooperation are paid directly by the applicable Customer outside the Budget. Supplier's assistance will include, without limitation, providing, among other things, Customers and its agents and consultants copies of tool lineups, tool processing sheets, bills of materials, PPAP packages, source schedules of materials, parts purchases from sub-suppliers, part prints, tool drawings and such other data and materials as may be reasonably necessary for resourcing, and by providing Customers and their agents, consultants, employees and potential successor suppliers reasonable access to Supplier's manufacturing facilities for the purpose of inspecting Tooling (defined below) and the manufacture of the Component Parts and to remove Customer Tooling and other Customer-owned property, if requested; provided however, that (i) in no event shall potential successor suppliers or competitors of Supplier have access to (I) Supplier plants for which there is a non-resourcing commitment in effect, or (II) as to plants for Remainco Component Parts which contain the Excluded Technology (defined below); have access without Supplier's prior written consent, which consent shall not be unreasonably withheld, and notwithstanding anything herein to the contrary, in no event shall such assistance or access include any information or access involving processing technologies or formulas pertaining to the Excluded Technology, as defined below..

F. Access. Supplier agrees that Customers and their designees, agents and representatives shall have reasonable access to Supplier's operations, books and records at any time during regular business hours, or outside of regular business hours upon reasonable request and prior notice, for the purposes of meeting with Supplier's representatives and monitoring Supplier's compliance with the terms of this Agreement and any other agreements and contracts between Supplier and Customers including, but not limited to, the Purchase Orders; monitoring production of the Component Parts and providing assistance with production of Component Parts if Customers deem it to be necessary; provided however, that (i) in no event shall potential successor suppliers or competitors of Supplier have access to Supplier plants for which there is a

non-resourcing commitment in effect, or (II) as to Remainco plants which contain the Excluded Technology (defined below) have access without Supplier's prior written consent, which consent shall not be unreasonably withheld; and (ii) notwithstanding anything herein to the contrary, in no event shall such access include any access to information, including books or records involving processing technologies or formulas pertaining to the Excluded Technology, as defined below.

G. <u>Confidentiality</u>. Supplier further acknowledges and agrees that it will preserve and protect each customer's confidential or proprietary information, including any intellectual property, from unauthorized use and disclosure.

H. <u>Information</u>. Supplier will provide to Customers any financial reporting a Customer may reasonably request. Supplier further agrees to meet, as reasonably requested by a Customer, to provide updates (in form, content and presentation as reasonably requested by Customer) of its financial condition, and any material changes to its operations, financial condition, lending relationship, and supplier relationships.

I. <u>Access and Security Agreement</u>. With respect to each Customer, Supplier will enter into an access and security agreement with respect to the Supplier's Canadian facility.

J. <u>Other Customers</u>. For all Other Customers identified in Exhibit B for which Supplier produces Component Parts during the Term, Supplier shall, no later than 14 days after the Effective Date: (i) charge, retroactive to the Effective Date, a surcharge above the applicable purchase order price in an amount designed to sufficiently cover costs incurred by Supplier for all Component Parts shipped to the Other Customers and to fund such Other Customers' equitable portion of the operating losses incurred by Supplier during the Term, which surcharge shall be reasonably acceptable to the Customers, (ii) require that the Other Customers pay their share of any required material and/or Hostage Payments (their share will be calculated based upon their respective portion of shipments or outside process services from that particular third party vendor making up any required Hostage Payments) and (iii) cause such Other Customer to pay all outstanding accounts receivable and obtain an agreement from such Other Customers to pay for Component Parts on net immediate terms as that term is defined in Section 5(D) above. To the extent an Other Customer refuses to pay the surcharge, or otherwise comply with the terms of this section, after the expiration of such 10 day period, Supplier agrees that it will not use any Customer Funding and other accommodations provided by the Customers pursuant to this Agreement to fund that Other Customer's production. Notwithstanding anything herein to the contrary, an Other Customer shall not include Honda or Nissan, to the extent that, on or before 10 days after the Effective Date, either of them agrees to purchase participations in the DIP funding, which participations shall increase in the Maximum DIP Participations. Contemporaneously with the purchase of a participation interest, Honda and/or Nissan, as the case may be, shall confirm in writing its agreement to the terms and conditions of this Agreement and such parties shall thereupon be deemed to be "Customers" for all purposes of this Agreement.

K. <u>License on Intellectual Property</u>. Notwithstanding anything in this Agreement to the contrary and subject to the liens of the Prepetition Lenders, and in consideration for the accommodations granted by Customers to Supplier under this Agreement, Supplier grants, effective upon an Event of Default, or as to a Remainco Component Part effective upon completion of resourcing such Remainco Component Part, to each Customer and their assignee(s) or designee(s) that are not competitors of Supplier (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property, ("<u>License</u>"). This section is not intended to limit or otherwise restrict any rights granted to Customers in their Purchase Orders or any other agreement, but is intended to expand those rights. Moreover, nothing in this Agreement may be construed as an admission by any Customer of the validity of Supplier's claimed rights to Intellectual Property, including an admission that a license is required by Customers to make, have made, sell, offer for sale and/or import its Component Parts. Customers will handle the Intellectual Property in accordance with the same confidentiality and other practices employed by Customers to safeguard their own most valuable intellectual property against unauthorized use and disclosure.

The term "Intellectual Property" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly sells to Customers including, without limitation, everything defined as "intellectual property" under 11 U.S.C. §101, as amended from time to time. Notwithstanding anything herein to the contrary, "Intellectual Property" shall not include the: (i) metal forming or forging technology relating to Supplier's Sintered businesses located in the North Vernon, PA, Ridgway, PA and St. Mary's, PA plants, or (ii) die casting or tooling technology relating to Supplier's Die Casting and Valve Body businesses located in the Niles, IL or Twinsburg, OH plants, (iii) tooling technology relating to Supplier's Punchcraft business located in Warren, MI. or (iv) technology related to the damper business in Thamesville, Ontario or (v) any Intellectual Property utilized by Suppliers' non-US and non-Canadian affiliates (individually and collectively, the "Excluded Technology"), for which no license is granted, but Intellectual Property shall include any tool CAD models and mathematical data used for the creation of Customer owned tooling, tooling and engineering drawings and CMM programs and fixtures, all of which Supplier acknowledges are owned by the respective Customer.

7. **Tooling Acknowledgment.**

A. The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, used in connection with the manufacture of Component Parts for Customers. The term "Unpaid Tooling" means Tooling manufactured for Customers for which Customers have not made full payment under the applicable purchase order with Supplier. The term "Supplier Owned Tooling" means Tooling which Supplier asserts is not owned by Customers and which is not subject to a purchase order issued by Customers. The term "Customer Tooling" means all Tooling other than Unpaid Tooling and Supplier Owned Tooling which is currently being used to manufacture Customers' Component Parts, whether under direct agreements between Supplier and Customers or agreements between Supplier and third parties.

B. Supplier acknowledges and agrees that Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customers, and (iii) held by Supplier (and, to the extent that Supplier has transferred the Customer Tooling to any third parties, by those third parties) as bailees-at-will.

C. Supplier will use commercially reasonable efforts to provide to Customers, within 30 days after the Effective Date, a list of Supplier Owned Tooling and Unpaid Tooling relating to Customers' Component Parts ("Tooling Lists"). Customers will provide assistance to Supplier in preparing the Tooling Lists as reasonably requested by Supplier. Customers reserve the right to dispute any Tooling List provided by Supplier. If Customers disagree with a Tooling List, Supplier and Customers will meet and attempt, in good faith, to resolve the dispute. If the dispute cannot be resolved by Supplier and Customers within 30 days after Customers' receipt of the Tooling List, the matter will be jointly submitted to a third party to be selected by Supplier and Customers or the Bankruptcy Court for expedited resolution. Any Tooling used to manufacture Customers' Component Parts not included in the Tooling List will be deemed Customer Tooling. If Supplier fails to timely provide a Tooling List, all Tooling will be deemed Customer Tooling.

D. If there is a dispute between Supplier and Customers over whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, and Customers will have the right to immediate possession of the Tooling (and Supplier may not withhold delivery of possession of the Tooling to Customers pending resolution of the dispute), but the Tooling will remain subject to any valid lien of Supplier or any claim or right to payment of Supplier for the disputed amount (despite Supplier's relinquishment of possession).

E. Once the purchase order price of an item of Unpaid Tooling has been paid, it will be included in the definition of Customer Tooling.

F.  Supplier has no right or title to, or interest in, Customer Tooling, but has only the obligation to hold as bailee-at-will and use Customer Tooling solely to manufacture Customers' Component Parts.

G.  The acknowledgements, rights and obligations contained in this Section 4 (i) are in addition to the rights of Supplier and Customers under the Purchase Orders or any other agreement between Supplier and Customers currently in effect, and (ii) will continue in effect after the expiration of the Term or the termination of this Agreement.

H.  Supplier grants to Customers permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customers determine that it is reasonably necessary to do so to reflect its interests in its Customer Tooling. Supplier also authorizes Customers to affix any plate, stamp, or other evidence of Customers' ownership upon each item of its Customer Tooling.

8.  **Options.**

A.  Supplier grants to Customers an irrevocable and exclusive option ("Option") to purchase, free and clear of the lien of the Lender and the Prepetition ABL Lenders, but subject to the lien of the Prepetition Term Lenders, exercisable on the expiration of the Term, any Supplier Owned Tooling, any returnable containers or dunnage, and any machinery or equipment and related or ancillary items which are owned by Supplier and dedicated exclusively to the manufacture, assembly or transport of Component Parts for Customers (collectively, "Dedicated Equipment"), for a price, subject to the Prepetition Term Agent's consent, (i) equal to the orderly liquidation value of any Dedicated Equipment as determined by the Stout Resius Ross appraisal of January 2007; or (ii) agreed to by Supplier, the Prepetition Term Agent and Customers. The Option may be exercised ("Exercise Period") immediately upon an Event of Default (defined below), the expiration of the Term or the earlier termination of this Agreement, or as to Remainco Component Parts, for each Customer, upon completion of resourcing the applicable Remainco Component Parts. The parties agree to cooperate in good faith to develop a list of the Dedicated Equipment within 30 days after the Effective Date.

B.  Any Dedicated Equipment purchased under this Section 8 will be free and clear of all liens, claims, and encumbrances (other than the lien of the Prepetition Term Lenders), and Customers will also be granted (for no additional consideration) a License as necessary to use and maintain the Designated Equipment. This Section 8 is not intended to limit any rights granted to Customers under their respective Purchase Orders, including rights concerning licensing and other Intellectual Property, but is intended to expand those rights.

C.  Supplier acknowledges that the prices above constitute commercially reasonable prices for the Dedicated Equipment (including the related License) and the License and that any sale under this Section 8 will be deemed to be commercially reasonable in all respects, including method, time, place, and terms. Upon exercise of the Option and payment of the applicable purchase price, Customers will have the right

to take immediate possession of the Dedicated Equipment purchased, to use the License without further payment of any kind, and to own, operate, use, enjoy, sell, assign, transfer or convey the Dedicated Equipment (and related License), and Supplier agrees to cooperate with Customers in its taking possession and control of the Designated Equipment purchased and any embodiments of Intellectual Property in the License. In addition, at the request of Customers, the Supplier will execute documents that are customary and reasonably requested by Customers to memorialize and implement this Section 8; provided, however, that Customers' and Supplier's inability to reasonably agree on mutually acceptable documentation will not deprive Customers or their sub-licensees of the use and enjoyment of the License or Independent License, as applicable, or its ownership and right to possession of the Dedicated Equipment.

    D.    The Options described in this Section 8 are continuing rights and obligations that survive expiration of the Term or any earlier termination of this Agreement, but are subject to the applicable Customer's performance of all of its obligations under this Agreement.

9.    **Events of Default.**

The occurrence of any one or more of the following will be an "<u>Event of Default</u>" under this Agreement, unless such event results from a Customer not performing its obligations under this Agreement or unless a waiver or deferral is agreed to in writing by the Customers.

    A.    Supplier repudiates or materially breaches its obligations, or refuses to perform its material obligations, under this Agreement or a Customer's Purchase Order, provided Customer is in compliance with its obligations the consequence of which is a substantial likelihood that Customer's production of Component Parts will be interrupted (in which case the Event of Default applies only to that Customer);

    B.    The Bankruptcy Filing is converted to a case under Chapter 7, or a trustee or examiner is appointed for the Supplier;

    C.    Supplier breaches or fails to meet any of the Milestones contained in Sections 3(b)(i-iv) under this Agreement.

    D.    An Event of Default occurs under the Financing Order then in effect that is not cured or stayed from enforcement within five business days following notice of the Event of Default, or the Lender otherwise ceases to make advances under the DIP Financing after the expiration of such five business day period for any reason other than a Customer's failure to fund its Participation under Section 4(A) above.

10.     **Reservation of Rights**

Unless waived or modified in this Agreement, each party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the parties, or applicable law, and each party expressly reserves all claims, rights and remedies it has under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law; provided however that in no event shall any such rights or remedies be asserted against a purchaser who has assumed any Purchase Orders in connection with a Sale.

11.     **Confidentiality**

Each party agrees that it will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any person or entity other than its officers, directors, employees and professional advisors and other parties to this Agreement except (a) to enforce this Agreement or (b) as a party may reasonably believe to be required by applicable law. The parties will take all commercially reasonable steps to ensure that the contents of this Agreement are kept secret and confidential except as provided above. The foregoing restrictions shall not apply to the extent this Agreement must be disclosed or filed in Supplier's Chapter 11 Cases and such restrictions shall automatically expire upon such filing or disclosure.

12.     **Notice**

Any notice must be in writing and will be deemed to be delivered at the time of delivery if delivered by hand, or at the time sent, if sent by fax or by email. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

|  |  |
|---|---|
| If to Ford: | Ford Motor Company<br>20100 Rotunda Dr.<br>Building #3, 3A-027<br>Dearborn, MI 48126<br>Attention: William Strong<br>Fax: (313) 206-7044<br>Email: wstrong@ford.com |
| With a copy to: | Ford Motor Company<br>Office of the General Counsel<br>1 American Rd., Ste. 416-A2<br>Dearborn, Michigan 48126<br>Attention: Daniella Saltz<br>Fax: (313) 322-3804<br>Email: dsaltz@ford.com |

|                  |                                                      |
|------------------|------------------------------------------------------|
| and              | Miller Canfield Paddock and Stone PLC                |
|                  | 150 West Jefferson, Suite 2500                       |
|                  | Detroit, MI 48226                                    |
|                  | Attention: Timothy A. Fusco                          |
|                  | Fax:(313) 496-7500                                   |
|                  | Email:fusco@millercanfield.com                       |
| If to GM:        | General Motors Corporation                           |
|                  | 30009 Van Dyke Avenue                                |
|                  | P.O. Box 9025                                        |
|                  | Mail Code: 480-206-136                               |
|                  | Warren, MI 48090-9025                                |
|                  | Attention: Mark W. Fischer                           |
|                  | Fax: (586) 575-3404                                  |
|                  | Email: mfischer@gm.com                               |
| With copy to:    | Honigman Miller Schwartz and Cohn LLP                |
|                  | 2290 First National Building                         |
|                  | Detroit, MI 48226                                    |
|                  | Attention: Donald F. Baty, Jr.                       |
|                  | Fax: (313) 465-7315                                  |
|                  | Email: dbaty@honigman.com                            |
| If to Chrysler:  | Chrysler LLC                                         |
|                  | 800 Chrysler Drive                                   |
|                  | CIMS 485-14-78                                       |
|                  | Auburn Hills, Michigan 48326                         |
|                  | Attention: Sigmund Huber                             |
|                  | Director, Supplier Relations                         |
|                  | Facsimile: (248) 512-1771                            |
|                  | Email: seh43@chrysler.com                            |
| With a copy to:  | Chrysler LLC                                         |
|                  | 1000 Chrysler Drive                                  |
|                  | CIMS 485-14-78                                       |
|                  | Auburn Hills, Michigan 48326-2766                    |
|                  | Attention: Kim R. Kolb                               |
|                  | Senior Staff Counsel                                 |
|                  | Facsimile: (248) 512-1771                            |
|                  | Email: krk4@chrysler.com                             |
| and:             | Dickinson Wright PLLC                                |
|                  | 500 Woodward Avenue, Suite 4000                      |
|                  | Detroit, Michigan 48226                              |
|                  | Attention: James A. Plemmons                         |
|                  | Facsimile: (313) 223-3598                            |

19

Email: jplemmons@dickinsonwright.com

If to Supplier:

Metaldyne Corporation
47603 Halyard Drive
Plymouth, Michigan 48170-2429
Attention: David L. McKee
Fax: (734) 207-6797
Email: davidmckee@metaldyne.com

With copy to:

Foley & Lardner LLP
One Detroit Center
500 Woodward Ave., Suite 2700
Detroit, Michigan 48226-3489
Attention: Judy A. O'Neill
Fax: (313) 234-2800
Email: joneill@foley.com

If to Lender, to:

Deutsche Bank AG, New York Branch
60 Wall Street
New York, New York 10005
Attention: Enrique Landaeta
Facsimile: (212) 797-4655

With a copy to:

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attention: Eric Leicht and Scott
Greissman
Facsimile: (212) 354-8113
Email: eleicht@whitecase.com /
sgreissman@whitecase.com

13. **General Terms**

A. Notwithstanding anything in this Agreement to the contrary, no Customer may enforce any obligation hereunder against Supplier, unless such Customer is in full compliance with all of its obligations under this Agreement.

B. This Agreement, together with any other documents executed in connection with this Agreement, constitute the entire understanding of the parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement or one of the other documents executed in connection with this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all parties.

20

C.     The persons executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent.

D.     Supplier must obtain the consent of Customers to assign or transfer, directly or indirectly, any of its rights or obligations under this Agreement. Likewise, this Agreement is not intended for the benefit of any third parties other than the Prepetition Lenders.

E.     The delay or failure of a Customer to exercise any right, power or privilege under this Agreement does not affect that right, power or privilege. Any single or partial exercise of any right, power or privilege does not preclude further exercise on another occasion. Waiver of any breach of any term of this Agreement or Purchase Order by any party does not waive any other breach of that or any other term by any party.

F.     If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement nevertheless remain enforceable.

G.     Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customers' rights under this Agreement.

H.     Nothing in this Agreement may be interpreted to constitute Supplier as Customers' agent for any purpose.

I.     This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts will be construed together to constitute one instrument. The parties agree that their respective signatures may be delivered by fax or email and that fax or email signatures will be treated as originals for all purposes.

J.     This Agreement must be construed – and its performance must be enforced – under internal Michigan law, without reference to its conflicts of laws principles. During the Chapter 11 Cases, the parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York, as to any claim or proceeding over which it may have jurisdiction. Each party waives any objection to the exercise of jurisdiction over it by this court.

14.    **REPRESENTATIONS. EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT. NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT. ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

15. **JURY TRIAL WAIVER. THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS. NO PARTY WILL BE DEEMED TO HAVE RELINQUISHED ITS WAIVER OF JURY TRIAL UNLESS THAT PARTY DOES SO IN WRITING.**

**[Signatures on next page]**

**Metaldyne Corporation, on behalf of itself and its subsidiaries**

By: _____

    Name: _____

    Title: _____

**Ford Motor Company**

By: _____

    Name: _____

    Title: _____

**General Motors Corporation**

By: _____

    Name: _____

    Title: _____

**Chrysler LLC on behalf of itself and Chrysler Motors LLC**

By: _____

    Name: _____

    Title: _____

**Chrysler de Mexico S.A. de C.V.**

By: _____

    Name: _____

    Title: _____

**Deutsche Bank, AG**

By: _____

      Name: _____

      Title: _____

CLI-1716641v7

# EXHIBIT B

## Other Customers

Other OEMs

Hyundai
Honda *
Nissan *
Mitsubishi

Other Suppliers

Dana
Magna
TRW
American Axle
Federal Mogul
Conti
Cummins
Navistar

*If not a participant in the DIP Facility

# EXHIBIT E

# IWASAKI AFFIDAVIT

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Richard H. Engman
Ross S. Barr

- and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox
Ryan T. Routh

Proposed Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
Metaldyne Corporation, et al.,          :   Case No. 09-13412 (___)
                                        :
                         Debtors.       :   (Jointly Administered)
                                        :
------------------------------------------------------x
```

## AFFIDAVIT OF TERRY IWASAKI IN
## SUPPORT OF MOTION OF DEBTORS AND DEBTORS IN
## POSSESSION FOR INTERIM AND FINAL ORDERS PURSUANT
## TO SECTIONS 361, 362, 363, 364 AND 510 OF THE BANKRUPTCY CODE
## AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
## (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE
## PREPETITION SECURED LENDERS, (II) OBTAIN POSTPETITION FINANCING
## AND (III) PROVIDE ADEQUATE PROTECTION TO THE PREPETITION
## SECURED LENDERS, (B) AUTHORIZING DEBTORS TO ENTER INTO,
## AND APPROVING, AN ACCOMMODATION AGREEMENT WITH CERTAIN
## CUSTOMERS AND (C) PROVIDING NOTICE AND SCHEDULING FINAL HEARING

STATE OF NEW YORK     )
                                )    ss:
COUNTY OF NEW YORK  )

Terry Iwasaki, being duly sworn, deposes and says:

1.     I am Vice President, Chief Financial Officer and Treasurer of Metaldyne Corporation ("Metaldyne"), one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). Metaldyne is a leading global designer and supplier of powertrain and chassis products for the automotive industry with primary offices at 47603 Halyard Drive, Plymouth, Michigan 48170.

2.     I submit this Affidavit in support of the Motion of Debtors and Debtors in Possession for Interim and Final Orders Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to (I) Use Cash Collateral of the Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide Adequate Protection to the Prepetition Secured Lenders, (B) Authorizing Debtors to Enter Into, and Approving, an Accommodation Agreement With Certain Customers and (C) Providing Notice and Scheduling Final Hearing (the "Motion"), filed by the Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases").[1]

3.     Except as otherwise indicated, all statements in this Affidavit are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

personal knowledge, review of documents or opinion. I am authorized to submit this Affidavit on behalf of the Debtors.

## Qualifications

4.    As Vice President, Chief Financial Officer and Treasurer, I provide financial direction and guidance to Metaldyne. In this role, I lead the development of Metaldyne's long-range plans, global capital markets activities and capital investments. Additionally, I implement and oversee Metaldyne's financial controls and policies to safeguard Metaldyne's assets and accurately report results.

5.    I have been employed with Metaldyne since 1996, serving in a number of roles including Vice President of Finance, Commercial Operations, and as group controller for Metaldyne's Engine Products and Hydraulic Controls Group.

6.    Prior to joining Metaldyne, I worked as controller for the former MascoTech and for Ishikawa Gasket America, Inc., a U.S. subsidiary of a Japanese automotive components supplier. I began my career as a financial advisor with American Express.

7.    I hold a Bachelor's degree from Michigan State University.

## Background

8.    Metaldyne is a wholly-owned subsidiary of Metaldyne Holdings LLC ("Metaldyne Holdings"). On January 11, 2007, in connection with a plan of merger, Asahi Tec Corporation ("Asahi Tec"), a Japanese corporation, acquired the shares of Metaldyne. On the same date, Asahi Tec contributed those shares to Metaldyne Holdings, and Asahi Tec thereby became the indirect parent of Metaldyne and the other Debtors. RHJ International S.A. ("RHJI"), a corporation formed under the laws of Belgium and listed on the Euronext exchange, presently holds approximately 60.1% of the outstanding capital stock of Asahi Tec.

9.      The Metaldyne Companies went into and emerged from their merger transaction with Asahi Tec still highly-leveraged, even though the transaction was delevering. To ameliorate the effects of such continuing leverage, in early 2008 the Debtors developed and began to implement an internal restructuring that was designed to excise costs and enhance operational efficiencies. Prior to the Petition Date, the Debtors had implemented several phases of that plan, which resulted in cost savings of over $60 million per year (in addition to $40 million in annual interest savings obtained through the Tender Offer transaction described below).

10.      Due to the precipitous reduction in production levels by the North American OEMs in 2008 and the tightening of consumer and wholesale financing for the OEMs' vehicles, the Debtors experienced liquidity pressures in the Summer and Fall of 2008. These problems were exacerbated by the constraints placed upon the Debtors by their own debt service obligations. After reaching a series of agreements with Asahi Tec, RHJI and the North American OEMs, among other parties, on October 29, 2008, the Debtors launched a cash tender offer (the "Tender Offer") for the outstanding 11% senior subordinated notes due 2012 and 10% senior notes due 2013 (collectively, the "Notes"). The Tender Offer consideration to be paid by the Debtors was significantly less than the par value of the Notes. The Tender Offer, which was accepted by over 90% of the eligible noteholders, was completed on November 28, 2008 and resulted in the retirement of over $350 million in debt, or approximately 40% of the aggregate long-term debt of the Debtors that was outstanding at the time. Cash for the Tender Offer was received from Asahi Tec (after Asahi Tec received such cash through an equity investment by RHJI) and from the North American OEMs in exchange for the issuance of

$60 million in new notes to the North American OEMs by Metaldyne. In addition, as part of the Tender Offer, the Notes, which had been secured, became unsecured obligations of the Debtors.

11.    While the completion of the Tender Offer provided the Debtors with a brief respite from liquidity pressures, the extended holiday shutdowns of the Debtors' North American OEM customers and the continued historic difficulties in the North American automotive industry quickly eroded the Debtors' liquidity in December 2008 and early 2009. As has been widely reported, North American vehicle production has dropped nearly in half, with over 15 million units produced in each year between 2004 and 2007, approximately 12.6 million units produced in 2008 and only 1.7 million units produced in the first quarter of 2009. Key industry analysts are projecting production of approximately 8 million units for 2009.

12.    Reacting to these unprecedented figures, in early 2009, the Metaldyne Companies implemented a new round of internal restructuring initiatives and began exploring options to further refinance and/or de-lever the Metaldyne Companies. Specifically, the Debtors sought additional capital from various sources, including private equity firms, RHJI and the Debtors' senior secured lenders. While various entities explored options for making a capital investment into the Debtors, ultimately none of the entities approached by the Metaldyne Companies were willing to make a direct investment in the companies or enter into a re-financing transaction; however, certain such entities expressed a desire to purchase certain assets or businesses from the Debtors pursuant to a sale under section 363 of the Bankruptcy Code. The Debtors' efforts, thus, were refocused upon negotiating with potential purchasers in an effort to arrange a sale of the company as a whole or a sale of one or more business units on a going concern basis.

13.     For the fiscal year ended March 29, 2008, the Metaldyne Companies recorded annual revenue of approximately $1.32 billion, of which approximately $782 million was from sales of the Debtors. As of March 29, 2008, utilizing book values, the Metaldyne Companies had assets of approximately $977 million and liabilities of approximately $927 million. As of the Petition Date, the Metaldyne Companies have approximately 4,450 employees, of which approximately 2,500 are employees of the Debtors.

**Prepetition Indebtedness**

14.     Debtor Metaldyne Company LLC ("Metaldyne Company") is a borrower under a senior secured credit facility (as amended, the "Prepetition Term Credit Agreement") pursuant to the Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Debtor Metaldyne Intermediate Holdco, Inc. ("Metaldyne Intermediate"), The Bank of New York Mellon ("BONYM" or the "Prepetition Term Agent") (as administrative agent and collateral agent)[2], Citicorp North America, Inc. (as syndication agent), Deutsche Bank Securities Inc. (as documentation agent) and the other lender parties thereto (collectively, the "Prepetition Term Lenders").[3] Twenty-four of the other Debtors are guarantors under the Prepetition Term Credit Agreement (the "Subsidiary Guarantors").[4]

---

[2]     BONYM is in the process of taking over as successor agent to JP Morgan Chase, N.A.; the Debtors are presently unaware if that transition is completed. The Debtors understand that JP Morgan Chase will continue to serve as agent for the letter of credit facility under the Prepetition Term Credit Agreement.

[3]     Metaldyne Company is a wholly-owned subsidiary of Metaldyne Intermediate. Metaldyne Intermediate is a wholly-owned subsidiary of Metaldyne.

[4]     The Subsidiary Guarantors are: ER Acquisition Corp.; Metaldyne Tubular Products, Inc.; W.C. McCurdy Co.; Halyard Aviation Services, Inc.; Metaldyne Europe, Inc.; NC-M Chassis Systems, LLC; MASG Disposition, Inc.; Metaldyne Services, Inc.; Metaldyne Machining and Assembly Company, Inc.; Precision Headed Products, Inc.; Metaldyne Sintered Components St. Marys, Inc. (f/k/a Windfall Products, Inc.); Metaldyne Asia, Inc.; Punchcraft Company; Metaldyne Sintered Components, LLC; Metaldyne Sintered Components of Indiana, Inc.; GMTI Holding Company; Metaldyne Precision Forming - Fort Wayne, Inc.; MASX Energy Services Group, Inc.; Metaldyne Light Metals Company, Inc.; Stahl International, Inc.; Metaldyne U.S. Holding Co.; Metaldyne DuPage Die Casting Corporation; Metaldyne Lester Precision Die Casting, Inc.; and Windfall Specialty Powders, Inc.

15. On October 29, 2008, in connection with the Tender Offer, Metaldyne Company and Metaldyne Intermediate entered into an agreement with the Prepetition Term Lenders to amend such credit agreements to ease certain covenants, increase the interest rates in certain circumstances, provide additional security to the lenders and make certain other changes.

16. The Prepetition Term Credit Agreement has a seven-year term loan component (the "Secured Term Loan"), and all amounts outstanding thereunder mature on January 11, 2014. The Secured Term Loan and other indebtedness outstanding under the Prepetition Term Credit Agreement may become due prior to the maturity date thereunder if the Metaldyne Company or the Subsidiary Guarantors fail to comply with the conditions set forth in the Prepetition Term Credit Agreement. Borrowings under the Secured Term Loan presently bear interest at a rate per annum equal to, at the option of Metaldyne Company, the sum of (a) either (i) the London Interbank Offered Rate ("LIBO Rate"), based on a 1, 2 or 3 month interest period as selected by the borrower or (ii) the "ABR Rate"[5] plus (a) the "Applicable Margin,"[6] plus (c) default interest of 2.00% plus (d) paid in kind interest of 1.00%.[7] On the Petition Date, the principal amount outstanding under the Secured Term Loan portion of the Prepetition Term Credit Agreement was $408 million.

17. The Prepetition Term Credit Agreement also contains a revolving credit facility that provided for revolving credit loans (the "DF Revolving Credit Loans") up to $10.0 million and a synthetic letter of credit facility pursuant to which the Debtors may request

---

[5] The "ABR Rate" is the greatest of (a) the prime rate, (b) the federal funds rate plus 0.5% or (c) one-month LIBO Rate plus 1.0%.

[6] The "Applicable Margin" for LIBO Rate loans is currently 3.50% and the Applicable Margin for ABR Rate loans is currently 2.50%, but may increase depending upon the leverage ratio submitted by the borrowers under the Prepetition Term Credit Agreement.

[7] The amount of paid in kind interest charged can range from 1.00% to 2.00% based upon the leverage ratio submitted by the borrowers under the Prepetition Term Credit Agreement.

letters of credit for the benefit of third parties up to $60.0 million (less the amount of the DF Revolving Credit Loans outstanding). As of the Petition Date, $10 million in principal amount had been borrowed as DF Revolving Credit Loans. The DF Revolving Credit Loans bear interest, for each borrowing, at the same rate as the Secured Term Loan. The DF Revolving Credit Loans mature on January 11, 2012, and any issued but not disbursed letters of credit expire on the same date.

18.     Shortly before the Petition Date, the beneficiary under a letter of credit in the amount of approximately $9.7 million that was issued under the Prepetition Term Credit Agreement made a drawing under such letter of credit, and the amount of the drawing now represents a reimbursement obligation of the Debtors to the Prepetition Term Agent under the facility. This obligation bears interest at the ABR Rate plus (a) 2.50%, (b) a default rate of 2.00% and (c) paid in kind interest of 1.00%. An additional $38.6 million in undrawn letters of credit issued have been issued, which, if drawn, would increase the amounts to be repaid under the Prepetition Term Credit Agreement.

19.     To secure the obligations under the Prepetition Term Credit Agreement (the "Prepetition Term Loan Obligations") Metaldyne Intermediate, Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted BONYM, as agent and for the benefit of the Prepetition Term Lenders, security interests in substantially all of their personal tangible and intangible property (subject to certain exceptions including, among other things, the limitation of security interests to 65% of such entities' equity interests in their first-tier foreign subsidiaries) (collectively, the "Common Collateral"). Moreover, to further secure the Prepetition Term Loan Obligations, BONYM, as agent and for the benefit of the

Prepetition Term Lenders, obtained a first-priority mortgage upon the Debtors' three facilities located in New Castle, Indiana; Greenville, North Carolina; and Farmington Hills, Michigan (the "Mortgaged Facilities" and together with the Common Collateral, the "Prepetition Collateral").[8]

20.     Metaldyne Company also is a borrower under a revolving credit facility (as amended, the "Prepetition ABL Credit Agreement" and, together with the Prepetition Term Credit Agreement, the "Prepetition Credit Facilities") pursuant to the ABL Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate, DBNY (in such capacity, the "Prepetition ABL Agent" and, together with the Prepetition Term Agent, the "Prepetition Agents") (as administrative agent and collateral agent), JPMorgan Chase Bank, N.A. (as syndication agent) and Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central) (as co-documentation agents) and the other lender parties thereto (the "Prepetition ABL Lenders" and together with the Prepetition Term Lenders, the "Prepetition Lenders"). The Subsidiary Guarantors also are guarantors under the Prepetition ABL Credit Agreement.

21.     On October 29, 2008, in connection with the Tender Offer, Metaldyne Company and Metaldyne Intermediate entered into an amendment of the Prepetition ABL Credit Agreement with the Prepetition ABL Lenders to ease certain covenants, increase the interest rates, provide additional security to the Prepetition ABL Lenders, reduce availability of revolving commitments and make certain other changes.

22.     The Prepetition ABL Credit Agreement was amended as of April 22, 2009 pursuant to a Forbearance Agreement and Second Amendment to Credit Agreement, and in connection therewith the commitments of the Prepetition ABL Lenders were reduced to an

---

[8]     The Greenville, North Carolina facility was sold in September 2008, and the mortgage was released.

aggregate amount equal to $55,000,000. The Prepetition ABL Credit Agreement was further amended as of May 21, 2009 to (a) reduce the original revolving loan commitments by an additional $20,000,000 and (b) provide for additional commitments (the "Incremental Loan Commitment") up to a maximum amount of $6,491,000. DBNY, who is one of the Prepetition ABL Lenders (in such capacity, the "Incremental Loan Lender"), agreed to provide the Incremental Loan Commitment and extend loans (the "Incremental Loans") under the Prepetition ABL Agreement. As a result, the aggregate amount of commitments under the Prepetition ABL Credit Agreement, after taking into account the Incremental Loan Commitment, remained less than the original total commitment. The Incremental Loan Lender and North American OEMs entered into a Subordinated Participation Agreement (the "Participation Agreement") as of May 21, 2009, pursuant to which the Incremental Loan Lender sold an economic participation in the Incremental Loans to the North American OEMs.

23. Loans under the Prepetition ABL Credit Agreement mature on January 11, 2012, and any issued but not disbursed letters of credit expire on the same date. Borrowings (other than the Incremental Loans) under the Prepetition ABL Credit Agreement currently bear interest, for each borrowing, at a rate equal to, at the option of Metaldyne Company, the sum of (i) either (a) the LIBO Rate or (b) the ABR Rate plus (ii) the "Applicable Margin" for the Prepetition ABL Credit Agreement.[9] Incremental Loans under the Prepetition ABL Credit Agreement currently bear interest at a rate equal to ABR plus 2.00% per annum. The principal amount outstanding under the Prepetition ABL Credit Agreement as of the Petition Date was approximately $35.49 million, consisting of approximately $29 million in revolving loans and $6.49 million in Incremental Loans. Borrowings under the Prepetition ABL Credit Agreement

---

[9] The "Applicable Margin" for the Prepetition ABL Agreement is 3.25% for LIBO Rate loans and 2.25% for ABR Rate loans.

have been used for Metaldyne's working capital and other general corporate purposes, including capital expenditures. Despite the Debtors' having been in default under the Prepetition ABL Credit Agreement prior to the Petition Date, DBNY and the Prepetition ABL Lenders have continued to work with the Debtors to ensure that the Debtors had sufficient working capital to continue operating through the filing of these cases.

24.    To secure the obligations under the Prepetition ABL Credit Agreement (the "Prepetition ABL Obligations" and together with the Prepetition Term Loan Obligations, the "Prepetition Obligations"), Metaldyne Intermediate, Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted DBNY, as agent and for the benefit of the Prepetition ABL Lenders, security interests in the Common Collateral. In addition, to secure the Prepetition ABL Obligations, DBNY, as agent and for the benefit of the Prepetition ABL Lenders, obtained a second-priority mortgage upon the Mortgaged Facilities.

### First Priority Intercreditor Agreement

25.    The Intercreditor Agreement (the "First Priority Intercreditor Agreement")[10], dated as of January 11, 2007, was entered into by BONYM, as successor to JPMorgan Chase Bank, N.A., as administrative agent under the Prepetition Term Credit Agreement, and DBNY, as administrative agent under the Prepetition ABL Credit Agreement, Metaldyne Intermediate and Metaldyne Company. The First Priority Intercreditor Agreement distinguishes the relative priorities of the Prepetition ABL Lenders under the Prepetition ABL Credit Agreement and the Prepetition Term Lenders under the Prepetition Term Credit Agreement with respect to Common Collateral. The First Priority Intercreditor Agreement

---

[10]    A true and correct copy of the First Priority Intercreditor Agreement is annexed to the Motion as Exhibit I.

provides that the Prepetition ABL Lenders have a first-priority security interest in Common Collateral constituting accounts, chattel paper representing accounts, deposit accounts and related property, inventory and certain related collateral, including the proceeds of the foregoing (collectively, the "Prepetition ABL Priority Collateral"). The Prepetition Term Lenders have a second-priority security interest on the Prepetition ABL Priority Collateral. The Prepetition Term Lenders have a first-priority security interest, and the Prepetition ABL Lenders have a second-priority security interest, in the remaining Common Collateral (the "Prepetition Term Priority Collateral").

## The Debtors' Urgent Need for Postpetition Financing

26.     It is essential that the Debtors obtain immediate postpetition financing and authority to use the Prepetition Lenders' Cash Collateral. This relief is essential to the Debtors' efforts to continue their ordinary course, day-to-day operations, provide goods to their customers and successfully complete the Sales Processes and maintain a business as usual atmosphere.

27.     Immediate access to postpetition financing and the use of Cash Collateral is necessary to provide working capital during these Chapter 11 Cases to provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course. Absent access to postpetition financing and the ability to use Cash Collateral immediately, the Debtors also could be forced to cease all business operations in the short term to the direct detriment of all parties in interest.

28.     Without the immediate access to postpetition financing and the ability to use Cash Collateral, the Debtors could suffer substantial and irreparable harm, which could threaten their ability to maximize value for stakeholders. By contrast, if the relief sought in the Motion is approved, the Debtors' ability to minimize disruption to their business operations,

instill confidence in their various stakeholders and successfully complete the Sale Processes will be substantially enhanced. The Debtors' need for postpetition financing and the use of Cash Collateral, therefore, is urgent. In addition, because the Debtors lack sufficient unencumbered funds to meet their imminent expenses necessary for a smooth transition to chapter 11, it is essential that they obtain interim financing under the terms set forth in the Interim Order before the Court conducts the Final Hearing.

## The Proposed Debtor in Possession Financing Facility

29.     The DIP Lender, the North American OEMs and the Debtors have agreed to the DIP Facility terms as described in the Interim Order. The DIP Lender agreed to provide debtor in possession financing to the Debtors as fully funded by the North American OEMs through the purchase of the Subordinated Participations. Pursuant to the terms of the Participation Agreement the North American OEMs will agree to subordinate their right of payment to that of the Prepetition ABL Lenders.

30.     In addition, the North American OEMs also have agreed to certain financial accommodations in connection with their purchase of component parts from the Debtors. Specifically, the North American OEMs and the Debtors entered into the Accommodation Agreement memorializing these terms. Pursuant to the Accommodation Agreement, the North American OEMs agree, subject to entry of an acceptable financing order, to limit resourcing activities and provide the Debtors with certain financial accommodations and purchase the Subordinated Participations. For example, pursuant to the Accommodation Agreement, the North American OEMs will grant the Debtors certain credit enhancements, including expedited payment terms, and limit their right of setoff to 3% of the face value of invoices. The Debtors will acknowledge the North American OEMs' tooling ownership, agree to cooperate with the North American OEMs in their resourcing activities if certain sales

milestones are not met or a default occurs and grant the North American OEMs an option to acquire dedicated tooling and equipment that remain in the estates after the Sale Processes are concluded, all pursuant to the terms specified in the Accommodation Agreement.

31.     Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Facility with the DIP Lender and the Accommodation Agreement with the North American OEMs.

## The DIP Facility is Necessary to Preserve Assets of the Debtors' Estates

32.     It is essential that the Debtors immediately obtain the financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and to make certain capital expenditures and satisfy certain working capital requirements of the Debtors' businesses. The DIP Facility and the use of Cash Collateral are also essential to provide the Debtors' various stakeholders, including customers, employees, vendors, service providers and other key constituencies, with confidence in the Debtors' ability to continue to operate on a business as usual basis while they pursue the Sale Processes. As a result, the DIP Facility is necessary to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.

33.     The success of the Chapter 11 Cases depends on, among other things, (a) the Debtors' ability to meet their day-to-day working capital requirements and acquire services without interruption or delay (so as not to impair the assets held for sale) and (b) the confidence of the Debtors' stakeholders. If the relief sought in the Motion is denied or delayed, the Debtors likely will experience business disruptions in the short term, stakeholder confidence may be destroyed and the Debtors' ability to maximize value for stakeholders through the Sale Processes may be damaged irreparably. Further, pursuant to the Prepetition Term Credit Agreement and the Prepetition ABL Credit Agreement, the Debtors have pledged virtually all

their cash and the proceeds of existing accounts receivable and inventory as collateral. As a result, without immediate access to the Cash Collateral and new borrowing relief, the Debtors' business operations would grind to an almost immediate halt. In addition, the new liquidity under the proposed interim portion of the DIP Facility will ensure that the Debtors can make the payments requested by the First Day Pleadings, pay claims incurred in the ordinary course and provide assurances to the Debtors' customers that they will be able to deliver products during these Chapter 11 Cases.

34.     As a result of the Debtors' recent liquidity constraints and in anticipation of the immediate need for the postpetition financing and the use of Cash Collateral, the Debtors have, in consultation with AlixPartners, LLP, as financial advisors to the Debtors, performed a review and analysis of their projected cash needs.[11] Based upon that review and analysis, the Debtors and AlixPartners, LLP have prepared the Budget outlining the Debtors' postpetition cash needs. The Budget was subsequently vetted and negotiated with the Prepetition ABL Agent and the North American OEMs with an eye toward prudent husbandry of resources during these cases. The Budget was also provided to the Prepetition Term Lenders.

35.     The interim availability under the proposed DIP Facility along with the use of Cash Collateral will allow the Debtors to meet their immediate cash needs and help provide assurances to the Debtors' suppliers, vendors and employees that they will be paid for postpetition services. The liquidity provided by the DIP Facility, to be used in accordance with the Budget, also will provide assurances to the Debtors' customers that they will be able to deliver products during these Chapter 11 Cases. Approval of interim borrowing under the DIP Facility thus is crucial to the success of these Chapter 11 Cases.

---

[11]     A true and correct copy of the Budget is attached to Motion as Exhibit C.

## Application of the Business Judgment Standard

36.     It is the Debtors' sound business judgment that a postpetition credit facility is appropriate for these cases. I believe that the terms of the DIP Facility are fair and reasonable, and are in the best interests of the Debtors' estates, and the Debtors could not obtain postpetition financing from any other lending source on any other terms.

## The Prepetition Lenders are Adequately Protected

37.     The Prepetition Lenders' interests in the Prepetition Collateral are adequately protected by virtue of (a) the Debtors' expenditure of cash in accordance with the Budget, which will, among other things, protect the value of the Debtors' accounts receivable, and (b) the grant of the Adequate Protection Replacement Liens on, and the Adequate Protection Superpriority Claims against, the Debtors' assets. The Budget, which was prepared with the assistance of the Debtors' professional advisors and vetted with the DIP Lender's, the Prepetition ABL Lenders' and the North American OEMs' advisors, provides an additional layer of adequate protection because it ensures that the Debtors' expenditure of cash will be limited to only those items that are necessary and essential to fund the Debtors' operations and preserve the Prepetition Collateral during the Sale Processes. If funds are not made available to pay these essential items on an emergency basis, the Debtors' businesses likely would be forced immediately to shut down, and the Prepetition Lenders' collateral would be at risk.

38.     The Prepetition ABL Priority Collateral, which includes approximately $43.5 million in net accounts receivable from the Debtors' customers, would be subject to risk of significant decline in the event of a shut down of the Debtors' operations. In such an event, the Debtors would be unable to continue to supply the North American OEMs and their other customers, thus resulting in a potential breach of the Debtors' obligations under the supply agreements with their customers. The Debtors anticipate that their customers would take the

position that they are entitled to set off any damages that may result from the Debtors' failure to satisfy their obligations to the customers against the accounts receivable owed by such customers to the Debtors. In fact, certain of the Debtors' customers already have indicated their intention to effectuate such a setoff in the event that the Debtors are unable to perform their supply obligations. The Debtors estimate these potential setoffs would reduce significantly (if not eliminate altogether) the Debtors' accounts receivable and, therefore, eliminate the value of this portion of the Prepetition ABL Priority Collateral. As a result, a significant portion of the value of the Prepetition ABL Priority Collateral is directly dependant on the Debtors' continued operation, which is possible only if the Debtors are authorized to enter into the Accommodation Agreement, make borrowings under the DIP Facility and use the Cash Collateral.

## Interim Borrowings Under the DIP Facility

39.     Pending a Final Hearing, the Debtors require use of up to $56 million of Cash Collateral and to borrow up to $11.7 million under the DIP Facility, each on an interim basis. This interim financing is necessary for among other things, the orderly continuation of their business operations including the satisfaction of obligations to trade vendors and raw material suppliers, equipment and real property lease payments, utility payments and deposits, freight and shipping costs, capital maintenance expenditures, insurance, taxes, employee obligations, plant consolidation and rigging expenses and professional fees. Absent authorization from the Court to obtain secured credit and use the Cash Collateral, as requested, on an interim basis pending the Final Hearing, the Debtors' estates will be immediately and irreparably harmed. The use of the Cash Collateral and the availability of interim loans under the DIP Facility will provide the necessary assurance to vendors, employees and customers of the Debtors' ability to meet their near-term obligations and continue to operate on a business as usual basis.

## **Good Faith**

40. The terms and conditions of the DIP Facility, the use of Cash Collateral and the Accommodation Agreement are fair and reasonable and were negotiated by the parties in good faith and at arms' length.

41. Without approval of the Accommodation Agreement, access to the DIP Facility and the use of the Cash Collateral, I believe that the Debtors would experience a severe disruption of their businesses. Accordingly, because it is my belief that maintaining the operation of the Debtors' businesses is critical to maximizing value in the Chapter 11 Cases, it is in the best interest of the estates that the Debtors be authorized to enter into the Accommodation agreement and the DIP Facility and to use the Cash Collateral in order to maintain such value.

Terry Iwasaki
Vice President, Chief Financial Officer
and Corporate Controller
Metaldyne Corporation

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 20th day of May 2009.

ALICIA FARRINGTON
NOTARY PUBLIC, State of New York
No. 01FA6085424
Qualified in Kings County
Commission Expires June 20, 2010