JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Richard H. Engman

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox
Ryan T. Routh

Proposed Attorneys for Debtors
 and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                              :
In re                                         :   Chapter 11
                                              :
Metaldyne Corporation, et al.,                :   Case No. 09-13412 (MG)
                                              :
                        Debtors.              :   (Jointly Administered)
                                              :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR
(I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE
SALE OF THE DEBTORS' POWERTRAIN GROUP, (B) APPROVING CERTAIN
BIDDER PROTECTIONS AND (C) SCHEDULING A FINAL SALE HEARING
AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
AND (II) AN ORDER (A) AUTHORIZING THE SALE OF CERTAIN
ASSETS RELATED TO THE DEBTORS' POWERTRAIN GROUP FREE AND CLEAR
OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH**

# TABLE OF CONTENTS

**Page**

<u>Statements</u>

Background ............................................................................................................. 1

Jurisdiction ........................................................................................................... 3

Relief Requested ................................................................................................... 3

The Powertrain Group ........................................................................................... 4

The Decision to Sell the Powertrain Assets ......................................................... 5

The Proposed Sale Transaction ............................................................................. 7

Extraordinary Provisions Under the Guidelines ................................................... 9

Bidding Procedures for the Powertrain Group ..................................................... 10

Proposed Stalking Horse Bidding Protections ..................................................... 15

Proposed Notice of the Sale Hearing ................................................................... 19

<u>Argument</u>

Approval of the Sale Transaction under Section 363 of the Bankruptcy Code ............... 21

RHJI is a "Good Faith" Purchaser ....................................................................... 23

Approval of Sale Free and Clear ......................................................................... 24

Approval of Assumption of Contracts ................................................................. 26

The Court Should Establish (i) a Deadline to Object to the Assumption
and Assignment of Debtor Contracts and (ii) the Cure Amounts
as Set Forth in the Contract and Cure Schedule .................................. 28

Notice .................................................................................................................. 30

No Prior Request .................................................................................................. 31

EXHIBITS

EXHIBIT 1 – Agreement

EXHIBIT 2 – Summary of the Principal Terms of the Agreement

EXHIBIT 3 – Form of Sale Notice

EXHIBIT 4 – Form of Bidding Procedures Order

EXHIBIT 5 – Form of Approval Order

CLI-1712038v15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

In re 995 Fifth Ave. Assocs., L.P.,
 96 B.R. 24 (Bankr. S.D.N.Y. 1989) ...................................................................................17

Bace v. Babbitt,
 No. 07 Civ. 2420 (WHP), 2008 WL 800579 (S.D.N.Y. Mar. 25, 2008) ................................24

In re Bally Total Fitness of Greater New York, Inc.,
 No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) ........................................................16

In re BearingPoint, Inc.,
 No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) ...........................................................16

In re Beker Indus., Inc.,
 63 B.R. 474 (Bankr. S.D.N.Y. 1986) ...................................................................................26

In re Chi-Chi's Inc.,
 No. 03-13063 (CGC) (Bankr. D. Del. Nov. 4, 2003) ............................................................17

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),
 722 F.2d 1063 (2d Cir. 1983) .............................................................................................21

Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.),
 333 B.R. 30 (S.D.N.Y. 2005) .............................................................................................25

In re Fortunoff Fine Jewelry and Silverware, LLC,
 No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) ........................................................16

In re FSC Corp.,
 No. 00-B-04659 (Bankr. N.D. Ill. Feb. 28, 2000) ................................................................17

In re G+G Retail, Inc.,
 No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) .........................................................16

In re Global Crossing Ltd.,
 295 B.R. 726 (Bankr. S.D.N.Y. 2003) .................................................................................22

In re Great Northern Paper, Inc.,
 No. 03-10048-LHK (Bankr. D. Me. Feb. 18, 2003) ..............................................................17

Hargrave v. Twp. of Pemberton (In re Tabone, Inc.),
 175 B.R. 855 (Bankr. D.N.J. 1994) ....................................................................................30

In re Ionosphere Clubs, Inc.,
    100 B.R. 670 (Bankr. S.D.N.Y. 1989) ...................................................................22

Licensing By Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) ..................................................................21, 23, 24

Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.
    (In re Integrated Res., Inc.),
    147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) ...................17, 18

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),
    4 F.3d 1095 (2d Cir. 1993) ...................................................................27

Pelican Homestead v. Wooten (In re Gabeel),
    61 B.R. 661 (Bankr. W.D. La. 1985) ...................................................................30

In re Phoenix Steel Corp.,
    82 B.R. 334 (Bankr. D. Del. 1987) ...................................................................22

In re Riverstone Networks, Inc.,
    No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006) ...................................................16

In re Rock Indus. Mach. Corp.
    572 F.2 1195 (7th Cir. 1978) ...................................................................24

In re Sasson Jeans, Inc.,
    90 B.R. 608 (S.D.N.Y. 1988) ...................................................................24

In re Silicon Graphics, Inc.,
    No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) ...................................................16

In re Twinlab Corp.,
    No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sep. 26, 2003) ...............................................16

Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit
    Corp.),
    75 B.R. 944 (Bankr. N.D. Ohio 1987) ...................................................................25

FEDERAL STATUTES

11 U.S.C. § 105(a) ...................................................................25

11 U.S.C. § 363 ...................................................................23, 24, 25

11 U.S.C. § 365 ...................................................................26, 27

28 U.S.C. § 157(b) ...................................................................3

28 U.S.C. § 1334.................................................................................................3

28 U.S.C. 1408.................................................................................................3

28 U.S.C. 1409.................................................................................................3

**OTHER AUTHORITIES**

General Order M-331.............................................................................3, 9, 20, 21, 31

TO THE HONORABLE
UNITED STATES BANKRUPTCY JUDGE:

Metaldyne Corporation and 30 of its domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent as follows:

## **Background**

1.    On May 27, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  By an order entered on May 29, 2009, the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On June 4, 2009, the United States Trustee appointed, pursuant to section 1102 of the Bankruptcy Code, an official committee of unsecured creditors (Docket No. 129) (the "Creditors' Committee").

3.    Metaldyne Corporation ("Metaldyne") is a wholly-owned subsidiary of Metaldyne Holdings LLC ("Metaldyne Holdings"), which, in turn, is a wholly-owned subsidiary of Asahi Tec Corporation ("Asahi Tec"), a Japanese corporation.  RHJ International S.A. ("RHJI"), a corporation formed under the laws of Belgium and listed on the Euronext exchange, presently holds approximately 60.1% of the outstanding capital stock of Asahi Tec.  Debtor MD Products Corp. ("MD Products") is a New York corporation.  Metaldyne is the direct or indirect parent of MD Products, each of the other Debtors and each of the Debtors' nondebtor subsidiaries (collectively, the "Metaldyne Companies").

4.    The Metaldyne Companies are leading global manufacturers of highly engineered metal components for the global light vehicle market, are market leaders for many of

the products they sell and are among the 50 largest auto parts suppliers in North America.  The Metaldyne Companies operate through two business units, the Powertrain segment and the Chassis segment.  The Metaldyne Companies' products are used in cars, vans, sport-utility vehicles, light trucks, heavy trucks and other vehicles.  The Metaldyne companies provide content for the majority of the light vehicles manufactured in North America.

5.     Prior to the Petition Date, after exploring a number of restructuring alternatives, the Debtors received interest from various parties in a purchase of certain of the assets of their Chassis segment and interest from other parties in a purchase of the majority of the assets of their Powertrain segment.  Prior to the Petition Date, the Debtors entered into letters of intent to sell these two groups of assets and are negotiating the terms of asset purchase agreements for the sale of one of these business segments.  The Debtors are also exploring the sale of certain of their other facilities.  By this Motion, the Debtors are seeking approval to sell certain of the assets of their Powertrain segment through an auction process and the establishment of certain bidding procedures.  By a separate motion, the Debtors intend to seek Court approval of the establishment of an auction process and bid procedures to consummate the sale of the majority of the assets of their Chassis segment (collectively, the "Sale Processes").

6.     For the fiscal year ended March 29, 2009, the Metaldyne Companies recorded annual revenue of approximately $1.32 billion, of which approximately $782 million was from sales of the Debtors.  As of March 29, 2009, utilizing book values, the Metaldyne Companies had assets of approximately $977 million and liabilities of approximately $927 million.  As of the Petition Date, the Metaldyne Companies have approximately 4,450 employees, of which approximately 2,500 are employees of the Debtors.

## Jurisdiction

7.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

8.     Metaldyne has entered into a Purchase Agreement (including all exhibits, schedules and ancillary agreements related thereto, the "Agreement") with RHJ International S.A. ("RHJI"), dated as of June 15, 2009, which contemplates a set of related transactions (the "Sale Transaction") for the sale of certain of the assets of the Metaldyne Companies' powertrain business group (the "Powertrain Group") to RHJI or its designee, subject to higher and better offers.[1]

9.     By this Motion, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 6004-1, 6006-1 and 9006-1(b) of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and General Order M-331 of the Bankruptcy Court ("General Order M-331"), the Debtors hereby seek the entry of two orders.

10.     *First*, the Debtors request the entry of an order in the form attached hereto as Exhibit 4 (the "Bidding Procedures Order"):

(a)     scheduling a hearing (the "Sale Hearing") to be held before the Court on July 27, 2009 to consider approval of the sale of those assets of the Debtors that are used in the Powertrain Group (collectively, the "Powertrain Assets") to RHJI or the party submitting the highest and best offer for the Powertrain Assets at an auction (the "Auction") to be held on July 24, 2009; and

---

[1]     A copy of the Agreement (without exhibits, schedules and ancillary agreements) is attached hereto as Exhibit 1.

(b)     authorizing and approving (i) notice of the Auction and Sale Hearing in the form attached hereto as <u>Exhibit 3</u> (the "<u>Sale Notice</u>") and (ii) the Debtors' proposed procedures for soliciting other bids for the Powertrain Assets (the "<u>Bidding Procedures</u>"), including the granting of certain stalking-horse bidder protections and the conduct of the Auction.

11.    *Second*, upon conclusion of the Sale Hearing, the Debtors request the entry of an order in the form attached hereto as <u>Exhibit 5</u> (the "<u>Approval Order</u>")[2] authorizing (a) the sale of the Powertrain Assets free and clear of liens, claims and other interests and (b) the assumption and assignment of the executory contracts and unexpired leases of the Debtors which are to be assumed and assigned to RHJI or the winning party at the Auction in connection with the Sale Transaction.

## The Powertrain Group

12.    The Metaldyne Companies' Powertrain Group is a leading manufacturer of a broad range of powertrain components, sub-assemblies and modules, including steel powder metal connecting rods and engine bearing caps, aluminum castings (including valve bodies, clutch modules, balance shaft modules, front cover assemblies, differential cases and crankshaft dampers) and tubular fabricated products that are used for a variety of applications. The Powertrain Group contains a number of sub-groups, including a sintered products group (which includes powder metal and connecting rod units), a vibration control products group and a powertrain products group (which includes tubular fabrication units). The Powertrain Group operates 11 domestic and 10 foreign manufacturing facilities and holds approximately 60% of the assets of the Metaldyne Companies, based upon book values.

13.    The Powertrain Group had revenues of approximately $784 million for calendar year 2008 from OEM customers, such as General Motors, Ford, Chrysler, Honda,

---

[2]    In connection with the Debtors' debtor in possession financing facility (the "<u>DIP Facility</u>"), the Bidding Procedures Order and the Approval Order shall be in form and substance reasonably acceptable to Deutsche Bank, AG, as agent for the Debtors' postpetition lenders (the "<u>DIP Agent</u>").

Toyota, Hyundai, Mazda and Mitsubishi and other Tier I suppliers such as Visteon, Delphi, Bosch, International Automotive Components, Magna Steyr, Timken, Detroit Diesel, American Axle, Navistar, Cummins and ZF Lemforder.

## The Decision to Sell the Powertrain Assets

14.     After receiving feedback from the market as they sought a recapitalization of their business prepetition, the Debtors determined that selling their assets as going concerns would preserve and maximize value for their stakeholders.  Hence, the Debtors embarked upon an intensive prepetition marketing of their assets, which they have continued postpetition.

15.     Because the proposed buyer of the Powertrain Assets is an insider of the Debtors, the Debtors have been extremely cautious in their decision-making process.  In March of 2009, the Board of Directors of Metaldyne Corporation appointed a special committee (the "Special Committee") to oversee the marketing and sale of the Powertrain Assets.  The members of the Special Committee are fully independent, are not employed by the Debtors and have no affiliation with RHJI or the Asahi Tec Companies.  The Special Committee was given full authority to solicit, evaluate, negotiate, approve or reject reorganization proposals for the Powertrain Assets, and to analyze, authorize and pursue a divestiture or divestitures of the equity or assets, or some of them, of the Metaldyne Companies.  The Special Committee has participated in and overseen the process of marketing and negotiating bids for the Powertrain Assets and the Debtors' other assets and directed management to select RHJI to serve as a stalking horse bidder for the Powertrain Assets only after determining that RHJI had presented the highest and best offer to date for the Powertrain Assets.

16.     Beginning in late February of 2009 and continuing postpetition, Lazard Frères & Co. LLC ("Lazard"), the Debtors' financial advisor and investment banker, has been actively engaged in the effort to market, among others, the Powertrain Assets.  As part of that

effort, Lazard reached out to approximately 34 potential buyers of assets of the Debtors,
including the Debtors' term lenders. Of those 34 potential buyers, two expressed no interest in
any of the Debtors' assets, and Lazard engaged the remaining 32 potential buyers, including both
strategic and financial buyers, in discussions about the Debtors' assets. Lazard provided the
25 buyers expressing sufficient interest in some or all of the Debtors' assets with confidentiality
agreements. To date, 12 parties have returned signed confidentiality agreements and were
subsequently provided with an information package describing the Debtors' Assets. Seven
potential buyers have either attended management presentations or spoken directly with
management after they provided a satisfactory indication of interest, either written or oral, to the
Debtors concerning a possible purchase of some of the Debtors' assets. Of these seven who had
discussions with management, three were specifically interested in the Debtors' Chassis segment,
two were interested generally in the Debtors' assets and two were interested specifically in assets
associated with the Debtors' Powertrain Assets. It was during this process that RHJI submitted a
formal letter of intent, made the highest and best offer to date for the Powertrain Assets, which
offer encompassed substantially all of the Powertrain Group's worldwide assets, and agreed to
serve as a stalking horse bidder for the Powertrain Assets.

17. Even as the Debtors move forward with implementing the procedures
outlined in this Motion, Lazard will continue to solicit offers for and market the Powertrain
Assets and certain of the Debtors' other assets to a wide range of potential purchasers.
Specifically, Lazard will continue to: (a) reengage all the investors that have already been
solicited as potential purchasers; (b) provide access to a data room of confidential information on
the Chassis Assets to all Qualified Bidders; and (c) provide customized information packets to

potential purchasers. In this way, the Debtors intend to maximize the number of participants that may be willing to participate as buyers at an auction for the Powertrain Assets.

## The Proposed Sale Transaction

18.     Pursuant to the Agreement, the Metaldyne Companies will sell the Powertrain Assets to RHJI for $25 million in cash (subject to certain adjustments) and $50 million in notes (the "New Notes"), plus the assumption of certain liabilities of the Metaldyne Companies related to the Powertrain Assets. Pursuant to the Agreement, RHJI will acquire the Powertrain Assets through (a) the purchase of the various Powertrain Assets located at the relevant Metaldyne Companies' facilities, (b) the assignment of the unexpired non-residential real property leases, equipment leases and other agreements associated with certain of such facilities and (c) the employment of certain members of the Metaldyne Companies' workforce currently employed at such facilities.

19.     A summary of the principal terms of the Agreement is attached hereto as Exhibit 2 and is incorporated herein by reference. Among other things, the Agreement sets forth (a) the Powertrain Assets to be purchased by RHJI (as well as those Powertrain Assets excluded from the Sale Transaction); (b) certain liabilities of the Powertrain Assets that will be assumed by RHJI (the "Assumed Liabilities") (as well as those liabilities that RHJI will not assume); (c) the executory contracts and unexpired leases of the Debtors that are to be assumed and assigned to RHJI in connection with the Sale Transaction (collectively, the "Debtor Contracts"), as well as the allocation of responsibility for payment of associated cure costs (collectively, the "Cure Costs"). The Agreement further includes various representations, warranties and covenants made or agreed to by the parties, certain employment-related provisions and certain indemnification provisions.

20.     The Agreement further provides for a breakup fee of $2 million (i.e., 2.6% of the total consideration to be paid for the Powertrain Assets (excluding the value of liabilities to be assumed)) (the "Breakup Fee") and for reimbursement of RHJI's actual out-of-pocket expenses of up to $750,000 (the "Expense Reimbursement") to be paid if the Metaldyne Companies consummate an alternative transaction for the Powertrain Assets.

21.     In connection with the sale of assets and transfer of liabilities under the Agreement, RHJI and the Metaldyne Companies will be executing customary transfer documents and a transition services agreement, the form of which will be agreed to between signing and closing.  The Metaldyne Companies and RHJI will also be executing:  (a) certain amended equipment leases; (b) an escrow agreement; and (c) other ancillary agreements.

22.     RHJI's obligations under the Agreement are conditioned upon certain events, including RHJI's completion of its due diligence investigation regarding the Debtors' business, assets and liabilities to RHJI's sole and absolute discretion.  Pursuant to the terms of the Agreement, however, the Agreement will automatically terminate if RHJI has not provided the Debtors with written notice by July 2, 2009 that the due diligence and certain other conditions either have been satisfied or waived by RHJI (the "Satisfaction Notice").  In addition, RHJI will not be entitled to the Breakup Fee or Expense Reimbursement unless and until it provides the Satisfaction Notice by the July 2 deadline.

**Extraordinary Provisions Under the Guidelines**

23.     The Agreement contains the following items that may be considered

Extraordinary Provisions under the "Guidelines for the Conduct of Asset Sales" promulgated by

General Order M-331:[3]

(a)     Sale to Insider.  RHJI is an insider of the Debtors.  RHJI presently holds
approximately 60.1% of the outstanding capital stock of Asahi Tec.  Asahi Tec is
the parent of Metaldyne Holdings and thereby the indirect parent of Metaldyne
and the other Debtors.  Members of RHJI also serve on Metaldyne Corporation's
board of directors.

(b)     Agreements with Management.  RHJI expects to make offers of employment to
certain members of the Debtors' senior management.  As described herein, the
Board of Directors of Metaldyne Corporation appointed a Special Committee of
independent members to oversee the marketing and sale of the Powertrain Assets
to ensure the fairness of the sale and the proposed transaction in the light of any
such potential employment by RHJI of the Debtors' management.

(c)     Private Sale/No Competitive Bidding.  While an exclusivity provision was in
place for a short time prior to the Petition Date, such period expired as of the
Petition Date.  The Debtors are not hereby seeking Court approval of any such
provisions in this Motion.

(d)     Deadlines that Effectively Limit Notice.  While the Debtors are seeking an
expedited hearing with respect to approval of the Bidding Procedures, parties in
interest will have ample time to object to any proposed sale transaction.  As a
result, the Debtors believe that none of the deadlines requested in this Motion will
effectively limit notice.

(e)     Use of Proceeds.  Section 4.05(b) of the Agreement provides that RHJI may
reasonably determine and communicate the allocation of the purchase price being
paid for the Powertrain Assets to the Powertrain Assets.  RHJI's allocation of the
purchase price paid for the Powertrain Assets will not be binding on the Debtors
for purposes of distribution of the net sale proceeds in the chapter 11 cases.  In
addition, the proposed Sale Order provides that "at the Closing, the Liens in favor
of or for the benefit of the Prepetition Secured Parties on the Purchased Assets
shall attach to the proceeds of the sale of the Purchased Assets in the same order
of priority; and the proceeds from the sale of the Purchased Assets attributable (in
an amount satisfactory to the Prepetition ABL Agent) to the DIP Collateral other
than the Prepetition Term Priority Collateral shall be used first to pay (and shall

---

[3]     The following list of possible "Extraordinary Provisions" as such term is defined in General Order M-331 is
not intended to be an admission that any of these items are unusual relief in a large, multinational sale of
assets pursuant to section 363 of the Bankruptcy Code.

be paid directly to) the Prepetition ABL Agent for application to the Prepetition ABL Obligations and the DIP Obligations in accordance with the terms of the DIP Financing Order."

(f)   Successor Liability.  The proposed form of Approval Order contains certain findings with respect to the Powertrain Assets being free of successor liability. RHJI has required these findings as part of its offer to purchase the Powertrain Assets.

(g)   Relief from Bankruptcy Rule 6004(h).  The proposed form of Approval Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Powertrain Group operates in an intensely competitive market for automotive parts and any uncertainty regarding the ultimate ownership of the Powertrain Assets would make it more difficult to compete in that market.  Because of these pressures, the Metaldyne Companies and RHJI would like to consummate the sale of the Powertrain Assets as soon as possible.  In addition, under the terms of the DIP Facility, the sale of the Powertrain Assets is required to close by July 28, 2009 unless extended pursuant to the terms of such financing.

## Bidding Procedures for the Powertrain Group

24.   The Debtors request that the Court approve the following Bidding Procedures for Powertrain Assets:[4]

(a)   Important Dates:  The Debtors will:

    (i)   assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept bids until **5:00 p.m. (Eastern Time) on July 23, 2009**;

    (ii)   negotiate with Qualified Bidders (as defined below) in preparation for the Auction to begin at **10:00 a.m. (Eastern Time) on July 24, 2009**; and

    (iii)   in consultation with the Creditors' Committee and the DIP Agent, select the Successful Bidder (as defined below) at the conclusion of the Auction and seek authority to sell the Powertrain Assets to such Successful Bidder at the Sale Hearing to be held by the Court at **10:00 a.m. (Eastern Time) on July 27, 2009**.

(b)   Determinations by Debtors.  The Debtors shall (i) coordinate the efforts of Potential Bidders (as defined below) in conducting their respective due diligence

---

[4]   The description of the Bidding Procedures described herein is for the convenience of the Court and other parties in interest.  The full copy of the Bidding Procedures, which are included as part of the proposed Bidding Procedures Order attached hereto as Exhibit 3, should be reviewed with respect to any particular question regarding the Bidding Procedures.

investigations regarding the Powertrain Assets, (ii) determine (with the assistance of Lazard) whether any person or entity is a Qualified Bidder, (iii) receive bids from Qualified Bidders, (iv) negotiate any bids and (v) conduct (with the assistance of Lazard) the Auction (collectively, the "Bidding Process").  Any person or entity who wishes to participate in the Bidding Process must be a Qualified Bidder.

(c)     Participation Requirements.  Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each interested person or entity (a "Potential Bidder") must deliver the following (unless previously delivered) to:  (i) Metaldyne Corporation, 47603 Halyard Drive, Plymouth, Michigan 48170-2429 (Attn:  David McKee, Esq., General Counsel); (ii) Lazard Frères & Co., L.L.C., 190 S. La Salle Street, Chicago, Illinois (Attn:  Michael Macakanja); (iii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Richard H. Engman, Esq. and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  Heather Lennox, Esq. and Ryan T. Routh, Esq.); (iv) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn:  Kurt F. Gwynne, Esq.); (v) White & Case, 1155 Avenue of the Americas, New York, New York 10036 (Attn:  Eric F. Leicht, Esq. and Scott Greissman, Esq.); and (vi) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York  10004 (Attn:  Gary Kaplan, Esq.), so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on July 20, 2009:

     (i)     an executed confidentiality agreement in form and substance satisfactory to the Debtors;

     (ii)     a statement demonstrating to the Debtors' satisfaction a *bona fide* interest in purchasing the Powertrain Assets or substantially all of the Debtors' assets; and

     (iii)     proof of financial wherewithal to consummate a sale transaction.

(d)     Due Diligence Access.  If the Debtors determine that a Potential Bidder has a *bona fide* interest in the Powertrain Assets, no later than two business days after the Debtors make that determination and have received from a Potential Bidder all of the materials required above, the Debtors will deliver to the Potential Bidder: (i) an information packet containing information and financial data with respect to the Powertrain Assets (the "Information Packet"); (ii) a copy of the Agreement; and (iii) access information for the Debtors' confidential electronic data room concerning the Powertrain Assets (the "Data Room").  Until the Bid Deadline (as defined below), the Metaldyne Companies will provide any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Metaldyne Companies, in their business judgment, determine to be reasonable and appropriate under the circumstances.

(e)     Bid Delivery Requirements.  A Potential Bidder that desires to make a bid shall deliver written and electronic copies of its bid to:  (i) Metaldyne Corporation,

47603 Halyard Drive, Plymouth, Michigan 48170-2429 (Attn: David McKee, Esq., General Counsel); (ii) Lazard Frères & Co., L.L.C., 190 S. La Salle Street, Chicago, Illinois 60603 (Attn: Michael Macakanja); (iii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn: Richard H. Engman, Esq.) and 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: Heather Lennox, Esq. and Ryan T. Routh, Esq.); (iv) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq.); (v) White & Case, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Eric F. Leicht, Esq. and Scott Greissman, Esq.); and (vi) Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Attn: Gary Kaplan, Esq.), so as to be received not later than 5:00 p.m. (Prevailing Eastern Time) on July 23, 2009 (the "Bid Deadline"). Electronic delivery information for bids will be provided upon request to any Potential Bidder who continues to have an interest in the Powertrain Assets as of the Bid Deadline.

(f) <u>Bid Requirements</u>. A bid is a signed document from a Potential Bidder that provides, at a minimum, that:

    (i) the Potential Bidder offers to purchase the Powertrain Assets (or substantially all of the Debtors' assets) and to assume the Assumed Liabilities at the purchase price and upon the terms and conditions set forth in a copy of an asset purchase agreement enclosed therewith, marked to show any proposed amendments and modifications to the Agreement (the "Marked Agreement");

    (ii) the bid is not subject to any due diligence or financing contingency and is irrevocable until the earlier of September 1, 2009 or one business day following the closing of the Sale Transaction;

    (iii) does not entitle a bidder (other than RHJI) to any break-up fee, termination fee or similar type of payment or reimbursement; and

    (iv) the purchase price in such bid is a higher and better offer for the Powertrain Assets than that described in the Agreement and herein, and such offer shall not be considered a higher and better offer unless such bid provides for net consideration to the Metaldyne Companies of at least $3 million more than the sum of the consideration to be paid by RHJI and the value of the Assumed Liabilities for the Powertrain Assets (the "Alternative Minimum Purchase Price").

(g) <u>Supporting Information for Bids</u>. A Potential Bidder shall accompany its bid with: (1) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder and such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtors may reasonably request; (2) a copy of a board resolution or similar document demonstrating the authority of the

Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (3) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws.

(h)     Rejection of Bids.  The Debtors reserve the right to reject any bid for the Powertrain Assets if such bid:

   (i)     is on terms that are materially more burdensome or conditional than the terms of the Agreement;

   (ii)     is a bid on a subset of the Powertrain Assets unless two or more such bids, taken together, provide for higher and better value to the Debtors' estates;

   (iii)     requires any indemnification of such Qualified Bidder on terms that are materially more burdensome than the terms of the Agreement;

   (iv)     does not provide for the complete assumption of all liabilities proposed to be assumed under the Agreement;

   (v)     does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees); or

   (vi)     does not propose to cooperate with the Debtors and/or other potential purchasers of the Debtors' assets in negotiating an appropriate form of transition services agreement(s).

(i)     Deposit Requirement.  A Potential Bidder must deposit with an escrow agent selected by the Debtors (the "Deposit Agent") a deposit equal to $2.5 million (any such deposit, a "Good Faith Deposit").  The Good Faith Deposit must be made by certified check or wire transfer and will be held by the Deposit Agent in accordance with the terms of the escrow agreement to be provided with the Agreement.

(j)     Qualification of Bids.  A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  For purposes of the Bidding Procedures, RHJI is a Qualified Bidder and the Agreement executed by RHJI is a Qualified Bid.  A Qualified Bid will be valued based upon all of the factors set forth in section (h) above as well as factors such as:  (i) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities; (ii) the fair value to be provided to the Metaldyne Companies under the Qualified Bid; (iii) the ability to close the proposed Sale Transaction without delay; (iv) the ability to obtain any and all necessary antitrust approvals for the proposed transaction; and (v) any other factors the Debtors may deem relevant.  Within one business day after receipt of a Qualified Bid from a Qualified Bidder, and, in any event, prior to

the Auction, the Debtors shall distribute by email or facsimile a copy of each Qualified Bid to counsel to each Qualified Bidder (including RHJI).

(k)     Selection of Baseline Bid.  Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction.  The Debtors will select the highest and best Qualified Bid or Qualified Bids for the Powertrain Assets (the "Baseline Bid") to serve as the starting point at the Auction.  As soon as practicable, the Debtors shall provide all Qualified Bidders with a copy of the Baseline Bid.

(l)     Time and Place for Auction.  If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction.  The Auction shall take place at 10:00 a.m. (Prevailing Eastern Time) on July 24, 2009, at the offices of Jones Day, located at 222 East 41st Street, New York, New York 10017, or such other time or such other place as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids.  Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.  Professionals for the prepetition secured lenders, the DIP Agent and the Creditors' Committee shall be able to attend and observe the Auction.

(m)     Minimum Overbid.  A minimum overbid from the RHJI Agreement of $3 million (the "Minimum Overbid"), being enough to cover the Breakup Fee and the Expense Reimbursement, will be required for any Baseline Bid based on a Qualified Bid other than the Agreement, or for any Qualified Bid made at the Auction.

(n)     Minimum Bid Increment.  At the Auction, participants (including RHJI) will be permitted to increase their bids and will be permitted to bid based only upon the terms of the Baseline Bid (except to the extent otherwise authorized by the Debtors).  The bidding will start at the purchase price and terms proposed in the Baseline Bid, and continue with the Minimum Overbid (if not already accounted for in the Baseline Bid) and, thereafter, in increments of at least $500,000.  If RHJI bids at the Auction, RHJI will receive a "credit" in the amount of the Breakup Fee and Expense Reimbursement to be counted towards its bid.

(o)     Additional Rules for Auction.  The Debtors may, in consultation with the DIP Agent and Creditors' Committee, adopt rules for the Auction at any time that will best promote the goals of the Bidding Process and that are not inconsistent with any provisions of the Agreement or the Bidding Procedures described herein.  Any such rules will provide that:  (i) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (ii) all bids will be made and received in one room, on an open basis, and all other bidders will be entitled to be present for all bidding with the understanding that the true identity of each bidder will be fully disclosed to all other bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (iii) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

(p)     Selection of Successful Bid.  Immediately prior to the conclusion of the Auction, the Debtors, after consultation with the DIP Agent and the Creditors' Committee, will:  (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (ii) identify the successful bid (the "Successful Bid"); and (iii) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder (the "Successful Bidder"), and the amount and other material terms of the Successful Bid.  At the Sale Hearing, the Debtors shall present the Successful Bid to the Bankruptcy Court for approval.

(q)     Return of Deposits.  The Good Faith Deposits of all Qualified Bidders, including RHJI, shall be held in escrow by the Deposit Agent and shall not become property of the Debtors' bankruptcy estates absent further order of the Bankruptcy Court. The Deposit Agent shall retain the Good Faith Deposits of the Successful Bidder and the party with the next highest or otherwise best bid (the "Next Highest Bidder") until the earlier of the closing of the Sale Transaction or the termination or the expiration of the applicable Marked Agreement or the Agreement.  The Good Faith Deposits of the other Qualified Bidders shall be returned within four business days of the entry of the Approval Order.  At the closing of the Sale Transaction contemplated by the Successful Bid, a Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit.  The Good Faith Deposit of the Next Highest Bidder shall be released by the Debtors upon the earlier of (i) four business days after the closing of the Sale Transaction or (ii) the withdrawal of the Powertrain Assets (together with the Assumed Liabilities) for sale by the Debtors.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

The Debtors believe that the proposed Bidding Procedures provide an appropriate framework for selling the Powertrain Assets and will enable the Debtors to review, analyze and compare all bids received to determine which bid or combination of bids is in the best interests of the Debtors' estates and creditors.

### Proposed Stalking Horse Bidding Protections

25.     The Debtors are also requesting approval of the provisions of the Agreement regarding the payment of the Breakup Fee of $2 million (i.e., 2.6% of the total consideration to be paid for the Powertrain Assets (excluding the value of liabilities to be assumed) and the Expense Reimbursement up to a cap of $750,000 if and only if RHJI has provided the Satisfaction Notice that the due diligence and certain other conditions under the

Agreement have been satisfied or waived by July 2, 2009. The Breakup Fee and Expense Reimbursement are only payable upon closing of a Court-approved sale of the Powertrain Assets to an entity other than RHJI who outbids RHJI at the Auction (an "Alternative Transaction"). RHJI required the inclusion of these provisions in the Agreement to be willing to serve as a stalking horse bidder. RHJI's bid establishes a very high floor value for the Powertrain Assets. If RHJI does not provide the Satisfaction Notice to evidence its full commitment to purchasing the Powertrain Assets by July 2, 2009, then the Agreement will not be the stalking horse bid and RHJI will not be entitled to the bid protections. In such instance, the Debtors will auction the Powertrain Assets without a stalking horse in accordance with the procedures described herein.

26. Courts in this and other districts have approved similar breakup fees and expense reimbursements. See In re BearingPoint, Inc., No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a breakup fee of approximately 3% of the purchase price and an expense reimbursement of up to $5,000,000); In re Silicon Graphics, Inc., No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving breakup fee of approximately 2.8% of the purchase price and expense reimbursement of $750,000); In re Fortunoff Fine Jewelry and Silverware, LLC, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving breakup fee of 2.8% of the purchase price); In re Bally Total Fitness of Greater New York, Inc., No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving breakup fee of 4.3% of the purchase price and expense reimbursement of up to 2.1% of the purchase price); In re G+G Retail, Inc., No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) (approving breakup fee of 3%); In re Twinlab Corp., No. 03-15564 (RDD) (Bankr. S.D.N.Y. Sep. 26, 2003) (approving breakup fee of 5.3% and expense reimbursement); see also In re Riverstone Networks, Inc., No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006) (approving breakup fee of 3% of the purchase price plus expense

reimbursement of up to $1 million); In re Chi-Chi's Inc., No. 03-13063 (CGC) (Bankr. D. Del.

Nov. 4, 2003) (approving breakup fee of 5.1%); In re Great Northern Paper, Inc., No. 03-10048-

LHK (Bankr. D. Me. Feb. 18, 2003) (approving breakup fee of 6.6% of purchase price plus

expense reimbursement); In re FSC Corp., No. 00-B-04659 (Bankr. N.D. Ill. Feb. 28, 2000)

(approving breakup fee of 3.4% plus expense reimbursement of up to $500,000).

        27.     The Breakup Fee and the Expense Reimbursement have encouraged RHJI

to bid for the Powertrain Assets and perform diligence with respect to such assets, and this will

allow the Debtors to maximize the potential sale value of the Powertrain Assets at the Auction.

Courts in this district have recognized that break-up fees and expense reimbursements may be

used to protect bidders in connection with a sale of assets pursuant to section 363 of the

Bankruptcy Code and that such fees can be "important tools to encourage bidding and to

maximize the value of the debtor's assets." Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal

dismissed, 3 F.3d 49 (2d Cir. 1993). Such protections enable a debtor to assure a sale to a

contractually-committed bidder at a price the debtor believes is fair and reasonable, while

providing the debtor with the opportunity of obtaining even greater benefits for the estate

through an auction process. See In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr.

S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to

enter the bidding by providing some form of compensation for the risks it is undertaking.")

(citation omitted).

        28.     The Debtors submit that the proposed Breakup Fee and the Expense

Reimbursement also meet the "business judgment rule" standard. Bankruptcy courts generally

approve bidding protections similar to the proposed Breakup Fee and the Expense

Reimbursement under a "business judgment rule standard" pursuant to which courts grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest business judgment. Specifically, courts in this district have approved break-up fees so long as (a) the relationship between the parties is not tainted by self-dealing, (b) the fee does not hamper bidding and (c) the amount of the fee is reasonable in relation to the size of the transaction. In re Integrated Res., Inc., 147 B.R. at 657. The Debtors submit that the proposed Breakup Fee and the Expense Reimbursement will not chill bidding, are reasonable and ultimately promote the Debtors' ability to maximize the value of their estates. In addition, as already discussed above, the proposed Breakup Fee and the Expense Reimbursement are reasonable in relation to the breakup fees and expense reimbursements approved in other cases in this and other districts.

29. The Debtors took particular care to avoid any self-dealing when selecting the stalking horse bid for the Powertrain Assets. Specifically, the Special Committee consisting of two fully independent directors evaluated the offers for the Powertrain Assets, including the Breakup Fee and Expense Reimbursement provisions. The decision to select the bid submitted by RHJI for the Powertrain Assets was made by the Special Committee in its sole discretion after the extensive marketing of the Powertrain Assets by Lazard.

30. As described above, RHJI's obligations under the Agreement are conditioned upon RHJI's delivery of the Satisfaction Notice by July 2, 2009. The Debtors and RHJI have worked diligently to eliminate the due diligence and other conditions prior to the filing of this Motion, but because of the requirement in the DIP Facility to file this Motion by June 15, 2009, RHJI was not able to complete its due diligence in time to meet such deadline. Although RHJI, as an insider, is familiar with the Debtors' operations, RHJI has required

additional time to conduct due diligence because the businesses that RHJI would purchase are not separately accounted for either financially or operationally; hence, much new analysis is occurring as part of the due diligence process. Accordingly, the Debtors agreed to give RHJI a limited period after the execution of the Agreement, through July 2, 2009, to complete its due diligence. The Debtors believe that this due diligence will ultimately benefit all potential bidders for the Powertrain Assets, including another potential stalking horse bidder should RHJI terminate the Agreement, by presenting a clearer analysis of the value of a portion of the Powertrain segment as a stand-alone entity. Moreover, RHJI will not be entitled to the Breakup Fee or Expense Reimbursement unless and until it delivers the Satisfaction Notice by the July 2 deadline.

31. Accordingly, the Debtors should be authorized to offer forms of bid protection such as the proposed Breakup Fee and the Expense Reimbursement as are necessary in the Debtors' business judgment, subject to RHJI's delivery of the Satisfaction Notice by July 2, 2009.

## **Proposed Notice of the Sale Hearing**

32. Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein. The Debtors propose that, to be considered, objections to the Sale Transaction and/or any component thereof must be in writing, filed with the Court and served so as to be received no later than 4:00 p.m. (Eastern Time) on July 23, 2009 (except for certain limited exceptions described below) by (a) Metaldyne Corporation, 47603 Halyard Drive, Plymouth, Michigan 48170-2429 (Attn: David McKee, Esq., General Counsel), (b) counsel for the Debtors, Jones Day, 222 East 41st Street, New York, New

York 10017 (Attn: Richard H. Engman, Esq.) and Jones Day, 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn: Heather Lennox, Esq. and Ryan T. Routh, Esq.), (c) counsel to the Creditors' Committee, Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq.), (d) counsel to the DIP Agent, White & Case, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Eric F. Leicht, Esq. and Scott Greissman, Esq.) and (e) counsel to RHJI, Cravath, Swaine & Moore, LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019-7475 (Attn: Thomas Dunn, Esq. and Richard Levin, Esq.).

33.     Within two business days after entry of the Bidding Procedures Order (the "Mailing Deadline"), the Debtors shall serve the Sale Notice, together with a copy of the Bidding Procedures Order upon the Special Service List and the General Service List, pursuant to the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (Docket No. 133) (the "Case Management Order"), entered on June 5, 2009, which includes, in accordance with General Order M-331, counsel for the Creditors' Committee, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), counsel to the DIP Agent, counsel for the Debtors' prepetition lenders, counsel to the Debtors' indenture trustee, and all entities who have requested service pursuant to Bankruptcy Rule 2002. In addition, in accordance with General Order M-331, the Debtors shall serve notice, by first-class mail, postage prepaid upon: (a) any party who, in the past year, expressed in writing to the Debtors an interest in the Powertrain Assets or the Debtors' other assets; (b) all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Powertrain Assets or the Debtors' other assets; (c) the Securities and Exchange Commission;

(d) the Internal Revenue Service; (e) all applicable state attorneys general and local environmental enforcement agencies; (f) all applicable state and local taxing authorities; (g) the Federal Trade Commission; (h) the United States Attorney General/Antitrust Division of Department of Justice; (i) the United States Environmental Protection Agency; and (j) the United States Attorney.

34.     In addition, on the Mailing Deadline, or as soon as practicable thereafter, the Debtors will run a publication version of the Sale Notice one time in the national edition of the *Wall Street Journal* and the *Detroit Free Press*.  The Sale Notice provides that any party that wishes to obtain a copy of this Sale Motion, including all exhibits, may do so by making such a request in writing to Jones Day, 901 Lakeside Avenue, North Point, Cleveland, Ohio 44114 (Attn:  Betty Yakovich), Facsimile:  (216) 579-0212, or by accessing the website of the Debtors' claims and noticing agent, BMC Group, at www.bmcgroup.com/metaldyne.

35.     The Debtors submit that the notice of the Sale Motion, the Auction and the Sale Hearing as provided for herein complies fully with Bankruptcy Rule 2002, Local Bankruptcy Rule 2002-1 and General Order M-331 and constitutes good and adequate notice of the sale of the Powertrain Assets and the proceedings with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

## Argument

### *Approval of the Sale Transaction under Section 363 of the Bankruptcy Code*

36.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997); Comm. of Equity Sec. Holders v.

Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Global Crossing

Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675

(Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987)

(stating that judicial approval of a section 363 sale requires a showing that the proposed sale is

fair and equitable, a good business reason exists for completing the sale and the transaction is in

good faith).

37. The Debtors have sound business justifications for selling the Powertrain

Assets at this time. The collapse over the course of the last year in consumer demand for, and

OEM production of, automobiles coupled with the tightening of credit markets has made a stand-

alone reorganization of the Debtors' businesses economically infeasible. Accordingly, the

Debtors believe that the sale of the Powertrain Assets and the Debtors' other assets presents the

best opportunity for the Debtors to maximize the ultimate recoveries of their stakeholder

constituencies.

38. Moreover, the Debtors have executed the Agreement only after the

thorough consideration of a number of alternatives. Lazard solicited approximately 34 potential

buyers. Seven potential buyers that Lazard provided with information packages describing the

Debtors' assets attended management presentations after they provided a satisfactory indication

of interest, either written or oral, to the Debtors concerning a possible purchase of the Powertrain

Assets. The consideration that the Debtors will receive from RHJI (or from another Successful

Bidder following the Auction) in return for the Powertrain Assets is fair, reasonable and far

exceeds the value that the Debtors would receive for such assets were they to be liquidated or

sold piecemeal to various purchasers. As of the date of this Motion, the Debtors have received

no definitive offer to purchase the Powertrain Assets that promises greater economic value than

that embodied in the Agreement (which economic value will be market-tested by a fair and open Auction, as described herein). Finally, all of these findings are based on the opinions of the Special Committee of independent directors that was given full authority to explore the sale of the Powertrain Group.

39. In addition, Lazard will continue to market the Powertrain Assets up until the Bid Deadline by (a) reengaging all the investors that have already been solicited as potential purchasers, (b) providing access to a data room of confidential information on the Powertrain Assets to all Qualified Bidders, and (c) providing customized information packets to potential purchasers. In this way, the Debtors intend to maximize the number of participants who may participate as buyers at the Auction.

40. The Debtors submit that the Agreement (or any Marked Agreement submitted by a Successful Bidder) constitutes (or will constitute) the best offer for the Powertrain Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any available alternative. Thus, the Debtors' entry into the Agreement or Marked Agreement, as the case may be, represents a sound exercise of their reasonable business judgment.

### *RHJI is a "Good Faith" Purchaser*

41. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals, in In re Gucci, has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code)); see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same; quoting Gucci); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

42.    The Debtors submit that RHJI is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. The consideration to be received by the Debtors pursuant to the Agreement is substantial, fair and reasonable. The parties have entered into the Agreement without collusion, in good faith and from vigorous, arm's-length bargaining positions. There is no indication of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or any similar conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code. As already discussed, the Debtors took particular care to ensure that the RHJI bid was evaluated and negotiated by the Special Committee of fully independent directors after the extensive marketing efforts of Lazard. Accordingly, the Debtors seek a finding that RHJI is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and entitled to the full protection thereof.

### *Approval of Sale Free and Clear*

43.    The Debtors request approval to sell the Powertrain Assets free and clear of any and all liens, claims and encumbrances (except for the Assumed Liabilities) in accordance

with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f) of the Bankruptcy Code,

a debtor in possession may sell property of the estate "free and clear of any interest in such

property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint

Stevens, Inc.), 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where … a sale is to be free and clear of

existing liens and interests other than those of the estate, one or more of the criteria specified in

section 363(f) of the statute must also be met.").  This provision is supplemented by

section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order,

process or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a); see also Volvo White Truck Corp. v. Chambersburg

Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987)

("Authority to conduct such sales is within the court's equitable powers when necessary to carry

out the provisions of Title 11.").

   44.  The Debtors believe that each of the parties holding liens in the Powertrain

Assets could be compelled to accept a monetary satisfaction of such interests.  Moreover, the

Debtors believe that the purchase price for the Powertrain Assets will exceed the economic value

of any liens on the Powertrain Assets.  This Court has adopted the view that the "aggregate value

of all liens" referenced in section 363(f)(3) of the Bankruptcy Code means the actual economic value of the liens, not their face amount.  In re Beker Indus., Inc., 63 B.R. 474, 477 (Bankr. S.D.N.Y. 1986).  Thus, where the purchase price for a debtor's assets is the best available under the circumstances, a court may authorize the sale free and clear of existing liens, claims and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims and encumbrances.  Id. at 477-78.  In this instance, the procedures outlined in this Motion and the Debtors' extensive and continuing efforts to market the Powertrain Group will ensure that the purchase price for the Powertrain Assets is the best available.  Therefore, the sale of the Powertrain Assets should be approved free and clear of any and all liens, claims and encumbrances regardless of their face amount.

45.    In addition, certain holders of liens otherwise have consented (or, absent any objection to this Motion, may be deemed to have consented) to the sale of the Powertrain Assets.[5]  Finally, any lien, claim or encumbrance in the Powertrain Assets will attach to the net proceeds of the Sale Transaction, subject to any claims and defenses the Debtors may possess with respect thereto.[6]  Accordingly, the Debtors believe that (a) the Sale Transaction will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and (b) the sale of the Powertrain Assets should be approved free and clear of all liens, claims and encumbrances.

***Approval of Assumption of Contracts***

46.    The standard for a debtor to assume and assign or reject an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code is whether the

---

[5]    Further, certain of the liens asserted against the Powertrain Assets may be disputed by the Debtors.  As such, the Debtors fully reserve their rights to challenge the amount or validity of any purported lien, claim or encumbrance on any and all available grounds.

[6]    The proposed form of the Approval Order provides that any liens on the Debtors' assets will attach to the proceeds of the Sale Transaction.  See Approval Order, attached as Exhibit 5, at ¶ 7.

debtor's decision is made within its sound business judgment.  See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (noting that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

47.     The Debtors seek authority to assume and assign the Debtor Contracts that are identified in Schedule A of the Agreement and the Contract and Cure Schedule (as such term is defined below).  The Debtors assert that, upon compliance with the procedures outlined below, they will have met all requirements of sections 365(b) and 365(f) of the Bankruptcy Code and should be permitted to assume and assign the Debtor Contracts to RHJI (or a Successful Bidder other than RHJI), as the case may be.

48.     The assumption and assignment of Debtor Contracts is provided for in the Agreement and is an integrated part of the Sale Transaction.  In light of the proposed divestiture of the Powertrain Assets, the Debtor Contracts will no longer be necessary to the Debtors' reorganization and would constitute a burden on their chapter 11 estates.  By contrast, the Debtor Contracts may have significant value to RHJI (or a Successful Bidder other than RHJI). Accordingly, the assumption and assignment of the Debtor Contracts is warranted, in the Debtors' business judgment, to eliminate the ongoing liabilities associated therewith and to complete (and maximize the value of) the Sale Transaction.  Assumption and assignment of the Debtor Contracts is, thus, a sound and reasonable exercise of the Debtors' business judgment and should be approved.

**The Court Should Establish (i) a Deadline to Object to
the Assumption and Assignment of Debtor Contracts and
(ii) the Cure Amounts as Set Forth in the Contract and Cure Schedule**

49. In connection with the assumption and assignment of Debtor Contracts pursuant to any Sale Transaction, the Debtors believe that it is necessary to establish a process by which (a) the Debtors and the counterparties to Debtor Contracts that will be assumed can establish the cure obligations, if any, to be paid in accordance with section 365 of the Bankruptcy Code and (b) for the nondebtor counterparties of such assumed Debtor Contracts to assert any objection they may have to the assumption and assignment of same. No later than July 5, 2009, the Debtors will file a schedule of cure obligations (the "Contract and Cure Schedule") for the Debtor Contracts, which shall include a description of each Debtor Contract to potentially be assumed and assigned under the Agreement and the amount, if any, necessary to cure such Debtor Contracts pursuant to section 365 of the Bankruptcy Code. A copy of the Contract and Cure Schedule, together with the Sale Notice and the Bidding Procedures Order, will be served on each of the nondebtor parties identified on the Contract and Cure Schedule by first class mail.

50. Any objections to any cure amount(s) set forth on the Contract and Cure Schedule (any such objection, a "Cure Objection" and any such disputed amounts, "Disputed Cure Costs") must be in writing and filed with the Court and served on the parties identified in paragraph 32 above so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on July 20, 2009. If no timely Cure Objection is filed and served with respect to a Debtor Contract, the cure amounts identified on the Contract and Cure Schedule with respect to the applicable Debtor Contracts will be the only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under such contracts.

51. Any objections to the provision of adequate assurance of future performance under any Debtor Contract identified on the Contract and Cure Schedule (any such

objection, an "Adequate Assurance Objection"), must be in writing and filed with the Court and served on the parties listed in paragraph 32 above so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on July 24, 2009.  If no timely Adequate Assurance Objection is filed and served with respect to a Debtor Contract, RHJI (or a Successful Bidder other than RHJI) will be deemed to have provided adequate assurance of future performance under the applicable Debtor Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code.

52.     The Debtors intend to cooperate with counterparties to Debtor Contracts to attempt to reconcile any differences related to cure amounts and/or adequate assurance of future performance.  If a timely Cure Objection or Adequate Assurance Objection is received and any such objection cannot otherwise be resolved by the parties, the Debtors request that the Court schedule a hearing to be held before the Court on July 27, 2009 to resolve any issues raised by such objections.  The pendency of disputes relating to cure amounts or adequate assurance of future performance will not prevent or delay the closing on any sale of assets, including the assumption and assignment of Debtor Contracts necessary to effectuate such closing.

53.     As soon as practicable after (a) an amendment to the Contract and Cure Schedule adding a Debtor Contract thereto or (b) the receipt of a Qualified Bid seeking the assumption and assignment of a Debtor Contract not listed on the Contract and Cure Schedule (any such contract, an "Additional Contract"), the Debtors shall provide notice to the Creditors' Committee and each affected counterparty of the proposed assumption and assignment of the Additional Contracts and of any Cure Costs associated therewith.  Any objections to the assumption and assignment of Additional Contracts, including but not limited to any objections to the provision of adequate assurance or the proposed Cure Cost associated with an Additional Contract, must be filed with the Court and served so as to be received no later than 4:00 p.m.

(Eastern Time) on the date that is 5 days following the Debtors' delivery of notice to an affected counterparty of the proposed assumption and assignment of such Additional Contract and of any Cure Costs associated therewith.

54.     Except as may otherwise be agreed to by the parties to a Debtor Contract, the defaults under the Debtor Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows:  (a) if RHJI is the Successful Bidder, RHJI will assume responsibility for the Cure Amounts (as defined in the Agreement), subject to the provisions of section 2.03(a)(ii) of the Agreement; (b) if a party other than RHJI is the Successful Bidder, the Debtor Contracts shall be cured by payment of the Cure Costs and Disputed Cure Costs in accordance with the terms of the Marked Agreement.

55.     Finally, the Debtors request that any party failing to object to the proposed Sale Transaction be deemed to consent to the treatment of its Debtor Contract under section 365 of the Bankruptcy Code and this Sale Motion.  See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).  Moreover, the Debtors request that each such party be deemed to consent to the assumption and assignment of its Debtor Contract notwithstanding any anti-alienation provision or other restriction on assignment.  See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## Notice

56.     Pursuant to the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (Docket No. 133) (the "Case Management Order"), entered on June 5, 2009, notice of this Motion has been given to the parties identified on the Special Service List and the General

Service List (as such terms are defined in the Case Management Order), which includes, in accordance with General Order M-331, counsel for the Creditors' Committee, the Office of the United States Trustee for the Southern District of New York, counsel for the Debtors' postpetition lenders, counsel for the Debtors' prepetition lenders, counsel to the Debtors' indenture trustee, and all entities who have requested service pursuant to Bankruptcy Rule 2002. The Debtors have also provided notice, in accordance with  General Order M-331, to (a) any party who was contacted by Lazard regarding the Powertrain Assets or the Debtors' other assets and (b) all parties who are known to claim interests in or liens upon the Powertrain Assets. The Debtors submit that no other or further notice need be provided.

<strong><u>No Prior Request</u></strong>

57.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order in substantially the form attached hereto as <u>Exhibit 3</u>, approving the Bidding Procedures; (ii) enter the Approval Order in substantially in the form attached hereto as <u>Exhibit 4</u>, authorizing the sale of the Powertain Assets to the Successful Bidder at the Auction; and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: June 15, 2009
      New York, New York

Respectfully submitted,

<u> /s/ Ryan T. Routh                    </u>
Richard H. Engman
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

 - and -

Heather Lennox
Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION