**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
In re:                                          :
                                                :    Chapter 11
                                                :
Metaldyne Corporation, et al.,[1]               :    Case No. 09-13412 (MG)
                                                :
                                                :    Jointly Administered
                          Debtors.              :
                                                :
--------------------------------------------------------x

### FINAL ORDER PURSUANT TO SECTIONS 361, 362, 363, 364 AND 510 OF THE BANKRUPTCY CODE AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) AUTHORIZING THE DEBTORS TO (I) USE CASH COLLATERAL OF THE PREPETITION SECURED LENDERS, (II) OBTAIN POSTPETITION FINANCING AND (III) PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS AND (B) AUTHORIZING DEBTORS TO ENTER INTO, AND APPROVING, AN <u>ACCOMMODATION AGREEMENT WITH CERTAIN CUSTOMERS</u>

Upon the motion, dated May 28, 2009 (the "<u>Motion</u>"),[2] of Metaldyne Corporation

("<u>Corp.</u>") and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") in the

above-captioned Chapter 11 cases, for entry of an order (A) authorizing the Debtors to (I) use

cash collateral, pursuant to Section 363 of title 11 of the United States Code (as amended, the

"<u>Bankruptcy Code</u>"), (II) obtain postpetition financing pursuant to Sections 361, 362 and 364 of

the Bankruptcy Code and (III) provide adequate protection to the Prepetition Secured Parties (as

---

[1]..The other Debtors are Metaldyne Company LLC; Metaldyne Intermediate Holdco Inc.; MascoTech Saturn Holdings, Inc., MD Products Corp., ER Acquisition Corp.; Metaldyne Tubular Products, Inc.; W.C. McCurdy Co.; Halyard Aviation Services, Inc.; Metaldyne Europe, Inc.; NC-M Chassis System, LLC; MASG Disposition, Inc.; Metaldyne Services, Inc.; Metaldyne Machining and Assembly Company, Inc.; Precision Headed Products, Inc.; Windfall Products, Inc.; Metaldyne Asia, Inc.; Punchcraft Company; Metaldyne Sintered Components, LLC; Metaldyne Sintered Components of Indiana, Inc.; Metaldyne Sintered Components St. Marys, Inc., GMTI Holding Company; Metaldyne Precision Forming-Fort Wayne, Inc.; MASX Energy Services Group, Inc.; Metaldyne Light Metals Company, Inc.; Stahl International, Inc.; Metaldyne U.S. Holding Co.; Metaldyne DuPage Die Casting Corporation; Metaldyne Lester Precision Die Casting, Inc.; Windfall Specialty Powders, Inc.; Metaldyne Driveline Co. LLC; and Metaldyne Engine Co. LLC.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

defined below) pursuant to Sections 361, 362 and 363 of the Bankruptcy Code, (B) authorizing Debtors to enter into, and approving, an Accommodation Agreement in the form of Exhibit A hereto (the "Accommodation Agreement"), with Ford Motor Company ("Ford"), General Motors Corporation ("GM") and Chrysler LLC ("Chrysler") and (C) scheduling interim and final hearings pursuant to Rule 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), the Debtors sought the following relief:

(i) The Court's authorization to obtain credit and incur debt pursuant to Sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code, in the form of a secured, superpriority credit facility (the "DIP Facility", and any loans or other extensions of credit thereunder, the "DIP Loans") provided by Deutsche Bank AG, New York Branch ("DBNY"), as agent (in such capacity, the "DIP Agent") and as lender (in such capacity, the "DIP Lender")[3]: (a) on an interim basis, during the period (the "Interim Period") from May 29, 2009 through and including the date of entry of this Order (the "Final Order"), up to a maximum principal amount of $11,700,000, and (b) upon entry of this Final Order, DIP Loans up to a maximum principal amount of $18,508,789.[4] The DIP Facility will be available to Metaldyne Company LLC ("Metaldyne Company"), as borrower (the "Borrower") and will be guaranteed by the

---

[3] Ford, GM, Chrysler, Honda of America Mfg. Inc. and Nissan North America, Inc. (collectively, the "Customers") have agreed to purchase a one hundred percent (100%) fully subordinated, last-out participation in the DIP Facility pursuant to an Amended and Restated Subordinated Participation Agreement in the form attached hereto as Exhibit B (the "Participation Agreement"). Notwithstanding anything to the contrary set forth herein, neither the DIP Agent nor the DIP Lender shall have any obligation to fund DIP Loans unless and until the Customers' participation in such DIP Loans has been fully funded by the Customers and made immediately available to the DIP Agent. As used herein, Accommodation Agreement shall refer to such agreement as modified by the June 12 Stipulation (as defined below).

[4] The maximum proposed amount of the DIP Facility was increased to $19,858,789, pursuant to the June 12 Stipulation.

other Debtors. The terms of the DIP Facility are set forth herein and on Exhibit C hereto (the "DIP Facility Terms").

(ii)    The Court's authorization to use proceeds of the DIP Facility in accordance with the 13-week consolidated cash flow forecast prepared by the Debtors and annexed hereto as Exhibit D (as updated from time to time, subject to the approval of the Prepetition ABL Agent (as defined below), the DIP Agent and the Customers, the "Budget"), and as otherwise provided in the Interim Order (as defined below) and in this Final Order, including to repay the Prepetition ABL Obligations (as defined below) to the extent set forth herein.

(iii)    The Court's authorization to grant to the DIP Agent for the benefit of the DIP Lender (collectively, the "DIP Secured Parties"), as security for repayment of the DIP Obligations (as defined below), in accordance with the relative priorities among the liens securing the DIP Facility, the liens securing the Prepetition Credit Facilities (as defined below) and the Adequate Protection Replacement Liens (as defined below), in each case as set forth more fully below and in each case subject to the Carve-Out (as defined below):

(a)    pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative claim having recourse to all prepetition and postpetition assets and property of the Debtors' estates and proceeds thereof, including for the avoidance of doubt all Unencumbered Foreign Stock (as defined below) and the real property and other collateral subject to the Specified Mortgages (as defined below) to the extent the Specified Mortgages are avoided, but excluding the Debtors' claims and causes of action under Sections 502(d),

544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law, and the proceeds thereof, whether received by judgment, settlement or otherwise (the "Avoidance Actions");

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, enforceable, perfected and non-avoidable lien on all assets and property of the Debtors (now owned or hereafter acquired) that were not encumbered by valid, enforceable, perfected and non-avoidable liens as of the Petition Date (as defined below), other than (i) Avoidance Actions and (ii) thirty-five percent (35%) of the equity interests (collectively, the "Unencumbered Foreign Stock") of the Debtors in their wholly-owned direct foreign subsidiaries, and proceeds thereof (collectively, all such unencumbered assets and property, other than the Unencumbered Foreign Stock and Avoidance Actions, the "Unencumbered Collateral"), *pari passu* with the Adequate Protection Replacement Liens thereon in favor of the Prepetition ABL Secured Parties (as defined below);

(c) pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, enforceable, perfected and non-avoidable lien on all assets and property of the Debtors (now owned or hereafter acquired) and proceeds thereof which, in the case of liens on assets or property (x) comprising Prepetition Term Priority Collateral (as defined below), shall be (A) junior and subject to (1) the Prepetition Liens (as defined below) and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties (as defined below) and (2) Third Party Liens (as defined below) that were, as of the Petition Date,

senior and prior to the Prepetition Liens on the Prepetition Term Priority Collateral of the Prepetition Term Secured Parties, and (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties, and (y) that were, as of the Petition Date, encumbered only by Third Party Liens, shall be junior and subject to such Third Party Liens.  As used herein, "Third Party Liens" means all liens on the Debtors' assets or property of any parties (the "Third Party Lienholders") other than the Prepetition Secured Parties (as defined below) that were valid, enforceable, perfected and non-avoidable as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code); and

(d)    pursuant to Sections 364(d)(1) and 510(a) of the Bankruptcy Code, a valid, enforceable, perfected and non-avoidable priming lien on all assets and property of the Debtors (now owned or hereafter acquired) other than Unencumbered Collateral and proceeds thereof which, in the case of liens on such assets and property (x) other than Prepetition Term Priority Collateral, shall be (A) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties and (B) senior and prior to the Prepetition Liens thereon of the Prepetition Term Secured Parties and all Third Party Liens thereon which were junior and subject to the Prepetition Liens of the Prepetition ABL Secured Parties as of the Petition Date, and (y) comprising Prepetition Term Priority Collateral, shall be (A) junior and subject to the Prepetition Liens and the Adequate Protection

Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties and all Third Party Liens thereon which were senior and prior to the Prepetition Liens thereon of the Prepetition Term Secured Parties as of the Petition Date, (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties and (C) senior and prior to all Third Party Liens thereon which were junior and subject to the Prepetition Liens thereon of the Prepetition ABL Secured Parties as of the Petition Date.

(iv)     The Court's enforcement of the terms of the Prepetition Intercreditor Agreement (as defined below) pursuant to Section 510(a) of the Bankruptcy Code.

(v)     The Court's authorization to use "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties have an interest including, in the case of the proceeds of Prepetition ABL Priority Collateral (as defined below), to permanently and indefeasibly repay Prepetition ABL Obligations as and to the fullest extent set forth herein.

(vi)     The Court's authorization to grant Adequate Protection Superpriority Claims (as defined below) and Adequate Protection Replacement Liens, to the extent of and as compensation for any Diminution in Value (as defined below), to the Prepetition Agents (as defined below) for the benefit of the Prepetition Secured Parties, in each case in accordance with the relative priorities among the claims for and liens securing repayment of the DIP Facility and the Prepetition Credit Facilities, as set forth more fully below, and subject to the Carve-Out.

(vii)     Modification by the Court of the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and this Final Order (including the DIP Facility Terms).

(viii)    Approval by the Court of the Accommodation Agreement.

(ix)      Scheduling by the Court of a final hearing (the "<u>Final Hearing</u>") to consider entry of this Final Order approving the DIP Facility on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion.

(x)       The Court's waiving of any applicable stay (including under Rule 6004 of the Federal Rules of Bankruptcy Procedure) and providing for immediate effectiveness of the Interim Order and this Final Order.

The United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>" or the "<u>Court</u>") having considered the Motion, the DIP Facility, the Accommodation Agreement, the Affidavit of Thomas A. Amato, sworn to on May 28, 2009 in Support of the First Day Motions and Pursuant to Local Bankruptcy Rule 1007-2, the Affidavit of Linda Theisen, sworn to on May 28, 2009, in Support of Certain First Day Relief Related to Suppliers, the Declaration of Eric Mendelsohn and the Affidavit of Terry Iwasaki, both sworn to on May 28, 2009, in Support of the Motion, and the evidence submitted at the interim hearing on the Motion held on May 29, 2009 (the "<u>Interim Hearing</u>") and at the final hearing on the Motion held on June 22, 2009 (the "<u>Final Hearing</u>"); and the Bankruptcy Court having entered on May 29, 2009, after the Interim Hearing, that certain Interim Order Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (a) Authorizing the Debtors to (i) Use Cash Collateral of The Prepetition Secured

Lenders, (ii) Obtain Postpetition Financing and (iii) Provide Adequate Protection to The Prepetition Secured Lenders, (b) Authorizing Debtors to Enter into, and Approving, an Accommodation Agreement with Certain Customers and (c) Providing Notice and Scheduling Final Hearing (Dkt. No. 78, as modified by the June 12, Stipulation, the "Interim Order"); and the Bankruptcy Court in the Interim Order having approved the DIP Facility on an interim basis, and having approved the Accommodation Agreement; and the Bankruptcy Court thereafter having entered that certain Stipulation and Order in respect of the Interim Order on June 12, 2009 (the "June 12 Stipulation"), among other things, increasing the maximum amount of the DIP Loans requested by the Borrower from $18,508,789 to $19,858,789 and otherwise modifying the Interim Order and the Accommodation Agreement; and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Bankruptcy Rules and the local rules of the Bankruptcy Court, due and proper notice of the Motion, the Interim Hearing and the Final Hearing having been given; and the Final Hearing having been held before the Court and concluded on June 22, 2009; and upon the record of the Interim Hearing and the Final Hearing; and it appearing that approval of the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and is essential for the continued operation of the Debtors' businesses; and, subject to the terms hereof, the Court having determined that there is adequate protection of the interests of holders of liens on the property of the estates on which liens are granted; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A. **Petition Date.** On May 27, 2009 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Cases") with the Bankruptcy Court. The Debtors have continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Cases.

B. **Jurisdiction and Venue.** This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for these cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Committee Formation.** On June 4, 2009, the United States Trustee for Region 2 appointed an official committee of unsecured creditors (the "Committee") in the Cases, which was modified on June 18, 2009.

D. **Interim Order.** At the Interim Hearing, the Bankruptcy Court approved the DIP Facility on an interim basis pending the Final Hearing and entry of this Final Order, and approved the Accommodation Agreement. Pursuant to the Interim Order, the Final Hearing (to consider final approval of the DIP Facility) was scheduled for June 22, 2009.

E. **Notice.** Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors to (a) the United States Trustee for the Southern District of New York; (b) counsel to the Prepetition Term Agent (as defined below); (c) counsel to the DIP Agent and the Prepetition ABL Agent; (d) counsel to the Prepetition Term Lenders; (e) counsel to the Trustee (as defined below); (f) counsel to the Customers; (g) counsel to Asahi Tec; (h) counsel to RHJI; (i) those creditors holding the 50 largest unsecured claims against the Debtors estates; (j)

counsel for the Committee; and (k) other parties who have filed a request for notices with the Bankruptcy Court as of June 15, 2009 (the "Notice Parties"), by telecopy, email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Final Hearing and the relief requested in the Motion constitutes due, sufficient and appropriate notice and complies with Section 102(1) of the Bankruptcy Code, Rules 2002 and 4001(b) and (c) of the Bankruptcy Rules and the local rules of the Bankruptcy Court.

F. **Prepetition Secured Indebtedness.**[5] Subject to paragraph 6 below, the Debtors admit, stipulate and agree that:

(i) **Prepetition ABL Facility.** Metaldyne Intermediate Holdco, Inc., ("Holdings"), Metaldyne Company, as borrower, certain lenders (the "Prepetition ABL Lenders"), DBNY, as administrative agent (in such capacity, the "Prepetition ABL Administrative Agent") and collateral agent (in such capacity, the "Prepetition ABL Collateral Agent", and together with the Prepetition ABL Administrative Agent, the "Prepetition ABL Agent"), JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as syndication agent, and Citicorp North America, Inc. ("Citicorp") and Wachovia Capital Finance Corporation (Central), as co-documentation agents, are party to that certain Credit Agreement dated as of January 11, 2007

---

[5] As of the Petition Date, Corp., the other loan parties party thereto, and The Bank of New York Mellon Trust Company, N.A., as trustee (in such capacity, the "Trustee"), were party to (i) that certain Indenture, dated as of October 27, 2003 (as amended, restated, supplemented or otherwise modified, the "2013 Agreement"), pursuant to which Corp. issued to the holders thereof (the "2013 Holders") certain 10% Senior Notes due 2013 (the "2013 Notes") and (ii) that certain Indenture dated as of June 22, 2002 (as amended, restated, supplemented or otherwise modified, the "2012 Agreement", and together with the 2013 Agreement, the "Agreements"), pursuant to which Corp. issued to the holders thereof (the "2012 Holders", and together with the 2013 Holders, the "Holders") certain Senior Subordinated Notes due 2012 (the "2012 Notes", and together with the 2013 Notes, the "Prepetition Notes"). Prior to the Petition Date, in connection with the transactions contemplated by that certain Offer to Purchase, Consent Solicitation and Acceptance Solicitation Statement, dated October 29, 2008, Corp. purchased in excess of 90% of the Prepetition Notes, and all of the liens and security interests in favor of the Trustee and the Holders securing repayment thereof were terminated. In addition, pursuant to that certain Debt Cancellation Agreement, dated as of September 26, 2008, between Corp., the guarantors party thereto and Chrysler, LLC, prior to the Petition Date, Chrysler LLC, the holder of all of Corp.'s 10% senior subordinated notes due January 15, 2014 (the "2014 Notes") terminated, cancelled and discharged all of the Corp.'s obligations under the 2014 Notes and the related Indentures.

(as amended, restated, supplemented or otherwise modified, the "Prepetition ABL Credit Agreement", and the credit facility thereunder, the "Prepetition ABL Facility"). The Prepetition ABL Obligations are jointly and severally guaranteed by the Debtors (other than Corp., Metaldyne Company, MascoTech Saturn Holdings, Inc., MD Products Corp., Metaldyne Driveline Co. LLC and Metaldyne Engine Co. LLC) (collectively, the "Debtor Guarantors"), pursuant to that certain Guarantee Agreement dated as of January 11, 2007 (the "Prepetition ABL Guarantee"; the Debtor Guarantors, together with Metaldyne Company, the "Prepetition Loan Party Debtors"), in favor of the Prepetition ABL Collateral Agent for the benefit of the Prepetition ABL Secured Parties. The Prepetition ABL Obligations are secured by liens on and security interests in substantially all of the Prepetition Loan Party Debtors' assets and property pursuant to, among other documents, (i) that certain Security Agreement, dated as of January 11, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition ABL Security Agreement"), among the Prepetition Loan Party Debtors and the Prepetition ABL Collateral Agent for the benefit of the Secured Parties (as defined in the Prepetition ABL Security Agreement, the "Prepetition ABL Secured Parties"), (ii) that certain Pledge Agreement, dated as of January 11, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition ABL Pledge Agreement"), among Holdings, Metaldyne Company, certain of the other Prepetition Loan Party Debtors and the Prepetition ABL Collateral Agent for the benefit of the Prepetition ABL Secured Parties, and (iii) the other Security Documents (as defined in the Prepetition ABL Credit Agreement, and together with the Prepetition ABL Security Agreement and the Prepetition ABL Pledge Agreement, collectively, the "Prepetition ABL Security Documents").

(ii)     **Prepetition Term Facility.**  Holdings, Metaldyne Company, as borrower, certain lenders (the "Prepetition Term Lenders", and together with the Prepetition ABL Lenders, the "Prepetition Lenders"), JPMorgan Chase, as administrative agent (in such capacity, the "Prepetition Term Administrative Agent", and together with the Prepetition ABL Administrative Agent, the "Prepetition Administrative Agents") and collateral agent (in such capacity, the "Prepetition Term Collateral Agent", and together with the Prepetition Term Administrative Agent, the "Prepetition Term Agent"; further, the Prepetition Term Collateral Agent together with the Prepetition ABL Collateral Agent, the "Prepetition Collateral Agents"; and the Prepetition Term Agent together with the Prepetition ABL Agent, collectively, the "Prepetition Agents"), Citicorp, as syndication agent, and Deutsche Bank Securities, Inc., as documentation agent, are party to that certain Credit Agreement dated as of January 11, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition Term Credit Agreement" and the credit facility thereunder, the "Prepetition Term Facility", and together with the Prepetition ABL Facility, collectively, the "Prepetition Credit Facilities").  The Prepetition Term Obligations (as defined below) are jointly and severally guaranteed by Holdings and each of the other Prepetition Loan Party Debtors (other than Metaldyne Company) pursuant to that certain Guarantee Agreement dated as of January 11, 2007 (the "Prepetition Term Guarantee"), in favor of the Prepetition Term Collateral Agent for the benefit of the Prepetition Term Secured Parties.  The Prepetition Term Obligations are secured by liens on and security interests in substantially all of the Prepetition Loan Party Debtors' assets and property pursuant to, among other documents, (i) that certain Security Agreement, dated as of January 11, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition Term Security Agreement"), among the Prepetition Loan Party Debtors and the Prepetition Term Collateral Agent for the benefit of the

Secured Parties (as defined in the Prepetition Term Security Agreement, the "Prepetition Term Secured Parties", and together with the Prepetition ABL Secured Parties, collectively, the "Prepetition Secured Parties"), (ii) that certain Pledge Agreement, dated as of January 11, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition Term Pledge Agreement"), among Holdings, Metaldyne Company, certain of the other Prepetition Loan Party Debtors and the Prepetition Term Collateral Agent for the benefit of the Prepetition Term Secured Parties, and (iii) the other Security Documents (as defined in the Prepetition Term Credit Agreement, and collectively with the Prepetition Term Security Agreement and the Prepetition Term Pledge Agreement, the "Prepetition Term Security Documents", and together with the Prepetition ABL Security Documents, collectively, the "Prepetition Security Documents").

(iii)    **Security Interests, Liens, Collateral, etc.**  The liens and security interests (collectively, the "Prepetition Liens") granted by the Prepetition Loan Party Debtors on their assets and property (all such assets and property, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, collectively, the "Prepetition Collateral"), under the Prepetition Security Documents to the Prepetition Collateral Agents for the benefit of the Prepetition Secured Parties, as security for, as the case may be, the Prepetition ABL Obligations and the Prepetition Term Obligations (collectively, the "Prepetition Obligations"), are (other than in respect of mortgages on certain Prepetition Term Priority Collateral consisting of real property granted within ninety days prior to the Petition Date, which may be avoidable (the "Specified Mortgages")) valid, enforceable and non-avoidable, and have been properly recorded and perfected under state law.

(iv)    **Prepetition Intercreditor Agreement.**  Holdings, Metaldyne Company, the Prepetition ABL Collateral Agent and the Prepetition Term Collateral Agent are party to that certain Intercreditor Agreement, dated as of January 11, 2007 (the "Prepetition Intercreditor Agreement"), pursuant to which the parties thereto agreed, among other things, that (a) the Prepetition Liens granted under the Prepetition ABL Security Documents to the Prepetition ABL Collateral Agent for the benefit of the Prepetition ABL Secured Parties, on the Prepetition Collateral comprising, among other things, all of the Prepetition Loan Party Debtors' accounts, chattel paper representing accounts, deposit accounts (including all cash and other funds in such accounts), securities, securities entitlements and securities accounts, inventory, and all documents, general intangibles, instruments, supporting obligations, books and records relating to the foregoing (collectively, to the extent identified as "ABL Priority Collateral" in the Prepetition Intercreditor Agreement and all other property identified as such therein, the "Prepetition ABL Priority Collateral"), are senior and prior to the Prepetition Liens thereon granted under the Prepetition Term Security Documents to the Prepetition Term Collateral Agent for the benefit of the Prepetition Term Secured Parties, and (b) the Prepetition Liens granted under the Prepetition Term Security Documents to the Prepetition Term Collateral Agent for the benefit of the Prepetition Term Secured Parties on the other Prepetition Collateral (to the extent identified as "Term Priority Collateral" in the Prepetition Intercreditor Agreement, the "Prepetition Term Priority Collateral") are senior and prior to the Prepetition Liens thereon granted under the Prepetition ABL Security Documents to the Prepetition ABL Collateral Agent for the benefit of the Prepetition ABL Secured Parties.  The Prepetition Term Collateral Agent for the Prepetition Term Secured Parties has consented pursuant to Section 5.2 of the Prepetition Intercreditor Agreement to the use of Cash Collateral and the DIP Facility as set forth herein,

which is valid and enforceable in these Cases. The implementation of the DIP Facility, and the granting of the DIP Liens thereunder and all Adequate Protection Replacement Liens, do not violate and are expressly permitted by the terms of the Prepetition Intercreditor Agreement. The Debtors admit, stipulate and agree (for themselves only) that the Prepetition Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto.

(v)    **Amendment to Prepetition ABL Credit Agreement.** The Second Amendment to the Forbearance Agreement, and the Third Amendment to the Prepetition ABL Credit Agreement, dated as of May 21, 2009 and the Fourth Amendment and Consent to Credit Agreement, dated as of May 27, 2009 (collectively, the "Amendments"), including, without limitation, the Incremental Loan Facility thereunder, the participations of the Customers therein, and all related transactions, were entered into in contemplation of these Cases as a necessary condition to the DIP Facility and use of Cash Collateral, and the applicable Prepetition ABL Lenders have consented to the terms of the DIP Facility and use of Cash Collateral in reliance on the validity and enforceability of the Amendments. Without the Amendments, the Debtors' respective businesses, property and assets, and those of their non-Debtor affiliates, would have dramatically deteriorated in value causing irreparable harm to the Debtors and their estates. The Amendments are (x) legal, valid, binding, and enforceable against each applicable Debtor and (y) not subject to any challenge or action of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

G.    **Stipulations as to Prepetition Credit Facilities.** Subject to paragraph 6 below, the Debtors admit, stipulate and agree that:

(i)    **Prepetition ABL Obligations.** As of the Petition Date, the Prepetition Loan Party Debtors were indebted and liable to the Prepetition ABL Agent and the Prepetition

ABL Lenders (and any other counterparty in respect of any outstanding Cash Management Obligations or Hedging Obligations (each as defined in the Prepetition ABL Guarantee)), without objection, defense, counterclaim or offset of any kind under the Loan Documents (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Loan Documents"), (i) with respect to Loans (as defined and to the extent provided in the Prepetition ABL Credit Agreement), in the aggregate principal amount of not less than $29,011,420.33, plus $6,491,000 with respect to the aggregate principal amount of the Incremental Loans (as defined in the Prepetition ABL Credit Agreement, and collectively, the "Prepetition ABL Loans"), plus, in each case, accrued (both before and after the Petition Date) and unpaid interest thereon, and (ii) for fees, expenses and other Obligations (as defined in the Prepetition ABL Credit Agreement, including any Cash Management Obligations, Hedging Obligations and any attorneys', accountants', consultants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Prepetition ABL Loan Documents) incurred under the Prepetition ABL Loan Documents (items (i) and (ii), collectively, the "Prepetition ABL Obligations"). As of the Petition Date, the value of the Prepetition ABL Priority Collateral exceeds the amount of the Prepetition ABL Obligations.

(ii)     **Prepetition Term Obligations.**  As of the Petition Date, the Prepetition Loan Party Debtors were indebted and liable to the Prepetition Term Agent and the Prepetition Term Lenders (and any other counterparty in respect of any outstanding Cash Management Obligations or Hedging Obligations (each as defined in the Prepetition Term Guarantee)), without objection, defense, counterclaim or offset of any kind under the Loan Documents (as defined and to the extent provided in the Prepetition Term Credit Agreement, the "Prepetition Term Loan Documents"), (i) in the aggregate principal amount of not less than $408,000,000

with respect to the Loans and $58,334,112 with respect to DF LC Exposure (comprised of DF Loans totaling $10,000,000, other unreimbursed DF LC Disbursements totaling $9,718,055, and undrawn DF Letters of Credit totaling $38,616,057 in the aggregate) (each as defined in the Prepetition Term Credit Agreement), plus accrued (before the Petition Date) and unpaid interest thereon, and (ii) for fees, expenses and other Obligations (as defined in the Prepetition Term Credit Agreement, including any Cash Management Obligations, Hedging Obligations and any attorneys', accountants', consultants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Prepetition Term Loan Documents) incurred under the Prepetition Term Loan Documents (items (i) and (ii), collectively, the "Prepetition Term Obligations").

(iii)    **Enforceability, etc. of Prepetition Obligations.**    The Prepetition Obligations are (a) legal, valid, binding, and enforceable against each applicable Prepetition Loan Party Debtor and (b) not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise (except for the lien subordination contemplated herein and in the Prepetition Intercreditor Agreement).  The Debtors, for the avoidance of doubt subject to the Committee's Reservation of Rights in paragraph 6, do not have, hereby forever release, and are forever barred from bringing, any claims, counterclaims, causes of action, defenses or setoff rights, of any kind or nature, whether arising under contract, law or equity, relating in any way to the Prepetition Obligations or the Prepetition Loan Documents, or any transactions related in any way thereto, whether arising under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, against any of the Prepetition Secured Parties and their respective affiliates, subsidiaries, agents, officers, directors, employees and attorneys.

(iv)   **Enforceability, etc. of Prepetition Liens**.   The Prepetition Liens on the Prepetition Collateral granted in favor of the Prepetition Collateral Agents for the respective Prepetition Secured Parties under the applicable Prepetition Security Documents are (other than in respect of the Specified Mortgages) legal, valid, enforceable, non-avoidable, and duly perfected and are not subject to challenge, avoidance, attack, offset, re-characterization or subordination under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise (except for the lien subordination contemplated herein and in the Prepetition Intercreditor Agreement and the Specified Mortgages), and, as of the Petition Date, and without giving effect to this Final Order, the Debtors are not aware of any liens or security interests having priority over the Prepetition Liens, except, as the case may be, certain "Permitted Encumbrances" (as defined in the Prepetition ABL Loan Documents and in the Prepetition Term Loan Documents, as the case may be).   The Prepetition Liens were granted to the applicable Prepetition Collateral Agents for the respective Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and/or commitments secured thereby.

(v)   **Indemnity**.   The Prepetition ABL Agent and the DIP Agent and the DIP Lender have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related to negotiating and implementing the DIP Facility and the use of Cash Collateral, including the granting of the DIP Liens, the Adequate Protection Replacement Liens, and any challenges or objections to the DIP Facility or the use of Cash Collateral.   Accordingly, the Prepetition ABL Agent and the DIP Agent shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto.   No exception or

defense in contract, law or equity to the Debtors' obligations to indemnify and hold the Prepetition ABL Agent, the DIP Agent and the DIP Lender harmless as set forth in this paragraph G(v) exists, and Debtors waive any such defenses.

H.     **Need for Postpetition Financing, Use of Cash Collateral and Reaffirmation and Confirmation of Approval of the Accommodation Agreement.**     The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Good cause has been shown for entry of this Final Order.  An immediate need exists for the Debtors to obtain funds in order to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the use of Cash Collateral and the approval of the Accommodation Agreement.  In the absence of the availability of such funds in accordance with the terms hereof, and without the approval of the Accommodation Agreement, the continued operation of the Debtors' businesses would not be possible, and serious and irreparable harm to the Debtors, their estates, their creditors and equity holders would occur. Further, the possibility for a successful reorganization and/or sale of all or any material portion of the Debtors' assets, as a going concern or otherwise, would be jeopardized in the absence of the availability of funds in accordance with the terms of this Final Order.  It is essential that the Debtors obtain and maintain the Customers' support and cooperation.  The Customers are Metaldyne Company's largest customers, and each has paid any and all unpaid prepetition amounts it owed to the Debtors and has agreed to accelerate payment on new invoices and to make other financial accommodations to Metaldyne Company, in each case pursuant to the Accommodation Agreement.  Thus, the ability of the Debtors to preserve and maintain the value

of their assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the use of Cash Collateral and the approval of the Accommodation Agreement.

I. **No Credit Available on More Favorable Terms.** The Debtors have been unable to obtain on more favorable terms and conditions than those provided in the Interim Order and this Final Order, (a) adequate unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, (b) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (c) credit for money borrowed secured by a lien on property of the estate that is not otherwise subject to a lien, or (d) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien. The Debtors are unable to obtain credit for borrowed money without granting the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) to the DIP Secured Parties and without also entering into the Accommodation Agreement.

J. **Use of Proceeds of the DIP Facility.** Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under the Interim Order or this Final Order) shall be used in accordance with the terms and conditions of this Final Order and the Budget; provided, that no more than $125,000 in the aggregate of the proceeds of the DIP Facility, DIP Loans, DIP Collateral (as defined below) or Cash Collateral, may be used by the Committee to investigate the Prepetition Liens and the claims of the Prepetition Agents and the Prepetition Lenders in accordance with paragraph 7.

K. **Application of Proceeds of DIP Collateral.** All proceeds of the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, shall be

applied in accordance with and subject to the terms and conditions hereof. As a condition to the effectiveness of and extensions of credit under the DIP Facility, and to the authorization to use Cash Collateral and the other Prepetition Collateral, each Debtor has agreed that as of and commencing on May 29, 2009 and continuing on and after the date of this Final Order, the Debtors shall use all Cash Collateral and the proceeds of DIP Collateral as set forth herein and in accordance with the Budget (subject to Permitted Variances (as defined below)), including, as the case may be, to indefeasibly and permanently repay the Prepetition ABL Obligations (other than the Incremental Loans) with Cash Collateral comprising proceeds of the Prepetition ABL Priority Collateral to the fullest extent provided for herein. Repayment of the Prepetition ABL Obligations in accordance with this Final Order is necessary to adequately protect the Prepetition ABL Secured Parties and because the Prepetition ABL Secured Parties will not otherwise consent to the DIP Facility, the extensions of credit to the Debtors thereunder, the use of the Prepetition Collateral, the granting of the DIP Liens or the terms of the Carve-Out. Such payment will not prejudice the Debtors or their estates, because the Debtors will otherwise have sufficient liquidity under the DIP Facility and the payment of such amounts is subject to the rights of parties in interest under paragraph 6 herein.

L. **Adequate Protection for Secured Parties.** The Prepetition ABL Agents have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses, and to permanently repay the Prepetition ABL Obligations (other than the Incremental Loans), in accordance with the terms hereof. The Prepetition ABL Agents for the Prepetition ABL Secured Parties have agreed, and the Prepetition Term Secured Parties by virtue of the operation of Section 5.2 of the Prepetition Intercreditor Agreement are deemed to have

agreed, to permit the Debtors to use the respective Prepetition Collateral, including the Cash

Collateral in accordance with the terms hereof and the Budget until the earlier of (i) the sixtieth

day following the Effective Date (as defined in the Accommodation Agreement), as such date is

extended pursuant to the proviso to clause (iii) of Section 2 of the Accommodation Agreement

(the "Final Termination Date"), and (ii) the date of occurrence of an Event of Default, subject to

the terms and conditions set forth herein, including the protections afforded a party acting in

"good faith" under Section 363(m) of the Bankruptcy Code.  All of the Prepetition Secured

Parties are entitled to the adequate protection as set forth herein pursuant to Sections 361, 362

and 363 of the Bankruptcy Code for any Diminution in Value.  Based on the Motion and on the

record presented to the Court at the Interim Hearing and at the Final Hearing, the terms of the

proposed adequate protection arrangements herein are fair and reasonable, reflect the Debtors'

prudent exercise of business judgment and constitute reasonably equivalent value and fair

consideration for the Prepetition Agents' consent thereto; provided, that nothing herein shall

limit the rights of the Prepetition Secured Parties to seek new or different adequate protection if

circumstances change materially from those that existed on the Petition Date, subject to and

without limiting any provision or the effectiveness of the Prepetition Intercreditor Agreement.

Subject to the rights of the Prepetition ABL Agent under paragraph 3(b) and on Exhibit E, a

bankruptcy filing of GM or any of its affiliates will not in and of itself constitute "materially

changed circumstances" for purposes of the immediately preceding sentence.

      M.    **Section 552**.  In light of, as applicable, the subordination of their liens and

superpriority claims to the Carve-Out and the granting of the DIP Liens on the Prepetition

Collateral, the DIP Secured Parties and the Prepetition Secured Parties are each entitled to all of

the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

N.     **Extension of Financing.**  The DIP Secured Parties have indicated a willingness to provide financing to the Debtors in accordance with the terms hereof.  The DIP Secured Parties are good faith financiers.  The DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Final Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

O.     **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)     The terms and conditions of the DIP Facility, and the fees paid and to be paid thereunder, and the terms and conditions of the Accommodation Agreement, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)     the DIP Facility and all actions taken by the DIP Secured Parties in respect thereof were negotiated and taken in good faith and at arm's length between and among the Debtors and the DIP Secured Parties;

(iii)     the terms of the Accommodation Agreement are fair, just and reasonable under the circumstances, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, are supported by reasonably equivalent value and fair consideration, and have been negotiated in good faith and at arm's length by and among the parties, with all parties represented by counsel; and

(iv)    use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Secured Parties are entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

P.    **Relief Essential; Best Interest.**  The relief requested in the Motion (and as provided in this Final Order) is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and property.  It is in the best interest of Debtors' estates that the Debtors be allowed to enter into the DIP Facility, to have entered into the Accommodation Agreement, and to use the Cash Collateral, in each case as contemplated in the Interim Order and herein.

Q.    **Entry of Final Order.**  For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).

**NOW, THEREFORE,** on the Motion of the Debtors and the record before this Court with respect to the Motion, including the record made during the Interim Hearing and the Final Hearing, and with the consent of the Debtors, the Prepetition Secured Parties and the DIP Secured Parties, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted.**  The Motion is granted in accordance with the terms and conditions set forth in this Final Order.  Any objections to the Motion with respect to entry of this Final Order to the extent not withdrawn, waived or otherwise resolved, and all reservation of rights included therein, are hereby denied and overruled.

2.    **DIP Facility.**

(a)     **DIP Obligations, etc.**     The Debtors are expressly and immediately authorized, empowered and directed to enter into the DIP Facility and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms hereof, including the DIP Facility Terms, and to execute and deliver all instruments, certificates, agreements and documents which may be reasonably required or otherwise necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described and provided for herein. The term (the "Term") of the DIP Facility, which commenced on May 29, 2009, and shall continue until the earlier of (i) the Final Termination Date and (ii) the occurrence of an Event of Default. The Debtors are hereby authorized and directed to do and perform all acts, and to pay all principal, interest, reasonable fees and expenses, indemnities and other amounts described herein and as such become due, including, without limitation the reasonable fees and expenses of the attorneys and financial advisors of the DIP Secured Parties as provided for herein (collectively, all advances and other obligations (including indemnities) under the DIP Facility, the "DIP Obligations"). The DIP Obligations shall not otherwise be subject to further approval of this Court. All DIP Obligations shall represent valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with their terms and shall be paid at the end of the Term. The reasonable fees and expenses of the Customers' Advisors (as defined below) shall be included in the maximum setoff permitted to be taken by the Customers under the Accommodation Agreement in accordance with the terms thereof. Interest on the DIP Loans shall accrue (but not be paid currently) at a floating rate per annum equal to two percent (2%) in excess of the "prime rate" established from time to time by JPMorgan Chase, and shall be added to the DIP Obligations. The Participation Agreement is a valid and binding contract among the DIP Agent, the DIP Lender and the Customers, and is enforceable in accordance with its terms.

(b) **Authorization to Borrow, etc.** In order to enable them to continue to operate their businesses, subject to the terms and conditions of this Final Order (including the DIP Facility Terms) and the Budget, the Borrower is hereby authorized under the DIP Facility to borrow (and the other Debtors to guarantee repayment of) up to an aggregate principal amount of $19,858,789.

(c) **DIP Liens.** Subject to the Carve-Out and the relative priorities among the liens securing the DIP Facility, the Adequate Protection Replacement Liens and the liens securing the Prepetition Credit Facilities, the DIP Agent for the ratable benefit of the DIP Secured Parties was granted effective immediately upon entry of the Interim Order, and hereby is granted on a final basis, as set forth more fully in this Final Order, the following security interests and liens (which shall immediately be valid, binding, perfected, continuing, enforceable and non-avoidable), in and on all now owned or hereafter acquired assets and property, whether real or personal, of the Debtors including, without limitation, all Prepetition Collateral and all cash, any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, chattel paper, goods, investment property, deposit accounts, equity interests, securities accounts, securities entitlements, commercial tort claims, books, records, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, tradenames, other intellectual property, equity interests, and all proceeds of the foregoing (collectively referred to as the "DIP Collateral", provided, that the DIP Collateral shall (i) include (x) only sixty-five percent (65%) of the equity interests directly owned by the Debtors in their foreign subsidiaries and proceeds (it being understood, for the avoidance of doubt, that such equity interests also comprise Prepetition Term Priority Collateral), and (y) the real property and other

collateral subject to the Specified Mortgages to the extent the Specified Mortgages are avoided, and proceeds, and (ii) not include the Unencumbered Foreign Stock or the Avoidance Actions); and all such liens and security interests granted to the DIP Agent for the benefit of the DIP Secured Parties pursuant to the Interim Order and this Final Order, the "DIP Liens"):

(I)     pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable lien on all DIP Collateral which comprises Unencumbered Collateral, which lien shall be *pari passu* with the Adequate Protection Replacement Liens thereon granted to the Prepetition ABL Secured Parties;

(II)    pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable lien upon all DIP Collateral which, in the case of liens on assets or property (x) comprising Prepetition Term Priority Collateral, shall be junior and subject to (A) the Prepetition Liens and the Adequate Protection Replacement Liens thereon of, in each case, the Prepetition Term Secured Parties and (B) any Third Party Liens which as of the Petition Date were senior and prior to the Prepetition Liens on the Prepetition Term Priority Collateral of the Prepetition Term Secured Parties; and (y) that were encumbered as of the Petition Date only by Third Party Liens, shall be junior and subject to such Third Party Liens (collectively, the prepetition liens which are senior and prior to the DIP Liens as and to the extent set forth in this subparagraph (II) are hereafter referred to as the "Senior Prepetition Liens"); and

(III)    pursuant to Sections 364(d)(l) and 510(a) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable priming lien on all DIP Collateral (x) which, in the case of liens on all DIP Collateral other than Prepetition Term Priority Collateral and the Unencumbered Collateral, shall be (A) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties, and (B) senior and prior to the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties and all Third Party Liens thereon which were junior and subject to the Prepetition Liens of the Prepetition Term Secured Parties as of the Petition Date, and (y) comprising Prepetition Term Priority Collateral, which liens shall be (A) junior and subject to the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition Term Secured Parties, and all Third Party Liens thereon which were, as of the Petition Date, senior and prior to the Prepetition Liens of the Prepetition Term Secured Parties, (B) *pari passu* with the Prepetition Liens and the Adequate Protection Replacement Liens thereon in favor of, in each case, the Prepetition ABL Secured Parties and (C) senior and prior to all Third Party Liens thereon which, as of the Petition Date, were junior and subject to the Prepetition Liens thereon of the Prepetition ABL Secured Parties.

(d) **Other Provisions Relating to the DIP Collateral.** The DIP Liens shall secure all of the DIP Obligations. The DIP Liens shall not without the consent of the DIP Agent and the Customers be made subject to, or *pari passu* with, any lien or security interest, other than to the extent expressly provided herein and to the Carve-Out, by any court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "Successor Cases"), and/or upon the dismissal of any of the Cases. It is understood and agreed, and hereby ordered, that, notwithstanding anything to the contrary set forth in this Final Order (including any exhibit hereto) or in any other order of this Court entered in the Cases, any amounts advanced or expended by or on behalf of the Prepetition ABL Secured Parties (in their sole and absolute discretion), including after the occurrence and during the continuance of an Event of Default, directly or indirectly, to protect, preserve, maintain, market, sell or liquidate the Prepetition ABL Priority Collateral or any DIP Collateral (other than Prepetition Term Priority Collateral) subject to the Adequate Protection Replacement Liens in favor of the Prepetition ABL Secured Parties, including any reasonable professional or advisory fees and expenses of White & Case LLP, Capstone Advisory Services, Hilco Appraisal Services ("Hilco") and FTI Consulting, Inc. ("FTI") (collectively, the "ABL Advisors"), shall be added to the Prepetition ABL Obligations and also (but without duplication) to the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties, including in each case for all purposes hereunder. The DIP Liens and the Adequate Protection Replacement Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of Section 552 of the

Bankruptcy Code or, in respect of the DIP Liens and the Adequate Protection Replacement Liens in favor of the Prepetition ABL Secured Parties, Section 506(c) of the Bankruptcy Code.

(e) **Enforceable Obligations.** This Final Order shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

(f) **Protection of DIP Secured Parties and Other Rights.** From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the Interim Order and this Final Order and in compliance with the Budget (subject to Permitted Variances).

(g) **Superpriority Administrative Claim Status.**

(I) The DIP Obligations shall, pursuant to Section 364(c)(1) of the Bankruptcy Code, at all times constitute an allowed superpriority claim (the "<u>DIP Superpriority Claims</u>") of the DIP Lender, and be payable from and have recourse to all DIP Collateral and the Unencumbered Foreign Stock. All DIP Superpriority Claims shall be subject to the Carve-Out.

(II) Other than as expressly provided herein, including with respect to the Adequate Protection Superpriority Claims in favor of the Prepetition ABL Secured Parties and the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior

to or on a parity with the DIP Liens and the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder or under or in connection with the DIP Facility.

3. **Authorizations and Approvals.**

(a) **Use Cash Collateral and Proceeds of DIP Facility.** Pursuant to the terms and conditions of the Interim Order and this Final Order, and subject to the adequate protection granted to the Prepetition Secured Parties as hereinafter set forth, each Debtor is authorized during the Term (and, subject to paragraph 15(b), not beyond) to use (a) the advances under the DIP Facility, and (b) Cash Collateral of the Prepetition Secured Parties, in each case in the amounts and for the line item expenditures set forth in the Budget; provided, that (x) in the second and third weeks of the Budget, actual cumulative total disbursements before any repayment of the Prepetition ABL Obligations (the "Cumulative Disbursements") may exceed budgeted Cumulative Disbursements by up to 20%; (y) in the fourth and fifth weeks of the Budget, actual Cumulative Disbursements may exceed budgeted Cumulative Disbursements by up to 12.5%; and (z) in each subsequent week of the Budget, actual Cumulative Disbursements may exceed budgeted Cumulative Disbursements by up to 7.5% ((x) through (z) collectively, the "Permitted Variances"). The Budget may be modified only with the prior written consent of the Debtors, the Prepetition ABL Agent and the Customers. Notwithstanding anything herein to the contrary, subject only to the Debtors' rights under paragraph 15(b), the Debtors' right to use the extensions of credit under the DIP Facility and Cash Collateral shall terminate at the end of the Term, including upon written notice being provided by the DIP Agent or the Prepetition ABL Agent, as the case may be, to the Debtors that an Event of Default has occurred and is continuing. Nothing in the Interim Order or this Final Order shall authorize the disposition of

any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted herein (subject to any required Court approval).

(b)     **Borrowing Base and Applicable Availability Block; Reserves; Mandatory Prepayments.**  The Borrowing Base and the Applicable Availability Block (as defined in the Prepetition ABL Credit Agreement) shall continue in effect in accordance with the terms of the Prepetition ABL Credit Agreement subject to the terms set forth on Exhibit E hereto and, notwithstanding anything to the contrary herein, shall constitute a further limitation on the Debtors' use of Cash Collateral hereunder.  Without limiting any other provision hereof, the Debtors shall make mandatory prepayments of the Prepetition ABL Obligations (other than the Incremental Loans) as set forth on Exhibit E, which shall be indefeasible and shall permanently reduce the Prepetition ABL Obligations (other than the Incremental Loans).

(c)     **Approval of Accommodation Agreement.**  Approval of the Accommodation Agreement, as modified by the June 12 Stipulation, is hereby reaffirmed, confirmed and ratified, and the Debtors are hereby authorized and directed to continue to deliver, perform and comply with all of the terms, conditions and covenants of, and to take all actions necessary and appropriate to implement, the Accommodation Agreement.

4.     **Adequate Protection for Prepetition Secured Parties.**  As adequate protection for the interests of the Prepetition Secured Parties in the Prepetition Collateral (including Cash Collateral) for, and in an aggregate amount equal to, the diminution in value of such interest, and also including, in the case of the Prepetition ABL Secured Parties, on a dollar-for-dollar basis, the aggregate amount of any Cash Collateral (other than proceeds of Prepetition Term Priority Collateral) not used to permanently repay the Prepetition ABL Obligations (collectively,

"Diminution in Value"), from and after the Petition Date, calculated, as applicable, in accordance with Section 506(a) of the Bankruptcy Code, whether or not resulting from the use, sale or lease by the Debtors of the Prepetition Collateral (including Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of Section 362(a), the Prepetition Secured Parties shall receive adequate protection as follows:

(a) **Adequate Protection Replacement Liens.** To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have, pursuant to Sections 361, 363(e) and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon (the "Adequate Protection Replacement Liens") all of the DIP Collateral, in accordance with the following priorities:

(I) The Adequate Protection Replacement Liens of the Prepetition ABL Secured Parties shall be (x) in the case of all DIP Collateral other than Prepetition Term Priority Collateral (i) *pari passu* with the DIP Liens and the Prepetition Liens in favor of the Prepetition ABL Secured Parties, in each case thereon, and (ii) senior and prior to all other liens thereon other than Third Party Liens which, as of the Petition Date, were senior and prior to the Prepetition Liens thereon of the Prepetition ABL Secured Parties; and (y) in the case of Prepetition Term Priority Collateral, (i) *pari passu* with the DIP Liens and the Prepetition Liens in favor of the Prepetition ABL Secured Parties, in each case thereon, (ii) junior to the Prepetition Liens and the Adequate Protection Replacement Liens of the Prepetition Term Secured Parties, and any Third Party Liens, which as of

the Petition Date, were senior and prior to the Prepetition Liens thereon of the Prepetition Term Secured Parties, and (iii) senior and prior to all other liens thereon.

(II)    The Adequate Protection Replacement Liens of the Prepetition Term Secured Parties shall be senior and prior to (x) in the case of all DIP Collateral other than Prepetition Term Priority Collateral, all liens thereon other than the DIP Liens, the Prepetition Liens and the Adequate Protection Replacement Liens of the Prepetition ABL Secured Parties and any Senior Prepetition Liens thereon in favor of Third Party Lienholders, and (y) in the case of Prepetition Term Priority Collateral, all liens thereon other than any Senior Prepetition Liens thereon in favor of Third Party Lienholders.

(III)    The Adequate Protection Replacement Liens shall in all cases be subject to the Carve-Out.

(b)    **Adequate Protection Superpriority Claims.**    To the extent of the aggregate Diminution in Value, the Prepetition Secured Parties shall have, subject to the payment of the Carve-Out, allowed superpriority administrative expense claims (the "Adequate Protection Superpriority Claims") as provided for in Section 507(b) of the Bankruptcy Code and payable from and having recourse to all DIP Collateral (and to the proceeds of Unencumbered Foreign Stock), subject to any existing security interests therein and liens thereon. The Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties shall have priority over the Adequate Protection Superpriority Claims of the Prepetition Term Secured Parties in respect of recourse to proceeds of all DIP Collateral other than Prepetition Term Priority Collateral,

while the Adequate Protection Superpriority Claims of the Prepetition Term Secured Parties shall have priority over the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties in respect of recourse to proceeds of Prepetition Term Priority Collateral. The Prepetition Term Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of their Adequate Protection Superpriority Claims (other than in respect of proceeds of Prepetition Term Priority Collateral), and the DIP Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of their DIP Superpriority Claims, in each case unless and until the Prepetition ABL Obligations and (without duplication) the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties have indefeasibly been paid in full in cash. The Adequate Protection Superpriority Claims granted to the Prepetition Term Secured Parties under the Prepetition Term Facility may be impaired pursuant to a Plan (as defined below) with the vote of the applicable class of the holders of such claims that satisfies the requirements of Section 1126 of the Bankruptcy Code.

(c)     **Adequate Protection Payments, etc.**

(I)     The Prepetition ABL Administrative Agent shall receive from the Debtors (x) when due, all accrued but unpaid interest on the Prepetition ABL Loans and fees at the non-default contract rate provided for in the Prepetition ABL Facility; provided, that (1) the Prepetition ABL Administrative Agent reserves the right to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition ABL Facility, and for the payment of any other amounts provided for in the Prepetition ABL Facility, and (2) if, in

accordance with applicable law, the Bankruptcy Court allows any claim by the Prepetition ABL Administrative Agent under the Prepetition ABL Facility for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Prepetition ABL Facility, or for the payment of any other amounts provided for in the Prepetition ABL Facility, such claim shall be added to and comprise part of the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties for all purposes herein, and (y) as and to the fullest extent set forth herein, permanent repayments of the Prepetition ABL Obligations (other than the Incremental Loans).

(II)     Promptly upon receipt of invoices therefor, the Prepetition ABL Administrative Agent shall receive from the Debtors current cash payments of all reasonable professional fees and expenses of the ABL Advisors.  The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information).

(III)     Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") and Zolfo Cooper ("Zolfo" and together with Fried Frank, the "Term Advisors") shall receive from the Debtors (x) to the extent not already paid, cash payment of all unpaid prepetition amounts owed to the Term Advisors (after application of amounts held on retainer by the Term

Advisors) and (y) payment upon receipt by the Debtors of invoices therefor, of all reasonable postpetition fees and expenses; provided, that the aggregate amount of the fees and expenses in clauses (x) and (y) above shall not exceed $500,000 (less any payments received by the Term Advisors since entry of the Interim Order). All such invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the Term Advisors to redact privileged, confidential or sensitive information).

(d) **Monitoring of Prepetition Collateral.** Without limiting the foregoing, the Prepetition ABL Agent shall be permitted to continue to retain and utilize the ABL Advisors, and each Customer shall be entitled to retain legal counsel and advisors (the "Customers' Advisors"), in each case at the Debtors' sole cost and expense (but in the case of the Customers subject to the maximum setoff permitted by the Accommodation Agreement), and such consultants and advisors shall be given reasonable access to the Debtors' books, records, assets and properties for purposes of monitoring the Debtors' business, and value of the DIP Collateral. Hilco and FTI shall be permitted to conduct for the Prepetition ABL Secured Parties at the discretion of the Prepetition ABL Agent field audits and inventory appraisals in respect of the DIP Collateral.

(e) **Budget and Variance Reports, etc.** Subject to the terms and conditions set forth in this Final Order, the Debtors shall provide to the Prepetition Agents on Thursday of each week a report for the prior week (ending at the close of business on Friday of such prior week) setting forth the receipts and expenditures for such prior week (including detailed schedules supporting the cash flow forecast in excel format), and the amount of variance, if any,

on a line-item basis from the corresponding projected amounts as set forth in the Budget for such week (the "Variance Report").  The weekly Variance Report shall contain information relating to the immediately prior week, as well as cumulative information from and after the Petition Date, and shall be delivered to the Prepetition ABL Agent and the Customers, along with a statement of the account balances for all of the Debtors' bank accounts.

(f)     **Financial Reporting, etc.**   The Debtors shall continue to provide the Prepetition Agents with all financial and other reporting (other than weekly cash flow reporting, financial covenant testing and monthly financial statements), set forth in the Prepetition Credit Facilities, including weekly Borrowing Base Certificates (as defined in the Prepetition ABL Credit Agreement) and all supporting and/or related schedules, documentation and information at the times and as otherwise required under the Prepetition ABL Facility.  The Debtors shall provide the Prepetition ABL Agent and the Customers with the monthly financial reporting given to the United States Trustee and shall continue to conduct weekly conference calls with the Prepetition ABL Agent in respect of their businesses, results of operations (including Budget variances), prospective asset sales and sale process, and other restructuring and bankruptcy related matters.  The Debtors shall provide the Prepetition ABL Agent  and the Prepetition Term Agent copies of all reports prepared for the Customers, and shall provide the Customers with copies of all reports prepared for the Prepetition ABL Agent and the Prepetition Term Agent.

5.     **DIP and Adequate Protection Replacement Lien Perfection.**   The Interim Order and/or this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the

taking of any other action to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Secured Parties and the Prepetition Secured Parties (with respect to the Adequate Protection Replacement Liens) may, each in their sole discretion, file such financing statements, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Cases. The Debtors shall execute and deliver to the DIP Secured Parties and the Prepetition Secured Parties all such financing statements, mortgages, security agreements, notices and other documents as the DIP Secured Parties and the Prepetition Secured Parties may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Replacement Liens. The DIP Agent, in its discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.

6. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims.** Nothing in this Final Order shall prejudice whatever rights any Committee or any other party in interest (other than the Debtors or any of their affiliates) may have (a) to object to or challenge any and all findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the Prepetition Liens on the Prepetition Collateral, or (ii)

the validity, allowability, priority, status or amount of the Prepetition Obligations, or (b) to bring suit against any of the Prepetition Secured Parties in connection with or related to the respective Prepetition Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Obligations or otherwise; provided, that unless any Committee or any other party in interest obtains the requisite standing to commence, and commences, an adversary proceeding raising such objection or challenge, including without limitation any claim against the Prepetition Secured Parties in the nature of a setoff, counterclaim or defense to the Prepetition Obligations (including but not limited to, those under Sections 506 (subject to the waiver of Bankruptcy Code Section 506(c) claims as provided herein), 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties), by the date that is seventy-five (75) days following entry of this Final Order (the period described in the immediately preceding clause shall be referred to as the "Challenge Period", and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is validly raised during the Challenge Period, shall be referred to as the "Challenge Period Termination Date"), upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any Committee, any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest) shall be deemed to be forever waived and barred, and the Prepetition Obligations shall be deemed to be an allowed secured claim within the meaning of Sections 502 and 506 of the Bankruptcy Code for all purposes in connection with the Cases and the findings herein, including, without limitation, in paragraphs F and G, in respect to the Prepetition Liens, the Prepetition Collateral and the Prepetition Obligations shall be binding on all creditors, interest holders and parties in interest.  To the extent any such objection or complaint is filed,

such findings herein shall nonetheless remain binding and preclusive on any Committee and on any other person or entity, except to the extent that such assertions were expressly challenged in such objection or complaint.

7. **Carve-Out.**[6] Subject to the terms and conditions contained in this paragraph 7, the DIP Liens, DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Replacement Liens and the Adequate Protection Superpriority Claims, which have the relative priorities as set forth herein, shall, in any event, in all cases be subordinate upon the occurrence and during the continuance of an Event of Default to (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (ii) $6,000,000 in the aggregate, which amount may be used subject to the terms of this Final Order to pay any allowed (after proper application therefor and Court order) fees or expenses incurred by the Debtors and the Committee appointed in the Cases to the extent provided for in the then current Budget and that remain unpaid in respect of (A) allowances of compensation for services rendered or reimbursement of reasonable expenses awarded (after proper application) by the Bankruptcy Court to the Debtors' or the Committee's professionals and (B) the reimbursement of reasonable expenses allowed (after proper application) by the Bankruptcy Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) (items (i) and (ii), collectively, the "Carve-Out"; in addition, the Carve-out shall also include, for the benefit of any Chapter 7 trustee appointed in the Cases, $100,000 for "burial" type expenses if the Cases are converted to Chapter 7); provided, that (x) the dollar limitation in clause (ii) above

---

[6] For the avoidance of doubt, the Carve-Out will not be reduced by the payment of any transaction or similar fee payable to Lazard Fréres & Co. ("Lazard"), which shall instead be paid from the proceeds of sale of the Debtors' chassis or powertrain businesses to the extent Lazard's retention as the Debtors' investment bank, and its compensation, are approved by order of the Court upon proper application after notice and an opportunity for parties in interest to object on any basis.

on fees and expenses shall be reduced by the amount of any compensation or reimbursement of expenses paid prior to the occurrence of an Event of Default in respect of which the Carve-Out is invoked and by any fees, expenses, indemnities or other amounts paid to any agent or lender (or any of their respective attorneys or agents under the Prepetition Credit Facilities, the DIP Facility or otherwise), and (y) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.  No portion of the Carve-Out, any Cash Collateral or proceeds of the DIP Facility or any other amounts may be used for the payment of the fees and expenses of any person incurred in (i) challenging, or in relation to the challenge of, any of the Prepetition Secured Parties' or the DIP Secured Parties' liens or claims (or the value of their respective Prepetition Collateral or DIP Collateral), or the initiation or prosecution of any claim or action against any of the Prepetition Secured Parties or the DIP Secured Parties, including any claim under Chapter 5 of the Bankruptcy Code, and state law or any foreign law, in respect of any of the Prepetition Credit Facilities or the DIP Facility, or in preventing, hindering or delaying the realization by the Prepetition Secured Parties or the DIP Secured Parties upon any Prepetition Collateral or DIP Collateral, or the enforcement of their respective rights under the Prepetition ABL Loan Documents, the Prepetition Term Loan Documents, the Interim Order or this Final Order (including the DIP Facility Terms), as the case may be, and (ii) connection with any claims or causes of actions against the Prepetition Secured Parties or the DIP Secured Parties under the Prepetition Credit Facilities or the DIP Facility (as the case may be), their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Prepetition Lien or DIP Lien.  No more than $125,000 in the aggregate of the Carve-Out, any Cash Collateral or proceeds of the DIP Facility or DIP Collateral may be used by

the Committee (but by no other person or entity, including the Debtors) to investigate claims and/or liens of the Prepetition Agents, Prepetition Lenders, DIP Agent or DIP Lender under, as the case may be, the Prepetition Credit Facilities or the DIP Facility.  Upon the written request of the Debtors delivered to the Customers and the Prepetition ABL Agent, (i) eighty percent (80%) of the Carve-Out will be funded directly by the Customers through their purchase and funding of participations in the DIP Facility under the Participation Agreement (notwithstanding the occurrence or continuance of an Event of Default, and whether or not the Term has expired) and, promptly thereafter, advanced by the DIP Agent as DIP Loans, (provided, that in no event will the DIP Loans referred to in this sentence, together with all other DIP Loans, exceed the maximum principal amount of the DIP Facility), and (ii) twenty percent (20%) of the Carve-Out (and no more, whether or not the Customers have funded their eighty percent (80%) share of the Carve-Out) will be funded from proceeds of the DIP Collateral (other than Prepetition Term Priority Collateral).

8.    **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors or any Committee or shall affect the right of the DIP Secured Parties or the Prepetition Agents to object to the allowance and payment of such fees and expenses.

9.    **Section 506(c) Claims**.  As a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions thereunder, and to the use of the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights, benefits, or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the Prepetition ABL

Secured Parties and the Adequate Protection Replacement Liens and the Prepetition Liens, in each case, in favor of the Prepetition ABL Secured Parties. Nothing contained in the Interim Order or in this Final Order shall be deemed a consent by the Prepetition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against the DIP Collateral or the Prepetition Collateral under Section 506(c) of the Bankruptcy Code or otherwise.

10. **Collateral Rights; Limitations in Respect of Subsequent Court Orders.** Without limiting any other provisions of the Interim Order or this Final Order, unless the DIP Agent, the Prepetition ABL Agent and the Customers, as the case may be, have provided their respective written consent, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is superior to or *pari passu* with those granted pursuant to the Interim Order and/or this Final Order to the DIP Secured Parties or the Prepetition ABL Secured Parties, or (ii) the use of Cash Collateral (other than proceeds of Prepetition Term Priority Collateral) for any purpose other than as set forth in the Budget or to indefeasibly pay in full in cash the Prepetition ABL Obligations (other than the Incremental Loans). Without limiting in any respect the terms or enforceability of the Prepetition Intercreditor Agreement or the DIP Facility and this Final Order, nothing in this Final Order shall be construed as a consent by the Term Lenders to (i) the obtaining of credit or the incurring of indebtedness by the Debtors (or any of them) secured by a security, mortgage, or collateral interest or other lien on Prepetition Term Priority Collateral which is senior to the Prepetition Liens of the Prepetition Term Secured Parties, or (ii) the use of proceeds of any Prepetition Term Priority Collateral.

11. **Proceeds of Subsequent Financing.** Without limiting the provisions and protections of paragraph 10 above, if at any time prior to the indefeasible repayment in full in cash of all Prepetition ABL Obligations and all DIP Obligations, and the termination of the DIP Secured Parties' obligations to make loans and advances or other extensions of credit under the DIP Facility, including subsequent to the confirmation of any Chapter 11 plan or plans (the "Plan") with respect to the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) in violation of this Final Order, then all of the cash proceeds derived from such credit or debt and all Cash Collateral (other than the proceeds of Prepetition Term Priority Collateral) shall immediately be turned over, first, to the Prepetition ABL Agent in permanent and indefeasible repayment and reduction of the Prepetition ABL Obligations, and then, to the DIP Agent in payment of the DIP Obligations, in each case in accordance with the relative rights, claims, and priorities specified herein (including paragraph 16 below).

12. **Cash Management.** Cash collections (including, but not limited to, payments from customers with respect to accounts receivable but, for the avoidance of doubt, not the proceeds of DIP Loans prior to expenditure by the Debtors) constituting proceeds of assets which constitute DIP Collateral (other than Prepetition Term Priority Collateral) shall be directed to lock-box and/or deposit accounts ("cash collection accounts") under the sole dominion and control of the Prepetition ABL Collateral Agent pursuant to the structure in effect immediately prior to the Petition Date or otherwise satisfactory to the Prepetition ABL Agent. The Debtors and the financial institutions where the Debtors' cash collection accounts are maintained are authorized and directed to implement and/or continue in accordance with the Prepetition ABL

Facility daily cash sweeps from the cash collection accounts to an account or accounts maintained at DBNY. The Debtors will at all times maintain all Cash Collateral of the Prepetition ABL Secured Parties (other than proceeds of Prepetition Term Priority Collateral) in a segregated account (which is and shall hereby be subject to the Prepetition ABL Agent's perfected first priority lien granted hereunder) and not commingle such Cash Collateral with any proceeds of DIP Loans (prior to expenditure by the Debtors) or any other funds. Until the occurrence of an Event of Default, all amounts collected in the cash collection accounts may be used in accordance with the Budget; after the occurrence and during the continuance of an Event of Default, all such amounts shall, subject only to the Debtors' rights under paragraph 15(b), be applied in the accordance with paragraph 16 herein.

13. **Disposition of DIP Collateral.** The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except for sales of inventory and collection of accounts receivable in the ordinary course of business or as approved by the Bankruptcy Court to the extent required under applicable bankruptcy law.

14. **Survival of Certain Provisions.** In the event of the entry of any order converting any of these Cases into a Successor Case, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Replacement Liens and the Adequate Protection Superpriority Claims shall continue in these proceedings and in any Successor Case, and such DIP Liens, DIP Superpriority Claims, Adequate Protection Replacement Liens and Adequate Protection Superpriority Claims shall maintain their respective priority as provided by this Final Order.

15. **Events of Default; Rights and Remedies Upon Event of Default.**

(a) The occurrence of any of the following shall constitute an event of default hereunder (each, an "Event of Default"):

(i)     the failure by any Debtor to comply with, or perform, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order and/or this Final Order, including the failure by any Debtor to make any payment to the Prepetition ABL Secured Parties required under the Interim Order and/or this Final Order;

(ii)    any Debtor shall file any motion seeking to incur indebtedness or to obtain credit (other than under the DIP Facility, as expressly permitted herein or unsecured credit incurred in the ordinary course of the Debtors' businesses and consistent with the Debtors' past business practices) unless, in connection therewith, all of the Prepetition ABL Obligations and the DIP Obligations, and the Adequate Protection Superpriority Claims granted to the Prepetition ABL Secured Parties shall first be paid indefeasibly in full in cash and satisfied;

(iii)   any of the Debtors shall make any payment on or in respect of the DIP Facility, on account of the DIP Obligations, the DIP Superpriority Claims or otherwise, or the DIP Secured Parties shall seek enforcement of any rights in respect thereof, before the Prepetition ABL Obligations and the Adequate Protection Superpriority Claims in favor of the Prepetition ABL Secured Parties shall first be paid indefeasibly in full in cash and satisfied;

(iv)    the entry of an order of the Court not expressly permitted hereunder granting any lien on or security interest in any property of the estate of any Debtor in favor of any party other than in favor of the Prepetition Secured Parties or the DIP Secured Parties, as expressly set forth herein, without the express prior written consent of the Prepetition ABL Agent and the Customers;

(v)      the entry of an order by the Court or any other court having jurisdiction to do so granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow (x) a holder or holders of any security interest (other than the liens and security interests of the Prepetition ABL Secured Parties) in the assets or property of any Debtor to foreclose or otherwise realize upon any such security interests which assets or property have an aggregate value in excess of $100,000 in any instance or $250,000 in the aggregate or (y) a third party to proceed against any asset or assets of any of the Debtors in respect of a claim in excess of $100,000 in any instance or $250,000 in the aggregate;

(vi)      the entry of an order of the Court or any other court having jurisdiction to do so amending, supplementing, staying, vacating, reversing, revoking, rescinding, reconsidering or otherwise modifying the Interim Order or this Final Order without the consent of the Prepetition ABL Agent;

(vii)      dismissal of any of the Cases or conversion of any of the Cases to chapter 7 cases, the appointment of a Chapter 11 trustee or examiner with enlarged powers in respect of any Debtor, or unless and until the Prepetition ABL Obligations have been indefeasibly paid in full in cash, the filing of a motion or pleading by any Debtor seeking the dismissal of its Case under Section 1112 of the Bankruptcy Code or otherwise;

(viii)      the entry of an order by the Court, or any other court having jurisdiction to do so (1) authorizing the sale of all or substantially all of any Debtor's assets and property unless such order provides for the indefeasible

application of sufficient net cash proceeds from such sale to repay the Prepetition ABL Obligations (other than the Incremental Loans) in full or (2) authorizing any other sale or disposition of any DIP Collateral (other than Prepetition Term Priority Collateral) unless such order provides for the indefeasible application to the Prepetition ABL Obligations (other than the Incremental Loans), in accordance with the terms and conditions hereof and of the Prepetition ABL Loan Documents, of all net cash proceeds from such sale or disposition which are attributable (at an amount equal to the greater of net book value and the value attributed to such assets in the most recently delivered Borrowing Base Certificate) to such DIP Collateral;

(ix)    the entry of an order of the Court approving any claims for recovery of amounts under Section 506(c) of the Bankruptcy Code or otherwise arising from the preservation or disposition of any DIP Collateral (other than Prepetition Term Priority Collateral);

(x)    any Debtor shall file any plan of reorganization which fails to provide for payment in full in cash of all Prepetition ABL Obligations (other than the Incremental Loans) upon the effective date thereof, or the Debtors shall state their support for (in writing or on the record in a judicial proceeding), or take any action in support of, such a plan;

(xi)    the Adequate Protection Replacement Liens and the Adequate Protection Superpriority Claims granted to the Prepetition ABL Agent and the Prepetition ABL Lenders shall cease to be valid, perfected and enforceable in all respects, or any Debtor shall assert (or support any assertion by a third party) the

invalidity or unenforceability of any of the Adequate Protection Replacement Liens or Adequate Protection Superpriority Claims granted to the Prepetition ABL Secured Parties;

(xii)   any Debtor shall make any payment (including "adequate protection" payments) on or in respect of any prepetition indebtedness or prepetition obligations other than (i) to the Prepetition ABL Secured Parties on account of the Prepetition ABL Obligations (other than the Incremental Loans), (ii) to the Prepetition Term Secured Parties on account of the proceeds of Prepetition Term Priority Collateral or the Unencumbered Foreign Stock or (iii) for "First Day Motion Payments" up to the amounts set forth in such line item in the Budget, or (iv) for the fees and expenses of the Term Advisors as provided for herein;

(xiii)   the Debtors' cash expenditures exceed those permitted by the Budget (subject to the Permitted Variances);

(xiv)   any Debtor shall seek to, or shall support (in any such case by way of, *inter alia*, any motion or other pleading filed with the Court) any other person's motion to disallow or subordinate in whole or in part the Prepetition ABL Secured Parties' claims in respect of the Prepetition ABL Obligations, or to challenge the validity, enforceability, perfection or priority of the liens in favor of the Prepetition ABL Secured Parties (including, without limitation, any of their Prepetition Liens), but, without limiting any other provision of the Interim Order or this Final Order, excluding any challenge to the Specified Mortgages;

(xv)    there is an order entered by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of the Prepetition ABL Secured Parties;

(xvi)   this Final Order shall cease to be in full force and effect and unstayed;

(xvii)  the expiration of the period provided by Section 1121 of the Bankruptcy Code for the Debtors' exclusive right to file a plan, as such period may be extended pursuant to Section 1121 of the Bankruptcy Code, without the Debtors having filed and continuing to pursue confirmation of a plan, or the granting of any motion providing for the termination of the Debtors' exclusivity period;

(xviii) the filing of a motion or pleading by any Debtor, or the failure of the Debtors to file an objection to or to otherwise contest (or otherwise consenting to, supporting or acquiescing in) any motion or pleading filed by any other party in interest, seeking any of the matters set forth in paragraphs (iii) through (xiv) above; or

(xix)   the Accommodation Agreement shall, subject to any applicable cure period, cease to be in full force and effect or an event or occurrence shall have occurred or exists which enables or entitles the Customers to declare the Debtors in breach thereof, or to otherwise allow the Customers to exercise any of their rights or remedies thereunder.

(b)     Any automatic stay otherwise applicable to the Prepetition ABL Secured Parties is hereby modified so that (i) after the occurrence of any Event of Default and (ii) at any

time thereafter during the continuance of such Event of Default, upon five (5) business days' prior written notice of such occurrence, in each case given to each of the Debtors, counsel to the Debtors, counsel to the DIP Agent, counsel to each of the Customers, counsel for any Committee appointed in the Cases, and the United States Trustee, the Prepetition ABL Secured Parties shall be entitled to exercise their rights and remedies in respect of the DIP Collateral (other than Prepetition Term Priority Collateral), in accordance with this Final Order and the Prepetition ABL Loan Documents. Notwithstanding the immediately preceding sentence, immediately following the giving of notice by the Prepetition ABL Agent or the DIP Agent of the occurrence of an Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of Prepetition ABL Priority Collateral and the DIP Collateral (other than proceeds of Prepetition Term Priority Collateral) to the Prepetition ABL Agent for application in accordance with paragraph 16 herein; (ii) the Prepetition ABL Agent shall continue to be permitted to apply such proceeds in accordance with paragraph 16 herein; (iii) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral, other than (x) up to $1,500,000 of Cash Collateral (subject to paragraph 3(b) and Exhibit E) and up to $1,500,000 of DIP Loans, which may be used for line item expenditures in accordance with the Budget, and (y) towards the satisfaction of the Prepetition ABL Obligations (in the case of proceeds of DIP Collateral other than Prepetition Term Priority Collateral), and the Carve-Out, as provided in paragraph 16 herein; and (iv) any obligation otherwise imposed on the DIP Secured Parties to provide any loan or advance to the Debtors pursuant to the DIP Facility shall immediately be suspended. Following the giving of written notice by the Prepetition ABL Agent or the DIP Agent of the occurrence of an Event of Default, the Debtors and any Committee shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of

Default has occurred.  If the Debtors or any Committee do not contest such occurrence within such five (5) business-day day period, or if the Debtors or any Committee do timely contest the occurrence of an Event of Default and the Bankruptcy Court does not stay the enforcement thereof within such five (5) business day-period, the automatic stay, as to the DIP Secured Parties, shall automatically terminate at the end of such notice period.  Nothing herein shall preclude the Prepetition ABL Secured Parties from seeking an order from the Bankruptcy Court upon written notice (electronically (including via facsimile) in a manner that generates a receipt for delivery, or via overnight mail) to the United States Trustee, counsel to the Debtors, counsel to the DIP Agent and counsel to the Committee, if any, authorizing the Prepetition ABL Secured Parties to exercise any enforcement rights or remedies with respect to the Prepetition ABL Priority Collateral on less than five (5) business days' notice.

(c)	Subject only to the provisions of paragraph 15(b), upon the occurrence of an Event of Default, the Prepetition ABL Agent is authorized to exercise all remedies and proceed under or pursuant to this Final Order and the Prepetition ABL Loan Documents.  All proceeds realized in connection with the exercise of the rights and remedies of the Prepetition ABL Secured Parties (other than proceeds of Prepetition Term Priority Collateral) shall be turned over to the Prepetition ABL Agent for application to the Prepetition ABL Obligations under paragraph 16 herein and otherwise in accordance with the provisions of the Prepetition ABL Loan Documents; provided, that in the event of the liquidation of the Debtors' estates after an Event of Default and the termination of the commitments to extend credit hereunder, the amount of the Carve-Out shall be funded into a segregated account.

(d)	The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of this Final Order as necessary to (i) permit the Debtors

to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP Secured Parties under the DIP Facility or this Final Order, (ii) authorize and allow the Prepetition ABL Agent, subject to the terms set forth in the Prepetition ABL Credit Agreement, herein and on Exhibit E, to adjust the Borrowing Base and the Applicable Availability Block, and to take any reserves in respect of the Borrowing Base, and (iii) authorize the Prepetition ABL Secured Parties to receive, retain and apply payments and proceeds of Prepetition Collateral (including Cash Collateral) and DIP Collateral (in each case, other than Prepetition Term Priority Collateral) as provided herein (including as set forth on Exhibit E).

(e)     Nothing included herein shall prejudice, impair, or otherwise affect the Prepetition ABL Secured Parties' or DIP Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors (including, but subject to the limitations set forth in paragraph K above and on Exhibit E, other or additional adequate protection).

16.     **Applications of Proceeds of Collateral, Payments and Collections.**

(a) As a condition to the extension of credit under the DIP Facility and the authorization to use Cash Collateral, each Debtor has agreed that proceeds of DIP Collateral and Prepetition Collateral (but not, in each case, Prepetition Term Priority Collateral), any amounts held on account of the DIP Collateral or Prepetition Collateral (but not Prepetition Term Priority Collateral), and all payments and collections received by the Debtors with respect to all proceeds other than proceeds of Prepetition Term Priority Collateral shall be used and applied in accordance with the Budget (subject to the Permitted Variances).  Subject to the Debtors' rights under paragraph 15(b), after the occurrence and during the continuance of an Event of Default, all proceeds of DIP Collateral and Prepetition Collateral (but not Prepetition Term Priority

Collateral), whenever received, shall be applied as follows: (i) *first*, to permanently and indefeasibly repay and reduce the Prepetition ABL Obligations in accordance with the Prepetition ABL Loan Documents, subject to paragraph 6 herein, until indefeasibly paid in full in cash; (ii) *second*, to reduce the DIP Obligations then due and owing; and (iii) *third*, to the estates. Additionally, if, at any time, the amount of the Prepetition ABL Obligations (other than the Incremental Loans) exceeds the Borrowing Base, including after taking into account any reserves taken or the Applicable Availability Block implemented by the Prepetition ABL Secured Parties in their sole discretion, the Debtors shall immediately, without notice or demand, permanently repay (other than from proceeds of Prepetition Term Priority Collateral) the Prepetition ABL Obligations (other than the Incremental Loans) in an aggregate amount equal to such excess. Notwithstanding any of the foregoing to the contrary, all proceeds of Prepetition Term Priority Collateral shall be applied in accordance with the terms of the Prepetition Intercreditor Agreement.

(b)     Following the occurrence and during the continuation of an Event of Default, prior to application of proceeds as specified in paragraph 16(a), funds sufficient to fund the Carve-Out shall first be wired to the Debtors in accordance with paragraphs 7 and 15(c). The Debtors shall hold these funds in an interest-bearing account in trust for the benefit of parties claiming under the Carve-Out, and upon satisfaction of all such claims any remaining funds shall be returned to the Prepetition ABL Agent and the DIP Agent, as the case may be, for application in accordance with this paragraph 16.

17.     **Proofs of Claim, etc.**  The Prepetition Secured Parties and the DIP Secured Parties will not be required to file proofs of claim in the Cases or in any Successor Case.

18.    **Other Rights and Obligations.**

(a)    **Good Faith Under Section 364(e); No Modification or Stay of this Final Order.**  Based on the findings made in connection with the DIP Facility, including as set forth in this Final Order, and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, including as approved by this Final Order, in the event any or all of the provisions of the DIP Facility or this Final Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties are entitled to the protections provided in Section 364(e) of the Bankruptcy Code, and, no such appeal, modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby.  Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Liens and DIP Superpriority Claims granted to the DIP Secured Parties shall be governed in all respects by the original provisions of the DIP Facility, including this Final Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and DIP Superpriority Claims granted herein, with respect to any such claim.  Because the DIP Loans are made in reliance on this Final Order, the obligations owed the DIP Secured Parties prior to the effective date of any stay, modification or vacation of this Final Order shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under the DIP Facility, including this Final Order.

(b)     **Expenses.**  Subject to the other terms and provisions of this Final Order, the Debtors will pay all reasonable expenses incurred by the Prepetition ABL Agent and the Customers (including, without limitation, the reasonable fees and disbursements of the Customers' permitted attorneys and financial advisors and any of the ABL Advisors) in connection with the preparation, execution, delivery and administration of the DIP Facility, including this Final Order, in each case whether or not the transactions contemplated hereby are fully consummated.  Payment of such fees shall not be subject to allowance by the Bankruptcy Court.  Professionals for the DIP Secured Parties or Prepetition Secured Parties shall not be required to comply with the United States Trustee fee guidelines.  Copies of invoices submitted to the Debtors by the professionals for the DIP Secured Parties or the Prepetition Secured Parties shall be forwarded by the Debtors to the United States Trustee, counsel for any Committee, and such other parties as the Court may direct.  The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information).

(c)     **Binding Effect.**  The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Secured Parties and the Prepetition Secured Parties, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 or Chapter 7 case.

(d)     **No Waiver.**  The failure of the Prepetition Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the Prepetition Credit Facilities or otherwise, as applicable, shall not constitute a waiver

of any of the Prepetition Secured Parties' and the DIP Secured Parties' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the Prepetition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law against any person or entity in any court, including without limitation, the rights of the Prepetition Secured Parties and the DIP Secured Parties (i) to request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, or (ii) to propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Plan, or (iii) to exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.

(e)     **No Third Party Rights.**  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

(f)     **No Marshaling.**  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

(g)     **Section 552(b).**  The DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral.

(h)    **Amendment.**    No waiver, modification, or amendment of any of the provisions hereof or the Budget shall be effective unless set forth in writing, signed by, or on behalf of, all the Debtors, the DIP Agent and the Prepetition ABL Agent and approved by the Bankruptcy Court.

(i)    **Information for the Committee**.    The Debtors shall provide to the Committee the same financial statements, reports and other information that the Debtors are required to provide to the Prepetition Agents and DIP Agent pursuant to this Final Order as and when the Debtors provide such information to the Prepetition Agents and DIP Agent.

(j)    **Survival of Final Order.**    The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Cases, (ii) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) to the extent authorized by applicable law, dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of this Final Order, including the DIP Liens and DIP Superpriority Claims granted pursuant to this Final Order, and any protections granted to or for the benefit of the Prepetition Secured Parties (including the Adequate Protection Replacement Liens and the Adequate Protection Superpriority Claims), shall continue in full force and effect notwithstanding the entry of such order, and such DIP Liens and DIP Superpriority Claims and protections for the Prepetition Secured Parties (including the Adequate Protection Replacement Liens and the Adequate Protection Superpriority Claims) shall maintain their priority as provided by this Final Order until all the obligations of the Debtors to the DIP Lender and the Prepetition Obligations have been indefeasibly paid in full in cash and discharged.  The Prepetition ABL

Obligations shall not be discharged by the entry of an order confirming or consummation of a Plan, the Debtors having waived such discharge pursuant to Section 1141(d)(4) of the Bankruptcy Code.

(k)  **Enforceability.**  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(l)  **No Waivers or Modification of Final Order.**  The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Agent, the Prepetition ABL Agent and the Customers and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the Prepetition ABL Agent or the Customers.  Nothing herein shall be construed to limit the right of any party in interest to object to any modification or extension on any basis.

(m)  **Waiver of any Applicable Stay.**  Any applicable stay (including, without limitation, under Interim Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final Order.

19.  **ACE Objection Resolved.**  Notwithstanding anything to the contrary herein, any security interest or lien granted under this Final Order shall not extend to the paid loss deposit funds or other funds held by ACE American Insurance Company and its affiliates to secure the Debtors' deductibles and other obligations arising under the insurance policies and related agreements.

20.  **Retention of Jurisdiction.**  The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

21.     **Intercreditor Agreement Among the Prepetition ABL Secured Parties, the DIP Secured Parties, and the Prepetition Term Secured Parties.**   Notwithstanding any provision of the Interim Order or this Final Order, and despite the DIP Superpriority Claim and Adequate Protection Superpriority Claims with respect to the Unencumbered Foreign Stock being pari passu, effective from July 2, 2009, the DIP Secured Parties and the Prepetition ABL Secured Parties agree with the approval of this Court (a) to subordinate their respective DIP Superpriority Claim and Adequate Protection Superpriority Claim with respect to the Unencumbered Foreign Stock to the Adequate Protection Superpriority Claim of the Prepetition Term Secured Parties with respect to the Unencumbered Foreign Stock and (b) that they shall not receive any proceeds of the Unencumbered Foreign Stock unless and until the Prepetition Term Secured Parties' Adequate Protection Superpriority Claim for diminution in value of the Prepetition Term Secured Parties' collateral is paid in full.

SO ORDERED by the Bankruptcy Court this June __, 2009.


_____
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket:

[Accommodation Agreement]

# ACCOMMODATION AGREEMENT

Metaldyne Corporation, on behalf of itself and its domestic and Canadian controlled affiliates and subsidiaries (collectively, "Supplier"), Deutsche Bank AG New York Branch in its capacity as DIP lender and DIP agent ("Lender"), Ford Motor Company ("Ford"), General Motors Corporation ("GM"), Chrysler LLC, on behalf of itself and Chrysler Motors LLC ("Chrysler US") and Chrysler de Mexico S.A. de C.V. ("Chrysler Mexico", and together with Chrysler US, "Chrysler"), as debtor-in-possession under Case No. 09-50002 pending in the United States Bankruptcy Court for the Southern District of New York, ("Chrysler", and together with Ford and GM the "Customers" or each individually, "Customer") enter into this accommodation agreement ("Agreement") on May __, 2009.

## BACKGROUND

A.    Pursuant to various supply agreements and/or releases issued by the Customers and accepted by Supplier ("Purchase Orders" or individually, a "Purchase Order"), Supplier is obligated to manufacture the Customers' requirements of certain component parts, service parts and assembled goods, as modified to reflect any approved engineering changes (collectively, "Component Parts" or individually, a "Component Part"). Notwithstanding anything herein to the contrary, component parts produced at the New Castle facility shall not be included in the definition of Component Parts or be governed by this Agreement.

B.    Supplier has determined that it must file petitions under chapter 11 of title 11 of the United States Code (the "Chapter 11 Cases") to effect a sale (the "Sale Process") of all or substantially all of their assets used in connection with their powertrain, balance shaft module and chassis businesses (the "Sale Assets"). To continue its operations during the Chapter 11 Cases, Supplier must obtain debtor-in-possession financing ("DIP Financing") in accordance with, among other things, financing orders to be entered in the Chapter 11 Cases (the interim and final of such orders, the "Financing Orders").

C.    Metaldyne Company LLC ("Metaldyne Company") is a borrower under a revolving credit facility (as amended and with all related loan and security documents, the "Prepetition ABL Loan Documents") pursuant to the ABL Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate Holdco, Inc. ("Metaldyne Intermediate"), Deutsche Bank AG New York Branch (the "Prepetition ABL Agent") (as administrative agent and collateral agent), JPMorgan Chase Bank, N.A. (as syndication agent) and Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central) (as co-documentation agents) and the other lender parties thereto (the "Prepetition ABL Lenders" and, together with the Prepetition ABL Agent, the "ABL Secured Parties"). In addition, Metaldyne Company is a borrower under a senior secured credit facility (as amended and with all related loan and security documents, the "Prepetition Term Loan Documents" and, together with the Prepetition

ABL Loan Documents, the "Prepetition Loan Documents") pursuant to the Credit Agreement, dated as of January 11, 2007, among Metaldyne Company, Metaldyne Intermediate, The Bank of New York Mellon (the "Prepetition Term Agent" and, together with the Prepetition ABL Agent, the "Prepetition Agents") (as administrative agent and collateral agent), Citicorp North America, Inc. (as syndication agent), Deutsche Bank Securities Inc. (as documentation agent) and the other lender parties thereto (collectively, the "Prepetition Term Lenders" and, together with the Prepetition Term Agent, the "Term Secured Parties"). The ABL Secured Parties and the Term Secured Parties are collectively referred to herein as the "Prepetition Lenders." To secure the indebtedness outstanding under the Prepetition Loan Documents, the Prepetition Lenders have prepetition liens on substantially all of Supplier's assets.

D.      The Lender has agreed to make the DIP Financing available to the Supplier subject to, among other things, receiving funded Participations (as defined below) and  the financial accommodations from the Customers set forth herein (collectively, the "Customer Accommodations").  The DIP Financing will be structured as a Replacement ABL Agreement (as such term is defined in the Intercreditor Agreement, dated as of January 11, 2007, among Deutsche Bank AG, New York Branch, as collateral agent, JPMorgan Chase Bank, N.A., as collateral agent, Metaldyne Intermediate and Metaldyne Company) (the "Intercreditor Agreement").

E.      In consideration for the Customers agreeing to provide such financial and other accommodations, the Customers have requested that Supplier provide them with certain assurances and acknowledgments in connection with the protection of the supply of Component Parts.

F.      Subject to the terms of this Agreement, the Customers have agreed to provide certain financial and other accommodations to Supplier, and Supplier has agreed to provide the Customers with certain supply protection.

Based on the foregoing recitals and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the parties agree as follows:

<u>**TERMS AND CONDITIONS**</u>

1.      <u>**Conditions to Effectiveness**</u>

The effectiveness of this Agreement is expressly conditional upon occurrence of the following conditions precedent ("Effective Date"):

a.      All parties to this Agreement have executed this Agreement;

b.      Supplier has commenced the Chapter 11 Cases;

c.      The entry of an interim Financing Order or other orders acceptable to the Customers that, among other things, approve this Agreement and the NCM Production Agreement (as defined infra.) as postpetition contracts in the Chapter 11 Cases.

2

2.    **Term of the Agreement**

For purposes of this Agreement, the "Term" shall mean the period from the Effective Date through the earlier of (the "Termination Date") (i) the Sale Date (defined below); (ii) the occurrence of an Event of Default (as defined below); and (iii) sixty (60) days following the Effective Date; provided that Supplier may extend the Term for up two consecutive fifteen (15) day periods  (the "Extended Termination Date") if Sale Orders have been entered and if the Supplier would still have funding availability under the terms of the Financing Orders. If sufficient funding is not available for any such fifteen (15) day period, without an obligation to provide any additional funding, the Customer agree to consider, in good faith, a request for additional funding.

3.    **Sale Process**

A.    Sale Process.  Upon commencement of the Chapter 11 Cases, Supplier will continue the sale processes that were commenced prepetition to effect one or more transactions for the sale of Supplier's assets (each, a "Sale") with the intent to close such Sales within 60 days of the Effective Date of this Agreement (the closing date of the latest of such sales, the "Sale Date").

B.    Milestones.  The  following milestones will apply to the Sale Process (each a "Milestone" or collectively, the "Milestones"):

(i)    Letter(s) of Intent.  Obtain, by June 5, 2009 a letter or letters of intent for the sale of some or all of the Sale Assets.

(ii)    Definitive Agreement(s).  Execute by June 15, 2009 one or more definitive purchase agreements and file motions to approve the Sales on the terms outlined in the definitive purchase agreements with the Bankruptcy Court; provided however that such dates shall be extended by the Customers, in the event Supplier has made good faith progress toward finalizing definitive purchase agreements, such that an extension will not jeopardize a closing by the date set forth below.

(iii)    Sale Process Approval(s).  Obtain by June 24, 2009 an order approving procedures for the approval of one or more Sales and any applicable bidding protections and procedures;

(iv)    Sale Approval Order(s).  Obtain, by July 27, 2009, an order from the Bankruptcy Court approving one or more Sales.

(v)    Closing Date(s).  Close one or more Sales by the later of 60 days after the Effective Date or the Extended Termination Date (the "Closing Deadline").

Supplier further agrees to provide the Customers updates, as frequently as is requested by the Customers, on the status of the Sale Process.  Subject to (i) the execution of confidentiality agreements in form and substance mutually agreeable to Supplier and Customers and (ii) any other confidentiality agreements that Supplier may have with

third parties, Supplier will promptly provide Customers copies of all nonprivileged documents and information relating to the Sale Processes including, but not limited to, offering memoranda, letters of interest or intent and executed copies of asset purchase agreements.

C.    RemainCo.  It is Supplier's current intent that the assets of Supplier that are not sold pursuant to the Sale Processes, together with the remaining liabilities of the estates (collectively, "Remainco"), unless previously liquidated, sold, will either be transferred to a creditors' trust through a plan of reorganization or otherwise wound down, any such particular course of action depending entirely upon the available resources to fund such particular course of action.  The DIP Financing will not fund the costs to operate the non-US plants in Remainco that are identified in a nonexclusive list on Exhibit A (the "Remainco Plants"), as may be supplemented by written notice by Supplier to the Customers. The cash management order entered in the Chapter 11 Cases will permit the prepetition cash management system related to Supplier's Canadian affiliate to continue postpetition. If, after expiration of the Term, any Customer desires production of Component Parts from any of the Remainco Plants, the applicable Customer and Supplier will work in good faith to determine the cost of such production, which cost Customer shall bear.  The Customers and the Supplier will work together to transfer the Component Part production of each of the Customers from the Remainco Plants prior to the expiration of the Term, with the costs of transfer to be funded by the applicable Customer. The costs of transfer may, at the option of the applicable Customer, be funded as additional advances under the DIP Financing by the purchase of additional Participations (as defined, infra.).  In the event that the Sale Process is not concluded by Termination Date or, if applicable the Extended Termination Date, the DIP Financing will terminate.  For clarity, the DIP Financing will not fund extraordinary costs associated with the Remainco facilities after the Term expires.

4.    **Funding**

A.    As a condition to the Lender's provision of the DIP Financing, the Customers will each purchase their respective percentages (55.9% Ford; 24.3% Chrysler; and 19.8% GM) of subordinated, last-out participations in loans made under the Replacement ABL Agreement, as and when required, in accordance with a Budget (as defined below) and pursuant to the terms of a Subordinated Participation Agreement reasonably acceptable to Lender and the Customers (each, a "Participation").  The aggregate amount of the Participations will be $18,508,789 (the "Maximum DIP Participations") plus the amounts of any participations acquired pursuant to Section 6.J. herein,

B.    Supplier, Lender and the Customers will agree on the terms of a budget (the "Budget") pursuant to which Supplier will conduct its operations during the Term. The Budget will contain an agreed-upon funding for Supplier's incentive and severance costs, Supplier's professional fees and the fees of the UST.

C.     Subject to the Customers providing the Customer Accommodations, Lender will provide Supplier with the DIP Financing pursuant and subject to the terms and conditions of the Financing Orders during the Term in accordance with the Financing Orders.

D.     During the Term, no Customer will impose pricedowns or price reductions on Supplier with respect to the Component Parts.

E.     Within 10 days of the Effective Date, each Customer will acknowledge to Supplier its account payable balance and its tooling payable balance. Each Customer will use its commercial best efforts to resolve any disputed tooling invoices within 10 days of the Effective Date.

5.     **Customers' Accommodations**

A.     <u>Limitation on Setoffs</u>. As to all accounts payable owing by each Customer to Supplier generated or existing prior to the expiration of the Term, including prepetition payables ("<u>Customer Accounts</u>"), each Customer agrees, solely for the benefit of Lender and the Prepetition Lenders, or any assignee or successor of Lender, not to exercise its respective rights of setoff and/or recoupment, including, without limitation, in connection with any prior, existing or future defaults under any Purchase Orders, or any defenses, rights and claims (including without limitation claims for any incidental, special or consequential damages), other than to the extent of the Allowed Setoffs, Tooling Setoffs and Material Setoffs, (each defined below); <u>provided</u>, <u>however</u>, (i) under no circumstances may Allowed Setoffs exceed 3% percent ("<u>Cap</u>") of the face amount of any invoices or accounts payable; (ii) once an Allowed Setoff is deducted from a particular invoice or account payable, no further Allowed Setoffs may be taken against such invoice or account payable, and (iii) if an invoice or account payable is paid, a Customer will have no right after that payment to assert an Allowed Setoff in respect of that payment. Any Allowed Setoffs in excess of the Cap will be rolled over and available for deduction against any subsequent payment of any invoices or accounts payable; <u>provided</u>, <u>however</u>, under no circumstances will an Allowed Setoff against any invoice or account payable exceed the Cap.

(i)     For purposes of this Agreement:

(a)     "<u>Allowed Setoffs</u>" means any setoff, recoupment or deductions, whether for defective or nonconforming products, quality problems, unordered or unreleased parts (other than for parts produced for an Inventory Bank pursuant to this Agreement) returned to Supplier, short shipments, hostage payments made to material vendors that are not Material Setoffs and for which Supplier has requested in writing (or, if relating to a period prior to the Effective Date, that Customer has identified to Supplier in writing) that such Customer make such payments, misshipments, premium freight charges (not caused by a Customer), improper invoices, mispricing, duplicate payments or billing errors, and

5

professional fees and costs incurred by one law firm and one financial advisory firm per Customer and related to Supplier incurred by each Customer individually (the "Professional Fees") but excluding any incidental, special or consequential damages arising from or relating to such items.

(b)  "Material Setoffs" means any setoff or recoupment for (A) direct payments to vendors by a Customer for the cost of materials, services or components purchased by a Customer pursuant to Supplier's written request and used by Supplier in connection with the production of Component Parts, if such material, services or components could have been purchased by Supplier but for the vendor's refusal to sell to Supplier on a COD basis, or (B) materials, services or components supplied to Supplier by a Customer in the ordinary course of business to be used in production of Component Parts for which in either instance written notice of the amount paid to vendors or Supplier, or the invoice amount of such items provided in the ordinary course, as applicable, for those materials, services or components ("Direct Payment Notice") has been received by Lender and the Prepetition ABL Agent in advance of the next reporting date for the borrowing base under the Prepetition ABL Loan Documents.  Material Setoffs may be taken only against accounts that arise from shipments made by Supplier to Customer from and after the one business day following receipt by Lender and the Prepetition ABL Agent of the Direct Payment Notice.

(c)  "Tooling Setoffs" means any  payments to tooling vendors, including progress payments, necessary to receive possession of tooling (i) over which Lender or the Prepetition Lenders do not possess a priority lien with respect to such tooling; or (ii) which payments are necessary to secure the release of tooling where the affected Customer(s), acting in good faith, determine(s) insufficient time exists to exercise judicial remedies to obtain possession or control of such tooling.  Tooling Setoffs may be taken only (1) against amounts owed by Customer to Supplier under the applicable tooling purchase order, and (2) only as to which a written notice of the amount paid to the tooling vendor(s) has been provided to the Lender and the Prepetition Agents in advance of such intended setoff.  If the amount due to the Supplier under the tooling purchase order for particular tooling, less any amounts paid to the tooling vendor by a Customer, exceeds, as a result of a prior partial payment by the Supplier to the tooling vendor, the amount owed to the tooling vendor,  the applicable Customer shall pay the excess (less the cost to complete if applicable) to the Prepetition Term Lenders on account of Supplier, or to Supplier in the event

6

that Lender's and the Prepetition Lenders' claims have been satisfied in full.

(ii)    Customers reserve and do not waive any rights and interests they respectively may or would have against the Supplier but for this Agreement, including the right to assert affirmative claims against Supplier and setoffs asserted for defense purposes.  Customers further agree that they will not assert any such rights and interest against any purchaser in a Sale, including any assignee of a purchase order if the Customers, or a Customer, consent(s) to such assignment.

B.    <u>Inventory Purchase Agreement</u>.

(i)    Upon the occurrence of an Inventory Trigger Event (defined below), each Customer will purchase and pay for, within 30 days of the Inventory Trigger Event, all of (collectively, "<u>Customer Inventory</u>"): Supplier's raw materials (including purchased components),and finished goods inventory related to that Customer's Component Parts that are usable (defined below) by the Customer or the Customer's new supplier and merchantable (defined below) and any Component Parts that are the subject of unsatisfied releases that are or were provided to Supplier and under which Supplier actually produced Component Parts ("<u>Releases</u>") from (i) Lender or the Prepetition ABL Agent, as applicable, (if Lender or the Prepetition ABL Agent obtains possession of and the right to sell such inventory by way of repossession, voluntary surrender, judicial intervention or otherwise), (ii) a trustee, receiver or interim receiver lawfully acting for the benefit of the Lender ("<u>Trustee</u>") or (iii) Supplier, if Lender and the Prepetition ABL Agent so elect.

(ii)    Notwithstanding anything contained in this Agreement to the contrary, Customers will be required to purchase Customer Inventory pursuant to this Agreement only upon the occurrence of an Inventory Trigger Event,  provided that Lender, the Prepetition ABL Agent, Supplier or a Trustee, as the case may be, can make the Customer Inventory available for pick up by the applicable Customer free and clear of all liens and security interests within 30 days after the occurrence of an Inventory Trigger Event; <u>provided</u>, <u>however</u>, that the determination of whether the Customer Inventory is usable and merchantable shall be made on the date of the Customer Inventory is available for pick up by the applicable Customer ("<u>Determination Date</u>").

(iii)    For purposes of this Agreement, the following definitions shall apply:

(a)    "merchantable" means merchantable as that term is defined in U.C.C. § 2-314 and in conformance with applicable Purchase Order or supply contract specifications, reasonably applied.

(b)    "<u>Inventory Trigger Event</u>" means the first to occur of the following events without payment of all of the obligations of the

Supplier to the Lender and the Prepetition ABL Agent: (i) as to each Customer separately, such Customer resources some or all of its Component Part production from Supplier (provided that resourcing by a Customer of less than all of its business shall be deemed to be a Trigger Event only as to Customer Inventory related to the resourced Component Parts); (ii) expiration of the Term; (iii) conversion of any of the Supplier's chapter 11 cases to a chapter 7 case under the Bankruptcy Code; and (iv) an Event of Default by Supplier that is continuing and is not waived by the applicable Customer.

(c)  "usable" means finished goods and raw materials, as the case may be, relating to the Component Parts or tooling which are usable by Customer (or the Customer's alternative supplier(s) of the Component Parts) in connection with manufacturing the Component Parts for which a Customer has unsatisfied requirements as of the Determination Date but in all cases in quantities not less than those called for by any Releases (including so-called fabrication or similar Releases relating to the procurement of raw materials and any inventory bank builds requested by a Customer) existing as of the Determination Date less any portion of such releases that are satisfied by the delivery of Component Parts or Customer Inventory prior to the Determination Date, it being understood that Customer Inventory in amounts called for by unsatisfied Releases (including any requested inventory bank builds) shall be deemed usable for purposes of this Agreement.

C.  Purchase Price.  The price for Customer Inventory to be purchased under this Agreement ("Purchase Price") will be calculated as follows:

(i)  for raw materials – 100% of Supplier's actual and documented cost of the raw materials excluding premium freight charges not requested by the Customer; and

(ii)  for finished Component Parts – 100% of the existing Purchase Order price (in effect on the date of purchase of the Inventory) to Customer.

All prices are F.O.B. Supplier.  Upon a Customer's request made within two business days after an Inventory Trigger Event, and subject to the Customer's agreement to purchase the resulting finished goods, Lender and the Prepetition ABL Agent will permit, Supplier will complete, work-in-process inventory after an Inventory Trigger Event subject to agreement by Lender, the Prepetition ABL Agent, Supplier, and Customer on a budget to cover the costs incurred for such production and the price to Customer of the resulting finished goods, and payment in advance by the applicable Customer or Customers of all costs associated with completing the work in process pursuant to such budget; provided, further, that such production shall be completed no later than five business days after the Inventory Trigger Event.

8

In the event merchantable and usable raw material is used in the production of Component Parts for more than one Customer ("Common Materials"), the Common Materials will be allocated to each Customer, without regard to any portion allocated to any other customer, on a pro-rata basis based upon each party's respective sales percentage at the applicable plant over the 4 month period ending April 30, 2009.

Customers agree to pay directly to the Prepetition ABL Agent or, if the claims of the Prepetition ABL Secured Parties have been paid in full in cash, Lender (for Supplier's account) the Purchase Price of their respective Customer Inventory purchased pursuant to this Agreement without setoff, recoupment or deduction for any claims or rights Customers may otherwise have against Supplier or the Prepetition Lenders, which rights and claims Customers otherwise reserve and do not waive, except as otherwise provided under this Agreement.

D.    Change of Account Payable Terms.  For those shipments of the Component Parts invoiced or shipped on and after the Effective Date by the Supplier, including its Canadian affiliate, through the expiration or termination of the Term, all Customers except Chrysler Mexico will make payments on net immediate terms. Chrysler Mexico will continue its current payment terms of 10/25 prox.  For purposes of this Agreement "net immediate" shall mean payments on average within 8 days after receipt by the Customer.  Ford agrees that all pre-Effective Date accounts payable will be paid no later than 15 days after the Bankruptcy Filing, provided that an interim Financing Order has been entered before that time.  GM agrees that it shall on May 29, 2009 pay all accounts payable for all goods received by GM and reflected in GM's disbursement system as of the close of business on May 28, 2009.  Chrysler agrees that Chrysler Mexico shall pay its reconciled pre-Effective Date payable of approximately $1.61 million on or before two  business days of the Effective Date and shall use its best efforts to reconcile its disputed Component Parts accounts within fourteen days of the Effective Date with such reconciled amounts paid within the next payment cycle.  Chrysler agrees that Chrysler Mexico shall pay its reconciled pre-Effective Date payable of approximately $1.61 Million on or before two business days of the Effective Date and shall use its best efforts to reconcile its disputed Component Part accounts within fourteen days of the Effective Date with such reconciled amounts paid within the next payment cycle.  Chrysler US shall pay its reconciled accounts as set forth in the NCM Production Agreement

E.    Exclusion of New Castle Facility.  Nothing in this Agreement shall pertain to the New Castle Component Parts, which shall be governed by the terms of the NCM Production Agreement dated May    , 2009, which agreement shall be approved by the Bankruptcy Court.  Chrysler shall have no rights under this Agreement unless it enters into a mutually acceptable NCM Production Agreement on or before the Effective Date. Chrysler US asserts that Supplier supplies goods or services critical to the going concern value of Chrysler US' businesses or the consummation of a sale transaction among Chrysler LLC and certain subsidiaries and New Carco Acquisition LLC and an indirect wholly owned subsidiary of Fiat S.p.A.

9

F.    Bankruptcy.  In the event a Customer files a petition for relief under chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court during the Term, that Customer will file a motion on its petition date to seek Court approval and direction to assume and continue performance of its obligations under this Agreement, including timely payment of all prepetition amounts owed Supplier, and will diligently prosecute such motion to obtain expedited approval thereof.  No rights of any Customer hereunder and no obligations of Supplier to any Customer shall be of any force and effect unless such Customer is in full compliance with all of its obligations under this Agreement, including the funding of Subordinated Participations as set forth above.

G.    Resourcing.  Until the first to occur of (i) the expiration or termination of the Term or; and (ii) an Event of Default occurs, the Customers will not resource and will not further dual source the Component Parts, other than Component Parts manufactured at the Remainco Plants or the Component Parts that the Supplier and the Customer mutually agree in writing may be (the "Remainco Component Parts").  The foregoing limitation shall not prohibit the Customers from taking action during the Term to prepare for resourcing such as entering into discussions and sending requests for proposals to alternative suppliers regarding the production of the Component Parts Supplier will fully cooperate and assist the Customers in their respective resourcing preparations, provided, however, that (i) reasonable steps will be taken to protect confidential or trade-secret information and the Excluded Technology from competitors, and (ii) the costs for such preparations are contained within the Budget or are paid for directly by the Customer seeking such preparations.  For clarity, this Section is not intended to constitute a commitment under this Agreement for the Customers to retain any of their business with Supplier after the expiration or termination of the Term or to consent to assignment of any of their respective purchase orders, and (b) the Customers may immediately begin to resource Component Parts manufactured at the Remainco Plants.

For clarity, the foregoing limitation does not include or prohibit (i) changes in releases due to normal business fluctuations, (ii) cessation of production due to product or program changes.

H.    Survival. The obligations of the Customers described in Clauses A, B, C and D above are continuing obligations that survive the expiration of the Term.

6.    **Supplier's Obligations**

A.    Continued Production.  Supplier will continue to manufacture the Component Parts for the Customers in accordance with the terms of their respective Purchase Orders and related releases; provided that, in the case of the Remainco Plants, Supplier has sufficient liquidity or financing to do so.  Supplier agrees to notify Customers' respective line purchasing agent of any threat or threats to shipment of Component Parts on a timely basis, promptly upon learning of that threat or threats.  Except as specifically provided in this Agreement, this Agreement is not intended to

10

modify the terms and conditions of the Customers' respective Purchase Orders, which terms and conditions otherwise remain in full force and effect. In the event of any inconsistency between the terms of this Agreement and the terms of the Customers' respective Purchase Orders, the terms of this Agreement will control.

B. <u>Bankruptcy Filing</u>. Supplier will immediately file a Voluntary Petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"). As promptly as possible upon the filing of its Chapter 11 Cases, Metaldyne will file such necessary motions to approve and effectuate the DIP Order.

C. <u>Purchase Order Assignment</u>. No Purchase Order of any Customer may be assigned to any proposed purchaser or assignee of the purchase order without the express prior written consent of the Customer party to the Purchase Order.

D. <u>Inventory Banks</u>. Supplier will build for each Customer an inventory bank of Component Parts in accordance with a schedule to be provided to Supplier by each Customer. Supplier will immediately begin producing inventory banks on the later of the Effective Date or the date on which the schedule is received by the Supplier and ship inventory-bank parts as they are produced. The Customers will pay for the Component Parts in accordance with the payment terms set forth in this Agreement. Supplier's obligation to build the inventory bank parts will be subject to: (i) receipt of a schedule by each Customer, (ii) the procurement of parts by Supplier, provided, Supplier shall immediately notify any Customer of an inability to procure parts that will impair the ability of the Supplier to produce that Customer's inventory bank; (iii) the Budget, provided, however, that if the Debtor asserts it is unable to produce the inventory bank for any customer due to budgetary limitation, such Customer may advance the amounts necessary to commence or continue the inventory bank directly to the Supplier and the Supplier shall thereupon immediately commence or continue its production, (iv) reasonably applied internal capacity limitations (*e.g.*, machine capacity and manpower limitations); and (v) Customer's payment of verifiable, incremental out-of-pocket costs incurred by Supplier in connection with building the Inventory Bank including, but not limited to, all special packaging and handling costs (*e.g.*, disposable dunnage, wrapping, coating, etc.) ("<u>Incremental Bank Costs</u>"). Supplier's production of an inventory bank for a Customer cannot disrupt normal production for other Customers of Supplier. Supplier will fulfill releases for "all time buys" of past-model service Component Parts if requested to do so by a Customer, which shall be part of the inventory bank. Upon a Customer's request for an inventory bank, Supplier shall promptly provide a schedule to the Customer setting forth the Incremental Bank Costs Supplier anticipates that it will incur in connection with building the inventory bank ("<u>Bank Build Budget</u>"). The Customers are not obligated to reimburse Supplier for any Incremental Bank Costs that have not been disclosed to the Customer and approved in writing before being incurred and Supplier is not obligated to commence production of an inventory bank before such approval. Supplier will ship the Inventory Bank to the locations designated in writing by each Customer, as produced, and each Customer will pay for its inventory bank according to the terms of this Agreement. The Customers agree that, to the extent that the inventory banks consist of Component

Parts other than Remainco Component Parts and a Sale occurs, the Customer will negotiate in good faith with the successful purchaser with respect to the manner in which the Component Parts will be utilized by the Customer.

Supplier will not produce inventory banks for Supplier's other customers ("Other Customers") unless (x) such Other Customer agrees to provide all of the accommodations provided by the Customers or other accommodations which have a reasonably equivalent economic impact, or (y) producing inventory banks for the Other Customer does not utilize available capacity that could be used to build inventory banks requested by Customers and such Other Customers agree in writing to piece price increases that reasonably compensate Supplier for all incremental costs incurred in producing the inventory bank, including premium labor costs.

     E.    <u>Cooperation in Resourcing Business</u>.  If it becomes necessary to do so and is otherwise permitted under this Agreement, and, (for clarity, as to Remainco Component Parts, immediately upon the Effective Date), Supplier will cooperate and use its best efforts assisting Customers in moving the production of Component Parts to one or more replacement suppliers; provided that the costs of such cooperation are paid directly by the applicable Customer outside the Budget.  Supplier's assistance will include, without limitation, providing, among other things, Customers and its agents and consultants copies of tool lineups, tool processing sheets, bills of materials, PPAP packages, source schedules of materials, parts purchases from sub-suppliers, part prints, tool drawings and such other data and materials as may be reasonably necessary for resourcing, and by providing Customers and their agents, consultants, employees and potential successor suppliers reasonable access to Supplier's manufacturing facilities for the purpose of inspecting Tooling (defined below) and the manufacture of the Component Parts and to remove Customer Tooling and other Customer-owned property, if requested; provided however, that (i) in no event shall potential successor suppliers or competitors of Supplier have access to (I) Supplier plants for which there is a non-resourcing commitment in effect, or (II) as to plants for Remainco Component Parts which contain the Excluded Technology (defined below); have access without Supplier's prior written consent, which consent shall not be unreasonably withheld, and notwithstanding anything herein to the contrary, in no event shall such assistance or access include any information or access involving processing technologies or formulas pertaining to the Excluded Technology, as defined below..

     F.    <u>Access.</u>  Supplier agrees that Customers and their designees, agents and representatives shall have reasonable access to Supplier's operations, books and records at any time during regular business hours, or outside of regular business hours upon reasonable request and prior notice, for the purposes of meeting with Supplier's representatives and monitoring Supplier's compliance with the terms of this Agreement and any other agreements and contracts between Supplier and Customers including, but not limited to, the Purchase Orders; monitoring production of the Component Parts and providing assistance with production of Component Parts if Customers deem it to be necessary; provided however, that  (i) in no event shall potential successor suppliers or competitors of Supplier have access to Supplier plants for which there is a

non-resourcing commitment in effect, or (II) as to Remainco plants which contain the Excluded Technology (defined below) have access without Supplier's prior written consent, which consent shall not be unreasonably withheld; and (ii) notwithstanding anything herein to the contrary, in no event shall such access include any access to information, including books or records involving processing technologies or formulas pertaining to the Excluded Technology, as defined below.

G. <u>Confidentiality</u>. Supplier further acknowledges and agrees that it will preserve and protect each customer's confidential or proprietary information, including any intellectual property, from unauthorized use and disclosure.

H. <u>Information</u>. Supplier will provide to Customers any financial reporting a Customer may reasonably request. Supplier further agrees to meet, as reasonably requested by a Customer, to provide updates (in form, content and presentation as reasonably requested by Customer) of its financial condition, and any material changes to its operations, financial condition, lending relationship, and supplier relationships.

I. <u>Access and Security Agreement</u>. With respect to each Customer, Supplier will enter into an access and security agreement with respect to the Supplier's Canadian facility.

J. <u>Other Customers</u>. For all Other Customers identified in Exhibit B for which Supplier produces Component Parts during the Term, Supplier shall, no later than 14 days after the Effective Date: (i) charge, retroactive to the Effective Date, a surcharge above the applicable purchase order price in an amount designed to sufficiently cover costs incurred by Supplier for all Component Parts shipped to the Other Customers and to fund such Other Customers' equitable portion of the operating losses incurred by Supplier during the Term, which surcharge shall be reasonably acceptable to the Customers, (ii) require that the Other Customers pay their share of any required material and/or Hostage Payments (their share will be calculated based upon their respective portion of shipments or outside process services from that particular third party vendor making up any required Hostage Payments) and (iii) cause such Other Customer to pay all outstanding accounts receivable and obtain an agreement from such Other Customers to pay for Component Parts on net immediate terms as that term is defined in Section 5(D) above. To the extent an Other Customer refuses to pay the surcharge, or otherwise comply with the terms of this section, after the expiration of such 10 day period, Supplier agrees that it will not use any Customer Funding and other accommodations provided by the Customers pursuant to this Agreement to fund that Other Customer's production. Notwithstanding anything herein to the contrary, an Other Customer shall not include Honda or Nissan, to the extent that, on or before 10 days after the Effective Date, either of them agrees to purchase participations in the DIP funding, which participations shall increase in the Maximum DIP Participations. Contemporaneously with the purchase of a participation interest, Honda and/or Nissan, as the case may be, shall confirm in writing its agreement to the terms and conditions of this Agreement and such parties shall thereupon be deemed to be "Customers" for all purposes of this Agreement.

13

K.     <u>License on Intellectual Property</u>.  Notwithstanding anything in this Agreement to the contrary and subject to the liens of the Prepetition Lenders, and in consideration for the accommodations granted by Customers to Supplier under this Agreement, Supplier grants, effective upon an Event of Default, or as to a Remainco Component Part effective upon completion of resourcing such Remainco Component Part, to each Customer and their assignee(s) or designee(s) that are not competitors of Supplier (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property, ("<u>License</u>").  This section is not intended to limit or otherwise restrict any rights granted to Customers in their Purchase Orders or any other agreement, but is intended to expand those rights.  Moreover, nothing in this Agreement may be construed as an admission by any Customer of the validity of Supplier's claimed rights to Intellectual Property, including an admission that a license is required by Customers to make, have made, sell, offer for sale and/or import its Component Parts.  Customers will handle the Intellectual Property in accordance with the same confidentiality and other practices employed by Customers to safeguard their own most valuable intellectual property against unauthorized use and disclosure.

The term "Intellectual Property" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly sells to Customers including, without limitation, everything defined as "intellectual property" under 11 U.S.C. §101, as amended from time to time. Notwithstanding anything herein to the contrary, "Intellectual Property" shall not include the:  (i) metal forming or forging technology relating to Supplier's Sintered businesses located in the North Vernon, PA, Ridgway, PA and St. Mary's, PA plants, or (ii) die casting or tooling technology relating to Supplier's Die Casting and Valve Body businesses  located in the Niles, IL or Twinsburg, OH plants, (iii) tooling technology relating to Supplier's Punchcraft business located in Warren, MI. or (iv) technology related to the damper business in Thamesville, Ontario or (v) any Intellectual Property utilized by Suppliers' non-US and non-Canadian affiliates (individually and collectively, the "Excluded Technology"), for which no license is granted, but Intellectual Property shall include any tool CAD models and mathematical data used for the creation of Customer owned tooling, tooling and engineering drawings and CMM programs and fixtures, all of which Supplier acknowledges are owned by the respective Customer.

14

7. **Tooling Acknowledgment.**

A.    The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, used in connection with the manufacture of Component Parts for Customers. The term "Unpaid Tooling" means Tooling manufactured for Customers for which Customers have not made full payment under the applicable purchase order with Supplier. The term "Supplier Owned Tooling" means Tooling which Supplier asserts is not owned by Customers and which is not subject to a purchase order issued by Customers. The term "Customer Tooling" means all Tooling other than Unpaid Tooling and Supplier Owned Tooling which is currently being used to manufacture Customers' Component Parts, whether under direct agreements between Supplier and Customers or agreements between Supplier and third parties.

B.    Supplier acknowledges and agrees that Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customers, and (iii) held by Supplier (and, to the extent that Supplier has transferred the Customer Tooling to any third parties, by those third parties) as bailees-at-will.

C.    Supplier will use commercially reasonable efforts to provide to Customers, within 30 days after the Effective Date, a list of Supplier Owned Tooling and Unpaid Tooling relating to Customers' Component Parts ("Tooling Lists"). Customers will provide assistance to Supplier in preparing the Tooling Lists as reasonably requested by Supplier. Customers reserve the right to dispute any Tooling List provided by Supplier. If Customers disagree with a Tooling List, Supplier and Customers will meet and attempt, in good faith, to resolve the dispute. If the dispute cannot be resolved by Supplier and Customers within 30 days after Customers' receipt of the Tooling List, the matter will be jointly submitted to a third party to be selected by Supplier and Customers or the Bankruptcy Court for expedited resolution. Any Tooling used to manufacture Customers' Component Parts not included in the Tooling List will be deemed Customer Tooling. If Supplier fails to timely provide a Tooling List, all Tooling will be deemed Customer Tooling.

D.    If there is a dispute between Supplier and Customers over whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, and Customers will have the right to immediate possession of the Tooling (and Supplier may not withhold delivery of possession of the Tooling to Customers pending resolution of the dispute), but the Tooling will remain subject to any valid lien of Supplier or any claim or right to payment of Supplier for the disputed amount (despite Supplier's relinquishment of possession).

E.    Once the purchase order price of an item of Unpaid Tooling has been paid, it will be included in the definition of Customer Tooling.

F.     Supplier has no right or title to, or interest in, Customer Tooling, but has only the obligation to hold as bailee-at-will and use Customer Tooling solely to manufacture Customers' Component Parts.

G.     The acknowledgements, rights and obligations contained in this Section 4 (i) are in addition to the rights of Supplier and Customers under the Purchase Orders or any other agreement between Supplier and Customers currently in effect, and (ii) will continue in effect after the expiration of the Term or the termination of this Agreement.

H.     Supplier grants to Customers permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customers determine that it is reasonably necessary to do so to reflect its interests in its Customer Tooling. Supplier also authorizes Customers to affix any plate, stamp, or other evidence of Customers' ownership upon each item of its Customer Tooling.

8.     **Options**.

*A.*     Supplier grants to Customers an irrevocable and exclusive option ("Option") to purchase, free and clear of the lien of the Lender and the Prepetition ABL Lenders, but subject to the lien of the Prepetition Term Lenders, exercisable on the expiration of the Term, any Supplier Owned Tooling, any returnable containers or dunnage, and any machinery or equipment and related or ancillary items which are owned by Supplier and dedicated exclusively to the manufacture, assembly or transport of Component Parts for Customers (collectively, "Dedicated Equipment"), for a price, subject to the Prepetition Term Agent's consent, (i) equal to the orderly liquidation value of any Dedicated Equipment as determined by the Stout Resius Ross appraisal of January 2007; or (ii) agreed to by Supplier, the Prepetition Term Agent and Customers. The Option may be exercised ("Exercise Period") immediately upon an Event of Default (defined below), the expiration of the Term or the earlier termination of this Agreement, or as to Remainco Component Parts, for each Customer, upon completion of resourcing the applicable Remainco Component Parts. The parties agree to cooperate in good faith to develop a list of the Dedicated Equipment within 30 days after the Effective Date.

B.     Any Dedicated Equipment purchased under this Section 8 will be free and clear of all liens, claims, and encumbrances (other than the lien of the Prepetition Term Lenders), and Customers will also be granted (for no additional consideration) a License as necessary to use and maintain the Designated Equipment. This Section 8 is not intended to limit any rights granted to Customers under their respective Purchase Orders, including rights concerning licensing and other Intellectual Property, but is intended to expand those rights.

C.     Supplier acknowledges that the prices above constitute commercially reasonable prices for the Dedicated Equipment (including the related License) and the License and that any sale under this Section 8 will be deemed to be commercially reasonable in all respects, including method, time, place, and terms. Upon exercise of the Option and payment of the applicable purchase price, Customers will have the right

16

to take immediate possession of the Dedicated Equipment purchased, to use the License without further payment of any kind, and to own, operate, use, enjoy, sell, assign, transfer or convey the Dedicated Equipment (and related License), and Supplier agrees to cooperate with Customers in its taking possession and control of the Designated Equipment purchased and any embodiments of Intellectual Property in the License.  In addition, at the request of Customers, the Supplier will execute documents that are customary and reasonably requested by Customers to memorialize and implement this Section 8; provided, however, that Customers' and Supplier's inability to reasonably agree on mutually acceptable documentation will not deprive Customers or their sub-licensees of the use and enjoyment of the License or Independent License, as applicable, or its ownership and right to possession of the Dedicated Equipment.

        D.     The Options described in this Section 8 are continuing rights and obligations that survive expiration of the Term or any earlier termination of this Agreement, but are subject to the applicable Customer's performance of all of its obligations under this Agreement.

9.    **Events of Default.**

The occurrence of any one or more of the following will be an "<u>Event of Default</u>" under this Agreement, unless such event results from a Customer not performing its obligations under this Agreement or unless a waiver or deferral is agreed to in writing by the Customers.

        A.     Supplier repudiates or materially breaches its obligations, or refuses to perform its material obligations, under this Agreement or a Customer's Purchase Order, provided Customer is in compliance with its obligations the consequence of which is a substantial likelihood that Customer's production of Component Parts will be interrupted (in which case the Event of Default applies only to that Customer);

        B.     The Bankruptcy Filing is converted to a case under Chapter 7, or a trustee or examiner is appointed for the Supplier;

        C.     Supplier breaches or fails to meet any of the Milestones contained in Sections 3(b)(i-iv) under this Agreement.

        D.     An Event of Default occurs under the Financing Order then in effect that is not cured or stayed from enforcement within five business days following notice of the Event of Default, or the Lender otherwise ceases to make advances under the DIP Financing after the expiration of such five business day period for any reason other than a Customer's failure to fund its Participation under Section 4(A) above.

10. **Reservation of Rights**

Unless waived or modified in this Agreement, each party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the parties, or applicable law, and each party expressly reserves all claims, rights and remedies it has under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law; provided however that in no event shall any such rights or remedies be asserted against a purchaser who has assumed any Purchase Orders in connection with a Sale.

11. **Confidentiality**

Each party agrees that it will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any person or entity other than its officers, directors, employees and professional advisors and other parties to this Agreement except (a) to enforce this Agreement or (b) as a party may reasonably believe to be required by applicable law. The parties will take all commercially reasonable steps to ensure that the contents of this Agreement are kept secret and confidential except as provided above. The foregoing restrictions shall not apply to the extent this Agreement must be disclosed or filed in Supplier's Chapter 11 Cases and such restrictions shall automatically expire upon such filing or disclosure.

12. **Notice**

Any notice must be in writing and will be deemed to be delivered at the time of delivery if delivered by hand, or at the time sent, if sent by fax or by email. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

|  |  |
|---|---|
| If to Ford: | Ford Motor Company |
|  | 20100 Rotunda Dr. |
|  | Building #3, 3A-027 |
|  | Dearborn, MI 48126 |
|  | Attention: William Strong |
|  | Fax: (313) 206-7044 |
|  | Email: wstrong@ford.com |
|  |  |
| With a copy to: | Ford Motor Company |
|  | Office of the General Counsel |
|  | 1 American Rd., Ste. 416-A2 |
|  | Dearborn, Michigan 48126 |
|  | Attention: Daniella Saltz |
|  | Fax: (313) 322-3804 |
|  | Email: dsaltz@ford.com |

CLI-1716641v7

|              |                                        |
|--------------|----------------------------------------|
| and          | Miller Canfield Paddock and Stone PLC  |
|              | 150 West Jefferson, Suite 2500         |
|              | Detroit, MI 48226                      |
|              | Attention: Timothy A. Fusco            |
|              | Fax:(313) 496-7500                     |
|              | Email:fusco@millercanfield.com         |
| If to GM:    | General Motors Corporation             |
|              | 30009 Van Dyke Avenue                  |
|              | P.O. Box 9025                          |
|              | Mail Code: 480-206-136                 |
|              | Warren, MI 48090-9025                  |
|              | Attention: Mark W. Fischer             |
|              | Fax: (586) 575-3404                    |
|              | Email: mfischer@gm.com                 |
| With copy to:| Honigman Miller Schwartz and Cohn LLP  |
|              | 2290 First National Building           |
|              | Detroit, MI 48226                      |
|              | Attention: Donald F. Baty, Jr.         |
|              | Fax: (313) 465-7315                    |
|              | Email: dbaty@honigman.com              |
| If to Chrysler: | Chrysler LLC                        |
|              | 800 Chrysler Drive                     |
|              | CIMS 485-14-78                         |
|              | Auburn Hills, Michigan 48326           |
|              | Attention: Sigmund Huber               |
|              | Director, Supplier Relations           |
|              | Facsimile: (248) 512-1771              |
|              | Email: seh43@chrysler.com              |
| With a copy to: | Chrysler LLC                        |
|              | 1000 Chrysler Drive                    |
|              | CIMS 485-14-78                         |
|              | Auburn Hills, Michigan 48326-2766      |
|              | Attention: Kim R. Kolb                 |
|              | Senior Staff Counsel                   |
|              | Facsimile: (248) 512-1771              |
|              | Email: krk4@chrysler.com               |
| and:         | Dickinson Wright PLLC                   |
|              | 500 Woodward Avenue, Suite 4000        |
|              | Detroit, Michigan 48226                |
|              | Attention: James A. Plemmons           |
|              | Facsimile: (313) 223-3598              |

Email: jplemmons@dickinsonwright.com

| | |
|---|---|
| If to Supplier: | Metaldyne Corporation<br>47603 Halyard Drive<br>Plymouth, Michigan 48170-2429<br>Attention: David L. McKee<br>Fax: (734) 207-6797<br>Email: davidmckee@metaldyne.com |
| With copy to: | Foley & Lardner LLP<br>One Detroit Center<br>500 Woodward Ave., Suite 2700<br>Detroit, Michigan 48226-3489<br>Attention: Judy A. O'Neill<br>Fax: (313) 234-2800<br>Email: joneill@foley.com |
| If to Lender, to: | Deutsche Bank AG, New York Branch<br>60 Wall Street<br>New York, New York 10005<br>Attention: Enrique Landaeta<br>Facsimile: (212) 797-4655 |
| With a copy to: | White & Case LLP<br>1155 Avenue of the Americas<br>New York, NY 10036<br>Attention: Eric Leicht and Scott Greissman<br>Facsimile: (212) 354-8113<br>Email: eleicht@whitecase.com /<br>sgreissman@whitecase.com |

13. **General Terms**

A.    Notwithstanding anything in this Agreement to the contrary, no Customer may enforce any obligation hereunder against Supplier, unless such Customer is in full compliance with all of its obligations under this Agreement.

B.    This Agreement, together with any other documents executed in connection with this Agreement, constitute the entire understanding of the parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement or one of the other documents executed in connection with this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all parties.

C.     The persons executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent.

D.     Supplier must obtain the consent of Customers to assign or transfer, directly or indirectly, any of its rights or obligations under this Agreement.  Likewise, this Agreement is not intended for the benefit of any third parties other than the Prepetition Lenders.

E.     The delay or failure of a Customer to exercise any right, power or privilege under this Agreement does not affect that right, power or privilege.  Any single or partial exercise of any right, power or privilege does not preclude further exercise on another occasion.  Waiver of any breach of any term of this Agreement or Purchase Order by any party does not waive any other breach of that or any other term by any party.

F.     If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement nevertheless remain enforceable.

G.     Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customers' rights under this Agreement.

H.     Nothing in this Agreement may be interpreted to constitute Supplier as Customers' agent for any purpose.

I.     This  Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document.  All counterparts will be construed together to constitute one instrument.  The parties agree that their respective signatures may be delivered by fax or email and that fax or email signatures will be treated as originals for all purposes.

J.     This Agreement must be construed – and its performance must be enforced – under internal Michigan law, without reference to its conflicts of laws principles.  During the Chapter 11 Cases, the parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the Southern District of New York, as to any claim or proceeding over which it may have jurisdiction.  Each party waives any objection to the exercise of jurisdiction over it by this court.

14.     **REPRESENTATIONS.  EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT.  NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT. ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

CLI-1716641v7

15. **JURY TRIAL WAIVER. THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS. NO PARTY WILL BE DEEMED TO HAVE RELINQUISHED ITS WAIVER OF JURY TRIAL UNLESS THAT PARTY DOES SO IN WRITING.**

**[Signatures on next page]**

CLI-1716641v7

**[Signature page to Accommodation Agreement]**

**Metaldyne Corporation, on behalf of itself and its subsidiaries**

By: _____

    Name: _____

    Title: _____

**Ford Motor Company**

By: _____

    Name: _____

    Title: _____

**General Motors Corporation**

By: _____

    Name: _____

    Title: _____

**Chrysler LLC on behalf of itself and Chrysler Motors LLC**

By: _____

    Name: _____

    Title: _____

**Chrysler de Mexico S.A. de C.V.**

By: _____

    Name: _____

    Title: _____

CLI-1716641v7

**Deutsche Bank, AG**

By: _____

      Name: _____

      Title: _____

CLI-1716641v7

# EXHIBIT B

## Other Customers

Other OEMs

Hyundai
Honda *
Nissan *
Mitsubishi

Other Suppliers

Dana
Magna
TRW
American Axle
Federal Mogul
Conti
Cummins
Navistar

*If not a participant in the DIP Facility

[Amended and Restated Subordinated Participation Agreement]

## AMENDED AND RESTATED SUBORDINATED PARTICIPATION AGREEMENT (DIP FACILITY)

Subordinated Participation Agreement (this "Agreement"), dated as of May 29, 2009 and amended and restated as of June [__], 2009, among Deutsche Bank AG New York Branch ("DBNY"), in its capacity as DIP Agent under the DIP Facility referred to below (the "DIP Agent"), DBNY, in its capacity as DIP Lender under the DIP Facility (the "Granting Lender"), DBNY, in its capacities as Administrative Agent and Collateral Agent (collectively in such capacities, the "Prepetition ABL Agent") under the Prepetition ABL Credit Agreement referred to below and the other Prepetition ABL Loan Documents (as defined in the Interim Order referred to below) on behalf of the Prepetition ABL Lenders and the other Prepetition ABL Secured Parties (as each such term is defined in the Interim Order), Ford Motor Company ("Ford"), Chrysler LLC ("Chrysler"), General Motors Corporation ("General Motors" and, together with Ford and Chrysler, the "Original Participants" and, each, an "Original Participant"), Honda of America Mfg., Inc., on behalf of itself and certain of its affiliates and subsidiaries ("Honda") and Nissan North America, Inc. ("Nissan" and, together with Honda and the Original Participants, collectively, the "Participants" and, each, a "Participant"). Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Interim Order and any Final Order (as defined below).

## W I T N E S S E T H:

WHEREAS, on May 28, 2009, Metaldyne Corporation, Metaldyne Company LLC (the "Borrower") and certain of its affiliates organized in the United States (collectively, the "Debtors") filed voluntary petitions in cases pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), styled In re Metaldyne Corporation, et al., case no. O9-13412 (collectively, the "Case");

WHEREAS, pursuant to an interim order entered May 29, 2009, docket no. 78 (as amended, modified and/or supplemented from time to time, the "Interim Order"), the Bankruptcy Court authorized the Borrower and the other Debtors to obtain credit and incur debt pursuant to Sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code in the form of a secured, superpriority credit facility (as amended, modified and/or supplemented from time to time, the "DIP Facility") provided by the DIP Agent and the Granting Lender;

WHEREAS, the DIP Agent, the Granting Lender, the Prepetition ABL Agent and the Original Participants are parties to a Participation Agreement, dated as of May 29, 2009 (as amended, modified and/or supplemented to but not including the Effective Date referred to below, the "Original DIP Participation Agreement"), pursuant to which the Granting Lender agreed to sell and assign to the Original Participants, and the Original Participants severally agreed to purchase from the Granting Lender, for cash, at par, undivided, last-out, subordinated interests (each, an "Original Participation") in the DIP Loans made (or to be made) under the DIP Facility, in each case in accordance with the terms thereof and the Orders (each, as in effect immediately prior to the Effective Date);

WHEREAS, pursuant to a stipulation and order entered June [__], 2009, docket no. [__] (the "June [__], 2009 Stipulation and Order"), the Bankruptcy Court amended the Interim Order to authorize an increase of $1,350,000 in the maximum aggregate principal amount of the DIP Facility (the "DIP Facility Increase");

WHEREAS, Metaldyne Intermediate Holdco, Inc., the Borrower, the Prepetition ABL Lenders parties thereto from time to time, the Prepetition ABL Agent, JPMorgan Chase Bank, N.A., as Syndication Agent, and Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central), as Co-Documentation Agents, are parties to that certain Credit Agreement, dated as of January 11, 2007 (as amended, modified and/or supplemented from time to time, the "Prepetition ABL Credit Agreement");

WHEREAS, the Prepetition ABL Agent is party to the Credit Facilities Intercreditor Agreement, dated as of January 11, 2007 (as amended, modified and/or supplemented from time to time, the "Intercreditor Agreement"), among the Prepetition ABL Agent, the Prepetition Term Agent and certain of the Debtors, which, among other things, sets forth certain rights concerning the Prepetition Collateral;

WHEREAS, the Prepetition ABL Agent, DBNY, as Incremental Lender (as defined in the Prepetition ABL Credit Agreement) (in such capacity, the "Prepetition ABL Granting Lender"), and Ford, Chrysler and General Motors, as participants in the Incremental Loans (as defined in the Prepetition ABL Credit Agreement), are parties to a Subordinated Participation Agreement, dated as of May 22, 2009 (as amended, modified and/or supplemented from time to time, the "Prepetition Subordinated Participation Agreement"); and

WHEREAS, the parties hereto wish to amend and restate the Original DIP Participation Agreement in the form of this Agreement to, *inter alia*, provide for the Granting Lender to sell and assign to all of the Participants, and all of the Participants to purchase (on a several basis) from the Granting Lender, for cash, at par, undivided, last-out, subordinated interests (each, a "Participation") in the DIP Loans made (or to be made) under the DIP Facility (after giving effect to the DIP Facility Increase), in each case in accordance with the terms thereof and the Orders;

NOW THEREFORE, for valuable consideration, the parties hereto agree that the Original DIP Participation Agreement shall be and hereby is amended and restated in its entirety as follows:

1.    Defined Terms.

(a)    As used herein, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agent" shall mean DBNY in its collective capacities as the DIP Agent and as the Prepetition ABL Agent.

"DIP Documents" shall mean the Orders (as they relate to the DIP Facility and the DIP Obligations), the Intercreditor Agreement and any other documentation in respect of the DIP Facility.

"Final Order" shall mean any final order entered by the Bankruptcy Court approving the DIP Facility, the DIP Documents and the related transactions.

"Lenders" shall mean the collective reference to the DIP Lender and the Prepetition ABL Lenders.

"Loans" shall mean the collective reference to the DIP Loans and the Prepetition ABL Loans.

"Obligations" shall mean the collective reference to the Prepetition ABL Obligations, the DIP Obligations, the Adequate Protection Superpriority Claims of the ABL Secured Parties, the Participations with respect to the DIP Obligations and the Participations (as defined in the Prepetition Subordinated Participation Agreement) with respect to the Incremental Loans.

"Orders" shall mean the Interim Order, any Final Order and any further orders of the Bankruptcy Court that are approved by the parties hereto and relate to the Obligations, in each case as amended or modified from time to time with the consent of the parties hereto.

"Secured Parties" shall mean the collective reference to the DIP Secured Parties and the Prepetition ABL Secured Parties.

"Senior Obligations" shall mean the collective reference to (i) the Prepetition ABL Obligations (including (x) any and all indebtedness, obligations or liabilities for which the Borrower or any other Debtor would otherwise be liable to the Prepetition ABL Secured Parties under or in connection with the Prepetition ABL Loan Documents were it not for the invalidity, irregularity or unenforceability thereof by reason of any bankruptcy, insolvency or other law or order of any kind, or for any other reason, and (y) all fees, costs and expenses due to the Prepetition ABL Agent or any other Prepetition ABL Secured Party from any Debtor under the Prepetition ABL Loan Documents and the Orders, but excluding (z) the Incremental Loans), (ii) the Adequate Protection Superpriority Claims of the Prepetition ABL Secured Parties and (iii) all fees, costs and expenses of, all indemnities in favor of, and all protective advances made as permitted pursuant to the Orders by, the DIP Agent and the Granting Lender in their capacities as DIP Agent and DIP Lender, respectively, arising out of or in connection with the DIP Facility or the DIP Documents (including fees and disbursements of counsel and any expenses paid to protect or enforce on DIP Collateral).

(b)     All references to a "Participant" or "Participants" in Section 7 and elsewhere in this Agreement refer to the Participants solely in their capacities as assignees of the undivided, last-out, subordinated participations in the DIP Loans under the DIP Documents and this Agreement, and not in their capacities as customers, account debtors or in any other capacity or capacities or in any other relationship any Participant may have with any of the Debtors.

Nothing in this Agreement affects the rights, powers, and privileges of the Participants acting in any other capacity or capacities. References to the Borrower and any other Debtor include the Borrower and such Debtor, and any trustee or successor in interest of the Borrower or such Debtor, in the Case or any subsequent or successor case commenced or continued under the Bankruptcy Code or in any other Insolvency Proceeding (as defined below).

2.   Participation Commitments.   The Granting Lender absolutely and unconditionally agrees to sell to the Participants an undivided, last-out, subordinated participation in its share of each advance of the DIP Loans in accordance with the terms of this Agreement. To the extent the Borrower requests DIP Loans in accordance with the Budget or the Orders, each Participant shall purchase from the Granting Lender a Participation in the DIP Loans in an amount equal to the percentage of the DIP Loans set forth opposite its name on attached Schedule I ("Participation Percentage") up to the aggregate amount set forth opposite its name on attached Schedule 1 ("Participation Cap"). The obligations of each Participant to purchase Participations shall be several and not joint and shall be limited to its respective Participation Percentage and Participation Cap.

3.   Funding of Participations.   At least one business day prior to the date of any advance of DIP Loans by the Granting Lender, each Participant or its designee will pay to the DIP Agent for credit to the Granting Lender in immediately available funds an amount (each such amount, its "Participation Amount") equal to such Participant's Participation Percentage of such advance of the DIP Loans. The DIP Agent is not obligated to advance the proceeds of a request for an advance of the DIP Loans by the Borrower unless and until the Participants shall have paid to the DIP Agent in immediately available funds their respective Participation Amounts such that the aggregate amount of such Participation Amounts equals the aggregate principal amount of the DIP Loans so requested by the Borrower (in which case it will advance the DIP Loans promptly after receipt in immediately available funds of such Participation Amounts).

4.   Effect of the Participations.

(a)   Without further action by the DIP Agent or the Granting Lender, execution and delivery of this Agreement and receipt by the DIP Agent on behalf of the Granting Lender of a payment for a Participation shall constitute the Granting Lender's sale and assignment and the Participants' purchase of a Participation and shall confer on the Participants with respect to the Participation, undivided, last-out, subordinated interests in the DIP Loans made by the Granting Lender to the Borrower and, through the Granting Lender, in all the rights and benefits of the Granting Lender under the provisions of the DIP Documents (including any and all support and collateral security for the DIP Loans), subject to the terms of this Agreement and the DIP Documents.

(b)   The interests of the Participants in the DIP Loans shall in all respects be subject to the subordination provisions contained in Section 6 and the other limitations provided in this Agreement.

(c)   Subject to the terms of the Orders, the Agent, on behalf of the Lenders and the other Secured Parties, shall have the right to apply payments of any kind from any source,

including the proceeds of any DIP Collateral, to the payment of the Senior Obligations until the Payment-in-Full of All Senior Obligations (as defined below), in any manner in the Agent's sole and unfettered discretion before making any payments whatsoever to the Participants.

5. <u>Administration of the Loans and the Other Obligations.</u>

(a) Until the Payment-in-Full of All Senior Obligations, (i) except as otherwise expressly provided in this Agreement (including Section 5(b) below), the DIP Agent, the Granting Lender and the other DIP Secured Parties shall have the right to manage, perform, and enforce the terms of the DIP Documents, and to exercise and enforce all of the privileges and rights exercisable by it or them under the DIP Documents, in its or their sole discretion, without the concurrence of the Participants and (ii) except as otherwise expressly provided in this Agreement or the Prepetition Subordinated Participation Agreement, the Prepetition ABL Agent, the Prepetition ABL Lenders and the other Prepetition ABL Secured Parties shall have the right to manage, perform, and enforce the terms of the Prepetition ABL Loan Documents, and to exercise and enforce all of the privileges and rights exercisable by it or them under the Prepetition ABL Loan Documents, in its or their sole discretion, without the concurrence of the Participants, including, without limitation, the right to amend any of the Prepetition ABL Loan Documents, to amend, modify, waive, terminate, or release any of the Prepetition ABL Obligations of the Borrower or any other Debtor or to release any Collateral securing the Prepetition ABL Loans or any other Prepetition ABL Obligations.

(b) Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Granting Lender and the DIP Agent, on behalf of itself, the Granting Lender and the other DIP Secured Parties, each agrees that it shall not, without the prior written consent of the Participants, agree to: (i) release the Borrower or any of the other Debtors from its obligations with respect to the DIP Loans or the other DIP Obligations, (ii) reduce the principal amount of the DIP Loans or the amount of any other DIP Obligations, (iii) reduce the interest rate applicable to the DIP Loans, (iv) increase the amount of the Granting Lender's commitment to extend credit pursuant to the DIP Facility, (v) amend or modify, or consent to any amendment or modification of, any of the DIP Documents, (vi) amend or modify the Intercreditor Agreement in any respect (other than immaterial technical amendments that do not affect the rights or recoveries of the Participants under this Agreement, the DIP Documents or the Intercreditor Agreement), (vii) waive, modify, or amend any of the provisions of the Orders or the Budget, (viii) release, or subordinate, any Lien against any portion of the DIP Collateral constituting ABL Priority Collateral securing the DIP Loans in connection with a sale, disposition or other transaction that involves all or any portion of such DIP Collateral and a "credit bid" within the meaning of Section 363(k) of the Bankruptcy Code for all or any portion of the purchase price (each, a "<u>Credit Bid Disposition</u>"), except in connection with a sale, disposition or other transaction in which the Credit Bid Rights (as defined in the Intercreditor Agreement) are given effect, (ix) release, or subordinate, any Lien against any portion of the DIP Collateral constituting ABL Priority Collateral securing the DIP Loans in connection with any financing (other than the Loans and any financing permitted by the Orders) (any such financing, an "<u>Other Financing</u>") or (x) release, or subordinate, any Lien against any portion of the DIP Collateral securing the DIP Obligations (other than in connection with (1) a sale, disposition or other transaction made or consummated in the ordinary course of business and not otherwise prohibited by the terms of the DIP Documents, (2) a Credit Bid Disposition subject to clause

(viii) above or (3) an Other Financing subject to clause (ix) above), unless, prior to any such release or subordination by the DIP or the Granting Lender, each Participant is first given 10 business days' prior written notice thereof (during which 10 business day period prior to such release or subordination the Participants may effect a purchase of all (and not less than all) Prepetition ABL Obligations (other than Incremental Loans and all accrued but unpaid interest thereon) in accordance with the requirements of Sections 16 and 17 and take (or cause to be taken) all actions described in Section 17). For the avoidance of doubt, except as expressly set forth in this clause (b) of this Section 5 or the Orders, the Participants shall have no consent or voting rights whatsoever.

(c) The DIP Agent shall promptly notify the Participants of any failure by any one or more of the Participants to fund any Participation.

(d) The DIP Agent shall furnish to the Participants the same information provided to the Granting Lender with respect to advances, payments, principal balances, accrued interest and other reporting concerning the DIP Loans, together with copies, as and to the extent provided to the Granting Lender, of all amendments, modifications, notices, certificates, reports, and other agreements, documents or instruments made or given in connection with the DIP Loans and the DIP Documents.

(e) This Agreement shall not be construed to create a fiduciary relationship between the Secured Parties or the Agent, on the one hand, and any Participant, on the other hand. Each Participant acknowledges and agrees that the Granting Lender's or the DIP Agent's actions under this Agreement are strictly administrative and any repayment of principal or interest or other amount to any Participant is solely dependent upon the Borrower and the other Debtors. Except for willful misconduct or actual fraud, each Participant exonerates the Secured Parties and the Agent of and from any obligation or liability, express or implied, for any loss, depreciation of or failure to realize upon the Loans or any other Obligations, or any DIP Collateral securing the Loans or any other Obligations, or for failure to collect or receive payments of any sums owing from the Borrower or any other Debtor or for any mistake, omission, or error of judgment in passing upon or accepting the Loans or any other Obligations, the DIP Collateral, if any, any DIP Documents or the Prepetition ABL Loan Documents, or in making of any advances of monies or extensions of credit to the Debtors, or in making any examinations, audits or reviews of the affairs of the Debtors or the DIP Collateral, or in granting to the Debtors extensions of time for payment of the Loans or any other Obligations or in administering or monitoring the DIP Collateral for the Loans or any other Obligations. Moreover, the Granting Lender and the DIP Agent do not assume and do not have any obligation or liability and undertake no guaranties, express or implied, with respect to the existing or future financial worth or responsibility of the Borrower, any other Debtor or of any of the account debtors of the Borrower or any other Debtor, with respect to the genuineness or value of the DIP Collateral or with respect to the payment or the collectability of the DIP Loans or any other DIP Obligations.

6. <u>Subordinate Participation</u>. No Participant shall be entitled to any monies or other consideration received by the Agent, the Lenders or the other Secured Parties in accordance with the provisions of the DIP Documents or the Prepetition ABL Loan Documents, whether directly or indirectly, from the sale or liquidation of any DIP Collateral or otherwise, in

reduction of its respective Participation unless and until all Senior Obligations (including, without limitation (x) the cash collateralization in an amount and manner, and on terms, satisfactory to the Prepetition ABL Agent) of all LC Exposure in respect of Letters of Credit (as each such term is defined in the Prepetition ABL Credit Agreement), (y) all contingent Senior Obligations (including, without limitation, contingent Senior Obligations in respect of any indemnity or any pending or threatened litigation) and (z) all other costs, expenses, consultants' fees and reasonable attorneys' fees) have been irrevocably repaid in full in cash, or cash collateralized in an amount, manner, and on terms, acceptable to the Agent, and the Debtors' right to use Cash Collateral (as defined below) has been terminated (the "Payment-in-Full of All Senior Obligations"). If at any time prior to written notice by the Agent to the Participants that the Payment-in-Full of All Senior Obligations has occurred, any Participant shall receive from any source whatsoever (whether the Borrower, another Debtor or otherwise (except (a) payments among the Participants of amounts received not in contravention of this Agreement and (b) as a result of the exercise by the Participants of set-off rights to the extent permitted by Section 15)) any payment on account of their Participations in the DIP Loans or otherwise in respect of the DIP Obligations, such Participant shall hold such payment in trust for the Secured Parties and promptly pay over to the Agent on behalf of the Secured Parties such payment in the form received with any necessary endorsements. The DIP Agent and the Granting Lender will have the right, in their sole and absolute discretion, to hold funds collected on account of the DIP Obligations and not remit them to the Participants in the event the DIP Agent or the Granting Lender has reason to believe that the Agent or any Lender will be required to defend claims or disgorge for any reason any amounts paid to it or will extend additional Loans or incur any other Senior Obligations (including attorneys' fees or other expenses). If any Secured Party is required to disgorge any amounts it has received on account of the Senior Obligations, the Participants shall immediately reimburse such Secured Party for the amount that such Secured Party was required to disgorge, limited to the amount of distributions received by the Participants on account of their Participations through the date of such disgorgement. For the avoidance of doubt, once the DIP Loans are funded by the Participants, no monies or other consideration shall be paid to, or received by, any Participant in respect of the DIP Obligations or its Participation (except as a result of the exercise by the Participants of set-off rights to the extent permitted by Section 15), until the Payment-in-Full of All Senior Obligations shall have occurred.

7. Agreements Regarding Insolvency Proceedings.

(a)     In connection with (i) the Case, (ii) any subsequent or successor case commenced or continued under the Bankruptcy Code with respect to any Debtor, (iii) any other federal, state or foreign bankruptcy, insolvency, reorganization or other law affecting creditors' rights or any other or similar proceedings seeking any stay, reorganization, arrangement, composition or readjustment of the obligations and indebtedness of any Debtor, (iv) any other proceeding seeking the appointment of any trustee, receiver, liquidator, custodian or other insolvency official with similar powers with respect to any Debtor or any of its assets, (v) any other proceeding for liquidation, dissolution or other winding up of the business of any Debtor or (vi) any assignment for the benefit of creditors or any marshalling of assets of any Debtor (any of the events referred to in preceding clauses (i) through (v), an "Insolvency Proceeding"), the agreements contained in this Agreement shall remain in full force and effect and enforceable pursuant to their terms. No payment or other realization or recovery of any amounts or other consideration on account of the Participations (except as a result of the exercise by the

Participants of set-off rights to the extent permitted by Section 15) shall be received or retained by any of the Participants unless and until the Payment-in-Full of All Senior Obligations shall have occurred, including, without limitation, the payment in full in cash of all interest, fees, costs and expenses of the Prepetition ABL Agent, the Prepetition ABL Lenders and the other Prepetition ABL Secured Parties during the pendency of any Insolvency Proceeding, regardless of whether such interest, fees, costs and expenses are allowed or allowable by the Bankruptcy Court or any other bankruptcy court.

(b)     No Participant shall contest, challenge, or object to any claim by the Agent, any Lender or any other Secured Party against the Borrower or any other Debtor (including any claim under 11 U.S.C. § 506(b)) or the extent, validity, perfection, or priority of the liens held by the Agent, any Lender and/or any other Secured Party as security for the Loans or other Obligations.

(c)     Until the Payment-in-Full of All Senior Obligations, the Participants agree that the Agent may consent to the sale or foreclosure or disposition of any or all of the DIP Collateral (including any DIP Collateral subject to the adequate protection Liens of the Agent) in the Case or any other Insolvency Proceeding, whether such sale or disposition is to be made pursuant to Section 363 of the Bankruptcy Code, pursuant to a plan of reorganization or otherwise, and the Participants shall be deemed to have consented to any such sale or disposition and all of the terms applicable thereto; provided that, other than in connection with a Credit Bid Disposition, prior to any such sale, foreclosure or disposition (other than in connection with a sale, foreclosure or disposition made in the ordinary course of business and not otherwise prohibited by the terms of the DIP Documents), each Participant is first given 10 business days' prior written notice thereof, during which 10 business day period prior to such transaction the Participants may effect a purchase of all (and not less than all) Prepetition ABL Obligations (other than the Incremental Loans and all accrued but unpaid interest thereon) in accordance with Section 16 below and take (or cause to be taken) all actions described in Section 17; and, provided, further, that in the case of a Credit Bid Disposition, the Agent, on behalf of itself and the Secured Parties, and the Secured Parties may not consent to the sale or other disposition without the prior written consent of the Participants, unless the Credit Bid Rights (as defined in the Intercreditor Agreement) are given effect.

(d)     If, in any Insolvency Proceeding, the Agent desires to permit use of any DIP Collateral (including any Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code)), or permit or provide additional financing under either Section 363 or 364 of the Bankruptcy Code (an "Additional DIP Financing"), then, so long as the terms of the Additional DIP Financing are permitted by the Orders and Section 5(b)(ix) of this Agreement, the Participants agree that no objection shall be raised by any of the Participants to such Additional DIP Financing or use of DIP Collateral, including any objection based on lack of adequate protection.

(e)     Until the Payment-in-Full of All Senior Obligations, no Participant shall (i) seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the DIP Collateral, without the prior written consent of the Agent or (ii) oppose any request by the Agent to seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the DIP Collateral.

(f)     In the Case or any other Insolvency Proceeding, no Participant shall object to any adequate protection sought by the Agent, the Lenders and the other Secured Parties.

(g)     The Participants agree that, until the Payment-in-Full of All Senior Obligations, no Participant shall be entitled to benefit from any avoidance action affecting or otherwise related to any distribution or allocation made in respect of any of the Obligations, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application to the Senior Obligations until the Payment-in-Full of All Senior Obligations shall have occurred.

(h)     In the Case or any other Insolvency Proceeding, the Participants shall not be entitled to separate classification in such Insolvency Proceeding or in any plan of reorganization in such Insolvency Proceeding or to vote on account of any claim that they may have or to accept or reject any plan of reorganization or disclosure statement.

(i)     Each Participant hereby waives any claim such Participant may have against the Agent arising out of the election of the Agent for the application of Section 1111(b)(2) of the Bankruptcy Code and agrees to make no election under Section 1111(b)(2) of the Bankruptcy Code in respect of its interest in the DIP Collateral without the consent of the Agent.

(j)     The Participants agree that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Agent may reasonably request to effectuate the provisions of this Section 7.

8.     <u>Interest Payments and Other Charges</u>.     Interest on the Participations outstanding from time to time shall accrue at the interest rate provided for DIP Loans under (and shall otherwise be calculated in accordance with) the DIP Documents and shall be paid by adding such accrued interest to the aggregate amount of the Participations. Accordingly, until the Payment-in-Full of All Senior Obligations, the Participants shall not receive (or be entitled to receive) payments of cash interest on the Participations.     Any fees, late charges, expense reimbursements, indemnification payments, or other amounts owing to the Granting Lender in connection with the DIP Facility shall, to the extent attributable to the Participations and not constituting a Senior Obligation, be payable to the Participants only after the Payment-in-Full of All Senior Obligations shall have occurred.

9.     <u>Payments to Participants</u>.     To the extent that the Participants are entitled to receive any payment on account of the Participations after the Payment-in-Full of All Senior Obligations, those payments shall be paid to the Participants in accordance with their Participation Percentages; <u>provided</u> that no Participant shall receive more than the ratio of (a) the aggregate outstanding Participation Amount funded by such Participant, to (b) the aggregate outstanding Participation Amounts funded by all the Participants. As among the Participants, except to the extent provided in Section 15 of the Prepetition Subordinated Participation Agreement and Section 15 of this Agreement, payments that are permitted to be made to the Participants under the Prepetition Subordinated Participation Agreement on account of their "Participations" following the "Payment-in-Full of All Senior Obligations" (as each such term is

defined in the Prepetition Subordinated Participation Agreement) and under this Agreement on account of their Participations following the Payment-in-Full of All Senior Obligations first shall be made to the Original Participants in accordance with the Prepetition Subordinated Participation Agreement until the "Participations" purchased under the Prepetition Subordinated Participation Agreement have been irrevocably repaid in full in cash and, thereafter, shall be made to the Participants on account of their Participations purchased under, and in accordance with, this Agreement.

10.     Acceptance of Risk.     Each Participant represents to the Agent, the Lenders and the other Secured Parties that it accepts (and is able to bear) the financial risks inherent in the Participation and does not foresee the occurrence of any event that would alter that ability.  Further, each Participant accepts the full risk of nonpayment of the Participation it may acquire under this Agreement and agrees that none of the Agent, any Lender or any other Secured Party shall be responsible for the performance or observance by the Borrower or any other Debtor of any of the terms, covenants, or conditions of the DIP Documents or the Prepetition ABL Loan Documents.

11.     Characterization.     Each Participant acknowledges that the sale of the Participation it may acquire is being made at its request and is the purchase of an undivided, last out, subordinated interest in an ordinary debt and related collateral security, if any, and is not and shall not be construed to be a "security" as that term is defined under any applicable state or federal securities laws.

12.     Credit Investigation.     Each Participant acknowledges that it had an opportunity to make such review and investigation as it and its attorneys and advisors believe to be necessary to enable such Participant to make an independent, informed judgment with respect to the creditworthiness of the Debtors, the value and extent of the DIP Collateral, the Agent's and the other Secured Parties' rights against the Borrower and the other Debtors and their respective assets and the desirability of purchasing the Participation.  Each Participant acknowledges that it is experienced and knowledgeable in financial matters, and that it is not purchasing the Participation for purposes of investment gain (other than the possible payment of interest thereon), and that it has all necessary information to make an independent, informed judgment with respect to the financial status and condition of the Debtors.  The Agent and the other Secured Parties have no duty or responsibility, either initially or on a continuing basis, to provide any Participant with any credit or other information.  The Agent and the other Secured Parties are not responsible to any Participant for any recital, statement, information, representation or warranty whether oral or in any agreement, document, certificate or statement delivered in or in connection with the DIP Documents or the Prepetition ABL Loan Documents.  The Agent and the other Secured Parties are not required to make any inquiry concerning the performance or observance of any terms of the DIP Documents, the Prepetition ABL Loan Documents, the Debtors' financial condition or the existence of any default or event of default under any of the foregoing.

13.     No Restriction on Rights.     Nothing in this Agreement shall be construed to limit or restrict the Agent, the Lenders or the other Secured Parties from in any way exercising any rights or remedies arising under the DIP Documents or the Prepetition ABL Loan Documents, as applicable, or any documents or agreements executed by the Borrower or any

other Debtor or provided for under applicable law, except to the extent otherwise expressly provided in this Agreement or (in the case of the Prepetition ABL Secured Parties) the Prepetition Subordinated Participation Agreement. No Participant shall have any direct claim against the Debtors or any right to enforce any of the terms of the DIP Documents, including, but not limited to, exercising any rights or remedies arising under the Orders or any documents or agreements executed by the Borrower or any other Debtor or provided for under applicable law, unless and until (a) the Payment-in-Full of All Senior Obligations shall have occurred, (b) the DIP Agent and the Granting Lender shall have assigned their respective rights and obligations under the DIP Documents to the Successor DIP Agent (as defined below) or the Participants, as applicable, in accordance with Section 17 of this Agreement and (c) the Prepetition ABL Agent and the Prepetition ABL Secured Parties shall have assigned their respective rights and obligations under the Prepetition ABL Documents to the Successor Prepetition ABL Agent (as defined below) or the Participants, as applicable, in accordance with Sections 16 and 17 of this Agreement. Until such time, (i) all rights, remedies, and privileges with respect to the DIP Loans and the other DIP Obligations may be exercised only by the DIP Agent on behalf of DIP Lender and the other DIP Secured Parties and, except to the extent otherwise provided in this Agreement, without any requirement of consent or approval of the Participants and (ii) all rights, remedies, and privileges with respect to the Prepetition ABL Loans and the other Prepetition ABL Obligations may be exercised only by the Prepetition ABL Agent on behalf of Prepetition ABL Lenders and the other Prepetition ABL Secured Parties and, except to the extent otherwise provided in this Agreement, the Prepetition Subordinated Participation Agreement or the Orders, without any requirement of consent or approval of the Participants.

14. Further Assignments and Participations. Each Participant agrees not to sell, assign or transfer, in whole or in part, its Participation or its respective undivided, last out, subordinate interest in the DIP Loans without the prior written consent of the DIP Agent; provided that no such consent shall be required (i) for any transfer to another Participant, (ii) for any transfer to an affiliate that is a wholly-owned subsidiary of a Participant or its parent, or (iii) in the event of assignment or transfer resulting from the merger, consolidation, or other change in control of a Participant so long as the surviving entity assumes or is obligated under this Agreement as a matter of law.

15. Setoffs by Participants. Until the Payment-in-Full of All Senior Obligations, no Participant shall set off or recoup any amounts owing to it by either the Borrower or any other Debtor on account of such Participant's purchase of its Participations against any amounts owing by such Participant to the Borrower or any other Debtor, except to the extent permitted pursuant to the Accommodation Agreement or the NCM Production Contract (as each such term is defined in the Orders).

16. Option to Purchase Obligations.

(a) Subject to compliance with Sections 17(c), (d) and (e) below, each ABL Secured Party agrees that until the Payment-in-Full of All Senior Obligations (other than the obligations referred to in clause (iii) of the definition thereof), the Participants (or any one or more of them) shall have the option to purchase by way of assignment (and thereby assume all duties of the Secured Parties not terminated pursuant to Section 17(c) or (e) below) all, but not less than all, of the Prepetition ABL Loans and other Prepetition ABL Obligations (other than the

Incremental Loans and accrued but unpaid interest thereon) by prior written notice of not less than 10 business days to the Prepetition ABL Agent (which notice, once given, shall be irrevocable and fully binding on the Participants). Such purchase shall be carried out within 10 business days of the delivery of such notice pursuant to (x) in the case of the Prepetition ABL Loans, the terms of the Prepetition ABL Credit Agreement for assignments by the Prepetition ABL Lenders as set forth in Section 9.04 thereof or (y) in the case of the other Prepetition ABL Obligations, such other arrangements and documentation as are reasonably satisfactory to the Prepetition ABL Agent, and shall be for a cash purchase price that will result in the Payment-in-Full of All Senior Obligations (other than the obligations referred to in clause (iii) of the definition thereof) in accordance with the terms of the Prepetition ABL Loan Documents (i.e., at par in the case of principal). By their acknowledgements to this Agreement, the Borrower and the other Debtors hereby consent to the assignment to the Participants on such terms and hereby agree that any such sale shall release the Prepetition ABL Secured Parties from all of their obligations under the Prepetition ABL Loan Documents (other than (x) any remaining rights and obligations of the Prepetition ABL Agent and the Prepetition ABL Granting Lender with respect to Incremental Loans and (y) any remaining rights or obligations of a Prepetition ABL Secured Party as an Issuing Bank (as defined in the Prepetition ABL Credit Agreement) or a provider of cash management services, which expressly survive in connection with agreements contemplated by Section 17(d) and (e) below).

(b)     For the avoidance of doubt, no Participant shall be obligated to purchase Prepetition ABL Loans or other Prepetition ABL Obligations as a result of the exercise by any other Participant of the purchase option set forth in Section 16(a), it being understood that each Participant's option to purchase Prepetition ABL Loans or other Prepetition ABL Obligations pursuant thereto is discretionary and may be exercised by one Participant, any number of the Participants or all the Participants.

17.     Assignment of DIP Documents and Prepetition ABL Loans.

(a)     At the request of the Participants following (or concurrently with) the Payment-in-Full of All Senior Obligations, (i) the Granting Lender shall assign all of its rights and obligations as DIP Lender under the DIP Documents (including any outstanding DIP Loans and its commitment to extend credit under the DIP Facility) to the Participants jointly (i.e., elevate the Participations to DIP Loans), (ii) the DIP Agent shall assign all of its rights and obligations under the DIP Documents in its capacity as such to the Successor DIP Agent, (iii) DBNY, in its capacity as the Prepetition ABL Granting Lender, shall assign all of its rights and obligations as Incremental Lender under the Prepetition ABL Credit Agreement (including any outstanding Incremental Loans) to the Participants jointly (i.e., elevate the Participations to Incremental Loans), and (iv) the Prepetition ABL Agent shall assign all of its rights and obligations under the Prepetition ABL Loan Documents in its capacity as such to the Successor Prepetition ABL Agent; provided that, in connection with (and as a condition to) the foregoing, the Participants shall first pay in full in cash all Senior Obligations of the type described in clause (iii) of the definition thereof then owing to the DIP Agent and the DIP Lender. The foregoing assignments shall be (i) evidenced by documentation reasonably satisfactory to the DIP Agent, the Granting Lender, the Prepetition ABL Agent or the Prepetition ABL Granting Lender and (ii) made without recourse to the DIP Agent, the Granting Lender, the Prepetition ABL Agent and the Prepetition ABL Granting Lender, and without representation or warranty of

any nature or kind by the DIP Agent, the Granting Lender, the Prepetition ABL Agent or the Prepetition ABL Granting Lender.

(b)    At the time of (and as a condition to) any assignment under Section 17(a) and at the time of any exercise by the DIP Agent of its right of resignation pursuant to Section 17(f) below, the Participants shall designate a new administrative agent under the DIP Facility (a "Successor DIP Agent"), which Successor DIP Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent, and the retiring DIP Agent shall promptly transfer to such Successor DIP Agent all sums held by it, together with all records and other documents reasonably necessary or appropriate in connection with the performance of the duties of such Successor DIP Agent, whereupon such retiring DIP Agent shall be discharged from its duties and obligations as DIP Agent under the DIP Documents.  After the retiring DIP Agent's resignation as DIP Agent, all of the provisions of the DIP Documents which are for the benefit of the DIP Agent shall remain in full force and effect and inure to the retiring DIP Agent's benefit as to any actions taken or omitted to be taken by it while it was DIP Agent.

(c)    At the time of (and as a condition to) any assignment under Section 17(a) and any exercise of the option to purchase set forth in Section 16 above, the Participants shall designate a new Prepetition ABL Agent (a "Successor Prepetition ABL Agent"), which Successor Prepetition ABL Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Prepetition ABL Agent, and the retiring Prepetition ABL Agent shall promptly (i) transfer to such Successor Prepetition ABL Agent all sums and possessory Collateral held by it under the Prepetition ABL Security Documents, together with all records and other documents reasonably necessary or appropriate in connection with the performance of the duties of such Successor Prepetition ABL Agent under the Prepetition ABL Loan Documents, and (ii) execute and deliver to such Successor Prepetition ABL Agent such amendments to financing statements, and take such other actions, as may be reasonably necessary in connection with the assignment to such Successor Prepetition ABL Agent of the security interests created under the Prepetition ABL Security Documents, whereupon such retiring Prepetition ABL Agent shall be discharged from its duties and obligations under the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents.  After the retiring Prepetition ABL Agent's resignation as Prepetition ABL Agent, all of the provisions of the Prepetition ABL Loan Documents which are for the benefit of the Prepetition ABL Agent shall remain in full force and effect and inure to the Prepetition ABL Agent's benefit as to any actions taken or omitted to be taken by it while it was Prepetition ABL Agent.  The provisions of this Section 17(c) are intended to supplement (but not supersede) the resignation provisions of the Prepetition ABL Agent contained in Article VIII of the Credit Agreement.

(d)    At the time of (and as a condition to) any exercise of the option to purchase set forth in Section 16 above, the Participants shall designate a new Issuing Bank under the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents which successor Issuing Bank shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Issuing Bank and the retiring Issuing Bank shall be discharged from its duties and obligations under the Prepetition ABL Credit Agreement; provided, that, in lieu of such replacement of the existing Issuing Bank, the Participants may (i) cash collateralize the then outstanding Letters of Credit  (as defined in the Prepetition ABL Credit Agreement) on terms, and pursuant to documentation, satisfactory to the Issuing Bank in an amount at all times equal

to 102% of the face amount of such Letters of Credit (after giving effect to the application of any such cash collateral to amounts from time to time payable in respect of Letters of Credit pursuant to the Prepetition ABL Credit Agreement (including, without limitation, fees accruing pursuant to Section 2.11(b) thereof)) and (ii) indemnify and hold the Issuing Bank harmless from any other liability in connection with the Issuing Bank continuing to serve as the Issuing Bank under the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents (which shall be evidenced pursuant to an agreement reasonably satisfactory to the existing Issuing Bank); provided, however, that the foregoing shall not be construed to limit the right of the existing Issuing Bank to resign as Issuing Bank in accordance with the terms of the Prepetition ABL Credit Agreement, in which case existing Letters of Credit issued by the existing Issuing Bank shall not be required to be immediately replaced but the existing Issuing Bank shall not be required to issue any further Letters of Credit and shall maintain all of its rights as Issuing Bank with respect to any Letters of Credit issued by it prior to such date of resignation. After the retiring Issuing Bank's resignation as Issuing Bank, all of the provisions of the Prepetition ABL Credit Agreement and the other Prepetition ABL Loan Documents which are for the benefit of the Issuing Bank shall remain in full force and effect and inure to the retiring Issuing Bank's benefit as to any actions taken or omitted to be taken by it while it was Issuing Bank under the Prepetition ABL Credit Agreement and other Prepetition ABL Loan Documents.

(e)     Prior to (and as a condition to) the exercise of the option to purchase set forth in Section 16 above, all commitments to extend credit under the Prepetition ABL Credit Agreement, all Hedging Agreements (as defined in the Prepetition ABL Credit Agreement) entered into with Prepetition ABL Secured Parties (if any) and all agreements with Prepetition ABL Secured Parties to provide cash management services giving rise Cash Management Obligations (as defined in the Prepetition ABL Credit Agreement) shall have terminated in accordance with their terms (or, in the case of agreements to provide cash management services, cash collateral and other indemnification arrangements satisfactory to the Prepetition ABL Secured Party providing such cash management services shall have been entered into among such Prepetition ABL Secured Party and the Participants).

(f)     The DIP Agent may at any time in its discretion, upon 15 business days' prior notice to the Participants, resign from its duties as DIP Agent under the DIP Documents, in which case the DIP Agent and the Participants agree to promptly take the actions described in Sections 17(a)(ii) and (b).

18.     Reimbursement of Expenses.  Each Participant agrees (which agreement shall survive any termination of its Participation) to reimburse the DIP Agent on behalf of the Granting Lender for its "Pro Rata Share" (being defined as the percentage determined by dividing the amount of the Participant's Participation by the aggregate amount of the DIP Obligations) of all reasonable out-of-pocket expenses (including reasonable attorneys' fees) incurred by the DIP Agent and the Granting Lender after the effective date of the Original DIP Participation Agreement in connection with the DIP Obligations for and on behalf of the DIP Secured Parties and the Participants or with an Event of Default or in enforcing the obligations of the Borrower or any other Debtor in respect of the DIP Facility, to the extent that the Granting Lender and the DIP Agent are not reimbursed by the Borrower or the other Debtors. If the DIP Agent requests instructions from the Participants with respect to any act or action (including failure to act) in connection with this Agreement or any other DIP Document, the DIP Agent

shall be entitled to refrain from such act or taking such action unless and until the DIP Agent shall have received instructions in a writing signed by all of the Participants and shall not incur liability to any Participant by reason of so refraining. Without limiting the foregoing, no Participant shall have any right of action whatsoever against the DIP Agent as a result of the DIP Agent acting or refraining from acting hereunder or under any other DIP Document in accordance with the instructions of the Participants. If any indemnity furnished to the Granting Lender and the DIP Agent in Section 19 below shall become impaired, they or it may call for additional indemnity and cease to do the acts indemnified against until such additional indemnity is given. Notwithstanding anything to the contrary in this Agreement or otherwise (i) the DIP Agent may apply any distributions that would otherwise be made to such Participant to such Participant's obligations under this Section 18 or Section 19 and (ii) the aggregate amount of all payments required to be made by the Participants pursuant to this Section 18, when added to the aggregate amount of all payments required to be made by the Participants pursuant to Section 19, shall not exceed $1,500,000 (the "Recourse Liability Cap"). Each Participant shall be liable for its Pro Rata Share of the Recourse Liability Cap and shall not be liable for any other Participant's Pro Rata Share of the Recourse Liability Cap.

19.    Right to Indemnity Etc. Each Participant, in accordance with its Pro Rata Share, severally agrees to indemnify the DIP Agent, to the extent that the DIP Agent shall not have been reimbursed by any Debtor, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the DIP Agent on and after the effective date of Original DIP Participation Agreement in exercising its powers, rights and remedies or performing its duties under this Agreement, the Original DIP Participation Agreement or otherwise in its capacity as the DIP Agent in any way relating to or arising out of this Agreement, the Original DIP Participation Agreement or the DIP Documents; provided, no Participant shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the DIP Agent's actual fraud or willful misconduct (as determined by a final order or judgment of a court of competent jurisdiction). If this indemnity furnished to the DIP Agent for any purpose shall, in the opinion of the DIP Agent, become insufficient or become impaired, the DIP Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Participant to indemnify the DIP Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Participant's Pro Rata Share thereof. Notwithstanding anything to the contrary in this Agreement or otherwise (i) the DIP Agent may apply any distributions that would otherwise be made to such Participant to such Participant's obligations under this Section 19 or Section 18 and (ii) the aggregate amount of all payments required to be made by the Participants pursuant to this Section 19, when added to the aggregate amount of all payments required to be made by the Participants pursuant to Section 18, shall not exceed the Recourse Liability Cap. Each Participant shall be liable for its Pro Rata Share of the Recourse Liability Cap and shall not be liable for any other Participant's Pro Rata Share of the Recourse Liability Cap. Each of the DIP Agent and the Prepetition ABL Agent, in acting or refraining to act in connection with this Agreement, any other DIP Document or any Prepetition ABL Loan Document, as applicable, shall be entitled to benefits and protections as against the Participants which correspond to the benefits and protections afforded to the DIP Agent as against the DIP

Lender pursuant to the Orders (but only to the extent not inconsistent with the terms of, and concerning matters not otherwise expressly addressed in, this Agreement).

20.    Successors and Assigns.   This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement and the Secured Parties; provided, however, that no other Person (including but not limited to the Borrower and the other Debtors but excluding the Secured Parties) shall be entitled to claim any beneficiary status as to any right or obligation under this Agreement.

21.    Interpretation.   This Agreement shall be construed in accordance with the laws of the State of New York (without reference to its conflict of laws principles).  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

22.    Notices.   All notices to be given under this Agreement shall be given to the applicable party at the address indicated below, or such other address as shall be indicated in writing to the other party:

If given to Participants, sent to:

| If to GM: | General Motors Corporation |
|---|---|
| | 30009 Van Dyke Avenue |
| | P.O. Box 9025 |
| | Mail Code: 480-206-136 |
| | Warren, Michigan 48090-9025 |
| | Attention: Mark. W. Fischer |
| | Facsimile: (586) 575-3404 |
| | Email: mark.w.fischer@gm.com |
| | |
| With a copy to: | Honigman Miller Schwartz and Cohn LLP |
| | 600 Woodward Avenue |
| | Detroit, Michigan 48226 |
| | Attention: Donald F. Baty, Jr. |
| | Facsimile: (313) 465-7315 |
| | Email: dbaty@honigman.com |
| | |
| If to Ford: | Ford Motor Company |
| | 5500 Auto Club Drive |
| | Mail Drop 415-3E462 |
| | Dearborn, Michigan 48126 |
| | Attention: William R. Strong |
| | Facsimile: (313) 206-7044 |
| | Email: wstrong@ford.com |

| With a copy to: | Miller Canfield Paddock and Stone, P.L.C. |
| | 150 West Jefferson Ave., Suite 2500 |
| | Detroit, Michigan 48226 |
| | Attention: Jonathan S. Green |
| | Facsimile: (313) 496-7500 |
| | Email: green@mcps.com |

| and: | Ford Motor Company |
| | Office of the General Counsel |
| | One American Road, WHQ, Suite 323 |
| | Dearborn, Michigan 48126 |
| | Attention: Daniella Saltz |
| | Facsimile: (313) 337-3209 |
| | Email: dsaltz@ford.com |

| If to Chrysler: | Chrysler LLC |
| | 800 Chrysler Drive |
| | CIMS 485-14-78 |
| | Auburn Hills, Michigan 48326 |
| | Attention: Sigmund Huber |
| | Director, Supplier Relations |
| | Facsimile: (248) 512-1771 |
| | Email: seh43@chrysler.com |

| With a copy to: | Chrysler LLC |
| | 1000 Chrysler Drive |
| | CIMS 485-14-78 |
| | Auburn Hills, Michigan 48326-2766 |
| | Attention: Kim R. Kolb |
| | Senior Staff Counsel |
| | Facsimile: (248) 512-1771 |
| | Email: krk4@chrysler.com |

| and: | Dickinson Wright PLLC |
| | 500 Woodward Avenue, Suite 4000 |
| | Detroit, Michigan 48226 |
| | Attention: James A. Plemmons |
| | Facsimile: (313) 223-3598 |
| | Email: jplemmons@dickinsonwright.com |

| If to Honda, to: | Honda of America Mfg., Inc. |
| | North America Cost Planning, 21001-A |
| | SR 739 |
| | Raymond, OH 43067 |
| | Attention: Mark Vandevelde |
| | Facsimile: (937) 645-7401 |
| | E-mail: Mark_Vandevelde@ham.honda.com |

| | |
|---|---|
| With a copy to: | Honda of America Mfg., Inc.<br>24000 Honda Parkway<br>Marysville, OH 43040-9251<br>Attention: Joe F. LaFleur, Esq.<br>Facsimile: (937) 644-6583<br>E-mail: Joe_LaFleur@ham.honda.com |
| and: | Vorys, Sater, Seymour and Pease LLP<br>52 East Gay Street<br>Columbus, OH 43216-1008<br>Attention: Robert A. Bell Jr.<br>Facsimile: (614) 719-5169<br>E-mail: rabell@vorys.com |
| If to Nissan, to: | Nissan North America, Inc.<br>One Nissan Way<br>Franklin, TN 37067<br>Attention: Cal Vickers<br>Senior Director<br>Facsimile: (615) 725-8504<br>E-mail: Cal.Vickers@Nissan-USA.com |
| With a copy to: | Nissan North America, Inc.<br>One Nissan Way<br>Franklin, TN 37067<br>Attention: Dan Nugent<br>Senior Counsel<br>Facsimile: 615-725-8504<br>E-mail: Dan.Nugent@Nissan-USA.com |
| and: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Attention: Eric B. Schultenover<br>Facsimile: 615-244-6804<br>Email: Eric.schultenover@wallerlaw.com |
| If to the Granting<br>Lender, to: | Deutsche Bank AG, New York Branch<br>60 Wall Street<br>New York, New York 10005<br>Attention: Enrique Landaeta<br>Facsimile: (212) 797-4655 |
| With a copy to: | White & Case LLP |

1155 Avenue of the Americas
New York, NY 10036
Attention: Eric Leicht and Scott Greissman
Facsimile: (212) 354-8113
Email: eleicht@whitecase.com /
        sgreissman@whitecase.com

23.    Complete Agreement.    This Agreement and any other agreements referenced in it constitute the entire understanding of the parties in connection with the matters referenced and shall not be modified or altered except by a writing signed by the Participants, the Granting Lender, the DIP Agent and the Prepetition ABL Agent. There are no other agreements, oral or written, express or implied, relating to its subject matter other than this Agreement and the other agreements referenced and all prior agreements and understandings have been merged into this Agreement. This Agreement supersedes and replaces the Original DIP Participation Agreement. Notwithstanding the foregoing, nothing contained in this Agreement is intended to modify the terms of the Prepetition Subordinated Participation Agreement.

24.    Amendments; Waivers.    No amendment or modification to this Agreement or waiver of or consent to departure from strict compliance with this Agreement shall be binding unless in writing and signed by the party to be charged, and this requirement of a writing may not be modified orally or by course of conduct.

25.    Effectiveness.    This Agreement shall become effective upon the entry of the June [___], 2009 Stipulation and Order (the "Effective Date").

26.    Construction.    Each party acknowledges that it has participated in the negotiation of this Agreement, and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured, dictated or drafted such provision. The Participants acknowledge that they have reviewed (or have had the opportunity to review) this Agreement with counsel of their choice and have executed this Agreement of their own free will and accord.

27.    Counterparts.    This Agreement may be executed in counterparts and by separate parties on separate counterparts; and facsimile or other electronic transmission copies of any signatures shall be treated as original signatures.

28.    WAIVER OF JURY TRIAL.    THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT. NO PARTY WILL BE DEEMED TO HAVE RELINQUISHED ITS WAIVER OF JURY TRIAL UNLESS THAT PARTY DOES SO IN WRITING.

29.    CONSENT TO JURISDICTION; SERVICE OF PROCESS.    EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SHALL

HAVE NONEXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTICIPANTS, THE AGENT, THE LENDERS AND THE OTHER SECURED PARTIES PERTAINING TO THIS AGREEMENT OR THE DIP DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE DIP DOCUMENTS; PROVIDED THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE DIP COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE AGENT. EACH PARTICIPANT EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTICIPANT HEREBY WAIVES ANY OBJECTION THAT SUCH PARTICIPANT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH PARTICIPANT HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL LEGAL PROCESS, SUMMONS, NOTICES AND OTHER DOCUMENTS AND OTHER SERVICE OF PROCESS OF ANY KIND AND CONSENTS TO SUCH SERVICE IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN THE UNITED STATES OF AMERICA WITH RESPECT TO OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE DIP DOCUMENTS BY ANY MEANS PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, INCLUDING BY THE MAILING THEREOF (BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID) TO ITS ADDRESS AS SPECIFIED IN SECTION 22 OF THIS AGREEMENT.

[signature pages follow]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

DEUTSCHE BANK AG NEW YORK BRANCH, as DIP Agent, Prepetition ABL Agent, Granting Lender and (for purposes of Section 17) Prepetition ABL Granting Lender

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

FORD MOTOR COMPANY,
as Participant

By: _____
    Name:
    Title:

CHRYSLER LLC,
as Participant

By: _____
   Name:
   Title:

GENERAL MOTORS CORPORATION,
as Participant

By: _____
    Name:
    Title:

HONDA OF AMERICA MFG., INC.,
as Participant

By: _____
    Name:
    Title:

NISSAN NORTH AMERICA, INC.,
as Participant

By: _____
    Name:
    Title:

Acknowledged:


METALDYNE INTERMEDIATE HOLDCO,
INC., as a Debtor


By: _____
     Name:
     Title:


METALDYNE COMPANY LLC, as a Debtor


By: _____
     Name:
     Title:


EACH OF THE ENTITIES LISTED ON
SCHEDULE A ATTACHED HERETO,
each as a Debtor


By: _____
     Name:
     Title:

## SCHEDULE A

ER Acquisition Corp.

GMTI Holding Company

Halyard Aviation Services, Inc.

MASG Disposition, Inc.

MASX Energy Services Group, Inc.

Metaldyne Asia, Inc.

Metaldyne Dupage Die Casting Corporation

Metaldyne Europe, Inc.

Metaldyne Lester Precision Die Casting, Inc.

Metaldyne Light Metals Company, Inc.

Metaldyne Machining and Assembly Company, Inc.

Metaldyne Precision Forming-Fort Wayne, Inc.

Metaldyne Services, Inc.

Metaldyne Sintered Components, LLC

Metaldyne Sintered Components of Indiana, Inc.

Metaldyne Sintered Components St. Marys, Inc.

Metaldyne Tubular Products, Inc.

Metaldyne U.S. Holding Co.

NC-M Chassis Systems, LLC

Precision Headed Products, Inc.

Punchcraft Company

W.C. McCurdy Co.

Windfall Specialty Powders, Inc.

Stahl International, Inc.

# SCHEDULE I TO SUBORDINATED
## PARTICIPATION AGREEMENT

| **Participant** | **Participation Percentage** | **Participation Cap** |
|---|---|---|
| Chrysler LLC | 22.6% | $4,497,635.73 |
| Ford Motor Company | 52.1% | $10,346,413.05 |
| General Motors Corporation | 18.5% | $3,664,740.22 |
| Honda of America Mfg., Inc. | 4.3% | $850,000.00 |
| Nissan North America, Inc. | 2.5% | $500,000 |

EXHIBIT C

DIP Facility Terms

To request a DIP Loan borrowing, the Borrower shall notify the DIP Agent of such request by telephone not later than 12:00 noon, New York City time, two (2) business days before the date of the proposed borrowing. Each such telephonic borrowing request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the DIP Agent of a written borrowing request in a form approved by the DIP Agent and signed by the Borrower. Each such telephonic and written borrowing request shall specify the date, which shall be a business day, and amount of such borrowing. Promptly following receipt of a borrowing request in accordance herewith, the DIP Agent shall advise each Customer of the details thereof and of the amount of such Customer's participation therein. The Customers shall fund their respective participations no later than 12:00 noon on the business day prior to the date of the proposed borrowing. The DIP Agent shall have no obligation to fund DIP Loans unless the full amount of the Customers' participations therein have been fully funded and are immediately available to the DIP Agent. Each borrowing of DIP Loans shall be in an amount that is an integral multiple of $100,000 and not less than $500,000. The proceeds of such borrowing shall be funded into the following account: Deutsche Bank Trust Company Americas, Account Name: Deutsche Bank NY Loan Operations, Account No. 60200119, Reference: Metaldyne Company LLC.

All payments made by the Debtors under the DIP Facility will be made without setoff, counterclaim or other defense. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in the second succeeding sentence, any tax imposed on or measured by the net income or net profits of the DIP Secured Parties pursuant to the laws of the jurisdiction in which it is organized or the jurisdiction in which the principal office or applicable lending office of such DIP Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, the Debtors agree to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under the DIP Facility, after withholding or deduction for or on account of any Taxes, will not be less than the amount otherwise payable thereunder. If any amounts are payable in respect of Taxes pursuant to the preceding sentence, the Debtors agree to reimburse the DIP Secured Parties, upon the DIP Agent's written request, for taxes imposed on or measured by the net income or net profits of the DIP Secured Parties pursuant to the laws of the jurisdiction in which they are organized or in which the principal office or applicable lending office of the DIP Secured Parties is located or under the laws of any political subdivision or taxing authority of any such jurisdiction in which they are organized or in which the principal office or applicable lending office of the DIP Secured Parties is located and for any withholding of taxes as they shall determine are payable by, or withheld from, the DIP Secured Parties, in respect of such amounts so paid to or on behalf of the DIP Secured Parties pursuant to the preceding sentence and in respect of any

amounts paid to or on behalf of them pursuant to this sentence.  The Debtors will furnish to the DIP Agent within 45 days after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by such Debtors.  The Debtors agree to indemnify and hold harmless the DIP Secured Parties, and reimburse the DIP Secured Parties upon their written request, for the amount of any Taxes so levied or imposed and paid by them.

The DIP Agent will be entitled to the benefits and protections which correspond to the benefits and protections afforded to the Prepetition ABL Agent pursuant to Article VIII of the Prepetition ABL Credit Agreement, which is incorporated herein _mutatis_ _mutandis_.

To the extent that the Prepetition ABL Collateral Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition ABL Security Document, the DIP Agent is also deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Prepetition ABL Security Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Final Order.  The Prepetition ABL Collateral Agent shall serve as agent for the DIP Agent for purposes of perfecting their respective security interests and liens on all DIP Collateral that is of a type such that perfection of a security interest therein may be accomplished only by possession or control by a secured party.

[Budget]

# METALDYNE
## Cash Flow - Budget [A]

| Week Ending | Preliminary 1 5/22/2009 | 2 5/29/2009 | 3 6/5/2009 | 4 6/12/2009 | 5 6/19/2009 | 6 6/26/2009 | 7 7/3/2009 | 8 7/10/2009 | 9 7/17/2009 | 10 7/24/2009 | 11 7/31/2009 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | $71 | $3,069 | $1,026 | ($409) | ($409) | $846 | $2,162 | ($2,786) | ($8,354) | ($16,035) | ($16,601) | $71 |
| **Receipts** | | | | | | | | | | | | |
| Customer Receipts: | | | | | | | | | | | | |
| AR Trade | 4,636 | 8,792 | 8,010 | 3,656 | 6,136 | 4,757 | 3,208 | 2,608 | 3,968 | 1,915 | 3,560 | 51,827 |
| Net Sucart Receipts - Big Three | — | — | 1,584 | 3,711 | 3,711 | 3,711 | 3,711 | — | 6,331 | 6,331 | 6,331 | 29,091 |
| Proceeds from Customer (DIP) Loans | 6,491 | — | — | — | — | — | — | — | — | — | — | 6,491 |
| Pre-petition A/R payment [C] | — | — | — | 2,000 | — | — | — | 300 | — | — | — | 2,300 |
| Process Charge | — | — | — | — | — | 3,250 | — | — | — | 3,250 | — | 6,500 |
| Other Receipts [D] | — | 700 | 2,000 | — | — | 1,783 | — | — | — | 1,783 | 3,250 | 12,950 |
| **Total Receipts [D]** | 11,127 | 9,492 | 11,594 | 16,201 | 9,847 | 13,502 | 6,919 | 10,248 | 10,259 | 13,541 | 13,541 | 109,159 |
| **Disbursements** | | | | | | | | | | | | |
| AP Trade | (2,293) | (6,960) | (6,514) | (6,514) | (6,514) | (6,514) | (951) | (951) | (6,898) | (6,898) | (6,898) | (57,905) |
| Leases | — | (893) | (94) | — | — | — | (609) | (619) | (445) | (445) | (445) | (1,600) |
| Utilities | — | — | — | — | — | — | (315) | (315) | (315) | (315) | (315) | (1,525) |
| Freight | (150) | (150) | (143) | (143) | (143) | (143) | (143) | (143) | (172) | (172) | (172) | (1,216) |
| Capital Expenditure | (50) | (50) | (46) | (46) | (46) | (46) | (46) | (46) | (93) | (93) | (93) | (413) |
| Insurance Payments | (175) | (50) | (55) | (46) | (46) | (49) | (53) | (89) | (102) | (251) | (272) | (1,144) |
| Taxes | — | — | — | — | — | — | (40) | (155) | (155) | — | — | (155) |
| Employees | (20) | (40) | (40) | (44) | (0) | (46) | (46) | (46) | (46) | — | — | (420) |
| Payroll | (32,448) | (35,321) | (35,982) | (6,780) | (7,402) | (7,615) | (8,907) | (7,459) | (7,507) | (8,512) | (8,140) | (72,169) |
| Sales/Severance Incentive | — | (700) | (2,851) | (649) | (2,891) | (649) | (2,827) | (885) | (25) | (310) | (18,545) | |
| Benefits | (515) | (505) | (680) | (680) | (691) | (826) | (490) | (986) | (785) | (826) | (712) | (7,416) |
| **Operating Disbursements** | (3,103) | (9,657) | (10,552) | (8,214) | (11,983) | (10,249) | (10,246) | (3,234) | (11,477) | (10,221) | (11,953) | (99,034) |
| **Operating Cash Flow** | $8,024 | $(165) | $941 | $7,988 | $(2,228) | $4,372 | $(189) | $(927) | $(8,478) | $108 | $1,589 | $10,125 |
| Plant Consolidation / Rigging | (767) | (469) | (430) | (624) | (725) | (619) | (325) | (788) | (325) | (697) | (697) | (1,500) |
| Utility Deposits | — | (183) | (190) | (190) | (380) | (380) | (325) | (180) | (185) | (229) | (229) | (1,600) |
| Company Professional Fees (legal / advisors) [B] | (469) | — | — | — | — | — | — | — | — | — | — | (5,787) |
| Other Professional Fees (legal / advisors) [B] | (41) | (146) | (129) | (46) | (46) | (285) | — | — | — | — | (272) | (6,677) |
| Bank Fees / Interest (est) | — | — | — | — | — | — | (1,106) | (3,973) | (1,510) | — | — | (418) |
| ABL Draw (Paydown) | (3,847) | (1,080) | (1,225) | (1,776) | (944) | (1,904) | — | — | — | 2,594 | 3,685 | (17,414) |
| **Total Cash Inflow (Outflow) [a]** | $2,998 | $(2,043) | $(1,435) | $(0) | $1,255 | $1,316 | $(4,948) | $(5,568) | $(7,681) | $(566) | $401 | $71 |
| **Ending Cash Balance** | $3,069 | $1,026 | $(409) | $(409) | $846 | $2,162 | $(2,786) | $(8,354) | $(16,035) | $(16,601) | $71 | $71 |
| **LIQUIDITY** | | | | | | | | | | | | |
| Borrowing Base | $39,974 | $38,835 | $37,610 | 35,834 | 34,840 | 32,936 | 31,830 | 27,657 | 29,710 | 26,441 | 31,833 | |
| Permitted Variance % | 20.0% | 20.0% | 12.5% | 12.5% | 12.5% | 12.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | |
| Less: ABL Drawn | (767) | (2,091) | (4,394) | (3,905) | (5,428) | (6,677) | (4,797) | (5,096) | (5,593) | (5,794) | (7,780) | |
| Total Availability | $39,974 | $38,835 | $37,610 | $54,457 | $3,646 | $52,762 | | | | | | |
| Customer pre-petition loan | 59 | | | | | | | | | | | |
| Cumulative disbursements before ABL paydown [a] | (10,455) | (21,971) | (31,242) | (31,242) | (43,420) | (53,414) | (63,903) | (67,953) | (79,910) | (90,593) | (103,704) | |
| Permitted Variance % | 20.0% | 20.0% | 12.5% | 12.5% | 12.5% | 12.5% | 7.5% | 7.5% | 7.5% | 7.5% | 7.5% | |
| Cumulative Permitted Disb. Variance [b] | (2,091) | (4,394) | — | — | (5,428) | (6,677) | (4,797) | (5,096) | (5,593) | (6,794) | (7,780) | |
| Cumulative Permitted Disb. Variance [b] | (29,915) | (29,835) | (27,610) | (25,834) | (24,940) | (22,959) | (21,830) | (17,867) | (16,347) | (16,550) | (18,347) | (18,271) |

**NOTES:**

[A] Consistent with the calculation of the borrowing base under the existing revolving credit facility, the Budget excludes all receipts and disbursements associated with shipments of parts into and out of the Companies' Ramos, Mexico facility (which is a maquiladora under Mexican law). In the normal course, Metaldyne utilizes cash received from the Ramos facility as described in Metaldyne's Cash to make certain disbursements on behalf of this entity. This facility is expected to be self-funding during the 13-week period. As such, disbursements made that relate to the Ramos, Mexico location are not included as disbursements for purposes of the permitted variance calculation.

[B] Assumes Advisory Success fee is paid from asset sale proceeds.

[C] Represents collection of pre-petition A/R owing to domestic Metaldyne entities associated with direct production operating costs, lease cost reimbursement, and associated overhead allocations. Metaldyne is also working with customers for the purchase of inventory. Inventory collections are not included and amount is to be determined.

[D] Other receipts includes estimated reimbursement for direct production costs, lease cost reimbursement, and reimbursement of related costs. Metaldyne continues to work with customers to develop specific production schedules and reimbursement of related costs.

[a] NOTE: Excludes severance, plant consolidation costs, and any bank build impacts. The timing and amount of these costs will vary with customer requirements, and therefore, the measurement of these items is excluded from the permitted variance test and calculation. The permitted variance calculation also excludes disbursements made on behalf of Ramos USA (see note).

[a] Calculated as cumulative disbursements before ABL paydown times the permitted variance % for the period.

CONFIDENTIAL

Borrowing Base, Applicable Availability Block, Reserves, etc.[7]

Borrowing Base and Applicable Availability Block:  shall continue during the Chapter 11 Cases in each case as in effect under (and as defined in) the Prepetition ABL Credit Agreement immediately prior to the Petition Date (including, without limitation, eligibility criteria and rights to establish, increase or decrease reserves or additional eligibility restrictions under the Borrowing Base), all as further adjusted in accordance with the terms hereof.

Borrowing Base Certificates and Mandatory Prepayments:  the Debtors will continue to provide weekly Borrowing Base Certificates in accordance with the terms of the Prepetition ABL Credit Agreement and if, at any time, the amount of the Prepetition ABL Obligations (other than the Incremental Loans) exceeds the Borrowing Base after taking into account the Applicable Availability Block and any reserves or additional eligibility restrictions, in each case as then in effect, the Debtors may not use Cash Collateral other than to immediately and permanently repay the Prepetition ABL Obligations (other than the Incremental Loans) in the amount of such excess.  If the amount of Cash Collateral at such time is insufficient for such purpose, the Debtors shall immediately request DIP Loans and/or use the proceeds of DIP Loans to make such repayment.

Mandatory Repayments with the Proceeds from Dispositions of DIP Collateral:  all net cash proceeds from the sales or dispositions of any DIP Collateral (other than Prepetition Term Priority Collateral and ordinary course disposition of inventory and collections of accounts) shall be immediately and permanently applied to repay outstanding Prepetition ABL Obligations (other than the Incremental Loans).

Accounts Receivable:  subject to the other terms hereof, will continue to be deemed immediately ineligible if the applicable account debtor becomes subject to a bankruptcy or insolvency proceeding.

Inventory:  for the avoidance of doubt, inventory directly purchased by a customer from a vendor which is in the possession of a Debtor (for the purpose of manufacturing the same into finished product or otherwise), and inventory manufactured for the purpose of a customer inventory bank, unless in each case subject to an accommodation agreement or similar arrangement reasonably acceptable to the Prepetition ABL Agent, shall not be included in the Borrowing Base.

Reserves:  for the avoidance of doubt, the Prepetition ABL Agent may reserve against the Borrowing Base the value of any inventory included therein (unless subject to an accommodation agreement or similar arrangement reasonably acceptable to the Prepetition ABL Agent) which (i) is manufactured for purchase by customers who become subject to a bankruptcy or insolvency proceeding or (ii) the Prepetition ABL Agent determines at any time in its sole

---

[7] Capitalized terms used but not defined herein shall have the meanings given them in the Interim Order to which this Exhibit E is attached.

discretion is unmerchantable. Examples of unmerchantable inventory include, but are not limited to, inventory manufactured for customers who:

- have entered into extended shut-downs during which period they are not taking possession of Metaldyne's parts;

- appear reasonably likely to re-source parts supplied by Metaldyne; or

- appear reasonably likely to terminate the production of parts or platforms where Metaldyne's products are sourced.

The Prepetition ABL Agent agrees, so long as no Event of Default shall have occurred and be continuing, to provide the Debtors with no less than five (5) business days' prior written notice of its intention to take a reserve against any inventory in accordance with the terms hereof and/or the Prepetition ABL Credit Agreement, setting forth in reasonable detail the basis therefor. If, within such five (5) business day period, the Debtors enter into an accommodation agreement or similar arrangement with the applicable customer which is in form and substance reasonably satisfactory to the Prepetition ABL Agent (and, to the extent the applicable customer is subject to a bankruptcy proceeding, which has been approved by the Bankruptcy Court having jurisdiction over such bankruptcy case), the Prepetition ABL Agent agrees that it will not implement such reserve.

GM Bankruptcy: the Prepetition ABL Agent agrees that, notwithstanding anything to the contrary set forth in the Prepetition ABL Credit Agreement, accounts receivable owed by GM or any of its affiliates, and inventory manufactured for GM or any of its affiliates, shall be removed from the Borrowing Base within ten (10) days after a bankruptcy filing by GM and/or such affiliate, unless, within such ten (10) day period, the Accommodation Agreement is approved by the Bankruptcy Court having jurisdiction over the applicable bankruptcy case and/or the Debtors enter into with GM and/or such affiliate an accommodation agreement or similar arrangement reasonably satisfactory to the Prepetition ABL Agent which is approved by the Bankruptcy Court having jurisdiction over the applicable bankruptcy case.

Applicable Availability Block: will continue to apply to the Borrowing Base until the Prepetition ABL Obligations are indefeasibly paid in full in cash, and shall be deemed to be $10,000,000 for each fiscal week ended after May 29, 2009 (i.e., the last fiscal week of the existing forbearance period agreed to by the Prepetition ABL Lenders), subject to adjustment as provided in the following sentence. The Applicable Availability Block will increase on the first day of each fiscal week by $500,000, beginning with the fiscal week ended July 24, 2009.