**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re
Metaldyne Corporation, *et al.,*
                     Debtors.
------------------------------------------------------------------x

**NOT FOR PUBLICATION**

Chapter 11

Case No. 09-13412 (MG)

(Jointly Administered)

**MEMORANDUM OPINION REGARDING ORDER
APPROVING DEBTOR'S MOTION SEEKING (A) AUTHORIZATION
TO (I) USE CASH COLLATERAL OF THE PREPETITION SECURED
LENDERS, (II) OBTAIN POSTPETITION FINANCING, AND (III) PROVIDE
ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDERS AND (B)
AUTHORIZING DEBTORS TO ENTER INTO, AND APPROVING, <u>AN
ACCOMMODATION AGREEMENT WITH CERTAIN CUSTOMERS</u>**

**INTRODUCTION**

Pending before the Court is the Debtors' motion seeking authorization to use their Prepetition Secured Lenders' cash collateral, obtain DIP financing, and provide adequate protection to the Prepetition Secured Lenders, as well as approval of the Accommodation Agreement with certain of their customers (together the "DIP Facility"). (ECF Doc. #29.) The terms and conditions of the DIP Facility are described in greater detail in the Findings of Fact and Conclusions of Law approving the DIP Facility, as well as its exhibits, that are being entered contemporaneously with this Memorandum. The Court refers to various provisions of the DIP Facility in this Memorandum solely for purposes of explaining the rationale for its rulings on various objections.

Like so many other recently-filed cases, this one was filed as a short-term stop gap on the way to several proposed quick § 363 sales of Metaldyne, in two or more pieces. The DIP Facility and cash collateral use will expire in 60 days, effectively leaving no choice but a § 363

1

sale unless the case is converted to a chapter 7. The first of two expected bidding procedure motions is scheduled for tomorrow. The final DIP and cash collateral motion hearing was held yesterday. The Creditors Committee, joined by the PBGC, opposes the DIP Facility motion, arguing it is "unfair."

## BACKGROUND

At the first-day hearing, the Prepetition Term Lenders objected to entry of the DIP Facility on the grounds that their liens in certain of the Debtors' collateral were being primed without their consent and without their having been provided adequate protection. (ECF Doc. #53.) The critical issue was that with respect to the ABL Priority Collateral—that is, the portion of the Debtors' collateral over which the ABL Lenders had a first priority lien and the Prepetition Term Lenders had a second priority lien—the Prepetition Term Lenders were primed by virtue of a DIP Facility Lien that would be placed ahead of all Prepetition Secured Lenders.[1] The Prepetition Term Lenders refused to grant their consent without further adequate protection. At the hearing, the Debtors and the Prepetition Term Lenders, with the consent of the DIP Lenders and the Prepetition ABL Lenders, reached an agreement resolving their disputes.[2] The Court therefore approved entry of the DIP Facility on an interim basis, pending final approval. (ECF Doc. #78.)

A hearing was scheduled for June 22, 2009, to consider entry of a final order approving the DIP Facility. Several of the Debtors' creditors, including the Official Committee of

---

[1] The Prepetition ABL Lenders consented to the priming.

[2] The resolution provided that the Prepetition Term Lenders would receive as adequate protection: (i) the first priority lien on the Debtors' unencumbered 35% equity interest in non-debtor foreign subsidiaries' stock; (ii) a first priority lien on previously unencumbered mortgages on certain properties; and (iii) $500,000 in professional fees.

2

Unsecured Creditors,[3] objected to numerous aspects of the proposed DIP Facility.  (ECF Docs. #206, 207, 209 & 245.)[4]  In particular, the Committee argued that numerous provisions in the DIP Facility unfairly prejudiced the prospects of an unsecured creditor recovery, particularly where, as here, the Debtors have unencumbered assets that would otherwise be available to unsecured creditors.  The Committee also argued that these cases were being run for the benefit of the Prepetition Secured Lenders and various insiders, and that the DIP budget was insufficient to pay all claims.  At the hearing on June 22, 2009, the Court considered the evidence presented[5] and the oral argument of all counsel.  The Court hereby GRANTS the Debtors' motion to the extent provided herein, and authorizes the Debtors to enter into the DIP Facility on a final basis.  Contemporaneously herewith, the Court will issue its findings of fact and conclusions of law in support of its approval of the DIP Facility.  This memorandum is being issued to address the Committee's five objections, namely:

- *Liens on Unencumbered Foreign Assets*:  Prepetition, the Debtors' principal unencumbered asset was a 35% equity interest in the stock of some of their non-debtor foreign subsidiaries (the "Unencumbered Foreign Stock").[6]  The DIP

---

[3]     The Committee was appointed on June 4, 2009, after the first-day hearing.  (ECF Doc. #129, amended at ECF Doc. #248.)

[4]     The Debtors resolved the objections of four of those parties—Dyne (DE) LP, Key Equipment Finance, Perot Systems Corporation, and an informal objection by Ace Insurance of America—before the hearing.  Those resolutions were placed on the record at the June 22, 2009 hearing.  The Pension Benefit Guaranty Corporation also filed an untimely joinder to the Committee's objections.  (ECF Doc. #258.)  The Court will not consider untimely objections in the disposition of this dispute.  In any event, because the PBGC incorporated the Committee's objections into its own, the Court resolves the PBGC's objections on the same grounds.

[5]     Specifically, the Court reviewed exhibits AP 1-18 (submitted into evidence by the Committee), the deposition designations of Jeffrey Johnston and Terry Iwasaki (respectively, the "Johnston Deposition" and the "Iwasaki Deposition"), the live testimony of Jeffrey Johnston, and the affidavits of Terry Iwasaki and Eric Mendelsohn (respectively, the "Iwasaki Affidavit" and the "Mendelsohn Affidavit").

[6]     The remaining 65% equity interest is already pledged as collateral for the Prepetition Term Lenders.  (Debtors Motion ¶ 5 n.8.)

3

Facility proposes to give the Prepetition Term Lenders adequate protection replacement liens on the Unencumbered Foreign Stock.

- *Liens on Potentially Preferential Mortgages*: Shortly before the petition date, and allegedly within the preference period, the Debtors recorded mortgages on five previously unencumbered properties in exchange for consideration received during the Tender Offer period.[7] The Committee argues that those mortgages are preferences that should be preserved for the benefit of unsecured creditors (the "Preferential Mortgages").[8] The Debtors, however, in negotiating the resolution with the Prepetition Term Lenders, pledged those assets as part of the Prepetition Term Lenders' adequate protection.

- *Inadequate Funding for § 503(b)(9) Claims and Trade Payables*: The Committee contends that the DIP budget does not provide for sufficient funding of trade payables and § 503(b)(9) claims beyond the 60-day DIP period.

- *Section 506(c) Waiver*: The Committee objects to the grant to the Prepetition ABL Lenders surcharge waivers under § 506(c).

- *Section 552(b) Equities of the Case*: The Committee objects to a proposed finding of fact that the § 552(b) equities of the case exception will not apply.

The Court will consider each of these objections in turn.[9]

---

[7] On October 29, 2008, the Debtors launched a cash tender offer to cash out a significant amount of their 2012 and 2013 notes. (Debtors' Motion ¶ 13.)

[8] The Court is not finding that these mortgages are preferential or are otherwise avoidable. The Court simply refers to these mortgages as the "Preferential Mortgages" for convenience's sake, because that is the term the parties used.

[9] The Committee did raise other objections at the hearing, but either (i) the Court resolved those objections at the hearing, (ii) the objections were consensually resolved, or (iii) the contemporaneously-filed findings of fact and conclusions of law resolves them.

**DISCUSSION**

A.  **The Adequate Protection Replacement Liens on Unencumbered Foreign Stock and Preferential Mortgages**

With respect to the first two objections, the Court has considered them and overrules them.  Under § 364(d)(1), the court may only authorize the debtor to obtain credit that primes a prepetition security interest if (a) the debtor is unable to obtain such credit on an unsecured basis on more favorable terms (which the Court concludes has been established (*see* Mendelsohn Affidavit ¶ 14.)),[10] and (b) the primed lienholder is adequately protected.  11 U.S.C. § 364(d)(1).  Under § 361(2), adequate protection may take the form of "additional or replacement lien[s] to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property."  11 U.S.C. § 361(2).  Under § 363(c)(2), the debtor may not use cash collateral unless the secured creditor consents, or the court authorizes such use.  11 U.S.C. § 363(c)(2).  The Court therefore must first assess whether the Prepetition Term Lenders have consented to the priming of their ABL Priority Collateral liens, such that they do not require adequate protection replacement liens on the Unencumbered Foreign Stock or the Preferential Mortgages.  If the Court finds that the Prepetition Term Lenders have not consented to the use of cash collateral, the Court must then review the evidence submitted and decide whether the Prepetition Term Lenders would be adequately protected if they do not receive the adequate protection replacement liens on the Unencumbered Foreign Stock or the Preferential Mortgages.

The Committee argues that under the Intercreditor Agreement the Prepetition Term Lenders are deemed to have consented, and cannot request or accept additional adequate protection, because the Prepetition ABL Lenders have consented to the use of cash collateral.

---

[10]  The Court similarly concludes that the Debtors urgently need post-petition financing to preserve the assets of the estates.  (*See* Iwasaki Affidavit ¶¶ 26-35.)

5

The Intercreditor Agreement governs the relative priority of the Prepetition Term Lenders and the Prepetition ABL Lenders with respect to the collateral over which they each have liens (the ABL Priority Collateral, the Prepetition Term Priority Collateral, and the Common Collateral, as those terms are used in the agreement; collectively the "encumbered collateral"). (Ex. AP-7, § 5.2(a).) It provides that in the event the Prepetition ABL Lenders consent to the use of encumbered collateral under § 363, or consent to a third party providing DIP financing secured by encumbered collateral, the Prepetition Term Lenders "will be deemed to have consented to . . . the use of such collateral or such DIP Financing *on the grounds of a failure to provide adequate protection for the Term Liens securing the Term Obligations* or any other grounds" and "will not request or accept adequate protection or any other relief in connection *with the use of such collateral or such DIP Financing* except as set forth in paragraph 5.4 below." (*Id.* § 5.2(a) (emphasis added).) The Intercreditor Agreement thus limits the Prepetition Term Lenders' rights in two ways: (1) it limits the grounds on which they may object to the use of their collateral, if the Prepetition ABL Lenders consent under certain conditions, and (2) it limits their rights to additional adequate protection in the encumbered collateral. It does *not*, however, govern the Prepetition Term Lenders' rights to adequate protection replacement liens on *unencumbered* collateral, such as the Preferential Mortgages or the Unencumbered Foreign Stock.

Before the interim hearing, the Prepetition Term Lenders objected to the priming lien on the grounds that they had not consented to the priming and the Debtors had not provided adequate protection. They argued that the DIP Facility's payment structure—which provided that the Prepetition ABL Lenders would be paid before the DIP Lenders on the ABL Priority Collateral—meant that the Prepetition ABL Lenders were not "shar[ing] the pain of the Debtors' restructuring," and so the Prepetition Term Lenders could not be deemed to have consented to

6

the priming under the Intercreditor Agreement. (ECF Doc. #53 ¶ 13.) The Debtors argued that because the DIP Lenders' priming lien on the ABL Priority Collateral was *pari passu* with the Prepetition ABL Lenders' liens—the payment priority notwithstanding—the Debtors satisfied the conditions under the Intercreditor Agreement for the Prepetition Term Lenders to be deemed to have consented to the priming.

At the interim hearing, the parties "agreed to disagree" on whether the Prepetition Term Lenders are deemed to have consented to the priming and negotiated a settlement: the Debtors provided the Prepetition Term Lenders with modest additional adequate protection measures in exchange for the Prepetition Term Lenders withdrawing the objection and consenting to the priming. (Ex. AP-18, at 59-62.) At the final hearing, the Prepetition Term Lenders reiterated that their consent is conditioned on this agreement; if the adequate protection replacement liens are not granted, they will renew the objection to entry of the DIP. Because the parties reached an agreement resolving the dispute that conditions the Prepetition Term Lenders' objection to the use of their collateral, the Court concludes that the Prepetition Term Lenders have not consented to the use of their collateral. Further, as noted above, nothing in the Intercreditor Agreement prohibits the Prepetition Term Lenders from accepting the adequate protection replacement liens on unencumbered collateral.

The Court further finds that the Prepetition Term Lenders are not adequately protected unless they receive the adequate protection replacement liens in question. It was uncontested at the hearing that the Prepetition Term Lenders are under-water.[11] In addition, the parties agreed that the Prepetition ABL Lenders are oversecured in the ABL Priority Collateral. Therefore, prepetition there was substantial value in the Prepetition Term Lenders' second priority lien in

---

[11] The evidence showed that the outstanding amount due on the Prepetition Term facility was $408 million. (Iwasaki Deposition, at 73:1-9.)

7

the Debtors' cash collateral. Under the DIP Facility, however, the Prepetition Term Lenders' liens on the ABL Priority Collateral are being primed by the DIP Lenders' liens, which have a value of almost $20 million. This effectively wipes out the Prepetition Term Lenders' second priority lien in the cash collateral. In order to approve the continued use of cash collateral, the Prepetition Term Lenders must be adequately protected at least to this amount (not including additional adequate protection for any diminution in the value of their collateral).

The Debtors have only limited unencumbered assets upon which replacement liens can be provided: avoidance actions and the Unencumbered Foreign Stock. The Debtors propose to provide liens on the Unencumbered Foreign Stock and some of the avoidance actions, as well as $500,000 in professional fees, as adequate protection for the Prepetition Term Lenders being primed by the DIP Facility. In the aggregate, these proposed adequate protection liens and payments are less than the amount in the diminution in value the Prepetition Term Lenders will suffer by being primed. Indeed, the evidence presented at the hearing showed that the value of the Unencumbered Foreign Assets, on the high side in an orderly chapter 11 sale, as opposed to a rushed chapter 7 liquidation, was about $7.4 million.[12] (Ex. AP-1, at 315, 332.) Of course, if it turns out that the Prepetition Term Lenders suffer no actual diminution in value, the Prepetition Term Lenders will never call on the additional collateral and the value will be available to the unsecured creditors.

Thus, it appears that the Committee's real gripe is not with the adequate protection super-priority liens being given to the prepetition lenders (since they are clearly entitled to such protection), but rather that the DIP Facility is being approved at all. The Committee, in effect,

---

[12] No evidence was presented regarding the value of the Preferential Mortgages. Johnston testified at his deposition that two of the properties had an appraised market value of $2.4 million. (Johnston Deposition, at 72:14-20.)

8

argues that the unsecured creditors will be better off if further financing is denied, the case is converted to chapter 7 (the only alternative unless the prepetition lenders blink), the secured creditors be allowed to foreclose on their collateral, and the unsecured creditors (including the substantial deficiency claim of the Prepetition Term Lenders) are able to recover what they can from the presently unencumbered assets.

It is not clear that the Committee really believes its own rhetoric; more likely, it is saber-rattling in an effort to use what little leverage it has in an effort to force a better deal. That 4,000 or so Metaldyne employees would lose their jobs, and the automobile manufacturers would lose a critical vendor (the OEMs are supplying the DIP), appears to be of little moment to the Committee, or at least to its counsel. (*See* Johnston Deposition, at 25:1-26:22.) The unsecured creditor body is substantially composed of Metaldyne's trade creditors—mostly its suppliers and customers—who also likely stand to lose if Metaldyne is liquidated. But, I suppose, the Committee should not be overly faulted for playing the cards in its admittedly weak hand.

Since credit is not available to Metaldyne on better terms, and the prepetition lenders are, as a matter of law, entitled to adequate protection, the real issue is whether the Debtors in the exercise of their business judgment have demonstrated that the value of the estate will best be protected for all creditors (not just the secured creditors) by having the Court give final approval to the DIP Facility. The Court concludes based on the evidence presented at the hearing that the Debtors have carried their burden. As noted above, the Court's findings of fact and conclusions of law are set forth in a separate order entered today.

### B.    Inadequate Funding for § 503(b)(9) Claims

The Committee also objects to entry of the DIP Facility, because the DIP budget does not adequately fund § 503(b)(9) and trade-payable claims beyond the 60-day period. In essence, the

9

Committee argues that the DIP Facility bleeds the estates dry in 60 days; the Committee therefore requests that the Debtors either revise the budget, or post some form of security—either a letter of credit or a carve-out—to ensure the payment of these claims. The evidence shows that the Debtors face an approximately $5-$7 million § 503(b)(9) liability.[13] (Johnston Deposition, at 96:8-97:18.)

A review of the evidence submitted shows that at this juncture, the proposed budget is adequate. The Debtors do not intend to pay all of the § 503(b)(9) claims through the DIP Facility; they expect there to be negotiations and settlements as part of the continuing efforts of the Debtors to sell off their units as part of these cases; they also expect other funds to become available, either through avoidance actions or other avenues. (Iwasaki Deposition, at 70:9-71:1; Johnston Deposition, at 97:19-98:15.) The Debtors also may pay some § 503(b)(9) claims as part its essential supplier budget. (Iwasaki Deposition, at 68:15-69:2.) With respect to the DIP budget itself, the evidence shows that the Debtors intend to manage their budget in such a way as to make available capital beyond July. (Johnston Deposition, at 58:1-10; 101:17-02:17.) The evidence further shows that the budget assumes no trade credit, so every dollar that the Debtors do obtain on credit is added back into the budget. (Johnston Deposition, at 92:8-93:12.) On balance, the Court concludes that the Debtors exercised reasonable business judgment in establishing the DIP budget. The objection to entry of the DIP Facility on the grounds that trade payables would not be paid is OVERRULED.

---

[13]    Ms. Iwasaki testified that she believed the § 503(b)(9) claims totaled about $8 to $11 million. (Iwasaki Deposition, at 66:21-67:4.) But as Mr. Johnston testified, that amount includes about $2-$4 million that would be paid by Chrysler as part of the New Castle production agreement. (Johnston Deposition, at 96:8-97:7.)

### C.  Section 506(c) Waiver

The Committee also objects to the § 506(c) waiver.  Under § 506(c), the debtor is permitted to surcharge a secured creditor for the cost of preserving and disposing the secured creditor's collateral.  11 U.S.C. § 506(c).  The Committee objects to the waiver in the DIP Facility, arguing that it is another example of the Debtors giving away a potential recovery for unsecured creditors.  Under the DIP Facility, the Debtors have waived the § 506(c) surcharge only with respect to the ABL Priority Collateral.  While the Court is ordinarily skeptical of the need for a § 506(c) waiver for precisely the reasons advanced by the Committee, the Court is satisfied in this instance that it is appropriate.  The ABL Priority Collateral, for which the Prepetition ABL Lenders have a first priority lien, covers the Debtors' "soft assets":  their accounts receivable, chattel paper, and the like.[14]  The Prepetition ABL Lenders are therefore funding these cases, and should not be surcharged for the privilege of doing so.  The cost of preserving and disposing of these assets is also minimal.  The Court therefore OVERRULES the Committee's objection to the § 506(c) waiver.

### D.  Section 552(b) Waiver

Finally, with respect to the § 552(b) waiver of the equities of the case exception, the objection is SUSTAINED.  Section 552(b) provides that if the debtor enters into a security agreement prepetition that covers proceeds, products, offspring or profits of the collateral, the terms of the security agreement and applicable nonbankruptcy law will be enforced against proceeds, products, offspring or profits acquired after the petition date, unless, based on the equities of the case, the court orders otherwise.  11 U.S.C. § 552(b); *see also* 5 COLLIER'S ON BANKRUPTCY ¶ 552.02[1] (15th rev. ed. 2005).  The Debtors request that the Court make a

---

[14]  The Prepetition Term Lenders have a first priority lien on the Debtors' "hard assets":  their property, plants, and equipment.  Under the DIP Facility, there is no § 506(c) waiver as to the Prepetition Term Priority Collateral.

11

finding of fact that the exception is waived here.  But the waiver of an equitable rule is not a finding of fact (an agreement or stipulation among the Debtors and their various lenders, perhaps), and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party interest argues that the equities of the case exception should apply to curtail a particular lenders' rights, the Court will consider it.


Dated: New York, New York
       June 23, 2009                    /s/ Martin Glenn_____
                                        **UNITED STATES BANKRUPTCY JUDGE**