UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
:
In re : Chapter 11
:
Metaldyne Corporation, *et al.,* : Case No. 09-13412 (MG)
:
Debtors. : (Jointly Administered)
:
----------------------------------------------------------------x

# DECLARATION OF MICHAEL MACAKANJA IN SUPPORT OF DEBTORS' SECOND EMERGENCY MOTION TO AMEND ORDER APPROVING BIDDING PROCEDURES FOR THE SALE OF CERTAIN ASSETS RELATED TO THE DEBTORS' POWERTRAIN GROUP, (B) APPROVING CERTAIN BIDDER PROTECTIONS AND (C) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF

I, Michael Macakanja, make this Declaration under 28 U.S.C § 1746 and state the following under penalty of perjury:

1. I am a Director at the firm Lazard Frères & Co. LLC ("<u>Lazard</u>"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10020. Unless otherwise stated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my investment banking experience; (c) information provided by the Debtors concerning the operation and finances of the Debtors; and (d) information provided to me by Lazard colleagues and employees working with my collaboration.

2. I make this Declaration in support of the Debtors' request for an order amending the bidding procedures for the sale of certain assets of the Debtors' Powertrain businesses (the "<u>Powertrain Assets</u>") pursuant to the Second Emergency Motion of Debtors and Debtors in Possession to Amend Order (A) Approving Bidding Procedures for the Sale of Certain Assets Related to the Debtors' Powertrain Group, (B) Approving Certain Bidder

Protections and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof (Docket No. 504) (the "Second Emergency Motion"), which was filed with the Court on July 24, 2009. Capitalized terms not otherwise defined herein have the meanings given to them in the Second Emergency Motion or the Bidding Procedures Order (as such term is defined below).

### Michael Macakanja's Qualifications

3. Lazard is a global, full service investment bank founded in 1848. Lazard is focused on providing financial and investment banking advice and transaction execution on behalf of its clients. Lazard's broad range of corporate advisory services includes services pertaining to: general financial advice; domestic and cross-border mergers and acquisitions; divestitures; privatization; special committee assignments; takeover defenses; corporate restructuring; and strategic partnerships/joint ventures.

4. Lazard has extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 cases. Lazard's employees have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing over $1 trillion in debtors' assets. Lazard has been retained as a financial advisor and investment banker in numerous large and complex chapter 11 cases.

5. I have been in my current position at Lazard since April 2002 with a focus on sales and acquisitions of automotive suppliers with occasional related work with original equipment manufacturers in the automotive industry. Within the automotive sector, I have been involved in a broad range of financial advisory assignments, including buy- and sell-side M&A transactions and offerings of public and private equity. Selected clients with whom I have worked include Aftermarket Technology Corp., Cooper Tire & Rubber, Dura, Goodyear, Hayes

Lemmerz, Johnson Controls, Lear, Methode, Tenneco, Venture, Visteon and numerous private equity firms.

6. Prior to Lazard, I worked in the sales and acquisitions arena while employed first by Robert W. Baird & Co. and subsequently by William Blair & Company.

7. I have an M.B.A. degree with concentrations in Finance and Accounting from the University of Chicago and a B.S. in Industrial Engineering from Purdue University. I hold Series 7 and 66 securities licenses.

8. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration.

## The Prepetition Marketing of the Powertrain Assets

9. Prior the commencement of the Debtors' chapter 11 cases, Lazard assisted the Debtors in marketing the Powertrain Assets. Because of the ongoing turmoil in the automotive industry created by the first threatened and then actual bankruptcies of Chrysler and General Motors, however, the number of investors actively looking to invest in the automotive sector has been limited.

10. With the impending bankruptcies of Chrysler and General Motors and substantial production cuts, it was imperative for Metaldyne to quickly secure appropriate financing and to do so in the most expeditious and cost effective manner. Despite Lazard's efforts, due to the turmoil in the credit markets generally and the automotive industry specifically, banks and other investors were either unwilling or unable to provide Metaldyne with

DIP Financing. As a result, the only viable alternative to emerge was for Metaldyne to seek DIP Financing via an arrangement with its largest customers, including Ford, General Motors and Chrysler (which were ultimately joined by Honda and Nissan).

11. As a condition to the DIP Financing, Metaldyne was required to expeditiously pursue a sale of its major assets, including the Powertrain Assets. The conditions for obtaining the DIP Financing drove the timelines for the sale process for the Powertrain Assets.

12. Initially, Lazard focused its efforts on a small pool of the most likely potential investors. This decision was a function of timing and the economic landscape. With little available financing, a chaotic automotive industry and a management team at Metaldyne focused on both operational and restructuring issues, the time, expense and complexity of soliciting a large group of potential investors, many of whom were likely to have little or no interest in the Metaldyne assets, seemed unlikely to provide any additional value to Metaldyne.

13. Both RHJ International, S.A. ("RHJI") and KPS Capital Partners, LP ("KPS") were among the initial group of investors approached by Lazard. Because RHJI was also an insider of the Debtors, Metaldyne established a special committee of two fully independent directors (the "Special Committee") to engage in negotiations and evaluate potential transactions. Lazard has continued to interact with the Special Committee and its legal counsel and financial advisors in evaluating and negotiating offers for Powertrain Assets.

14. Prepetition, Lazard helped to negotiate a letter of intent between RHJI and the Debtors for the sale of the Powertrain Assets (the "LOI"). RHJI was the first of the parties contacted about purchasing the Powertrain Assets that was ready and willing to provide an LOI. The execution of the LOI with RHJI on May 27, 2009 was a critical step in the Debtors securing

-4-
CLI-1732315v4

the DIP Financing, and in fact fulfilled a milestone in the DIP Financing facility that otherwise might have caused the Debtors to be in breach of the DIP Financing facility early in their chapter 11 cases.

15. Prior to Petition Date, KPS and one of KPS's portfolio companies in the automotive industry, Hephaestus Holdings, Inc. ("HHI" and, together with KPS, the "HHI Group") expressed interest in acquiring Metaldyne's assets. On March 12, 2009, they entered into a confidentiality agreement with the Debtors. Upon signing the confidentiality agreement, the HHI Group worked towards potentially providing the Debtors with a debtor-in-possession financing loan ("DIP Loan").

16. On March 18, 2009, representatives of the HHI Group (George Thanopoulos, Mike Johnson, Kevin Madden and Ryan Baker) attended a management presentation regarding a DIP Loan opportunity at Metaldyne's Plymouth, Michigan headquarters. Tom Amato, Dave Gann and other members of the Debtors' senior management, as well as representatives from Lazard, attended the meeting with the HHI Group.

17. On March 31, Tom Amato of the Debtors visited the KPS offices to meet with Michael Psaros, David Shapiro and Kevin Madden. Among other things, KPS told Mr. Amato that it would not engage in a transaction with Metaldyne until there was perfect clarity regarding the GM and Chrysler bankruptcy cases and that KPS was not interested in a non-priming DIP Loan. After the March 31, 2009 meeting, Lazard continued to provide KPS with updates on the Metaldyne situation.

**Postpetition Marketing of the Powertrain Assets**

18. As soon as the LOI with RHJI was in place and the Debtors filed their chapter 11 cases, Lazard was able to and began to reach out to a much broader group of potential

investors since the Debtors' financial state was no longer confidential information.  With the DIP Financing and an LOI in place, the Debtors had more flexibility to explore potential options and to solicit more potential bidders.  To date, Lazard has reached out to approximately 62 potential buyers for all or a subset of the Debtors' assets.  Approximately 36 of those potential buyers have been provided with confidentiality agreements, 22 have returned confidentiality agreements to date, and seven have either attended management presentations or spoken directly with management about Metaldyne's various assets.  Of the seven who have had discussions with management, four, including the Debtors' prepetition term lenders, are specifically interested in the bulk of the Powertrain Assets.

19. A sale of a substantial portion of the Debtors' assets in a roughly 60-day time frame was a condition of the DIP Financing (subject to the Debtors' ability to extend the DIP Financing for a total of 30 days from the original expiration period).  Therefore, the Debtors, through the Special Committee, engaged in extensive negotiations with RHJI in an effort to sign a purchase agreement for the Powertrain Assets to serve as a "stalking horse" bid to set a floor value for the Powertrain Assets, provide a framework for the comparison of bids and to potentially encourage other potential bidders to step forward with definitive offers to purchase the Powertrain Assets.  Based on my experience, I believe that having a stalking horse bidder for a debtor's assets often provides such benefits and would also be likely to do so with respect to the Powertrain Assets.

20. The culmination of the extensive negotiations with RHJI was the execution of a purchase agreement for the Powertrain Assets between the Debtors and RHJI on June 15, 2009.  Shortly thereafter, the Debtors filed a motion with the Bankruptcy Court seeking, among other things, the approval of the procedures for the marketing and sale of the Powertrain

Assets (the "Bidding Procedures") as well as the approval of a breakup fee and an expense reimbursement for RHJI (collectively, the "Bidder Protections"); provided, however, that the Bidder Protections did not become effective unless RHJI provided the Debtors notice by July 2, 2009 that it had either satisfied or waived all outstanding due diligence issues related to the Powertrain Assets (the "Satisfaction Notice").

21. The time for RHJI to provide the Satisfaction Notice was a necessary element of the RHJI Agreement for two primary reasons. First, the timeline for the sale of the Debtors' assets imposed by the DIP Financing required that the Debtors seek approval of and commence a sale process under section 363 of the Bankruptcy Code as expeditiously as possible, even though certain issues related to structuring a sale of the Powertrain Assets (and the Debtors' other assets) remained unresolved. Second, the integrated and global nature of the Debtors' operations made structuring any transaction and conducting due diligence particularly complex. This was especially true because the Debtors had not planned to disaggregate the globally integrated Powertrain Assets into a separate business unit.

22. The extended time for RHJI to provide the Satisfaction Notice under the RHJI Agreement was the compromised solution developed after extensive arms-length negotiations between RHJI and the Debtors, through the Special Committee, to balance these competing interests. It allowed the Debtors to commence the sale process to meet the deadlines imposed by their DIP Financing with the possibility of having a stalking horse bid for the Powertrain Assets, while also giving RHJI and the Debtors additional time to work through the complex due diligence issues of the transaction before the RHJI Agreement became fully binding on the parties.

23. In addition, at the time of the filing the Powertrain Sale Motion, RHJI remained the only potential purchaser of the Powertrain Assets to have conducted significant due diligence and to have put forward a definitive offer to purchase the Powertrain Assets. While the RHJI Agreement provided some comfort that the Debtors would be able to lock in a stalking horse bid prior to the auction for the Powertrain Assets, the agreement also left the Debtors and Lazard free to market the Powertrain Assets and to continue to move other potential purchasers through the due diligence process. For these reasons, as well as because the RHJI Agreement had a value greater than the projected liquidation value of the Powertrain Assets, Lazard believed that the RHJI Agreement was the highest and best offer available at that time.

24. Over the course of the next several weeks, Lazard continued to market the Powertrain Assets and to move interested parties through the due diligence process.

25. In particular, immediately after the Petition Date, KPS contacted Lazard to inquire about acquiring the Metaldyne Powertrain assets. On June 12, 2009, Michael Psaros of KPS sent an email to Barry Ridings of Lazard requesting access to information, stating that KPS could move quickly on a transaction for the Powertrain assets. Lazard required KPS to adhere to established sale procedures as it had for all potential bidders. On June 19, 2009, KPS and HHI received access to the datasite.

26. From and after June 19, 2009, the Debtors, Lazard and the Debtors' professionals worked and communicated directly with HHI and their professionals to provide information and answers to the numerous due diligence requests raised by HHI. Lazard, Jones Day and senior management of the Debtors had meetings, calls, conferences and email correspondence with representatives of the HHI due diligence team who worked in the sales, engineering, operations, purchasing, HR and finance departments. Lazard, Jones Day and senior

management of the Debtors also had meetings, calls, conferences and email correspondence with professionals retained by HHI. For business and management issues, representatives from Lazard and Jones Day spoke with George Thanopoulos and Michael Johnson at HHI and had management meetings with Ryan Baker, Kyle Mumford, Kevin Madden and others at KPS. The professionals retained by HHI that conducted diligence and interfaced with the Debtors' professionals included the law firms of Proskauer Rose LLP (restructuring and bankruptcy issues), Jenner & Block LLP (corporate, tax and related issues), and Spilman Thomas & Battle PLLC (labor issues). Other professionals retained by HHI that conducted diligence with the Debtors and Lazard included Environ (environmental issues), Pricewaterhouse Coopers (accounting and tax issues), Mercer (employee and benefits issues), and Aon (insurance issues).

27. As the Satisfaction Notice deadline approached, RHJI notified the Debtors that it would be unable to satisfy its due diligence requirements by July 2, 2009. Among other issues, the Debtors and RHJI had been unable to resolve complex issues related to separating certain of the Powertrain Assets from the Debtors' foreign affiliates. At that time, despite other potential purchasers conducting due diligence, Lazard was given no indication that any of the other potential purchasers were ready or willing to submit a definitive offer to purchase the Powertrain Assets. Faced with losing what was still the only tangible offer to purchase the Powertrain Assets or allowing an extension for the Satisfaction Notice to retain the option of having a stalking horse bid for the Powertrain Assets, the Special Committee determined to negotiate an extension of the deadline for the Satisfaction Notice.

28. After several days of intensive negotiations, the Debtors and RHJI executed an amendment to the RHJI Agreement (the "First Amendment") to, among other things, extend the deadline for the Satisfaction Notice to July 16, 2009. At the same time, Lazard

-9-
CLI-1732315v4

continued to market the Powertrain Assets and to assist other potential bidders in conducting due diligence in accordance with the Bidding Procedures approved by the Bankruptcy Court.

29. As the July 16 deadline approached for the Satisfaction Notice, RHJI again notified the Debtors that it would need additional time to complete its due diligence. While many issues had been resolved, RHJI and the Debtors had yet to work out the complex legal and tax issues involved in separating the relevant Powertrain Assets from certain chassis assets in one of the Debtors' Spanish subsidiaries. RHJI made clear that it was willing to let the RHJI Agreement expire by its terms if the deadline for the Satisfaction of Notice was not extended and to proceed to submit a bid at the upcoming auction without the benefit of the Bidder Protections. Faced with entering the auction with no floor value in place, and still without any definitive purchase offers from other potential purchasers of the Powertrain Assets, the Special Committee negotiated with RHJI to execute an amendment to extend the deadline for the Satisfaction Notice until July 23, 2009, among certain other changes (the "Second Amendment"). At approximately the same time, the Debtors received a request from their term lenders to extend the sale process for the Powertrain Assets to allow bidders additional time to submit bids for the Powertrain Assets.

30. With a hearing to approve the First Amendment scheduled in the Bankruptcy Court on Monday, July 20, 2009 (the "July 20 Hearing"), the Debtors filed emergency motions to alert the Bankruptcy Court of the recent developments, and, after consultation with the Debtors' prepetition term lenders, their DIP lenders and other interested parties, filed a motion to extend certain of the deadlines set forth in the Bidding Procedures already approved by the Bankruptcy Court in order to provide all interested parties with additional time to perform due diligence and submit offers to purchase the Powertrain Assets.

-10-

31.     Even as the negotiations with RHJI progressed, Lazard continued to provide full access to requested due diligence materials to all parties potentially interested in purchasing the Powertrain Assets and prepared to proceed with an Auction for the Powertrain Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court.

32.     On Friday, July 17, 2009, the HHI Group announced its intention to submit a competing bid for the Powertrain Assets to serve as a stalking horse bid in lieu of the RHJI Agreement, the status of which was unclear pending a ruling by the Bankruptcy Court on the propriety of the First and Second Amendments.  A proposed purchase agreement was thereafter received from the HHI Group on the evening of Saturday, July 18, 2009, at which point it was reviewed by Lazard, as well as the other legal and financial advisors to the Debtors, and presented to the Special Committee for review.  After review, Lazard believed the bid submitted by the HHI Group to be similar but inferior to the RHJI Agreement.  Despite negotiations throughout the weekend, an offer from HHI that was superior to the RHJI Agreement was not received from the HHI Group prior to the Debtors and their advisors arriving at the Bankruptcy Court on Monday, July 20, 2009 for the hearing scheduled on, among other matters, motions filed by the Debtors to construe the Bidding Procedures Order to reflect the First and Second Amendments to the RHJI Agreement (the "<u>Motions to Construe</u>").

33.     At the July 20 Hearing, the HHI Group announced its intention to the Bankruptcy Court to submit a superior bid to the RHJI Agreement and to seek approval to serve as the stalking horse for the Powertrain Assets entitled to the Bidder Protections. In addition, the HHI Group objected to the Motions to Construe.  The July 20 Hearing was adjourned without a ruling on the Motions to Construe, and Lazard left the July 20 Hearing with the understanding that the Debtors and Lazard should engage with both RHJI and the HHI Group to determine who

was willing to submit the highest and best offer for the Powertrain Assets (preferably without due diligence conditions) to act as the stalking horse bid and to return to the Bankruptcy Court at a hearing scheduled for Thursday, July 23, 2009 (the "July 23 Hearing") to inform the Bankruptcy Court of the progress in those negotiations.

34. Over the course of the next several days, RHJI and the HHI Group each submitted revised offers for the Powertrain Assets. The discussions with respect to the enhanced bids were open and transparent. Each subsequent bid was communicated to both bidders and the Debtors' primary creditor constituencies were kept informed of the state of play. In addition, Lazard notified those other potential purchasers of the Powertrain Assets that had expressed serious interest and conducted significant due diligence of what had occurred at the July 20 Hearing, the status of the RHJI Agreement and the bid from the HHI Group, and informed such other potential bidders that they were also welcome to submit competing bids for the Powertrain Assets at any time for consideration, as was still provided for under the Bidding Procedures approved by the Bankruptcy Court.

35. Still, while other potential bidders reiterated their intent to bid for the Powertrain Assets at the auction, RHJI and the HHI Group remained the only parties that submitted competing bids for consideration to serve as a stalking horse bid entitled to Bidder Protections. While most of the bids exchanged among the parties remained fairly consistent in their terms, just prior to the July 23 Hearing, the HHI Group submitted a bid with a higher and all-cash purchase price for the Powertrain Assets (the "HHI Bid"). Lazard provided a financial analysis of the last proposed RHJI bid and the HHI Bid to the Special Committee, which analysis showed the HHI Bid to be the higher and better offer for the Powertrain Assets. This determination was communicated to RHJI immediately after the Special Committee's

determination that the HHI Bid was the higher and better offer. While RHJI did not submit an additional bid, it did provide the Debtors with the Satisfaction Notice. It was at this point that the parties returned to the Bankruptcy Court for the July 23 Hearing.

36. At the July 23 Hearing, both the last bid submitted by RHJI and the HHI Bid were presented to the Bankruptcy Court. In addition, the financial analysis prepared by Lazard was presented to the Bankruptcy Court. A copy of this analysis is attached hereto as Exhibit 1 to this Declaration. Since the July 23 Hearing, Lazard has updated the analysis and the updated analysis is attached hereto as Exhibit 2 to this Declaration. As can be seen from Exhibit 2, the HHI Bid is currently the highest and best offer for the Powertrain Assets.

37. More specifically, there are three basic differences between the RHJI Bid and the HHI Bid:

- First, RHJI has proposed to pay all cure costs associated with the assumption and assignment of executory contracts and unexpired leases that are in excess of $4.0 million (with the first $4.0 million paid by the Debtors), whereas HHI has proposed to pay all cure costs in excess of $6.0 million (with the first $6.0 million paid by the Debtors). While it is possible that RHJI or HHI could choose to assume and have assigned to them contracts and leases less than these thresholds, I believe it likely that cure costs will exceed $6.0 million, and thus believe that this component of the RHJI Bid is superior to the HHI Bid by approximately $2.0 million.

- Second, RHJI has proposed to pay $32 million in cash and a $50 million note, whereas HHI has proposed to pay $78 million in cash. Thus, the operative analysis is whether HHI's $46 million in excess cash is more valuable than RHJI's proposed $50 million note (provided that the deductions to the purchase price would be equivalent). Lazard's preliminary analysis of the note for comparative purposes is that it is worth $42.5 million (other creditor constituencies have advised Lazard that they believe that this valuation overvalues the note). Accordingly, I believe that the HHI Bid is superior to the RHJI Bid by at least $3.5 million in this regard.

- The third difference has to do with the sale of the accounts receivable and inventory associated with the business.

    ○ RHJI has indicated that it is prepared to accept all accounts receivable and inventory associated with the Powertrain Assets, and not just amounts

> associated with certain specified customers. RHJI would adjust its cash purchase price by the amount such accounts receivable and inventories differ from $30 million. As the Debtors currently estimate that the net amount to be transferred is approximately $31.4 million, the purchase price increase for RHJI is likely to be $1.4 million under this provision.
>
> o HHI has agreed to purchase accounts receivable and inventory associated with the business only from certain specified customers, but also has the option to purchase the remaining accounts receivable and inventory. The HHI Agreement also reduces the target accounts receivable and inventory amount to $28 million compared with the RHJI agreement, which benefits the estates. As the Debtors currently estimate that the net amount to be transferred is approximately $31.4 million, the purchase price increase for HHI would likely be $3.4 million under this provision, assuming HHI exercises its option. Were HHI not to exercise its option to assume the additional accounts receivable and inventory, Lazard estimates that HHI's purchase price would be reduced by approximately $4.3 million, and the Debtors would remain in possession of inventory and accounts receivable with an estimated liquidation value of $4.5 million.

Thus, based upon the above, the first difference makes the RHJI Bid superior by $2.0 million, the second difference makes the HHI bid superior by at least $3.5 million, and the third difference makes the HHI Bid superior by $2.0 million if HHI's option is exercised and the RHJI bid superior by $1.2 million if it is not. As a result, I have concluded that the HHI bid is superior to the RHJI bid by approximately $0.3 million to approximately $3.5 million.

38. It is my opinion that the absence of a stalking horse bidder for the Powertrain Assets could harm the overall value of Metaldyne's assets, even taking into account the cost of the bidder protections that are included in the HHI Bid. Because the HHI Bid is currently the highest and best offer for the Powertrain Assets, Lazard believes that selecting the HHI Bid to serve as the stalking horse bid for the Powertrain Assets would be beneficial to the Debtors' estates. The HHI Bid will provide a framework for the Powertrain Assets' sale process and establishes a baseline bid, higher than RHJI Agreement, to ensure that any qualified competing bid would have terms that are at least as attractive as those contained in the HHI Bid. Thus, in my opinion, providing the Bidder Protections to HHI as compensation for the

above-outlined benefits to the Debtors' estates is appropriate in these circumstances and consistent with the general rationale for bidder protections in the context of a sale of a debtor's assets pursuant to section 363 of the Bankruptcy Code.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of July, 2009 in New York, New York.

    /s/ Michael Macakanja
Michael Macakanja
Director
Lazard Freres & Co. LLC

**<u>EXHIBIT 1</u>**

ANALYSIS OF PROCEEDS AS PRESENTED ON 7/23/2009          CONFIDENTIAL DRAFT - SUBJECT TO MATERIAL CHANGE
($ in millions)

## ANALYSIS OF PROCEEDS

| | **RHJI** | **KPS** | Comments |
|---|---|---|---|
| Cash | $32.0 | $32.0 | |
| | | | |
| Deductions to Cash Purchase Price | | | |
|    Accelerated Closing Net Cash Loss | (0.3) | (0.3) | Earliest target closing is 8/27; deduction estimated assuming $2.3mm for month of August, pro rata |
|    Cost of PBGC Waiver (estimate) | (3.0) | (3.0) | Midpoint of estimated range of 1.0-5.0 to be confirmed |
|    Assumed Cure Amounts | (4.0) | (6.0) | Assumed cure payments net of 503(b)(9) claims (assumed to be 10% of total) |
|    Buyer/Seller Inventory/AR Adjustment Amount (Assumed $30.5mm Actual) | 0.5 | 2.5 | |
|    Admin Claims Included in Assumed Liabilities in Excess of $3mm | (1.5) | (1.5) | |
|    Outstanding indebtedness, other than Demand Note and: | | | |
|       $1.9mm debt at Metaldyne Industries Limited | | | |
|       $1.5mm debt at Suzhou | (0.0) | (0.0) | $38k associated with Suzhou. Value-neutral insofar as buyer assumes debt from seller |
|    Unpaid Medical and Dental for Transferred Employees | (1.4) | (1.4) | Postpetition unpaid medical |
|    Unpaid Payroll for Transferred Employees | (1.1) | (1.1) | Midpoint of estimated range of $0.3-$1.9 (dependent upon timing of closing) |
|    Unpaid Accrued Vacation for Transferred Employees | 0.0 | 0.0 | |
|    Spanish Taxes Incurred | (1.4) | (0.7) | |
|    Spanish Taxes Assumed by Purchaser | 0.7 | 0.0 | |
| Net Cash | $20.5 | $20.5 | |
| | | | |
| Assumed Administrative Claims | 3.0 | 3.0 | |
| | | | |
| New $50m Term Note (assuming 10-20% discount to face) | 42.5 | – | |
| Additional Cash Consideration | – | 46.0 | |
| Subtotal | $66.0 | $69.5 | |
| | | | |
| Demand Note EUR15m | 20.0 | 20.0 | |
| Net Value | $86.0 | $89.5 | |

Note: Analysis is based on most recent written proposals received from RHJI and KPS and subject to change.

**EXHIBIT 2**

CLI-1732315v4

**UPDATED ANALYSIS OF PROCEEDS**                                                                                   **CONFIDENTIAL DRAFT - SUBJECT TO MATERIAL CHANGE**

($ in millions)

| ANALYSIS OF PROCEEDS | | | |
|---|---|---|---|
| | **RHJI** | **KPS** | **Comments** |
| Cash | $32.0 | $32.0 | |
| | | | |
| Deductions to Cash Purchase Price | | | |
|    Accelerated Closing Net Cash Loss | (0.3) | (0.3) | Estimated $2.3mm net cash loss for month of August, pro rata for earliest target closing of 8/27 |
|    Estimated Cost of PBGC Waiver | (3.0) | (3.0) | Estimated on advice of counsel |
|    Assumed Cure Amounts | (4.0) | (6.0) | Assumed cure payments net of 503(b)(9) claims (assumed to be 10% of total) |
|    Working Capital Adjustment (a) | 1.4 | 3.4 | |
|    Admin Claims Included in Assumed Liabilities in Excess of $3mm | (1.5) | (1.5) | |
|    Outstanding Indebtedness (b) | (0.0) | (0.0) | $38k associated with Suzhou |
|    Unpaid Medical and Dental for Transferred Employees | (1.4) | (1.4) | Postpetition unpaid medical |
|    Unpaid Payroll for Transferred Employees | (1.1) | (1.1) | Midpoint of estimated range of $0.3-$1.9 (dependent upon timing of closing) |
|    Unpaid Accrued Vacation for Transferred Employees | 0.0 | 0.0 | No adjustment |
|    Spanish Taxes Incurred | (1.4) | (0.7) | Economically equivalent in both RHJI and KPS proposals |
|    Spanish Taxes Assumed by Purchaser | 0.7 | 0.0 | |
| Net Cash | $21.4 | $21.4 | |
| | | | |
| Assumed Administrative Claims | 3.0 | 3.0 | |
| | | | |
| New $50mm Term Loan (c) | 42.5 | – | |
| Additional Cash Consideration | – | 46.0 | |
| Subtotal | $66.9 | $70.4 | |
| | | | |
| Demand Note EUR15m | 20.0 | 20.0 | |
| Net Value | $86.9 | $90.4 | |
| **Bid Differential** | | **$3.5** | |
| | | | |
| Memo: Summary of Working Capital Assumptions | | | |
|    Working Capital Target | $30.0 | $28.0 | |
|    Net Working Capital Assets - 8/28/09 Forecast | | | |
|       Designated Customers | 23.7 | 23.7 | |
|       Additional Customers | 7.8 | 7.8 | |
|       Total Net Working Capital | $31.4 | $31.4 | |

Note: Analysis is based on the most recent proposals received from RHJI and KPS. Working capital adjustment is based on updated estimates provided by Alix Partners on 7/25/2009.
(a)   Assumes KPS exercises option to acquire accounts receivable and inventory associated with the Powertrain Assets.
(b)   Excludes German demand note, $1.9mm in debt at Metaldyne Industries Limited and $1.5mm in debt at Suzhou.
(c)   Assumes midpoint of illustrative 10%-20% discount to face value. Discount range based on preliminary term sheet. Subject to change based on analysis of pro forma capitalization and collateral quality.