UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                  :

In re                                       :    Chapter 11

Metaldyne Corporation, *et al.*,       :    Case No. 09-13412 (MG)

                       Debtors.           :    (Jointly Administered)

---------------------------------------------------------------x

**MEMORANDUM OPINION (I) GRANTING DEBTORS' SECOND EMERGENCY MOTION TO AMEND THE BIDDING PROCEDURES ORDER AND DESIGNATE HHI HOLDINGS, LLC AS STALKING HORSE BIDDER AND (II) DENYING DEBTORS' MOTION TO CONSTRUE FIRST BIDDING PROCEDURES ORDER TO REFLECT AMENDMENTS TO ASSET PURCHASE AGREEMENT WITH RHJI**

*A P P E A R A N C E S:*

JONES DAY
*Attorneys for the Debtors in Possession*
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
(216)586-3939
By:    Heather Lennox, Esq.
        Ryan T. Routh, Esq.

222 E. 41st St.
New York, NY 10017
(212) 326-3939
By:    Richard H. Engman, Esq.
        Harold K. Gordon, Esq.

2727 North Harwood Street
Dallas, Texas 75201-1515
(214) 220-3939
By:    George T. Manning, Esq.

1

REED SMITH LLP
*Attorneys for the Official Committee of Unsecured Creditors*
599 Lexington Avenue
New York, NY 10022
(212) 521-5400
By:   Mark D. Silverschotz, Esq.

FRIED FRANK HARRIS SHRIVER & JACOBSON
*Attorneys for the Prepetition Term Lenders*
One New York Plaza
New York, NY 10004
(212) 859-8000
By:   Gary L. Kaplan, Esq.

PROSKAUER ROSE LLP
*Attorneys for HHI Holdings, LLC*
70 W. Madison St.
Chicago, Illinois 6602-4342
(312) 962-3550
By:   Mark K. Thomas, Esq.

CRAVATH, SWAINE & MOORE LLP
*Attorneys for RHJ International, S.A.*
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000
By:   Richard Levin, Esq.
      Antony L. Ryan, Esq.
      Robert H. Trust, Esq.

**MARTIN GLENN,**
**United States Bankruptcy Judge**

### INTRODUCTION

Pending before the Court are two motions by the Debtors.  First, there is the confusingly titled "Motion of Debtors and Debtors in Possession for an Order Construing Definition of 'Agreement' in Bidding Procedures Order to Reflect Amendment to the Purchase Agreement with RHJ International, S.A. Relating to the Sale of Certain Assets of the Debtors' Powertrain Group" (or, for brevity's sake, the "Motion to Construe").  (ECF Doc. #349.)  The motion was

filed on July 3, 2009, was supplemented on July 17, 2009 (ECF Doc. #443), with a hearing originally scheduled for July 20, 2009. That hearing continued on July 23, and then again on July 27. In addition, there is the "Second Emergency Motion of Debtors and Debtors in Possession to Amend Order (A) Approving Bid Procedures for the Sale of Certain Assets Related to the Debtors' Powertrain Group, (B) Approving Certain Bidder Protections and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof" (the "Motion to Amend Bidding Procedures"). (ECF Doc. #504.) The motion was filed on July 24, 2009. It too was heard on July 27.

While the complete procedural background of this dispute is fully explained below, the Court is in essence faced with a choice between two conflicting motions filed by the Debtors. The Court either approves the Motion to Construe and one potential bidder, RHJ International S.A. ("RHJI"), becomes the stalking horse bidder for the Debtors' Powertrain assets and enjoys bidder protections. Or the Court approves the Motion to Amend Bidding Procedures and HHI Holdings, LLC ("HHI") becomes the stalking horse bidder for the same assets and enjoys the identical bidder protections. For the reasons explained below, the Court DENIES the Motion to Construe and GRANTS the Motion to Amend Bidding Procedures.[1]

## BACKGROUND

The Court has detailed the facts of this case in a previous opinion and order, familiarity with which is assumed. (*See* ECF Doc. #294.) The dispute revolves around the Debtors' decision to sell its Powertrain assets as part of a § 363 sale in a public auction. Shortly after the chapter 11 filing, the Debtors filed a motion to approve bidding procedures for the auction of its

---

[1] The Prepetition Term Lenders initially supported the Motion to Amend Bidding Procedures, but then filed an objection to both motions, arguing that neither party should receive bid protections. (ECF Doc. #524.) The Court OVERRULES the objection. The testimony at the hearing established that the HHI bid provides a floor for the auction. For the reasons explained below, the Court finds that the Debtors and HHI have satisfied the standards for approval of bid protections.

3

Powertrain assets, and to approve bidder protections for the proposed stalking horse bidder, RHJI. (ECF Doc. #214.)[2] RHJI is an insider; it owns approximately 60.1% of the Debtors' indirect parent company. (ECF Doc. #6 ¶ 8.) The proposed Asset Purchase Agreement attached to the motion contained a due diligence "out," providing that the agreement would terminate unless RHJI delivered to the Debtors a due diligence satisfaction notice by July 2, 2009. (ECF Doc. #214, at Ex. 1 § 6.02(*l*).) The APA also granted RHJI bidder protections in the form of a break-up fee and expense reimbursement. (*Id.* § 7.03.) The Prepetition Term Lenders objected to granting RHJI bidder protections on the grounds that (i) as an insider, RHJI should not receive bidder protections, and (ii) since the due diligence out had not yet passed, the APA was illusory. (ECF Doc. #293.) At the hearing, the Court granted the motion with a reduced break-up fee[3] on the grounds that a stalking horse bidder would bring value to the estate. (ECF Doc. #314 (the "Bidding Procedures Order").)

On July 3, 2009, the day after the due diligence period expired, the Debtors filed a new motion seeking to "construe" the Bidding Procedures Order as reflecting an amendment to the APA. (ECF Doc. #349.) Specifically, the Debtors indicated that before July 2, RHJI informed them that it needed more time to conduct its due diligence, and so the parties agreed to extend RHJI's deadline to deliver the due diligence satisfaction notice to July 16, 2009. A hearing on the Motion to Construe was scheduled on July 20, by which time all parties were supposed to know whether RHJI had delivered the satisfaction notice. (ECF Doc. #356.) On July 17, the Debtors filed a supplement to that motion, seeking approval of a further amendment to the APA

---

[2] The Debtors engaged Lazard Freres & Co., LLC ("Lazard") as investment bankers to market the Powertain assets. (ECF Doc. #278.) Lazard's marketing efforts began well before the chapter 11 filing.

[3] The original APA contained a break-up fee of $2 million and an expense reimbursement of $750,000. During the hearing to approve the bidding procedures and bidder protections, RHJI agreed to reduce its break-up fee to $1.5 million.

4

extending the deadline a second time, this time to July 23, 2009, three days after the scheduled hearing. (ECF Doc. #443.) The Debtors also filed a motion seeking to reschedule the auction for the Powertrain assets for August 5, 2009, with a sale hearing on August 7, 2009. (ECF Doc. #446.)

The Court held the hearing on July 20, as originally scheduled. With all parties consenting, the Court granted the motion to reschedule the auction. (ECF Doc. #464.)[4] As with the original bidding procedures motion, the Prepetition Term Lenders objected to the Motion to Construe, arguing that RHJI was not providing a floor for bidding if it could just walk from the agreement before July 23. The Prepetition Term Lenders further argued that the Court should deny the motion, because RHJI had already sought two extensions, and so there was no reason to assume they would not do so again. Two witnesses testified at the hearing, both agreeing that RHJI was not a formal stalking horse bidder, because it was not providing a floor for the bidding because it retained a due diligence out; but both witnesses testified that RHJI nevertheless brought value to the sale process. At the hearing, counsel for HHI, another potential bidder,[5] also objected to the amendment and informed the Court that it was prepared to submit a higher and better bid for the Debtors' Powertrain assets. All counsel consented to an adjournment to July 23, 2009, at 4:00 p.m., at which point the due diligence out included in the second amended APA would have expired and the parties would know whether RHJI had delivered the satisfaction notice. The Court also directed Debtors' counsel to confer with HHI's counsel to determine whether it was prepared to make a higher and better offer.

---

[4] Contrary to RHJI's suggestion, the Order merely moved the auction. It did not, nor did it purport to, approve any amendments to the RHJI APA. Indeed, the bidding procedures attached to the Order only reference the original agreement with RHJI and none of the amendments.

[5] Testimony revealed that HHI had in fact been interested in the Debtors' Powertrain assets for quite some time, dating back to Lazard's prepetition marketing efforts. The testimony also revealed that HHI ramped up its due diligence efforts in the period leading up to the July 20 hearing.

5

Over the next several days, the parties engaged in intensive due diligence and numerous rounds of negotiations. By the evening of July 22, RHJI submitted a revised bid and HHI submitted its bid. When contacted by the Debtors' advisors, RHJI orally indicated that it intended to waive the due diligence requirement, but it did not send the Debtors the written satisfaction notice required by the APA until the next day, July 23, at 2:11 p.m.[6] (ECF Doc. #523, at Ex. A.) The following morning, on July 23, the Debtors' special committee, consisting of two independent directors, met with its financial advisors and the Debtors' financial and legal advisors. Lazard presented a spreadsheet comparing the two offers showing that the RHJI bid was superior. Consequently, the special committee voted in favor of the amended RHJI bid as the stalking horse bid for the Debtors' Powertrain assets and agreed to seek Court approval of an amended Bidding Procedures Order and bid protections later that day. Later that morning, however, HHI submitted a revised bid, upping the cash portion to $78 million. The special committee met again in the early afternoon. Lazard presented a revised spreadsheet showing that the revised HHI bid was superior to the revised RHJI bid by approximately $3.5 million. (ECF Doc. #521, at Ex. 1.) When RHJI was advised that its revised bid had been topped by HHI and that the Debtors would seek approval of HHI's stalking horse bid, RHJI sent the Debtors the due diligence satisfaction notice, but stopped work on certain financial disclosure schedules.

At the hearing on July 23, the Debtors' counsel informed the Court that HHI had offered a higher and better bid for the Powertrain assets, and that they were prepared to move forward with HHI as a stalking horse.[7] Neither RHJI's revised bid nor HHI's revised bid contained a due

---

[6] Ciara Donohoe, a managing director with RHJI, testified that RHJI determined that it would be preferable to wait until closer to the July 23 hearing to deliver the satisfaction notice. While the Court does not doubt RHJI's good faith in refusing to send the satisfaction notice earlier, it is undisputed that RHJI did not send the satisfaction notice until 2:11 p.m. on July 23, after RHJI was notified about HHI's bid that had no due diligence out.

[7] As is further explained below, while the Court does not substitute its business judgment for the Debtors', based on the evidence presented, the Court agrees that HHI's bid was superior to RHJI's.

diligence out.  Because the parties were unsure how to proceed, HHI filed a formal objection to the Motion to Construe, and argued that because it had submitted a higher and better bid, it should be substituted for RHJI in the Bidding Procedures Order.  The Debtors provided the Court with a demonstrative purporting to show that the HHI bid was a higher and better offer.[8]

RHJI objected to the Debtors' selection of HHI, arguing that it had been the only Court-approved stalking horse bidder, and that the Debtors inappropriately conducted an auction before the actual scheduled auction.  In addition, RHJI argued that the Court could not approve the Debtors' request, because the Debtors had not filed a motion seeking approval of, or supplied the Court and other interested parties with, the HHI APA containing HHI's bid protections.  The Court directed the Debtors to file a new Motion to Amend Bidding Procedures by noon the next day (July 24, 2009), and scheduled a hearing on that motion, along with the Motion to Construe, for Monday, July 27, 2009.  The Court also informed the parties that the hearing would be an evidentiary hearing pursuant to Local Rule 9014-2(a).

## DISCUSSION

A. *The Motion to Construe Was an Improper Procedural Maneuver to Resurrect an Agreement to Provide Bid Protections that No Longer Had Court Approval*

As an initial matter, the Court must first identify what the two motions pending before it actually seek to accomplish.  The Motion to Amend Bidding Procedures is easy:  the Debtors seek to amend the Court's prior Bidding Procedures Order to substitute HHI as the stalking horse bidder in RHJI's place.  The Motion to Construe, however, as belied by its confusing name, is not so straightforward.  RHJI contends that the Motion to Construe just seeks an order approving

---

[8] This was the same spreadsheet presented to the special committee at the second meeting earlier that day.  The two bids were based on the same APA (HHI's bid was submitted as a mark-up of the RHJI APA).  As explained in greater detail below, the two bids were similar in all respects except three, most critically that the RHJI bid consisted of a $32 million cash component, while the HHI bid consisted of a $78 million cash component.  The spreadsheet was also subsequently revised over the weekend of July 24, although at all times the spreadsheet showed that HHI's bid was superior to RHJI's bid.

7

an amendment to the original Court-approved Bidding Procedures Order granting it bidder protections as the stalking horse. RHJI points to the fact that it and the Debtors agreed to the two due diligence extensions before the deadlines expired, so the agreement never expired on its own terms. In essence, RHJI argues that the Motion to Construe is just a formality to approve what the Debtors and RHJI had already done, and to thus give effect to the Court's original Bidding Procedures Order. Since the original Bidding Procedures Order remains in effect, RHJI argues that it remains the stalking horse bidder.

The essential flaw in RHJI's logic is that the Motion to Construe is not merely a motion to amend the Bidding Procedures Order. It is actually a motion to approve bidding protections under a new agreement between RHJI and the Debtors. The Bidding Procedures Order was based on an agreement that contained a July 2, 2009 deadline for RHJI to deliver to the Debtors a notice of its satisfaction with its due diligence. That agreement was the basis for Court approval of the bidder protections for RHJI. While the Debtors and RHJI may have agreed to extend the deadline twice, the Court never approved those amendments. As of July 3, therefore, RHJI was not entitled to any bidder protections. In short, once the July 2 deadline passed without Court approval for further extensions, the Debtors were back at square one vis-à-vis their stalking horse, and the break-up fee was once again "fair game." (ECF Doc. #494 at 25.)[9]

RHJI argues that notwithstanding the fact that its amended agreement still required Court approval, it is still binding on the Debtors and therefore the Debtors are bound by the agreement to pursue the break-up fee on behalf of RHJI. (*See* ECF Doc. #214 at Ex. 1 § 4.06(b) (requiring the Debtors to "diligently prosecute expedited approval of the Bidding Procedures Order,

---

[9] Indeed, how could it be otherwise? RHJI sought Court approval of the amendments. If it believed they were enforceable without Court approval, there would be no need to file the motion. Indeed, Donohoe testified that the amendments were subject to Court approval for purposes of obtaining bidder protections.

8

including the approval of the Break-up Fee and Expense Reimbursement").) There is a split in authority whether contracts subject to court approval are binding before court approval. *See In re Frye*, 216 B.R. 166, 173-74 (Bankr. E.D. Va. 1997). The *Frye* court explained that those courts that view such agreements as binding reason that contract formation and court approval require different analyses (the court adopted that view). *Id.* at 173; *see also In re United Shipping Co.*, 1989 WL 12723, at *5 (Bankr. D. Minn. Feb. 17, 1989) ("The considerations a court looks at in approving a settlement are entirely different than whether or not there was an agreement at all."). On the other hand, other courts look to the Code and reason that if "judicial approval [is] necessary to go forward, an agreement could not be binding absent the required approval." *Id.*; *see also In re Sparks*, 190 B.R. 842, 843 (Bankr. N.D. Ill. 1996) (holding that contracts are not binding before court approval, because "[t]he debtor-in-possession operates as a fiduciary; any actions taken by the debtor are to be in the best interests of the creditor body as a whole. For that reason . . . [the debtor's] actions are subject to . . . review by the creditors of the estate and the bankruptcy court.").[10] But this split only addresses the parties' obligations; it does not address the Court's role in adjudicating the dispute, and even those courts that adopt the view that contracts subject to court approval are binding on the parties pre-court approval, still hold that a court may reject a binding contract because of the presence of a better and higher offer, a situation that mirrors the one here:

> It may be that at the hearing on court approval, a party that wishes
> to withdraw may have sufficient reason to show that the contract
> should not be approved by the bankruptcy estate. The most
> common reason from the debtor-in-possession's point of view . . .

---

[10] It does not appear that the Second Circuit has weighed in on this split. At least two bankruptcy judges in this jurisdiction have held that contracts subject to court approval are not binding before court approval. *See In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 256 (Bankr. S.D.N.Y. 2005) (holding that because § 363 sale was subject to court approval, debtor was not bound to perform until then and could withdraw the application to approve and abandon the contract); *In re Leslie Fay Cos.*, 168 B.R. 294, 303 (Bankr. S.D.N.Y. 1994) (agreement subject to § 363(b)(1) "is not enforceable absent notice and a hearing").

> is a better offer. *When the court is faced with two offers that are in all respects comparable except for price, the court can reject the first one if it is of a lower amount.*

*In re Barry D. Wood*, 2008 Bankr. LEXIS 1783, at *9 (Bankr. E.D. Va. May 30, 2008) (finding that the debtor could proceed on breach claims based on contract that was subject to court approval) (emphasis added). To put it another way, the Debtors had the option to walk away from the bidder protections granted to RHJI up until the moment the Court approved them. That is exactly what the Debtors are proposing to do here. Unless and until amended *and approved by the Court*, the Bidding Procedures Order only entitled RHJI to the bidder protections if it delivered its notice of satisfaction with due diligence on or before July 2, 2009. It did not do so. Therefore, the Debtors are not obligated to pay a break-up fee and expense reimbursement to RHJI.[11]

  B.  *The Debtors Exercised Reasonable Business Judgment in Choosing the HHI Offer*

Once the Motion to Construe is properly seen as a motion to approve a new agreement with RHJI, this dispute is actually a very narrow one and presents a classic question under § 363(b): have the Debtors exercised their reasonable business judgment in choosing HHI as its stalking horse bidder over RHJI? In answering this question the Court is guided by the decisions in this jurisdiction emphasizing that the Court should not substitute its business judgment for that of the Debtors'. *See, e.g.*, *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Off. Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Global Crossing Ltd.*, 295 B.R. 726, 742-43 (Bankr. S.D.N.Y. 2003). The Court is mindful that "the fiduciary obligations of directors pervade bankruptcy administration." *In re Biderman*

---

[11] Indeed, Donohoe testified at the July 27, 2009 hearing that RHJI would only be entitled to the break-up fee and expense reimbursement if the Court granted the Motion to Construe.

*Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997). It is the overarching objective of sales in bankruptcy to maximize value to the estate. *See Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

Judge Gerber's decision in *Global Crossing*, in which the debtor faced a similar decision as the Debtors do here, is instructive in this regard. *In re Global Crossing Ltd.*, 295 B.R. 726 (Bankr. S.D.N.Y. 2003). There, the debtor Global Crossing entered into a purchase agreement whereby two parties—Hutchison and STT—would pay Global Crossing a combined $250 million for a 61.5% stake in a new company. The agreement contained a deadline of April 30, 2003, by which point Hutchison and STT had to have obtained regulatory approvals from certain federal agencies, or else the agreement could be terminated by any party without penalty. On April 30, 2003, Hutchison exercised its contractual rights and withdrew from the purchase agreement because it knew it could not obtain the necessary approvals. STT then exercised its contractual rights and stepped into Hutchison's position. STT and Global Crossing retained the right to terminate the agreement at any time until regulatory approvals were obtained.

Thereafter, Global Crossing learned of another potential purchaser, XO Communications, a company controlled by investor Carl Icahn. Over the next several months, XO made several proposals to purchase Global Crossing, each time changing the cash and debt portions of its proposal. After each proposal, Global Crossing's board and financial advisors, as well as the advisors to the Creditor's Committee, considered the proposal, and decided that the existing deal with STT was superior. Global Crossing thereafter filed a motion seeking approval of the amended purchase agreement substituting STT for Hutchison.

As is the case here, Judge Gerber framed the issue whether Global Crossing may amend its agreement as a "classic" issue under § 363(b): did it exercise reasonable business judgment in doing so? 295 B.R. at 729-30. In answering in the affirmative, Judge Gerber focused on the disinterestedness of the board, the extent of the board's deliberations, and their lengthy consideration of the relevant facts and their options. *Id.* at 744-45. The decision therefore passed the business judgment test. *Id.* at 746. Judge Gerber also found that Global Crossing's response to XO's overtures "was fully consistent with their fiduciary duty, which called for them to consider XO's expressions of interest . . . , but not, necessarily, to embrace XO as a bidder or abandon their other options . . . ." *Id.* at 745. Judge Gerber concluded, in words that apply with equal force to this case: "If this Court were to believe, for half a second, that the Debtors spurned a better offer to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers." *Id.* This Court agrees.

The Second Circuit has similarly recognized that in the context of § 363 auctions bankruptcy courts must have "broad discretion and flexibility . . . to enhance the value of the estates before it." *In re Fin. News Network, Inc.*, 980 F.2d 165, 169 (2d Cir. 1992). *Financial News Network* involved a similarly fluid auction process with a competing bidder entering the fray during a hearing to approve purchaser CNBC's bid to buy the debtor's assets. CNBC, which ultimately won the debtor's assets with a higher bid, appealed the bankruptcy court's subsequent approval of CNBC's higher bid on the ground that the bankruptcy court should not have reopened the bidding to consider a higher proposal from another party. The Second Circuit affirmed the district court (which affirmed the bankruptcy court). It cautioned that courts should not follow "such rigid adherence to the procedures that govern the sale as to elevate them over the substance of a bankruptcy court's principal responsibility, which is to secure for the benefit

of creditors the best possible bid." *Id.*[12] "To hold otherwise would seriously compromise the necessarily broad discretion of the bankruptcy court." *Id.* at 170.[13] The Court follows the same approach here.

There is little doubt that deciding to enter into a stalking horse agreement with HHI was a reasonable exercise of the Debtors' business judgment, consistent with the Debtors' fiduciary obligations to their stockholders and creditors, and consistent with the overall objective of maximizing value to the estate. The July 27 testimony of a member of the board's special committee and of the Debtors' investment banker supports this conclusion. Once another bidder entered the fray with a potentially higher and better offer, the Debtors *had to* consider the offer; failure to do so would have been a breach of their duties to the estate and its creditors. Once they had done so, it is clear from the facts presented here that the decision to seek approval of HHI's bid as the stalking horse bid was a reasonable exercise of business judgment.

The evidence presented shows that the two bids are substantially similar in all respects but three. First, and most critically, RHJI proposes to pay $32 million in cash and issue a $50 million note (worth substantially less than $50 million), while HHI proposes to pay $78 million in cash. Second, RHJI proposes to pay all cure costs in excess of $4 million, while HHI would pay all cure costs in excess of $6 million. And third, the two parties agreed to purchase differing amounts of accounts receivables and inventory, with RHJI agreeing to purchase all of it while HHI committed to purchase less with an option to purchase all of it. According to Michael Macakanja, the Debtors' investment banker at Lazard, the net difference between the two bids is

---

[12] *See also In re Wintex, Inc.*, 158 B.R. 540, 545-47 (D. Mass. 1992) (holding that bankruptcy court properly considered competing bid that topped initial offer by less than 5%, even though the topping bid did not comply with bid procedures order requiring counteroffers to exceed the initial offer by at least 10%).

[13] *See also In re Broadmoor Place Invs., L.P.*, 994 F.2d 744, 746 (10th Cir. 1993) (holding that a bankruptcy court "does have the power to disapprove a proposed sale recommended by a [debtor] if it has an awareness there is another proposal in hand which, from the estate's point of view, is better or more acceptable").

between $0.3 million and $3.5 million in HHI's favor, depending on whether HHI exercises its option. (ECF Doc. #521 ¶ 37; Ex. 2.)[14] The special committee, consisting only of disinterested independent directors, met twice to consider the proposals, both times with the committee's and the Debtors' financial and legal advisors present. The unrebutted evidence is that the HHI bid is in fact a better and higher offer for the Debtors' Powertrain assets. Under the business judgment standard, it was thus a reasonable decision by the independent directors to accept HHI's stalking horse bid over RHJI's, because it brought more value to the estate.

C.   *The Bid Protections Are Reasonable and Appropriate*

Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer. *Integrated Resources*, 147 B.R. at 659. The court in *Integrated Resources* adopted a three-part test for evaluating break-up fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; and (3) is the amount of the fee unreasonable relative to the proposed purchase price. *Id.* at 657. An analysis of those three factors here supports awarding a bidding protections to HHI.

First, HHI is not an insider. There has been no allegation or evidence of any self-dealing or manipulation. In fact, the losing bidder, RHJI, is the majority shareholder of the Debtors' indirect parent corporation. Second, there is no evidence that the fee will hamper bidding. There have already been competing bids between HHI and RHJI, and the testimony at the hearing was that the stalking horse bid brings value to the estate by setting a floor on the price and providing

---

[14]   Macakanja's calculations assumed a 10-20% discount on RHJI's $50 million note, giving it an economic value of $42.5 million. While the Court accepts this testimony as true, the Court has doubts that the note—whose capital structure is unknown, and is issued by the owner of an auto parts supplier when that sector of the economy is significantly depressed—is worth even that much. The evidence also showed that the ABL Lenders and the Prepetition Term Lenders both thought that Lazard overvalued the note.

14

a structure for potential competing bids. The evidence also showed that the stalking horse bid would provide comfort to the Debtors' employees and customers that the company was entering the auction with a locked-in bid. Third, the fee amount is not unreasonable relative to the proposed purchase price. The total amount of the proposed break-up fee and expense reimbursement is less than 3% of the total purchase price. This falls within the range of what courts in this jurisdiction have found to be acceptable break-up fees.

## CONCLUSION

The Court "walks a tightrope between, on the one hand, providing for an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the bankrupt estate." *Fin. News Network*, 980 F.2d at 166. The Bidding Procedures Order entered by the Court granting bid protections to RHJI was predicated on RHJI delivering the satisfaction notice on or before July 2, 2009. That did not happen. Whatever agreements RHJI negotiated with the Debtors to give it more time never received Court approval. RHJI cannot turn to this Court for retroactive approval of private agreements reached with the Debtors when such agreements may harm the estate because of the presence of a better and higher offer.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

The Motion to Amend the Bidding Procedures Order, and appoint HHI as the stalking horse bidder, is GRANTED.  The Motion to Construe the original Bidding Procedures Order to apply to the Second Amended APA with RHJI is DENIED.

Separate Orders to this effect will be entered.

Dated: New York, New York
July 28, 2009

                                        **/s/Martin Glenn**
                                          MARTIN GLENN
                                United States Bankruptcy Judge