**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------------x
                                                               :   NOT FOR PUBLICATION
                                                               :
In re                                                          :   Chapter 11
                                                               :
Metaldyne Corporation, et al.,                                 :   Case No. 09-13412 (MG)
                                                               :
                                        Debtors.               :   (Jointly Administered)
                                                               :
---------------------------------------------------------------x
```

**MEMORANDUM OPINION GRANTING DEBTORS' MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO MD INVESTORS CORP.**

*A P P E A R A N C E S:*

JONES DAY
*Attorneys for the Debtors in Possession*
901 Lakeside Avenue
Cleveland, Ohio  44114-1190
(216) 586-3939
By:   Heather Lennox, Esq.
        Ryan T. Routh, Esq.

325 John H. McConnell Boulevard - Suite 600
Columbus, Ohio 43215
(614) 469-3939
By:   Robert W. Hamilton, Esq.

222 E. 41st St.
New York, NY 10017
(212) 326-3939
By:   Richard H. Engman, Esq.

2727 North Harwood Street
Dallas, Texas  75201-1515
(214) 220-3939
By:   George T. Manning, Esq.

REED SMITH LLP
*Attorneys for the Official Committee of Unsecured Creditors*
599 Lexington Avenue
New York, NY 10022
(212) 521-5400
By:   Mark D. Silverschotz, Esq.

1201 Market Street - Suite 1500
Wilmington, DE 19801
(302) 778-7500
By:   Kurt F. Gwynne, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for MD Investors Corporation*
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
By:   David A. Agay, Esq.

601 Lexington Avenue
New York, NY 10022
(212) 446-4800
By:   Benjamin J. Steele, Esq.

BINGHAM McCUTCHEN LLP
*Attorneys for BDC Finance, LLC*
399 Park Avenue
New York, NY 10022
(212) 705-7000
By:   Steven Wilamowsky, Esq.

One Federal Street
Boston, MA 02110
(617) 951-8000
By:   Sabin Willett, Esq.


**MARTIN GLENN,**
**United States Bankruptcy Judge**

## INTRODUCTION

Pending before the Court is the Debtors' motion pursuant to § 363(b)(1) and (k) to approve the sale of substantially all of their assets to MD Investors Corporation ("MDI"), a consortium led by The Carlyle Group and Solus Alternative Asset Management LP representing

2

approximately 97% of the Debtors' Prepetition Term Lenders' secured debt. Virtually all of the Debtors' constituencies support the sale. As detailed in a separate Sale Order being entered contemporaneously, the Court concludes that the elements of § 363, as interpreted by the Second Circuit most recently in *In re Chrysler LLC*, --- F.3d ---, 2009 WL 2382766 (2d Cir. Aug. 5, 2009), as well as in *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983), have been satisfied. This Opinion addresses the only objection to the sale,[1] raised by BDC Finance, L.L.C. ("BDC"), an owner of approximately $3.5 million of the over $425 million of the Debtors' prepetition secured term debt. BDC argues that the Prepetition Term Lenders' agent, JPMorgan Chase, N.A. (the "Agent"), could not properly credit bid 100% of the prepetition term debt under § 363(k), even though 97% of the Prepetition Term Lenders are participants in MDI and directed the Agent to credit bid. BDC also challenges the Agent's release of the lien on certain collateral that will be retained by the Debtors. For the reasons explained below, the Court concludes that nothing in § 363(k), or in the cases interpreting § 363, prohibits the Agent from credit-bidding in this fashion. The Debtors' motion to approve the sale is therefore GRANTED.

## BACKGROUND

### A.  The Auction Process

The Court has issued two earlier opinions detailing the factual background of this case, familiarity with which is assumed. *See In re Metaldyne Corp.*, 2009 Bankr. LEXIS 1533 (Bankr. S.D.N.Y. June 23, 2009) (ECF Doc. #294); *In re Metaldyne Corp.*, --- B.R. ---, 2009 WL 2244602 (Bankr. S.D.N.Y. July 28, 2009) (ECF Doc. #542). At the time the Debtors filed their chapter 11 petitions in May 2009, they contemplated that there would be several public auctions

---

[1] There were also various objections to the assumption and assignment of executory contracts in connection with the sale. With the consent of all parties, those objections were adjourned to later dates.

3

to sell their four principal business units: the powertrain assets, the chassis assets, the balance shaft module ("BSM") assets, and the tubular assets. Two different investment bankers were retained to assist in marketing those assets—Lazard Freres & Co. (for the powertrain and chassis assets) and Donnelly Penman & Co. (for the BSM and tubular assets). The Court entered separate bidding procedures orders for auctions of the chassis assets and the powertrain assets.[2] The auctions were scheduled for August 3, 2009 (for the chassis assets), and August 5, 2009 (for the powertrain assets).[3]

On July 31, 2009, in anticipation of both auctions, MDI submitted a bid for all four of the Debtors' business units. (ECF Doc. #637 ¶ 26.) The bid consisted of $38 million in cash, subject to various purchase price adjustments, and a credit bid component. (*Id.*) The MDI bid was the only bid for that particular package of assets. The bid was also supported by $100 million commitment letters provided by Carlyle and Sola, which led Lazard to conclude that MDI would be able to consummate a sale transaction with the Debtors. (*Id.*) The Debtors' Special Committee therefore concluded that the MDI bid was a qualified bid. On August 2, 2009, the Debtors filed a notice of adjournment of the August 3 chassis assets auction, indicating that they had received a bid for substantially all of the company's assets, and so were going to hold the two auctions simultaneously on August 5, 2009.

In addition to MDI's bid for substantially all of the assets, the Debtors also received separate bids on the powertrain and chassis assets. The Debtors had executed stalking horse

---

[2] As explained in greater detail in *Metaldyne Corp.*, --- B.R. ---, 2009 WL 2244602 (Bankr. S.D.N.Y. July 28, 2009), the powertrain auction bidding procedures were amended when the Debtors decided to pursue a stalking horse contract with HHI Holdings, LLC, instead of proceeding with their initial stalking horse, RHJ International S.A., when the due diligence satisfaction deadline in the asset purchase agreement with RHJI expired.

[3] The powertrain auction was originally scheduled for July 24, 2009, with a sale hearing on July 27, 2009, but was adjourned on the consent of the parties and by order of the Court to August 5, 2009, with a sale hearing on August 7, 2009.

4

contracts with HHI Holdings, LLC for the powertrain assets and with Revstone Industries LLC for the chassis assets. Negotiations continued up to the bid deadlines of July 31 for the chassis assets and August 3 for the powertrain assets. Shortly before the August 3 auction, Revstone informed the Debtors that it was withdrawing from the sale process. (ECF Doc. #637 ¶ 34.) As a result, the only qualified bid for the chassis assets was from a Carlyle affiliate, Chassis Products LLC. Also on August 3, 2009, the Debtors received a bid for the powertrain assets from ACOF MD Holdings Ltd ("Ares"). (ECF Doc. #641 ¶ 14.) The Debtors, in consultation with their advisors, determined that the Ares bid was the best and highest qualified bid for the powertrain assets, and so would set the floor for bidding for the start of the powertrain auction on August 5.

      The auction commenced on August 5. After consulting with the Special Committee, the Debtors informed the auction participants that since the Chassis Products bid was the only qualified bid for the chassis assets, there would be no auction for the chassis assets. (ECF Doc. #641 ¶ 16.) The auction proceeded well into the night of August 5, and continued again on August 6, with bids for the various assets increasing incrementally. The final MDI bid was almost $70 million more in value than the combined stalking horse bids, and $27 million more than the combined next highest bids on the Debtors' individual business units. (ECF Doc. #637, at Ex. 1.) The final MDI bid consisted of $39.5 million in cash (subject to certain adjustments), assumption of $8.5 million in administrative priority claims, $2.5 million in cash to fund a litigation trust for the Creditors' Committee, assumption of a €15 million note, and, most critically in this case, a credit bid of all the senior secured term loan debt, in an amount not less than $425 million and the release of liens on any assets that are not included in the sale. (ECF Doc. #637 ¶¶ 39-44.) The Special Committee then decided, in consultation with its advisors and

5

interested parties, that no other bids were forthcoming, and deemed the MDI bid the successful bid. (ECF Doc. #641 ¶ 24.)

After the Special Committee reached its conclusion, the Debtors filed a notice of successful bidder, attaching the proposed asset purchase agreement with MDI. (ECF Doc. #632.) The Debtors also filed a memorandum of law in support of the sale (ECF Doc. #640), and declarations by Michael Macakanja (of Lazard Freres), Jeremy Lamb and Adam Fovenesi (of Donnelly Penman), and David Kell (a member of the Special Committee).[4]

BDC filed two motions: an emergency motion to adjourn the sale hearing and a formal objection to the sale itself. (ECF Docs. #636, 638.) The sale hearing commenced August 7, the morning after the auction concluded. After hearing argument, the Court denied BDC's motion to adjourn the sale hearing, ruling that the motion did not raise any issues that would require further briefing or discovery. BDC's counsel acknowledged that its objection raised a legal issue concerning the proper interpretation of the Credit Agreement and Security Agreement. (*See* Section B, *infra*.) The Court then conducted an evidentiary hearing on the sale motion, heard argument of counsel for parties-in-interest, and took the matter under submission.

### B. The Prepetition Term Loan Facility's Relevant Provisions

The Debtors Metaldyne Company LLC and Metaldyne Intermediate Holdco, Inc. are parties to a Prepetition Term Loan Facility, with JPMorgan Chase Bank, N.A. as Agent, with several lending parties. The Prepetition Term Loan Facility is governed by two documents relevant to this dispute, both of which were executed on January 11, 2007: the Credit Agreement

---

[4] All of those declarations were received into evidence at the sale hearing with no objections by any party, with the declarants cross-examined during the hearing. In addition, the Debtors also introduced into evidence the declaration of Jeffrey Johnston, of the Debtors' financial advisors AlixPartners LLP, addressing the liquidation value of the Debtors' assets. The parties also introduced the auction transcripts, the MDI APA, the Credit Agreement, and the Security Agreement into evidence.

6

and the Security Agreement.[5] BDC is one of the lenders under the Credit Agreement. As of the petition date, the principal amount owed was in excess of $425 million. BDC's share was approximately $3.5 million. The dispute between BDC, MDI, and the Debtors turns on interpreting these two agreements.

BDC argues that under the Credit Agreement and Security Agreement, MDI cannot direct the Agent to credit bid for the Debtors' assets under § 363(k) for the full amount of the debt, or to release BDC's liens on the Debtors' collateral, without BDC's consent and without distributing the proceeds of the sale *pro rata* to BDC. Specifically, BDC points to § 5.01 of the Security Agreement, which provides in relevant part:

> At any public . . . sale made pursuant to this Section, any Secured Party[6] may bid for or purchase free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor . . . the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to Grantor therefor.

In addition, BDC points to § 9.02(b) of the Credit Agreement, which provides in relevant part that the Credit Agreement may not "be waived, amended or modified" unless certain parties agreed, and that even then, such amendments shall not "(vi) release all or substantially all of the Collateral from the Liens of the Security Documents, without the written consent of each Lender[.]" According to BDC, these two provisions mean that only BDC may credit bid its

---

[5] Even though the Credit Agreement and Security Agreement were technically executed separately, the Court concludes that the agreements should be read as a single contract. (*See* MDI Ex. 2, Preamble (referencing the Credit Agreement in the preamble to the Security Agreement).) *See Liberty USA Corp. v. Buyer's Ins. Agency LLC*, 386 F. Supp. 2d 421, 425-27 (S.D.N.Y. 2005) (holding that promissory note and asset purchase agreement should be "construed as one contract," because the note was incorporated into the APA, and was executed on the same date, by the same parties, for the same purpose).

[6] "Secured Party" is defined to include "(a) the Lenders, (b) the Adminsitrative Agent, (c) the Collateral Agent," among others. (Security Agreement § 1.01.)

7

claim, and they prohibit the Agent from credit bidding BDC's claim and releasing BDC's liens without BDC's prior written consent.

BDC also points to two other provisions that protect its rights to proceeds from any sale. First, under § 2.18(c) of the Credit Agreement, if any lender receives proceeds from a sale that are greater than that lender's proportionate share, that lender must share the excess proceeds ratably with the other lenders. And second, under § 5.02 of the Security Agreement, all proceeds from the sale by the Agent of any collateral must be distributed among the lenders "pro rata in accordance with the amounts of the Obligations owed to them on the date of any such distribution." BDC argues that the Agent's credit bid in favor of MDI violates these provisions by preventing BDC from obtaining a *pro rata* recovery, because BDC did not consent to join MDI.[7]

The Debtors argue that the same loan documents grant the Agent the authority to credit bid and to release collateral on behalf of all of the lending parties, including BDC. The Debtors first point to Article VIII of the Credit Agreement, which provides in relevant part:

> Each of the Lenders and the Issuing Bank hereby irrevocably appoints the Administrative Agent (it being understood that reference in this Article VIII to the Administrative Agent shall be deemed to include the Collateral Agent) as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Section 5.01 of the Security Agreement lists the remedies the Agent may undertake, specifically that it may "exercise any and all rights afforded to a secured party under the Uniform

---

[7] BDC also relied on these same provisions in arguing that the Court should adjourn the sale hearing, because without seeing the MDI capital structure or corporate governance provisions, and without knowing how MDI proposes to compensate lenders, the Court cannot know whether the Agent is complying with the Credit and Security Agreements. As explained below, the Court concludes that it does not have to reach these issues. What BDC is complaining about is fundamentally a dispute with the Agent, the Prepetition Term Lenders, and MDI, not with the credit bid itself.

Commercial Code or other applicable law. Without limiting the foregoing, each Grantor agrees . . . that the Collateral Agent shall have the right . . . to sell or otherwise dispose of all or any part of the Collateral . . . for cash, upon credit or future delivery as the Collateral Agent shall deem appropriate."

Furthermore, the Debtors argue that BDC misconstrues the Security Agreement's provisions on credit-bidding. The Debtors point out that the portion of § 5.01 that BDC argues prohibits the Agent from credit-bidding only concerns auctions conducted by the Agent under § 9-611 of the Uniform Commercial Code, not auctions conducted by the Debtors under § 363 of the Bankruptcy Code.[8] Since more than 50% of the holders of the prepetition term debt—over 95%, in fact—have agreed to credit bid, the Debtors argue that BDC cannot now object. With respect to the provisions regarding distribution of proceeds, the Debtors argue—and MDI agrees—that BDC's objections are more properly directed at the conduct of the Agent, not the sale itself. Approving the sale to MDI will not limit or impair BDC's rights or remedies, if any, against the Agent, MDI, or the Prepetition Term Lenders.[9] Rather, the Debtors are just seeking to sell their assets free and clear of liens and interests under § 363(f). For the reasons explained below, the Court finds that the Debtors' reading of the Credit Agreement and Security Agreement is correct and holds that the Agent may credit bid under § 363(k) up to the full amount of the debt and may release the lien on any collateral.

---

[8] The Creditors Committee also point out that "Secured Party" in the Security Agreement includes the Agent in its definition. Therefore, a plain reading of § 5.01 permits the Agent, as well as any individual lender, to credit bid.

[9] A version of the proposed sale order submitted to the Court required BDC to sign a "stockholder agreement" with MDI as a condition to receiving any distribution. After BDC objected to that language, the Debtors and MDI agreed to remove it from the sale order. The same version of the proposed sale order included language that arguably would have released MDI and the Agent from any claims by BDC relating to the Debtors. Debtors' counsel stated that the Debtors did not intend to provide such a release, and the Court made clear that no release of claims against non-debtors would be provided. Nothing in this Opinion or in the Sale Order is intended to limit or in any way impair BDC's rights or remedies with respect to the Agent, the Prepetition Term Lenders, or MDI, except that transferred assets are free and clear of any liens or interests.

## DISCUSSION

### A.    Relevant Authority

The Credit Agreement and Security Agreement both contain choice of law provisions designating New York law as governing the interpretation of the agreements. (Credit Agreement § 9.09(a); Security Agreement § 6.07.) Therefore, the Court looks to New York law to interpret the relevant provisions of the contracts.

"It is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. Consequently, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Capital Partners LP v. Presstek, Inc.*, --- N.E.2d ---, 2009 WL 1765986, 2009 slip op. 05200 (N.Y. June 24, 2009) (citing *Greenfield v. Philles Records*, 98 N.Y. 562, 569 (2002)). If unambiguous language is present, a court may not look further than the four corners of a contract. *See W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990); *Nicholas Labs., Ltd. v. Almay, Inc.*, 900 F.2d 19, 21 (2d Cir. 1990). This general principle extends to the interpretation of security agreements. *See In re Gordon Car and Truck Rental, Inc.,* 75 B.R. 466, 472 (Bankr. N.D.N.Y. 1987) ( "[T]he language of security agreements is to be interpreted as written.").

Contract language is unambiguous if the language has a definite and precise meaning and no reasonable person could disagree on this meaning. *White v. Continental Cas. Co.*, 9 N.Y.3d 264, 267 (2007) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)). To determine whether a contract provision is ambiguous, courts may review related agreements entered contemporaneously. *See In re Northwest Airlines Corp.*, 393 B.R. 337, 345 (Bankr. S.D.N.Y. 2008).

Finally, contracts should be "construed as to give effect to every word and expression contained therein." *Riggs v. Riggs*, 613 N.Y.S.2d 454 (3d Dep't 1994) (citing *Birnbaum v. Jamestown Mut. Ins. Co.* 298 N.Y. 305, 311 (1948)); *In re Allegiance Telecom, Inc.*, 356 B.R. 93, 98 (Bankr. S.D.N.Y. 2006).

### B.    Contractual Right to Credit Bid

Fortunately, the Court is not writing on a blank slate in interpreting the Credit and Security Agreements. Two courts—including the Second Circuit—have recently interpreted provisions similar to § 9.02(b) of the Credit Agreement that limit an agent's right to amend loan documents, and reached the same result, concluding that a § 363(b) sale does not require an amendment of any loan document and does not limit the agent's power to act in connection with a § 363 sale. In addition, a court interpreting language similar to the language contained in Article VIII of Metaldyne's Credit Agreement and § 5.01 of Metaldyne's Security Agreement concluded that the agent had authority to credit bid over the objection of some of the secured lenders.

The Second Circuit in *Chrysler* recently interpreted a contract provision substantially identical to § 9.02(b) and held that it did not give a dissenting lender rights to prohibit the collateral agent from acting on its behalf. *In re Chrysler LLC*, --- F.3d ---, 2009 WL 2382766, at *8 (2d Cir. Aug. 2, 2009). While this aspect of the *Chrysler* decision involved a collateral agent's consent to a free-and-clear sale of substantially all of the debtors' assets under § 363(f)(2), a dissenting secured creditor relied on a similar provision prohibiting modifications or amendments to its loan documents to argue that Chrysler had to obtain the dissenting lender's consent in order to sell its assets free and clear. The Second Circuit rejected this argument, holding that

11

> [t]he § 363(b) Sale did not entail amendment of any loan document. To the contrary, the § 363(b) sale was effected by implementing the clear terms of the loan agreements-specifically, the terms by which (1) the lenders assigned an agent to act on their behalf, (2) the agent was empowered, upon request from the majority lenders, to direct the trustee to act, and (3) the trustee was empowered, at the direction of the agent, to sell the collateral in the event of a bankruptcy. Because the Sale required no amendment to the loan documents, Chrysler was not required to seek, let alone receive, the Pensioners' written consent.

*Id.* at *9. Similarly here, the sale through a credit bid does not involve or require amendment or modification of the loan documents. Rather, as provided for in Article VIII of the Credit Agreement and § 5.01 of the Security Agreement, the sale was effected by the Agent acting on the secured lenders' behalf, including BDC.[10]

*Chrysler*'s reasoning is further bolstered by Judge Walsh's analysis in *In re GWLS Holdings, Inc.*, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009), where he faced a strikingly similar situation to the one presented here. There, the debtor, GWLS Holdings, sought approval of the sale of substantially all of its assets to its first lien lenders as a result of a credit bid. Of the $337 million in first lien debt, holders of all but $1 million consented to the sale. Grace Bay Holdings, a holder of $1 million in first lien debt, objected. Significantly, Grace Bay relied on contract provisions substantively identical to § 9.02(b)(vi) of the Credit Agreement, arguing, as BDC argues here, that unanimous consent was required for any modification of the agreement, including the "waiver and release of the First Lien Lenders' claims to the collateral securing their claims . . . ." *Id.* at *5. Consistent with the Second Circuit's view in *Chrysler*, Judge Walsh

---

[10] Judge Gonzalez, in the opinion affirmed by the Second Circuit, similarly observed that the purpose of the loan documents "is to have the [Agent] act in the collective interest of the lenders. Restricting enforcement to a single agent to engage in unified action for the interests of a group of lenders, based upon a majority vote, avoids chaos and prevents a single lender from being preferred over others." *In re Chrysler LLC*, 405 B.R. 84, 103 (Bankr. S.D.N.Y. 2009) (citing *In re Enron Corp.*, 302 B.R. 463, 476 (Bankr. S.D.N.Y. 2003), *aff'd* 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. Fed. 14, 2005)).

rejected this argument, holding that this section only prohibits waivers and modifications of the loan documents themselves without unanimous consent, not credit bidding. *Id.*

Judge Walsh also looked at other provisions that are similar to Article VIII and § 5.01 and concluded that the agent had authority to credit bid on behalf of Grace Bay. As with Article VIII of the Metaldyne Credit Agreement, the Grace Bay credit agreement provided that the agent could "exercise such powers as are delegated to such Agents by the terms hereof and thereof together with such actions and powers as are reasonably incidental thereto." Judge Walsh concluded that Grace Bay therefore delegated to the agent the authority to credit bid. *Id.* at *5. And as with § 5.01 of the Metaldyne Security Agreement, the Grace Bay collateral agreement provided that the agent had "all rights and remedies of a secured party under New York UCC or any applicable law." Judge Walsh concluded that "any applicable law" included "the Bankruptcy Code in general, and § 363(k) in particular." *Id.* The Court reaches the same conclusion here. By operation of Article VIII of the Credit Agreement and § 5.01 of the Security Agreement, BDC delegated to the Agent authority to credit bid for the Debtors' assets and to release collateral as part of that transaction.[11]

Furthermore, the Court does not find persuasive BDC's argument that the portion of § 5.01 providing for a "Secured Party's" right to credit bid prohibits the Agent from credit bidding on BDC's (or any other secured lender's) behalf. First, as noted above, that portion of § 5.01 only concerns an auction conducted by the Agent in accordance with § 9-611 of the Uniform Commercial Code, not an auction conducted by the Debtors in accordance with § 363 of the Bankruptcy Code. By its terms, it is inapplicable to this case. Furthermore, that provision also

---

[11] Article VIII also prevents BDC from demanding adequate protection under § 363(e). Pursuant to Article VIII, BDC assigned to the Agent its rights and remedies under the Prepetition Term Loan Facility. BDC may have been a secured creditor at the outset, but once the Agent, acting on the secured lenders' behalf, releases the liens, BDC loses its status as a secured creditor entitled to adequate protection under § 363(e).

13

provides that it is the Agent and not any individual lender that determines "in its sole and absolute discretion" whether the collateral is sold in its entirety or in separate parcels. And finally, even if this provision did apply to bankruptcy sales, as BDC argues, the definition of "Secured Party" includes the Agent itself. The provision therefore does not restrict the Agent's right to credit bid.

BDC points to no other provision in the loan documents that restricts the Agent's right to credit bid or release collateral as part of that credit bid. BDC assigned to the Agent the right to credit bid and dispose of collateral. While the loan documents restrict the right of the Agent to unilaterally alter or waive any provisions in the agreements without the various constituent lenders' consent, nothing in the agreements prohibits the Agent from exercising rights that are consistent with § 363(k) of the Bankruptcy Code. The Court concludes that the Agent properly credit bid 100% of the term debt to purchase substantially all of the Debtors' assets in the auction and released the lien with respect to the remaining collateral that the Debtors will retain.

### C.    BDC's Contractual Rights to *Pro Rata* Proceeds from the Sale

BDC raises one additional objection to the sale: that without knowing the corporate structure of MDI and without knowing what consideration BDC, as a non-member of MDI, will receive, the Court cannot approve the sale since it may violate the provisions of the loan documents requiring that sale proceeds be distributed *pro rata* among the lenders.

BDC's objections are based on provisions in the loan documents entitling it to a *pro rata* distribution from the sale and raise issues concerning an inter-creditor dispute or a dispute between BDC and the Agent, neither of which is properly before this Court at this time, if they ever could properly be brought before this Court. At the Court's insistence, any provisions in the sale order that would bar or limit BDC's claims, if any, against MDI, the Prepetition Term

14

Lenders, or the Agent have been removed (except that the sale is free and clear of all liens and interests). Nothing in the sale order dictates how proceeds from or equity in the purchased assets should be shared among the lenders. The Second Circuit in *Chrysler* was also presented with an argument that the agent's conduct in connection with the § 363 sale violated the rights of a dissenting secured creditor. The court questioned whether the bankruptcy court would have jurisdiction to adjudicate the dispute and declined "to consider whether the allegations might give rise to some independent cause of action." 2009 WL 2382766, at *9. The Court in this case similarly declines to consider whether BDC has independent causes of action against MDI, the Prepetition Term Lenders, or the Agent.[12]

## CONCLUSION

As further detailed in the Sale Order entered contemporaneously with this Opinion, the Court concludes that there is a sound business reason for the sale of substantially all of the Debtors' assets at this time. The evidence at the hearing showed that the value of the Debtors' business is declining rapidly and that if a sale is not consummated at this time, there may be even less available for creditors. In addition, the evidence showed that the consideration MDI is offering—a cash price, plus a credit bid of the entire prepetition term loan debt, plus the assumption of all cure costs, plus the assumption of $8.5 million in administrative expense claims, and plus a provision of $2.5 million to fund litigation—is far in excess of any other offer for the Debtors' assets on the table and far in excess of the liquidation value of those same

---

[12] In a last-ditch effort to stall the sale, BDC requested at the sale hearing that the Court follow Judge Walsh's approach in *GWLS Holdings* and only approve the sale subject to a lien in the amount of BDC's claim, and allow the parties additional time for briefing and discovery. In *GWLS Holdings*, where "the sole issue was the contract interpretation issue," Judge Walsh had only been presented with the loan documents at the start of the sale hearing and had not had an opportunity to review them. *GWLS Holdings*, 2009 WL 453110, at *3. He therefore requested additional briefing (not discovery) and approved the sale subject to a lien in favor of Grace Bay. Here, the sole issue is the interpretation of substantively identical contract provisions that Judge Walsh and the Second Circuit in *Chrysler* have already interpreted. The Court therefore concludes that no additional briefing is necessary.

assets. Lastly, the evidence showed that time for consummating the sale is of the essence, because the DIP Lenders are not obligated—and in fact have refused—to fund these cases beyond the next few weeks. The totality of the circumstances presented here easily supports approving the sale at this juncture. A Sale Order containing the Court's detailed findings of fact and conclusions of law in support of the sale will be entered contemporaneously herewith.

Dated: August 12, 2009
      New York, New York

                                            **/s/Martin Glenn**
                                            MARTIN GLENN
                                    United States Bankruptcy Judge