**[THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Oldco M Corporation (f/k/a Metaldyne Corporation),** *et al.*, | : | **Case No. 09-13412 (MG)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | |
| _____ | : | |
| | : | **FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE FIRST AMENDED JOINT PLAN OF LIQUIDATION OF DEBTORS AND DEBTORS IN POSSESSION** |
| | : | _____ |
| | : | |
| | : | JONES DAY |
| | : | 222 East 41st Street |
| | : | New York, New York  10017 |
| | : | Telephone:  (212) 326-3939 |
| | : | Facsimile:  (212) 755-7306 |
| | : | Richard H. Engman |
| | : | |
| | : |  - and - |
| | : | |
| | : | JONES DAY |
| | : | North Point |
| | : | 901 Lakeside Avenue |
| | : | Cleveland, Ohio  44114 |
| | : | Telephone:  (216) 586-3939 |
| | : | Facsimile:  (216) 579-0212 |
| | : | Heather Lennox |
| | : | Ryan T. Routh |
| | : | |
| | : | Attorneys for Debtors and Debtors in Possession |

Date Proposed Disclosure Statement Filed with Court:  January 8, 2010

**FIRST AMENDED DISCLOSURE STATEMENT, DATED JANUARY        , 2010**
**SOLICITATION OF VOTES**
**WITH RESPECT TO THE**
**FIRST AMENDED JOINT PLAN OF LIQUIDATION**
**OF DEBTORS AND DEBTORS IN POSSESSION**

———————————————

**The board of directors of Oldco M Corporation (f/k/a Metaldyne Corporation) (referred to in this Disclosure Statement as "Oldco M" or "Old Metaldyne" and, collectively with 30 of its domestic direct and indirect subsidiaries, the "Debtors") believe that the First Amended Joint Plan of Liquidation of Debtors and Debtors in Possession attached as Exhibit I (the "Plan") to this First Amended Disclosure Statement for the Plan (this "Disclosure Statement") is in the best interests of creditors and other stakeholders. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth beginning on page 7 of this Disclosure Statement. More detailed instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and received by 5:00 p.m., Eastern time, on                , 2010 (the "Voting Deadline"), unless extended.**

———————————————

**The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied. See Section II.I. There is no assurance that these conditions will be satisfied or waived.**

———————————————

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

———————————————

**All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit I and the Risk Factors described under Section VIII, prior to submitting ballots in response to this solicitation.**

———————————————

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto and documents described therein as being Filed prior to approval of the Disclosure Statement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (*www.bmcgroup.com/metaldyne*) no later than ten days before the Confirmation Hearing. The Debtors also will serve the exhibits to the Plan via electronic mail on the parties on the general service list being maintained in the Chapter 11 Cases on or before ten days before the Confirmation Hearing.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the financial information regarding the Debtors and the liquidation analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

_____

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses, if any, and assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Section VIII. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward looking statements, whether as a result of new information, future events or otherwise.

**This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

_____

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT AND OVERVIEW OF THE PLAN ......................................................... 1

II. OVERVIEW OF THE PLAN .............................................................................................................. 2

    A. Introduction.................................................................................................................................. 2

    B. Summary of Classes and Treatment of Claims and Interests ..................................................... 3

        1. Priority Claims (Class 1 Claims) .................................................................................. 3

        2. Secured Claims (Class 2 Claims)................................................................................. 3

        3. Customer Note Claims (Class 3 Claims) ..................................................................... 3

        4. General Unsecured Claims  (Class 4 Claims)............................................................... 3

        5. Prepetition Intercompany Claims (Class 5 Claims) ..................................................... 3

        6. Subordinated Securities Claims (Class 6 Claims)........................................................ 3

        7. Old Common Stock of Oldco M (Class 7 Interests) ..................................................... 3

        8. Subsidiary Debtor Equity Interests (Class 8 Interests) ................................................ 3

    C. Impact of Classification of Claims on Subordination Rights....................................................... 5

        1. Provisions Relating to 2012 Senior Subordinated Note Claims and 2013 Senior
            Note Claims .................................................................................................................. 5

        2. Classification of Claims................................................................................................ 5

        3. Settlement .................................................................................................................... 6

    D. General Information Concerning Treatment of Claims and Interests ............................................ 6

    E. Special Provisions Relating to the Rights of Setoff of Creditors .................................................. 6

    F. Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims;
        Maximum Recovery..................................................................................................................... 6

    G. Sources of Payment of Certain Claims ...................................................................................... 7

    H. Voting on and Confirmation of the Plan .................................................................................... 7

        1. Voting Procedures and Requirements........................................................................... 7

        2. Confirmation Hearing ................................................................................................... 8

        3. Confirmation................................................................................................................. 8

        4. Acceptance or Cramdown............................................................................................. 9

        5. Feasibility .................................................................................................................... 9

        6. Best Interests Test; Chapter 7 Liquidation Analysis.................................................... 10

        7. Compliance with Applicable Provisions of the Bankruptcy Code................................. 11

        8. Alternatives to Confirmation and Consummation of the Plan ...................................... 11

    I. Conditions Precedent to the Effective Date of the Plan ............................................................. 11

        1. Conditions to the Effective Date.................................................................................. 11

        2. Waiver of Conditions to Confirmation or the Effective Date ........................................ 11

        3. Effect of Nonoccurrence of Conditions to the Effective Date ...................................... 12

        4. Request for Waiver of Stay of Confirmation Order....................................................... 12

        5. Substantive Consolidation of the Debtors.................................................................... 12

        6. Modification of the Plan .............................................................................................. 12

# TABLE OF CONTENTS

| | | 7. | Revocation of the Plan | 13 |

III. HISTORY OF THE DEBTORS .................................................................................................. 13

    A.    Historical Overview ................................................................................................. 13

    B.    The Old Metaldyne Companies on the Petition Date ............................................ 15

    C.    The Business Groups ............................................................................................... 15

        1.    Powertrain ................................................................................................... 15

        2.    Chassis ........................................................................................................ 16

    D.    Organizational Structure ......................................................................................... 16

    E.    Outstanding Equity Interests .................................................................................. 16

IV. CAPITAL STRUCTURE ........................................................................................................... 17

    A.    Significant Indebtedness ......................................................................................... 17

        1.    The Prepetition Senior Secured Loan Agreement ..................................... 17

        2.    The Prepetition ABL Agreement ............................................................... 18

        3.    The 2013 Senior Notes ............................................................................... 19

        4.    2012 Senior Subordinated Notes ................................................................ 20

        5.    The Intercreditor Agreements .................................................................... 20

        6.    The Customer Notes ................................................................................... 21

        7.    Prepetition Trade Debt ............................................................................... 21

    B.    Other Liabilities ...................................................................................................... 21

V. EVENTS LEADING UP TO THE DEBTORS' CHAPTER 11 FILING ................................... 22

    A.    Macroeconomic and Industry-Specific Problems ................................................. 22

    B.    Other Precipitating Factors ..................................................................................... 25

    C.    Recent Financial Performance ............................................................................... 25

    D.    The Old Metaldyne Companies' Operational Restructuring Efforts ..................... 26

    E.    2009 Negotiations with Stakeholders ................................................................... 26

VI. EVENTS DURING THE CHAPTER 11 CASES ....................................................................... 27

    A.    Commencement of Chapter 11 Cases ..................................................................... 27

    B.    First Day Relief ....................................................................................................... 27

    C.    Appointment of Creditors' Committee ................................................................... 28

    D.    Retention of Advisors for the Debtors .................................................................... 28

    E.    Debtor-in-Possession Financing ............................................................................. 29

    F.    Key Supplier Agreements ....................................................................................... 30

    G.    Termination of Pension Plans ................................................................................. 30

    H.    Sale of Certain Assets of the Old Metaldyne Companies ...................................... 31

        1.    Marketing of Powertrain Group Assets ..................................................... 31

        2.    Marketing of Chassis Group Assets ........................................................... 32

        3.    Auction and Sale of Assets to MD Investors Corporation ......................... 32

# TABLE OF CONTENTS

4.      Assets Not Sold in Sale Transaction ........................................................................ 34

I.     New Castle Facility ................................................................................................................ 34

J.     Assumption and Rejection of Certain Unexpired Executory Contracts and Leases.................... 35

K.     Claims Process and Bar Dates................................................................................................. 36

L.     Securities Litigation ............................................................................................................... 37

M.     Extension of Exclusive Periods ............................................................................................... 37

N.     Agreements with Customers at Remaining Facilities ............................................................... 37

        1.      Middleville Facility ....................................................................................... 38

        2.      Niles Facility ................................................................................................. 38

        3.      Thamesville Facility ...................................................................................... 38

        4.      Greensboro Facility ....................................................................................... 39

O.     Collective Bargaining Agreements and Retiree Benefit Obligations......................................... 39

VII.   THE DISTRIBUTION TRUST CREATED PURSUANT TO THE PLAN ............................................. 40

A.     Distribution Trust Generally ................................................................................................... 40

B.     Funding of and Transfer of Assets Into the Distribution Trust .................................................. 41

C.     Oversight Committee .............................................................................................................. 42

D.     Distribution Trustee ............................................................................................................... 42

E.     Distribution Trust Agreement ................................................................................................. 42

F.     Reports to be Filed by the Distribution Trustee ....................................................................... 42

G.     Fees and Expenses of the Distribution Trust............................................................................ 42

H.     Indemnification ..................................................................................................................... 43

I.     Tax Treatment ....................................................................................................................... 43

J.     Settlement of Claims .............................................................................................................. 44

K.     Sales of Assets by Distribution Trust ...................................................................................... 44

L.     Maintenance of Businesses by Distribution Trustee ................................................................. 44

M.     Creation and Maintenance of Trust Accounts and Distribution Trust Pools................................ 44

        1.      Creation of Trust Accounts ............................................................................ 44

        2.      Additional Funding of Trust Accounts ............................................................ 44

        3.      Closure of Trust Accounts ............................................................................. 44

VIII.  RISK FACTORS ...................................................................................................................... 44

A.     Allowance of Claims.............................................................................................................. 45

B.     Risk of Non-Confirmation of the Plan .................................................................................... 45

C.     Nonconsensual Confirmation .................................................................................................. 46

D.     Delays in Confirmation or Effective Date................................................................................ 46

E.     Distribution Trustee ............................................................................................................... 46

F.     Avoidance Actions ................................................................................................................. 46

G.     Substantive Consolidation....................................................................................................... 46

# TABLE OF CONTENTS

**Page**

| | | | |
|---|---|---|---|
| H. | | Securities Laws Considerations Regarding Trust Interests | 47 |
| | 1. | Non-Transferability of Trust Interests | 47 |
| | 2. | Uncertainty of Value of Trust Interests | 47 |
| IX. | | DISTRIBUTIONS UNDER THE PLAN | 47 |
| A. | | Payment of Administrative Claims | 47 |
| | 1. | Administrative Claims in General | 47 |
| | 2. | Statutory Fees | 47 |
| | 3. | Bar Dates for Administrative Claims | 48 |
| B. | | Payment of Priority Tax Claims | 48 |
| C. | | Distributions for Claims Allowed as of the Effective Date | 49 |
| D. | | Method of Distributions to Holders of Claims | 49 |
| E. | | Compensation and Reimbursement for Services Related to Distributions | 49 |
| F. | | Investment of Trust Accounts | 49 |
| G. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 49 |
| | 1. | Delivery of Distributions | 49 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 50 |
| H. | | Distributions on Account of Allowed Claims in Class 1 and Class 2 | 50 |
| I. | | Distributions on Account of Certain Noteholder Claims in Class 4 | 50 |
| | 1. | Status of Indentures; Role of 2012 Indenture Trustee and 2013 Indenture Trustee | 50 |
| | 2. | Implementation of Indenture Provisions and Subordination Rights | 51 |
| J. | | Selection of Distribution Dates for Class 3 Claims and Class 4 Claims and Provision of Notice Thereof | 52 |
| K. | | Calculation of Amounts to Be Distributed to Holders of Class 3 Claims and Class 4 Claims | 52 |
| L. | | Other Provisions Applicable to Distributions in All Classes | 52 |
| | 1. | Postpetition Interest | 52 |
| | 2. | Compliance with Tax Requirements | 53 |
| | 3. | Allocation of Distributions | 53 |
| M. | | Distribution Record Date | 53 |
| N. | | Means of Cash Payments | 53 |
| O. | | Surrender of Canceled Instruments or Securities | 53 |
| P. | | Setoffs | 53 |
| X. | | DISPUTED CLAIMS AND IMPLEMENTATION OF THE PLAN | 54 |
| A. | | Treatment of Disputed Claims | 54 |
| | 1. | Tort Claims | 54 |
| | 2. | No Distributions Pending Allowance | 54 |
| B. | | Objections to Claims | 54 |
| | 1. | Authority to Prosecute | 54 |

# TABLE OF CONTENTS

2. Pending Objections .................................................................................................... 54

3. Application of Bankruptcy Rules ............................................................................... 54

4. Authority to Amend Schedules .................................................................................. 55

5. Request for Extension of Claims Objection Bar Date .............................................. 55

C. Distributions on Account of Disputed Class 4 Claims Once Allowed ......................................... 55

D. Corporate Existence ............................................................................................................. 55

E. Dissolution Transactions ...................................................................................................... 55

1. Dissolution Transactions Generally ......................................................................... 55

2. Recourse Solely to Distribution Trust Assets ......................................................... 56

F. Corporate Governance, Directors and Officers .................................................................... 56

1. Certificates of Incorporation and Bylaws ................................................................ 56

2. Directors and Officers .............................................................................................. 56

3. Corporate Action ...................................................................................................... 56

G. No Revesting of Assets ......................................................................................................... 56

H. Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation ................ 56

1. Preservation of Causes of Action; Recovery Actions ............................................. 56

2. Comprehensive Settlement of Claims and Controversies ....................................... 57

3. Releases .................................................................................................................... 57

I. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims ..................... 58

J. Cancellation and Surrender of Instruments, Securities and Other Documentation ..................... 58

K. Release of Liens .................................................................................................................... 58

L. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 58

1. Effectuating Documents and Further Transactions .................................................. 58

2. Exemption From Transfer Taxes .............................................................................. 58

M. Implementation of Settlement with MD Investors ............................................................... 59

N. Substitution of Pending Legal Actions ................................................................................. 59

XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................... 59

A. Rejection of Executory Contracts and Unexpired Leases ..................................................... 59

1. Rejection ................................................................................................................... 59

2. Notice of Rejection ................................................................................................... 59

3. Bar Date for Rejection Damages .............................................................................. 59

4. Special Provisions Relating to Niles, Illinois and Middleville, Michigan
Premises .................................................................................................................... 59

B. Contracts and Leases Entered Into After the Petition Date .................................................. 60

C. Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........ 60

D. Payments Related to the Assumption of Executory Contracts and Unexpired Leases ................. 60

1. Assumption and Assignment Generally .................................................................... 60

|  |  |  |  |
|---|---|---|---|
|  | 2. | Assignments to Distribution Trust | 60 |
|  | 3. | Approval of Assumptions and Assumption Procedures | 60 |
| XII. | Analysis of Substantive Consolidation | | 61 |
| XIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN | | 63 |
| A. | General | | 63 |
| B. | U.S. Federal Income Tax Consequences to Holders of Claims | | 64 |
|  | 1. | Holders of Claims Generally | 64 |
|  | 2. | Holders of Allowed General Unsecured Claims | 64 |
| C. | Certain Other Tax Considerations for Holders of Claims | | 65 |
|  | 1. | Pre-Effective Date Interest | 65 |
|  | 2. | Post-Effective Date Interest | 65 |
|  | 3. | Bad Debt Deduction | 65 |
|  | 4. | Market Discount | 66 |
|  | 5. | Installment Method | 66 |
|  | 6. | Information Reporting and Backup Withholding | 66 |
| D. | Importance of Obtaining Professional Tax Assistance | | 66 |
| XIV. | ADDITIONAL INFORMATION | | 67 |
| XV. | RECOMMENDATION AND CONCLUSION | | 67 |

## TABLE OF EXHIBITS

**EXHIBIT I**      **First Amended Joint Plan of Liquidation of Debtors and Debtors in Possession**

**EXHIBIT II**     **Feasibility Analysis**

**EXHIBIT III**    **Chapter 7 Liquidation Analysis**

## I. PRELIMINARY STATEMENT AND OVERVIEW OF THE PLAN

The Debtors are seeking approval of the Plan, a copy of which is attached as Exhibit I. This Disclosure Statement is submitted by the Debtors in connection with the solicitation of acceptances of the Plan.

Oldco M Corporation (f/k/a Metaldyne Corporation) (referred to in this Disclosure Statement as "Oldco M" or "Old Metaldyne") is a wholly-owned subsidiary of Metaldyne Holdings LLC ("Old Metaldyne Holdings"). Old Metaldyne is the direct or indirect parent of each of the other Debtors and was, on the Petition Date, the direct or indirect parent of a number of foreign entities (collectively with the Debtors, the "Old Metaldyne Companies"), certain of which have been sold during the course of the Chapter 11 Cases. See Section VI.H. On January 11, 2007, in connection with a plan of merger, Asahi Tec Corporation ("Asahi Tec"), a Japanese corporation, acquired the shares of Old Metaldyne (the "Asahi Tec Transaction"). On the same date, Asahi Tec contributed those shares to Old Metaldyne Holdings, and Asahi Tec thereby became the indirect parent of Old Metaldyne and the other Debtors. RHJ International S.A. ("RHJI"), a corporation formed under the laws of Belgium and listed on the Euronext exchange, held approximately 60.1% of the outstanding capital stock of Asahi Tec as of the Petition Date.

On the Petition Date and through the closing of the Sale Transaction (as such term is defined below), the Old Metaldyne Companies were leading global manufacturers of highly engineered metal components for the global light vehicle market and are market leaders for many of the products that they sell. The Old Metaldyne Companies operated through two primary business units, the powertrain group and the chassis group, each of which accounted for approximately 50% of the Old Metaldyne Companies' worldwide sales during the fiscal year ended March 29, 2009. The powertrain group manufactured a broad range of powertrain components, sub-assemblies and modules, including steel powder metal connecting rods and engine bearing caps, aluminum castings, including valve bodies, clutch modules, balance shaft modules, front cover assemblies, differential assemblies, crankshaft dampers and tubular fabricated products that are used for a variety of applications. The chassis group manufactured components and sub-assemblies used in a variety of engineered chassis applications, including wheel-ends, knuckles and mini-corner assemblies, and utilized a variety of machining and assembly processes and applied full-service integrated machining and assembly capabilities to an array of chassis components.

The Old Metaldyne Companies' products were used in cars, mini-vans, sport-utility vehicles, light trucks, heavy trucks and other vehicles. The Old Metaldyne Companies provided content for the majority of the light vehicles manufactured in North America. The majority of the products manufactured by the Old Metaldyne Companies were sold directly to original equipment manufacturers ("OEMs"), but the Old Metaldyne Companies also made substantial amounts of sales to the OEMs' Tier I suppliers. The Old Metaldyne Companies' largest customers were Ford Motor Company ("Ford"), Chrysler LLC and its successor, Chrysler Group LLC (together, "Chrysler"), and General Motors Corporation and its successor, General Motors Company (together, "GM", and collectively with Chrysler and Ford, the "North American OEMs"). For the 2008 calendar year, these three entities accounted for approximately 18%, 17% and 7%, respectively, of the Old Metaldyne Companies' direct sales and for approximately 19%, 25% and 10%, respectively, of the Debtors' direct sales. If "indirect sales" — the sales of parts that are made to Tier I suppliers that are incorporated into products and assemblies that are then sold to Ford, Chrysler and GM — were added to the sales made directly to the North American OEMs, these three entities would have accounted for at least 60% of the Old Metaldyne Companies' sales and at least 75% of the Debtors' sales for the 2008 calendar year.

The commencement of the Chapter 11 Cases resulted from two primary sources: the dramatic and well-publicized pressures in the global auto industry — including the significant reduced production volumes resulting from those pressures and the Chapter 11 Cases — and the liquidity pressures placed upon the Debtors in light of industry stresses, their own capital structure and the reluctance of banks and other providers of capital to lend to automotive suppliers.

The Debtors anticipate that most, but not all, of their assets will have been liquidated and converted to Cash as of the Effective Date of the Plan. As discussed more fully in Section VII, pursuant to the Plan, the Debtors propose to establish a distribution trust to liquidate the Debtors' remaining assets, resolve Claims and make distributions pursuant to the Plan. The Plan also provides that all other Classes of Allowed Claims will be treated as set forth in the Plan and as summarized on the classification and treatment chart in Section II.B. Holders of Old

Common Stock and Subordinated Securities will receive no distribution under the Plan, and all Interests will be terminated as of the Effective Date.

## II. OVERVIEW OF THE PLAN

### A. Introduction

The following is a brief overview of certain material provisions of the Plan. This overview is qualified by reference to the provisions of the Plan, which is attached hereto as Exhibit I, and the exhibits thereto, as amended from time to time. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (*www.bmcgroup.com/metaldyne*) no later than ten days before the Confirmation Hearing. The Debtors also will serve the exhibits to the Plan via electronic mail on the parties on the general service list being maintained in the Chapter 11 Cases on or before ten days before the Confirmation Hearing.

The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. Although referred to as a plan of reorganization or plan of liquidation, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan. In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is, therefore, referred to as a "plan of liquidation." The primary objectives of the Plan are to (1) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis in accordance with the priorities established by the Bankruptcy Code and (2) settle, compromise or otherwise dispose of certain claims and interests on terms that the Debtors believe to be fair and reasonable and in the best interests of the Debtors' respective Estates and creditors. The Plan provides for, among other things: (a) the dissolution of each of the Debtors; (b) establishment of the Distribution Trust to take possession of the Debtors' remaining assets and then distribute the assets of the Distribution Trust to the holders of Allowed Claims; (c) rejection of all unexpired Executory Contracts and Unexpired Leases to which any Debtor is a party that were not previously assumed and assigned or rejected (subject to certain limited exceptions); and (d) certain other transactions to effect the Plan.

**By an order of the Bankruptcy Court dated             , 2010, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan . . . ." 11 U.S.C. § 1125(a)(1).**

The Debtors believe that the Plan is in the best interests of creditors and other stakeholders. All creditors entitled to vote are urged to vote in favor of the Plan by no later than the Voting Deadline.

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in Section II.H. The occurrence of the Effective Date is subject to certain conditions, which are summarized in Section II.I. There can be no assurance that these conditions will be satisfied.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan of liquidation are that the plan: (1) is accepted by the requisite holders of claims and interests in impaired classes of the debtor; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for the debtor; and (3) complies with the applicable provisions of the Bankruptcy Code. In this instance, only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan. See Section II.H for a discussion of the Bankruptcy Code requirements for Confirmation of the Plan.

**B.  Summary of Classes and Treatment of Claims and Interests**

The Plan divides holders of Claims against and Interests in the Debtors into eight (8) separate classes as follows:

**1.  Priority Claims (Class 1 Claims) are unimpaired**.  On the Effective Date, each holder of an Allowed Priority Claim will receive, from the Debtors or the Distribution Trust, Cash equal to the amount of such Allowed Claim.

**2.  Secured Claims (Class 2 Claims) are unimpaired**.  On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Secured Claim, other than a Customer Note Claim, will be classified in Class 2 and receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A or B below, at the election of the applicable Debtor or the Distribution Trustee.  The applicable Debtor will be deemed to have elected Option A except with respect to any Allowed Secured Claim as to which the applicable Debtor elects Option B in one or more pleadings Filed prior to Effective Date.

*Option A*:  On the Effective Date, Allowed Claims in Class 2 with respect to which the applicable Debtor elects Option A will receive Cash equal to the amount of such Allowed Claim.

*Option B*:  On the Effective Date, a holder of an Allowed Claim in Class 2 with respect to which the applicable Debtor elects Option B will be entitled to receive (and the applicable Debtor or the Distribution Trustee will release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim in Class 2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 4.  The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, MD Investors, the Distribution Trust or Distribution Trustee, or their respective property (other than as a holder of a Class 4 Claim).  In addition, to the extent a Class 2 Claim is based upon a right of setoff, the Debtors or the Distribution Trustee will not be required to pay such Claim, if Allowed, in Cash, but instead may acquiesce to the setoff of funds to satisfy the Claim.

**3.  Customer Note Claims (Class 3 Claims) are impaired**.  Holders of Allowed Customer Note Claims will be treated as unsecured claims under the Plan and will receive their Pro Rata share of Unsecured Creditor Distributions.

**4.  General Unsecured Claims  (Class 4 Claims) are impaired**.  Holders of Allowed 2013 Senior Note Claims, Allowed 2012 Senior Subordinated Note Claims and any other Allowed General Unsecured Claim (other than Allowed Customer Note Claims) and will receive their Pro Rata share of Unsecured Creditor Distributions.

**5.  Prepetition Intercompany Claims (Class 5 Claims) are impaired**.  No property will be distributed to or retained by the holders of Allowed Claims in Class 5.

**6.  Subordinated Securities Claims (Class 6 Claims) are impaired**.  No property will be distributed to or retained by the holders of Allowed Claims in Class 6, and such Interests will be canceled on the Effective Date.  Holders of the Class 6 Claims will be deemed to have rejected the Plan.

**7.  Old Common Stock of Oldco M (Class 7 Interests) are impaired**.  No property will be distributed to or retained by the holders of Allowed Interests in Class 7, and such Interests will be canceled on the Effective Date.  The holder of the Class 7 Interests will be deemed to have rejected the Plan.

**8.  Subsidiary Debtor Equity Interests (Class 8 Interests) are impaired**.  No property will be distributed to or retained by the holders of Allowed Interests in Class 8, and such Interests will be canceled on the Effective Date.  Holders of Class 8 Interests will be deemed to have rejected the Plan.

The estimated percentage recovery for each class under the Plan is provided in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, except as described in Section II.A of the Plan, have not been classified. For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Sections IX.A and IX.B. The Debtors' estimate of recoveries for holders of Claims in Classes 3 and 4 under the Plan are based on their estimate of the Administrative Claims, Cure Amount Claims, Priority Tax Claims, Priority Claims and Secured Claims that will ultimately be Allowed, including those that were Filed as of the date of this Disclosure Statement; *however*, there can be no assurance that the Debtors' estimate of the likely aggregate allowed amount of such Claims will prove to be accurate.

The estimated amounts of Claims shown in the table below are based upon the Debtors' preliminary review of certain (but not all) of the Claims Filed on or before October 15, 2009 and the Debtors' books and records and may be revised substantially following the completion of a detailed analysis of all the Claims Filed. In addition, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets of the Distribution Trust to be distributed to holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class. Each of the estimated Cash or other Distribution Trust Assets and the estimated aggregate amount of Allowed Claims has been made in ranges with both low and high estimates. In determining such amount, the Debtors have assumed that the Plan is consummated as described therein. These calculations do not include any value attributed to Recovery Actions, including preference actions, by any of the Estates. The Debtors have not commenced a review of potential Recovery Actions and, therefore, they are not in a position to provide an estimated value for such actions.

For a discussion of various factors that could materially affect the amount of Cash and other assets of the Distribution Trust to be distributed pursuant to the Plan, see Section VIII and the Feasibility Analysis attached hereto as Exhibit II. In addition, the Debtors' estimates for recoveries by holders of Allowed Claims are based on the Debtors' current view of the likely amount of Allowed Claims incurred by the Debtors through Confirmation of the Plan. There can be no guaranty that the Debtors' estimates of Allowed Claims will prove to be accurate.

### SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED TOTAL AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 1 (Priority Claims) | Unimpaired; Not Entitled to Vote | $200,000-$325,000 | 100% |
| Class 2 (Secured Claims) | Unimpaired; Not Entitled to Vote | $300,000-$750,000 | 100% |
| Class 3 (Customer Note Claims) | Impaired; Entitled to Vote | $61,544,000 | 0.4 – 2.1% [1] |

---

[1]  The estimated percentage recovery for holders of Claims in Class 3 is based upon the outstanding principal amounts of the Customer Notes plus the Debtors' calculation of accrued and unpaid interest thereon as of the Petition Date.

| CLASS | STATUS/ ENTITLED TO VOTE? | ESTIMATED TOTAL AMOUNT OF CLAIMS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|
| Class 4 (General Unsecured Claims) | Impaired; Entitled to Vote | $193,311,000 – $307,586,000 | 0.4 – 2.1%[2] |
| Class 5 (Prepetition Intercompany Claims) | Impaired; Not Entitled to Vote | $194,195,000[3] | N/A |
| Class 6 (Subordinated Securities Claims) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | Unliquidated | N/A |
| Class 7 (Old Common Stock of Oldco M) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | N/A | N/A |
| Class 8 (Subsidiary Debtor Equity Interests) | Impaired; Deemed to Reject the Plan; Not Entitled to Vote | N/A | N/A |

For purposes of computations of Claim amounts, administrative and other expenses and similar computational purposes, the Effective Date is assumed to occur on February 15, 2010. There can be no assurance, however, if or when the Effective Date will actually occur.

### C.      Impact of Classification of Claims on Subordination Rights

#### 1.      Provisions Relating to 2012 Senior Subordinated Note Claims and 2013 Senior Note Claims

In accordance with section 510(a) of the Bankruptcy Code and by application of provisions of the 2012 Senior Subordinated Note Indenture, the subordination rights of holders of 2013 Senior Note Claims and the 2013 Indenture Trustee will be preserved, and will be implemented in accordance with Section V.G of the Plan.

#### 2.      Classification of Claims

Other than the subordination rights that are expressly preserved pursuant to Section II.C of the Plan, the classification and manner of satisfying all Claims and Interests under the Plan takes into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(a) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest

---

[2]     The estimated percentage recovery for holders of Claims in Class 4 is based upon the outstanding principal amounts of the 2013 Senior Notes and 2012 Senior Subordinated Notes plus the Debtors' calculation of accrued and unpaid interest thereon as of the Petition Date (along with the Debtors' estimates of other Class 4 Claims). For the reasons described in Section V.G. of the Plan, the Debtors estimate that recoveries to holders of Allowed 2012 Senior Subordinated Note Claims will likely be zero and recoveries to holders of Allowed 2013 Senior Note Claims will likely be in excess of the amounts shown.

[3]     Amount based upon the liquidated amounts identified in the Schedules.

holders with respect to any distribution made pursuant to the Plan. Except as provided in Section II.C of the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

### 3.     Settlement

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim, except as provided in Section II.C of the Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and Claim and Interest holders and is fair, equitable and reasonable.

### D.     General Information Concerning Treatment of Claims and Interests

Procedures for the distribution of Cash and other assets of the Distribution Trust in the Distribution Trust pursuant to the Plan are described in Article V of the Plan or will be set forth in the Distribution Trust Agreement. The determination of the relative distributions to be received under the Plan by the holders of Claims in certain Classes was based upon, among other factors, estimates of the amounts of Allowed Claims in such Classes and the relative priorities of such Allowed Claims. The distributions to be received by creditors in certain Classes could differ from these estimates if the estimates prove to be inaccurate.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization or liquidation in certain circumstances even if the plan is not accepted by all impaired classes of claims and interests. See Section II.H.4. The Debtors have reserved the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code. Although the Debtors believe that, if necessary, the Plan could be confirmed under the cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

### E.     Special Provisions Relating to the Rights of Setoff of Creditors

Nothing in the Plan will expand or enhance a creditor's right of setoff, which is determined as of the Petition Date. Nothing in the Plan is intended to, or should be interpreted to, approve any creditor's effectuation of a postpetition setoff without the consent of the Distribution Trustee unless prior Bankruptcy Court approval has been obtained.

### F.     Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery

Holders of Allowed Secondary Liability Claims against any of the Debtors will be entitled to only one distribution from the Debtors in respect of the Liabilities related to such Allowed Secondary Liability Claim, and such claims against all of the Debtors will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim.

Notwithstanding any provision of the Plan to the contrary, holders of Allowed Secondary Liability Claims against a Debtor may not receive more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

### G. Sources of Payment of Certain Claims

Payments made on account of Allowed Administrative Claims, Cure Amount Claims, Allowed Priority Tax Claims, Allowed Priority Claims in Class 1 and Allowed Secured Claims in Class 2 (where Option A is elected) will be made from funds held in the Other Asset Trust Account. In the event that insufficient funds exist in the Other Asset Trust Account to make distributions called for under the Plan, such payments may be made from funds of the Recovery Action Trust Account, with any such payments reimbursed to the Recovery Action Trust Account by the Other Asset Trust Account to the fullest extent possible and as soon as reasonably practicable as Cash is received into the Other Asset Trust Account. The Distribution Trustee will keep records of any transfers made by the Recovery Action Trust Account into the Other Asset Trust Account for this purpose. If insufficient Cash is paid into the Other Asset Trust Account to reimburse the Recovery Action Trust Account, any deficiency will be waived.

### H. Voting on and Confirmation of the Plan

#### 1. Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified other than by curing defaults and reinstating maturities. Classes of claims and equity interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan. In addition, classes of claims and equity interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected plan unless such class otherwise indicates acceptance. The classification of Claims and Interests under the Plan is summarized, together with an indication of whether each class of Claims or Interests is impaired or unimpaired, in Section II.B above.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. **By order of the Bankruptcy Court, certain vote tabulation rules have been approved that temporarily allow or disallow certain Claims for voting purposes only. These tabulation rules are described in the solicitation materials provided with your ballot.**

Voting on the Plan by each holder of an impaired Claim is important. If you hold Claims in more than one Class, if you hold multiple general unsecured Claims or under certain other circumstances, you may receive more than one ballot. You should complete, sign and return each ballot you receive.

Under the terms of the Plan, only Classes 3, 4, 5, 6, 7 and 8 are impaired. Because holders of Claims in Classes 5, 6, 7 and 8 are deemed to have voted to reject the Plan, only holders of Claims in Classes 3 and 4 are entitled to vote on the Plan. If any of Class 3 or 4 votes to reject the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety. Further, if any of Classes 3 or 4 votes to reject the Plan, the Debtors reserve the right, in their sole discretion, to seek to not confirm the Plan. If any of the Classes of holders of impaired Claims vote to reject the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety. See Sections II.H.4 and II.H.8.

Please carefully follow all of the instructions contained on the ballot or ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All ballots must be completed and returned in accordance with the instructions provided.

To be counted, your ballot or ballots must be received by the Voting Deadline by The BMC Group, Inc. ("The BMC Group"), as agent for the Debtors. It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.

If you are entitled to vote and you did not receive a ballot, received a damaged ballot or lost your ballot, please call the Debtors' voting agent, The BMC Group, at 1-888-909-0100.

**Votes cannot be transmitted orally or by facsimile, except in the case of a master ballot submitted by the tabulation agent. Accordingly, you are urged to return your signed and completed ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is <u>received</u> by the Debtors' voting agent on or before the Voting Deadline.**

Holders of Claims entitled to vote may withdraw or modify their ballots by delivering (or having their nominee deliver) to The BMC Group, prior to the Voting Deadline, a subsequent properly completed and duly executed ballot. After the Voting Deadline, withdrawals of or modifications to ballots will not be permitted.

## 2. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for _____, 2010. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to the Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be Filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

## 3. Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure has been made that is required by section 1125 of the Bankruptcy Code;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date;

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the successors to the Debtors have been made; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to creditors or interest holders on account of such Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or

retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in such Class has accepted the Plan.

In addition, the Bankruptcy Court will not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section VIII.C of the Plan:

- The Plan shall not have been materially amended, altered or modified from the Plan as Filed on _____, 2010, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

- The obligation the Debtors to make payments of retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), to the extent that such obligations have not been assumed and assigned by a Final Order as of the Confirmation Hearing, shall have been terminated.

### 4. Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Bankruptcy Court to be in the best interests of each holder of a claim or interest in an impaired class. See Section II.H.6.

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. As indicated above, the Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that, unless a dissenting Class of Unsecured Claims or a Class of Interests with respect to a debtor receives full compensation for its Allowed Claims or Allowed Interests, no holder of Allowed Claims or Interests with respect to such debtor in any junior Class may receive or retain any property on account of such Claims or Interests. The "fair and equitable" standard has also been interpreted to prohibit any Class senior to a dissenting Class from receiving under a plan more than 100% of the amount of their Allowed Claims or Allowed Interests. The Debtors believe that, if necessary, the Plan may be crammed down over the dissent of certain Classes of Claims, in view of the treatment proposed for such Classes.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Debtors do not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

Any Class of Claims or Interests that receives nothing under the Plan are deemed to be dissenting Classes. As a result, in addition to any Class that does not vote to accept the Plan, the Debtors will, to the extent required, seek to use the "cramdown" provisions described above in respect to the Claims and Interests.

### 5. Feasibility

In connection with Confirmation of the Plan, the Bankruptcy Court would have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors (unless such liquidation or reorganization is proposed by the Plan). Because the Debtors' Plan proposes a liquidation of all of their assets, for purposes of this test the Debtors have analyzed the ability of the Distribution Trust to meet its obligations under the Plan, including the payment of all Administrative Claims, all expenses of the Distribution Trust, all Priority Tax Claims and all Allowed Class 1 Claims and Allowed Class 2 Claims. Based on the Debtors'

analysis, the Distribution Trust will have sufficient assets to make these payments to accomplish its tasks under the Plan. A report setting forth the Debtors' analysis in this regard is attached hereto as Exhibit II. That report shows that, after the payments required to be made under the Plan are made, the Debtors expect to have between $1.7 million and $8.5 million (excluding any proceeds that may be generated by Recovery Actions) for distribution to holders of General Unsecured Claims and MD Investors. Therefore, the Debtors believe that their liquidation pursuant to the Plan meets the feasibility requirements of the Bankruptcy Code.

**6.      Best Interests Test; Chapter 7 Liquidation Analysis**

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor plus any cash held by the Debtor.

As these Chapter 11 Cases are now liquidating cases and the Plan is a liquidating plan, the Liquidation Value available to holders of Unsecured Claims and Interests would be similar in many ways to the amounts expected to be available for distribution under the Plan. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtors during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases. Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay Unsecured Claims or to make any distribution in respect of Interests.

The information contained in Exhibit III hereto (the "Liquidation Analysis") provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each of the Debtors' properties and interests in property.

In summary, based upon the Liquidation Analysis, while liquidation under chapter 7 is not entirely different from the liquidation proposed by the Plan, the Debtors believe that chapter 7 liquidations of the Debtors would result in a potentially significant diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan. The principal differences in estimated proceeds available for general unsecured creditors in a chapter 7 liquidation from the distributions and recoveries estimated in the Plan are (a) estimated chapter 7 trustee fees and (b) increased risk associated with the release of the Initial MD Investors Funding Amount from escrow in a chapter 7 scenario. These factors are discussed further in the Liquidation Analysis. The Liquidation Analysis demonstrates that, in a chapter 7 liquidation, holders of Claims in Classes 3 and 4 would receive lower recoveries and there would be an increased risk that Administrative Claims and other claims paid in full under the Plan would not be paid in full. In addition, while not accounted for in the Liquidation Analysis, the Debtors believe that they are better positioned to maximize the value of certain of their assets and minimize Allowed Claims due to their familiarity with the Debtors' businesses. Consequently, the Debtors believe that the Plan will provide a greater ultimate return to holders of Customer Note Claims, Class 4 Claims and General Unsecured Claims and will provide greater certainty to holders of Administrative Claims, Priority Claims and Priority Tax Claims than would a chapter 7 liquidation of each Debtor.

### 7. Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan, believe that the Plan complies with all provisions of the Bankruptcy Code and will File a brief in support of Confirmation of the Plan prior to the Confirmation Hearing.

### 8. Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated alternatives to the Plan, including alternative structures and terms of liquidation for the Debtors. While the Debtors have concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtors, individually or collectively, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to File and solicit acceptances of a plan or plans of liquidation) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or different plans of liquidation. Further, if no plan of liquidation under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases. In a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to creditors. The net proceeds of the liquidation would be distributed in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidations, see Section II.H.6. The Debtors believe that Confirmation and consummation of the Plan is preferable to the available alternatives.

### I. Conditions Precedent to the Effective Date of the Plan

### 1. Conditions to the Effective Date

The Effective Date will not occur and the Plan will not be consummated unless and until each of the following conditions have been satisfied or duly waived:

- The Bankruptcy Court shall have entered the Confirmation Order.

- The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors to take all actions necessary or appropriate to implement the Plan, including completion of the Dissolution Transactions, the transfer of the assets of the Debtors to the Distribution Trust and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

- The Distribution Trust Agreement shall be executed, the Distribution Trust shall be created and the Distribution Trustee shall have been appointed and accepted such appointment.

- The Trust Accounts shall be created.

- The Plan and all exhibits to the Plan shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

### 2. Waiver of Conditions to Confirmation or the Effective Date

All conditions to Confirmation and the conditions to the Effective Date set forth in Sections VIII.B.4 through VIII.B.6 of the Plan may be waived in whole or part at any time by the Debtors without an order of the Bankruptcy Court.

### 3. Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C of the Plan within 60 days of the entry of the Confirmation Order, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section VIII.D of the Plan, then (a) the Plan will be null and void in all respects and (b) the Distribution Trust will be promptly dissolved.

### 4. Request for Waiver of Stay of Confirmation Order

The Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver will be Filed with the Bankruptcy Court and served on the parties listed in Section X.F of the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### 5. Substantive Consolidation of the Debtors

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the substantive consolidation of the Debtors for all purposes, including for the purpose of implementing the Plan, for purposes of voting, for assessing whether Confirmation standards have been met, for calculating and making distributions under the Plan and for filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. Pursuant to such order, as of the Effective Date: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtors will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may File and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (d) Intercompany Claims between Debtors will be eliminated and extinguished. Such substantive consolidation will not affect (i) the legal and corporate structures of the Debtors, subject to the right of the Debtors to complete the Dissolution Transactions; (ii) the vesting of assets in the Distribution Trust; (iii) the right to distributions from any insurance policies or proceeds of such policies; or (iv) the rights of the Debtors or the Distribution Trustee to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors, as described and to the extent set forth in Section VII.A of the Plan. Unless an objection to such substantive consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section X.F of the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing. This, however, will not affect the obligation of the substantively consolidated Debtors to (a) pay a single quarterly fee to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930 based upon the consolidated disbursements made by the substantively consolidated Debtors or (b) seek the closing of their substantively consolidated Chapter 11 Case.

### 6. Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

7. **Revocation of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any claims by or against, or any Interests in, any Debtor; (b) prejudice in any manner the rights of any Debtor or any other party in interest; or (c) constitute an admission of any sort by any Debtor or any other party in interest.

## III. HISTORY OF THE DEBTORS

### A. Historical Overview

The Old Metaldyne Companies and their predecessors have been integral components of the nation's automotive industry for approximately 80 years. The entity now known as Oldco M Corporation was founded as a Delaware corporation in 1984 under the name Masco Industries, Inc. At its creation, Masco Industries, Inc. was part of the Masco Corporation family of companies, which had begun producing parts for the automotive industry in 1929. Masco Industries, Inc. was later spun off and was publicly traded on the New York Stock Exchange under the name MascoTech, Inc. ("MascoTech") until November 2000. At that time, MascoTech was acquired in a leveraged buyout transaction by an investor group led by Heartland Industrial Partners, L.P. ("Heartland") and Credit Suisse First Boston and, shortly thereafter, MascoTech changed its name to Metaldyne Corporation. Heartland was the majority-owner of the Old Metaldyne Companies until the January 2007 Asahi Tec Transaction.

The Old Metaldyne Companies, as they existed on the Petition Date, were created by Old Metaldyne's acquisition of two other established auto parts suppliers: Simpson Industries, which was acquired in December 2000, and Global Metal Technologies, Inc., which was first acquired by Heartland and then later sold to Old Metaldyne in January 2001. The Old Metaldyne Companies also acquired certain of their operating assets from Dana Corporation (and its affiliates) in 2003 and Chrysler in 2004.

The Old Metaldyne Companies were involved in a number of divestitures in recent years. In June 2002, the Old Metaldyne Companies divested their non-automotive operations by (a) partially divesting a former subsidiary, TriMas Corporation, in June 2002 (which divestiture was completed in 2007), (b) selling their fittings operation in April 2003 and (c) selling two aluminum die casting facilities in February 2004. In March 2006, the Old Metaldyne Companies sold their U.S. forging operations to FormTech Industries LLC. In November 2008, the Old Metaldyne Companies sold their Italian subsidiary, GLO S.r.L., which produced parts for the aftermarket industry, as part of the Old Metaldyne Companies' move to concentrate on their core products.

The end result of these acquisitions and divestitures was to concentrate the Old Metaldyne Companies' business in the automotive industry and expand their geographic reach and product portfolio within that industry. In addition to the acquisitions described above, during the period of 2001 through 2007, the Old Metaldyne Companies made a number of significant new capital investments in plant expansions and equipment for use in manufacturing parts in the automotive industry. Funds for these acquisition, expansion and investment activities were derived in part from operating income, but primarily from (a) the issuance of over $500 million in new debt, including the 2012 Senior Subordinated Notes, the 2013 Senior Notes and the 2014 Notes (as such terms are defined below) and (b) proceeds from a number of significant sale-leaseback transactions, pursuant to which personal property and real property assets owned by the Debtors were sold to third parties and leased back to the Debtors, often at above-market lease rates.

Beginning in 2001, the Old Metaldyne Companies began to expand their corporate infrastructure by opening several technical and support centers, expanding their corporate headquarters facility into multiple sites and increasing corporate headquarters staff. These activities were deemed necessary to support the global automotive business expansion that the Old Metaldyne Companies had been pursuing. Unfortunately, due to the slow decline in market share of the Old Metaldyne Companies' biggest customers over the past decade and industry pressures that began around 2005 (as evidenced by several automotive supplier bankruptcies commenced around that time and thereafter), the Old Metaldyne Companies' revenues did not grow as rapidly as management had anticipated. Thus, at the end of 2006, prior to the Asahi Tec Transaction, the Old Metaldyne Companies had annual revenues of $1.85 billion, compared to $1.43 billion in annual revenues in 2002. The long-term debt of the Old Metaldyne

Companies during this period, however, had expanded to $926 million as of December 31, 2006, from $660 million as of December 31, 2002. Lease expense also increased significantly during this period, in part due to the sale-leaseback transactions described above. Specifically, overall lease expense increased from $12.6 million annually in 2001 to $47.8 million annually in 2006.

In January 2007, the Old Metaldyne Companies completed the Asahi Tec Transaction. The Asahi Tec Transaction had a number of benefits, including permitting the Old Metaldyne Companies to refinance certain of their existing credit facilities with certain funds from the transaction, reducing outstanding principal balances. The transaction also provided the Old Metaldyne Companies with a limited amount of additional operating funds. Shortly thereafter, in March 2007, Asahi Tec invested an additional $70 million (the proceeds of which came from a secondary public offering of Asahi Tec stock), most of which was utilized to repay long-term debt of the Old Metaldyne Companies. As a result of these transactions, the long-term debt of the Old Metaldyne Companies decreased by nearly $100 million. These transactions, while beneficial, did not fully address the Old Metaldyne Companies' cost structure or balance sheet leverage problems that had developed since the 2000 formation of Old Metaldyne.

In mid-2007, the Asahi Tec Companies and the Old Metaldyne Companies explored the potential for a joint global refinancing of their debt obligations, but no significant opportunities emerged. After the passage of more than a year, and due to, among other things, high levels of interest expense, lease expense and raw material costs and the tightening of trade credit by certain of the Old Metaldyne Companies' suppliers, the Old Metaldyne Companies recognized that they were faced with the potential for a default under the financial covenants contained in their Prepetition Senior Secured Loan Agreement and Prepetition ABL Agreement (as each term is defined below) at the close of the second calendar quarter of 2008.

In July 2008, Asahi Tec contributed $16.5 million to Old Metaldyne as an equity contribution (raised by RHJI's purchase of additional Asahi Tec shares), which was sufficient to prevent violations of financial covenants pursuant to the equity cure provisions of the Prepetition Senior Secured Loan Agreement and Prepetition ABL Agreement. As the third calendar quarter of 2008 drew near, however, it became clear to the Old Metaldyne Companies that Asahi Tec did not desire to exercise its equity cure rights again (and RHJI did not desire to fund such exercise) without a longer-term solution to the Old Metaldyne Companies' financial problems. It was clear to all parties involved that any viable solution would necessarily require a significant permanent reduction in the amount of debt service obligations being borne by the Old Metaldyne Companies.

The Old Metaldyne Companies engaged restructuring and investment banking professionals to explore all available strategic and financial alternatives. Unfortunately for the Old Metaldyne Companies, they were faced with increasingly tight credit markets in the latter half of 2008. Recognizing that no new investor or lender would emerge in such a financial environment, the Old Metaldyne Companies began to focus on negotiations with their existing stakeholders. This focus led to a number of multi-party negotiations in the Fall of 2008 between the Old Metaldyne Companies, Asahi Tec, RHJI, certain holders of the Debtors' notes, the Debtors' customers (particularly the North American OEMs), and the lenders under their Prepetition Senior Secured Loan Agreement and Prepetition ABL Agreement.

A number of positive developments resulted from these negotiations. First, Chrysler and its affiliates agreed to cancel $31.7 million in indebtedness (the "2014 Notes") owed by Old Metaldyne that was incurred as part of the Debtors' acquisition of their New Castle, Indiana facility from Chrysler. Second, the North American OEMs agreed to resolve certain commercial issues in a manner favorable to the Old Metaldyne Companies and pay amounts outstanding to resolve such disputes. Moreover, the Old Metaldyne Companies entered into commercial agreements with such customers that were generally favorable to the Old Metaldyne Companies. Third, on October 14, 2008, Asahi Tec made an additional equity infusion of $10.2 million (again through RHJI's purchase of additional Asahi Tec shares) into Old Metaldyne. These three developments provided the Debtors with sufficient liquidity and time to complete the Tender Offer transaction described below, as part of which the Debtors received $60 million in proceeds from the issuance of Customer Notes and $50 million in cash via an equity infusion from Asahi Tec (again funded by RHJI's purchase of additional shares in Asahi Tec). On October 29, 2008, Old Metaldyne launched a tender offer (the "Tender Offer") for all of its outstanding 11% senior subordinated notes due 2012 (the "2012 Senior Subordinated Notes") and 10% senior notes due 2013 (the "2013 Senior Notes"). The Tender Offer consideration offered by Old Metaldyne to holders of the notes was $106.30 per $1,000 of 2012 Senior

Subordinated Notes and $270.18 per $1,000 of 2013 Senior Notes.[4]  The Tender Offer, which was accepted by over 90% of the eligible noteholders, expired on November 26, 2008, and resulted in the retirement of over $360 million in debt, or approximately 40% of the aggregate long-term debt of the Debtors that was then outstanding.

Despite these positive developments, the historic decline in the United States automotive industry in late 2008 and early 2009 gave rise to a new round of liquidity crises for the Old Metaldyne Companies, which ultimately led to the commencement of these Chapter 11 Cases for the reasons set forth in Section V below.

**B.      The Old Metaldyne Companies on the Petition Date**

Old Metaldyne maintains its corporate headquarters in Plymouth, Michigan, a Detroit suburb.  On the Petition Date and prior to completion of the Sale Transaction, the Old Metaldyne Companies owned or leased 23 different properties and operated 14 leased and owned domestic manufacturing facilities and various other domestic business locations in six states.  Such other locations included warehouses, closed facilities, sublet facilities, engineering and technical centers and the Old Metaldyne Companies' global headquarters facility.  The Old Metaldyne Companies also operated 15 manufacturing facilities outside of the United States in Brazil, Canada, China, the Czech Republic, the United Kingdom, France, Germany, India,[5] Mexico,[6] South Korea and Spain.  As of the Petition Date, the Old Metaldyne Companies had approximately 4,500 employees, of which approximately 2,500 were United States employees of the Debtors.  This compares to approximately 6,500 employees (and 4,000 United States employees) employed by the Old Metaldyne Companies in December 2007, just prior to the commencement of the Old Metaldyne Companies' internal restructuring efforts.

With worldwide sales of over $1.32 billion for the fiscal year ended March 29, 2009, the Old Metaldyne Companies were leading global providers of metal-based products for the light vehicle market with unique process and product technology.  Old Metaldyne was one of the 50 largest suppliers of parts to the North American OEMs. The Old Metaldyne Companies' products were used in cars, mini-vans, sport-utility vehicles, light trucks, heavy trucks and other vehicles.  The Old Metaldyne Companies provided content for the majority of the light vehicles manufactured in North America.  The majority of the products manufactured by the Old Metaldyne Companies were sold directly to OEMs, but the Old Metaldyne Companies also made substantial amounts of sales to the OEMs' Tier I suppliers.  The Old Metaldyne Companies' three largest customers were Ford, Chrysler and GM.  For the 2008 calendar year, these three entities accounted for approximately 18%, 17% and 7%, respectively, of the Old Metaldyne Companies' direct sales and for approximately 19%, 25% and 10%, respectively, of the Debtors' direct sales.  If "indirect sales" — the sales of parts that are made to Tier I suppliers that are incorporated into products and assemblies that are then sold to Ford, Chrysler and GM — were added to the sales made directly to the North American OEMs, these three entities would have accounted for at least 60% of the Old Metaldyne Companies' sales and at least 75% of the Debtors' sales for the 2008 calendar year.

**C.      The Business Groups**

On the Petition Date and prior to completion of the Sale Transaction, the Old Metaldyne Companies operated through two primary business units, the powertrain group and the chassis group, each of which accounted for approximately 50% of the Old Metaldyne Companies' worldwide sales during the 2008 calendar year.

**1.      Powertrain**

The Old Metaldyne Companies' powertrain group (the "Powertrain Group") was a leading manufacturer of a broad range of powertrain components, sub-assemblies and modules, including steel powder metal connecting rods

---

[4]      These figures include an early participation premium for each series of notes that was offered by Old Metaldyne to holders that tendered their notes prior to an early participation deadline.

[5]      The Old Metaldyne Companies' Indian operations were part of a joint venture and were not wholly-owned.

[6]      One of the Old Metaldyne Companies' Mexican facilities, located in Ramos Arizpe, Coahuila, México, was a maquiladora.

and engine bearing caps, aluminum castings (including valve bodies, clutch modules, balance shaft modules, front cover assemblies, differential cases and crankshaft dampers) and tubular fabricated products used for a variety of applications. The Powertrain Group contained a number of sub-groups, including the sintered products group (which manufactured both conventional powder metal components and connecting rods), the vibration control products group (which manufactured dampers and isolation pulleys) and the powertrain products group (which manufactured driveline components, balance shaft modules, engine and transmission covers and tubular fabrications).

On the Petition Date, the Powertrain Group operated 11 domestic manufacturing facilities and a Mexican maquiladora facility, had revenues of approximately $784 million for the 2008 calendar year and held approximately 60% of the assets of the Old Metaldyne Companies, based upon book values, as of December 31, 2008.

### 2. Chassis

The Old Metaldyne Companies' chassis group (the "Chassis Group") was a leading supplier of components and sub-assemblies used in a variety of engineered chassis applications, including wheel-ends, knuckles and mini-corner assemblies. The Chassis Group included the Old Metaldyne Companies' foreign forging operations and North American machining and assembly operations, including the production of steering knuckles, wheel spindles and hub assemblies, all of which are key performance and safety components for an automobile.

On the Petition Date, the Chassis Group operated three domestic manufacturing facilities, including the Debtors' largest manufacturing facility located in New Castle, Indiana. The Chassis Group had revenues of $785 million for the 2008 calendar year and held approximately 40% of the assets of the Old Metaldyne Companies, based on book values, as of December 31, 2008.

### D. Organizational Structure

On the Petition Date, the Old Metaldyne Companies consisted of 65 corporate entities (including Old Metaldyne). The Old Metaldyne Companies other than Old Metaldyne were all direct or indirect subsidiaries of Old Metaldyne. On the Petition Date, the Old Metaldyne Companies included (1) Old Metaldyne, (2) its 30 direct or indirect domestic subsidiaries that, with Old Metaldyne, are the Debtors and (3) 35 entities that were direct or indirect foreign subsidiaries of Old Metaldyne that are not Debtors. As part of the Sale Transaction, 29 of these foreign entities were transferred to MD Investors and its affiliates (collectively, the "Transferred Entities"), leaving six foreign entities that remain owned by the Debtors, only one of which was in possession of material assets as of the date of this Disclosure Statement.

The remaining Old Metaldyne Companies are indirect subsidiaries of Asahi Tec through its subsidiary Old Metaldyne Holdings. That is, Old Metaldyne is the wholly-owned subsidiary of Old Metaldyne Holdings, and Old Metaldyne Holdings is the wholly-owned subsidiary of Asahi Tec. Asahi Tec's subsidiaries that are not Old Metaldyne Companies (the "Asahi Tec Companies"), which are not Debtors in these cases and which have not filed insolvency proceedings in any foreign jurisdiction, include 13 entities (including Asahi Tec and Metaldyne Holdings) that, other than Old Metaldyne Holdings, are entities that are incorporated in Asian countries.

### E. Outstanding Equity Interests

As a privately-held company, none of the Debtors' equity securities have been publicly-traded since the 2000 sale of MascoTech to Heartland. The Debtors presently have no preferred shares or other equity interests other than their common stock (or membership interests, for limited liability companies).

## IV.     CAPITAL STRUCTURE[7]

### A.     Significant Indebtedness

For the fiscal year ended March 29, 2009, the Old Metaldyne Companies recorded annual revenue of approximately $1.32 billion, of which approximately $782 million was from sales of the Debtors.  As of March 29, 2009, utilizing unaudited book values, the Old Metaldyne Companies had assets of approximately $977 million and liabilities of approximately $927 million.  Of this $927 million in liabilities, approximately $540 million was classified as long-term debt obligations.

The following are descriptions of the Debtors' long-term debt obligations as of the Petition Date:

### 1.     The Prepetition Senior Secured Loan Agreement

Debtor Oldco M Company LLC (f/k/a Metaldyne Company LLC) ("Old Metaldyne Company") was a borrower under a senior secured credit facility evidenced by that certain Credit Agreement, dated as of January 11, 2007 (as amended, the "Prepetition Senior Secured Loan Agreement"), among Old Metaldyne Company, Debtor Oldco M Intermediate Holdco, Inc. (f/k/a Metaldyne Intermediate Holdco, Inc.) ("Old Metaldyne Intermediate"), JPMorgan Chase Bank, N.A. (as administrative agent and collateral agent) (the "Prepetition Senior Secured Agent"), Citicorp North America, Inc. (as syndication agent), Deutsche Bank Securities Inc. (as documentation agent) and the other lender parties thereto (collectively, the "Prepetition Senior Secured Lenders").[8]  As of the Petition Date, twenty-four of the other Debtors were guarantors under the Prepetition Senior Secured Loan Agreement (the "Subsidiary Guarantors").[9]

The Prepetition Senior Secured Loan Agreement had a seven-year term loan component (the "Secured Term Loan"), and all amounts outstanding thereunder were scheduled to mature on January 11, 2014.  As of the Petition Date, borrowings under the Secured Term Loan bore interest at a rate per annum equal to, at the option of the Old Metaldyne Companies, the sum of (a) either (i) the London Interbank Offered Rate ("LIBO Rate"), based on a 1, 2 or 3 month interest period as selected by the borrower or (ii) the ABR Rate[10] plus (b) the Applicable

---

[7]     Nothing in this Section IV is an admission as to the proper characterization of the transactions and liabilities discussed herein.

[8]     Old Metaldyne Company is a wholly-owned subsidiary of Old Metaldyne Intermediate.  Old Metaldyne Intermediate is a wholly-owned subsidiary of Old Metaldyne.

[9]     The Subsidiary Guarantors were:  ER Acquisition Corp.; Oldco M Tubular Products, Inc. (f/k/a Metaldyne Tubular Products, Inc.); W.C. McCurdy Co.; Halyard Aviation Services, Inc.; Oldco M Europe, Inc. (f/k/a Metaldyne Europe, Inc.); NC M Chassis Systems, LLC; MASG Disposition, Inc.; Oldco M Services, Inc. (f/k/a Metaldyne Services, Inc.); Oldco M Machining and Assembly Company, Inc. (f/k/a Metaldyne Machining and Assembly Company, Inc.); Precision Headed Products, Inc.; Oldco M Sintered Components St. Marys, Inc. (f/k/a Metaldyne Sintered Components St. Marys, Inc., f/k/a Windfall Products, Inc.); Oldco M Asia, Inc. (f/k/a Metaldyne Asia, Inc.); Punchcraft Company; Oldco M Sintered Components, LLC (f/k/a Metaldyne Sintered Components, LLC); Oldco M Sintered Components of Indiana, Inc. (f/k/a Metaldyne Sintered Components of Indiana, Inc.); GMTI Holding Company; Oldco M Precision Forming - Fort Wayne, Inc. (f/k/a Metaldyne Precision Forming - Fort Wayne, Inc.); MASX Energy Services Group, Inc.; Oldco M Light Metals Company, Inc. (f/k/a Metaldyne Light Metals Company, Inc.); Stahl International, Inc.; Oldco M U.S. Holding Co. (f/k/a Metaldyne U.S. Holding Co.); Oldco M DuPage Die Casting Corporation (f/k/a Metaldyne DuPage Die Casting Corporation); Oldco M Lester Precision Die Casting, Inc. (f/k/a Metaldyne Lester Precision Die Casting, Inc.); and Windfall Specialty Powders, Inc.

[10]    The "ABR Rate" was the greatest of (a) the prime rate, (b) the federal funds rate plus 0.5% or (c) one-month LIBO Rate plus 1.0%.

Margin[11] plus (c) default interest of 2.00% plus (d) paid in kind interest of 1.00%.[12] On the Petition Date, the principal amount outstanding under the Secured Term Loan portion of the Prepetition Senior Secured Loan Agreement was approximately $408 million.

The Prepetition Senior Secured Loan Agreement also contained a revolving credit facility that provided for revolving credit loans (the "DF Revolving Credit Loans") up to $10.0 million and a synthetic letter of credit facility pursuant to which the Debtors could have requested letters of credit for the benefit of third parties up to $60.0 million (less the amount of the DF Revolving Credit Loans outstanding). As of the Petition Date, $10.0 million in principal amount had been borrowed as DF Revolving Credit Loans. The DF Revolving Credit Loans bore interest, for each borrowing, at the same rate as the Secured Term Loan. The DF Revolving Credit Loans were scheduled to mature on January 11, 2012, and any issued but not disbursed letters of credit were to expire on the same date. In addition, the Debtors had reimbursement obligations relating to $9.7 million in letters of credit drawn as of the Petition Date and potential obligations relating to other undrawn letters of credit.

To secure the obligations under the Prepetition Senior Secured Loan Agreement, Old Metaldyne Intermediate, Old Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted the Prepetition Senior Secured Agent, as agent and for the benefit of the Prepetition Senior Secured Lenders, security interests in substantially all of their personal tangible and intangible property (subject to certain exceptions including, among other things, the limitation of security interests to 65% of such entities' equity interests in their first-tier foreign subsidiaries) (collectively, the "Common Collateral"). Moreover, to further secure the obligations under the Prepetition Senior Secured Loan Agreement, the Prepetition Senior Secured Agent, as agent and for the benefit of the Prepetition Senior Secured Lenders, obtained a first-priority mortgage upon the Debtors' three facilities located in New Castle, Indiana; Greenville, North Carolina; and Farmington Hills, Michigan (the "Mortgaged Facilities").[13] Two intercreditor agreements (discussed below) governed the relative priorities of the Prepetition Senior Secured Loan Agreement obligations and the Debtors' other secured debt with respect to the Common Collateral.

On October 29, 2008, in connection with the Tender Offer, Old Metaldyne Company and Old Metaldyne Intermediate entered into an amendment with the Prepetition Senior Secured Lenders to the Prepetition Senior Secured Loan Agreement to permit the Tender Offer, ease certain covenants, increase the interest rates in certain circumstances, provide additional security to the Prepetition Senior Secured Lenders and make certain other changes. In connection with this amendment, in April 2009, the Debtors provided the Prepetition Senior Secured Lenders with a first-priority mortgage upon the Debtors' facilities located in Ridgway, Pennsylvania; St. Mary's, Pennsylvania; Bluffton, Indiana; Hamburg, Michigan, and Litchfield, Michigan.

As discussed in Section VI.H.3, upon the closing of the Sale Transaction and the application of the proceeds thereof, the Debtors satisfied their obligations under the Prepetition Senior Secured Loan Agreement.

### 2. The Prepetition ABL Agreement

Old Metaldyne Company was also a borrower under a revolving credit facility evidenced by that certain ABL Credit Agreement, dated as of January 11, 2007 (as amended, the "Prepetition ABL Agreement"), among Old Metaldyne Company, Old Metaldyne Intermediate, Deutsche Bank AG, New York Branch (as administrative agent and collateral agent) (the "Prepetition ABL Agent"), JPMorgan Chase Bank, N.A. (as syndication agent), Citicorp North America, Inc. and Wachovia Capital Finance Corporation (Central) (as co-documentation agents), Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc. (as joint lead arrangers), Deutsche Bank Securities Inc., J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. (as joint bookrunners) and the other lender parties

---

[11]    As of the Petition Date, the "Applicable Margin" for LIBO Rate loans was 3.50% and the Applicable Margin for ABR Rate loans was 2.50%, but could increase depending upon the leverage ratio submitted by the borrowers under the Prepetition Senior Secured Loan Agreement.

[12]    The amount of paid in kind interest charged could range from 1.00% to 2.00% based upon the leverage ratio submitted by the borrowers under the Prepetition Senior Secured Loan Agreement.

[13]    The Greenville, North Carolina facility was sold in September 2008, and the mortgage was released.

thereto (the "Prepetition ABL Lenders").  The Subsidiary Guarantors were also guarantors under the Prepetition ABL Agreement.

On October 29, 2008, in connection with the Tender Offer, Old Metaldyne Company and Old Metaldyne Intermediate entered into an amendment with the Prepetition ABL Lenders to amend the Prepetition ABL Agreement to permit the Tender Offer, ease certain covenants, increase the interest rates, provide additional security to the Prepetition ABL Lenders, reduce availability of revolving commitments and make certain other changes.

Loans under the Prepetition ABL Agreement were scheduled to mature on January 11, 2012, and any issued but not disbursed letters of credit were scheduled to expire on the same date.  Borrowings (other than the Incremental Loans) under the Prepetition ABL Agreement bore interest, for each borrowing, at a rate equal to, at the option of Old Metaldyne Company, the sum of (a) either (i) the LIBO Rate or (ii) the ABR Rate plus (b) the Applicable Margin for the Prepetition ABL Agreement.[14]  Incremental Loans under the Prepetition ABL Agreement bore interest at a rate equal to the ABR Rate plus 2.00% per annum.  Borrowings under the Prepetition ABL Agreement were used for Old Metaldyne's working capital and other general corporate purposes, including capital expenditures.  The principal outstanding under the Prepetition ABL Agreement as of the Petition Date was $35,502,420, consisting of $6,491,000 in Incremental Loans and $29,011,420 in revolving loans.  During the pendency of these Chapter 11 Cases but prior to the closing of the Sale Transaction, approximately $15 million in payments were made by the Debtors to pay down the balance under the Prepetition ABL Agreement.

To secure the obligations under the Prepetition ABL Agreement, Old Metaldyne Intermediate, Old Metaldyne Company and the Subsidiary Guarantors entered into (a) a Security Agreement dated January 11, 2007 and (b) a Pledge Agreement dated January 11, 2007, pursuant to which such parties granted the Prepetition ABL Agent, as agent and for the benefit of the Prepetition ABL Lenders, security interests in the Common Collateral.  In addition, to secure the obligations under the Prepetition ABL Agreement, the Prepetition ABL Agent, as agent and for the benefit of the Prepetition ABL Lenders, obtained a second-priority mortgage upon the Mortgaged Facilities.[15]  Furthermore, in connection with certain of the amendments to the Prepetition ABL Agreement described above, in April 2009 the Debtors provided the Prepetition ABL Lenders with a second-priority mortgage upon the Debtors' facilities located in Ridgway, Pennsylvania; St. Mary's, Pennsylvania; Bluffton, Indiana; Hamburg, Michigan and Litchfield, Michigan.  Two intercreditor agreements (discussed below) governed the relative priorities of the Prepetition ABL Agreement obligations and the Debtors' other secured debt with respect to the Common Collateral.

The Prepetition ABL Agreement was amended as of April 22, 2009 pursuant to a Forbearance Agreement and Second Amendment to Credit Agreement, and in connection therewith, the commitments of the Prepetition ABL Lenders were reduced by an aggregate amount equal to $65,000,000.  The Prepetition ABL  Agreement was further amended as of May 21, 2009 to (a) reduce the original revolving loan commitments by an additional $20,000,000 and (b) provide for additional commitments (the "Incremental Loan Commitment") in a maximum amount of $6,491,000.  The Prepetition ABL Agent, who was one of the Prepetition ABL Lenders (in such capacity, the "Incremental Loan Lender"), agreed to provide the Incremental Loan Commitment and extend loans (the "Incremental Loans") under the Prepetition ABL Agreement.  The Incremental Loan Lender and North American OEMs entered into a Subordinated Participation Agreement as of May 21, 2009, pursuant to which the Incremental Loan Lender sold an economic participation in the Incremental Loans to the North American OEMs.

As discussed in Section VI.H.3, upon the closing of the Sale Transaction and the application of the proceeds thereof, the Debtors satisfied all outstanding obligations under the Prepetition ABL Agreement.

### 3.  The 2013 Senior Notes

---

[14]  As of the Petition Date, the "Applicable Margin" for the Prepetition ABL Agreement was 3.25% for LIBO Rate loans and 2.25% for ABR Rate loans.

[15]  In connection with the sale of the Debtors' Greenville, North Carolina facility in September 2008, the second mortgage was released with respect to that facility.

Old Metaldyne's 2013 Senior Notes are governed by the Indenture, dated as of October 27, 2003 (as supplemented, the "2013 Senior Note Indenture"), by and among Old Metaldyne (as issuer), each of the guarantors named therein and The Bank of New York Mellon Trust Company, N.A. ("BONYMTC") (as trustee), as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008. The 2013 Senior Notes mature on November 1, 2013 and accrue interest at a rate of 10% per annum, payable semi-annually in arrears on May 1 and November 1 of each year. The Subsidiary Guarantors are the guarantors under the 2013 Senior Note Indenture.

Although the obligations under the 2013 Senior Notes were secured prior to the Tender Offer and related consent solicitation, the collateral securing the 2013 Senior Notes was released pursuant to the Third Supplemental Indenture executed in connection with the Tender Offer and related consent solicitation. In addition, as described above, the overwhelming majority of the 2013 Senior Notes were extinguished as a part of the Tender Offer transaction. Accordingly, the 2013 Senior Notes are now senior unsecured obligations, of which approximately $1.49 million in principal amount was outstanding as of the date of this Disclosure Statement.

### 4.     2012 Senior Subordinated Notes

Old Metaldyne's 2012 Senior Subordinated Notes are governed by the Indenture, dated as of June 20, 2002 (as supplemented, the "2012 Subordinated Note Indenture"), by and among Old Metaldyne (as issuer), each of the guarantors named therein and Law Debenture Trust Company of New York (as successor trustee to BONYMTC), as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008. The 2012 Senior Subordinated Notes mature on June 5, 2012 and accrue interest at a rate of 11% per annum, payable semi-annually in arrears on June 15 and December 15 of each year. Section 10 of the 2012 Subordinated Note Indenture subordinates obligations under the 2012 Senior Subordinated Notes to obligations under the 2013 Senior Notes, the Senior Secured Loan Agreement and the Prepetition ABL Agreement.

Although the obligations under the 2012 Senior Subordinated Notes were secured prior to the Tender Offer and related consent solicitation, the collateral securing the 2012 Senior Subordinated Notes was released pursuant to the Third Supplemental Indenture in connection with the Tender Offer and related consent solicitation. In addition, as described above, most of the 2012 Senior Subordinated Notes were extinguished as a part of the Tender Offer transaction. Accordingly, the 2012 Senior Subordinated Notes are now senior subordinated unsecured obligations, of which approximately $29.3 million in principal amount was outstanding as of the date of this Disclosure Statement.

### 5.     The Intercreditor Agreements

In connection with certain of the Debtors' initial entry into the Prepetition Senior Secured Loan Agreement and the Prepetition ABL Agreement, to establish their relative rights and priorities, the various secured lenders of the Debtors and these lenders entered into an intercreditor agreement with the collateral agents for the 2013 Senior Notes and the 2012 Senior Subordinated Notes. Particularly, the parties' rights and obligations are governed by that certain Three Priority Intercreditor Agreement, dated January 11, 2007, among the Prepetition Senior Secured Agent, as collateral agent under the Prepetition Senior Secured Loan Agreement; the Prepetition ABL Agent, as collateral agent under the Prepetition ABL Agreement; BONYMTC, as collateral agent for the 2013 Senior Notes; BONYMTC, as collateral agent for the 2012 Senior Subordinated Notes; Old Metaldyne Company; and Old Metaldyne, for itself and for certain others of the Debtors (the "Three Priority Intercreditor Agreement"). Pursuant to the Three Priority Intercreditor Agreement, the secured parties were granted relative priorities in the non-real property collateral that they had in common, as follows: the Prepetition Senior Secured Agent and the Prepetition ABL Agent were jointly granted first priority for the Prepetition Senior Secured Lenders and the Prepetition ABL Lenders, BONYMTC was granted second priority for the 2013 Senior Notes and BONYMTC was granted third priority for the 2012 Senior Subordinated Notes.[16] Pursuant to the release of collateral in connection with the

---

[16]     The 2012 Senior Subordinated Notes were granted priority equal to the 2014 Notes (which were canceled in 2008 as described in Section III.A above). In addition, as noted above, because stock in Metaldyne

Tender Offer and related consent solicitation, however, the 2013 Senior Notes and the 2012 Senior Subordinated Notes are now unsecured obligations and are no longer entitled to share in any collateral of the Prepetition ABL Lenders or the Prepetition Senior Secured Lenders.

A second intercreditor agreement (the "First Priority Intercreditor Agreement"), dated as of January 11, 2007, was entered into between the Prepetition Senior Secured Agent, as administrative agent under the Prepetition Senior Secured Loan Agreement, and the Prepetition ABL Agent, as administrative agent under the Prepetition ABL Agreement, Old Metaldyne Intermediate and Old Metaldyne Company. The First Priority Intercreditor Agreement distinguished the relative priorities of the Prepetition ABL Lenders under the Prepetition ABL Agreement and the Prepetition Senior Secured Lenders under the Prepetition Senior Secured Loan Agreement with respect to Common Collateral. The First Priority Intercreditor Agreement provided that the Prepetition ABL Lenders had a first-priority security interest in Common Collateral constituting accounts, chattel paper representing accounts, deposit accounts and related property, inventory and certain related collateral, including the proceeds of the foregoing (collectively, the "Prepetition ABL Priority Collateral"). The Prepetition Senior Secured Lenders had a second-priority security interest on the Prepetition ABL Priority Collateral. The Prepetition Senior Secured Lenders had a first-priority security interest, and the Prepetition ABL Lenders had a second-priority security interest, in the remaining Common Collateral.

### 6. The Customer Notes

In November 2008, in connection with the Tender Offer transaction, Old Metaldyne issued three promissory notes in the aggregate amount of $60 million (collectively, the "Customer Notes"): (a) a note in the amount of $27.5 million, payable to Chrysler; (b) a note in the amount of $22.75 million, payable to Ford; and (c) a note in the amount of $9.75 million, payable to GM. The Customer Notes mature and are payable, together with all accrued interest, on April 15, 2014. Interest under the Customer Notes accrues at a rate of 5% per annum, accrues throughout the term of the notes and is payable at the maturity of the notes. As of the Petition Date, the amount of accrued interest was calculated by the Debtors to be $1,544,000. Each holder of a Customer Note has agreed under the terms of the notes to waive rights of set off or recoupment that it might have that would permit it to set off accounts receivable owed to the Old Metaldyne Companies against the amounts owed by Old Metaldyne under the Customer Notes.

The Customer Notes are secured by Old Metaldyne's pledge of 100% of the stock of Old Metaldyne Intermediate, the direct subsidiary of Old Metaldyne. Because Old Metaldyne Intermediate has no assets other than 100% of the equity of Old Metaldyne Company LLC and because the Debtors believe that Old Metaldyne Intermediate is insolvent as of the date of this Disclosure Statement, it is likely that the Customer Notes are, in essence, unsecured obligations of Old Metaldyne.

### 7. Prepetition Trade Debt

The Debtors used a variety of raw materials and components in the manufacture of their products. The Debtors estimate that as of the Petition Date, they had between $60 million and $65 million in trade payables and as of the date of this Disclosure Statement, they had between $40 million and $45 million in remaining unpaid prepetition trade payables.

### B. Other Liabilities

The Debtors had a number of intercompany loans between the Debtors and the other Old Metaldyne Companies that are not set forth in detail herein, but were tracked by Old Metaldyne management in the Old Metaldyne Companies' books and records. Certain of these liabilities were assumed by MD Investors as part of the Sale Transaction, and certain obligations of the Transferred Entities to the Debtors were extinguished as part of that

_____

(continued…)

Intermediate was not pledged to the Prepetition Senior Secured Agent and the Prepetition ABL Agent, such parties did not have first priority security interests in that collateral.

transaction. The Debtors do not presently believe that they have significant contingent liabilities for product liability, mass tort or environmental claims.

The Debtors also have various pension liabilities in connection with the termination of the Metaldyne Corporation Pension Plan (the "Pension Plan") as of July 31, 2009 by the Pension Benefit Guarantee Corporation ("PBGC") as described under Section VI.G. Based upon outside actuarial reports, as of March 29, 2009, the Debtors anticipated that their discounted pension liabilities (including both qualified and non-qualified plans under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") were approximately $236 million. As of March 29, 2009, the Debtors had pension assets of approximately $173 million, thus indicating that the Pension Plan (not including any obligations of the foreign Old Metaldyne Companies) was underfunded by approximately $64 million at the time of the Pension Plan termination. The PBGC has Filed a Claim for such underfunding in the approximate amount of $157 million, which the Debtors believe is substantially overstated. Pension funding was a substantial cost for the Debtors prior to the Petition Date, with $19.8 million funded in 2006, $17.3 million funded in 2007 and $10.5 million funded in 2008. Following the Pension Plan termination, there are no ongoing pension funding liabilities. For information regarding action taken relating to the Debtors' pension plans during the Chapter 11 Cases, see Section VI.G.

## V. EVENTS LEADING UP TO THE DEBTORS' CHAPTER 11 FILING

### A. Macroeconomic and Industry-Specific Problems

As with many of the chapter 11 cases that have been commenced in the past 18 months, these Chapter 11 Cases have been commenced in part due to the worldwide economic downturn coupled with the lack of new financing for manufacturing companies. Most Western economies found themselves in the midst of recessions in 2008 and the first half of 2009. United States gross domestic product declined in the fourth quarter of 2008 at an annualized rate of 6.2%, which was the steepest decrease in GDP since 1982. In late 2008, major United States stock indices were down by more than 50% from their peaks in early 2008. The United States government took unprecedented steps to bolster the banking system and the economy in general through the Troubled Asset Relief Program (TARP Program) and its successor program, the Public-Private Investment Fund, and through the passage of significant economic stimulus measures.

The decline faced by the automotive industry — evidenced by the first-ever bankruptcy filings of major United States automakers — was particularly severe. As has been widely reported, sales of vehicles in North America decreased dramatically, and new vehicle manufacturing was for an extended period essentially cut in half. While over 15 million units were produced in each year between 2004 and 2007, only approximately 12.6 million units were produced in 2008 (with a majority of the production in the first half of the year) and only 8.1 million units were produced in the first ten months of 2009.

Annual United States vehicle sales, which have not been less than 12 million for any of the past 25 years, will fall short of that benchmark in 2009, even with extraordinary government incentives providing a boost to sales through the "Cash for Clunkers" program. CSM Worldwide has projected that, as OEMs work off excess inventories of vehicles, only 8.6 million new vehicles will be actually manufactured (as opposed to sold) in 2009.[17] While all OEMs suffered substantial declines in this environment, Chrysler, Ford and GM — which comprised the Debtors' largest customers — suffered to a greater extent than other global OEMs and lost market share during this period.

These declines resulted in the well-publicized chapter 11 bankruptcy filings by Chrysler and GM. Chrysler commenced chapter 11 cases on April 30, 2009 to implement a transaction that would involve the sale of substantially all of Chrysler's assets to an entity in which European car manufacturer Fiat would have a controlling stake. Prior to the sale of those assets, Chrysler idled all of its assembly plants until the closing of the Fiat transaction. GM commenced chapter 11 cases on June 1, 2009 to implement a transaction that would involve the sale of substantially all of GM's assets to NGMCO Inc., an entity funded by the U.S. Department of the Treasury. In

---

[17] See CSM Global Light Vehicle Production Summary (October 2009).

addition, GM implemented a staggered shut-down schedule of its assembly plants during the Spring and Summer of 2009. The operations of many auto parts suppliers were substantially reduced during these extended shutdowns.

Even before the worldwide economic downturn, the United States automotive industry found itself in difficult and troubling times. Even as total United States annual vehicle sales figures grew throughout the decade, the sales figures and financial performance of the North American OEMs have been in steady decline for nearly ten years. While total United States vehicle sales were relatively consistent between 1999 and 2006 (at a rate of between 17 to 18 million per year), the North American OEMs' (Old Metaldyne's key customers') shares of those sales decreased from approximately 70% in 1999 to approximately 50% in 2008. Ford, one of the two largest customers of the Old Metaldyne Companies prior to the Petition Date, saw a decline in domestic market share from 21.1% in 2002, to 18.2% in 2005, to 15.1% in 2008. Chrysler, the other large pre-Petition Date customer of the Debtors, while avoiding declines earlier in the decade, also saw its domestic market share drop from 13.2% to 11.0% between 2005 and 2008.[18] These market share declines directly and adversely affected Old Metaldyne's profitability.

Declining volumes had a direct impact on the Old Metaldyne Companies' results of operations and financial condition. The Debtors' pricing for a particular vehicle program was often established at the outset of the program based upon projected volumes of sales, but there is no volume guarantee. Pricing was established based upon the premise that many of the start-up capital costs would be recouped throughout the life of the vehicle program as part of the piece price. Thus, when vehicle volumes declined, the Debtors' capital costs could not be recouped. Moreover, due to the nature of the industry, significant manufacturing costs are fixed, including manufacturing facility leases, equipment leases and certain labor and legacy costs. For all of these reasons, when volumes declined substantially, maintaining profitability on such programs was nearly impossible.

Indeed, as the North American OEMs sought to reduce their own costs in an effort to halt the slide in their own financial performance earlier this decade, they began to put economic pressures on their own parts suppliers. These pressures manifested themselves through mandatory reductions in pricing for parts (referred to in the industry as "pricedowns") and a refusal by the North American OEMs to permit amendments to agreements to provide volume-related guarantees. These pressures began to build and ultimately contributed to a wave of automotive supplier bankruptcies that has continued unabated for the past six years, even during the period when macroeconomic conditions were relatively strong. During this period, a number of automotive and vehicle supply companies filed for chapter 11 relief, as set forth in the following table:

| Year | Debtor Entity |
|---|---|
| 2009[19] | Noble International Ltd. Contech LLC Hayes Lemmerz International, Inc. (second filing) Lear Corp. Mark IV Industries J.L. French Automotive Castings Inc. Visteon Corporation Formtech LLC Cooper-Standard Holdings Inc. |
| 2008 | Cadence Innovation LLC (second filing) Intermet Corporation (second filing) Progressive Molded Products, Inc. Blue Water Automotive Systems, Inc. Plastech Engineered Products, Inc. |

---

[18]    See Ward's Automotive Industry News (source of market share figures).

[19]    According to Automotive News, more than 20 major auto parts suppliers commenced bankruptcy in 2009.

| Year | Debtor Entity |
|------|---------------|
| 2007 | Johnson Rubber Co., Inc. <br> Blackhawk Automotive Plastics, Inc. <br> Remy Worldwide Holdings, Inc. <br> Rockford Products Cop. <br> Citation Corporation (second filing) |
| 2006 | J.L. French Automotive Casting Inc. <br> Dana Corporation <br> Dura Automotive <br> Amcast Industrial Corporation |

| Year | Debtor Entity |
|------|---------------|
| 2005 | Delphi Corporation<br>Collins & Aikman<br>Tower Automotive, Inc.<br>Meridian Automotive Systems, Inc.<br>EaglePicher Incorporated |
| 2004 | Intermet Corporation<br>Citation Corporation |

The companies identified above represent some of the largest — including the largest in Delphi Corporation — automotive suppliers in the United States.

The depth and length of the industry downturn is unprecedented and was unanticipated by virtually all industry analysts. While the Old Metaldyne Companies anticipated a continued industry downturn, even conservative projections could not keep up with the swiftness and severity of the production level decreases. The Tender Offer transaction completed by the Old Metaldyne Companies in the fourth quarter of 2008 was negotiated in September and October 2008. This transaction was not designed to be a short-term fix but, instead, was expected to provide the Old Metaldyne Companies with liquidity that would last for a substantial period of time, and thus assumed North American production levels of approximately 12.5 million units, which at the time was the most recently published CSM Worldwide projection and was thought by management to be conservative. At the late-November 2008 completion of the Tender Offer, the Old Metaldyne Companies possessed appropriate levels of liquidity. Unprecedented macroeconomic conditions and automotive industry conditions since that time, however, led to the Old Metaldyne Companies becoming stressed once more. These stresses were the major contributing factor that resulted in the commencement of the Chapter 11 Cases.

### B. Other Precipitating Factors

While the macroeconomic and industry specific downturns were more than sufficient causes of the Old Metaldyne Companies' economic troubles, a number of factors also contributed to the pressures besieging the Old Metaldyne Companies. As described in Section III.A above, the Old Metaldyne Companies were highly leveraged entities since the 2000 acquisition of MascoTech by Heartland. In January 2007, at the conclusion of the Asahi Tec Transaction, the Old Metaldyne Companies had over $850 million in debt (not including any borrowings under the Prepetition ABL Agreement). This level of debt, and the significant lease expense that was taken on prior to the January 2007 transaction, required debt and lease service obligations of a level such that any free cash flow generated since that time was devoted to making interest and lease payments, leaving little or no funds to devote to creating capital reserves that could be used to counteract the adverse financial environment.

Moreover, Old Metaldyne was faced with: (1) high raw material costs during the middle part of the decade; (2) high energy costs in recent years; (3) tens of millions of dollars in new tooling and re-sourcing costs caused by the failure of certain of the Debtors' suppliers because of difficult conditions in the automotive supply industry and certain bankruptcies; and (4) the tightening of trade credit by certain of the Debtors' suppliers as such suppliers faced their own financial difficulties.

### C. Recent Financial Performance

In the highly challenging automotive environment in which the Old Metaldyne Companies found themselves over the past several years, Old Metaldyne Companies' revenues suffered sharp declines, and the Debtors' operations in the United States were materially adversely affected. The Debtors' sales fell by approximately one-third during the fiscal year ended March 29, 2009 compared with the fiscal year ended March 31, 2008. In that same time period, the Debtors' EBITDA went from positive to negative.

### D.    The Old Metaldyne Companies' Operational Restructuring Efforts

Due to the significant declines in revenues experienced in the years prior to the Petition Date and anticipated further declines, the Old Metaldyne Companies took a number of efforts to right-size their business operations.  The Old Metaldyne Companies spent over a year prior to the Petition Date aggressively implementing a business restructuring to address operational issues well in advance of the commencement of these cases, which efforts resulted in approximately $100 million in annualized cost and capital savings.  Much of these costs savings were accomplished as part of the November 2008 Tender Offer transaction.  Due to that transaction, the Debtors reduced their annual interest expense by approximately $40 million per year.  The other operational and business restructurings were implemented by the Debtors to cut substantial costs out of their global operations.  Between 2006 and 2008, the Debtors eliminated various retiree health care obligations for both union and non-union employees.  These steps eliminated most of their outstanding retiree health obligations (other than those under legacy collective bargaining agreements).  In late 2007, the Debtors closed underperforming Chassis Group facilities located in Greenville, North Carolina and Farmington Hills, Michigan and carried out various salaried and hourly workforce reductions.  When that proved insufficient, in 2008, the Debtors implemented their "Plan to Win" pursuant to which they: (1) sold all of their remaining interests in corporate aircraft; (2) announced the intention to divest two additional facilities (their Middleville, Michigan and Niles, Illinois facilities); (3) consolidated their separate Chassis Group and Powertrain Group administration offices from two buildings into one; (4) implemented significant cuts in the ranks of salaried and management-level employees, including the elimination of over 100 salaried headquarters positions; (5) significantly reduced overall levels of executive compensation and bonus payments; (6) eliminated most merit pay increases for salaried employees; (7) restructured and streamlined divisions and improved capital investment discipline; (8) negotiated wage and benefit reductions in their existing labor agreements; and (9) on November 28, 2008, completed the divestiture of their Italian subsidiary, GLO S.r.L.

In early 2009, in light of the global economic turmoil, the Old Metaldyne Companies took additional steps to reduce costs in which they: (1) initiated another round of headcount reductions which, when combined with 2008 reductions, resulted in a reduction of one-half of all headquarters employees; (2) began preparations to consolidate their two locations in Plymouth, Michigan into one building; and (3) obtained substantial concessions from employees, including a 16% wage reduction for salaried employees, suspension of 401(k) matching and other retirement plan contributions for all salaried and hourly nonunion employees (including all contributions under executive retirement programs) and a suspension of most salaried and hourly bonus programs.  The Debtors also proactively approached their unions and negotiated reductions in amounts paid to their unionized workforce under amended or revised collective bargaining agreements prior to such agreements' scheduled expiration.

### E.    2009 Negotiations with Stakeholders

Reacting to the unprecedented decline in the United States automotive industry in late 2008 and early 2009 and the resulting liquidity crises for the Old Metaldyne Companies, in early 2009 management also began exploring options to further refinance and/or de-lever the Old Metaldyne Companies.  Specifically, the Debtors sought additional capital from various sources, including private equity firms, RHJI and the Debtors' senior secured lenders.  While various entities explored options for making a capital investment into the Debtors, ultimately none of the entities approached by the Old Metaldyne Companies were willing to make a direct investment in the companies or enter into a refinancing transaction; *however*, certain such entities expressed a desire to purchase certain assets or businesses from the Debtors pursuant to a sale under section 363 of the Bankruptcy Code.  The Debtors' efforts, thus, were refocused upon negotiating with potential purchasers in an effort to arrange a sale of the company as a whole or a sale of one or more business units on a going concern basis.

Thus, moving from their attempts to obtain a direct investment in the Debtors either in an in-court or out-of-court setting, the Debtors began to contact potential purchasers in an effort to arrange a sale of the company as a whole or a sale of one or more business units of the Debtors on a going concern basis, as the Debtors believed that such a sale would offer maximum value for stakeholders.  The Debtors, along with their advisors at Lazard Freres & Co. LLC ("Lazard"), contacted more than ten potential purchasers that had demonstrated recent interest in automotive industry assets and entered into confidentiality agreements with many of them.  At the same time, due to the Debtors' liquidity issues, the Debtors began contacting various banks and sources of financing, including their Prepetition ABL Lenders and their Prepetition Senior Secured Lenders, to gauge their interest in serving as debtor-in-possession lenders in the event that the commencement of bankruptcy cases became necessary.  Moreover, in

April 2009, after failing to make an interest payment under the Secured Term Loan portion of the Senior Secured Loan Agreement, the Debtors entered into forbearance agreements with their Prepetition Senior Secured Lenders and their Prepetition ABL Lenders to give the Debtors more time to advance the Sale Processes and prepare for an orderly chapter 11 filing.

As a result of their sales and marketing efforts, the Debtors received interest from various parties in a purchase of certain of the assets of their Chassis Group and interest from other parties in a purchase of the majority of the assets of their Powertrain Group. Ultimately, as a result of these efforts, the Debtors entered into a non-binding letter of intent for certain of the assets of their Chassis Group with The Carlyle Group. On the eve of their bankruptcy filings, the Debtors entered into a nonbinding letter of intent with RHJI for certain of the assets of their Powertrain Group.

## VI. EVENTS DURING THE CHAPTER 11 CASES

### A. Commencement of Chapter 11 Cases

On May 27, 2009, the Debtors commenced their reorganization cases through the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Chapter 11 Cases are being jointly administered as *In re: Oldco M Corporation (f/k/a Metaldyne Corporation), et al.* (Case No. 09-13412(MG)). The Chapter 11 Cases were assigned to U.S. Bankruptcy Judge Martin Glenn of the United States Bankruptcy Court for the Southern District of New York.

### B. First Day Relief

On the Petition Date, the Debtors Filed a number of motions and other pleadings (the "First Day Motions"), the most significant of which are described below. The First Day Motions were proposed to ensure an orderly transition into chapter 11.

The First Day Motions included:

- motions seeking to honor and pay various prepetition obligations, including: (i) certain employee wage and benefit obligations; (ii) certain workers' compensation obligations; (iii) certain Tax obligations, including trust fund taxes; (iv) certain obligations to customers; (v) insurance premium finance payments; (vi) claims of certain essential suppliers; (vii) claims of certain foreign suppliers; and (viii) claims of certain potential lienholders and tooling suppliers;

- a motion relating to the continued use of the Debtors' existing cash management system, bank accounts, business forms and investment and deposit guidelines;

- motions relating to case administration, joint administration and the use of The BMC Group as the Debtors' claims, noticing and balloting agent and motions relating to other administrative matters;

- a motion to approve a production agreement between the Debtors and Chrysler LLC with respect to the Debtors' production at their New Castle, Indiana facility pursuant to which Chrysler LLC agreed to cover certain costs at the facility in exchange for the Debtors' agreement to continue production through certain agreed upon dates (the "NCM Production Agreement");

- a motion to obtain postpetition debtor-in-possession financing, obtain the use of cash collateral and authorize entry into of an accommodation agreement with certain customers; and

- a motion to establish procedures for determining adequate assurance for the provision of utility services.

The First Day Motions, with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the Creditors' Committee, the United States Trustee and other parties, were granted.

**C.     Appointment of Creditors' Committee**

On June 4, 2009, the United States Trustee appointed the Creditors' Committee, which was modified on June 18, 2009.  The current membership of the Creditors' Committee and the professional advisors to the Creditors' Committee are as follows:

**Creditors' Committee Members:**

Microflex, Inc.
1800 North U.S. Hwy. 1
Ormond Beach, FL 32174
Attn: Gene Schiavone

Citation Corporation
27275 Haggerty Road, Suite 420
Novi, MI 48377
Attn: Lou Lavorata, Chief Financial Officer

SKF USA, Inc.
P.O. Box 332
Kulpsville, PA 19443-0330
Attn: Rex Thrasher, Director of Credit & Collections

International Union, UAW
8000 East Jefferson Avenue
Detroit, MI 48214
Attn: Niraj R. Ganatra, Associate General Counsel

QMP-America
Division of High Purity Iron, Inc.
1625 Route Marie-Victoria
Sorel-Tracy, Quebec Canada 33R 1M6
Attn: Diane D'Amour, Collection Manager

Law Debenture Trust Company of New York
400 Madison Ave., 4th Floor
New York, NY 10017
Attn: Michael A. Smith, Vice President

Shiloh Industries
880 Steel Drive
Valley City, OH 44280
Attn: Thomas M. Dugan

**Counsel:**

Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Attn: Mark D. Silverschotz

Reed Smith LLP
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
Attn: Kurt F. Gwynne and Mark W. Eckard

**Financial Advisors:**

Huron Consulting Services, LLC
900 Wilshire Drive, Suite 270
Troy, MI 48084
Attn: Jeffrey Beard, Managing Director

**D.     Retention of Advisors for the Debtors**

The Debtors obtained Bankruptcy Court approval of the retention of Lazard as their investment banker, AlixPartners as their financial advisor and consultant, Jones Day as their counsel and Foley & Lardner LLP ("Foley & Lardner") as their conflicts and special counsel.  Prior to the Petition Date:

- Lazard had been involved as investment banker for the Debtors in connection with the 2008 Tender Offer transaction and advised the Debtors with respect to their restructuring, financing and sale options since February 2009;

- AlixPartners assisted the Debtors since October 2008 in connection with the Debtors' restructuring efforts and in the preparation of these Chapter 11 Cases;

- Jones Day provided services to the Debtors since September 2008 in connection with the Tender Offer, a securities litigation matter, the Debtors' further restructuring efforts and the preparation of these Chapter 11 Cases; and

- Foley & Larder has historically represented the Debtors in numerous legal matters, including restructuring, commercial, financing, supplier and customer issues, employment, litigation and other matters.

The Bankruptcy Court approved the appointment of each of Lazard, AlixPartners, Jones Day and Foley & Lardner on June 22, 2009. On October 30, 2009, the Bankruptcy Court approved the retention of Deloitte Tax Consulting as tax advisors to the Debtors, effective as of July 15, 2009.

### E. Debtor-in-Possession Financing

In connection with their preparations for the Chapter 11 Cases, the Debtors determined that they would need to obtain a commitment for postpetition financing to ensure sufficient liquidity to continue operations and to administer and preserve the value of their Estates. After conducting an exhaustive search for postpetition financing from traditional lending sources, the Debtors determined that it would not be possible to obtain financing necessary to complete the Chapter 11 Cases from such sources. The Debtors therefore sought and obtained postpetition financing comprised of the following four distinct, but dependent, components: (1) the use of the cash collateral pursuant to section 363 of the Bankruptcy Code of the Prepetition ABL Lender and the Prepetition Senior Secured Lenders; (2) debtor-in-possession financing in the form of a secured superpriority credit facility ("DIP Facility," and any loans or other extensions of credit thereunder, the "DIP Loans") provided by the Deutsche Bank AG, New York ("DBNY"), as agent (in such capacity, the "DIP Agent") and as lender (in such capacity, the "DIP Lender"), (3) financial accommodations from certain OEMs pursuant to terms of the Accommodation Agreement (the "Accommodation Agreement") among Old Metaldyne, Ford, GM, Chrysler (on behalf of itself and Chrysler Motors LLC and Chrysler de Mexico S.A. de C.V.), Honda of America Mfg., Inc. and Nissan North America, Inc. (collectively, the "Customers") and (4) entry into the NCM Production Agreement, which improved the economics related to the Debtors' operation of their New Castle, Indiana facility and made the operation of this facility generally cost-neutral for the Debtors.

Pursuant to an agreement among the Customers (the "Subordinated Participation Agreement"), the Customers agreed to purchase 100% of subordinated, last-out participation in the DIP Facility. The respective percentages of participations in the DIP Facility for each Customer were as follows: Ford, 52.10%; Chrysler, 22.65%; GM, 18.45%; Honda, 4.28%; and Nissan, 2.52% (Honda and Nissan joined pursuant to an amendment to the Subordinated Participation Agreement). In connection with the Accommodation Agreement, the Customers also agreed to certain financial and other accommodations during the Chapter 11 Cases. Each Customer paid any and all unpaid prepetition amounts it owed to the Debtors and agreed to accelerate payment on new invoices to the Debtors. The Customers also agreed not to exercise certain of their respective rights of setoff and recoupment. As part of their obligations under the Accommodation Agreement, the Debtors committed to achieve certain milestones with respect to the sales of some or all of their assets used in connection with their powertrain, balance shaft module and chassis businesses (the "Required Assets"). These milestones included obtaining Bankruptcy Court approval of the process for one or more sales of the Required Assets by June 24, 2009 and obtaining Bankruptcy Court approval of a sale by August 15, 2009. The process undertaken to sell the Required Assets is described in more detail below under Section VI.H. Pursuant to the Accommodation Agreement, the Debtors agreed to continue to manufacture component parts for the Customers in accordance with pre-existing purchase orders and related releases, provided that they had sufficient liquidity. The Debtors also agreed to build inventory banks of component parts for each Customer, and each Customer agreed to commit to purchaser certain quantities of component parts from the Debtors.

Because it was contemplated that certain facilities would not be sold in connection with the Sale Transaction (the "Remainco Plants"), the Accommodation Agreement provided that the Customers would pay for

the costs associated with (1) the transfer of their production from the Remainco Plants after the expiration of the financing term and (2) the continued production remaining at the Remainco Plants after the financing term expired.

On May 29, 2009, the Debtors were authorized by the Bankruptcy Court to obtain credit and incur up to a maximum principal amount of $11.7 million in debt under the DIP Facility pursuant to sections 363 and 364(c)(1), (2), (3) and (d)(1) of the Bankruptcy Code on an interim basis (the "Interim Order"), until the entry of a Final Order approving the DIP Facility (the "Interim Period").  On June 23, 2009, the Bankruptcy Court entered the Final Order approving the DIP Facility (the "DIP Order"), through the expiration of the DIP Facility, up to a maximum principal amount of approximately $19.9 million.  The DIP Order authorized the grant to the DIP Agent for the benefit of the DIP Lender certain liens on prepetition collateral and certain unencumbered assets.  The Bankruptcy Court authorized use of the proceeds of the DIP Facility and cash collateral in accordance with a 13-week consolidated cash flow forecast (the "Budget"), which included repayments of certain prepetition obligations.  On October 1, 2009, the Debtors extended the Budget through October 15, 2009 (as extended, the "Budget Period").  The Bankruptcy Court authorized the Debtors to use cash collateral (in which the Prepetition ABL Lender and the Prepetition Secured Senior Lenders had an interest) and advances under the DIP Facility to permanently repay obligations under the Prepetition ABL Agreement in accordance with the Budget.

The DIP Facility initially was scheduled to expire on July 28, 2009, the sixtieth day following the date of the Interim Order.  On July 20, 2009, August 10, 2009, August 27, 2009 and October 1, 2009, the Bankruptcy Court approved amendments to certain terms of the Accommodation Agreement and the DIP Order.  These amendments extended the term of the DIP Facility and the Accommodation Agreement through October 15, 2009.  On October 15, 2009, the Customers agreed to a one day extension of the term of the DIP Facility to allow for the closing of the Sale Transaction.  The Debtors did not borrow any of the funds available for borrowing under the DIP Facility, and upon the closing of the Sale Transaction, the DIP Facility expired.

### F.        Key Supplier Agreements

To help prevent serious disruptions to the Debtors' business operations that could cause irreparable harm to the Debtors' and to preserve the going concern value of the Debtors' businesses and estates for the benefit of its stakeholders, the Debtors sought and obtained authorization from the Bankruptcy Court to pay certain essential suppliers ("Essential Supplier Payments") up to an aggregate amount of $7.1 million and certain foreign vendors ("Foreign Vendor Payments") up to an aggregate amount of $3.5 million.  Further, the Bankruptcy Court authorized the payment of prepetition lienholder claims to shippers, warehouseman, customs brokers and outside processors up to an aggregate amount of approximately $1.1 million ("Lienholder Payments").  Those suppliers that accepted an Essential Supplier Payment, Foreign Vendor Payments or a Lienholder Payment were required to provide certain trade terms to the Debtors pursuant to a trade agreement.  Throughout the opening weeks and months of the Debtors' Chapter 11 Cases, the Debtors negotiated and entered into over 60 such trade agreements.

### G.        Termination of Pension Plans

The PBGC is a wholly owned United States government corporation that administers the defined benefit pension plan termination insurance program under ERISA.  Pursuant to federal statute, Oldco M Corporation and each member of its controlled group are jointly and severally liable to the PBGC on behalf of the Pension Plan for amounts that Oldco M Corporation was required to contribute to the Pension Plan, as well as for certain liability in the event of a plan termination.  The Pension Plan was maintained by Oldco M Corporation and guaranteed in part by the PBGC.

On July 31, 2009, the PBGC filed a complaint for pension plan termination against Oldco M Corporation in the United States District Court for the Eastern District of Michigan, seeking an order terminating the Pension Plan, appointing PBGC as statutory trustee of the Pension Plan, establishing July 31, 2009 as the termination date of the Pension Plan and requiring that all relevant records be turned over to the PBGC.  In addition, PBGC published notice of its intent to terminate the Pension Plan in fourteen newspapers where Debtors have or had facilities.  On August 31, 2009, PBGC and Oldco M Corporation entered into an Agreement for Appointment of a Trustee and Termination of the Plans.  This agreement provided that the Pension Plan would be terminated effective as of July 31, 2009.  The PBGC, therefore, filed a notice of voluntary dismissal of its complaint in the United States District Court for the Eastern District of Michigan on August 31, 2009.

On August 12, 2009, the PBGC filed contingent claims against the Debtors on behalf of itself and the Pension Plan, which included: (1) claims for estimated unfunded benefit liabilities, totaling over $157,000,000; (2) unliquidated claims for missed statutory insurance premiums; and (3) unliquidated claims for missed minimum required contributions. The Claims were asserted as a mixture of priority and unsecured Claims. The Debtors believe that these Claims are overstated and assert, in certain instances, incorrect priorities. The Debtors and the PBGC are in discussions concerning these matters.

### H.    Sale of Certain Assets of the Old Metaldyne Companies

#### 1.    Marketing of Powertrain Group Assets

After the commencement of the Chapter 11 Cases, Lazard continued the solicitation of offers for and marketing of certain assets of the Powertrain Group (the "Powertrain Assets"), which had begun prior to the Petition Date. The Powertrain Assets proposed to be sold included domestic manufacturing facilities located in Ridgway, Pennsylvania; North Vernon, Indiana; St. Marys, Pennsylvania; Warren, Michigan; Bluffton, Indiana; Litchfield, Michigan; and Twinsburg, Ohio and foreign manufacturing facilities located in Ramos Arizpe, Mexico; Valencia, Spain; Indaiatuba, Brazil; Zell, Germany; Oslavany, Czech Republic; Nürnberg, Germany; Lyon, France; Halifax, United Kingdom; Barcelona, Spain; Suzhou, China; Jamshedpur, India; Dieburg, Germany; Luxemburg and Japan. On June 15, 2009, the Debtors entered into a Purchase Agreement (the "RHJI Purchase Agreement") with RHJI contemplating the sale of the Powertrain Assets to a newly formed subsidiary of RHJI ("RHJI Newco"). Pursuant to the RHJI Purchase Agreement, the Debtors and their nondebtor affiliates agreed, subject to higher and better offers and to the approval of the Bankruptcy Court, to sell the Powertrain Assets to RHJI Newco in exchange for: (a) a cash purchase price in an amount equal $25,000,000, subject to adjustments; (b) the assumption of certain liabilities of the Powertrain Group (the "Assumed Liabilities"); (c) the issuance by RHJI Newco to Old Metaldyne in trust for all of the Debtors selling Powertrain Assets of a term note in an aggregate principal amount of $50.0 million, paying interest at the LIBO Rate plus 5.0%; and (d) the exchange of a €15.0 million demand note issued by Metaldyne GmbH to RHJI Services S.A., an affiliate of RHJI, for a new term note issued by RHJI Newco in an aggregate principal amount of $20,000,000, in satisfaction of the corresponding intercompany debt owed by Old Metaldyne Company LLC to Metaldyne GmbH (which, at RHJI's option, would be either cancelled by Metaldyne GmbH or assumed by RHJI Newco).

The Debtors requested and, on June 25, 2009, obtained from the Bankruptcy Court an order (a) approving certain bidder protections for RHJI on a contingent basis (the "RHJI Bidder Protections"), (b) approving the bidding procedures for the sale of the Powertrain Assets, and (c) scheduling a sale hearing to consider the bids received and the assumption and assignment of certain Executory Contracts and Unexpired Leases related to the Powertrain Assets. The RHJI Bidder Protections included a break-up fee of not more than $1.5 million and an expense reimbursement of up to $750,000 in the event certain conditions in the RHJI Purchase Agreement were satisfied by July 2, 2009. The conditions in the RHJI Purchase Agreement, however, were not satisfied by the July 2, 2009 deadline. Instead, the Debtors and RHJI entered into two amendments to the RHJI Purchase Agreement which, among other things, sought to extend the July 2, 2009 deadline through July 23, 2009, subject to the approval of the Bankruptcy Court. That Bankruptcy Court, however, did not grant such approval.

On July 23, 2009, HHI Holdings, LLC ("HHI"), which is an affiliate of Hephaestus Holdings, Inc., a portfolio company of KPS Capital Partners, LP, presented a noncontingent Purchase Agreement to the Debtors (the "HHI Purchase Agreement") that provided for the purchase of the Powertrain Assets in exchange for consideration of $78 million in cash, subject to post-closing purchase price adjustments. HHI sought to replace RHJI as the stalking horse bidder for the Powertrain Assets. A special committee of the board of directors of Old Metaldyne formed for purposes of marketing the assets of the Powertrain Group (the "Special Committee") determined that the HHI Purchase Agreement offered higher and better consideration to the Debtors for the Powertrain Assets compared to the RHJI Purchase Agreement as originally Filed and as compared to the last-received offer from RHJI. The HHI Purchase Agreement also provided for a break-up fee in the amount of $1.5 million and an expense reimbursement of up to $750,000 (the "HHI Bidder Protections"). Because the Bankruptcy Court had not yet approved the amendments to the RHJI Purchase Agreement, and in accordance with the Debtors' right to modify the bidding procedures as necessary to fulfill their fiduciary duties to the estates, the Debtors requested at a hearing held the afternoon of July 23, 2009 that the Bankruptcy Court approve the HHI Purchase Agreement as the stalking horse bid for the Powertrain Assets and the HHI Bidder Protections. The Bankruptcy Court issued an order approving the

HHI Purchase Agreement as the stalking horse bid for the Powertrain Assets and the HHI Bidder Protections on July 28, 2009. That order also approved bidding procedures for the sale of the Powertrain Assets that required the Debtors to negotiate with qualified bidders in preparation for an auction to be held on August 5, 2009 if more than one qualified bid was timely received. The bidding procedures also provided that, in consultation with the Creditors' Committee, the DIP Agent, the Customers and other interested parties, the Debtors would select the successful bidder following the auction, with a hearing to regarding authority to sell the Powertrain Assets to the successful bidder to occur on August 7, 2009.

### 2. Marketing of Chassis Group Assets

Throughout the Chapter 11 Cases, Lazard also solicited offers for and marketed the sale of certain assets of the Chassis Group (the "Chassis Assets"). The Chassis Assets proposed to be sold included domestic manufacturing facilities located in Edon, Ohio and Greensboro, North Carolina, and certain operations located in Iztapalapa, Mexico and Barcelona, Spain, but did not include the Debtors' New Castle, Indiana facility, in which no buyer had expressed an interest. As discussed under Section VI.H.3 below, prior to the Petition Date, the Debtors and The Carlyle Group ("Carlyle") executed a nonbinding letter of intent (the "Carlyle LOI") for the sale of the Chassis Assets. When the Debtors and Carlyle were not able to come to terms on a definitive purchase agreement, the Debtors requested, and on July 8, 2009 received, an order from the Bankruptcy Court approving the entry by the Debtors, in their reasonable discretion, of a purchase agreement on or before July 22, 2009 to serve as a stalking horse bid for the Chassis Assets if such a bid could be identified and negotiated by the Debtors prior to that date. Under the order approved by the Bankruptcy Court, such a stalking horse bid would be entitled to certain bidder protections. The July 8, 2009 order also scheduled a hearing to consider approval of the sale of the Chassis Assets and established bidding procedures for the marketing and sale of the Chassis Assets, including, but not limited to, the conduct of an auction for those assets on August 3, 2009.

On July 22, 2009, the Debtors and Revstone Industries, LLC ("Revstone") entered into a Purchase Agreement (the "Revstone Purchase Agreement") contemplating the sale of the Chassis Assets to Revstone and for Revstone to serve as the stalking horse bidder for the Chassis Assets. The purchase price to be paid for the Chassis Assets included a base purchase price of $14,000,000, subject to various adjustments. In accordance with the July 8, 2009 order, the Revstone Purchase Agreement included a breakup fee of not more than $280,000 and an expense reimbursement of up to $250,000. Pursuant to the Revstone Purchase Agreement, Revstone would acquire all of the stock of Metaldyne Mexico, S.A. de C.V. and Metaldyne International Spain S.L. Additionally, Revstone would acquire assets from subsidiary plants in Greensboro, North Carolina and Edon, Ohio.

The bidding procedures established a July 31, 2009 deadline for submitting qualified bids for the auction of the Chassis Assets, which was initially scheduled to be held on August 3, 2009, if one or more qualified bids were received. The Bankruptcy Court also scheduled a sale hearing for August 4, 2009 to consider approval of the sale of the Chassis Assets to the successful bidder at the auction.

On July 31, 2009, the Debtors received a bid for the Chassis Assets from Chassis Products, LLC, an entity formed by Carlyle (the "Chassis Products Bid"). The Chassis Products Bid included a purchase price of $18 million, consisting of approximately $15 million in cash and an approximately $3 million credit bid. The Debtors, with the assistance of Lazard, evaluated the Chassis Products Bid and determined that it was a "qualified bid" with respect to the Chassis Assets.

### 3. Auction and Sale of Assets to MD Investors Corporation

On July 31, 2009, MD Investors Corporation ("MD Investors") (a joint venture between The Carlyle Group and Solus Alternative Asset Management LP), in connection with the Prepetition Senior Secured Lenders, submitted a bid (the "MDI Bid") for all four of the business units that were being marketed by the Debtors during the Chapter 11 Cases, which included the Powertrain Group and the Chassis Group, along with the balance shaft modules and tubular businesses. The MDI Bid proposed cash consideration of $38 million, subject to post-closing purchase price adjustments, and included a credit bid of at least $400 million of indebtedness under the Senior Secured Loan Agreement. The Debtors, with the assistance of Lazard, evaluated the MDI Bid and, following extensive discussions and after being provided with assurances from MD Investors that their bid would be modified in certain ways, determined that the bid was a "qualified bid" with respect to each of the auctions.

To be able to properly compare bids for individual groups of the Debtors' assets against the MDI Bid for the combined assets, the Debtors rescheduled the auction for the Chassis Assets for August 5, 2009. In addition, the Debtors contacted other potential bidders regarding the sale of the assets of the balance shaft module business (the "BSM Assets") and the tubular business (the "Tubular Assets") and invited interested bidders for such assets to attend the combined auction scheduled for August 5, 2009.

On August 3, 2009, the bid deadline for the Powertrain Assets, the Debtors received a bid from ACOF MD Holdings Ltd. ("Ares") for the Powertrain Assets (the "Ares Bid"). The Debtors, in consultation with Lazard, determined that the Ares Bid was a qualified bid with respect to the Powertrain Assets.

The Debtors and their advisors determined that the best manner in which to maximize value for the various groups of the Debtors' assets would be to auction the Powertrain Assets and the Chassis Assets as separate businesses first and then to seek to compare the MDI Bid to the combination of the highest and best bids for the Powertrain Assets, the Chassis Assets and the value that the Debtors believed they could achieve with respect to the BSM Assets and the Tubular Assets, based upon draft asset purchase agreements and other indications of interest that the Debtors had received in respect of those assets at that time (collectively, the "Individual Business Bids").

Shortly before the auction, Revstone advised the Debtors that it was withdrawing from the sale process for the Chassis Assets. Accordingly, only one qualified bid, the Chassis Products Bid, existed with respect to the Chassis Assets and that bid was for the Chassis Assets alone. As such, no auction was held with respect to the Chassis Assets, and the auction for the Chassis Assets was adjourned.

HHI and Ares both bid at the Powertrain Assets auction, with Ares making the final bid of $100 million. HHI advised that it no longer desired to bid on the Powertrain Assets and that portion of the auction was closed.

The Debtors then adjourned the auction to permit them to analyze and compare the MDI Bid with the Individual Business Bids and to discuss certain aspects of the MDI Bid. After intensive discussions lasting several hours, MD Investors provided a revised and improved bid. The auction was then adjourned for the evening to allow for the evaluation and clarification of the terms of the MDI Bid, with the auction to recommence on August 6, 2009.

On August 6, 2009, after further discussions, MD Investors submitted a further revised bid for substantially all of the Debtors' assets. When the auction re-opened on August 6, 2009, the MDI Bid was announced on the record as the highest and best bid. No other party advised the Debtors that it would increase any existing Individual Business Bid or related indication of interest for the Chassis Assets, the BSM Assets or the Tubular Assets. After consultation with interested parties in attendance at the auction, the MDI Bid was deemed the successful bid and the auction was closed.

Following the auction, the Debtors and MD Investors entered into a Purchase Agreement, dated as of August 7, 2009 (the "MDI Purchase Agreement"), pursuant to which the Debtors agreed to sell a majority of their assets (the "Sale Assets") to MD Investors, and MD Investors agreed to assume certain liabilities and various other obligations under certain Executory Contracts and Unexpired Leases (the "Sale Transaction"). The consideration provided under the MDI Purchase Agreement included, among other elements, $39.5 million in cash, subject to purchase price adjustments, including an adjustment relating to the amount drawn under the DIP Facility. In addition, MD Investors agreed to assume up to $8.5 million in Claims entitled to administrative priority status. MD Investors also agreed to credit bid all claims and obligations of secured parties under the Prepetition Senior Secured Loan Agreement, which were in the aggregate equal to no less than $425 million. As a result of the credit bid, the Prepetition Senior Secured Agent agreed to release its liens (and thus the lien of all of the Prepetition Senior Secured Lenders) on various other assets that were not part of the Sale Assets. Thus, any remaining assets in the Debtors' Estates were made available for payment of claims to other stakeholders upon their liquidation. In addition, the Sale Order with respect to the Sale Transaction provided for the funding of a liquidation trust in the amount of $2.5 million as part of a settlement with the Creditors' Committee with respect to various issues surrounding the credit bid. Finally, the MDI Purchase Agreement provided for the assumption of a €15,000,000 note in Europe and of certain unsecured nonpriority liabilities and the payment of cure costs for assumed and assigned contracts and leases.

On August 6, 2009, in anticipation of the auctions, and again on August 7, 2009 following acceptance of the MDI Bid, BDC Finance, L.L.C. ("BDC"), a Prepetition Senior Secured Lender holding approximately $3 million

of the more than $400 million in outstanding debt, Filed objections with the Bankruptcy Court.  Through its objections, BDC argued that the credit bid proposed by the MDI Bid violated the applicable credit agreements governing the rights of the Prepetition Senior Secured Lenders.  BDC further argued that the MDI Bid violated its rights under the Bankruptcy Code by not providing it with adequate protection under section 363(e) of the Bankruptcy Code and objected to granting MD Investors good faith purchaser status under section 363(m) of the Bankruptcy Code, among other things.  The Debtors, however, asserted (among other things) that BDC's objections were an improper attempt to convert an intercreditor dispute between BDC, on the one hand, and the Prepetition Senior Secured Agent and the other Prepetition Senior Secured Lenders, on the other hand, into an objection to the MDI Bid.  Moreover, the Debtors believed that the actions taken by the Prepetition Senior Secured Agent in credit bidding all outstanding debt under the Prepetition Senior Secured Loan Agreement was dispositive.  At an August 7, 2009 hearing before the Bankruptcy Court, the objections of BDC were litigated, with testimony from several witnesses over the course of a day-long hearing, with BDC seeking to prevent or, at minimum, delay the closing of the Sale Transaction.  Ultimately, each of the objections of BDC was overruled by the Bankruptcy Court.

On August 12, 2009, the Bankruptcy Court issued an order and accompanying opinion authorizing the sale of the Sale Assets free and clear of all liens, claims, interests and encumbrances and authorizing the assumption and assignment of the Assigned Agreements in connection therewith (the "Sale Order").  The Bankruptcy Court concluded that the consideration MD Investors offered under the MDI Purchase Agreement was far in excess of any other offer for the Debtor's assets and far in excess of the liquidation value of those assets.  The Sale Transaction closed on October 16, 2009.  Upon the closing of the Sale Transaction and the application of the proceeds thereof, the Debtors satisfied their obligations under the Prepetition Senior Secured Loan Agreement and the Prepetition ABL Agreement, and the DIP Facility expired.

BDC appealed the Sale Order to the United States District Court for the Southern District of New York (the "District Court").  BDC did not seek a stay pending appeal and asserted that, if it were successful, a remedy could be fashioned for it without the need to upset the Sale Transaction.  Briefing on the merits of the appeal is complete.  On October 28, 2009, the Debtors and MD Investors filed a joint motion to dismiss BDC's appeal as equitably and statutorily moot.  On October 30, 2009, the Creditors' Committee also filed a motion to dismiss on similar grounds.  On November 11, 2009, BDC filed an objection to both motions to dismiss.  The Debtors and MD Investors filed reply papers on November 23, 2009.  On December 29, 2009, the District Court issued its opinion and order affirming the Sale Order and dismissing BDC's appeal.  As of the date of this Disclosure Statement, BDC has not filed a further notice of appeal to the Second Circuit Court of Appeals; however, the period for making any such appeal has not run.

### 4.  Assets Not Sold in Sale Transaction

After the closing of the Sale Transaction, and after MD Investors exercised its option to include the Debtors' Twinsburg, Ohio facility as part of the purchased assets under the MDI Purchase Agreement, the Debtors still owned material assets.  Specifically, after the close of the Sale Transaction, the Debtors owned real property (at former operating locations) in Farmington Hills, Michigan; Bedford Heights, Ohio; and New Castle, Indiana.  In addition, the Debtors continued to operate at leased facilities (*i.e.*, the Remainco Plants) in Niles, Illinois; Middleville, Michigan and Greensboro, North Carolina (although certain of the personal property located at this facility was sold in the Sale Transaction).  In addition, the Debtors continued to own shares in six foreign entities, which are comprised of the two Foreign Asset Subsidiaries (Metaldyne International Holdings B.V. and Metaldyne Machining and Assembly Mfg. Co. (Canada) Ltd.) and the four Foreign No-Asset Subsidiaries.  Finally, the Debtors owned various intangible assets, including accounts receivable, claims and causes of action (including the Recovery Actions) and other assets.

### I.  New Castle Facility

Prior to the Petition Date, the Debtors and Chrysler entered into a Supply Agreement dated November 12, 2007 (the "NCM Supply Agreement").  The NCM Supply Agreement provided for the supply of component parts to Chrysler primarily from the Debtors' New Castle, Indiana facility (the "New Castle Facility").  These component parts were part of the Debtors' Chassis Group.  The NCM Supply Agreement contained a provision allowing either party to the agreement to terminate the agreement because of the insolvency of the other party.  After Mr. Nardelli, the then-CEO of Chrysler, testified in Congress in late 2008 as to the insolvent financial condition of Chrysler, and

given that the Debtors were losing money on the products produced under the NCM Supply Agreement, the Debtors terminated the NCM Supply Agreement. Because substantially all of the production at the New Castle Facility was production required under the NCM Supply Agreement, the Debtors decided to wind down the New Castle Facility. Chrysler, however, continued to require the products to be produced under the NCM Supply Agreement. As a result, Chrysler and the Debtors negotiated the terms of the NCM Production Agreement. The effectiveness of the Accommodation Agreement was conditioned upon the execution of the NCM Production Agreement among Chrysler Motors LLC, Chrysler Canada Inc. and NC-M Chassis Systems LLC ("NC-M") pursuant to which Chrysler agreed to pay all of the expenses directly related to the production of Chrysler's component parts plus 90% of the manufacturing burden, overhead and other common expenses incurred while the facility was also producing for Toyota. After Toyota production ceased, Chrysler agreed to pay substantially all of the manufacturing burden, overhead and other common expenses incurred, in addition to the expenses directly related to Chrysler's component parts. Chrysler also agreed to repay a significant portion of Chrysler's pre-existing debt owed to the Debtors and to purchase certain inventory at the New Castle Facility. NC-M also granted Chrysler an option to purchase certain tooling and equipment at the New Castle Facility. This option expired at the end of November 2009.

In addition, NC-M and Debtor Old Metaldyne Machinery and Assembly Company, Inc. (f/k/a Metaldyne Machinery and Assembly Company, Inc.) entered into an agreement (the "Toyota Production Agreement") with Toyota Motor Engineering & Manufacturing North America, Inc. ("Toyota") pursuant to which Toyota agreed to pay all of the expenses directly related to the production of Toyota's component parts plus 10% of the manufacturing burden, overhead and other common expenses incurred while the facility was producing for Toyota. Toyota also agreed to repay a significant portion of Toyota's preexisting debt owed to the Debtors and to purchase certain inventory. NC-M also granted Toyota an option to purchase certain tooling and equipment at the New Castle Facility.

Pursuant to orders dated May 29, 2009 and June 30, 2009, the Bankruptcy Court authorized the appropriate Debtors to enter into the NCM Production Agreement and Toyota Production Agreement, respectively.

The Debtors' ceased production at the New Castle Facility as of August 30, 2009 and shipped the final materials from the facility on August 31, 2009.

### J. Assumption and Rejection of Certain Unexpired Executory Contracts and Leases

As debtors in possession, the Debtors have the right under section 365 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court, to assume, assume and assign or reject executory contracts and unexpired leases. Since the Petition Date, the Debtors have obtained six orders from the Bankruptcy Court authorizing the rejection of certain Executory Contracts and Unexpired Leases. In addition, pursuant to the Sale Order, the Debtors were authorized to assume and assign certain Executory Contracts and Unexpired Leases (the "Assigned Agreements") to MD Investors. Lists of Assigned Agreements have been Filed with the Bankruptcy Court on a rolling basis, with the final notice Filed and served on relevant parties on December 4, 2009.

The Debtors are continuing to review their remaining Executory Contracts and Unexpired Leases. As discussed in Section XI.A.1, except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to reject each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned or rejected during the Chapter 11 Cases or pursuant to the Plan, which includes, but is not limited to, the Executory Contracts and Unexpired Leases identified on Exhibit IV.A to the Plan. The Debtors anticipate that they may File further motions to reject certain burdensome or unnecessary Executory Contracts and Unexpired Leases prior to the Effective Date as the Debtors wind down their remaining business operations.

Section 365 of the Bankruptcy Code provides generally that a debtor must decide within 90 days after commencement of its bankruptcy case to decide whether to assume, assume and assign or reject an unexpired lease of nonresidential real property. Under applicable bankruptcy law, a debtor may obtain one 120-day extension of this period. On August 20, 2009, the Bankruptcy Court approved a 120-day extension for the Debtors, extending their deadline to assume, assume and assign or reject nonresidential real property leases, which expired on December 23, 2009. Under applicable bankruptcy law, the Debtors have until Confirmation of the Plan to decide whether to reject their other Executory Contracts and Unexpired Leases.

## K. Claims Process and Bar Dates

On July 7, 2009, the Debtors Filed their Schedules identifying the assets and liabilities of their Estates. In addition, pursuant to an order dated July 7, 2009 (the "Bar Date Order"), the Bankruptcy Court established the following bar dates for the filing of proofs of Claim in the Chapter 11 Cases:

- August 14, 2009 as the general bar date for all Claims (the "General Bar Date"), except as noted below;

- November 23, 2009 as the bar date for government units holding Claims against the Debtors;

- the later of (1) the General Bar Date and (2) 30 days after the date of entry of the applicable rejection order of an Executory Contract or Unexpired Lease as the bar date for any claims arising from the rejection of the Executory Contract or Unexpired Lease; and

- the later of (1) the General Bar Date and (2) 30 days after the date that a notice of an amendment to the Schedules is served on a claimant as the bar date for Claims relating to such amendment to the Schedules.

As of the date of this Disclosure Statement, approximately 3,500 Claims had been Filed against the Debtors totaling approximately $15 billion. In addition, the Debtors have scheduled approximately 1,000 Claims. The Filed and scheduled Claims can be categorized as follows (the Claims in the below categories overlap):

- Approximately 2,620 Claims were Filed asserting general unsecured status in the approximate amount of $3.3 billion.

- Approximately 1,230 Claims were Filed asserting that the amount owed is unliquidated.

- Approximately 1,600 Claims were Filed by and/or scheduled for the Debtors' employees in the approximate amount of $3 billion. These Claims assert amounts owed for 401(K) stock, pension funds, employee wages and benefits, retiree benefits and pension and severance payments.

- Approximately 16 Claims relating to the Debtors' alleged environmental responsibilities were Filed and/or scheduled, which Claims are unliquidated.

- Approximately 2,000 Claims related to prepetition goods or services received by the Debtors were Filed and/or scheduled in the approximate amount of $76 million. These Claims include trade payables, mechanic's liens, reclamation claims and utilities.

- Approximately 144 Claims were Filed and/or scheduled by insurers in the approximate amount of $258 million.

- Approximately 52 Claims in relation to claims against the Debtors that are currently in the process of litigation were Filed and/or scheduled in the approximate amount of $418,000.

- Approximately 163 Claims were Filed by and/or scheduled for the Debtors' secured and unsecured lenders in the approximate amount of $12.4 billion.

- Approximately 51 Claims relating to prepetition taxes owed by the Debtors were Filed and/or scheduled in the approximate amount of $23 million. These taxes include business taxes, corporate taxes, income taxes, personal property taxes, real property taxes, sales and use taxes, unemployment taxes and withholding tax.

The Debtors believe that they have valid objections to many of the Claims that have been Filed and, thus, the ultimate allowed amount of such Claims will be significantly less than the asserted amounts. The Debtors have Filed or intend to File objections to Claims on a number of grounds, including, among others, that such Claims: (1) are duplicative of other Claims asserted against the Debtors; (2) were Filed after the applicable bar date; (3) have been amended and superseded by subsequently Filed Claims; (4) were Filed against the wrong Debtor; (5) overstate the Debtors' liability; (6) do not represent a valid obligation of the Debtors; or (7) were asserted with the improper priority status. The Debtors began filing omnibus objections to proofs of Claim in December 2009.

## L.    Securities Litigation

On January 14, 2009, Anthony Ziebron and James Vrana, on behalf of themselves and a purported class of similarly situated persons (collectively, the "Plaintiffs"), filed a complaint seeking class action status in the United States District Court for the Eastern District of Michigan. The purported class is defined as-(a) MascoTech, Inc. employees and former employees who purchased securities (common stock) in Old Metaldyne from January 14, 2002 to January 14, 2004 and who allegedly were damaged during the forced sale of those securities in February 2007 or (b) MascoTech, Inc. employees and former employees who held restricted stock awards and who had their awards vest beginning on November 28, 2000 and were forced to sell their stock in February 2007 as a result of the Debtors' acquisition by Asahi Tec. The Plaintiffs assert that the Debtors and/or the other defendants violated sections 10(b) and 20(a) of the Exchange Act and 78t(a)) and Rule 10b-5 thereunder and pursuant to Michigan law, breached their fiduciary duties, were unjustly enriched, committed silent fraud and converted the purported class' stock.

Pursuant to section 362 of the Bankruptcy Code, the securities litigation against Old Metaldyne has been stayed. Due to the automatic stay, the securities litigation is still in its infant stage in that (a) the United States District Court for the Eastern District of Michigan has not yet appointed lead counsel or certified a class, (b) the complaint has not been subjected to a motion to dismiss and (c) no discovery has occurred.

On August 13, 2009, the Plaintiffs Filed a motion seeking to lift the automatic stay so that they could proceed with the securities litigation in the Eastern District of Michigan and an extension of the General Bar Date for the purported class members. On September 11, 2009, the Debtors Filed an objection to this motion. The Plaintiffs have advised the United States District Court for the Eastern District of Michigan that they will likely dismiss the Debtors from the litigation. Under the Plan, any claims asserted by the Plaintiffs or the purported class will be subordinated to general unsecured creditors pursuant to section 510(b) of the Bankruptcy Code and are classified in Class 6 of the Plan.

## M.    Extension of Exclusive Periods

The Debtors' exclusive right to File a chapter 11 plan was initially scheduled to expire on September 24, 2009. To continue their efforts to complete and close the Sale Transaction, wind down the assets not included in the Sale Assets and work with other stakeholders to develop and obtain confirmation of a chapter 11 plan of liquidation, the Debtors' requested, and on September 17, 2009 received, an order of the Bankruptcy Court extending the Debtors' exclusive right to File a chapter 11 plan to January 22, 2010 and the exclusive right to solicit acceptances thereof until March 23, 2010.

## N.    Agreements with Customers at Remaining Facilities

As indicated above, the Accommodation Agreement provided that, at the end of the financing term, any Customer that desired production from any Remainco Plant would work in good faith with Old Metaldyne to determine the cost of such production and the Customer would agree to bear such cost. Further, the Accommodation Agreement explicitly provided that the DIP Loans would not fund extraordinary costs associated with the Remainco Plants after the financing expired. Old Metaldyne worked with the key customers at each of the following Remainco Plants to negotiate agreements to fund the expenses associated with their production and the wind-down of the Remainco Plants. The agreements described below document the wind-down funding arrangements for the Remainco Plants.

1.      **Middleville Facility**

On October 26, 2009, Old Metaldyne entered into an agreement with Chrysler to effect an orderly wind-down of Chrysler's production at Old Metaldyne's Middleville, Michigan facility (the "Middleville Facility"). The agreement was approved by the Bankruptcy Court on November 18, 2009. Under the terms of the agreement, Old Metaldyne agreed to continue to produce parts for Chrysler at the Middleville Facility in exchange for Chrysler's agreement to fund (a) Old Metaldyne's production for Chrysler upon the terms set forth in the purchase orders between the parties, (b) Chrysler's pro rata share of a fixed weekly amount for transition services and case costs, (c) performance bonuses for Chrysler-dedicated non-insider employees and (d) any operating losses incurred at the Middleville Facility during the term relating to production for Chrysler. In addition, Chrysler agreed to continue the limitation on its right to setoff and the obligation to purchase its remaining inventory at the end of the production period, notwithstanding the expiration of the Accommodation Agreement. Pursuant to this agreement, Chrysler agreed to fund amounts necessary to exercise its equipment and tooling options and obtained the option to purchase other Middleville equipment and tooling used for multiple Customers, provided that it obtained waivers from such other Customers holding unexpired options.

On or around October 30, 2009, Old Metaldyne entered into an agreement with Ford to effect an orderly wind-down of Ford's production at the Middleville Facility. The agreement was approved by the Bankruptcy Court on November 18, 2009. Under the terms of the agreement, Old Metaldyne agreed to continue to produce parts for Ford at the Middleville Facility in exchange for Ford's agreement to fund (a) Old Metaldyne's production for Ford upon the terms set forth in the purchase orders between the parties, (b) Ford's pro rata share of a fixed weekly amount for transition services and case costs, (c) performance bonuses for Ford-dedicated non-insider employees and (d) any operating losses incurred at the Middleville Facility during the term relating to production for Ford. In addition, Ford agreed to continue the limitation on its right to setoff and the obligation to purchase its remaining inventory at the end of the production period, notwithstanding the expiration of the Accommodation Agreement.

Production at the Middleville Facility is expected to cease prior to the Effective Date of the Plan.

2.      **Niles Facility**

On or around October 28, 2009, Old Metaldyne entered into an agreement with Ford to effect an orderly wind-down of Ford's production at Old Metaldyne's Niles, Michigan facility (the "Niles Facility"). The agreement was approved by the Bankruptcy Court on November 18, 2009. Under the terms of the agreement, Old Metaldyne agreed to continue to produce parts for Ford at the Middleville Facility in exchange for Ford's agreement to fund (a) Old Metaldyne's production for Ford at the Niles Facility upon the terms set forth in the purchase orders between the parties, (b) a fixed weekly amount for transition services and case costs, and (c) any operating losses incurred by Old Metaldyne during the term relating to production for Ford. In addition, Ford agreed to fund any rent payments owed for Old Metaldyne's Plymouth, Michigan facility during the term of the agreement.

Production at the Niles Facility ceased in December 2009.

3.      **Thamesville Facility**

Though Metaldyne Machining and Assembly Mfg. Co. (Canada) Ltd. ("Old Metaldyne Canada") is not a debtor in these proceedings, because it, Ford and Chrysler were parties to the Accommodation Agreement, on October 16, 2009 and October 23, 2009, Old Metaldyne Canada, entered into Transition Agreements with each of and Chrysler and Ford. Pursuant to the Transition Agreements, Old Metaldyne Canada agreed to continue to produce parts for Chrysler and Ford, respectively, at Old Metaldyne Canada's Thamesville, Ontario facility (the "Thamesville Facility") in exchange for payment under the purchase orders between Old Metaldyne Canada and each of Chrysler and Ford. In addition, Chrysler and Ford agreed to purchase their inventory at the end of the production, notwithstanding the expiration of the Accommodation Agreement. Further, Old Metaldyne Canada agreed to sell to Chrysler and Ford certain tooling and equipment located at the Thamesville Facility in exchange for funding of the purchase price into escrow with the National Automobile, Aerospace, Transportation and General Workers of Canada ("CAW"). The escrowed amounts were to be used to facilitate payment of severance obligations to Old Metaldyne Canada employees who are members of the CAW, all in accordance with escrow agreements entered into by Old Metaldyne Canada and the CAW with each of Chrysler and Ford.

Production at the Thamesville Facility ceased in October 2009

## 4. Greensboro Facility

The Debtors decided to wind down and cease operations at their Greensboro, North Carolina facility (the "Greensboro Facility"). Dana Ltd., Kelsey-Hayes Company and ZF Lemforder Corporation, the Debtors' largest customers at the Greensboro Facility, agreed to fund a portion of the Debtors' expenses associated with the wind-down of the Greensboro Facility. The terms of the Debtors' agreements with these customers have been memorialized in exit agreements with each participating customer, which agreements were entered in October 2009, and subsequently were filed under seal with the Bankruptcy Court. The exit agreements with Dana Ltd. and Kelsey-Hayes Company were approved by the Bankruptcy Court on November 12, 2009. and the exit agreement with ZF Lemforder Corporation was approved by the Bankruptcy Court on November 5, 2009. The exit agreements also set forth the provisions relating to, among other things, payment of post-petition accounts receivable, continued production of component parts in accordance with agreed to production schedules, payment terms, and the ownership and possession of tooling.

Additionally, the Debtors entered into an agreement with Metaldyne Chassis Products, LLC, a Delaware limited liability company ("MCP"), a subsidiary of MD Investors, whereby MCP agreed to fund a portion of employee retention bonuses for non-insider employees related to the wind down of the Greensboro Facility.

Production at the Greensboro Facility ceased in November 2009.

## O. Collective Bargaining Agreements and Retiree Benefit Obligations

As of the Petition Date, the Debtors were party to numerous collective bargaining agreements and other agreements with five different unions, including the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "USW"); International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"); the International Association of Machinists and Aerospace Workers (the "IAM"); the United Electrical, Radio and Machine Workers of America (the "UE"); and the Chauffeurs, Teamsters and Helpers Local Union 414, an Affiliate of the International Brotherhood of Teamsters (the "IBT"). In addition to their active collective bargaining agreements, the Debtors had a number of legacy retiree benefit obligations under collective bargaining agreements. While the Debtors had negotiated terminations of retiree benefit obligations in recent years at their active facilities, such obligations continued to exist for some of the Debtors' closed facilities.

In September 2009, after gaining an understanding of the obligations and agreements that MD Investors intended to assume as part of the MD Investors transaction, the Debtors began to analyze the collective bargaining agreements and retiree benefit obligations that would exist after the closing of sale of the Sale Assets to MD Investors. In particular, the Debtors reviewed their obligations to provide (1) wages and benefits pursuant to the collective bargaining agreements that they did not assume and assign as part of the MD Investors transaction and (2) "retiree benefits" (as that term is defined section 1114(a) of the Bankruptcy Code) to certain retired, bargained-for employees of their former manufacturing plants. As part of this process, the Debtors determined that it was necessary to either negotiate consensual terminations of or reject their remaining collective bargaining agreements because the underlying assumption of each of these collective bargaining agreements—that the Debtors would continue to operate manufacturing plants—no longer existed. Moreover, the Debtors concluded that the cost of maintaining the benefits provided under collective bargaining agreements and in respect of retiree benefit obligations would be millions of dollars. Accordingly, the Debtors determined that it would be impossible to pay administrative and priority claims in full and thus confirm the Plan absent the rejection or termination of the remaining collective bargaining agreements and termination of retiree benefits.

In an effort to reach a consensual termination of the remaining collective bargaining agreements and retiree benefits, the Debtors entered into negotiations with the USW, the UAW, the IAM, the UE and the IBT. For the most part, these negotiations were successful. The Debtors reached an agreement with the USW on the collective bargaining agreement associated with the Debtors' former Hamburg, Michigan facility. On December 17, 2009, the Bankruptcy Court issued an order approving the settlement agreement with the USW. In addition, on or around December 15, 2009, the Debtors reached agreements with (1) the UAW regarding (a) the termination of collective bargaining agreements that were not assigned to MD Investors, (b) a resolution of the Debtors' bargaining

obligations both for collective bargaining agreements that were assigned to MD Investors and those that were not and (c) the termination of retiree benefits for UAW-represented retirees; (2) the IBT regarding the termination of a collective bargaining agreement and the resolution of the Debtors' bargaining obligations related thereto; and (3) the IAM regarding the termination of retiree benefits for IAM-represented retirees.  On December 23, 2009, the Debtors filed motions with the Bankruptcy Court seeking approval of these settlement agreements.  Hearings on the approval of these motions are scheduled to be heard by the Bankruptcy Court on January 19, 2010.

The UE is the only union that has failed to enter into a consensual resolution of the termination of retiree benefits.  On December 30, 2009, the Debtors filed a motion seeking to terminate the retiree benefits for UE-represented retirees effective as of January 31, 2010.  A hearing on the approval of this motion is scheduled to be heard by the Bankruptcy Court on January 19, 2010.

In addition to any obligations the Debtors may have to provide retiree benefits to certain union-represented individuals, the Debtors also were obligated as of the Petition Date to provide retiree benefits to three individuals that were not represented by unions (the "Non-Union Retirees").  The Debtors are in the process of communicating with the Non-Union Retirees regarding the potential termination of the benefits provided to such individuals and are seeking to commence negotiations with such Non-Union Retirees.  The Debtors anticipate that if an agreement providing for the consensual termination of such benefits is not reached with the Non-Union Retirees in January 2010, the Debtors will seek to terminate their obligations to provide such benefits to the Non-Union Retirees, either through the filing of a motion under section 1114 of the Bankruptcy Code or otherwise.

## VII.     THE DISTRIBUTION TRUST CREATED PURSUANT TO THE PLAN

### A.     Distribution Trust Generally

On or prior to the Effective Date, the Distribution Trust will be established pursuant to the Distribution Trust Agreement for the purpose of liquidating the assets contributed to the Distribution Trust, resolving all Disputed Claims, pursuing any Recovery Actions, making all distributions to holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing the Plan and administering the Debtors' Estates. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Distribution Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan), the Distribution Trust (and the Distribution Trustee) will be empowered to:

- effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan;

- establish, maintain and administer the Trust Accounts, which will be segregated to the extent appropriate in accordance with the Plan;

- accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the assets of the Distribution Trust (directly or through its professionals or a Third-Party Disbursing Agent), in accordance with the Plan;

- sell, liquidate, transfer, distribute or otherwise dispose of the assets of the Distribution Trust (directly or through its professionals or a Third-Party Disbursing Agent) or any part thereof or any interest therein upon such terms as the Distribution Trustee determines to be necessary, appropriate or desirable;

- dissolve, wind down or liquidate any non-Debtor entity in which the Debtors have an equity interest, including, if determined to be appropriate in the judgment of the Distribution Trustee, authorizing the commencement of insolvency proceedings for any such non-Debtor entity in an appropriate forum;

- maintain as going concerns the businesses conducted at certain facilities of the Debtors that are transferred to the Distribution Trust (subject to the limitations described in the Plan), including purchasing raw materials and other goods, employing persons to perform manufacturing and other

services and selling such goods to customers once manufactured, in each case, pending the sale and liquidation thereof, to conserve and protect such assets and provide for the orderly liquidation thereof;

- calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan;

- comply with the Plan and exercise the Distribution Trustee's rights and fulfill its obligations thereunder;

- review, reconcile, settle or object to Claims and resolve such objections as set forth in the Plan;

- pursue Recovery Actions that are transferred to the Distribution Trust to the extent that their pursuit would likely result in a material economic benefit to creditors classified in Class 3 and Class 4 under the Plan, as determined by the Oversight Committee, in its sole discretion;

- retain, compensate and employ professionals to represent the Distribution Trustee with respect to its responsibilities;

- file appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and pay Taxes or other obligations owed by the Distribution Trust and the Debtors;

- exercise such other powers as may be vested in the Distribution Trustee under the Distribution Trust Agreement or the Plan, or as deemed by the Distribution Trustee to be necessary and proper to implement the provisions of the Plan and the Distribution Trust Agreement;

- take such actions as are necessary or appropriate to close or dismiss any or all of the Chapter 11 Cases; and

- dissolve the Distribution Trust in accordance with the terms of the Distribution Trust Agreement.

Notwithstanding anything to the contrary described in this Section VII.A, the Distribution Trust's primary purpose is liquidating the assets transferred to it by the Debtors, with no objective to continue or engage in the conduct of a trade or business except to the extent consistent with the trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

**B.    Funding of and Transfer of Assets Into the Distribution Trust**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, other than rights under any Executory Contract or Unexpired Lease that is being rejected pursuant to the Plan, the Debtors will transfer all assets remaining in their Estates to the Distribution Trust, including their equity or ownership interest in Foreign Asset Subsidiaries, and all such assets will vest in the Distribution Trust, to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement.  The assets will be transferred to and vest in the Distribution Trust on the Effective Date, free and clear of all Liens, except as set forth in Section III.J of the Plan.

Any Cash that is transferred by the Debtors to the Distribution Trust, and thus constitutes the Initial Other Asset Funding Amount, will be transferred into the Other Asset Trust Account.  On the Effective Date, the Debtors and MD Investors will cause the Initial MD Investors Funding Amount to be released from escrow and transferred into the Recovery Action Trust Account.

The Distribution Trustee will have the authority to create sub-accounts or sub-trusts within the Distribution Trust, which may have a separate legal existence, and which will be considered sub-accounts or sub-trusts of the Other Asset Trust Account, and into which the Distribution Trustee may deposit any non-Cash property, including real or personal property pending its liquidation.  Such sub-accounts or sub-trusts may hold legal title to such

property. Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts will be deposited directly into the Other Asset Trust Account.

The act of transferring assets and rights to the Distribution Trust, as authorized by the Plan, will not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Distribution Trust as if the asset or right was still held by the applicable Debtor.

## C.      Oversight Committee

An Oversight Committee will be established to review and monitor the actions of the Distribution Trustee in its administration of the Distribution Trust. The Oversight Committee will have standing to be heard in the Bankruptcy Court on all matters brought before the Bankruptcy Court in the Chapter 11 Cases after the Effective Date. The initial members of the Oversight Committee are identified on Exhibit III.C.3 to the Plan. In the event that a member of the Oversight Committee resigns, such member may be replaced by a party that previously served on the Creditors' Committee without order of the Bankruptcy Court. If all members of the Oversight Committee resign and no replacements are named, any duties of the Oversight Committee will be performed by the Distribution Trustee. The Oversight Committee will not be entitled to reimbursement from the Debtors or the Distribution Trust for any fees or expenses incurred in conducting its duties.

## D.      Distribution Trustee

The initial Distribution Trustee will be selected by the Creditors' Committee, subject to the consent of the Debtors (with such consent not being unreasonably withheld).

The Distribution Trustee will be the successor to and  representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Distribution Trustee will be specified in the Distribution Trust Agreement and will include the authority and responsibility to fulfill the items identified in Section III.C.1 of the Plan, subject to the oversight of the Oversight Committee. Other rights and duties of the Distribution Trustee and the beneficiaries of the Distribution Trust will be as set forth in the Distribution Trust Agreement.

## E.      Distribution Trust Agreement

The initial Distribution Trust Agreement generally will provide for, among other things: (1) the payment of reasonable compensation to the Distribution Trustee; (2) the payment of other expenses of the Distribution Trust, including the cost of pursuing the claims assigned to the Distribution Trust; (3) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (4) the investment of Cash by the Distribution Trustee within certain limitations; (5) the preparation and filing of appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and the payment of Taxes or other obligations owed by the Distribution Trust and the Debtors; (6) the maintenance (if appropriate) of any going concern vested in the Distribution Trust (subject to the limitations described therein and in the Plan); (7) the orderly liquidation of the Distribution Trust's assets; and (8)  the litigation, settlement, abandonment or dismissal of the Recovery Actions or any other claims, rights or causes of action assigned to the Distribution Trust.

## F.      Reports to be Filed by the Distribution Trustee

The Distribution Trustee, on behalf of the Distribution Trust, will File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Distribution Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

## G.      Fees and Expenses of the Distribution Trust

Distribution Trust Expenses will be paid from the Distribution Trust as required, at the direction of the Distribution Trustee. Any Recovery Action Distribution Trust Expenses will be paid solely from the Recovery

Action Trust Account.  Any Other Asset Distribution Trust Expenses will be paid solely from the Other Asset Trust Account, subject to the provisions of Section II.F of the Plan.  Any General Distribution Trust Expenses will be allocated one-half to the Recovery Action Trust Account and one-half to the Other Asset Trust Account, which allocated amounts may be drawn from such accounts to fund the Distribution Trust Expense Account.

In addition, the Distribution Trustee, on behalf of the Distribution Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors or the Creditors' Committee) to assist in carrying out its duties under the Plan and may compensate and reimburse the expenses of these professionals from the appropriate Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to the above limitations and any procedures established by the Distribution Trust Agreement.

### H.  Indemnification

The Distribution Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Distribution Trustee, the members of the Oversight Committee and/or other parties.  Any such indemnification will be the sole responsibility of the Distribution Trust and payable solely from the assets of the Distribution Trust.

### I.  Tax Treatment

The Distribution Trust is intended to be treated for U.S. federal income tax purposes in part as one or more liquidating trusts described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated either as discrete trusts taxed pursuant to section 641 *et seq.* of the Internal Revenue Code or as disputed ownership funds described in Treasury Regulation § 1.468B-9.  For federal income tax purposes, the transfer of assets by the Debtors to the Distribution Trust will be treated in part as the transfer of assets by the Debtors to the holders of Allowed General Unsecured Claims, subject to any liabilities of the Debtors or the Distribution Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Distribution Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one more Disputed Claims reserves.  The holders of Allowed General Unsecured Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Distribution Trust (subject to such liabilities), depending on their rights to distributions under the Plan.  As grantors and deemed owners of such assets, the holders of Allowed General Unsecured Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to such assets.  The holders of Allowed General Unsecured Claims will be required to use the values assigned to such assets by the Distribution Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest.  The Distribution Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts.  Among other things, the agreement will (1) require that the Distribution Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (2) limit the Distribution Trustee's investment powers, (3) limit the business operations carried on by the Distribution Trust to activities consistent with the trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof, (4) prohibit the Distribution Trust from receiving or retaining Cash or cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (5) distribute at least annually to the holders of Allowed General Unsecured Claims the Distribution Trust's net income and the net proceeds from the sale of Distribution Trust assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Distribution Trust assets.  Distribution Trust assets reserved for holders of Disputed Claims will be treated as one or more Disputed Claims reserves for tax purposes, which will be subject to an entity-level Tax on some or all of their net income or gain.  No holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset.  The Distribution Trustee will file all Tax returns on a basis consistent with the treatment of the Distribution Trust in part as one or more liquidating trusts (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as discrete trusts or disputed ownership funds, and will pay all Taxes owed from Distribution Trust assets.

### J. Settlement of Claims

Except as otherwise provided in the Plan or the Distribution Trust Agreement, on and after the Effective Date, the Distribution Trustee may compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Distribution Trust Expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

### K. Sales of Assets by Distribution Trust

In connection with the sale, liquidation, transfer, distribution or disposition of the assets of the Distribution Trust by the Distribution Trustee, the Distribution Trustee will deposit any proceeds of the litigation or settlement of Recovery Actions into the Recovery Action Trust Account and will deposit the net proceeds of all other sales, liquidations, transfers to dispositions into the Other Asset Trust Account. The Distribution Trustee may conduct any sales or liquidations of non-Cash assets from the Distribution Trust on any terms it deems reasonable, without further order of the Bankruptcy Court.

### L. Maintenance of Businesses by Distribution Trustee

Notwithstanding anything in Section III.C.1 of the Plan, the Distribution Trustee will not be permitted to operate any businesses owned by the Distribution Trust as operating businesses unless the Distribution Trustee reasonably believes that: (1) (a) such business operations will either be profitable or (b) the maintenance of the businesses will otherwise be in the best interests of the beneficiaries of the Distribution Trust, considered as a whole; and (2) the maintenance of the business is consistent with the Distribution Trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

### M. Creation and Maintenance of Trust Accounts and Distribution Trust Pools

#### 1. Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Distribution Trustee or, if applicable and appropriate, the Third-Party Disbursing Agent. The Other Asset Trust Account and Recovery Action Trust Account are required under the Plan, but the number and nature of any other Trust Accounts will be determined by the Distribution Trustee. To effect distributions, the Distribution Trustee may establish and maintain multiple Trust Accounts, including, without limitation, multiple Other Asset Trust Accounts or multiple Recovery Action Trust Accounts.

#### 2. Additional Funding of Trust Accounts

After the funding of the Trust Accounts on the Effective Date, each Trust Account will continue to be funded by the transfer of Cash through litigation or via the sale or dispositions of assets. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Distribution Trust Agreement.

#### 3. Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing final distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts will be distributed in accordance with the Plan and the Distribution Trust Agreement, and the Trust Accounts may be closed.

## VIII. RISK FACTORS

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Section XIII for a discussion of certain tax considerations.

A.      **Allowance of Claims**

This Disclosure Statement has been prepared based on a preliminary review of certain of the Filed Claims and the Debtors' books and records. Upon completion of more-detailed analysis of Filed Claims, the actual amount of Allowed Claims may differ materially from the Debtors' current estimates.

As noted in Section VI.K above, as of the date of this Disclosure Statement, over 3,500 Claims had been Filed against the Debtors totaling approximately $15 billion. The Debtors believe that they have valid objections to a majority of the Claims that have been Filed and, thus, the ultimate allowed amount of such Claims will be significantly less than the asserted amounts. Because the claim reconciliation and objection process has recently begun, the amount of Disputed Claims currently is material. If the allowed amount of Disputed Claims is greater than currently anticipated, the ultimate amount of Allowed Claims in these cases could exceed the Debtors' estimates in the development of the Plan as set forth in the table in Section II.B.

In these Chapter 11 Cases, the Disputed Claims likely to have the greatest impact on the recoveries for creditors in Class 3 and Class 4 are Administrative Claims, Priority Tax Claims, Priority Claims and Secured Claims that are Disputed Claims.

In particular, the Debtors estimate that they have more than $3.0 million in unpaid priority, secured and/or administrative property tax claims that will be allowed against their Estates. The amounts that have been asserted by the taxing authorities, however, substantially exceed this amount. In addition, claimants have filed hundreds of millions of dollars in claims asserting prepetition administrative priority or other priority status; whereas, the Debtors' estimate that the aggregate amount of allowed prepetition Administrative Claims and other Priority Claims should be less than $3.0 million, in part due to the payment of many of these claims by MD Investors as part of the MD Investors transaction. Similarly, claimants have filed Claims asserting tens of millions of dollars in Liabilities for Secured Claims that are not tax claims (*i.e.*, Secured Claims that are not tax Claims, the Claims of the Prepetition Senior Secured Lenders and the Prepetition ABL Lenders and the Claims asserted in the Customer Notes); whereas, the Debtors believe that the Allowed Secured Claims ultimately will be less than $1.0 million. The Debtors' estimate of recoveries for holders of Claims in Classes 3 and 4 under the Plan are also based on their estimates of the total Allowed Administrative Claims (including post-Petition Date Administrative Claims) expected to be paid in the Chapter 11 Cases, which estimated total is based in part on the Administrative Claims of which the Debtors were aware as of the date of this Disclosure Statement.

There can be no assurance, however, that the Debtors' estimates of the likely aggregate Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Administrative Claims or Allowed Secured Claims will prove to be accurate. If the Debtors' good faith estimates are too low, the amount of Cash available for distribution to holders of Allowed Claims in Classes 3 and 4 would be less than estimated, and the difference could be material and could reduce recoveries for Allowed Claims in Classes 3 and 4 to zero.

An additional risk factor relates to the amount of Allowed General Unsecured Claims. Many of the General Unsecured Claims have been asserted in unliquidated amounts or have been asserted in the hundreds of millions of dollars. The Debtors believe that substantial and material objections to many of these Claim exist. If the Debtors' estimates of Allowed General Unsecured Claims are too low, the Cash available for Pro Rata distribution will be distributed over a greater number of claimants, thus diluting recoveries to holders of Allowed General Unsecured Claims.

B.      **Risk of Non-Confirmation of the Plan**

Even if all impaired Classes accept or could be deemed to accept the Plan, the Plan may not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for Confirmation, requires, among other things: (1) that Confirmation not be followed by a need for further reorganization or liquidation (*i.e.*, that the Plan is "feasible"); (2) that the value of distributions to dissenting holders not be less than the value of distributions to such holders if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (3) that the Plan and the Debtors otherwise comply with the applicable provisions of the Bankruptcy Code. Although the Debtors believe that the Plan will meet all of the applicable requirements, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Section II.H.3 for additional information regarding the requirements for Confirmation.

### C.      Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if, excluding the acceptance of any "insider," at least one impaired Class has accepted the Plan and the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired Class that has not accepted the Plan.

The Debtors reserve the right to modify the terms of the Plan, as necessary, to seek Confirmation without the acceptance of all impaired Classes.  Such modification could result in less favorable treatment for non-accepting Classes of Claims than the treatment currently provided for in the Plan.  Further, in the event an impaired Class of Claims fails to approve the Plan, the Debtors may determine, in their sole discretion, not to seek Confirmation of the Plan.

### D.      Delays in Confirmation or Effective Date

Any delay in Confirmation or the effectiveness of the Plan could result in, among other things, increased Administrative Claims.  Increased Administrative Claims and any other negative effects of a delay in Confirmation or the effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### E.      Distribution Trustee

The ultimate amount of Cash available to satisfy the allowed amount of Claims in Classes 3 and 4 depends, in part, on the manner in which the Distribution Trustee operates the Distribution Trust and the expenses the Distribution Trustee incurs.  The expenses of the Distribution Trustee will be given priority over distributions to holders of Claims in Classes 3 and 4.  As a result, if the Distribution Trustee incurs professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Claims in Classes 3 and 4 will decrease.

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Classes 3 and 4 also will be affected by the performance and relative success of the Distribution Trustee in pursuing preference, fraudulent conveyance, setoff and other claims against potential parties under the Bankruptcy Code.  The less successful the Distribution Trustee is in pursuing such matters, the less Cash there will be available for distribution to satisfy Allowed Claims.  The Debtors have not assumed any recovery on account of such potential Recovery Actions in estimating the recoveries to Allowed Claims in Classes 3 and 4 under the Plan.

### F.      Avoidance Actions

In accordance with section 1123(b) of the Bankruptcy Code, even after Confirmation of the Plan, the Distribution Trustee will retain and may enforce any claims, demands, rights and causes of action that the Estates may have against any person or entity, including claims for preference, fraudulent conveyance and setoff.  In pursuing any such claims, the Distribution Trustee will act in the best interest of the Estates.  Accordingly, a holder of a Claim may be subject to one or more such claims brought by the Distribution Trustee, even if such holder has voted in favor of the Plan.

### G.      Substantive Consolidation

Pursuant to Section VII.B of the Plan, the Plan serves as a motion seeking Bankruptcy Court approval of the substantive consolidation of the Debtors' chapter 11 Estates.  The Plan, as proposed, classifies Claims and Interests for the substantively consolidated Debtors.  If the Bankruptcy Court fails to approve the proposed substantive consolidation, certain parties in interest might assert that the Plan as currently constituted could not be confirmed (although the Debtors reserve their rights to assert otherwise).  In addition, in the event that substantive consolidation is not approved, it is likely that most creditors holding Allowed Class 3 Claims and Allowed Class 4 Claims would receive substantially reduced recoveries in respect of their Allowed Claims compared to the recoveries anticipated under the Plan due to, among other things, the fact that the Debtors anticipate that substantial resources would need to be expended to attempt to establish the assets and liabilities of each individual Debtor and

to attempt to reconcile intercompany claims. Funds to attempt to allocate assets and liabilities among the Debtors would be paid from funds that otherwise would be available for distribution to creditors.

### H. Securities Laws Considerations Regarding Trust Interests

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan from registration under the Securities Act and state securities laws if three principal requirements are satisfied: (1) the securities must be offered and sold under a plan and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (2) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property. To the extent that the rights to distributions from the Distribution Trust are deemed to constitute securities issued in accordance with the Plan, the Debtors believe that such interests satisfy the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, such interests are exempt from registration under the Securities Act and applicable state securities laws.

### 1. Non-Transferability of Trust Interests

Holders of Claims receiving the rights to distributions from the Distribution Trust should be aware that such interests are not transferable. Therefore, there will not be any trading market for such interests, nor will such interests be listed on any public exchange or other market. The lack of liquidity of such interests may have a negative impact on their value.

### 2. Uncertainty of Value of Trust Interests

In addition to the prohibition on the transfer of the rights to distributions from the Distribution Trust, the value of such interests will depend on various significant risks and uncertainties, including, without limitation, (a) the success of the Distribution Trust in securing judgments and settlements on a favorable basis with respect to claims that the trust is pursuing, (b) the effect of substantial delays in liquidating the assets not sold in the Sale Transaction and liquidating the remaining claims and other contingent assets and liabilities and (c) the effects of any changes in tax and other government rules and regulations applicable to the Distribution Trust. These risks are in part beyond the control of the Distribution Trustee. The amount of any recovery realized by the Distribution Trust and its beneficiaries will vary depending upon the extent to which these risks materialize. In addition, the resolution of the claims held by the Distribution Trust may require a substantial amount of time to be resolved and liquidated. The associated delays could reduce the value of any recovery.

## IX. DISTRIBUTIONS UNDER THE PLAN

### A. Payment of Administrative Claims

### 1. Administrative Claims in General

Except as otherwise specified in Section II.A.1 of the Plan, and subject to the bar date provisions therein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or the Distribution Trustee, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive from the Debtors or the Distribution Trustee, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim. Holders of Administrative Claims against multiple Debtors for the same Liability will be entitled to distributions as if the holder had a single Administrative Claim against the Debtors.

### 2. Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash equal to the amount of such Administrative Claims. Fees payable pursuant to

28 U.S.C. § 1930 for each Debtor's Estate after the Effective Date will be paid from the Distribution Trust by the Distribution Trustee as General Distribution Trust Expenses in accordance therewith until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

### 3. Bar Dates for Administrative Claims

#### a. General Administrative Claim Bar Date Provisions

Unless previously Filed or as otherwise governed by the Bar Date Order or in another order of the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the parties identified in Section X.F of the Plan pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 30 days after the Effective Date. Holders of Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code that have asserted such claims as part of a proof of claim Filed in accordance with the Bar Date Order will not be required to File additional requests for payment of Administrative Claims with the Bankruptcy Court to maintain their assertion of such administrative priority claims, and the General Bar Date will continue to apply to such claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Distribution Trust or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to the requests for payment of postpetition Administrative Claims must be Filed and served on the parties identified in Section X.F of the Plan and the requesting party within 120 days after the Effective Date. Nothing in Section II.A.1.c of the Plan shall waive, extend or lengthen the General Bar Date for the holder of any prepetition claim, even if such prepetition claim is an Administrative Claim.

#### b. Bar Dates for Certain Administrative Claims

- *Professional Compensation.* Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the parties identified in Section X.F of the Plan and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; *provided, however*, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the parties identified in Section X.F of the Plan and the requesting party by 90 days after the Effective Date or such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order will supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

- *Ordinary Course Administrative Liabilities.* Holders of Administrative Claims arising from Liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid within 20 days of the Effective Date, be Filed with the Bankruptcy Court no later than 30 days after the Effective Date or such claims will be forever barred from asserting such claims against the Estates.

### B. Payment of Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the latest of (1) the Effective Date, (2) 45 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim and (3) the date on which an Allowed Priority Tax Claim would be due and payable in the ordinary course of business. Notwithstanding the foregoing, the holder of an Allowed Priority Tax

Claim will not be entitled to receive any payment under this provision on account of any penalty arising with respect to or in connection with such Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 4. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, MD Investors, the Distribution Trust or the Distribution Trustee, or their respective property (other than as a holder of a Class 4 Claim).

### C. Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article V of the Plan, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Articles II or V of the Plan that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 60 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section IV.D of the Plan (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.E.2 of the Plan (regarding undeliverable distributions) or Section V.M of the Plan (regarding surrender of canceled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.C of the Plan.

### D. Method of Distributions to Holders of Claims

The Distribution Trustee, in its capacity as Disbursing Agent, or such Third-Party Disbursing Agents as the Distribution Trustee may employ in its sole discretion, will make all distributions required under the Plan. Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan if approved by the Distribution Trustee.

### E. Compensation and Reimbursement for Services Related to Distributions

Each Third-Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Distribution Trustee, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with such services, to be paid as a General Distribution Trust Expense.

### F. Investment of Trust Accounts

To assist in making distributions under the Plan, the applicable Trust Accounts may be held in the name of the Distribution Trustee or in the name of one or more Third-Party Disbursing Agents for the benefit of holders of Allowed Claims under the Plan, or a secondary Trust Account may be created in the name of the Third-Party Disbursing Agent for the purpose of making disbursements. The Distribution Trustee will invest, or will direct the Third-Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Distribution Trust Agreement; *provided, however*, that should such Distribution Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third-Party Disbursing Agent not to invest such Cash. Distributions of Cash from accounts held by Third-Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

### G. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1. Delivery of Distributions

Distributions to holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

### 2. Undeliverable Distributions Held by Disbursing Agents

#### a. Holding of Undeliverable Distributions

Subject to Section V.E.2.c of the Plan, distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to Section V.E.2.a of the Plan until such time as a distribution becomes deliverable. Any Disbursing Agent holding undeliverable Cash will invest such Cash in a manner consistent with the Distribution Trust Agreement.

#### b. After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agents will make all distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date but prior to the Interim Distribution Bar Date.

#### c. Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert its right to an undeliverable distribution prior to the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such claim against the Debtors, the Distribution Trustee, their respective property or the Trust Accounts. In such cases, unclaimed distributions will be maintained in the applicable Trust Account for redistribution to other claimants entitled to distribution from such Trust Account.

### H. Distributions on Account of Allowed Claims in Class 1 and Class 2

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan will be made within 45 days of such claim becoming an Allowed Claim.

### I. Distributions on Account of Certain Noteholder Claims in Class 4

#### 1. Status of Indentures; Role of 2012 Indenture Trustee and 2013 Indenture Trustee

Distributions on account of Allowed 2013 Senior Note Claims and Allowed 2012 Senior Subordinated Note Claims will be made to the 2013 Indenture Trustee and the 2012 Indenture Trustee, respectively, and will be made in accordance with the Plan. If distributions are made pursuant to the distribution provisions set forth in the respective indentures, the 2013 Indenture Trustee and the 2012 Indenture Trustee will be entitled to retain and enforce against such distributions any charging liens and payment priorities under their respective indentures.

The 2012 Indenture Trustee and the 2013 Indenture Trustee will not be required to give any bond, surety or other security for the performance of its duties with respect to the administration and implementation of distributions.

Any and all distributions on account of Allowed 2012 Senior Subordinated Note Claims and Allowed 2013 Senior Note Claims will be subject to the rights of the 2012 Indenture Trustee and the 2013 Indenture Trustee to exercise their rights and remedies under the applicable indenture against such distribution for any unpaid fees and expenses incurred prior to the Effective Date and any fees and expenses incurred in making distributions pursuant to the Plan.

The 2013 Senior Note Indenture and the 2012 Senior Subordinated Note Indenture will continue to remain in effect after the Effective Date solely for the following purposes:

- allowing distributions to be made under the Plan pursuant to the applicable indenture and to permit the 2012 Indenture Trustee and the 2013 Indenture Trustee to perform such other necessary functions with respect thereto;

- permitting the 2012 Indenture Trustee and the 2013 Indenture Trustee to maintain or assert any charging lien they may have with respect to the distributions pursuant to the terms of the Plan for the fees and expenses of the 2012 Indenture Trustee or the 2013 Indenture Trustee, respectively;

- permitting the 2012 Indenture Trustee or the 2013 Indenture Trustee to exercise their rights and obligations relating to the interests of the 2012 Senior Subordinated Note Claims and the 2013 Senior Note Claims, respectively, including the right to appear and be heard in the Chapter 11 Cases and in any appeals; and

- permitting the exercise by the 2012 Indenture Trustee or 2013 Indenture Trustee of their rights under the subordination provisions of the 2012 Senior Subordinated Note Indenture and other applicable agreements.

### 2. Implementation of Indenture Provisions and Subordination Rights

To implement payment priorities, preserve the subordination rights of the holders of 2013 Senior Notes and to comply with the fee and expense provisions of the 2013 Senior Note Indenture and the 2012 Senior Subordinated Note Indenture, the following provisions will apply to distributions to be made under Class 4 to holders of Allowed 2013 Note Claims and holders of Allowed 2012 Senior Subordinated Note Claims:

- at least 21 days prior to a Distribution Date, the Distribution Trustee will advise the 2012 Indenture Trustee and the 2013 Indenture Trustee in writing of the amounts proposed to be distributed on account of 2012 Senior Subordinated Notes and 2013 Senior Notes.

- At least seven days prior to the Distribution Date, the 2012 Indenture Trustee will provide the Distribution Trustee and the 2013 Indenture Trustee with invoices documenting its Unpaid Indenture Trustee Fee Amount.

- On the Distribution Date, distributions to be made to holders of Allowed 2012 Senior Subordinated Note Claims will be made to the 2012 Indenture Trustee only to the extent necessary to satisfy any Unpaid Indenture Trustee Fee Amount for the 2012 Indenture Trustee. If any amount remains after the Unpaid Indenture Trustee Fee Amount for the 2012 Indenture Trustee has been satisfied, any excess will be distributed to the 2013 Indenture Trustee on the Distribution Date.

- Any amounts paid to the 2013 Indenture Trustee will be utilized first to satisfy any valid Unpaid Indenture Trustee Fee Amount for the 2013 Indenture Trustee. Any excess will then be distributed by the 2013 Indenture Trustee Pro Rata to the holders of Allowed 2013 Senior Note Claims or otherwise in accordance with the terms of the 2013 Senior Note Indenture.

- If the holders of Allowed 2013 Senior Note Claims have been paid in full as calculated by the Distribution Trustee (and agreed to by the 2013 Indenture Trustee or, if no such agreement is reached, determined by order of the Bankruptcy Court), including payment of interest calculated at the default rate under the terms of the 2013 Senior Notes, then the provisions of the third and fourth bullets above will no longer apply, and, instead (a) no further distributions will be made to any party on account of Allowed 2013 Senior Note Claims and (b) all distributions on account of Allowed 2012 Senior Subordinated Note Claims will be made to the 2012 Indenture Trustee, first for the satisfaction of its valid Unpaid Indenture Trustee Fee Amounts and, second, to be distributed by the 2012 Indenture Trustee Pro Rata to the holders of Allowed 2012 Senior Subordinated Note Claims or otherwise in accordance with the terms of the 2012 Senior Subordinated Note Indenture.

**J.**     **Selection of Distribution Dates for Class 3 Claims and Class 4 Claims and Provision of Notice Thereof**

Except where the Plan requires the making of a distribution on account of a particular Allowed Claim within a particular time, the Distribution Trustee will have the authority to select Distribution Dates that, in the judgment of the Distribution Trustee, provide holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred by the distribution process; *provided, however*, that, unless the Oversight Committee directs otherwise, the first Distribution Date after the Effective Date must occur prior to December 31, 2010 and a Distribution Date must occur at least once every twelve months thereafter, if any amounts are available for distribution on such date. Upon the selection of a Distribution Date by the Distribution Trustee, the Distribution Trustee may File a notice of such Distribution Date with the Bankruptcy Court that provides information regarding the distribution to be made. If applicable, distributions also will be made to MD Investors on the Distribution Dates.

**K.**     **Calculation of Amounts to Be Distributed to Holders of Class 3 Claims and Class 4 Claims**

**1.**     **Reserve for Certain Claims Senior to Class 3 Claims and Class 4 Claims**

Prior to any distribution to holders of Allowed Class 3 Claims or Allowed Class 4 Claims, the Distribution Trustee will estimate the amount of Net Recovery Action Asset Cash and Net Other Asset Cash that will remain after payment of all Distribution Trust Expenses and the resolution and payment of all Administrative Claims, Cure Amount Claims, Priority Tax Claims, Priority Claims in Class 1 and Secured Claims in Class 2. Such estimations will utilize assumptions that the Distribution Trustee will be unsuccessful in litigation with claimants with respect to any issue that is being reasonably contested. Such estimations will also assume that any unresolved Recovery Actions will result in no recovery for the Debtors' Estates and that the remaining non-Cash assets will produce no recovery for the Estates. Only if, after applying such assumptions, the estimated Net Recovery Action Asset Cash and Net Other Asset Cash is greater than zero may the Distribution Trustee be permitted to make any distributions to holders of Allowed Class 3 Claims or Allowed Class 4 Claims.

**2.**     **Allowed Class 3 Claims and Allowed Class 4 Claims**

On each Distribution Date, each holder of an Allowed Claim in Class 3 or Class 4 will receive a distribution of any Net Recovery Action Asset Cash and Net Other Asset Cash that has been determined to be available for distribution in accordance with Section V.I.1 of the Plan such that each holder of an Allowed Claim in such classes has received, in the aggregate, its Pro Rata share of the amounts of Net Recovery Action Asset Cash and Net Other Asset Cash that are made available for distribution to such Claim holders under Sections II.B.3 and II.B.4 of the Plan. All distributions will be made pursuant to the terms and conditions of the Plan and the Distribution Trust Agreement, and will be subject to the Debtors' or the Distribution Trustee's rights of setoff or deduction.

**3.**     **De Minimis Distributions**

On each Distribution Date prior to the Final Distribution Date, the Disbursing Agent will not distribute cash to the holder of an Allowed Class 3 Claim or Allowed Class 4 Claim if the amount of Cash to be distributed on account of such Claim is less than $25 in the aggregate. Any Cash not so distributed will be returned to the applicable Trust Account until the next Distribution Date. On the Final Distribution Date, if the aggregate amount of distributions to be made to such claimant is $25 or greater, such distribution will be made. Otherwise, the amount will be redistributed to other holders of Allowed Claims in such Class and such holder of an Allowed Claim will be forever barred from asserting its Claim for such distribution against the Distribution Trust or its property.

**L.**     **Other Provisions Applicable to Distributions in All Classes**

**1.**     **Postpetition Interest**

No interest will accrue on any Claims on and after the Effective Date.

## 2.    Compliance with Tax Requirements

Each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  The Distribution Trustee and any Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan or the Distribution Trust Agreement, each Person receiving or deemed to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Person on account of such distribution.

## 3.    Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under the Plan.

## M.    Distribution Record Date

As of the close of business on the Distribution Record Date, the transfer registers for the Prepetition Notes will be closed.  The applicable Disbursing Agent (including any indenture trustee and the DTC) will have no obligation to recognize the transfer or sale of any Prepetition Notes that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes of the Plan to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.  No transfers Filed with the Bankruptcy Court after the Distribution Record Date will be recognized by the Distribution Trustee or any Disbursing Agent.

The Distribution Trustee will have the authority, but no obligation, to recognize transfers of Claim made after the deadlines set forth above in its sole and absolute discretion.

## N.    Means of Cash Payments

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Distribution Trustee or, at the option of the Distribution Trustee, by wire transfer, electronic funds or ACH from a domestic bank; *provided, however*, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Distribution Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## O.    Surrender of Canceled Instruments or Securities

The Distribution Trustee will determine, in its sole discretion, if any requirement for surrendering canceled instruments or securities will be applicable to the holders of Prepetition Notes or Customer Notes and, if so determined, will File such requirement in the Bankruptcy Court and advise all known holders of Prepetition Notes or Customer Notes of such requirements and how they may comply with such requirements.  Absent such a Filing, holders of Prepetition Notes or Customer Notes need not surrender their canceled instruments in order to be entitled to distributions under the Plan.

## P.    Setoffs

Except with respect to claims of a Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agents or a

Third-Party Disbursing Agent, as instructed by the Distribution Trustee pursuant to section 558 of the Bankruptcy Code or applicable nonbankruptcy law, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or the Distribution Trustee may hold against the holder of such Allowed Claim; *provided, however,* that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Distribution Trustee of any claims, rights and causes of action that the Debtor or Debtors or the Distribution Trustee may possess against such a Claim holder, which are expressly preserved under Section III.G.1 of the Plan.

## X.     DISPUTED CLAIMS AND IMPLEMENTATION OF THE PLAN

### A.     Treatment of Disputed Claims

#### 1.     Tort Claims

Each Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim.  The amount of a Tort Claim that is not otherwise settled and resolved by a Stipulation of Amount and Nature of Claim will be determined and liquidated, in the discretion of the Distribution Trustee in either (a) the administrative or judicial tribunal of appropriate jurisdiction or (b) the United States District Court for the Southern District of New York.  The Distribution Trustee will provide written notice of its selection of the appropriate forum promptly after the Effective Date.  Such judicial tribunal will determine the amount of the Tort Claim, but will not enter or enforce a judgment against the Debtors, their Estates or the Distribution Trust, as all distributions on account of Tort Claims resolved in accordance with Section VI.A.1 of the Plan will be subject to and made in accordance with the Plan.  All claims, demands, rights, defenses and causes of action that the Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

#### 2.     No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim.  In lieu of distributions under the Plan to holders of Disputed Claims on the Effective Date, the Distribution Trustee will, in accordance with the Distribution Trust Agreement, establish appropriate Disputed Claims reserves for all Disputed Claims, with such reserves held in the applicable Trust Accounts.

### B.     Objections to Claims

#### 1.     Authority to Prosecute

The Distribution Trustee may object to any Claims it believes warrant the Filing of an objection prior to the Claims Objection Bar Date.  After the Effective Date, only the Distribution Trustee will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Distribution Trustee may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

#### 2.     Pending Objections

To the extent that the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Distribution Trustee will be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

#### 3.     Application of Bankruptcy Rules

To facilitate the efficient resolution of Disputed Claims, the Distribution Trustee will, notwithstanding Bankruptcy Rule 3007(c), be permitted to File omnibus objections to claims in accordance with the order of the Bankruptcy Court dated October 30, 2009.

### 4. Authority to Amend Schedules

The Debtors and the Distribution Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no proof of claim is timely Filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Distribution Trustee will provide the holder of such Claim with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

### 5. Request for Extension of Claims Objection Bar Date

Upon motion to the Bankruptcy Court, the Distribution Trustee may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims.  Any extension granted by the Bankruptcy Court will not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

### C. Distributions on Account of Disputed Class 4 Claims Once Allowed

On each Distribution Date, the applicable Disbursing Agent will make all distributions on account of any Disputed Class 4 Claim that has become an Allowed Claim since the most recent Distribution Date.  The timing and amount of such distribution will be determined in accordance with Sections V.G, V.H and V.I of the Plan.

### D. Corporate Existence

Consistent with Section III.B of the Plan, each of the Debtors will be subject to a Dissolution Transaction on or before the Effective Date, or as promptly thereafter as possible, and each Debtor will be deemed to cease to exist as of the Effective Date after the transfer of property of their Estates to the Distribution Trust.

### E. Dissolution Transactions

### 1. Dissolution Transactions Generally

On or after the entry of the Confirmation Order, the Debtors will enter into such Dissolution Transactions and will take such actions as may be necessary or appropriate to merge, dissolve or otherwise terminate the corporate existence of the Debtors and the Foreign No-Asset Subsidiaries as of the Effective Date or as promptly as possible thereafter.  The actions to effect the Dissolution Transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (d) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.  Nothing in the Plan will impact the limitations on setoff in Sections II.B and VII.A of the Plan.

Notwithstanding the foregoing and regardless of whether the actions described above have yet been taken with respect to a particular Debtor, as of the Effective Date and upon the transfer of the assets to the Distribution Trust under the Plan, the Debtors will be deemed dissolved and their business operations withdrawn for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith.

2.        **Recourse Solely to Distribution Trust Assets**

All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and holders of Allowed Claims against any Debtor will have recourse solely to the assets of the Distribution Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Distribution Trust Agreement.

F.        **Corporate Governance, Directors and Officers**

1.        **Certificates of Incorporation and Bylaws**

Consistent with Sections III.A and III.B of the Plan, each of the Debtors will cease to exist effective, and all existing certificates of incorporation and by-laws will be canceled, effective as of the Effective Date; accordingly, no new certificates of incorporation and by-laws will be necessary.

2.        **Directors and Officers**

Consistent with Sections III.A and III.B of the Plan, each of the Debtors will cease to exist effective as of the Effective Date and, thus, no individuals will serve as directors, officers or voting trustees after the Effective Date.

3.        **Corporate Action**

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions) or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Distribution Trustee or any other Person:  (a) the establishment of the Distribution Trust; (b) the appointment of the Distribution Trustee to act on behalf of the Distribution Trust; (c) the transfer of assets into the Distribution Trust as set forth in the Plan; (d) the distribution of Cash pursuant to the Plan; (e) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution and implementation of the Distribution Trust Agreement; and (g) the other matters provided for under the Plan involving the corporate structure of any Debtor or corporate action to be taken by or required of any Debtor or the Distribution Trustee.

G.        **No Revesting of Assets**

The property of the Debtors' Estates will not revest in the Debtors on or after the Effective Date but will instead vest in the Distribution Trust to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement.

H.        **Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation**

1.        **Preservation of Causes of Action; Recovery Actions**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Distribution Trustee will retain and may enforce any claims, demands, rights and causes of action that any Estate may hold against any Person to the extent not released under Section III.G.3 of the Plan or otherwise, including the Recovery Actions.  The Distribution Trustee may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the beneficiaries of the Distribution Trust.  Any recovery of Cash by the Distribution Trustee on account of Recovery Actions will be deposited in the Recovery Action Trust Account.  A nonexclusive schedule of currently pending actions and claims brought by one or more Debtors is attached as Exhibit III.G.1 to the Plan.  In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim on Exhibit III.G.1 to the Plan shall not be deemed an admission, denial or waiver of any claims, demands, rights or causes of action that any Debtor or Estate may hold against any

entity. The Debtors intend to preserve all such claims, demands, rights or causes of action as Recover Actions (except to the extent any such claim is specifically released in the Plan).

## 2. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section III.G.3 of the Plan, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## 3. Releases

### a. General Releases by Debtors

**Without limiting any other applicable provisions of or releases contained in the Plan, as of the Effective Date, the Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Liabilities (including Derivative Claims) that they have, had or may have against any Released Party, the 2012 Indenture Trustee and its Representatives (in their capacities as such), except with respect to any obligations arising under the Plan; provided, however, that the foregoing will not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have constituted intentional misconduct. Any such released Liabilities will not be transferred to the Distribution Trust.**

### b. General Releases by Holders of Claims or Interests

**Without limiting any other applicable provisions of or releases contained in the Plan or provided under the Bankruptcy Code, as of the Effective Date, in consideration for the consideration provided under the Plan, each holder of a Claim or Interest that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan or the Disclosure Statement that such entity has, had or may have against any Released Party; provided, however, that the foregoing will not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have constituted intentional misconduct.**

### c. Injunction Related to Releases

**The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in Section III.G.3 of the Plan.**

### d. Exculpation

**From and after the Effective Date, the Released Parties, the 2012 Indenture Trustee and its Representatives (in their capacities as such) will not have and will not incur any liability to any Person for any act taken or omitted, or to be taken, in connection with the sale of the majority of the Debtors' assets to MD Investors or the Debtors' other postpetition liquidation activity, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan, the exhibits to the Plan, this Disclosure Statement, the Distribution Trust Agreement or any other contract, instrument, release or other agreement or document provided in connection therewith; *provided*, *however*, that the foregoing provisions will not affect**

**the liability of any Person that otherwise would result from any such act or omission to the extent that the act or omission is determined in a Final Order to have constituted gross negligence or intentional misconduct.**

### I. Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim has not yet been satisfied by the combination of distributions pursuant to the Plan and proceeds payable to the holder of such Allowed Insured Claim under any pertinent insurance policies and applicable law. Nothing in Section III.H of the Plan will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

### J. Cancellation and Surrender of Instruments, Securities and Other Documentation

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan and except for purposes of distributions on account of Allowed Customer Note Claims, Allowed 2013 Senior Note Claims and Allowed 2012 Senior Subordinated Note Claims as contemplated by Section V.C of the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all outstanding common stock, secured and unsecured notes, indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or the Distribution Trustee. The holders of or parties to such canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan; *provided*, *however*, no distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim evidenced by such canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent if required pursuant to Section V.M of the Plan. Notwithstanding anything to the contrary in this provision, the 2012 Senior Subordinated Note Indenture and the 2013 Senior Note Indenture will continue to exist for the purposes set forth in Section V.G of the Plan.

### K. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, will attach to and be enforceable solely against the same assets that are owned by the Distribution Trustee in which the holder of such Claim had a Lien, including any net proceeds of sales of such assets. All such Liens against the assets of the Distribution Trust will be fully released and discharged upon the holder of the Liens receiving its full distribution under the Plan.

### L. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

#### 1. Effectuating Documents and Further Transactions

Prior to the Effective Date, the Chief Liquidation Officer or any other officer of each Debtor, and after the Effective Date, the Distribution Trustee, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

#### 2. Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax: (a) any transfer made by the Debtors to the Distribution Trust; (b) any sales made by the Distribution Trust to liquidate such assets in the trust and convert such assets into Cash; (c) any sales of assets made by the Debtors under section 363 of the Bankruptcy Code, to the extent

that title to the assets being sold transfers after the Confirmation Date; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; or (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### M. Implementation of Settlement with MD Investors

In accordance with the applicable provisions of the Sale Order, MD Investors will receive 50% of all distributions of Net Other Asset Cash made from the Distribution Trust. Distributions of such amounts will only be made on Distribution Dates for holders of Allowed Claims in Class 3 and Class 4, as set forth in Article V of the Plan.

### N. Substitution of Pending Legal Actions

On the Effective Date, the Distribution Trust or the Distribution Trustee, as applicable, will be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (1) pending contested matters or adversary proceedings in the Bankruptcy Court, (2) any appeals of orders of the Bankruptcy Court and (3) any state court or federal or state administrative proceedings pending as of the Petition Date. The Distribution Trustee and its professionals are not required to, but may take such steps as are appropriate to provide notice of such substitution.

## XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Rejection of Executory Contracts and Unexpired Leases

#### 1. Rejection

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to reject each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned or rejected during the Chapter 11 Cases, which includes, but is not limited to, the Executory Contracts and Unexpired Leases identified on Exhibit IV.A to the Plan. Parties that desire to object to the rejection of a specific Executory Contract or Unexpired Lease must File an objection to the Plan by the deadline for filing objections thereto.

#### 2. Notice of Rejection

The Debtors will serve a notice on all known counterparties to Executory Contracts or Unexpired Leases that are to be rejected pursuant to the Plan. The notice will provide parties in interest with the following information: (a) the identity of the contract or lease being rejected and (b) the procedures and bar date for asserting any claims arising from the rejection of the Executory Contract or Unexpired Lease. The failure of a party to an Executory Contract or Unexpired Lease to receive the notice to be provided under Section IV.A of the Plan will not prevent the rejection of the Executory Contract or Unexpired Lease.

#### 3. Bar Date for Rejection Damages

In accordance with the Bar Date Order, and except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court on or before the later of: (a) 30 days after the Effective Date or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to an order of the Bankruptcy Court. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors or the Distribution Trust.

#### 4. Special Provisions Relating to Niles, Illinois and Middleville, Michigan Premises

The Unexpired Lease associated with the Debtors' lease of real property for their Niles, Illinois facility will be treated in accordance with the Dyne Agreement and, to the extent that the provisions of Section IV.A of the Plan conflict with the terms of the Dyne Agreement, the terms of the Dyne Agreement will apply. The Unexpired Lease associated with the Debtors' lease of real property for their Middleville, Michigan facility will be treated in accordance with the Sprint Agreement and, to the extent that the provisions of Section IV.A of the Plan conflict with the terms of the Sprint Agreement, the terms of the Sprint Agreement will apply.

**B.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contracts and Unexpired Leases assumed by a Debtor, that are not assigned to MD Investors or the Distribution Trustee will be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such postpetition agreement, must File a claim or Administrative Claim in accordance with the Plan or have their rights forever waived and released.

**C.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise will not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts or Unexpired Lease. Notwithstanding any applicable nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases, and any such rights will vest in the Distribution Trust as of the Effective Date.

**D.      Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

**1.      Assumption and Assignment Generally**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor will assume each of the respective Executory Contracts and Unexpired Leases listed on Exhibit IV.D.1 to the Plan; *provided*, *however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit IV.D.1 to the Plan to: (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection under Section IV.A of the Plan; or (b) add any Executory Contract or Unexpired Lease to such Exhibit IV.D.1, thus providing for its assumption pursuant to Section IV.D.1 of the Plan. The Debtors will File Exhibit IV.D.1 to the Plan, and any amendments thereto, with the Bankruptcy Court. Nothing in the Plan or this Disclosure Statement shall constitute an admission by a Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor has any liability thereunder.

**2.      Assignments to Distribution Trust**

As of the Effective Date, any Executory Contract or Unexpired Lease identified upon Exhibit IV.D.1 to the Plan will be deemed assigned to the Distribution Trust, pursuant to section 365 of the Bankruptcy Code. Any Allowed Cure Amount Claims associated with the assumption and assignment of an Executory Contract or Unexpired Lease will be paid by the Distribution Trustee from the Other Asset Trust Account.

As of the Effective Date, any of postpetition agreements identified upon Exhibit IV.D.2 to the Plan will be assigned to the Distribution Trust by operation of, and to the extent permitted by, applicable nonbankruptcy law governing assumptions and assignments.

**3.      Approval of Assumptions and Assumption Procedures**

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions and assignments described in Sections IV.D.1 and IV.D.2 of the Plan, pursuant to section 365 of the Bankruptcy Code,

as of the Effective Date.  The procedures for assumption of an Executory Contract or Unexpired Lease, which will be included in the Confirmation Order proposed by the Debtors, will be as follows:

- After the entry of the Confirmation Order, but prior to the Effective Date, the Debtors will serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

- Any entity wishing to object to (a) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (b) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors or the Distribution Trustee, as applicable, a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section IV.D.3.a of the Plan.

- If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (a) the proposed assumption of the Executory Contract or Unexpired Lease will be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (b) the Cure Amount Claim identified by the Debtors in the notice will be fixed and will be paid to the appropriate contract or lease party identified on the notice on the Effective Date by the Distribution Trust.

- If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or the Distribution Trustee, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

- If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection then: (a) either party may notice the dispute for hearing by Filing a notice of hearing in the Bankruptcy Court no later than 20 days prior to the hearing date; and (b) the Debtors or the Distribution Trustee may File a reply to such objection no later than seven days prior to the proposed hearing date.

- If, at a hearing scheduled pursuant to Section IV.D.3.e of the Plan, the Bankruptcy Court imposes requirements upon the Debtors or the Distribution Trustee as a condition to assuming an Executory Contract or Unexpired Lease, or if the Bankruptcy Court determines that the Cure Amount Claim for a particular Executory Contract or Unexpired Lease is in excess of the amount proposed by the Debtors or the Distribution Trustee, the Debtors or the Distribution Trustee may, within their sole discretion, choose to reject such Executory Contract or Unexpired Lease by filing an appropriate amendment to Exhibit IV.A, Exhibit IV.D.1 or Exhibit IV.D.2 to the Plan, as applicable, within seven days of the entry of a Final Order with respect to such matter.

## XII.    ANALYSIS OF SUBSTANTIVE CONSOLIDATION

Pursuant to the Article VII of the Plan, the Debtors are proposing the substantive consolidation of the Debtors' chapter 11 Estates under the Plan.  The Debtors are proposing substantive consolidation because they have concluded that (A) the majority of the Debtors' creditors treated the Debtors as a single, consolidated entity and (B) substantive consolidation will be beneficial to all creditors by avoiding the costs of disentangling the affairs of the Debtors to the extent necessary to propose plans of liquidation for the individual Debtors.

In particular, when formulating the Plan, the Debtors and their professionals considered whether separate plans could be proposed for each of the Debtors or whether the creditors of each Debtor could be separately classified under the Plan. Multiple internal meetings were held by the Debtors and their professionals to discuss the ability of the Debtors to disentangle their affairs. Ultimately, as a result of this activity, the Debtors concluded that substantive consolidation was warranted in the Chapter 11 Cases for, among others, the following reasons:

- *Historical Accounting Practices*. Historically, the Debtors have not kept books and records for the individual legal entities that comprise the Debtors. In particular, the Debtors' financial statements treated Oldco M Corporation and Oldco M Company LLC as a single corporate entity. Financial results for the Debtors were reported on a consolidated basis, with all of the entities that were guarantors of the Debtors' long-term debt consolidated for reporting purposes. While underlying data at a more granular level is maintained by the Debtors, the Debtors' accounting systems were not designed to produce financial information on a legal entity basis. Instead, costs were assigned to "cost centers" which, in some cases, are not associated with any particular legal entity (but may perform services for multiple legal entities). Accordingly, absent substantive consolidation, the information underlying the Debtors historical financial statements would need to be examined, reformulated and allocated/disaggregated, and the assets and liabilities associated with such "cost centers" would need to be assigned to individual Debtor entities. This would be difficult for the reasons explained in the section below.

- *Uncertainty in Assignment of Assets and Liabilities*. In the event that the Debtors' estates were not substantively consolidated and the assignment of assets and liabilities to individual Debtor entities had to be undertaken, there are a number of instances where it is or would be uncertain to what Debtor entity a particular asset or liability should be assigned. Because of the movement of assets between plants and the re-sourcing of production internally, from one Debtor plant to another, the assets and liabilities associated with a particular plant cannot be definitively assigned to the Debtor entity that operated that plant without a review of underlying documentation. Assigning assets and liabilities is even more difficult in other situations, including: (1) assets and liabilities assigned to "cost centers" where such "cost centers" are not plainly affiliated or operated by a particular Debtor entity; (2) determining which assets and liabilities of Oldco M Corporation and Oldco M Company LLC, which were treated as a single entity for accounting purposes; (3) assignment of assets and liabilities where the underlying documentation does not identify a legal entity at all as the owner of the asset or obligor for a liability, where instead only the name "Metaldyne" is identified; and (4) assignment of assets and liabilities to a particular Debtor where the documentation cannot be located.

- *Intercompany Claims Reconstruction*. The Debtors' books and records reflect millions of Intercompany Claims as of the Petition Date, many of which date back a decade or more. While the Debtors have kept records of the "net" intercompany claim position for their various "cost centers," the Debtors have not tracked to which legal entity the amounts are owed. For example, the Debtors' records may reflect that Oldco M Sintered Components LLC owed Intercompany Claims in a particular amount as of the Petition Date, but would not reflect to which Debtor (or other) entity the amount was owed. The Debtors' employees have estimated that it would take thousands of hours of work to reconstruct the intercompany claims in order to determine this information and indicated that, even after such work was performed, it is uncertain whether the intercompany claims information would be entirely accurate.

- *Difficulty in Allocating MD Investors Sale Transaction Proceeds*. The Debtors believe that additional issues are raised by the Sale Transaction with MD Investors. In particular, no allocation of proceeds received from MD Investors was agreed upon or established in the Sale Transaction. Performing such an allocation for Plan purposes would be a costly exercise because valuations based upon book values for plant, property and equipment would be extremely unreliable (and overstated in most instances) given the economic environment. Such allocation would also be difficult because the Debtors do not have recent full appraisals for most of the items sold to MD Investors.

In addition, determining how the value provided through the credit bid portion of the MDI bid should impact the allocation process is a difficult legal issue that would need to be addressed if any allocation of sale proceeds were to be undertaken. This is because, unlike cash proceeds that can be allocated to different specified assets, it is unclear how value provided by a credit bid could be allocated or should impact the allocation process (as such value cannot be distributed to creditors in any event).

Furthermore, as part of the Sale Transaction, because MD Investors credit bid debt under the Prepetition Senior Secured Loan Agreement, it released its liens on the property that was not transferred to MD Investors as part of the Sale Transaction. Accordingly, a specific subset of Debtors that owned assets that were not transferred in the Sale Transaction received a benefit from this aspect of the transaction. This benefit, however, arguably was paid for by the Debtors that transferred assets to MD Investors in the Sale Transaction. Absent substantive consolidation, creditors of such other Debtors could suggest that intercompany payments should be made between Debtors to account for this fact.

- *Expectations of Creditors.* While certain, limited creditors may have been aware of the Debtors' legal structure, the Debtors believe that the vast majority of their creditors treated the Debtors as a single legal entity and did not rely upon the corporate separateness of the Debtors. As such, the Debtors believe that substantive consolidation will not frustrate or upset the reasonable expectations of the vast majority of their creditors.

For purposes of this Disclosure Statement, the Debtors evaluated whether they could prepare an analysis of estimated recoveries to creditors of individual Debtors absent substantive consolidation. The Debtors and their professionals, however, concluded that this would be impossible without incurring excessive time and expense in resolving the issues described above — *i.e.*, the very issues that the Debtors believe justify the substantive consolidation requested here. In light of this, the Debtors carefully considered whether there were reasons for not seeking to substantively consolidate the Debtors' Chapter 11 Cases. In doing so, the Debtors considered their experience in preparing their Schedules and the necessary good faith assumptions made by the Debtors in doing so in light of the entangling factors discussed above. The Debtors concluded that making good faith assumptions in the preparation of the Schedules, however, is substantially different than proving actual asset and liability allocations for separate Debtor legal entities. The Debtors believed that proving such allocations would be impossible without substantial further factual investigation by the Debtors and the incurrence of excessive costs associated therewith. Ultimately, the Debtors concluded that seeking to untangle their affairs could — through legal, financial advisory, accounting and additional employee costs — would easily consume a majority or even all of the modest amounts expected to be available for distributions to holders of Allowed Class 3 Claims and Allowed Class 4 Claims. Accordingly, in consultation with the Creditors' Committee, the Debtors concluded that substantive consolidation was appropriate in these Chapter 11 Cases.

Pursuant to Section VII.B of the Plan, the Plan serves as a motion seeking entry of an order substantively consolidating the Debtors. The Debtors intend to provide evidence supporting their request for substantive consolidation at or prior to the Confirmation Hearing and may supplement the rationales set forth herein at or prior to that hearing.

## XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

### A. General

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR AN INTEREST IS HEREBY NOTIFIED THAT (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR AN INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER OF A CLAIM OR AN INTEREST UNDER THE INTERNAL REVENUE CODE; (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN; AND (3) A HOLDER OF A CLAIM OR AN INTEREST SHOULD SEEK**

ADVICE BASED UPON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN.  NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS"); NO OPINION HAS BEEN REQUESTED FROM COUNSEL TO THE PLAN PROPONENTS CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTORS OR HOLDERS OF SECTION 510(b) CLAIMS AGAINST THE DEBTORS.  IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL, NON-U.S. OR NON-INCOME TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST.  HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

B.       U.S. Federal Income Tax Consequences to Holders of Claims

1.       Holders of Claims Generally

The U.s. federal income tax consequences of Plan implementation to the holders of Allowed Claims will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's claim is allowed or disputed on the Effective Date and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

In general, a holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's basis in the Claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount.  If the holder realizes a capital loss, its deduction of the loss may be subject to limitation.  The holder's aggregate Tax basis for any property received under the Plan generally will equal the amount realized.  The holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.  See Section XIII.C.4 below for a discussion of the character of any gain recognized from a Claim with accrued market discount.  See Section XIII.C.5 below for a discussion of the potential deferral of any gain or loss.

2.       Holders of Allowed General Unsecured Claims

As described above in Section VII.I, the Distribution Trust is intended to be treated for federal income tax purposes in part as one or more liquidating trusts within the meaning of Treasury Regulation § 301.7701-4(d) for the benefit of the holders of Allowed General Unsecured Claims. Accordingly, for federal income tax purposes, each holder of an Allowed General Unsecured Claim on the Effective Date should be treated as transferring its Claim to the Debtors in exchange for the holder's Pro Rata share of the Distribution Trust assets (subject to any Debtor or Distribution Trust Liabilities payable from the proceeds of such assets), followed by the holder's transfer of such assets (subject to such Liabilities) to the Distribution Trust.

The holder should realize gain or loss equal to the difference between the fair market value of its Pro Rata share of the Distribution Trust assets (reduced to reflect any liabilities to which such assets are subject) and the holder's adjusted basis in its Allowed General Unsecured Claim. Such gain or loss generally would be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim.

Each holder of an Allowed General Unsecured Claim will be required to include in income the holder's Pro Rata share of any income, gain, loss, deduction or credit recognized by the Distribution Trust. If the Distribution Trust sells or otherwise disposes of an asset in a transaction in which gain or loss is recognized, each holder of an Allowed General Unsecured Claim will be required to include in income gain or loss equal to the difference between (a) the holder's Pro Rata share of the cash or property received in exchange for the asset sold or otherwise disposed of, and (b) the holder's adjusted basis in the holder's Pro Rata share of the asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Holders of Allowed General Unsecured Claims will be required to report any income or gain recognized on the sale or other disposition of a Distribution Trust asset whether or not the Distribution Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the Distribution Trust.

**C.      Certain Other Tax Considerations for Holders of Claims**

**1.      Pre-Effective Date Interest**

In general, a Claim holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on its Claim may be required to take such amount into income as taxable interest upon receiving a distribution with respect to such interest. A Claim holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that, to the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim as of the Petition Date and thereafter, to the extent the Debtors' Estates are sufficient to satisfy such principal and interest accrued as of the Petition Date, to any interest accrued on such Claim from the Petition Date through the Effective Date, until paid in full. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of the amounts distributed to such holder is properly allocable to prepetition interest. Each holder of a Claim on which interest has accrued is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

**2.      Post-Effective Date Interest**

Holders of Allowed Claims may receive distributions subsequent to the Effective Date. The imputed interest provisions of the Internal Revenue Code may apply to treat a portion of any post-Effective Date distribution as imputed interest. Imputed interest may, with respect to certain holders, accrue over time using the constant interest method, in which event the holder may, under some circumstances, be required to include imputed interest in income prior to receipt of a distribution.

**3.      Bad Debt Deduction**

A holder who receives on account of a Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of

the Internal Revenue Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, the instrument or claim and the transaction establishing the loss with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take, and the amount and character of, such a deduction.

### 4. Market Discount

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the Internal Revenue Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 5. Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Internal Revenue Code.

In addition, a holder of an Allowed Claim may be deemed to receive an installment obligation in satisfaction of its Claim because of the potential additional payments such holders would receive if one or more Disputed Claims are disallowed. Under the Internal Revenue Code's installment method of reporting, any loss and a portion of any gain realized by the holder of an Allowed Claim would be deferred until the holder has received its final distribution from the Distribution Trust. Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of, or ability to elect out of, the installment method of reporting gain that may be recognized in respect of a Claim.

### 6. Information Reporting and Backup Withholding

All distributions under the Plan will be subject to federal income tax reporting and withholding. The Internal Revenue Code imposes "backup withholding" (currently at a rate of 28%) on certain "reportable" payments to certain taxpayers, including payments of interest. Under the Internal Revenue Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional federal income tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of income tax. A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### D. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XIV.   ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  In the event the Debtors determine to commence the Chapter 11 Cases, after the Petition Date, the Debtors will File all exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (*www.bmcgroup.com/metaldyne*) no later than ten days before the Confirmation Hearing.

## XV.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 3 and 4, the only Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

**[Remainder of Page Intentionally Left Blank.]**

Dated: January 8, 2010

Respectfully submitted,

OLDCO M CORPORATION (F/K/A METALDYNE CORPORATION), on its own behalf and on behalf of each affiliate Debtor

By:     /s/ Larry Carroll
Name:   Larry Carroll
Title:     Chief Liquidating Officer

Filed by:

 /s/ Ryan T. Routh
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile: (212) 755-7306
Richard H. Engman

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox
Ryan T. Routh

ATTORNEYS FOR DEBTORS AND DEBTORS
IN POSSESSION

**EXHIBIT I**

**FIRST AMENDED JOINT PLAN OF LIQUIDATION**
**OF DEBTORS AND DEBTORS IN POSSESSION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

In re                                              :

Oldco M Corporation (f/k/a Metaldyne Corporation), et al.,   :
      Debtors.

                                                  :

-------------------------------------------------------------------------- x

Chapter 11

Case No. 09-13412 (MG)

(Jointly Administered)


**FIRST AMENDED JOINT PLAN OF
LIQUIDATION OF DEBTORS AND
DEBTORS IN POSSESSION**

_____

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Richard H. Engman

  - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Heather Lennox
Ryan T. Routh

Attorneys for Debtors
 and Debtors in Possession

Date Proposed Plan Filed with Court:
    January 8, 2010

# TABLE OF CONTENTS

ARTICLE I.     DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .......... 1

    A.    Defined Terms ....................................................................................................... 1

    B.    Rules of Interpretation and Computation of Time ................................................ 11

        1.    Rules of Interpretation ............................................................................ 11

        2.    Computation of Time ............................................................................. 11

ARTICLE II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............................ 11

    A.    Unclassified Claims ............................................................................................. 11

        1.    Payment of Administrative Claims ......................................................... 11

        2.    Payment of Priority Tax Claims ............................................................. 13

    B.    Classified Claims and Interests ............................................................................ 13

        1.    Priority Claims (Class 1 Claims) ............................................................ 13

        2.    Secured Claims (Class 2 Claims) ........................................................... 13

        3.    Customer Note Claims (Class 3 Claims) ................................................ 13

        4.    General Unsecured Claims  (Class 4 Claims) ......................................... 13

        5.    Prepetition Intercompany Claims (Class 5 Claims) ............................... 13

        6.    Subordinated Securities Claims (Class 6 Claims) ................................... 14

        7.    Old Common Stock of Oldco M (Class 7 Interests) ............................... 14

        8.    Subsidiary Debtor Equity Interests (Class 8 Interests) ........................... 14

    C.    Impact of Classification of Claims on Subordination Rights ............................... 14

    D.    Special Provisions Relating to the Rights of Setoff of Creditors .......................... 14

    E.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery ............................................................................................. 15

    F.    Sources of Payment of Certain Claims ................................................................. 15

    G.    Cramdown ........................................................................................................... 15

ARTICLE III.    MEANS FOR IMPLEMENTATION OF THE PLAN ................................................... 15

    A.    Corporate Existence ............................................................................................. 15

    B.    Dissolution Transactions ...................................................................................... 15

        1.    Dissolution Transactions Generally ....................................................... 15

        2.    Recourse Solely to Distribution Trust Assets ........................................ 16

    C.    Distribution Trust ................................................................................................ 16

    D.    Corporate Governance, Directors and Officers .................................................... 20

    E.    No Revesting of Assets ........................................................................................ 20

    F.    Creation and Maintenance of Trust Accounts ...................................................... 20

    G.    Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation ................ 21

        1.    Preservation of Causes of Action; Recovery Actions ............................ 21

| | | |
|---|---|---|
| | 2. | Comprehensive Settlement of Claims and Controversies ............................... 21 |
| | 3. | Releases ..................................................................................................... 21 |
| | 4. | Exculpation ................................................................................................. 22 |
| H. | | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims .................... 22 |
| I. | | Cancellation and Surrender of Instruments, Securities and Other Documentation ...................... 22 |
| J. | | Release of Liens ..................................................................................................... 23 |
| K. | | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes ........... 23 |
| L. | | Implementation of Settlement with MD Investors ................................................... 23 |
| M. | | Substitution in Pending Legal Actions .................................................................... 23 |
| ARTICLE IV. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................... 24 |
| A. | | Rejection of Executory Contracts and Unexpired Leases ........................................ 24 |
| B. | | Contracts and Leases Entered Into After the Petition Date ..................................... 24 |
| C. | | Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases ........ 24 |
| D. | | Payments Related to the Assumption of Executory Contracts and Unexpired Leases ................. 25 |
| | 1. | Assumption and Assignment Generally ....................................................... 25 |
| | 2. | Assignments to Distribution Trust .............................................................. 25 |
| | 3. | Approval of Assumptions and Assumption Procedures ................................. 25 |
| ARTICLE V. | | PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 26 |
| A. | | Distributions for Claims Allowed as of the Effective Date ..................................... 26 |
| B. | | Method of Distributions to Holders of Claims ....................................................... 26 |
| C. | | Compensation and Reimbursement for Services Related to Distributions ................. 26 |
| D. | | Investment of Trust Accounts ................................................................................ 26 |
| E. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions ................ 27 |
| | 1. | Delivery of Distributions ........................................................................... 27 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents .............................. 27 |
| F. | | Distributions on Account of Allowed Claims in Class 1 and Class 2 ........................ 27 |
| G. | | Distributions on Account of Certain Noteholder Claims in Class 4 .......................... 27 |
| | 1. | Status of Indentures; Role of 2012 Indenture Trustee and 2013 Indenture Trustee ........ 27 |
| | 2. | Implementation of Indenture Provisions and Subordination Rights ............... 28 |
| H. | | Selection of Distribution Dates for Class 3 Claims and Class 4 Claims and Provision of Notice Thereof ..................................................................................... 29 |
| I. | | Calculation of Amounts to Be Distributed to Holders of Class 3 Claims and Class 4 Claims ........ 29 |
| J. | | Other Provisions Applicable to Distributions in All Classes .................................... 30 |
| K. | | Distribution Record Date ....................................................................................... 30 |

| | | | |
|---|---|---|---|
| L. | | Means of Cash Payments | 31 |
| M. | | Surrender of Canceled Instruments or Securities | 31 |
| N. | | Setoffs | 31 |
| ARTICLE VI. | | PROCEDURES FOR RESOLVING DISPUTED CLAIMS | 31 |
| A. | | Treatment of Disputed Claims | 31 |
| | 1. | Tort Claims | 31 |
| | 2. | No Distributions Pending Allowance | 31 |
| B. | | Objections to Claims | 32 |
| | 1. | Authority to Prosecute | 32 |
| | 2. | Pending Objections | 32 |
| | 3. | Application of Bankruptcy Rules | 32 |
| | 4. | Authority to Amend Schedules | 32 |
| | 5. | Request for Extension of Claims Objection Bar Date | 32 |
| C. | | Distributions on Account of Disputed Class 4 Claims Once Allowed | 32 |
| ARTICLE VII. | | SUBSTANTIVE CONSOLIDATION | 33 |
| A. | | Substantive Consolidation of the Debtors | 33 |
| B. | | Order Granting Substantive Consolidation | 33 |
| ARTICLE VIII. | | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN; EFFECT OF CONFIRMATION | 33 |
| A. | | Conditions to Confirmation | 33 |
| B. | | Conditions to the Effective Date | 34 |
| C. | | Waiver of Conditions to Confirmation or the Effective Date | 34 |
| D. | | Effect of Nonoccurrence of Conditions to the Effective Date | 34 |
| E. | | Request for Waiver of Stay of Confirmation Order | 34 |
| ARTICLE IX. | | RETENTION OF JURISDICTION | 34 |
| ARTICLE X. | | MISCELLANEOUS PROVISIONS | 36 |
| A. | | Modification of the Plan | 36 |
| B. | | Revocation of the Plan | 36 |
| C. | | Severability of Plan Provisions | 36 |
| D. | | Dissolution of Creditors' Committee | 36 |
| E. | | Successors and Assigns | 36 |
| F. | | Service of Documents | 36 |
| | 1. | Counsel to the Debtors | 36 |
| | 2. | The Distribution Trustee | 37 |
| | 3. | Counsel to the Creditors' Committee | 37 |

4.      Counsel to the 2012 Indenture Trustee ........................................................... 37

5.      Counsel to the 2013 Indenture Trustee ........................................................... 38

6.      Counsel to Asahi Tec Corporation ................................................................. 38

7.      Counsel to RHJI ............................................................................................. 38

# TABLE OF EXHIBITS[1]

| | |
|---|---|
| Exhibit I.A.32 | Debtors in the Chapter 11 Cases |
| Exhibit I.A.42 | Distribution Trust Agreement |
| Exhibit III.C.3 | Identification of Oversight Committee Members |
| Exhibit III.C.4 | Identification of Distribution Trustee |
| Exhibit III.G.1 | Nonexclusive List of Retained Causes of Action |
| Exhibit IV.A | Nonexclusive List of Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit IV.D.1 | Prepetition Executory Contracts and Unexpired Leases to be Assumed and Assigned to the Distribution Trust |
| Exhibit IV.D.2 | Postpetition Contracts and Leases to be Assigned to the Distribution Trust (if any). |

---

[1] To be Filed no later than 10 days before the Confirmation Hearing. All Exhibits will be made available on the Document Website once they are Filed. Copies of all exhibits to the Plan also may be obtained, free of charge, from BMC Group by calling 1-888-909-0100 (toll-free). The Debtors reserve the right to modify, amend, supplement, restate or withdraw any of the Exhibits after they are Filed and shall promptly make such changes available on the Document Website.

# INTRODUCTION

MD Products Corp., a New York corporation, Oldco M Corporation (f/k/a Metaldyne Corporation), a Delaware corporation, and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose the following first amended joint plan of liquidation (the "Plan") for the resolution of the outstanding claims against and equity interests in the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, 11 U.S.C. § 1129. Reference is made to the First Amended Disclosure Statement for First Amended Joint Plan of Liquidation of Debtors and Debtors in Possession dated January __, 2010 (the "Disclosure Statement") for a discussion of the Debtors' history, business, results of operations, historical financial information, and properties, and for a summary and analysis of the Plan. There also are other agreements and documents, which will be Filed with the Bankruptcy Court, that are referenced in the Plan or the Disclosure Statement and that will be available for review. This Plan constitutes the agreement among the Debtors and the Unsecured Creditors Committee (as such terms are defined below) regarding the settlement of claims against the Debtors' Estates.

ALL CREDITORS AND EQUITY HOLDERS ARE ENCOURAGED TO READ THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

## A.    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules (as each such term is defined below), will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.     "2012 Indenture Trustee" means Law Debenture Trust Company of New York, as successor to The Bank of New York Mellon Trust Company, N.A., solely in its capacity as indenture trustee.

2.     "2012 Senior Subordinated Note Claim" means any Claim against a Debtor under or evidenced by the 2012 Senior Subordinated Note Indenture, including any Claims pursuant to any guaranty agreement.

3.     "2012 Senior Subordinated Note Indenture" means, collectively:  (a) the Indenture, dated as of June 20, 2002, by and among Metaldyne (as issuer), each of the guarantors named therein and the 2012 Indenture Trustee, as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008, all relating to the 2012 Senior Subordinated Notes; and (b) all amendments thereto and extensions thereof.

4.     "2012 Senior Subordinated Notes" means the currently outstanding Series A and Series B unsecured 11% senior subordinated notes due June 15, 2012 issued pursuant to the 2012 Senior Subordinated Note Indenture.

5.     "2013 Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A., solely in its capacity as indenture trustee.

6. "2013 Senior Note Claim" means any Claim against a Debtor under or evidenced by the 2013 Senior Note Indenture, including any Claims pursuant to any guaranty agreement.

7. "2013 Senior Note Indenture" means, collectively: (a) the Indenture, dated as of October 27, 2003, by and among Metaldyne (as issuer), each of the guarantors named therein and the 2013 Indenture Trustee, as supplemented by the First Supplemental Indenture, dated December 18, 2006, the Second Supplemental Indenture, dated as of January 11, 2007, and the Third Supplemental Indenture, dated as of November 25, 2008, all relating to the 2013 Senior Notes; and (b) all amendments thereto and extensions thereof.

8. "2013 Senior Notes" means the currently outstanding unsecured 10% senior notes due November 1, 2013 issued pursuant to the 2013 Senior Note Indenture.

9. "Administrative Claim" means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date (except as set forth in clauses (c) and (d) herein) for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 365, 503(b), 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for goods delivered or services rendered, including leased equipment and premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; (c) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code that are not determined to be invalid or without value by a Final Order; (d) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' businesses; and (e) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911 1930.

10. "Allowed Claim" means:

    a. a Claim that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent or unliquidated and (ii) is not a Disputed Claim;

    b. a Claim (i) for which a proof of Claim or request for payment of Administrative Claim (or similar request) has been Filed by the applicable Bar Date or otherwise has been deemed timely Filed under applicable law and (ii) that is not a Disputed Claim;

    c. a Claim that is expressly allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or the Distribution Trust and the Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

    d. a Claim that the Debtors or the Distribution Trustee determine prior to the Claims Objection Bar Date (i) will not be subject to an objection or to an amendment to the Schedules and (ii) will be satisfied in accordance with the terms of the Plan.

11. "Allowed Interest" means, with reference to any Interest: (a) an Interest registered in the stock register, membership interest register or any similar register or schedule maintained by or on behalf of a Debtor as of the Distribution Record Date and (b) any Interest expressly deemed allowed by the Plan.

12. "Allowed … Claim" or "Allowed … Interest" means an Allowed Claim or Allowed Interest, as the case may be, in the particular Class or category specified.

13. "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

14.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

15.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

16.     "Bar Date" means a bar date established by the Bar Date Order or other applicable order of the Bankruptcy Court, which was August 14, 2009 for most General Unsecured Claims.

17.     "Bar Date Order" means the Bankruptcy Court's Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, which was entered by the Bankruptcy Court on July 7, 2009.

18.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

19.     "Cash" means legal tender of the United States of America and equivalents thereof.

20.     "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court that are being jointly administered under Case No 09-13412 (MG).

21.     "Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

22.     "Claims Objection Bar Date" means, for all Claims, the latest of: (a) 270 days after the Effective Date; (b) 75 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claim.

23.     "Class" means a class of Claims or Interests, as described in Article II.

24.     "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

25.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

26.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

27.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

28.     "Creditors' Committee" means the statutory official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

29.     "Cure Amount Claim" means a Claim based upon a Debtor's monetary defaults under an Executory Contract or Unexpired Lease that is to be paid in connection with the assumption of such contract or lease under section 365 of the Bankruptcy Code by one of the Debtors in connection with this Plan.

30.     "Customer Note Claim" means any Claim against a Debtor under or evidenced by a Customer Note and all security agreements and instruments related to a Customer Note.

31.     "Customer Notes" means, collectively, the Promissory Notes, dated November 21, 2008, issued by Oldco M to Chrysler LLC (on behalf of itself and Chrysler Motors LLC), Chrysler Canada, Inc., Ford Motor

Company and General Motors Corporation, with a maturity date of April 15, 2014, in the aggregate principal amount of $60 million.

32.     "Debtors" means, collectively, the debtors and debtors in possession identified on Exhibit I.A.32.

33.     "Derivative Claim" means a Claim (as defined in section 101(5) of the Bankruptcy Code) or cause of action against any Released Party that is the property of any of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code, including the Ziebron Claims.

34.     "DIP Lenders" means, collectively, Ford Motor Company, General Motors Corporation (and its successor General Motors Company), Chrysler LLC (and its successor Chrysler Group LLC), Honda of America Mfg. Inc. and Nissan North America, Inc., each solely in their capacity as DIP Lenders; and Deutsche Bank AG, New York Branch, as DIP Lender and as agent bank.

35.     "Disbursing Agent" means the Distribution Trustee, in its capacity as disbursing agent,  or any Third Party Disbursing Agent.

36.     "Disclosure Statement" means the First Amended Disclosure Statement for First Amended Joint Plan of Liquidation for the Debtors and Debtors in Possession, dated January ___, 2010 (including all exhibits and schedules thereto or referenced therein) that relates to the Plan that has been prepared and distributed by the Debtors, as plan proponents, pursuant to section 1125(g) of the Bankruptcy Code, as the same may be amended, modified or supplemented.

37.     "Disputed Claim" means any Claim (including any Tort Claim or any Ziebron Claim until it is Allowed):

        a.      if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, (i) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated or (ii) a Claim that is not listed on a Debtor's Schedules;

        b.      prior to and on the Claims Objection Bar Date, if a proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, all Claims that have not been expressly Allowed (i) in any Stipulation of Amount and Nature of Claim executed by the Debtors or the Distribution Trust and Claim holder; (ii) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court; (iii) in a Final Order; or (iv) pursuant to the terms of the Plan; or

        c.      after the Claims Objection Bar Date, if a proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law, such Claims for which the Debtors or the Distribution Trustee have Filed an objection in the Bankruptcy Court, and such objection has not been resolved in its entirety by a Final Order or withdrawn (and for which there is no agreement with the Claim holder to treat the Claim as a Disputed Claim for a period of time after the Claim Objection Bar Date).

Notwithstanding the above, if a Claim is an Allowed Claim under the definition set forth herein, it shall not also be considered to be a Disputed Claim.

38.     "Dissolution Transactions" means the transactions that the Debtors, or the Distribution Trustee, determine to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of the corporate entities that compromise the Debtors and the Foreign No-Asset Subsidiaries.

39.     "Distribution Date" means a date selected by the Distribution Trustee in accordance with the terms of the Plan and the Distribution Trust Agreement to make distributions on account of Allowed Class 3 and Allowed Class 4 Claims.

40.        "Distribution Record Date" means the close of business on the Confirmation Date.

41.        "Distribution Trust" means the trust established pursuant to Section III.C to, among other things, hold the Distribution Trust Assets and make distributions pursuant to Articles V and VI.

42.        "Distribution Trust Agreement" means the trust agreement, to be dated prior to the Effective Date, between the Debtors and the Distribution Trustee, governing the Distribution Trust, which shall be substantially in the form of Exhibit I.A.42.

43.        "Distribution Trust Expense" means any and all reasonable fees, costs and expenses incurred by the Distribution Trust or the Distribution Trustee (or any Disbursing Agent, Person, entity or professional engaged by the Debtors or the Distribution Trustee to effect distributions or otherwise assist the Distribution Trustee with its duties under the Distribution Trust Agreement) in connection with any of their duties under the Plan and the Distribution Trust Agreement, including, without limitation, any administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses and fees payable under 28 U.S.C. § 1930, costs associated with any maintenance of any going concern as part of the wind down of such going concern business operations or costs to maintain certain assets while they are held for sale.

44.        "Distribution Trustee" means the trustee appointed pursuant to Section III.C.4 (or any successor trustee), in his, her or its capacity as the trustee of the Distribution Trust.

45.        "Distribution Trust Expense Account" means the Trust Account(s) created by the Distribution Trustee to pay the General Distribution Trust Expenses.

46.        "Document Website" means the internet site address www.bmcgroup.com/metaldyne at which all of the exhibits and schedules to the Plan and the Disclosure Statement will be available to any party in interest and the public, free of charge.

47.        "DTC" means The Depository Trust Company.

48.        "Dyne Agreement" means the Stipulation and Agreed Order Among Debtors and Debtors in Possession, MD Investors Corporation and Dyne (DE) LP entered by the Court on December 17, 2009 that resolves the issues among the parties relating to the lease agreement, dated as of August 16, 2001, between Dyne (DE) L.P., on the one hand, and Debtor Oldco M Lester Precision Die Casting, Inc., Debtor Oldco M Machining and Assembly Company, Inc. and Debtor Oldco M DuPage Die Casting Corporation, on the other hand.

49.        "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section VIII.B have been met or waived.

50.        "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

51.        "Executory Contract or Unexpired Lease" means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto, and any ancillary agreements related thereto.

52.        "Face Amount" means (a) if a proof of Claim has been filed:  (i) if only a liquidated amount is provided on the proof of Claim, the full stated amount claimed by the holder of such Claim in any proof of Claim filed by the applicable Bar Date, (ii) if a portion of the Claim is unliquidated, an amount proposed by the Debtors or the Distribution Trustee in their reasonable estimation if they were unsuccessful in litigating the Claims to a Final Order, such amount to not be less than the liquidated amount of the Claim, in each case, however, if a party requests that the amount of the Claim be estimated for purposes of calculating distributions, the Face Amount shall be the amount so estimated by the Bankruptcy Court; or (b) if a proof of Claim has not been filed:  (i) the amount set forth in the Schedules, if such amount is liquidated; or (ii) an amount reasonably estimated, in the discretion of the

Debtors or the Distribution Trustee, to account for proofs of Claim not yet Filed that potentially could be filed by an applicable Bar Date.

53.     "Fee Claim" means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases.

54.     "Fee Order" means any order establishing procedures for interim compensation and reimbursement of expenses of professionals that may be entered by the Bankruptcy Court.

55.     "File," "Filed" or "Filing" means file, filed or filing with the clerk of the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

56.     "Final Distribution Date" for a particular Class of Claims means the Distribution Date upon which final distributions to claimants in the Class are to be made.

57.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 and/or rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

58.     "Foreign Asset Subsidiaries" means, collectively, Metaldyne International Holdings B.V. and Metaldyne Machining and Assembly Mfg. Co. (Canada) Ltd., which entities presently are subsidiaries of the Debtors.

59.     "Foreign No-Asset Subsidiaries" means, collectively, Metaldyne International Sales, Inc.; Metaldyne Chassis Manufacturing (Hangzhou) Co. Ltd.; R.J. Simpson India Private Limited; and Simpson Industries, Ltda., which entities presently are subsidiaries of the Debtors.

60.     "General Bar Date" means August 14, 2009, the Bar Date for most General Unsecured Claims asserted against the Debtors that was established by the Bar Date Order.

61.     "General Distribution Trust Expenses" means Distribution Trust Expenses other than Other Asset Distribution Trust Expenses or Recovery Action Distribution Trust Expenses, including (but not limited to), the fees of the Distribution Trustee, fees incurred in connection with the making of distributions, escrow expenses and fees payable under 28 U.S.C. § 1930.

62.     "General Unsecured Claim" means any Claim that is unpaid as of the Effective Date that is not an Administrative Claim, Cure Amount Claim, Priority Claim, Priority Tax Claim or Secured Claim.

63.     "Identified Unions" means, collectively:  (a) International Union, United Automobile, Aerospace and Agricultural Implement Works of America, specifically including (but not limited to) its Local No. 3520, its Local No. 373, its Local No. 371, its Local No. 1395 and its Local No. 3400; and (b) the International Association of Machinists and Aerospace Workers.

64.     "Initial MD Investors Funding Amount" means the $2.5 million that MD Investors has paid into escrow, and which shall be released from escrow to the Distribution Trustee on the Effective Date.

65.     "Initial Other Asset Funding Amount" means any Cash existing in the Debtors' Estates as of the Effective Date that is transferred into the Other Asset Trust Account pursuant to this Plan.

66.     "Insured Claim" means any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date that is covered under an insurance policy applicable to the Debtors or their businesses.

67.     "Intercompany Claim" means any Claim (a) of any Debtor against another Debtor or (b) of any entity that was a subsidiary of Oldco M as of the Petition Date against any Debtor that remained in existence, and had not otherwise been satisfied, released, waived or discharged (including through assumption by MD Investors), as of the date of the Confirmation Hearing.

68.     "Interest" means the rights of the holders of the Old Common Stock of any Debtor, any other instruments evidencing an ownership interest in a Debtor and the rights of any entity to purchase or demand the issuance of any of the foregoing, including: (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

69.     "Interim Distribution Bar Date" is the date, if any, selected by the Distribution Trustee prior to each Distribution Date for which any claims that become Allowed Claims prior to such date will be entitled to receive a distribution on the Distribution Date.

70.     "Liabilities" means any and all claims, Claims, obligations, suits, judgments, damages, demands, debts, rights, Recovery Actions, Derivative Claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

71.     "Liens" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

72.     "MD Investors" means MD Investors Corporation, a Delaware corporation.

73.     "Metaldyne" means Debtor Oldco M Corporation, f/k/a Metaldyne Corporation, a Delaware corporation.

74.     "Net Recovery Action Asset Cash" means the Initial MD Investors Funding Amount (a) less (i) any and all Recovery Action Distribution Trust Expenses and (ii) 50% of General Distribution Trust Expenses (b) plus any recoveries from Recovery Actions.

75.     "Net Other Asset Cash" means the Initial Other Asset Funding Amount (a) less (i) any Other Asset Distribution Trust Expenses; (ii) the amounts of Administrative Claims, Cure Amount Claims, Priority Tax Claims, Priority Claims in Class 1 and Secured Claims in Class 2 that are paid on or after the Effective Date; and (iii) 50% of General Distribution Trust Expenses (b) plus (i) any Cash transferred to the Other Asset Trust Account pursuant to Section II.F of this Plan and (ii) proceeds of sales or liquidation of non-Cash assets of the Distribution Trust (other than the from judgments or settlements of Recovery Actions).

76.     "Old Common Stock" means, when used with reference to a particular Debtor, the common stock, membership interests or partnership interests issued by such Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto.

77.     "Oldco M" means Oldco M Corporation, f/k/a Metaldyne Corporation, a Delaware corporation.

78.     "Ordinary Course Professionals Order" means the order entered by the Bankruptcy Court on June 22, 2009 authorizing the Debtors to retain, employ and pay professionals and service providers, as specified in the order, which are not materially involved in the administration of the Chapter 11 Cases.

79. "Other Asset Distribution Trust Expenses" means Distribution Trust Expenses incurred in connection with the maintenance, liquidation and administrative of assets other than Recovery Actions, including any expenses incurred in connection with the maintenance of going concern businesses, and that are incurred in an effort to maximize the ultimate value realized from the sale of a specific asset.

80. "Other Asset Trust Account" means the Trust Account that shall be created on or before the Effective Date and funded by the Debtors and into which any net proceeds of sales or liquidation of non-Cash assets of the Distribution Trust (other than the liquidation of Recovery Actions) shall be placed.

81. "Oversight Committee" shall mean the committee of creditors appointed under Section III.C.3 of the Plan, which shall consult with the Distribution Trustee and shall have the powers granted to it under the Plan and the Distribution Trust Agreement.

82. Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

83. "Petition Date" means May 27, 2009, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

84. "Plan" means this first amended joint plan of liquidation for the Debtors, and all Exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

85. "Prepetition ABL Agent" means Deutsche Bank AG, New York Branch, or any validly-appointed successor thereto.

86. "Prepetition Notes" means, collectively, the (a) 2013 Senior Notes and (b) 2012 Senior Subordinated Notes.

87. "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

88. "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

89. "Professional" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

90. "Pro Rata" means, when used with reference to a distribution of property to holders of Allowed Claims or Allowed Interests in a particular Class or other specified group of Claims or Interests pursuant to Article II, proportionately so that with respect to a particular Allowed Claim or Allowed Interest in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim or Interest to (ii) the amount of such Claim or Interest, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims or Interests in such Class or group of Claims or Interests to (ii) the amount of all Allowed Claims or Allowed Interests, as the case may be, in such Class or group of Claims or Interests. Until Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata distribution of property to holders of Allowed Claims in such Class.

91. "Recovery Actions" means, collectively and individually, all claims and causes of action held by the Debtors' Estates of any nature, including without limitation claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law, and the proceeds thereof, whether received by judgment, settlement or otherwise.

92.     "Recovery Action Distribution Trust Expenses" means Distribution Trust Expenses incurred in the pursuit of Recovery Actions, including attorneys' fees and costs and related expenses.

93.     "Recovery Action Trust Account" shall mean the Trust Account into which the Initial MD Investors Funding Amount is deposited and in which any proceeds of any Recovery Actions shall be deposited.

94.     "Released Parties" means, collectively and individually, the Debtors, any individual that has served as a director or an officer of a Debtor on or after the Petition Date (solely in their capacity as such), the Creditors' Committee and each of its members (solely in their capacity as such), the Identified Unions (solely in their capacities as authorized representatives under sections 1113 and 1114 of the Bankruptcy Code) and the Representatives of each of the foregoing (solely in their capacities as such).

95.     "Representatives" means, with respect to any entity, any successor, officer, director, partner, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other Professional of such entity, and committee of which such entity is a member, in each case in such capacity, serving on or after the Petition Date.

96.     "Sale Order" means the Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (III) Granting Related Relief, which was entered by the Bankruptcy Court on August 12, 2009.

97.     "Schedules" means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors on or about July 7, 2009, as required by section 521 of the Bankruptcy Code, as the same may have been thereafter, or may be, amended, modified or supplemented.

98.     "Secondary Liability Claim" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on:  (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

99.     "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to valid setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to valid setoff, as applicable, as determined pursuant to section 506 and, if applicable, section 1129(b) of the Bankruptcy Code, but shall not include any claim under the Customer Notes or asserted by the DIP Lenders or the Prepetition ABL Agent, in their capacities as such.

100.    "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

101.    "Spirit Agreement" means the Stipulation and Order Between Debtors and Spirit SPE Portfolio 2005-1 LLC Regarding Leases of Nonresidential Real Property Located in Livonia, Michigan and Middleville, Michigan entered by the Court on December 17, 2009 that resolves the issues among the parties relating to the lease agreement, dated as of January 23, 2002, between Spirit SPE Portfolio 2005-1, LLC and Oldco M Machining and Assembly Company, Inc. for the premises located in Middleville, Michigan.

102.    "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between a Debtor or the Distribution Trustee and a holder of a Claim or Interest, or an agreed order of the Bankruptcy Court,

establishing the amount and nature of a Claim or Interest; any such stipulation or other agreement between the Distribution Trustee and a holder of a Claim or Interest executed after the Effective Date will not be subject to approval of the Bankruptcy Court.

103. "Subordinated Securities Claims" means any Claim against any of the Debtors: (a) arising from rescission of a purchase or sale of the security of a Debtor or any affiliate of the Debtors; (b) for damages arising from the purchase or sale of a security; or (c) for reimbursement or contribution allowed under section 502 on account of such a claim; and shall explicitly include any Ziebron Claims.

104. "Subsidiary Debtor" means any Debtor other than Oldco M.

105. "Subsidiary Debtor Equity Interests" means, as to a particular Subsidiary Debtor, any Interests in such Debtor.

106. "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

107. "Third Party Disbursing Agent" means an entity designated by the Distribution Trustee to act as a Disbursing Agent pursuant to Article V.

108. "Tort Claim" means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

109. "Trust Accounts" means the bank accounts to be held in the name of the Distribution Trustee that are created pursuant to Section III.F, including, without limitation, the Distribution Trust Expense Account, the Recovery Action Trust Account and the Other Asset Trust Account, and any subaccounts thereof.

110. "Voting Deadline" means _____, 2010 at 5:00 p.m., Eastern Time, which is the deadline for submitting ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

111. "Unpaid Indenture Trustee Fee Amount" means, as of a specified date, all unpaid fees and expenses that are payable to the 2012 Indenture Trustee or the 2013 Indenture Trustee, or their respective professionals, under the terms of the 2012 Senior Subordinated Note Indenture and the 2013 Senior Note Indenture, respectively.

112. "Unsecured Creditor Distributions" means distributions of (a) 100% of Net Recovery Action Asset Cash, including proceeds of Recovery Actions, from the Recovery Action Trust Account and (b) 50% of Net Other Asset Cash from the Other Asset Trust Account.

113. "Ziebron Claims" means any claims asserted by or that could be asserted by any class that could be certified or any individual plaintiff in the action captioned as Ziebron, et al. v. Metaldyne Corp., et al., Case No. 09-10164, currently pending in the United States District Court for the Eastern District of Michigan before the Honorable District Judge John Corbett O'Meara.

### B. Rules of Interpretation and Computation of Time

#### 1. Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section I.B.1.

#### 2. Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

### ARTICLE II.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section II.A, have not been classified and thus are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

### A. Unclassified Claims

#### 1. Payment of Administrative Claims

##### a. Administrative Claims in General

Except as otherwise specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or the Distribution Trustee, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive from the Debtors or the Distribution Trustee, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, within 60 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.  Holders of Administrative Claims against multiple Debtors for the same Liability shall be entitled to distributions as if the holder had a single Administrative Claim against the Debtors.

b.     **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash equal to the amount of such Administrative Claims. Fees payable pursuant to 28 U.S.C. § 1930 for each Debtor's Estate after the Effective Date will be paid from the Distribution Trust by the Distribution Trustee as General Distribution Trust Expenses in accordance therewith until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

c.     **Bar Dates for Administrative Claims**

i.     **General Administrative Claim Bar Date Provisions**

Unless previously Filed or as otherwise governed by the Bar Date Order or in another order of the Bankruptcy Court, requests for payment of Administrative Claims must be Filed and served on the parties identified in Section X.F pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 30 days after the Effective Date. Holders of Administrative Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code that have asserted such claims as part of a proof of claim filed in accordance with the Bar Date Order shall not be required to File additional requests for payment of Administrative Claims with the Bankruptcy Court to maintain their assertion of such administrative priority claims, and the General Bar Date shall continue to apply to such claims. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable bar date will be forever barred from asserting such Administrative Claims against the Debtors, the Distribution Trust or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to the requests for payment of postpetition Administrative Claims must be Filed and served on the parties identified in Section X.F and the requesting party within 120 days after the Effective Date. Nothing in this Section II.A.1.c shall waive, extend or lengthen the General Bar Date for the holder of any prepetition claim, even if such prepetition claim is an Administrative Claim.

ii.     **Bar Dates for Certain Administrative Claims**

A.     **Professional Compensation**

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the parties identified in Section X.F and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the parties identified in Section X.F and the requesting party prior to 90 days after the Effective Date or such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order will supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

B.     **Ordinary Course Administrative Liabilities**

Holders of Administrative Claims arising from Liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date but prior to the Effective Date must, if not paid within 20 days of the Effective Date, be Filed with the Bankruptcy Court no later than 30 days after the Effective Date or such claims shall be forever barred from asserting such claims against the Estates.

2.      **Payment of Priority Tax Claims**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim on the latest of (i) the Effective Date, (ii) 45 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim and (iii) the date on which an Allowed Priority Tax Claim would be due and payable in the ordinary course of business. Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment under this provision on account of any penalty arising with respect to or in connection with such Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 4. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, MD Investors, the Distribution Trust or the Distribution Trustee, or their respective property (other than as a holder of a Class 4 Claim).

B.      **Classified Claims and Interests**

1.      **Priority Claims (Class 1 Claims) are unimpaired.** On the Effective Date, each holder of an Allowed Priority Claim will receive, from the Debtors or the Distribution Trust, Cash equal to the amount of such Allowed Claim.

2.      **Secured Claims (Class 2 Claims) are unimpaired**. On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Secured Claim, other than a Customer Note Claim, shall be classified in Class 2 and receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A or B below, at the election of the applicable Debtor or the Distribution Trustee. The applicable Debtor will be deemed to have elected Option A except with respect to any Allowed Secured Claim as to which the applicable Debtor elects Option B in one or more pleadings Filed prior to the Effective Date:

*Option A:* On the Effective Date, Allowed Claims in Class 2 with respect to which the applicable Debtor elects Option A will receive Cash equal to the amount of such Allowed Claim.

*Option B*: On the Effective Date, a holder of an Allowed Claim in Class 2 with respect to which the applicable Debtor elects Option B will be entitled to receive (and the applicable Debtor or the Distribution Trustee shall release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim in Class 2 will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 4. The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, MD Investors, the Distribution Trust or the Distribution Trustee, or their respective property (other than as a holder of a Class 4 Claim). In addition, to the extent a Class 2 Claim is based upon a right of setoff, the Debtors or the Distribution Trustee shall not be required to pay such Claim, if Allowed, in Cash, but instead may acquiesce to the setoff of funds to satisfy the Claim.

3.      **Customer Note Claims (Class 3 Claims) are impaired.** Holders of Allowed Customer Note Claims shall be treated as unsecured claims under the Plan and will receive their Pro Rata share of Unsecured Creditor Distributions.

4.      **General Unsecured Claims (Class 4 Claims) are impaired.** Holders of Allowed 2013 Senior Note Claims, Allowed 2012 Senior Subordinated Note Claims or any other Allowed General Unsecured Claim (other than Allowed Customer Note Claims) will receive their Pro Rata share of Unsecured Creditor Distributions.

5.      **Prepetition Intercompany Claims (Class 5 Claims) are impaired.** No property will be distributed to or retained by the holders of Allowed Claims in Class5..

6.     **Subordinated Securities Claims (Class 6 Claims) are impaired.**  No property will be distributed to or retained by the holders of Subordinated Securities Claims in Class 6.  Holders of Class 6 Claims will be deemed to have rejected the Plan.

7.     **Old Common Stock of Oldco M (Class 7 Interests) are impaired.**  No property will be distributed to or retained by the holders of Allowed Interests in Class 7, and such Interests will be canceled on the Effective Date.  The holder of the Class 7 Interests will be deemed to have rejected the Plan**.**

8.     **Subsidiary Debtor Equity Interests (Class 8 Interests) are impaired.**  No property will be distributed to or retained by the holders of Allowed Interests in Class 8, and such Interests will be canceled on the Effective Date.  Holders of Class 8 Interests will be deemed to have rejected the Plan.

**C.     Impact of Classification of Claims on Subordination Rights**

1.     Provisions Relating to 2012 Senior Subordinated Note Claims and 2013 Senior Note Claims

In accordance with section 510(a) of the Bankruptcy Code and by application of provisions of the 2012 Senior Subordinated Note Indenture, the subordination rights of holders of 2013 Senior Note Claims and the 2013 Indenture Trustee shall be preserved, and shall be implemented in accordance with Section V.G below.

2.     Classification of Claims

Other than the subordination rights that are expressly preserved pursuant to this Section II.C, the classification and manner of satisfying all Claims and Interests under the Plan takes into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510 of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in Section II.C, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, distributions pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

3.     Settlement

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim, except as provided in this Section II.C.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and Claim and Interest holders and is fair, equitable and reasonable.

**D.     Special Provisions Relating to the Rights of Setoff of Creditors**

Nothing in this Plan shall expand or enhance a creditor's right of setoff, which shall be determined as of the Petition Date.  Nothing in this Plan is intended to, or shall be interpreted to, approve any creditor's effectuation of a postpetition setoff without the consent of the Distribution Trustee unless prior Bankruptcy Court approval has been obtained.

E.    **Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

1.    Holders of Allowed Secondary Liability Claims against any of the Debtors will be entitled to only one distribution from the Debtors in respect of the Liabilities related to such Allowed Secondary Liability Claim and such claims against all of the Debtors will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim.

2.    Notwithstanding any provision hereof to the contrary, holders of Allowed Secondary Liability Claims against a Debtor may not receive more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

F.    **Sources of Payment of Certain Claims**

Payments made on account of Allowed Administrative Claims, Cure Amount Claims, Allowed Priority Tax Claims, Allowed Priority Claims in Class 1 and Allowed Secured Claims in Class 2 (where Option A is elected) shall be made from funds held in the Other Asset Trust Account.  In the event that insufficient funds exist in the Other Asset Trust Account to make distributions called for under the Plan, such payments may be made from funds of the Recovery Action Trust Account, with any such payments reimbursed to the Recovery Action Trust Account by the Other Asset Trust Account to the fullest extent possible and as soon as reasonably practicable as Cash is received into the Other Asset Trust Account.  The Distribution Trustee shall keep records of any transfers made by the Recovery Action Trust Account into the Other Asset Trust Account for this purpose.  If insufficient Cash is paid into the Other Asset Trust Account to reimburse the Recovery Action Trust Account, any deficiency shall be waived.

G.    **Cramdown**

The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

**ARTICLE III.
MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    **Corporate Existence**

Consistent with Section III.B, each of the Debtors will be subject to a Dissolution Transaction on or before the Effective Date, or as promptly thereafter as possible, and each Debtor will be deemed to cease to exist as of the Effective Date after the transfer of property of their Estates to the Distribution Trust.

B.    **Dissolution Transactions**

1.    **Dissolution Transactions Generally**

a.    On or after the entry of the Confirmation Order, the Debtors will enter into such Dissolution Transactions and will take such actions as may be necessary or appropriate to merge, dissolve or otherwise terminate the corporate existence of the Debtors and the Foreign No-Asset Subsidiaries as of the Effective Date or as promptly as possible thereafter.  The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these

entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions. Nothing herein shall impact the limitations on setoff set forth in Sections II.B and VII.A.

        b.      Notwithstanding the foregoing and regardless of whether the actions described above have yet been taken with respect to a particular Debtor, as of the Effective Date and upon the transfer of the assets to the Distribution Trust under the Plan, the Debtors shall be deemed dissolved and their business operations withdrawn for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith.

        2.      **Recourse Solely to Distribution Trust Assets**

        All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and holders of Allowed Claims against any Debtor will have recourse solely to the assets of the Distribution Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Distribution Trust Agreement.

**C.**      **Distribution Trust**

        1.      Distribution Trust Generally

        On or prior to the Effective Date, the Distribution Trust shall be established pursuant to the Distribution Trust Agreement for the purpose of liquidating the assets contributed to the Distribution Trust, resolving all Disputed Claims, pursuing any Recovery Actions, making all distributions to holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing the Plan and administering the Debtors' Estates. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Distribution Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Distribution Trust (and the Distribution Trustee) shall be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (iii) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the assets of the Distribution Trust (directly or through its professionals or a Third Party Disbursing Agent), in accordance with the Plan; (iv) sell, liquidate, transfer, distribute or otherwise dispose of the assets of the Distribution Trust (directly or through its professionals or a Third Party Disbursing Agent) or any part thereof or any interest therein upon such terms as the Distribution Trustee determines to be necessary, appropriate or desirable; (v) dissolve, wind down or liquidate any non-Debtor entity in which the Debtors have an equity interest, including, if determined to be appropriate in the judgment of the Distribution Trustee, authorizing the commencement of insolvency proceedings for any such non-Debtor entity in an appropriate forum; (vi) maintain as going concerns the businesses conducted at certain facilities of the Debtors that are transferred to the Distribution Trust (subject to the limitations described herein), including purchasing raw materials and other goods, employing persons to perform manufacturing and other services and selling such goods to customers once manufactured, in each case, pending the sale or liquidation thereof, to conserve and protect such assets and provide for the orderly liquidation thereof; (vii) calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (viii) comply with the Plan and exercise the Distribution Trustee's rights and fulfill its obligations thereunder; (ix) review, reconcile, settle or object to Claims and resolve such objections as set forth in the Plan; (x) pursue Recovery Actions that are transferred to the Distribution Trust to the extent that their pursuit would likely result in a material economic benefit to creditors classified in Class 3 and Class 4 hereunder, as determined by the Oversight Committee, in its sole discretion; (xi) retain, compensate and employ professionals to represent the Distribution Trustee with respect to its responsibilities; (xii) file appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and pay Taxes or other obligations owed by the Distribution Trust and the Debtors; (xiii) exercise such other powers as may be vested in the Distribution Trustee under the Distribution Trust Agreement or this Plan, or as deemed by the Distribution Trustee to be necessary and proper to implement the provisions of the Plan and the Distribution Trust Agreement; (xiv) take such actions as are necessary or appropriate to close or dismiss any or all of the Chapter 11 Cases; and (xv) dissolve the Distribution

Trust in accordance with the terms of the Distribution Trust Agreement. Notwithstanding anything to the contrary in this Section III.C.1, the Distribution Trust's primary purpose is liquidating the assets transferred to it by the Debtors, with no objective to continue or engage in the conduct of a trade or business except to the extent consistent with the trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

2. Funding of and Transfer of Assets Into the Distribution Trust

a. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, other than rights under any Executory Contract or Unexpired Lease that is being rejected pursuant to the Plan, the Debtors will transfer all assets remaining in their Estates to the Distribution Trust, including their equity or ownership interest in the Foreign Asset Subsidiaries, and all such assets shall vest in the Distribution Trust, to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement. The assets will be transferred to and vest in the Distribution Trust on the Effective Date, free and clear of all Liens, except as set forth in Section III.J below.

b. Any Cash that is transferred by the Debtors to the Distribution Trust, and thus constitutes the Initial Other Asset Funding Amount, shall be transferred into the Other Asset Trust Account. On the Effective Date, the Debtors and MD Investors shall cause the Initial MD Investors Funding Amount to be released from escrow and transferred into the Recovery Action Trust Account.

c. The Distribution Trustee shall have the authority to create sub-accounts or sub-trusts within the Distribution Trust, which may have a separate legal existence, and which shall be considered sub-accounts or sub-trusts of the Other Asset Trust Account, and into which the Distribution Trustee may deposit any non-Cash property, including real or personal property pending its liquidation. Such sub-accounts or sub-trusts may hold legal title to such property. Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts shall be deposited directly into the Other Asset Trust Account.

d. The act of transferring assets and rights to the Distribution Trust, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Distribution Trust as if the asset or right was still held by the applicable Debtor.

3. Oversight Committee

An Oversight Committee shall be established to review and monitor the actions of the Distribution Trustee in its administration of the Distribution Trust. The Oversight Committee shall have standing to be heard in the Bankruptcy Court on all matters brought before the Bankruptcy Court in the Chapter 11 Cases after the Effective Date. The initial members of the Oversight Committee are identified on Exhibit III.C.3 to the Plan. In the event that a member of the Oversight Committee resigns, such member may be replaced by a party that previously served on the Creditors' Committee without order of the Court. If all members of the Oversight Committee resign and no replacements are named, any duties of the Oversight Committee shall be performed by the Distribution Trustee. The Oversight Committee shall not be entitled to reimbursement from the Debtors or the Distribution Trust for any fees or expenses incurred in conducting its duties.

4. Distribution Trustee

a. The initial Distribution Trustee shall be selected by the Creditors' Committee, subject to the consent of the Debtors (with such consent not being unreasonably withheld).

b. The Distribution Trustee shall be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Distribution Trustee shall be specified in the Distribution Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section III.C.1 above, subject to the oversight of the Oversight Committee. Other rights and duties of the Distribution Trustee and the beneficiaries of the Distribution Trust shall be as set forth in the Distribution Trust Agreement.

5.      Distribution Trust Agreement

        The Distribution Trust Agreement generally will provide for, among other things:  (i) the payment of reasonable compensation to the Distribution Trustee; (ii) the payment of other expenses of the Distribution Trust, including the cost of pursuing the claims assigned to the Distribution Trust; (iii) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (iv) the investment of Cash by the Distribution Trustee within certain limitations; (v) the preparation and filing of appropriate Tax returns and other reports on behalf of the Distribution Trust and the Debtors and the payment of Taxes or other obligations owed by the Distribution Trust and the Debtors; (vi) the maintenance (if appropriate) of any going concern vested in the Distribution Trust (subject to the limitations described herein and therein); (vii) the orderly liquidation of the Distribution Trust's assets; and (viii) the litigation, settlement, abandonment or dismissal of the Recovery Actions or any other claims, rights or causes of action assigned to the Distribution Trust.

6.      Reports to be Filed by the Distribution Trustee

        The Distribution Trustee, on behalf of the Distribution Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Distribution Trust Agreement), no later than 31 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

7.      Fees and Expenses of the Distribution Trust

        a.      Distribution Trust Expenses shall be paid from the Distribution Trust as required, at the direction of the Distribution Trustee.  Any Recovery Action Distribution Trust Expenses shall be paid solely from the Recovery Action Trust Account.  Any Other Asset Distribution Trust Expenses shall be paid solely from the Other Asset Trust Account, subject to the provisions of Section II.F.  Any General Distribution Trust Expenses shall be allocated one-half to the Recovery Action Trust Account and one-half to the Other Asset Trust Account, which allocated amounts may be drawn from such accounts to fund the Distribution Trust Expense Account.

        b.      In addition, the Distribution Trustee, on behalf of the Distribution Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors or the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the expenses of these professionals from the appropriate Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to the above limitations and any procedures established by the Distribution Trust Agreement.

8.      Indemnification

        The Distribution Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Distribution Trustee, the members of the Oversight Committee and/or other parties. Any such indemnification shall be the sole responsibility of the Distribution Trust and payable solely from the assets of the Distribution Trust.

9.      Tax Treatment

        The Distribution Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated either as discrete trusts taxed pursuant to Section 641 et seq. of the Internal Revenue Code (the "IRC") or as disputed ownership funds described in Treasury Regulation § 1.468B-9.  For federal income tax purposes, the transfer of assets by the Debtors to the Distribution Trust will be treated in part as the transfer of assets by the Debtors to the holders of Allowed General Unsecured Claims, subject to any liabilities of the Debtors or the Distribution Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Distribution Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one more Disputed Claims reserves.  The holders of Allowed General Unsecured Claims

will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Distribution Trust (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the holders of Allowed General Unsecured Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to such assets. The holders of Allowed General Unsecured Claims will be required to use the values assigned to such assets by the Distribution Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest. The Distribution Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (i) require that the Distribution Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (ii) limit the Distribution Trustee's investment powers, (iii) limit the business operations carried on by the Distribution Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (iv) prohibit the Distribution Trust from receiving or retaining Cash or cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (v) distribute at least annually to the holders of Allowed General Unsecured Claims the Distribution Trust's net income and the net proceeds from the sale of Distribution Trust assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Distribution Trust assets. Distribution Trust assets reserved for holders of Disputed Claims will be treated as one or more Disputed Claims reserves for tax purposes, which will be subject to an entity-level Tax on some or all of their net income or gain. No holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Distribution Trustee will file all Tax returns on a basis consistent with the treatment of the Distribution Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as discrete trusts or disputed ownership funds, and will pay all Taxes owed from Distribution Trust assets.

10.     Settlement of Claims

Except as otherwise provided in the Plan or the Distribution Trust Agreement, on and after the Effective Date, the Distribution Trustee may compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Distribution Trust Expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

11.     Sales of Assets by Distribution Trust

In connection with the sale, liquidation, transfer, distribution or disposition of the assets of the Distribution Trust by the Distribution Trustee, the Distribution Trustee shall deposit any proceeds of the litigation or settlement of Recovery Actions into the Recovery Action Trust Account and shall deposit the proceeds of all other sales, liquidations, transfers to dispositions into the Other Asset Trust Account. The Distribution Trustee may conduct any sales or liquidations of non-Cash assets from the Distribution Trust on any terms it deems reasonable, without further order of the Bankruptcy Court.

12.     Maintenance of Businesses by Distribution Trustee

Notwithstanding anything in Section III.C.1 above, the Distribution Trustee shall not be permitted to operate any businesses owned by the Distribution Trust as operating businesses unless the Distribution Trustee reasonably believes that: (a) (i) such business operations will either be profitable or (ii) the maintenance of the businesses will otherwise be in the best interests of the beneficiaries of the Distribution Trust, considered as a whole; and (b) the maintenance of the business is consistent with the Distribution Trust's liquidating purpose and reasonably necessary to conserve and protect such assets and provide for the orderly liquidation thereof.

**D.    Corporate Governance, Directors and Officers**

1.    Certificates of Incorporation and Bylaws

Consistent with Sections III.A and III.B above, each of the Debtors will cease to exist, and all existing certificates of incorporation and by-laws will be canceled, effective as of the Effective Date; accordingly, no new certificates of incorporation and by-laws will be necessary.

2.    Directors and Officers

Consistent with Sections III.A and III.B above, each of the Debtors will cease to exist effective as of the Effective Date and, thus, no individuals will serve as directors, officers or voting trustees after the Effective Date.

3.    Corporate Action

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions) or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Distribution Trustee or any other Person:  (a) the establishment of the Distribution Trust; (b) the appointment of the Distribution Trustee to act on behalf of the Distribution Trust; (c) the transfer of assets into the Distribution Trust as set forth in the Plan; (d) the distribution of Cash pursuant to the Plan; (e) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution and implementation of the Distribution Trust Agreement; and (g) the other matters provided for under the Plan involving the corporate structure of any Debtor or corporate action to be taken by or required of any Debtor or the Distribution Trustee.

**E.    No Revesting of Assets**

The property of the Debtors' Estates shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Distribution Trust to be administered by the Distribution Trustee in accordance with the Plan and the Distribution Trust Agreement.

**F.    Creation and Maintenance of Trust Accounts**

1.    Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Distribution Trustee or, if applicable and appropriate, the Third Party Disbursing Agent.  The Other Asset Trust Account and Recovery Action Trust Account are required under the Plan, but the number and nature of any other Trust Accounts shall be determined by the Distribution Trustee.  To effect distributions, the Distribution Trustee may establish and maintain multiple Trust Accounts, including, without limitation, multiple Other Asset Trust Accounts or multiple Recovery Action Trust Accounts.

2.    Additional Funding of Trust Accounts

After the funding of the Trust Accounts on the Effective Date, each Trust Account will continue to be funded by the transfer of Cash through litigation or via the sale or dispositions of assets.  Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Distribution Trust Agreement.

3.	Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing final distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Distribution Trust Agreement, and the Trust Accounts may be closed.

**G.	Preservation of Causes of Action; Settlement Agreements and Releases; Exculpation**

1.	**Preservation of Causes of Action; Recovery Actions**

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Distribution Trustee will retain and may enforce any claims, demands, rights and causes of action that any Estate may hold against any Person to the extent not released under Section III.G.3 or otherwise, including the Recovery Actions.  The Distribution Trustee may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the beneficiaries of the Distribution Trust.  Any recovery of Cash by the Distribution Trustee on account of Recovery Actions will be deposited in the Recovery Action Trust Account.  A nonexclusive schedule of currently pending actions and claims brought by one or more Debtors is attached as Exhibit III.G.1.  In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim on Exhibit III.G.1 shall not be deemed an admission, denial or waiver of any claims, demands, rights or causes of action that any Debtor or Estate may hold against any entity.  The Debtors intend to preserve all such claims, demands, rights or causes of action as Recovery Actions (except to the extent any such claim is specifically released herein).

2.	**Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section III.G.3, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

3.	**Releases**

a.	**General Releases by Debtors**

**Without limiting any other applicable provisions of or releases contained in the Plan, as of the Effective Date, the Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Liabilities (including Derivative Claims) that they have, had or may have against any Released Party and the 2012 Indenture Trustee and its Representatives (in their capacities as such), except with respect to any obligations arising under the Plan; provided, however, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have constituted intentional misconduct. Any such released Liabilities shall not be transferred to the Distribution Trust.**

b.	**General Releases by Holders of Claims or Interests**

**Without limiting any other applicable provisions of or releases contained in the Plan or provided under the Bankruptcy Code, as of the Effective Date, in consideration for the consideration provided under the Plan, each holder of a Claim or Interest that votes in favor of the Plan, to the fullest**

**extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan or the Disclosure Statement that such entity has, had or may have against any Released Party; provided, however, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any act or omission to the extent that the act or omission is determined in a Final Order to have constituted intentional misconduct.**

      c.        **Injunction Related to Releases**

**The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, rights of contribution or rights of indemnification released pursuant to the Plan, including pursuant to the releases in this Section III.G.3.**

    4.        **Exculpation**

From and after the Effective Date, the Released Parties and the 2012 Indenture Trustee and its Representatives (in their capacities as such) shall neither have nor incur any liability to any Person for any act taken or omitted, or to be taken, in connection with the sale of the majority of the Debtors' assets to MD Investors or the Debtors' other postpetition liquidation activity, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan, the exhibits to the Plan, the Disclosure Statement, the Distribution Trust Agreement or any other contract, instrument, release or other agreement or document provided in connection therewith; provided, however, that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that the act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**H.**        **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim has not yet been satisfied by the combination of distributions pursuant to this Plan and proceeds payable to the holder of such Allowed Insured Claim under any pertinent insurance policies and applicable law.  Nothing in this Section III.H will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

**I.**        **Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan and except for purposes of distributions on account of Allowed Customer Note Claims, Allowed 2013 Senior Note Claims and Allowed 2012 Senior Subordinated Claims as contemplated by Section V.C, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all outstanding common stock, secured and unsecured notes, indentures, instruments and securities issued by any of the Debtors will be canceled and of no further force and effect, without any further action on the part of the Bankruptcy Court, any Debtor or the Distribution Trustee.  The holders of or parties to such canceled instruments and securities will have no rights arising from or relating to such instruments and securities or the cancellation thereof, except the rights provided pursuant to the Plan; provided, however, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Claim evidenced by such canceled instruments or securities unless and until such instruments or securities are received by the applicable Disbursing Agent if required pursuant to Section V.M.  Notwithstanding anything to the contrary in this provision, the 2012 Senior Subordinated Note Indenture and the 2013 Senior Note Indenture shall continue to exist for the purposes set forth in Section V.G below.

**J. Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such Liens, including any rights to any collateral thereunder, shall attach to and be enforceable solely against the same assets that are owned by the Distribution Trustee in which the holder of such Claim had a Lien, including any net proceeds of sales of such assets. All such Liens against the assets of the Distribution Trust shall be fully released and discharged upon the holder of the Liens receiving its full distribution under the Plan.

**K. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes**

1.    Effectuating Documents and Further Transactions

Prior to the Effective Date, the Chief Liquidation Officer or any other officer of each Debtor, and after the Effective Date, the Distribution Trustee, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

2.    Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax or similar Tax:  (a) any transfer made by the Debtors to the Distribution Trust; (b) any sales made by the Distribution Trust to liquidate such assets in the trust and convert such assets into Cash; (c) any sales of assets made by the Debtors under section 363 of the Bankruptcy Code, to the extent that title to the assets being sold transfers after the Confirmation Date; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

**L. Implementation of Settlement with MD Investors**

In accordance with the applicable provisions of the Sale Order, MD Investors will receive 50% of all distributions of Net Other Asset Cash made from the Distribution Trust.  Distributions of such amounts shall only be made on Distribution Dates for holders of Allowed Claims in Class 3 and Class 4, as set forth in Article V below.

**M. Substitution in Pending Legal Actions**

On the Effective Date, the Distribution Trust or the Distribution Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (i) pending contested matters or adversary proceedings in the Bankruptcy Court, (ii) any appeals of orders of the Bankruptcy Court and (iii) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Distribution Trustee and its professionals are not required to, but may take such steps as are appropriate to provide notice of such substitution.

## ARTICLE IV.
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**A.      Rejection of Executory Contracts and Unexpired Leases**

1.      Rejection

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors will be deemed to reject each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned or rejected during the Chapter 11 Cases, which includes, but is not limited to, the Executory Contracts and Unexpired Leases Identified on Exhibit IV.A.  Parties that desire to object to the rejection of a specific Executory Contract or Unexpired Lease must file an objection to the Plan by the deadline for filing objections thereto.

2.      Notice of Rejection

The Debtors will serve a notice on all known counterparties to Executory Contracts or Unexpired Leases that are to be rejected pursuant to the Plan.  The notice shall provide parties in interest with the following information:  (a) the identity of the contract or lease being rejected and (b) the procedures and bar date for asserting any claims arising from the rejection of the Executory Contract or Unexpired Lease.  The failure of a party to an Executory Contract or Unexpired Lease to receive the notice to be provided under this section IV.A shall not prevent the rejection of the Executory Contract or Unexpired Lease.

3.      Bar Date for Rejection Damages

In accordance with the Bar Date Order, and except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease must be Filed with the Bankruptcy Court on or before the later of:  (a) 30 days after the Effective Date or (b) 30 days after such Executory Contract or Unexpired Lease is rejected pursuant to an order of the Bankruptcy Court.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors or the Distribution Trust.

4.      Special Provisions Relating to Niles, Illinois and Middleville, Michigan Premises

The Unexpired Lease associated with the Debtors' lease of real property for their Niles, Illinois facility shall be treated in accordance with the Dyne Agreement and, to the extent that the provisions of this Section IV.A conflict with the terms of the Dyne Agreement, the terms of the Dyne Agreement shall apply.  The Unexpired Lease associated with the Debtors' lease of real property for their Middleville, Michigan Facility shall be treated in accordance with the Spirit Agreement and, to the extent that the provisions of this Section IV.A conflict with the terms of the Spirit Agreement, the terms of the Spirit Agreement will apply.

**B.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by a Debtor, including any Executory Contracts and Unexpired Leases assumed by a Debtor, that are not assigned to MD Investors or the Distribution Trustee will be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such postpetition agreement, must file a claim or Administrative Claim in accordance with the Plan or have their rights forever waived and released.

**C.      Pre-existing Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory

Contracts or Unexpired Lease. Notwithstanding any applicable nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases, and any such rights shall vest in the Distribution Trust as of the Effective Date.

**D.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases**

  1.  **Assumption and Assignment Generally**

    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor shall assume each of the respective Executory Contracts and Unexpired Leases listed on Exhibit IV.D.1; provided, however, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit IV.D.1 to:  (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection under Section IV.A; or (b) add any Executory Contract or Unexpired Lease to Exhibit IV.D.1, thus providing for its assumption pursuant to this Section IV.D.1.  The Debtors shall File Exhibit IV.D.1, and any amendments thereto, with the Bankruptcy Court.  Nothing herein shall constitute an admission by a Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor has any liability thereunder.

  2.  **Assignments to Distribution Trust**

    As of the Effective Date, any Executory Contract or Unexpired Lease identified upon Exhibit IV.D.1 shall be deemed assigned to the Distribution Trust, pursuant to section 365 of the Bankruptcy Code. Any Allowed Cure Amount Claims associated with the assumption and assignment of an Executory Contract or Unexpired Lease shall be paid by the Distribution Trustee from the Other Asset Trust Account.

    As of the Effective Date, any of postpetition agreements identified upon Exhibit IV.D.2 shall be assigned to the Distribution Trust by operation of, and to the extent permitted by, applicable nonbankruptcy law governing assumptions and assignments.

  3.  **Approval of Assumptions and Assumption Procedures**

    The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and assignments described in Sections IV.D.1 and IV.D.2, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  The procedures for assumption of an Executory Contract or Unexpired Lease, which shall be included in the Confirmation Order proposed by the Debtors, shall be as follows:

    a.  After the entry of the Confirmation Order, but prior to the Effective Date, the Debtors shall serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of:  (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

    b.  Any entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must File and serve on counsel to the Debtors or the Distribution Trustee, as applicable, a written objection setting forth the basis for the objection within 20 days of service of the notice described in Section IV.D.3.a.

    c.  If no objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease:  (i) the proposed assumption of the Executory Contract or Unexpired Lease shall be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the

Cure Amount Claim identified by the Debtors in the notice shall be fixed and shall be paid to the appropriate contract or lease party identified on the notice on the Effective Date by the Distribution Trust.

d.  If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, the Debtors or the Distribution Trustee, as applicable, and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

e.  If an objection to the proposed assumption or Cure Amount Claim is properly Filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection then: (i) either party may notice the dispute for hearing by Filing a notice of hearing in the Bankruptcy Court no later than 20 days prior to the hearing date; and (ii) the Debtors or the Distribution Trustee may File a reply to such objection no later than seven days prior to the proposed hearing date.

f.  If, at a hearing scheduled pursuant to Section IV.D.3.e above, the Bankruptcy Court imposes requirements upon the Debtors or the Distribution Trustee as a condition to assuming an Executory Contract or Unexpired Lease, or if the Bankruptcy Court determines that the Cure Amount Claim for a particular Executory Contract or Unexpired Lease is in excess of the amount proposed by the Debtors or the Distribution Trustee, the Debtors or the Distribution Trustee may, within their sole discretion, choose to reject such Executory Contract or Unexpired Lease by filing an appropriate amendment to Exhibit IV.A, Exhibit IV.D.1 or Exhibit IV.D.2, as applicable, within seven days of the entry of a Final Order with respect to such matter.

## ARTICLE V.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.  Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article V, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article II or Article V that are allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 60 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section IV.D (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section V.E.2 (regarding undeliverable distributions) or Section V.M (regarding surrender of canceled instruments and securities) are satisfied. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Section VI.C.

**B.  Method of Distributions to Holders of Claims**

The Distribution Trustee, in its capacity as Disbursing Agent, or such Third Party Disbursing Agents as the Distribution Trustee may employ in its sole discretion, will make all distributions required under the Plan. Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan if approved by the Distribution Trustee.

**C.  Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Distribution Trustee, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses (including reasonable attorneys' fees and disbursements) incurred in connection with such services, to be paid as a General Distribution Trust Expense.

**D.  Investment of Trust Accounts**

To assist in making distributions under the Plan, the applicable Trust Accounts may be held in the name of the Distribution Trustee or in the name of one or more Third Party Disbursing Agents for the benefit of holders of Allowed Claims under the Plan, or a secondary Trust Account may be created in the name of the Third

Party Disbursing Agent for the purpose of making disbursements. The Distribution Trustee shall invest, or shall direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Distribution Trust Agreement; provided, however, that should such Distribution Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third Party Disbursing Agent not to invest such Cash. Distributions of Cash from accounts held by Third Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

**E.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.      **Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent:  (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

2.      **Undeliverable Distributions Held by Disbursing Agents**

a.      **Holding of Undeliverable Distributions**

Subject to Section V.E.2.c, distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to this Section V.E.2.a until such time as a distribution becomes deliverable. Any Disbursing Agent holding undeliverable Cash will invest such Cash in a manner consistent with the Distribution Trust Agreement.

b.      **After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agents will make all distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date but prior to the Interim Distribution Bar Date.

c.      **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert its right to an undeliverable distribution prior to the date that is 90 days prior to the Final Distribution Date will be forever barred from asserting any such claim against the Debtors, the Distribution Trustee, their respective property or the Trust Accounts. In such cases, unclaimed distributions will be maintained in the applicable Trust Account for redistribution to other claimants entitled to distribution from such Trust Account.

**F.      Distributions on Account of Allowed Claims in Class 1 and Class 2**

Distributions to be made to holders of Allowed Claims classified in Class 1 or Class 2 under the Plan shall be made within 45 days of such claim becoming an Allowed Claim.

**G.      Distributions on Account of Certain Noteholder Claims in Class 4**

1.      **Status of Indentures; Role of 2012 Indenture Trustee and 2013 Indenture Trustee**

Distributions on account of Allowed 2013 Senior Note Claims and Allowed 2012 Senior Subordinated Note Claims shall be made to the 2013 Indenture Trustee and the 2012 Indenture Trustee, respectively,

and shall be made in accordance with this Plan. If distributions are made pursuant to the distribution provisions set forth in the respective indentures, the 2013 Indenture Trustee and the 2012 Indenture Trustee shall be entitled to retain and enforce against such distributions any charging liens and payment priorities under their respective indentures.

The 2012 Indenture Trustee and the 2013 Indenture Trustee shall not be required to give any bond, surety, or other security for the performance of its duties with respect to the administration and implementation of distributions.

Any and all distributions on account of Allowed 2012 Senior Subordinated Note Claims and Allowed 2013 Senior Note Claims shall be subject to the rights of the 2012 Indenture Trustee and the 2013 Indenture Trustee to exercise their rights and remedies under the applicable indenture against such distribution for any unpaid fees and expenses incurred prior to the Effective Date and any fees and expenses incurred in making distributions pursuant to this Plan.

The 2013 Senior Note Indenture and the 2012 Senior Subordinated Note Indenture shall continue to remain in effect after the Effective Date solely for the following purposes:

a. allowing distributions to be made under the Plan pursuant to the applicable indenture and to permit the 2012 Indenture Trustee and the 2013 Indenture Trustee to perform such other necessary functions with respect thereto;

b. permitting the 2012 Indenture Trustee and the 2013 Indenture Trustee to maintain or assert any charging lien they may have with respect to the distributions pursuant to the terms of the Plan for the fees and expenses of the 2012 Indenture Trustee or the 2013 Indenture Trustee, respectively;

c. permitting the 2012 Indenture Trustee or the 2013 Indenture Trustee to exercise their rights and obligations relating to the interests of the 2012 Senior Subordinated Note Claims and the 2013 Senior Note Claims, respectively, including the right to appear and be heard in the Chapter 11 Cases and in any appeals; and

d. permitting the exercise by the 2012 Indenture Trustee or 2013 Indenture Trustee of their rights under the subordination provisions of the 2012 Senior Subordinated Note Indenture and other applicable agreements.

2. **Implementation of Indenture Provisions and Subordination Rights**

To implement payment priorities, preserve the subordination rights of the holders of 2013 Senior Notes and to comply with the fee and expense provisions of the 2013 Senior Note Indenture and the 2012 Senior Subordinated Note Indenture, the following provisions will apply to distributions to be made under Class 4 to holders of Allowed 2013 Senior Note Claims and holders of Allowed 2012 Senior Subordinated Note Claims:

a. At least 21 days prior to a Distribution Date, the Distribution Trustee shall advise the 2012 Indenture Trustee and the 2013 Indenture Trustee in writing of the amounts proposed to be distributed on account of 2012 Senior Subordinated Notes and 2013 Senior Notes.

b. At least seven days prior to the Distribution Date, the 2012 Indenture Trustee shall provide the Distribution Trustee and the 2013 Indenture Trustee with invoices documenting its Unpaid Indenture Trustee Fee Amount.

c. On the Distribution Date, distributions to be made to holders of Allowed 2012 Senior Subordinated Note Claims shall be made to the 2012 Indenture Trustee only to the extent necessary to satisfy any Unpaid Indenture Trustee Fee Amount for the 2012 Indenture Trustee. If any amount remains after the Unpaid Indenture Trustee Fee Amount for the 2012 Indenture Trustee has been satisfied, any excess shall be distributed to the 2013 Indenture Trustee on the Distribution Date.

d.       Any amounts paid to the 2013 Indenture Trustee shall be utilized first to satisfy any Unpaid Indenture Trustee Fee Amount for the 2013 Indenture Trustee.  Any excess shall then be distributed by the 2013 Indenture Trustee Pro Rata to the holders of Allowed 2013 Senior Note Claims or otherwise in accordance with the terms of the 2013 Senior Note Indenture.

e.       If the holders of Allowed 2013 Senior Note Claims have been paid in full as calculated by the Distribution Trustee (and agreed to by the 2013 Indenture Trustee or, if not such agreement is reached, determined by order of the Bankruptcy Court), including payment of interest calculated at the default rate under the terms of the 2013 Senior Notes, then the provisions of subsections (c) and (d) above shall no longer apply, and, instead (1) no further distributions shall be made to any party on account of Allowed 2013 Senior Note Claims and (2) all distributions on account of Allowed 2012 Senior Subordinated Note Claims shall be made to the 2012 Indenture Trustee, first for the satisfaction of its valid Unpaid Indenture Trustee Fee Amounts and, second, to be distributed by the 2012 Indenture Trustee Pro Rata to the holders of Allowed 2012 Senior Subordinated Note Claims or otherwise in accordance with the terms of the 2012 Senior Subordinated Note Indenture.

**H.       Selection of Distribution Dates for Class 3 Claims and Class 4 Claims and Provision of Notice Thereof**

Except where this Plan requires the making of a distribution on account of a particular Allowed Claim within a particular time, the Distribution Trustee shall have the authority to select Distribution Dates that, in the judgment of the Distribution Trustee, provide holders of Allowed Claims with payments as quickly as reasonably practicable while limiting the costs incurred by the distribution process; provided, however, that, unless the Oversight Committee directs otherwise, the first Distribution Date after the Effective Date must occur prior to December 31, 2010 and a Distribution Date must occur at least once every twelve months thereafter, if any amounts are available for distribution on such date.  Upon the selection of a Distribution Date by the Distribution Trustee, the Distribution Trustee may file a notice of such Distribution Date with the Bankruptcy Court that provides information regarding the distribution to be made.  If applicable, distributions also shall be made to MD Investors on the Distribution Dates.

**I.       Calculation of Amounts to Be Distributed to Holders of Class 3 Claims and Class 4 Claims**

1.       Reserve for Certain Claims Senior to Class 3 Claims and Class 4 Claims

Prior to any distribution to holders of Allowed Class 3 Claims or Allowed Class 4 Claims, the Distribution Trustee shall estimate the amount of Net Recovery Action Asset Cash and Net Other Asset Cash that will remain after payment of all Distribution Trust Expenses and the resolution and payment of all Administrative Claims, Cure Amount Claims, Priority Tax Claims, Priority Claims in Class 1 and Secured Claims in Class 2.  Such estimations shall utilize assumptions that the Distribution Trustee will be unsuccessful in litigation with claimants with respect to any issue that is being reasonably contested.  Such estimations shall also assume that any unresolved Recovery Actions shall result in no recovery for the Debtors' Estates and that remaining non-Cash assets shall produce no recovery for the Estates.  Only if, after applying such assumptions, the estimated Net Recovery Action Asset Cash and Net Other Asset Cash is greater than zero shall the Distribution Trustee be permitted to make any distributions to holders of Allowed Class 3 Claims or Allowed Class 4 Claims.

2.       Allowed Class 3 Claims and Allowed Class 4 Claims

On each Distribution Date, each holder of an Allowed Claim in Class 3 or Class 4 will receive a distribution of any Net Recovery Action Asset Cash and Net Other Asset Cash that has been determined to be available for distribution in accordance with Section V.I.1 such that each holder of an Allowed Claim is such classes has received, in the aggregate, its Pro Rata share of the amounts of Net Recovery Action Asset Cash and Net Other Asset Cash that are made available for distribution to such Claim holders under Sections II.B.3 and II.B.4.  All distributions shall be made pursuant to the terms and conditions of the Plan and the Distribution Trust Agreement, and shall be subject to the Debtors' or the Distribution Trustee's rights of setoff or deduction.

3. De Minimis Distributions

On each Distribution Date prior to the Final Distribution Date, the Disbursing Agent shall not distribute cash to the holder of an Allowed Class 3 Claim or an Allowed Class 4 Claim if the amount of Cash to be distributed on account of such Claim is less than $25 in the aggregate. Any Cash not distributed pursuant to this Section V.I.3 will be returned to the applicable Trust Account until the next Distribution Date. On the Final Distribution Date, if the aggregate amount of distributions to be made to such claimant is $25 or greater, such distribution shall be made. Otherwise, the amount shall be redistributed to other holders of Allowed Claims in such Class and such holder of an Allowed Claim will be forever barred from asserting its Claim for such distribution against the Distribution Trust or its property.

**J.  Other Provisions Applicable to Distributions in All Classes**

1. Postpetition Interest

No interest shall accrue on any Claims on and after the Effective Date.

2. Compliance with Tax Requirements

a.  Each Disbursing Agent will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Distribution Trustee and any Disbursing Agent will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements.

b.  Notwithstanding any other provision of the Plan or the Distribution Trust Agreement, each Person receiving or deemed to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax imposed on such Person on account of such distribution.

3. Allocation of Distributions

All distributions to a holder of an Allowed Claim that has components of principal and interest will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any applicable accrued interest included in such Claim to the extent interest is payable under this Plan.

**K.  Distribution Record Date**

1. As of the close of business on the Distribution Record Date, the transfer registers for the Prepetition Notes will be closed. The applicable Disbursing Agent (including any indenture trustee and the DTC) will have no obligation to recognize the transfer or sale of any Prepetition Notes that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Distribution Record Date.

2. Transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 for which a notice of transfer has been Filed on or prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. No transfers Filed with the Bankruptcy Court after the Distribution Record Date shall be recognized by the Distribution Trustee or any Disbursing Agent.

3. The Distribution Trustee shall have the authority, but no obligation, to recognize transfers of Claim made after the deadlines set forth in Sections V.K.1 and V.K.2 above in its sole and absolute discretion.

L.    **Means of Cash Payments**

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by the Distribution Trustee or, at the option of the Distribution Trustee, by wire transfer, electronic funds or ACH from a domestic bank; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Distribution Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

M.    **Surrender of Canceled Instruments or Securities**

The Distribution Trustee shall determine, in its sole discretion, if any requirement for surrendering canceled instruments or securities shall be applicable to the holders of Prepetition Notes or Customer Notes and, if so determined, shall File such requirement in the Bankruptcy Court and advise all known holders of Prepetition Notes or Customer Notes of such requirements and how they may comply with such requirements. Absent such a Filing, holders of Prepetition Notes or Customer Notes need not surrender their canceled instruments in order to be entitled to distributions under the Plan.

N.    **Setoffs**

Except with respect to claims of a Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agents or a Third Party Disbursing Agent, as instructed by the Distribution Trustee pursuant to section 558 of the Bankruptcy Code or applicable nonbankruptcy law, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the applicable Debtor or the Distribution Trustee may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or the Distribution Trustee of any claims, rights and causes of action that the Debtor or Debtors or the Distribution Trustee may possess against such a Claim holder, which are expressly preserved under section III.G.1.


# ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A.    **Treatment of Disputed Claims**

1.    **Tort Claims**

Each Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim. The amount of a Tort Claim that is not otherwise settled and resolved by a Stipulation of Amount and Nature of Claim shall be determined and liquidated, in the discretion of the Distribution Trustee in either (a) the administrative or judicial tribunal of appropriate jurisdiction or (b) the United States District Court for the Southern District of New York. The Distribution Trustee shall provide written notice of its selection of the appropriate forum promptly after the Effective Date. Such judicial tribunal shall determine the amount of the Tort Claim, but shall not enter or enforce a judgment against the Debtors, their Estates or the Distribution Trust, as all distributions on account of Tort Claims resolved in accordance with this Section VI.A.1 shall be subject to and made in accordance with the Plan. All claims, demands, rights, defenses and causes of action that the Debtors may have against any Person in connection with or arising out of any Tort Claim are expressly retained and preserved.

2.    **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. In lieu of distributions under the Plan to holders of Disputed Claims on the Effective Date, the Distribution Trustee shall, in accordance with the Distribution

Trust Agreement, establish appropriate disputed claims reserves for all Disputed Claims, with such reserves held in the applicable Trust Accounts.

**B.      Objections to Claims**

      1.      **Authority to Prosecute**

      The Distribution Trustee may object to any Claims it believes warrant the Filing of an objection prior to the Claims Objection Bar Date.  After the Effective Date, only the Distribution Trustee will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.  After the Effective Date, the Distribution Trustee may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim without approval of the Bankruptcy Court.

      2.      **Pending Objections**

      To the extent that the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Distribution Trustee shall be substituted as the objecting party without further action of the parties or order of the Court.

      3.      **Application of Bankruptcy Rules**

      To facilitate the efficient resolution of Disputed Claims, the Distribution Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to claims in accordance with the order of the Bankruptcy Court dated October 30, 2009.

      4.      **Authority to Amend Schedules**

      The Debtors and the Distribution Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no proof of claim is timely filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Distribution Trustee will provide the holder of such Claim with notice of such amendment and such parties will have 30 days to File an objection to such amendment in the Bankruptcy Court.

      5.      **Request for Extension of Claims Objection Bar Date**

      Upon motion to the Bankruptcy Court, the Distribution Trustee may request, and the Bankruptcy Court may grant, an extension to the Claims Objection Bar Date generally or with respect to a specific list of Claims. Any extension granted by the Bankruptcy Court shall not be considered to be a Plan modification under section 1127 of the Bankruptcy Code.

**C.      Distributions on Account of Disputed Class 4 Claims Once Allowed**

      On each Distribution Date, the applicable Disbursing Agent will make all distributions on account of any Disputed Class 4 Claim that has become an Allowed Claim since the most recent Distribution Date.  The timing and amount of such distribution shall be determined in accordance with sections V.G, V.H and V.I above.

## ARTICLE VII.
## SUBSTANTIVE CONSOLIDATION

### A.    Substantive Consolidation of the Debtors

Pursuant to the Confirmation Order, the Bankruptcy Court will approve the substantive consolidation of the Debtors for all purposes, including for the purpose of implementing the Plan, for purposes of voting, for assessing whether Confirmation standards have been met, for calculating and making distributions under the Plan and for filing post-Confirmation reports and paying quarterly fees to the Office of the United States Trustee. Pursuant to such order, as of the Effective Date:  (A) all assets and liabilities of the Debtors will be deemed merged; (B) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (C) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtors will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors, and the Debtors may file and the Bankruptcy Court will sustain objections to Claims for the same liability that are Filed against multiple Debtors; and (D) Intercompany Claims between Debtors will be eliminated and extinguished.  Such substantive consolidation will not affect (A) the legal and corporate structures of the Debtors, subject to the right of the Debtors to complete the Dissolution Transactions; (B) the vesting of assets in the Distribution Trust; (C) the right to distributions from any insurance policies or proceeds of such policies; or (D) the rights of the Debtors or the Distribution Trustee to contest alleged setoff or recoupment efforts by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and otherwise applicable law.

### B.    Order Granting Substantive Consolidation

This Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors, as described and to the extent set forth in Section VII.A above.  Unless an objection to such substantive consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section X.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.  Notwithstanding this provision, nothing herein shall affect the obligation of the substantively consolidated Debtors to (1) pay a single quarterly fee to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930 based upon the consolidated disbursements made by the substantively consolidated Debtors or (2) seek the closing of their substantively consolidated Chapter 11 Case.


## ARTICLE VIII.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN; EFFECT OF CONFIRMATION

### A.    Conditions to Confirmation

The Bankruptcy Court will not be requested to enter the Confirmation Order, unless and until the following condition has been satisfied or duly waived pursuant to Section VIII.C:

1.    The Plan shall not have been materially amended, altered or modified from the Plan as Filed on _____, 2010, unless such material amendment, alteration or modification has been made in accordance with Section X.A.

2.    The obligation the Debtors to make payments of retiree benefits (as such term is defined in section 1114(a) of the Bankruptcy Code), to the extent that such obligations have not been assumed and assigned to a third party by a Final Order as of the Confirmation Hearing, shall have been terminated.

**B.** **Conditions to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section VIII.C:

1. The Bankruptcy Court shall have entered the Confirmation Order.

2. The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors to take all actions necessary or appropriate to implement the Plan, including completion of the Dissolution Transactions, the transfer of the assets of the Debtors to the Distribution Trust and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3. The Distribution Trust Agreement shall be executed, the Distribution Trust shall be created and the Distribution Trustee shall have been appointed and accepted such appointment.

4. The Trust Accounts shall be created.

5. The Plan and all exhibits to the Plan shall have been Filed and shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A.

**C.** **Waiver of Conditions to Confirmation or the Effective Date**

All conditions to Confirmation and the conditions to the Effective Date set forth in Sections VIII.B.4 through VIII.B.6 above may be waived in whole or part at any time by the Debtors without an order of the Bankruptcy Court.

**D.** **Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section VIII.C within 60 days of the entry of the Confirmation Order, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section VIII.D, then (1) the Plan will be null and void in all respects; and (2) the Distribution Trust shall be promptly dissolved.

**E.** **Request for Waiver of Stay of Confirmation Order**

This Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver shall be Filed with the Bankruptcy Court and served on the parties listed in Section X.F on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

## ARTICLE IX.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the full extent legally permissible, including jurisdiction to:

1.      Allow, disallow, estimate, determine, liquidate, reduce, classify, re–classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

2.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

3.      Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

4.      Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and the Distribution Trust Agreement;

5.      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor or Estate that may be pending on the Effective Date or brought thereafter;

6.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Distribution Trust Agreement;

7.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, including the Distribution Trust Agreement, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

8.      Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

9.      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

10.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

11.      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

12.      Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

13.      Enter a final decree closing the Chapter 11 Cases;

14.      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes; and

15.     Hear any other matter over which the Bankruptcy Court has jurisdiction under the provisions of the Bankruptcy Code and the Bankruptcy Rules.


# ARTICLE X.
# MISCELLANEOUS PROVISIONS

## A.     Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date.

## B.     Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will:  (1) constitute a waiver or release of any claims by or against, or any Interests in, any Debtor; (2) prejudice in any manner the rights of any Debtor or any other party in interest; or (3) constitute an admission of any sort by any Debtor or any other party in interest.

## C.     Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## D.     Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee and any other official committees appointed in the Chapter 11 Cases will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases.  The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim whatsoever for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Creditors' Committee, except to the extent necessary to file, prepare and defend any fee application.

## E.     Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## F.     Service of Documents

Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the parties identified below must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

1.     **Counsel to the Debtors**

Richard H. Engman
JONES DAY
222 East 41st Street

New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

- and -

Heather Lennox
Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Email:   hlennox@jonesday.com
            rrouth@jonesday.com


2.      **The Distribution Trustee**

Robert D. Katz, CTP, MBA, CPA
Managing Director
Executive Sounding Board Associates Inc.
2 Penn Center, 1500 JFK Blvd, Suite 1730
Philadelphia, PA  19102
Telephone:  (215) 568-5788

3.      **Counsel to the Creditors' Committee**

Mark D. Silverschotz
Reed Smith LLP
599 Lexington Avenue
New York, NY  10022
Email:  MSilverschotz@ReedSmith.com

Kurt F. Gwynne
Mark W. Eckard
Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, Delaware  19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
Email:   KGwynne@ReedSmith.com
            MEckard@ReedSmith.com


4.      **Counsel to the 2012 Indenture Trustee**

Tina N. Moss
Pryor Cashman LLP
7 Times Square
New York, New York  10036-6569
Telephone:  (212) 421-4100
Facsimile:  (212) 798-6355
Email:  tmoss@pryorcashman.com

5.    **Counsel to the 2013 Indenture Trustee**

Lawrence P. Gottesman
Bryan Cave LLP
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-1193
Facsimile: (212) 541-1493
Email:  lawrence.gottesman@bryancave.com


6.    **Counsel to Asahi Tec Corporation**

Evan Jones
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
Email: ejones@omm.com

7.    **Counsel to RHJI**

Thomas E. Dunn
Richard Levin
Cravath Swaine & Moore, LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10010
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
Email: tdunn@cravath.com
Email: rlevin@cravath.com

Dated:  January 8, 2010

Respectfully submitted,

OLDCO M CORPORATION, on its own behalf and on behalf of each affiliate Debtor

Filed by:

  /s/Ryan T. Routh
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Richard H. Engman

  - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox
Ryan T. Routh

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

By:       /s/  G. Larry Carroll
Name:   G. Larry Carroll
Title:     Chief Liquidating Officer

## DEBTORS IN THE CHAPTER 11 CASES
## EXHIBIT I.A.32

| Case No | Original Debtor Name | Revised Debtor Name |
|---------|---------------------|---------------------|
| 09-13432 | ER Acquisition Corp. | No Change |
| 09-13433 | GMTI Holding Company | No Change |
| 09-13434 | Halyard Aviation Services, Inc. | No Change |
| 09-13435 | MascoTech Saturn Holdings, Inc. | No Change |
| 09-13436 | MASG Disposition, Inc. | No Change |
| 09-13437 | MASX Energy Services Group, Inc. | No Change |
| 09-13411 | MD Products Corp. | No Change |
| 09-13425 | Metaldyne Asia, Inc. | Oldco M Asia, Inc. |
| 09-13414 | Metaldyne Company LLC | Oldco M Company LLC |
| 09-13412 | Metaldyne Corporation | Oldco M Corporation |
| 09-13426 | Metaldyne Driveline Co., LLC | Oldco M Driveline Co., LLC |
| 09-13418 | Metaldyne DuPage Die Casting Corporation | Oldco M DuPage Die Casting Corporation |
| 09-13413 | Metaldyne Engine Co., LLC | Oldco M Engine Co., LLC |
| 09-13427 | Metaldyne Europe, Inc. | Oldco M Europe, Inc. |
| 09-13441 | Metaldyne Intermediate Holdco, Inc. | Oldco M Intermediate Holdco, Inc. |
| 09-13415 | Metaldyne Lester Precision Die Casting, Inc. | Oldco M Lester Precision Die Casting, Inc. |
| 09-13420 | Metaldyne Light Metals Company, Inc. | Oldco M Light Metals Company, Inc. |
| 09-13419 | Metaldyne Machining and Assembly Company, Inc. | Oldco M Machining and Assembly Company, Inc. |
| 09-13428 | Metaldyne Precision Forming - Fort Wayne, Inc. | Oldco M Precision Forming - Fort Wayne, Inc. |
| 09-13429 | Metaldyne Services, Inc. | Oldco M Services, Inc. |
| 09-13416 | Metaldyne Sintered Components, LLC | Oldco M Sintered Components, LLC |
| 09-13430 | Metaldyne Sintered Components of Indiana, Inc. | Oldco M Sintered Components of Indiana, Inc. |

| 09-13421 | Metaldyne Sintered Components St. Marys, Inc. | Oldco M Sintered Components St. Marys, Inc. |
|----------|-----------------------------------------------|---------------------------------------------|
| 09-13417 | Metaldyne Tubular Products, Inc. | Oldco M Tubular Products, Inc. |
| 09-13431 | Metaldyne U.S. Holding Co. | Oldco M U.S. Holding Co. |
| 09-13422 | NC-M Chassis Systems, LLC | No Change |
| 09-13438 | Precision Headed Products, Inc. | No Change |
| 09-13423 | Punchcraft Company | No Change |
| 09-13439 | Stahl International, Inc. | No Change |
| 09-13440 | W.C. McCurdy Co. | No Change |
| 09-13424 | Windfall Specialty Powders, Inc. | No Change |

**EXHIBIT II**

**FEASIBILITY ANALYSIS**

# OLDCO M CORPORATION

## PLAN FEASIBILITY ANALYSIS

# OLDCO M CORPORATION
# PLAN FEASIBILITY ANALYSIS

*GENERAL*

In connection with confirmation of the Joint Plan of Liquidation of the Debtors and Debtors in Possession (the "Plan") proposed by Oldco M Corporation (fka Metaldyne Corporation), the Bankruptcy Court would have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors (unless such liquidation or reorganization is proposed by the Plan). Because the Plan proposes a liquidation of all of their assets, for purposes of this test the Debtors have analyzed the ability of the Distribution Trust to meet its obligations under the Plan, including the payment of all Administrative Claims, all expenses of the Distribution Trust, all Priority Tax Claims and all Allowed Class 1 Claims and Allowed Class 2 Claims. Based on the Debtors' analysis, the Distribution Trust will have sufficient assets to make these payments to accomplish its tasks under the Plan. Therefore, the Debtors believe that their liquidation pursuant to the Plan meets the feasibility requirements of the Bankruptcy Code.

The Feasibility Analysis reflects the Debtors' judgment as to the occurrence or nonoccurrence of certain future events, which are subject to change. The assumptions disclosed herein are those that the Debtors believe to be significant to the Feasibility Analysis. Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties. Consequently, actual results could differ significantly from those shown here.

*PLAN CONFIRMATION IS ASSUMED*

This Feasibility Analysis assumes that the Plan is confirmed as filed, with an Effective Date of March 1, 2010. Accordingly, the analysis assumes the substantive consolidation of the Debtors and the priorities of distribution proposed in the Plan.

*OPERATING WIND-DOWN / CUSTOMER RESOURCING*

The Debtors have entered into various wind-down agreements with the key customers at the remaining manufacturing facilities. These agreements provide for the monetization of accounts receivable and inventory assets, as well as the recovery of certain wind-down costs. The analysis assumes that the Company's customers have fully resourced their production prior to the Effective Date of the Plan consistent with existing wind-down agreements, and thus there will be no need to operate the businesses of the Debtors after the Effective Date. Consequently, accounts receivable and inventory assets are assumed to be monetized as of the Effective Date.

*LIQUIDATION OF FIXED ASSETS*

A significant amount of machinery and equipment has already been sold prior to the Effective Date. After the conclusion of the operating wind-down period, the Debtors' remaining machinery and equipment is to be marketed and then sold via public auction or other sale

processes within three months of the Effective Date. The analysis also assumes that owned real property is sold within three months after the Effective Date. To the extent that assets are presumed to be sold prior to March 1, 2010, such assets are included in the "Cash" line item. Assets to be sold on or after March 1, 2010 are included in the "Fixed Assets" line item.

*LIQUIDATION OF NON-DEBTOR SUBSIDIARY*

The Debtors have six non-Debtor subsidiaries, of which only one has non-de minimis assets. This subsidiary, Oldco M Machining and Assembly Mfg. Co. (Canada) Ltd., is a Canadian corporation that is going through a wind-down of its operations and liquidation of its assets. This analysis assumes that the Debtors will not recover any amounts from the wind-down of any of the non-debtor subsidiaries or that any recovery would be de minimis.

**Oldco M**
**Plan Feasibility Analysis**
**($ in 000's)**

| | Notes | Recovery Amount | | |
| | | Low | High | Midpoint |
|---|---|---|---|---|
| **Proceeds from Assets** | | | | |
| Cash | [A] | $9,611 | $11,415 | $10,513 |
| Funding from MD Investors Escrow Account | [B] | 2,500 | 2,500 | 2,500 |
| Accounts Receivable & Inventory | [C] | - | - | - |
| Fixed Assets | [D] | 3,292 | 5,020 | 4,156 |
| Investment in Non-Debtor Subs | [E] | - | - | - |
| Other Assets | [F] | - | 586 | 293 |
| Avoidance Action Proceeds | [G] | - | - | - |
| **Total Proceeds from Assets** | | $15,403 | $19,521 | $17,462 |
| | | | | |
| **Secured, Administrative and Priority Claims** | | | | |
| Distribution to GECC from Sale of Pledged Equipment | [H] | $200 | $300 | $250 |
| Unpaid Pre-Effective Date Professional Fees | [I] | 3,921 | 3,421 | 3,671 |
| Post-Effective Date Professional Fees | [I] | 1,065 | 1,065 | 1,065 |
| Wind-Down Expenses | [I] | 544 | 544 | 544 |
| 503(b)(9) Claims | [J] | 2,478 | 1,478 | 1,978 |
| Other Secured, Administrative & Priority Claims | [J] | 2,150 | 1,241 | 1,696 |
| Secured & Priority Property Tax Claims | [K] | 3,516 | 3,256 | 3,386 |
| **Total Secured, Administrative and Priority Claims** | | $13,875 | $11,306 | $12,590 |
| | | | | |
| **Estimated Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors** | | **$1,528** | **$8,215** | **$4,872** |
| | | | | |
| **Estimated Distribution to Unsecured Creditors** | | | | |
| Funding from MD Investors Escrow Account | [B] | $1,528 | $2,500 | $2,500 |
| Avoidance Action Proceeds | [G] | - | - | - |
| 50% of Remaining Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors | [L] | - | 2,858 | 1,186 |
| **Total Estimated Distribution to Unsecured Creditors** | | $1,528 | $5,358 | $3,686 |
| | | | | |
| **Estimated Allowed Claims** | [M] | 369,130 | 254,855 | 311,992 |
| | | | | |
| *Estimated Recovery Rate for Unsecured Claims* | | *0.4%* | *2.1%* | *1.2%* |
| | | | | |
| **Estimated Distribution to MD Investors** | | | | |
| 50% of Remaining Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors | [L] | $0 | $2,858 | $1,186 |
| | | | | |
| **Total Proceeds Available for Subordination Claims and Equity Interests** | | **$0** | **$0** | **$0** |

*The accompanying notes are an integral part of the analysis*

## FOOTNOTES TO PLAN FEASIBILITY ANALYSIS

*Note A – Cash*

The wind-down of the Debtors' manufacturing operations is likely to be, and assumed to be for purposes of this analysis, concluded prior to the Effective Date. Consequently, working capital monetization and many (but not all) equipment sales are assumed to occur prior to the Effective Date. Estimated cash on hand as of the Effective Date is assumed to fund the expenses of the Distribution Trust. The March 1, 2010 cash balance has been forecast based on the estimated outcome of certain wind-down and liquidation activities that have occurred prior to the Effective Date. In addition, the cash balance assumes that there are no adverse purchase price adjustments after the net settlement calculations from the MD Investors Transaction are concluded. The net settlement adjustment position of MD Investors will not be presented until mid-December 2009; therefore, the cash balance is subject to change for final purchase price adjustments, if any. The Debtors are not currently aware of any incremental purchase price adjustments in addition to those taken at closing. There are other significant assumptions and risks associated with the estimates used to develop the forecasted cash balance as of March 1, 2010. Therefore, the beginning cash balance is subject to material change.

*Note B – Funding from MD Investors Escrow Account*

The analysis assumes that $2.5 million from the MD Investors escrow account that was created pursuant to the Sale Order and designated thereunder for the funding of a liquidation or litigation trust for unsecured creditors becomes an asset of the Distribution Trust, as is proposed by the Plan. As also proposed by the Plan, to the extent there is not sufficient cash to fund secured, administrative and priority claims, the funding from the MD Investors escrow account may be used to satisfy these claims, subject to repayment. Any portion of this funding that is not used to fund secured, administrative and priority claims will be distributed to the general unsecured claim holders.

*Note C – Accounts Receivable & Inventory*

The Debtors have entered into various wind-down agreements with the key customers at the remaining manufacturing facilities. These agreements provide for the monetization of accounts receivable and inventory assets, as well as the recovery of certain wind-down costs. The analysis assumes that the Company's customers have fully resourced their production prior to the Effective Date of the Plan consistent with existing wind-down agreements. Consequently, accounts receivable and inventory assets are assumed to be fully monetized as of the Effective Date and the liquidation proceeds are included in the cash balance.

*Note D – Fixed Assets*

Fixed Assets includes all land, buildings, machinery and equipment that are anticipated to be owned by the Debtors on March 1, 2010, net of the projected costs, including carrying costs, of liquidating those assets.

In 2009, the Debtors obtained desktop orderly and forced liquidation value appraisals from Stout Risius Ross ("SRR"), updated from SRR's 2007 purchase accounting appraisals for

real estate, as well as machinery and equipment for five representative manufacturing facilities. The liquidation value for the Debtors' property, plant and equipment at other facilities was derived by considering amounts actually offered for certain sales in process. Where a sale is not yet in process, the liquidation value was derived by considering appraisal values, management estimates and estimates from various third party brokers and equipment dealers.

MD Investors has advised the Debtors that it believes that it owns certain of the equipment located at facilities that MD Investors did not purchase as part of the MD Investors transaction (in addition to the personal property that was specifically identified in the purchase agreement as to be transferred to MD Investors as part of the transaction ("MD Investors Identified Property")). The Debtors believe that this assertion is without merit and have assumed, for purposes of this analysis, that all personal property at the Debtors' facilities, other than MD Investors Identified Property, is owned by the Debtors (or their customers, in the case of customer owned tooling). In the event that the Debtors were proved incorrect, the amount set forth in the Fixed Assets line item, would need to be reduced.

Based on discussions with appraisers and auctioneers, the proceeds from the sale of property, plant and equipment are subject to the following risk factors: (1) due to the current distress in the automotive sector, lack of liquidity and overall economic environment, a significant amount of equipment taken to auction is not being sold, and (2) the risks associated with not performing a detailed appraisal and physical examination of all of the specific assets, which the Debtors believe would be cost-prohibitive under the circumstances.

The analysis does not include any value associated with any leased property. All leased property is assumed returned to the respective lessor. Oldco M does not believe it has any substantial below-market leases that would bring value via assignment.

*Note E – Non-Debtor Subsidiary*

The Debtors have six non-Debtor subsidiaries, of which only one has non-de minimis assets. This subsidiary, Oldco M Machining and Assembly Mfg. Co. (Canada) Ltd., is a Canadian corporation that is going through a wind-down of its operations and liquidation of its assets. This analysis assumes that the Debtors will not recover any amounts from the wind-down of any of the non-debtor subsidiaries or that any recovery would be de minimis.

*Note F—Other Assets*

Other assets are comprised primarily of tax refunds. Tax refund recoveries are based on management estimates as well as input from external tax advisors.

*Note G—Avoidance Actions*

The analysis assumes no recovery from avoidance actions. No recovery has been assumed solely because no attempt to value avoidance actions has yet been undertaken by the Debtors, not because the Debtors have concluded that they are valueless. In accordance with section 1123(b) of the Bankruptcy Code, after confirmation of the Plan, the Distribution Trustee will retain and may enforce any claims, demands, rights and causes of action that the Estates may have against any person or entity, including claims for preference, fraudulent conveyance and

setoff.  Any portion of avoidance action proceeds that is not used to fund secured, administrative and priority claims will be distributed to the general unsecured claim holders.

*Note H—Distribution to GECC*

Obligations under certain equipment lease agreements with General Electric Capital Corporatino ("GECC") that have been rejected pursuant to section 365 of the Bankruptcy Code are secured by a first priority lien on a limited amount of machinery and equipment located at the Debtors' New Castle, Indiana facility.  The net proceeds from the sale of this equipment are assumed to be distributed to GECC.

*Note I – Costs Associated with Liquidation*

Professional fees include the cost of attorneys, accountants, brokers and other professionals retained by the Distribution Trustee during the liquidation period, as well as any Chapter 11 professional fees incurred prior to the Effective Date.  These amounts include all unpaid professional fees for prior fee periods, including hold backs required by the court.

Wind-down expenses during the liquidation are based upon the assumption that certain plant and corporate personnel would be retained to oversee the liquidation process.  The remaining staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks including payroll and tax forms and records.  Certain minimum staff would be required at the physical locations to complete the closure of the facilities, to disassemble the equipment and to oversee the sale process for equipment and real estate.  Additionally, certain facilities expenses would continue to be incurred until all of the facilities are liquidated.

*Note J – 503(b)(9) Claims, Other Secured, Administrative & Priority Claims*

Chapter 11 administrative claims are assumed to be paid in full.  These claims are primarily made up of 503(b)(9) claims and other administrative claims.  The proofs of claim that have been filed claims have not been fully reconciled and the amounts set forth for this line item are based, in part, upon the Debtors' own books and records and not upon filed claims; therefore, estimate Other Administrative and 503(b)(9) Claims are subject to material change upon final reconciliation of such claims.  Such amounts also are continuing to change as amounts continue to be paid by MD Investors to parties whose executory contracts and unexpired leases have been assumed and assigned in the MD Investors transaction.

In addition, other secured, administrative and priority claims include amounts that the Debtors anticipate would need to be paid (a) to unions, in order to resolve any pending claims and to obtain a rejection of remaining collective bargaining agreements under section 1113 of the Bankruptcy Code, (b) to unions or other representatives, to resolve any pending claims associated with retiree health benefits and (c) to the Pension Benefit Guaranty Corporation as an administrative claim to resolve certain of its claims against the Debtors' Estates.

Furthermore, other secured, administrative and priority claims also include estimates for anticipated payments related to other secured claims, certain vendor claims as well as miscellaneous employee claims.

This analysis assumes no cause of action arises for violation of the WARN Act, which may create additional administrative claims. It is assumed the pre Effective Date wind-down period allows for sufficient time to comply with provisions of the WARN Act.

*Note K – Secured & Priority Property Tax Claims*

Chapter 11 priority tax claims are assumed to be paid in full, and an estimate has been made for the payment of interest and/or penalties in connection with these claims. These claims consist of personal and real property secured and priority tax claims. These Claims are assumed to have priority as set out in the Bankruptcy Code. Filed claims have not been reconciled; and therefore, estimated Priority Property Tax Claims are subject to material change

*Note L – Distribution of Proceeds*

Under the Sale Order, MD Investors has the right to receive fifty (50) percent of the net cash proceeds recovered, after payment of secured, administrative and priority claims that, but for such payment, otherwise would be distributed to holders of General Unsecured Claims on account of such claims; provided, however, that such assets shall not include any causes of action held by the Debtors' estates, including without limitation, claims arising under chapter 5 of the Bankruptcy Code, or similar causes of action arising under state law. Additionally, MD Investors is not entitled to share in the funding from the MD Investors Escrow account. A distribution to MD Investors has been calculated based upon these parameters.

*Note M – General Unsecured Claims*

For purposes of the analysis, general unsecured claims are based on management's best estimate. It should be noted that filed claims have not been fully reconciled; and therefore, estimated unsecured claims are subject to material change. In addition, the bar date for filing rejection damages claims has not yet passed in many instances, and thus significant claims may not be included in this estimation. Unsecured claims are assumed to be paid on a *pro rata* basis from the net liquidation proceeds available after the payment of all other claims.

**EXHIBIT III**

**CHAPTER 7 LIQUIDATION ANALYSIS**

# OLDCO M CORPORATION

## LIQUIDATION ANALYSIS

# OLDCO M CORPORATION
## LIQUIDATION ANALYSIS

*GENERAL*

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors' chapter 11 cases were to be converted to Chapter 7 on March 1, 2010 (the "Conversion Date") and the Debtors' assets liquidated by a Court-appointed trustee.

In connection with confirmation of the Joint Plan of Liquidation of the Debtors and Debtors in Possession (the "Plan") proposed by Oldco M Corporation (fka Metaldyne Corporation), the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any impaired Class that has not voted to accept the Plan. Accordingly, if an impaired Class does not accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Liquidation Analysis reflects the Debtors' judgment as to the occurrence or nonoccurrence of certain future events, which are subject to change. The assumptions disclosed herein are those that the Debtors believe to be significant to the Liquidation Analysis. Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties. Consequently, actual results could differ significantly from those shown here.

In summary, as the Debtors' Plan is a liquidating plan, the principal differences in estimated proceeds available for general unsecured creditors in a Chapter 7 liquidation from the distributions and recoveries estimated in the Plan are (a) estimated higher chapter 7 trustee fees and (b) risk associated with the release of funds from the MD Investors escrow account, as described in Note B below. The analysis demonstrates that, in a chapter 7 liquidation, the Debtors' estates would be subjected to the risk that the Debtors would have insufficient funds to pay all of their administrative, secured and priority claims and that unsecured nonpriority creditors could receive no recovery.

*OPERATING WIND-DOWN / CUSTOMER RESOURCING*

The Debtors have entered into various wind-down agreements with the key customers at the remaining manufacturing facilities. These agreements provide for the monetization of accounts receivable and inventory assets, as well as the recovery of certain wind-down costs. The analysis assumes that the Company's customers have fully resourced their production prior to the Conversion Date consistent with existing wind-down agreements, and thus there will be no need to operate the businesses of the Debtors within chapter 7. Consequently, accounts receivable and inventory assets are assumed to be monetized as of the date of conversion, although the act of

conversion could inject risk into the ability of the Debtors' estates to collect fully upon such receivables.

*LIQUIDATION OF FIXED ASSETS*

A significant amount of machinery and equipment has already been sold. After the conclusion of the operating wind-down period, the Debtors' remaining machinery and equipment is to be marketed and then sold via public auction or other sale processes within three months of the Conversion Date. The analysis also assumes that owned real property is sold within three months after the Conversion Date. To the extent that assets are presumed to be sold prior to March 1, 2010, such assets are included in the "Cash" line item. Assets to be sold on or after March 1, 2010 are included in the "Fixed Assets" line item.

*LIQUIDATION OF NON-DEBTOR SUBSIDIARY*

The Debtors have six non-Debtor subsidiaries, of which only one has non-de minimis assets. This subsidiary, Oldco M Machining and Assembly Mfg. Co. (Canada) Ltd., is a Canadian corporation that is going through a wind-down of its operations and liquidation of its assets. This analysis assumes that the Debtors will not recover any amounts from the wind-down of any of the non-debtor subsidiaries or that any recovery would be de minimis.

**Oldco M**
**Liquidation Analysis**
**($ in 000's)**

| | Notes | Recovery Amount | | |
| --- | --- | --- | --- | --- |
| | | Low | High | Midpoint |
| **Proceeds from Assets** | | | | |
| Cash | [A] | $9,611 | $11,415 | $10,513 |
| Funding from MD Investors Escrow Account | [B] | - | - | - |
| Accounts Receivable & Inventory | [C] | - | - | - |
| Fixed Assets | [D] | 3,292 | 5,020 | 4,156 |
| Investment in Non-Debtor Subs | [E] | - | - | - |
| Other Assets | [F] | - | 586 | 293 |
| Avoidance Action Proceeds | [G] | - | - | - |
| **Total Proceeds from Assets** | | $12,903 | $17,021 | $14,962 |
| | | | | |
| **Secured, Administrative and Priority Claims** | | | | |
| Distribution to GECC from Sale of Pledged Equipment | [H] | $200 | $300 | $250 |
| Unpaid Chapter 11 Professional Fees | [I] | 3,921 | 3,421 | 3,671 |
| Chapter 7 Professional Fees | [I] | 1,065 | 1,065 | 1,065 |
| Chapter 7 Trustee Fees | [I] | 122 | 191 | 157 |
| Wind-Down Expenses | [I] | 544 | 544 | 544 |
| 503(b)(9) Claims | [J] | 2,478 | 1,478 | 1,978 |
| Other Secured, Administrative & Priority Claims | [J] | 2,150 | 1,241 | 1,696 |
| Secured & Priority Property Tax Claims | [K] | 3,516 | 3,256 | 3,386 |
| **Total Secured, Administrative and Priority Claims** | | $13,997 | $11,497 | $12,747 |
| | | | | |
| **Estimated Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors** | | **($1,094)** | **$5,524** | **$2,215** |
| | | | | |
| **Estimated Distribution to Unsecured Creditors** | | | | |
| Funding from MD Investors Escrow Account | [B] | $0 | $0 | $0 |
| Avoidance Action Proceeds | [G] | - | - | - |
| 50% of Remaining Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors | [L] | - | 2,762 | 1,107 |
| **Total Estimated Distribution to Unsecured Creditors** | | $0 | $2,762 | $1,107 |
| | | | | |
| **Estimated Allowed Claims** | [M] | 369,130 | 254,855 | 311,992 |
| | | | | |
| *Estimated Recovery Rate for Unsecured Claims* | | *0.0%* | *1.1%* | *0.4%* |
| | | | | |
| **Estimated Distribution to MD Investors** | | | | |
| 50% of Remaining Net Proceeds Available for Distribution to Unsecured Creditors and MD Investors | [L] | $0 | $2,762 | $1,107 |
| | | | | |
| **Total Proceeds Available for Subordination Claims and Equity Interests** | | **$0** | **$0** | **$0** |

*The accompanying notes are an integral part of the analysis*

## FOOTNOTES TO LIQUIDATION ANALYSIS

*Note A – Cash*

The wind-down of the Debtors' manufacturing operations is likely to be, and assumed to be for purposes of this analysis, concluded prior to the Conversion Date. Consequently, working capital monetization and many (but not all) equipment sales are assumed to occur prior to the Conversion Date. Estimated cash on hand as of the Conversion Date is assumed to fund the expenses of the Distribution Trust. The March 1, 2010 cash balance has been forecast based on the estimated outcome of certain wind-down and liquidation activities that have occurred prior to the Conversion Date. In addition, the cash balance assumes that there are no adverse purchase price adjustments after the net settlement calculations from the MD Investors Transaction are concluded. The net settlement adjustment position of MD Investors will not be presented until mid-December 2009; therefore, the cash balance is subject to change for final purchase price adjustments, if any. The Debtors are not currently aware of any incremental purchase price adjustments in addition to those taken at closing. There are other significant assumptions and risks associated with the estimates used to develop the forecasted cash balance as of March 1, 2010. Therefore, the beginning cash balance is subject to material change.

*Note B – Funding from MD Investors Escrow Account*

The analysis assumes that $2.5 million from the MD Investors escrow account that was created pursuant to the Sale Order and designated thereunder for the funding of a liquidation or litigation trust for unsecured creditors does not become available for distribution to creditors in a chapter 7 scenario. While the Debtors believe that such funds should be made available for distribution to creditors regardless of the outcome of these Chapter 11 Cases, there can be no assurances that such funds would be made available in chapter 7. Due to this uncertainty, the Debtors have, for purposes of this analysis only, presumed that these funds would not be available for distribution to creditors in chapter 7.

*Note C – Accounts Receivable & Inventory*

The Debtors have entered into various wind-down agreements with the key customers at the remaining manufacturing facilities. These agreements provide for the monetization of accounts receivable and inventory assets, as well as the recovery of certain wind-down costs. The analysis assumes that the Company's customers have fully resourced their production prior to the Conversion Date consistent with existing wind-down agreements. Consequently, accounts receivable and inventory assets are assumed to be fully monetized as of the Conversion Date and the liquidation proceeds are included in the cash balance.

*Note D – Fixed Assets*

Fixed Assets includes all land, buildings, machinery and equipment that are anticipated to be owned by the Debtors on March 1, 2010, net of the projected costs, including carrying costs, of liquidating those assets.

In 2009, the Debtors obtained desktop orderly and forced liquidation value appraisals from Stout Risius Ross ("SRR"), updated from SRR's 2007 purchase accounting appraisals for

real estate, as well as machinery and equipment for five representative manufacturing facilities. The liquidation value for the Debtors' property, plant and equipment at other facilities was derived by considering amounts actually offered for certain sales in process. Where a sale is not yet in process, the liquidation value was derived by considering appraisal values, management estimates and estimates from various third party brokers and equipment dealers.

MD Investors has advised the Debtors that it believes that it owns certain of the equipment located at facilities that MD Investors did not purchase as part of the MD Investors transaction (in addition to the personal property that was specifically identified in the purchase agreement as to be transferred to MD Investors as part of the transaction ("MD Investors Identified Property")). The Debtors believe that this assertion is without merit and have assumed, for purposes of this analysis, that all personal property at the Debtors' facilities, other than MD Investors Identified Property, is owned by the Debtors (or their customers, in the case of customer owned tooling). In the event that the Debtors were proved incorrect, the amount set forth in the Fixed Assets line item would need to be reduced.

Based on discussions with appraisers and auctioneers, the proceeds from the sale of property, plant and equipment are subject to the following risk factors: (1) due to the current distress in the automotive sector, lack of liquidity and overall economic environment, a significant amount of equipment taken to auction is not being sold, and (2) the risks associated with not performing a detailed appraisal and physical examination of all of the specific assets, which the Debtors believe would be cost-prohibitive under the circumstances.

The analysis does not include any value associated with any leased property. All leased property is assumed returned to the respective lessors. Oldco M does not believe it has any substantial below-market leases that would bring value via assignment.

*Note E – Non-Debtor Subsidiary*

The Debtors have six non-Debtor subsidiaries, of which only one has non-de minimis assets. This subsidiary, Oldco M Machining and Assembly Mfg. Co. (Canada) Ltd., is a Canadian corporation that is going through a wind-down of its operations and liquidation of its assets. This analysis assumes that the Debtors will not recover any amounts from the wind-down of any of the non-debtor subsidiaries or that any recovery would be de minimis.

*Note F—Other Assets*

Other assets are comprised primarily of tax refunds. Tax refund recoveries are based on management estimates as well as input from external tax advisors.

*Note G—Avoidance Actions*

The analysis assumes no recovery from avoidance actions. No recovery has been assumed solely because no attempt to value avoidance actions has yet been undertaken by the Debtors, not because the Debtors have concluded that they are valueless. In chapter 7, a trustee would retain and may enforce any claims, demands, rights and causes of action that the Estates may have against any person or entity, including claims for preference, fraudulent conveyance and setoff. Any portion of avoidance action proceeds that is not used to fund secured, administrative and priority claims will be distributed to the general unsecured claim holders.

*Note H—Distribution to GECC*

Obligations under certain equipment lease agreements with General Electric Capital Corporatino ("GECC") that have been rejected pursuant to section 365 of the Bankruptcy Code are secured by a first priority lien on a limited amount of machinery and equipment located at the Debtors' New Castle, Indiana facility. The net proceeds from the sale of this equipment are assumed to be distributed to GECC.

*Note I – Costs Associated with Liquidation*

Professional fees include the cost of attorneys, accountants, brokers and other professionals retained by the chapter 7 during the liquidation period, as well as any Chapter 11 professional fees incurred prior to the Conversion Date. These amounts include all unpaid professional fees for prior fee periods, including hold backs required by the court.

Chapter 7 trustee fees would be incurred in accordance with section 326 of the Bankruptcy Code.

Wind-down expenses during the liquidation are based upon the assumption that, even within chapter 7, certain plant and corporate personnel would be retained to oversee the liquidation process. The remaining staff would also be needed to maintain and close the accounting records and to complete certain administrative tasks including payroll and tax forms and records. Certain minimum staff would be required at the physical locations to complete the closure of the facilities, to disassemble the equipment and to oversee the sale process for equipment and real estate. Additionally, certain facilities expenses would continue to be incurred until all of the facilities are liquidated.

*Note J – 503(b)(9) Claims, Other Secured, Administrative & Priority Claims*

Chapter 11 administrative claims are primarily made up of 503(b)(9) claims and other administrative claims. The proofs of claim that have been filed claims have not been fully reconciled and the amounts set forth for this line item are based, in part, upon the Debtors' own books and records and not upon filed claims; therefore, estimate Other Administrative and 503(b)(9) Claims are subject to material change upon final reconciliation of such claims. Such amounts also are continuing to change as amounts continue to be paid by MD Investors to parties whose executory contracts and unexpired leases have been assumed and assigned in the MD Investors transaction.

In addition, other secured, administrative and priority claims include amounts that the Debtors anticipate would need to be paid (a) to unions, in order to resolve any pending claims and to obtain a rejection of remaining collective bargaining agreements under section 1113 of the Bankruptcy Code, (b) to unions or other representatives, to resolve any pending claims associated with retiree health benefits and (c) to the Pension Benefit Guaranty Corporation as an administrative claim to resolve certain of its claims against the Debtors' Estates.

Furthermore, other secured, administrative and priority claims also include estimates for anticipated payments related to other secured claims, certain vendor claims as well as miscellaneous employee claims.

This analysis assumes no cause of action arises for violation of the WARN Act, which may create additional administrative claims. It is assumed the pre Conversion Date wind-down period allows for sufficient time to comply with provisions of the WARN Act.

*Note K – Secured & Priority Property Tax Claims*

Priority tax claims consist of personal and real property secured and priority tax claims, and an estimate has been made for the interest and/or penalties in connection with these claims. These Claims are assumed to have priority as set out in the Bankruptcy Code. Filed claims have not been reconciled; and therefore, estimated Priority Property Tax Claims are subject to material change

*Note L – Distribution of Proceeds*

Under the Sale Order, MD Investors has the right to receive fifty (50) percent of the net cash proceeds recovered, after payment of secured, administrative and priority claims that, but for such payment, otherwise would be distributed to holders of General Unsecured Claims on account of such claims; provided, however, that such assets shall not include any causes of action held by the Debtors' estates, including without limitation, claims arising under chapter 5 of the Bankruptcy Code, or similar causes of action arising under state law. Additionally, MD Investors is not entitled to share in the funding from the MD Investors Escrow account. A distribution to MD Investors has been calculated based upon these parameters.

*Note M – General Unsecured Claims*

For purposes of the analysis, general unsecured claims are based on management's best estimate. It should be noted that filed claims have not been fully reconciled; and therefore, estimated unsecured claims are subject to material change. In addition, the bar date for filing rejection damages claims has not yet passed in many instances, and thus significant claims may not be included in this estimation. Unsecured claims are assumed to be paid on a *pro rata* basis from the net liquidation proceeds available after the payment of all other claims.