**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                                        :
                                                              :
                                                              :
    Oldco M Corporation,                    :    Chapter 11
    (f/k/a Metaldyne Corporation), *et al.,*  :
                                                              :    Case No. 09-13412 (MG)
                                                              :    Confirmed Case
                   Debtor.   :
-------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART MOTION FOR ALLOWANCE OF ADMINISTRATIVE**
**EXPENSES**

*A P P E A R A N C E S:*

Celeste R. Gill, Esq.
Assistant Attorney General
Environment, Natural Resources and Agriculture Division
*Attorney for Michigan Department of Natural Resources and Environment*
525 W. Ottawa, 6th Floor
G. Mennen Williams Building
P.O. Box 30755
Lansing, MI  48909
By:     Celeste R. Gill, Esq.

REED SMITH LLP
*Attorneys for Oldco M Distribution Trust*
1201 N. Market Street
Suite 1500
Wilmington, DE  19801
By:     Kimberly E.C. Lawson, Esq.


**MARTIN GLENN**
**United States Bankruptcy Judge**

       Pending before the Court is the motion of the Michigan Department of Natural

Resources and Environment ("MDNRE") for allowance and payment of an

administrative expense under section 503(b)(1)(A) of the Bankruptcy Code.  (*See*

1

Michigan Department of Natural Resources and Environment's Motion for Allowance and Payment of Administrative Claims, ECF # 1540 ("Motion").) In addition to the Motion, MDNRE filed Proof of Claim number 3572, asserting an unsecured claim in the amount of $4,059.05, and the same administrative expense requested in the Motion.[1]

Metaldyne Corporation and certain of its affiliates filed their chapter 11 petitions on May 27, 2009 (together, "Metaldyne" or "Debtors"). The Debtors chapter 11 plan was confirmed on February 23, 2010. (ECF # 1384.) Under the terms of the confirmed liquidation plan, Oldco M Distribution Trust (the "Trust") is the post-confirmation entity charged with prosecuting all claim objections and distributing all plan assets pursuant to the terms of the plan.[2] The Trust objected to the Motion and to the Proof of Claim. (ECF # 1615.)

Metaldyne was a large automobile parts manufacturer with numerous domestic and international manufacturing facilities. MDNRE's Motion for allowance of an administrative expense relates to environmental remediation costs arising from groundwater contamination at Metaldyne's Hamburg, Michigan manufacturing facility. The Motion also seeks allowance of an administrative expense relating to Metaldyne's Litchfield, Michigan facility, but does not provide any estimate for future remediation costs for that facility. Both the Hamburg and Litchfield facilities were sold to MD Investors Corporation ("MDI") in a Bankruptcy Code § 363 sale of substantially all of Debtors' assets. The sale closed on October 16, 2009. MDI assumed environmental

---

[1] During the August 24, 2010 hearing on the motion, MDRNE's counsel stated that the proof of claim for allowance of an administrative expense was filed for protective purposes only, acknowledging that allowance of administrative expenses must be sought by motion pursuant to section 503(b) of the Bankruptcy Code.

[2] Upon confirmation of the chapter 11 plan, Metaldyne changed its names to Oldco M Corporation, since the purchaser of most of Metaldyne's prepetition assets also purchased the Metaldyne name.

2

liabilities incurred after the closing date. MDNRE asserts a small administrative expense claim ($486.23) for the period between Metaldyne's bankruptcy filing and the sale closing date and a $4,059.05 prepetition unsecured claim. The Trust does not object to either of these amounts thus those portions of the claim are allowed. But MDNRE also seeks to recover a much larger administrative expense for future remediation costs at the Hamburg facility estimated by MDRNE to be $264,470 over a ten-year period. The Trust objects to that portion of the Motion, arguing that MDI assumed responsibility for future environmental liability.

The important issue raised by this Motion is whether MDNRE is entitled to recover from the Trust an administrative expense for the post-sale-closing environmental remediation costs that were assumed by MDI.

Future remediation costs are currently being borne by MDI and not by MDRNE. The future costs to be incurred by *some* party may be able to be estimated with sufficient certainty. MDRNE acknowledges that its $264,470 future estimate *assumes* that "the State of Michigan conducts all future response activities at this site." (*See* Affidavit of Leslie E. Smith, III, attached to the Motion as Exhibit B, ¶ 10 ("The above and attached estimated future costs were developed assuming that the State of Michigan conducts all future activities at this site.").) No factual basis for this assumption is provided. MDRNE expressed concern in its motion that MDI will cease performing mandated remediation, leaving these sites as "orphans," with the state thereafter footing the bill if remediation efforts are continued as they need to be. The Trust acknowledged during argument that under existing state law, absent Metaldyne's intervening chapter 11 bankruptcy proceeding, Metaldyne would remain secondarily liable for remediation costs

3

even after it sold the facilities. As explained below, while the Debtors' future remediation obligations are not dischargeable in this bankruptcy case, the question here is whether MDRNE is entitled to have its future, contingent, unliquidated costs and expenses allowed as an administrative expense under section 503(B)(1)(A) for the "actual, necessary costs and expenses of preserving the estate"? 11 U.S.C. § 503(b)(1)(A). The Court concludes that MDRNE has failed to carry its burden of establishing its entitlement to the future costs as an administrative expense. Therefore, MDRNE's Motion for allowance of an administrative expense in the amount of $486.23 is granted, but its Motion for allowance of an administrative expense in the amount of $264,836.82 is denied.

## BACKGROUND

Since 1985, Metaldyne or its predecessors have been subject to a consent injunction requiring ongoing remediation efforts for groundwater contamination at the Hamburg facility.[3] As a result, a groundwater remediation system was installed at Hamburg including one purge well, thirteen monitoring wells and a water treatment system.[4] MDRNE states that "the current groundwater remediation system appears to be containing migration of the plume of contamination such that no unacceptable exposures are currently occurring. Should the system be shut down it is likely that contaminated groundwater will migrate off-site, if it has not already done so, and eventually impact downgradient residential wells." (Motion ¶ 14 (footnotes omitted).)

---

[3] Contaminants present in the groundwater at the Hamburg facility include 1,1,1 trichloroethane, trans-1,2 dichloroethene, and trichloroethylene (TCE).

[4] TCE concentrations at the source area were recently found to be 410 ppb. TCE concentrations at one property line monitoring well was recently found to be 6 ppb. Groundwater criteria for drinking water limit TCE concentrations to 5 ppb.

4

Following an auction on August 5 and 6, 2009, at a hearing on August 7, 2009, the Court approved a Bankruptcy Code § 363 sale to MDI of substantially all of the Debtors' assets, free and clear of all liens, claims, encumbrances and interests. On August 12, 2009, the bankruptcy court entered a sale order approving the sale. (ECF # 674.) As part of the sale MDI entered into an asset purchase agreement, dated August 7, 2009 ("APA"), setting forth the terms and conditions of the sale. (*See id.* at Ex. 1.) MDRNE did not object to the sale or to the sale order. The Hamburg and Litchfield facilities were included in the sale. The APA provided that MDI agreed to assume all liabilities after the closing date from MDI's ownership of the purchased assets "including those constituting Environmental Liabilities but only to the extent resulting or arising from acts or omissions occurring after the Closing."[5] (*See* APA at § 1.03(a)(iii), p.9.)

MDNRE argues that it is entitled to recover as an administrative expense pursuant to section 503(b)(1)(A) "post-petition response activity costs that it has incurred and future environmental response costs that it may incur under state and federal environmental laws . . . ." (Motion ¶ 1.) But MDNRE acknowledges that, to date, it has only incurred unreimbursed post-petition response costs of $486.23. MDNRE estimates future response costs over the next ten years at $264,470. The Trust argues that, as a result of the section 363 sale, MDI expressly assumed all liability for post-closing

---

[5] "Environmental Liabilit[ies]" are defined in the Agreement so as to include:

> [A]ll Liabilities (including Liability for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resource damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising or resulting from or based upon (i) the presence or Release of, or exposure to, any Hazardous Material or (ii) the compliance or non-compliance with any Environmental Law or the terms and conditions of any Environmental Permit.

"Environmental Law" includes "all applicable Federal, state, local, provincial and foreign laws (including common law) . . . relating in any way to pollution, or protection of the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) . . . ." *See* APA at § 8.02, p. 60.

5

remediation costs for the Hamburg and Litchfield facilities. The Trust also argues that MDRNE has failed to establish that future costs are "actual, necessary costs and expenses of preserving the estate," as required by section 503(b)(1)(A).

The $264,470 that MDNRE seeks to recover as an administrative expense assumes that MDI has already or will abandon ongoing remediation work at Hamburg, forcing the state to step in and complete the necessary work, even though MDI expressly assumed liability for post-closing environmental liabilities in the APA and appears to be continuing remediation at the sites. MDRNE provided no evidence that MDI has or may discontinue remediation work, or that MDI may be financially unable to continue with the required remediation work.

For the reasons explained below, the Court concludes that MDNRE has failed to establish its entitlement to future costs and expenses. Future remediation costs for an expected ten-year period have not yet been incurred and those costs are currently being borne by MDI and not by MDNRE. In the absence of evidence to support its assumption that the state will be forced to undertake all remediation work, MDRNE's argument is entirely speculative; this is not sufficient to support allowance of an administrative expense.

**DISCUSSION**

The only issue that must be decided is whether MDRNE is entitled to an allowed administrative expense under section 503(b)(1)(A) for post-sale-closing remediation costs. Although addressed by the Trust and MDRNE in their briefs, there is no issue here whether remediation costs satisfy the definition of a "claim" under section 101(5) of the Bankruptcy Code, which requires a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

6

disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A). The significance of that issue in many cases arises because a "claim"—including costs expended for environmental remediation—may be discharged in a bankruptcy case, leaving a creditor, including a state, with a limited recovery in cases such as this one in which general unsecured creditors will recover very little.

An allowed administrative expense priority under sections 503(b)(1)(A) and 507(a)(2) does not depend on the definition of the term "claim." An "allowed administrative expense" includes the "actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1)(A), without regard to whether those expenses might also satisfy the definition of a claim under section 101(5). *See* 5 COLLIER ON BANKRUPTCY ¶ 503.06[4][d] (15th ed. rev. 2009) ("In sum, for section 503 purposes, to determine whether a cost is an administrative expense, the focus is not on dischargeability or the existence, or not, of a 'claim' as defined in section 101 of the Code.").

It is helpful to understand how environmental remediation costs and obligations are treated in bankruptcy cases.

### A.     Bankruptcy Court Treatment of Remediation Costs Arising from Prepetition Conduct

The starting point for analysis of bankruptcy court treatment of environmental remediation costs is the Supreme Court's decision in *Midlantic National Bank v. N.J. Dep't of Environmental Protection*, 474 U.S. 494 (1986). Focusing on property with serious environmental contamination, the Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.* at 507. While concluding

7

that abandonment of contaminated property under section 554 of the Bankruptcy Code is not, in most cases, a viable option for the debtor, the Court did not reach the question whether a state can seek reimbursement as an administrative expense of remediation costs expended by the state after the debtor failed to do what was required. *Id*. at 498 n.2 ("The sole issue presented by these petitions is whether a trustee may abandon property under § 554 in contravention of local laws designed to protect the public's health and safety. New York is claiming reimbursement for its expenditures as an administrative expense. That question, however, like the question of the ultimate disposition of the property, is not before us.").

After the *Midlantic* decision, lower federal courts have dealt with a variety of issues concerning the treatment of remediation costs during a bankruptcy case. The leading decision in the Second Circuit remains *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991) (*Chateaugay*). The court addressed the treatment of future remediation costs of the EPA for CERCLA response costs at sites owned by the debtor, LTV Corp.:

> We deal here with the far more manageable problem of sums ultimately to be owed to EPA at such time as it incurs CERCLA response costs. When such costs are incurred, EPA will unquestionably have what can fairly be called a 'right to payment.' That right is currently unmatured and will not mature until the response costs are incurred.

*Id.* at 1004.

The *Chateaugay* court concluded that most remediation costs based on prepetition conduct meet the Code definition of claims, even though the result may mean the claims are dischargeable.

8

> The relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.' True, EPA does not yet know the full extent of the hazardous waste removal costs that it may one day incur and seek to impose on LTV, and it does not yet even know the location of all the sites at which waste may yet be found. But the location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by EPA are all steps that may fairly be viewed, in the regulatory context, as rendering EPA's claim 'contingent,' rather than as placing them outside the Code's definition of 'claim.'

*Id.* at 1005.

The significance of this holding is that clean up costs for contamination arising from prepetition conduct—even if those costs have not yet been incurred—meet the definition of claims under section 101(5) and could be discharged as part of a bankruptcy case.

With respect to the problem of liquidating or fixing the amount of such claims, the court stated "[c]ontingent claims may be estimated if their liquidation 'would unduly delay administration of the case,'" applying section 502(c) of the Bankruptcy Code. *Id.* at 1006. Thus, future response costs that are not merely speculative can be estimated for allowance. But the court in this part of its opinion was dealing with claims under section 502 of the Bankruptcy Code and not administrative expenses under section 503.[6]

---

[6] Section 502(c) applies to estimating "for purpose of allowance under this section—(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay administration of the case . . . ." 11 U.S.C. § 502(c)(1). By its terms it applies only to estimating claims for purpose of allowance under section 502. But a number of cases have approved the use of the section 502(c) procedure for estimating administrative expenses under section 503(b). In *In re Adelphia Business Solutions, Inc.*, 341 B.R. 415, 424 (Bankr. S.D.N.Y. 2003), the court explained:

> Section 502, on its face, speaks of claims, which arise before the filing of a case, and does not address admin claims. Nevertheless, a fair number of cases have held that estimation can likewise be used for admin claims. Although § 502(c) on its face applies to pre-petition claims, "[c]ourts have nonetheless assumed

9

Because administrative expenses receive a priority under section 507(a)(2), they diminish the possible recovery for unsecured creditors and should not be allowed unless a creditor satisfies its burden of proof. *See In re Hemingway Transp. Inc.*, 954 F.2d 1, 4-5 (1st Cir. 1992) ("The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses.").

**B.    A Debtor Has a Non-Dischargeable Obligation to Comply With an Order Requiring Cleanup of Property Posing A Continuing Risk of Serious Health or Safety Hazards**

The *Chateaugay* court went on to consider whether injunctive remedies—often ordered to remedy environmental contamination, as occurred with respect to the Hamburg facility—meet the definition of claims.

> These injunctions, as we have noted, frequently combine an obligation as to which the enforcing agency has an alternative right to payment with an obligation as to which no such alternative exists. An injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable. Thus, if EPA directs LTV to remove some wastes that are not currently causing pollution, and if the EPA could have itself incurred the costs of removing such wastes and then sued LTV to recover the response costs, such an order is a 'claim' under the Code. On the other hand, if the order, no matter how phrased, requires LTV to take any action that ends or ameliorates current pollution, such an order is not a 'claim.' . . . . [A] cleanup order that accomplishes the dual objectives of removing accumulating wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim.

*Chateaugay*, 944 F.2d at 1008.

---

that the estimation process in section 502(c) may be equally employed for estimating post-petition claims, when necessary to avoid delaying the administration of the bankruptcy case (especially when it comes to the confirmation process).

*Id.* (citing *In re MacDonald,* 128 B.R. 161, 164-165 (Bankr. W.D. Tex. 1991) (Clark, J.)).

10

The consent injunction concerning the Hamburg facility likewise implicates the "dual objectives" of removing contaminants and stopping or ameliorating ongoing pollution. *See id.* ("We recognize that most environmental injunctions will fall on the non-'claim' side of the line."). Therefore, Oldco M Corp., which owned the Hamburg facility at the time it filed its chapter 11 petitions, continues to have the non-dischargeable duty to comply with Michigan state environmental laws, even though Oldco M Corp. no longer owns the site. (*See* Motion at ¶ 21, p.7 ("Part 201 of NREPA [MCL 324.20130(1) provides that '[a]n indemnification, hold harmless, or similar agreement or conveyance is not effective to transfer from a person who is liable under section 20126 to the state for evaluation or response activity costs or damages for a release or threat of release to any other person the liability imposed under this part.'").) But the fact that Oldco M Corp.'s obligation is not dischargeable does not answer the question whether MDNRE is entitled to allowance of an administrative expense.

### C.   Postpetition Response Costs of Administrative Agencies *May* Be Entitled to Administrative Priority

The *Chateaugay* court also addressed whether postpetition response costs are entitled to administrative priority as "actual, necessary costs and expenses of preserving the estate." *See* 944 F.2d. at 1009 (quoting 11 U.S.C. § 503(b)(1)(A)).

As already explained, the consent injunction entered with respect to the Hamburg facility easily fits within the *Chateaugay* court's description of an injunction with "dual objectives," and as such Oldco M Corp. cannot be discharged from the obligation to comply with the injunction. But this conclusion does not answer the question whether postpetition remediation costs are entitled to treatment as an administrative expense. On this issue the *Chateaugay* court affirmed the district court below, concluding:

11

> If property on which toxic substances pose a significant hazard to public health cannot be abandoned, it must follow, the Court reasoned, that expenses to remove the threat posed by such substances are necessary to preserve the estate. We agree, as have other courts considering the same issue. LTV's argument that EPA should not be able to obtain administrative priority for a contingent claim by liquidating it overlooks the fact that EPA is doing more than fixing the amount of its claim; it is acting, during administration of the estate, to remedy the ongoing effects of a release of hazardous substances. . . . [N]othing in the District Court's ruling eliminates the obligation of notice and hearing before the allowance of a particular request for payment of an administrative expense. . . . [W]hether any particular item of cost is entitled to priority requires a particularized determination.

*Id.* at 1010 (citations omitted).

Several important distinctions should be noted about the facts in *Chateaugay* and the facts in this case. First, LTV continued to own and operate the contaminated properties; Metaldyne sold the Hamburg facility in a section 363 sale, with the buyer, MDI, expressly assuming post-closing environmental liabilities. Second, the EPA stepped in to undertake remediation efforts when LTV failed to do so; Metaldyne and now MDI have continued complying with the remediation plan. Third, while EPA may not have been able to determine the precise amount of its future response costs at the time it was seeking allowance for administrative expenses, EPA's claim was hardly speculative since EPA was undertaking the remediation work. MDNRE's claim, on the other hand, is speculative as first Metaldyne and now MDI has performed the remediation work, and MDNRE has not shown any factual basis for its assumption that the state will have perform all remediation work for the next 10 years.

Metaldyne owned and operated the Hamburg and Litchfield sites when the bankruptcy case commenced, but sold them in the section 363 sale during the case. Neither party has cited, nor has the Court found, any cases dealing with administrative

12

expense treatment for response costs incurred after the property is sold during the bankruptcy case. Whether a sale of estate property during a bankruptcy case prevents a state from obtaining an administrative expense priority for response costs actually incurred by the state after the sale remains an open question.

In *In re Insilco Technologies, Inc.*, 309 B.R. 111 (Bankr. D. Del. 2004), the court considered whether New York State was entitled to allowance of an administrative expense for environmental response costs on property the debtor sold four years before the bankruptcy case was filed. *Id.* at 115. The debtor did not use or occupy the property after the sale. Distinguishing cases in which administrative expense treatment was allowed where the debtor owned the property, the court concluded that the claims were not entitled to administrative expense treatment because "the costs . . . in remediating the contamination at the Property will not benefit the estate." *Id.* "Absent a benefit to the estate, an administrative claim cannot be allowed." *Id.* at 116. Nevertheless, the court recognized that "[w]hile the Debtors may not be able to discharge any duty to comply with the Consent Orders, this does not elevate [New York's] claim for costs into an administrative expense, especially when the Property is not part of the estate." *Id. See also* 5 COLLIER ON BANKRUPTCY ¶ 503.06[4][a] ("If the bankruptcy estate owns property contaminated with hazardous waste that presents a continuing danger to public health and safety, costs associated with the cleanup of the property incurred during the bankruptcy case are accorded administrative priority. Conversely, administrative expense status is denied for cleanup costs on property no longer owned by the estate.").

MDNRE argues that *In re Torwico Electronics, Inc.*, 8 F.3d 146 (3rd Cir. 1993), supports its argument for administrative expense treatment even though the Hamburg

13

facility has been sold. But *Torwico* did not involve the issue of allowance of an administrative expense and, therefore, the case is inapposite. In *Torwico*, the State of New Jersey attempted to force the chapter 11 debtor, Torwico, to comply with its cleanup obligations under state and federal environmental laws on property it had previously leased but had returned to the landlord before the bankruptcy case was filed. The debtor did not own, lease or operate the property after the bankruptcy case was filed. Groundwater contamination was found at a site from an illegal seepage pit that Torwico had used, presenting a continuing danger to health and safety because the contamination was migrating into local waters. *Id.* at 147. The state failed to file a proof of claim before the bar date. The debtor argued that the cleanup costs were "claims" within the definition of section 101(5), and were barred as a result of the state's failure to file a timely proof of claim. Applying the Second Circuit's decision in *Chateaugay* and the Seventh Circuit's decision in *In re CMC Heartland Partners*, 966 F.2d 1143, 1147 (7th Cir. 1992) (finding that cleanup orders concerning threatened or ongoing contamination are not discharged and survive bankruptcy), the court concluded that Torwico's cleanup obligations did not constitute a "claim" and, therefore, were not barred by the failure to file a proof of claim. *Torwico*, 8 F.3d at 150.

Torwico sought to distinguish *CMC*, arguing that unlike the debtor in *CMC*, Torwico "no longer owns or occupies the land here." *Id.* at 151. The *Torwico* court rejected the attempted distinction:

> We do not find Torwico's suggested distinction persuasive. . . . Torwico can (and in the state's view, must) conduct the cleanup: it has access to the site and the state has not, apparently, performed any cleanup on its own. . . . Under New Jersey law, Torwico is accordingly still responsible for the nuisance and cannot avoid compliance with the environmental laws.

14

*Id.*

The state did not seek and the court did not address whether the state would be entitled to an allowed administrative expense if the state had performed the cleanup. *See Insilco Techs.*, 309 B.R. at 116 ("*Torwico* does not stand for the proposition that clean up costs incurred on behalf of an out of possession debtor will be afforded administrative priority treatment because the debtor has continuing obligations to comply with environmental laws. Rather, *Torwico* addressed whether a debtor's duty to comply with environmental laws was dischargeable, not the priority of expenses.") Therefore, the case does not support MDNRE's argument.

The Trust argues that the decision in *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009), resolves in its favor the issue of a debtor's liability for response costs after a section 363 sale of property. While the court's analysis in *General Motors* is useful, it too is inapposite to the issue presented in this case because the court was not faced with the issue whether to allow an administrative expense priority for environmental response costs. The debtor there proposed a section 363 sale of substantially all of the assets of "Old GM" to "New GM," free and clear of all liens, claims, encumbrances and interests. Certain objectors, including the New York State Attorney General, objected to the sale on the grounds that the sale approval order would too broadly release Old GM and New GM from their duties to comply with environmental laws and cleanup obligations. *Id.* at 507. After the proposed sale order was modified, the bankruptcy court overruled the objections. Under the sale order, "neither Old GM nor New GM will be relieved of its duty to comply with environmental laws." *Id.* at 508. While concluding that after the section 363 "free and clear" sale, New

15

GM would not have successor liability for Old GM's environmental liabilities, "the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility." *Id.* The sale order in *General Motors*, like the sale order in this case, provided that the buyer assumed post-sale-closing environmental liabilities.

Metaldyne continued to operate the Hamburg facility during the bankruptcy case before the sale to MDI closed, and, as a debtor in possession, Metaldyne was required to "manage and operate the property in [its] possession . . . according to the requirements of the valid laws of the State in which such property is situated . . . ." 28 U.S.C. § 959(b). This includes state environmental laws. *See Midlantic*, 474 U.S. at 505; *Lancaster v. State of Tennessee (In re Wall Tube & Metal Prods. Co.)*, 831 F.2d 118, 121-22 (7th Cir. 1987) ("*Wall Tube*"). If Metaldyne had ceased remediation and the state had been forced to step in to protect public and health and safety, the state would have been entitled to an allowed administrative expense for the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Just as *Midlantic* prevents a debtor from abandoning property to avoid obligations under state environmental laws, to the extent that significant health and safety risks exist, a state may well have valid grounds to object to a property sale to a party that will not, or financially cannot, offer adequate assurance that it will meet its environmental compliance obligations.[7] Because the Court concludes that MDNRE has failed to carry its burden of proof to support allowance of an

---

[7] A state might well have reasonable grounds to object if a sale resulted in an administrative claim for future environmental response costs against a debtor that still owned the property becoming a general unsecured claim (or no claim at all) against the debtor, and a possibly uncollectible claim against a financially weak or unwilling buyer.

16

administrative expense for future response costs, it is unnecessary for the Court to decide whether such future costs could be entitled to administrative priority treatment even though the Hamburg facility is no longer estate property.

          1.     *MDRNE Bears the Burden of Establishing that the Future Expenses Qualify for Administrative Priority*

The party seeking an administrative expense allowance bears the burden of establishing that it qualifies for administrative priority. *See In re Hemingway Transp. Inc.*, 954 F.2d at 5 ("The burden of proving entitlement to priority payment as an administrative expense therefore rests with the party requesting it."); *In re Insilco Techs., Inc.*, 309 B.R. at 114 ("An administrative expense claimant bears the burden of establishing that its claim qualifies for priority status.") (citing *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001)); *In re Mahoney-Troast Const. Co.*, 189 B.R. 57, 59 (D.N.J. 1995) ("The burden is upon the claimant to establish that its claim qualifies for allowance as an administrative expense.").

          2.     *MDNRE Failed to Establish its Entitlement to an Administrative Expense*

Case law makes clear that an environmental agency's costs of responding to serious environmental contamination that poses a substantial risk to health or safety are generally entitled to administrative expense treatment. *See Pa. Dep't of Envtl. Res. v. Conroy*, 24 F.3d 568, 569 (3d Cir. 1994) (finding that costs incurred by state agency to remediate property will be accorded administrative expense treatment because the expenses incurred to remove the threat are necessary to preserve the estate); *Chateaugay*, 944 F.2d at 1009 (finding that expenses to remove toxic substances that pose a significant hazard to public health are necessary to preserve the estate); *Wall Tube*, 831 F.2d at 122-24 (finding that in the absence of compliance by the debtor's estate, state was entitled to

17

administrative expense to assess the gravity of the environmental hazard). But in each of these cases (and in many others) the debtor had abdicated its responsibility to remediate serious environmental contamination, no other private party had stepped in, and a state or federal regulatory agency had undertaken the remediation work and sought to recover its costs. The postpetition costs of the agencies were entitled to administrative expense treatment under section 503(b)(1)(A) for the "the actual, necessary costs and expenses of preserving the estate . . . ."

In many ways this is an "easy case," in the sense that no extended analysis is required to determine whether MDNRE incurred actual and necessary costs and expenses of preserving the estate. Because MDNRE has not demonstrated that it has expended any money for response costs (with the exception of the small administrative expense allowed in this opinion), or that it will be required to do so in the future (since MDI continues to perform the remediation obligations), there can be no argument whether "any particular item of cost is entitled to priority," based upon a "particularized determination." *See Chateaugay*, 944 F.2d at 1010. *See also In re Microfab, Inc.*, 105 B.R. 161, 166 (Bankr. D. Mass. 1989) (denying as premature the state's request for allowance of an administrative expense as the state had not yet expended any funds to clean up the site and it "cannot speculate as to what amounts might eventually be allowable as 'actual' and 'necessary' expenses of the estate").[8]

---

[8] Decisions on what are "actual and necessary costs and expenses of preserving the estate" reflect a wide range of judicial approaches and results. *See, e.g., Matter of H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998) ("An 'actual and necessary cost' must have been of benefit to the estate and its creditors. This requirement is in keeping with the conceptual justification for administrative expense priority: that creditors must pay for those expenses necessary to produce the distribution to which they are entitled. That is, the costs of salvage are to be paid. The 'benefit' requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary.'") (internal quotation marks and citations omitted); *In re American Coastal Energy Inc.*, 399 B.R. 805, 816 (Bankr. S.D. Tex. 2009) ("The 'post-

## CONCLUSION

For the foregoing reasons, MDNRE's Motion for allowance of an administrative expense is **GRANTED** in the amount of $486.23, and it is **DENIED** as to any post-sale-closing response costs.

**IT IS SO ORDERED.**

DATED:    September 7, 2010
         New York, New York

                                                   /s/Martin Glenn
                                                   MARTIN GLENN
                                        United States Bankruptcy Judge

---

petition' language [from court opinions], like the 'benefit' requirement, 'has no independent basis in the Code' and therefore is best treated as a 'way of testing whether a particular expense was truly "necessary"' rather than an independent element of § 503(b)(1)(A)."). The *American Coastal Energy* court also recognized that "[t]he Second, Third, and Sixth Circuits have all held that post-petition expenses incurred to redress pre-petition environmental liabilities are entitled to administrative expense priority," because if the estate could not avoid the costs by abandonment, amounts expended to eliminate the threat of the hazardous materials was necessary for preservation of the estate. *Id.* at 812 (citing *Pa. Dep't of Envtl. Res. v. Conroy*, 24 F.3d at 569-70; *Chateaugay*, 944 F.2d at 999, 1009-10; *Wall Tube*, 831 F.2d at 121-22). *See also In re N.P. Mining Co., Inc.*, 963 F. 2d 1449, 1457 (11th Cir. 1992) (determining that no benefit to the estate was required for there to be an "actual and necessary" expense; "[i]f postpetition costs 'ordinarily incident to operation of a business' that do not confer a benefit on the estate can indeed qualify as 'actual, necessary' expenses of preserving the estate, then a strong case can be made that when a licensed business operates in the regulated atmosphere of strip mining in Alabama, incurring regulatory penalties is a cost ordinarily incident to operation of a business and should be accorded administrative-expense priority"). Courts in the Ninth Circuit, however, appear to more strictly construe "actual and necessary." *See In re Dant & Russell, Inc.*, 853 F.2d 700, 709 (9th Cir. 1988) (determining that a lessor's request for expenses for environmental cleanup, for which it was jointly liable with the debtor, was a component of a rejection damage claim, and thus unsecured); *In re Lazar*, 207 B.R. 668, 680 (Bankr. C.D. Cal. 1997) ("The requirement that an administrative expense be postpetition cannot be met absent . . . new contamination. A continued postpetition deterioration or postpetition failure to remediate prior contamination does not satisfy this requirement.").

19