UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
In re                            :    Chapter 11 Case No.
                                 :
Metaldyne Corporation, et al.,   :    09-13412 (MG)
                                 :
                    Debtors.     :    (Jointly Administered)
-------------------------------------------------x
```

## DECLARATION OF
## ERIC MENDELSOHN IN SUPPORT OF
## THE SECOND AND FINAL FEE APPLICATION OF
## LAZARD FRÈRES & CO. LLC, DEBTORS' INVESTMENT
## BANKER FOR ALLOWANCE OF COMPENSATION AND FOR THE
## REIMBURSEMENT OF ACTUAL AND NECESSARY EXPENSES INCURRED
## FOR THE PERIOD FROM MAY 27, 2009 THROUGH OCTOBER 16, 2009

Pursuant to 28 U.S.C. § 1746, I, Eric Mendelsohn, declare under penalty

of perjury as follows:

1.     I am a Managing Director of Lazard Frères & Co. LLC ("Lazard"),

which has its principal office at 30 Rockefeller Plaza, New York, New York 10020.  I am

authorized to execute this declaration (this "Declaration") on behalf of Lazard.  Unless

otherwise stated herein, I have personal knowledge of the facts set forth in this

Declaration.[1]

2.     This Declaration is being submitted in support of Lazard's Second

and Final Fee Application, dated May 31, 2010 [Docket No. 1575], and Supplemental

Filing to The Final Fee Application, dated July 12, 2010 [Docket No. 1602] (collectively,

the "Final Fee Application").  It addresses (i) the concerns raised by this Court at the

September 23, 2010 hearing regarding the level of detail contained in Lazard's time

---

[1]    Certain of the disclosures herein relate to matters within the personal knowledge of
       other professionals at Lazard and are based on information provided by them.

records (the "Time Records") included in the Final Fee Application and (ii) questions the

Court raised about the nature of Lazard's retention.[2] Over a year has passed since Lazard

concluded its work for Metaldyne Corporation and its affiliated-debtors in the above-

captioned cases (collectively, the "Debtors"). Given the passage of time we felt it would

be useful to first refresh the Court on the background relating to Lazard's retention and

then provide a narrative describing the work performed by Lazard with more specificity

than the Time Records that concerned the Court.

## RETENTION

3.       On June 22, 2009, this Court entered its Order Pursuant to sections

327 and 328(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), Bankruptcy Rule 2014(a) and Local Rule 2014-1, Authorizing the

Debtors and Debtors in Possession to Employ and Retain Lazard Frères & Co. LLC as

Investment Bankers, *nunc pro tunc* as of the Petition Date [Docket No. 278] (the

"Retention Order"). Pursuant to the Retention Order the terms of the engagement letter

between the Debtors and Lazard, dated as of February 1, 2009 (the "Engagement

Letter"), including the fee arrangements set forth therein, were approved. The Final Fee

Application requests final approval of the payments authorized in the Retention Order,

which included reimbursement of expenses, the payment to Lazard of monthly fees in the

amount of $150,000 each (the "Monthly Fees") and payment of a sale transaction fee in

the amount of $3,025,000 (the "Sale Transaction Fee") payable upon the sale of all or

---

[2]      A representative of Lazard was not at the September 23rd hearing to respond to the
Court's concerns and, as a result, the hearing to consider the Final Fee Application
has been adjourned to October 27, 2010. A representative from Lazard will be
available at that time to address any additional concerns the Court may have,
including matters discussed in this Declaration.

substantially all of the assets of the Debtors.[3]

4.    The Sale Transaction Fee, adjusted to reflect applicable credits (as set forth in the Final Fee Application), was paid to Lazard pursuant to paragraph 7 of the Retention Order upon the closing of the sale of substantially all of the Debtors' assets to MD Investors Corporation.[4]  The Monthly Fees have also been paid.  No objections have been filed to any of Lazard's fees.[5]

## TIME DETAIL

5.    As required by the Retention Order, Lazard's Time Records were maintained in half-hour increments.  In addition, they were categorized into eleven (11) project codes which are broadly described in the section titled "Summary of Services Rendered" in the Final Fee Application.  The majority of time spent by Lazard professionals involved Merger & Acquisition Activity (project code 7 – 568.8 hours) and Interfacing With Professionals, Official Committees and other Parties-In-Interest (project

---

[3]    The Retention Order also authorized payment of a Minority Sale Fee and a Restructuring Fee, both of which are further defined in the Engagement Letter.

[4]    Paragraph 7 of the Retention Order provides that, "in accordance with footnote 5 in the Interim DIP Order, the full amount of any Sale Transaction Fee or Minority Sale Transaction Fee will be paid from the gross proceeds of any such sales as a cost of any such sale before net proceeds are made available for distribution to secured creditors."  For the purposes of this footnote, capitalized terms not otherwise defined shall have the meanings set forth in the Retention Order.

[5]    Lazard agreed to make two accommodations for the benefit of the Debtors and their estates.  First, Lazard agreed to a Sale Transaction Fee in the amount of $3,025,000, instead of billing a potentially higher Sale Transaction Fee (approximately $4.3 million) that could have been calculated including the amount of the credit bid for the Debtors' assets (in excess of $500 million).  Second, based on discussions with the US Trustee, Lazard agreed to forgo $25,607.31 of expense reimbursement for fees of Lazard's outside counsel.

code 1 – 368.8 hours). In light of the confidential nature of our discussions with potential

buyers and ongoing litigation with certain parties in the case, Lazard's time entries were

purposely not overly detailed to protect confidential information regarding the sale

process from disclosure to potential bidders and other parties. As noted by the Court,

many of the activities of Lazard professionals were performed in large blocks of time.

Lazard has reviewed its time records, consulted with the individuals who were involved

in this matter, reviewed call logs and diligence lists, and in the following paragraphs,

provides the Court with more detail concerning Lazard's work.

**Time Relating to "Recoveries," "Waterfall" and "Bid Analysis"**

      6.    Lazard professionals worked with the Debtors and their counsel to

analyze the potential recoveries to each creditor constituency based on a range of

hypothetical sale assumptions for the Debtors' various businesses. Because the

prepetition revolver and term loan had different levels of priority with respect to different

assets and the term lenders were likely to credit bid in any auction, Lazard worked

extensively with the Debtors and their counsel to develop an allocation methodology for

the distributable proceeds based on the form of consideration and the rights of each

creditor constituency. Lazard professionals assisted in producing numerous iterations of

such analysis, and participated in meetings with each of the creditor and customer advisor

groups to refine an appropriate allocation methodology. Due to the complex nature of

these analyses and the combination of both significant financial and legal inputs, Lazard

professionals often spent many hours in a row on multiple days dedicated to creating and

reviewing these models.

**Time Relating to Sale Process and Merger & Acquisition Activity**

7.     Lazard conducted sale processes for multiple assets simultaneously beginning prior to commencement of these chapter 11 cases and continuing through the closing of the sales.  Specifically, the Debtors contemplated the sale of their powertrain and chassis businesses separately based on indications of interest from potential acquirers, while also pursuing the potential sale of substantially all of the assets to a single acquiror.  Lazard (i) assisted the Debtors in preparing solicitation materials describing the Debtors' assets and operations including a roughly 50-page management presentation, (ii) contacted over 62 potential acquirers, (iii) facilitated due diligence for approximately 22 parties, (iv) assisted in securing multiple stalking horse bidders, and (v) advised the Special Committee of the Debtors' Board of Directors in connection with the negotiation and documentation of the asset sales.

8.     Additionally, in the course of negotiations with the potential stalking horse bidders and in connection with the bankruptcy auction process, Lazard reviewed and analyzed the proposals received from various potential acquirers and assisted the Special Committee in assessing which proposal, or combination of proposals, represented the best and highest offer.  This process required Lazard to assist the Special Committee in valuing non-cash consideration contemplated by certain proposals and in negotiating the terms of such non-cash consideration.  Additionally, Lazard prepared detailed analyses of the credit bid proposed by the Debtors' term lenders, which included potential recoveries to other creditor constituencies, vis-à-vis the alternative all-cash proposals.

9.     Due to the compressed timeframe of these cases, Lazard professionals conducted the sale processes on an expedited basis which resulted in many members of the team spending the majority of their working hours on calls with potential buyers. Lazard professionals often spent many hours in a row dedicated to back-to-back calls with potential buyers, diligence meetings, discussions regarding bids, and negotiations of bids. Due to the similar nature of these activities and Lazard's concern regarding disclosure of the number and names of specific counter-parties, Lazard at times combined these similar and contiguous activities into single time entries. Further detail on the sale process was submitted to this Court as part of the Declaration of Michael Macakanja in Support of Debtors' Request for an Order Approving the Sale of Substantially All of the Assets of the Debtors' Free and Clear of All Liens, Claims, Interests and Other Encumbrances [Docket No. 637], which is attached hereto for convenience as Exhibit A.

**Time Relating to Auctions and Pre-Auction Activities**

10.     Many of the largest time block entries relate to August 5 and August 6 auctions and the week leading up to them. The level of activity – largely focused on completing the M&A process to maximize proceeds to the estate – was frenetic during this period and Lazard professionals were working around-the-clock to finalize and negotiate multiple offers for the Debtors' assets. Due to the similar and contiguous nature of these activities, Lazard at times combined these activities into single time entries.

**Time Relating to Attendance at and Preparation for Court Hearings**

11.    Lazard recorded large amounts of time preparing for court hearings including the preparation of declarations and witnesses. These activities generally required many hours in a row of work dedicated to drafting materials and preparing witnesses for contested proceedings.

**Time Relating to Internal Calls**

12.    Lazard participated in numerous daily calls with the Debtors' professionals and management team regarding the sale processes, financing and creditor distributions, among other topics.  Given the high volume and similar nature of these calls each day, Lazard professionals at times combined multiple calls together under headings such as "internal calls."

**Time Relating to Committee/Advisor Discussions**

13.    Throughout the Debtors' chapter 11 cases, Lazard professionals engaged in daily conversations with the Debtors' creditors, customers and their respective advisors, to facilitate due diligence and negotiations.  Lazard professionals prepared, reviewed, advised and assisted in the preparation of presentation materials for the Debtors' creditor constituencies, which included analyses of rapidly changing industry dynamics, the Debtors' business and financial plan, and issues related to the chapter 11 auction process and recoveries.  On certain occasions, Lazard combined for Time Record purposes multiple lengthy calls and meetings with these constituencies, especially when a similar subject matter was repeatedly discussed.  Many of the large blocks of time that

are attributed to committee/advisor discussions also occurred during the pre-auction week when intense discussions and negotiations were ongoing regarding the various bids, the value of the bids and the potential distribution of proceeds.

**Time Relating to Advising the Board of Directors and**
**Providing Financial Analysis and Operations Planning**

14.     Lazard professionals advised the Special Committee of the Board of Directors in its evaluation of potential structural and process alternatives and in negotiations associated with the sale process, prior to and during the pendency of the case. Lazard professionals prepared numerous presentations for the Special Committee's review, including extensive analyses of the proposals received from prospective acquirers.

15.     Lazard professionals assisted in the review and analysis of the Debtors' short-term liquidity position and longer-term forecast. Lazard professionals reviewed weekly cash flow forecasts, including cash receipts, disbursements and projected funding requirements, as well as monthly forecasts and the latest industry performance benchmarks and production estimates. Additionally, Lazard professionals participated in numerous discussions with management regarding valuation and the funding requirements related to the orderly liquidation of those assets not sold in the course of the chapter 11 cases. In connection with the consummation of the sales, Lazard professionals analyzed the sources and uses of funds and assisted the Debtors in negotiating and finalizing the transaction documentation.

## CONCLUSION

16.     A representative of Lazard will be available to answer any remaining questions the Court may have about the Final Fee Application, the Time Detail contained therein, or the Retention Agreement. In sum, Lazard is proud of the work it performed for the Debtors and the outcome of these cases.

Executed on October 21, 2010

_____
ERIC MENDELSOHN

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x
                                        :
In re                                   :   Chapter 11
                                        :
Metaldyne Corporation, et al.,          :   Case No. 09-13412 (MG)
                                        :
                    Debtors.            :   (Jointly Administered)
                                        :
-----------------------------------------------------------x
```

## DECLARATION OF MICHAEL MACAKANJA IN SUPPORT OF DEBTORS' REQUEST FOR AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND OTHER ENCUMBRANCES

I, Michael Macakanja, make this Declaration under 28 U.S.C § 1746 and state the following under penalty of perjury:

1.      I am a Director at the firm Lazard Frères & Co. LLC ("Lazard"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10020.  Unless otherwise stated, all facts set forth in this Declaration are based upon:  (a) my personal knowledge; (b) my investment banking experience; (c) information provided by the Debtors concerning the operation and finances of the Debtors; and (d) information provided to me by Lazard colleagues and employees working with my collaboration.

2.      I make this Declaration in support of the Debtors' request for an order approving the sale of certain assets of the Debtors' Powertrain group (the "Powertrain Assets") pursuant to the Motion of Debtors and Debtors in Possession for (I) An Order (A) Approving Bidding Procedures for the Sale of the Debtors' Powertrain Group, (B) Approving Certain Bidder Protections and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) An Order (A) Authorizing the Sale of Certain Assets Related to the

Debtors' Powertrain Group Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith (Docket No. 214) (the "Powertrain Sale Motion"), which was filed with the Court on June 16, 2009. I also make this Declaration in support of the Debtors' request for an order approving the sale of certain assets of the Debtors' Chassis group (the "Chassis Assets") pursuant to the Motion of Debtors and Debtors in Possession for (I) An Order (A) Approving Bidding Procedures for the Sale of the Debtors' Chassis Group, (B) Authorizing the Debtors to Grant Certain Bidder Protections, If Applicable, and (C) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) An Order (A) Authorizing the Sale of Certain of the Assets of the Debtors' Chassis Group Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith (Docket No. 323) (the "Chassis Sale Motion"), which was filed with the Court on June 25, 2009.

3.    By the Powertrain Sale Motion and the Chassis Sale Motion, the Debtors seek to sell their Powertrain Assets, Chassis Assets, their balance shaft module business (the "BSM Assets") and their tubular products business (the "Tubular Assets" and, collectively, the "Debtor Assets"). Capitalized terms not otherwise defined herein have the meanings given to them in the Powertrain Sale Motion.

### Michael Macakanja's Qualifications

4.    Lazard is a global, full service investment bank founded in 1848. Lazard is focused on providing financial and investment banking advice and transaction execution on behalf of its clients. Lazard's broad range of corporate advisory services includes services pertaining to: general financial advice; domestic and cross-border mergers and acquisitions;

divestitures; privatization; special committee assignments; takeover defenses; corporate restructuring; and strategic partnerships/joint ventures.

5.     Lazard has extensive experience in the reorganization and restructuring of troubled companies, both out-of-court and in chapter 11 cases. Lazard's employees have advised debtors, creditors, equity constituencies and government agencies in many complex financial reorganizations. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing over $1 trillion in debtors' assets. Lazard has been retained as a financial advisor and investment banker in numerous large and complex chapter 11 cases.

6.     I have been in my current position at Lazard since April 2002 with a focus on sales and acquisitions of automotive suppliers with occasional related work with original equipment manufacturers in the automotive industry. Within the automotive sector, I have been involved in a broad range of financial advisory assignments, including buy- and sell-side M&A transactions and offerings of public and private equity. Selected clients with whom I have worked include Aftermarket Technology Corp., Cooper Tire & Rubber, Dura, Goodyear, Hayes Lemmerz, Johnson Controls, Lear, Methode, Tenneco, Venture, Visteon and numerous private equity firms.

7.     Prior to Lazard, I worked in the sales and acquisitions arena while employed first by Robert W. Baird & Co. and subsequently by William Blair & Company.

8.     I have an M.B.A. degree with concentrations in Finance and Accounting from the University of Chicago and a B.S. in Industrial Engineering from Purdue University. I hold Series 7 and 66 securities licenses.

9.     Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my

experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration.

### The Prepetition Marketing of the Powertrain Assets

10.     Prior to the commencement of the Debtors' chapter 11 cases, Lazard assisted the Debtors in marketing the Powertrain Assets. Because of the ongoing turmoil in the automotive industry created by the first threatened and then actual bankruptcies of Chrysler and General Motors, however, the number of investors actively looking to invest in the automotive sector has been limited.

11.     With the impending bankruptcies of Chrysler and General Motors and substantial production cuts, it became imperative for Metaldyne to quickly secure appropriate financing and to do so in the most expeditious and cost effective manner. Despite Lazard's efforts, due to the turmoil in the credit markets generally and the automotive industry specifically, banks and other investors were either unwilling or unable to provide Metaldyne with either out-of-court or DIP Financing. As a result, the only viable alternative to fund chapter 11 cases was for Metaldyne to seek DIP Financing via an arrangement with its largest customers, including Ford, General Motors and Chrysler (which were ultimately joined by Honda and Nissan).

12.     As a condition to the DIP Financing, Metaldyne was required to expeditiously pursue a sale of its major assets, including the Powertrain Assets. The conditions for obtaining the DIP Financing drove the timelines for the sale process for the Powertrain Assets.

-4-

13. Initially, prior to the commencement of these chapter 11 cases, Lazard focused its efforts on a small pool of the most likely potential purchasers. This decision was a function of timing and the economic landscape. With little available financing, a chaotic automotive industry and a management team at Metaldyne focused on both operational and restructuring issues, the time, expense and complexity of soliciting a large group of potential investors, many of whom were likely to have little or no interest in the Metaldyne assets, seemed unlikely to provide any additional value to Metaldyne.

14. RHJ International, S.A. ("RHJI"), KPS Capital Partners, LP ("KPS"), The Carlyle Group ("Carlyle") and the Debtors' prepetition term lenders (the "Term Lenders"), among others, were in this initial group of investors approached by Lazard. Because RHJI was also an insider of the Debtors, Metaldyne established a special committee of two fully independent directors (the "Special Committee") to engage in negotiations and evaluate potential transactions. Lazard has continued to interact with the Special Committee and its legal counsel and financial advisors in evaluating and negotiating offers for Powertrain Assets. Once it became clear that RHJI was not interested in purchasing the Chassis Assets, the full Metaldyne board of directors resumed oversight and control over the sales process for the Chassis Assets. Lazard has since interacted with the Metaldyne board of directors and Metaldyne's senior management team, as well as Metaldyne's legal and other financial advisors, in evaluating and negotiating offers for Chassis Assets.

15. Prepetition, Lazard helped to negotiate a letter of intent between Carlyle and the Debtors for the sale of the Chassis Assets (the "Carlyle LOI"). The execution of the LOI with Carlyle on May 1, 2009 was a critical step in the Debtors being able to secure the DIP Financing.

CLI-1734404v4

16.     Prepetition, Lazard also helped to negotiate a letter of intent between RHJI and the Debtors for the sale of the Powertrain Assets (the "RHJI LOI"). RHJI was the first of the parties contacted about purchasing the Powertrain Assets that was ready and willing to provide an LOI. The RHJI LOI was executed on May 27, 2009.

## Postpetition Marketing of the Debtor Assets

17.     As soon as the LOI with RHJI was in place and the Debtors had filed their chapter 11 cases, Lazard began to reach out to a much broader group of potential investors. With the DIP Financing and the LOIs in place, the Debtors had more flexibility to explore potential options and to solicit more potential bidders. To date, Lazard has reached out to approximately 62 potential buyers for all or a subset of the Debtors' assets. Approximately 36 of those potential buyers have been provided with confidentiality agreements, 22 have returned confidentiality agreements to date, and seven have either attended management presentations or spoken directly with management about Metaldyne's various assets. Of the seven who have had discussions with management, five, including RHJI, KPS, the Term Lenders, MD Investors Corporation ("MD Investors") (a joint venture between Carlyle and Solus Alternative Asset Management LP, which are term loan lenders themselves, and which ultimately became representative of the entire term lender group) and ACOF MD Holdings Ltd. ("Ares") have been specifically interested in purchasing the Powertrain Assets. In turn, four have been specifically interested in purchasing the bulk of the Chassis Assets, including Revstone Industries, LLC ("Revstone") and Carlyle, through its affiliate Chassis Products LLC ("Chassis Products").

18.     Since reaching out to the broader group of potential buyers, Lazard has arranged or provided (a) access to the electronic data rooms for the Debtor Assets (the "Data Room") to qualified interested parties in accordance with the proposed bidding procedures and

(b) customized information packets to potential investors. The Data Room has provided a means for Lazard to quickly move potential buyers through the diligence process.

19. A sale of a substantial portion of the Debtors' assets in a roughly 60-day time frame was a condition of the DIP Financing (subject to the Debtors' ability to extend the DIP Financing for a total of 30 days from the original expiration period). Moreover, any delay in proceeding with a sale of the Powertrain Assets or the Chassis Assets would increase the risk that the Debtors' customers and suppliers could lose confidence in the continued viability of the Powertrain Assets or the Chassis Assets, which could lead to lost business and, hence, lower value for these assets.

*Postpetition Marketing of the Powertrain Assets*

20. Thus, soon after the Petition Date, the Debtors, through the Special Committee, engaged in extensive negotiations with RHJI in an effort to sign a purchase agreement for the Powertrain Assets to serve as a "stalking horse" bid to set a floor value for the Powertrain Assets, provide a framework for the comparison of bids and to encourage other potential bidders to step forward with definitive offers to purchase the Powertrain Assets.

21. The culmination of the extensive negotiations with RHJI was the execution of a purchase agreement for the Powertrain Assets between the Debtors and RHJI on June 15, 2009. Shortly thereafter, the Debtors filed the Powertrain Sale Motion, which included a breakup fee and an expense reimbursement for RHJI (collectively, the "Bidder Protections"); provided, however, that the Bidder Protections did not become effective unless RHJI provided the Debtors notice by July 2, 2009 that it had either satisfied or waived all outstanding due diligence issues related to the Powertrain Assets (the "Satisfaction Notice"). RHJI did not deliver the Satisfaction Notice by July 2, 2009, and the Bankruptcy Court ruled on July 27, 2009 that RHJI was not entitled to Bidder Protections.

-7-

22.     Even as the negotiations with RHJI progressed, Lazard continued to provide full access to requested due diligence materials to all parties potentially interested in purchasing the Powertrain Assets and prepared to proceed with an Auction for the Powertrain Assets in accordance with the Bidding Procedures approved by the Bankruptcy Court.

23.     On July 17, 2009, KPS and one of its portfolio companies, Hephaestus Holdings, Inc. ("HHI" and together with KPS the "HHI Group") announced its intention to submit a competing bid for the Powertrain Assets to serve as a stalking horse bid in lieu of the purchase agreement with RHJI. The Debtors received a proposed purchase agreement from the HHI Group on the evening of July 18, 2009.

24.     Over the course of the next several days, RHJI and the HHI Group each submitted competing offers for the Powertrain Assets. The discussions with respect to the enhanced bids were open and transparent. Each subsequent bid was communicated to both bidders and the Debtors' primary creditor constituencies were kept informed of the state of play. In addition, Lazard notified those other potential purchasers of the Powertrain Assets that had expressed serious interest and conducted significant due diligence of the status of the purchase agreement with RHJI and the bid from the HHI Group, and informed such other potential bidders that they were also welcome to submit competing bids for the Powertrain Assets at any time for consideration, as was still provided for under the Bidding Procedures approved by the Bankruptcy Court.

25.     Still, while other potential bidders reiterated their intent to bid for the Powertrain Assets at the auction, RHJI and the HHI Group remained the only parties that submitted competing bids for consideration to serve as a stalking horse bid entitled to Bidder Protections. In the morning of July 23, 2009, RHJI submitted a revised bid for the Powertrain

-8-

Assets (the "RHJI Stalking Horse Bid"). In the afternoon of July 23, 2009, the HHI Group submitted a revised bid which provided for a headline consideration of $78 million (the "HHI Stalking Horse Bid"). Lazard advised the Special Committee that the HHI Stalking Horse Bid was superior to the RHJI Stalking Horse Bid because it included an all cash offer and higher purchase price than the RHJI Bid. Thus, the Debtors requested, and on July 27, 2009 received, authorization from the Bankruptcy Court to enter into a Purchase Agreement under which the HHI Stalking Horse Bid would serve as the stalking horse bid for the Powertrain Assets.

26.     On July 31, 2009, MD Investors, in connection with the Term Lenders, submitted a bid (the "MDI Bid") for all four of the business units that were being marketed by the Debtors, including the powertrain, chassis, balance shaft modules and tubular businesses. The MDI Bid proposed headline cash consideration of $38 million, subject to various purchase price adjustments, and included a credit bid component. The Debtors, with the assistance of Lazard, evaluated the MDI Bid and, following extensive discussions and after being provided with assurances from MD Investors that their bid would be modified in certain ways, determined that the bid was a Qualified Bid because it was the only bid on the package of assets identified in the bid and presented the possibility for a superior outcome for the Debtors' estates. In addition, based upon the commitment letter provided by Carlyle Strategic Partners II, L.P. and CSP II Coinvestment, L.P. and a commitment letter provided by Sola Ltd. and Ultra Master Ltd., Lazard had a reasonable basis to believe that MD Investors would be able to consummate a sale transaction with the Debtors and perform its obligations under a purchase agreement.

27.     In order to be able to properly compare bids for individual groups of the Debtors' assets against the MDI Bid for the combined assets, the Debtors cancelled the scheduled auction for the Chassis Assets on August 3, 2009 and rescheduled such auction for

-9-

August 5, 2009. In addition, the Debtors reached out to other bidders contacted about the sale of the BSM Assets and the Tubular Assets and invited interested bidders for such assets to attend the auction scheduled for August 5, 2009.

28.    On August 3, 2009, the bid deadline for the Powertrain Assets, the Debtors received a bid for the Powertrain Assets from Ares (the "Ares Bid"). The Debtors, in consultation with Lazard, determined that Ares was a Qualified Bidder and that the Ares Bid was a Qualified Bid.

29.    I believe the timetable and the bidding procedures proposed by the Debtors are a reasonable basis on which to conduct the sale process and provide for a reasonable chance for the Debtors to sell the Powertrain Assets for the highest and best value.

*Postpetition Marketing of the Chassis Assets*

30.    During the due diligence process, several parties expressed interest in becoming the stalking horse bidder. Two of these parties submitted proposals that included a higher cash value than that of Carlyle's initial proposal. On July 14, 2009, the Debtors requested that all interested parties submit revised proposals on or before July 16, 2009. Only Carlyle and Revstone submitted revised bids.

31.    On July 21, 2009, Lazard presented both the Revstone and Carlyle proposals to the Debtors' Board of Directors. The Debtors' Board considered the Revstone bid to be the then current highest and best bid for the Chassis Assets. On July 22, 2009, the Debtors and Revstone executed an agreement for the sale of the Chassis Assets to Revstone (the "Revstone Agreement") to serve as the stalking horse bid for the Chassis Assets. In accordance with the Bidding Procedures Order, the Debtors provided notice of the Revstone Agreement to the appropriate parties. Lazard advised the Debtors' Board that the final Revstone

proposal was superior to the final Carlyle proposal because it not only provided the estate with a higher nominal value, but also because its structure was simpler and more favorable than Carlyle's proposed structure.

32.     Based on Lazard's interactions with potential purchasers as well as the execution of the Revstone Agreement, I believe the timetable and the bidding procedures followed by the Debtors and approved in the Bidding Procedures Order was a reasonable basis upon which to conduct the sale process.

## The Auction

33.     The Debtors and their advisors determined that the best manner in which to maximize value would be to auction the Chassis Assets and the Powertrain Assets first and then to seek to compare the MDI Bid to the combination of the bids for the Powertrain Assets, the Chassis Assets and the value that the Debtors thought they could achieve with respect to the BSM Assets and the Tubular Assets, based upon draft asset purchase agreements and other indications of interest that the Debtors had in respect of those assets (collectively, the "Individual Business Bids").

34.     Shortly before the Auction, Revstone advised the Debtors that it was withdrawing from the sale process. Accordingly, with only one Qualified Bid, the bid from Chassis Products, existed for the Chassis Assets. As such, no Auction was held with respect to the Chassis Assets, and the auction for the Chassis Assets was adjourned pending the determination of the MDI Bid.

35.     With respect to the Powertrain Assets auction, the Debtors first sought to discuss with HHI and Ares certain aspects of the HHI Bid and the Ares Bid that were problematic to the Debtors and to ask the parties to modify their bids so that the bids could be

compared on an "apples to apples" basis. As a result of this process, HHI and Ares each modified their bids in a manner beneficial to the Debtors. Because the headline consideration in the Ares Bid was $81 million, and thus exceeded the HHI Bid by the required overbid amount, Lazard advised the Special Committee that the Ares Bid was superior. The Special Committee concurred after consulting with its own and the Debtors' advisors, and determined that the Ares Bid was the Baseline Bid.

36.     HHI and Ares submitted 17 bids at the Auction, with Ares making the final bid with a headline consideration of $100 million. HHI advised that it no longer desired to bid on the Powertrain Assets and this portion of the Auction was closed.

37.     The Debtors then adjourned the Auction to permit them to analyze and compare the MDI Bid with the Individual Business Bids and to discuss certain aspects of the MDI Bid that were problematic to the Debtors. Lazard and the Debtors, in consultation with the Special Committee, first concluded that the existing Individual Business Bids were superior to the MDI Bid, and MD Investors was informed of this conclusion. After intensive discussions lasting several hours, MD Investors provided a revised and improved bid. The Auction was then adjourned for the evening to allow for the evaluation and clarification of the terms of the MDI Bid, with the Auction to recommence the next morning.

38.     The next day, after further discussions, MD Investors submitted a further revised bid for substantially all of the Debtors' Assets. Lazard advised the Special Committee that it believed that the MDI Bid, as revised, was higher and better than the Individual Business Bids, and the Special Committee and its advisors agreed. When the Auction re-opened on August 6, 2009, the MDI Bid was announced on the record. After a break, Ares declined to submit a further bid for the Powertrain Assets. Moreover, no other party advised the Debtors

-12-

that they would increase any existing Individual Business Bid or related indication of interest for the Chassis Assets, the BSM Assets or the Tubular Assets. After consultation with interested parties in attendance at the Auction, the Special Committee, in consultation with its advisors and the Debtors and their advisors, concluded that the MDI Bid remained the highest and best bid. Accordingly, the MDI Bid was deemed the Successful Bid and the Auction was closed.

Evaluation of Certain Elements of Proposed Consideration From MD Investors

39.     The Debtors and MD Investors are entering into a Purchase Agreement dated as of August 7, 2009 (the "Purchase Agreement") for the Debtor Assets. The consideration provided under the Purchase Agreement includes, among other elements, $39.5 million in cash, and subject to certain adjustments, as set forth in sections 2.01, 2.03, 4.05(b) and 4.05(f) of the Purchase Agreement (the "Purchase Price Adjustment Provisions"), including a potential upward $1.5 million adjustment relating to the Debtors' postpetition financing facility that should be realizable by the Debtors. In connection with advising the Special Committee regarding the bids that have been received, I have (a) reviewed and analyzed the Purchase Price Adjustment Provisions; and (b) consulted with the Debtors' management and other legal and financial advisors regarding the Purchase Price Adjustment Provisions; and (c) reviewed financial and other information and documents likely to impact the operation of the Purchase Price Adjustment Provisions. Based upon these activities and in reliance on the forecasts and other materials provided by the Debtors, Lazard estimated that the Purchase Price Adjustment Provisions were likely to have a net impact that was positive but not material.

40.     In addition, in section 1.03(i) of the Purchase Agreement, MD Investors has agreed to assume up to $8.5 million in claims entitled to administrative priority status. MD

Investors is being given no purchase price adjustment for this assumption. This adds $8.5 million in value.

41.     MD Investors has also agreed to credit bid all claims and obligations under the senior secured term loan agreement, which were in the aggregate equal to no less than $425 million.

42.     As a result of the credit bid, I am advised that MD Investors will release its liens on any assets that are not part of the Debtor Assets being sold under the Purchase Agreement. Thus, any remaining assets in the Debtors' estates will be available for payment of claims to other stakeholders.

43.     Moreover, the Purchase Agreement provides additional value to the Debtors' estates through the funding of a litigation trust for the Unsecured Creditors' Committee in the amount of $2.5 million to permit the committee to pursue certain claims and causes of action for the benefit of creditors.

44.     Finally, the Purchase Agreement provides value through the assumption of a €15,000,000 note in Europe. Value is also provided through the assumption by the MD Investors of unsecured nonpriority liabilities under the Purchase Agreement. With respect to this item, value is provided to the Debtors' creditors through MD Investors' payment of cure costs for assumed and assigned contracts and leases. This assumption of liabilities and payment provides additional consideration to those creditors of the estates whose contracts are assumed and assigned to MD Investors, although I have not sought to quantify this benefit.

45.     Taking all of the above into consideration and Lazard's analysis of prior bids, Lazard has prepared the analysis set forth in Exhibit 1 attached hereto. This analysis

-14-

demonstrates how the sales and marketing processes undertaken in these cases have increased the value of the Debtors' estates and improved recoveries for the Debtors' stakeholders.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of August, 2009 in New York, New York.

_____
Michael Macakanja
Director
Lazard Frères & Co. LLC

Filed by:

/s/ Ryan T. Routh
Richard H. Engman
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

- and -

Heather Lennox
Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

CLI-1734404v4

**EXHIBIT 1**

# EVOLUTION OF VALUE THROUGH AUCTION PROCESS

($ in millions)

## ILLUSTRATIVE VALUE EVOLUTION

| | RHJI/Powertrain + Other Sales | KPS/Powertrain + Other Sales | Aces/Powertrain + Other Sales | MD Investors |
|---|---|---|---|---|
| ABL | $15 | $15 | $15 | $15 |
| *% Recovery* | *100%* | *100%* | *100%* | *100%* |
| Sub ABL | $7 | $7 | $7 | $7 |
| *% Recovery* | *100%* | *100%* | *100%* | *100%* |
| DIP | $12 | $12 | $12 | $12 |
| *% Recovery* | *100%* | *100%* | *100%* | *100%* |
| Term Loan | $34 | $50 | $65 | $89 (a) |
| *% Recovery* | *8%* | *11%* | *15%* | *20%* |
| Administrative Claims (b) | $17 | $25 | $25 | $25 |
| *% Recovery* | *68%* | *100%* | *100%* | *100%* |
| Assumed Foreign Indebtedness | $23 | $23 | $23 | $23 |
| Unsecured Creditors | $0 | $1 | $3 | $6 |
| *% Recovery* | *0%* | *0%* | *0%* | *1%* |
| Total Value | $107 | $133 | $150 | $177 |
| *Cumulative Value Added* | *--* | *$26* | *$42* | *$69* |
| *Percent Increase* | *--* | *24%* | *40%* | *65%* |

Note:     KPS and Aces proposals assume $29 million in proceeds from the sale of Chassis, Balance Shaft Modules and Tubular businesses.

(a)     The Term lenders' claim has been fully satisfied by the offset permitted under §363(k). The recovery estimated under the MD Investors proposal represents the value to the estate of not having to make the distribution to the Term lenders that would be required to achieve similar recovery to unsecured creditors under the Aces proposal.

(b)     Cash and assumed administrative expenses.